No. 25-1458

*In the*

# UNITED STATES COURT OF APPEALS
*for the*
# FIRST CIRCUIT

ROOTERMAN LLC,

*Plaintiff-Appellee,*

v.

KLODIAN BELEGU; QUALITY AIR CARE CORPORATION;
WATER DAMAGE RESTORATION LTD, F/K/A RM WATER DAMAGE
RESTORATION LTD; 911 SEWER & DRAIN CORPORATION,

*Defendants-Appellants.*

*On Appeal from the United States District Court
for the District of Massachusetts
No. 1:24-cv-13015-PBS
The Honorable Patti B. Saris*

## APPELLANTS' APPENDIX

MARC J. RANDAZZA
JAY M. WOLMAN
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: 888-887-1776
ecf@randazza.com
Attorneys for Defendants-Appellants.

# TABLE OF CONTENTS

| Date Filed | Description | Pages |
|---|---|---|
| 12/06/2024 | Complaint [Dkt. No. 1] | AA001 – AA088 |
| 12/06/2024 | Exh. A – Rooterman Web Pages [Dkt. No 1-1] | AA089 – AA108 |
| 12/06/2024 | Exh. B – January 20, 2022 Trademark Assignment Agreement [Dkt. No. 1-2] | AA109 – AA121 |
| 12/06/2024 | Exh. C – A Corp. Rooter-man Franchise Agreements [Dkt. No. 1-3] | AA122 – AA155 |
| 12/06/2024 | Exh. D – Travis Hershner Linkedin Profile [Dkt. No. 1-4] | AA156 – AA157 |
| 12/06/2024 | Exh. E. – September 16, 2024 Rooterman Notice of Termination [Dkt. No. 1-5] | AA158 – AA159 |
| 12/06/2024 | December 5, 2024 Civil Cover Sheet [Dkt. No. 1-6] | AA160 |
| 12/06/2024 | Category Form [Dkt. No. 1-7] | AA161 |
| 12/06/2024 | Motion for Preliminary Injunction and Expedited Hearing [Dkt. No. 2] | AA162 – AA164 |
| 12/06/2024 | Proposed Order [Dkt. No. 2-1] | AA165 – AA167 |
| 12/06/2024 | Memorandum in Support of Motion for Preliminary Preliminary Injunction and Expedited Hearing [Dkt. No. 3] | AA168 – AA184 |
| 12/06/2024 | Exh. 1 – "rooterman of new jersey" Google Search Business Listings [Dkt. No. 3-1] | AA185 – AA186 |

| 12/06/2024 | Exh. 2 – 911 Sewer & Drain Google Search Service Listing [Dkt. No 3-2] | AA187 – AA188 |
| 12/16/2024 | Verified First Amended Complaint [Dkt. No. 7] | AA189 – AA206 |
| 12/16/2024 | Exh. A – Rooterman Web pages [Dkt. No. 7-1] | AA207 – AA226 |
| 12/16/2024 | Exh. B - January 20, 2022 Trademark Assignment Agreement [Dkt. No. 7-2] | AA227 – AA239 |
| 12/16/2024 | Exh. C – A Corp. Franchise Agreements [Dkt. No. 7-3] | AA240 – AA273 |
| 12/16/2024 | Exh. D – December 11, 2024 911 Sewer & Drain Mark Application Information [Dkt. No. 7-4] | AA274 – AA277 |
| 12/16/2024 | Exh. E – 911 Sewer & Drain Blog Posts [Dkt. No. 7-5] | AA278 – AA286 |
| 12/16/2024 | Exh. F – 911 Sewer & Drain February 7, 2024 "Emergency Response How Nj Water Damage Companies Can Save Your Home" Blog Post [Dkt. 7-6] | AA287 – AA297 |
| 12/16/2024 | Exh. G – 911 Sewer & Drain Services Web Page [Dkt. No. 7-7] | AA298 – AA312 |
| 12/16/2024 | Exh. H – "rooterman of nj" Google Search Results [Dkt. No. 7-8] | AA313 – AA316 |
| 12/16/2024 | Exh. I – 911 Sewer and Drain Facebook Reviews [Dkt. No. 7-9] | AA317 – AA321 |
| 12/16/2024 | Exh. J - Travis Hershner Linkedin Profile [Dkt. No. 7-10] | AA322 – AA323 |
| 12/16/2024 | Exh. K - September 16, 2024 Rooterman Notice of Termination [Dkt. No. 7-11] | AA324 – AA327 |

| 12/19/2024 | Revised Motion for Preliminary Injunction [Dkt. 9] | AA328 – AA330 |
| 12/19/2024 | Proposed Order [Dkt. No. 9-1] | AA331 – AA334 |
| 12/19/2024 | Memorandum in Support of Revised Motion for Preliminary Injunction [Dkt. 10] | AA335 – AA354 |
| 12/19/2024 | Exh.1 – "rooterman of new jersey" Google Search Business Listings [Dkt. No. 10-1] | AA355 – AA356 |
| 12/19/2024 | Exh. 2 – 11 Sewer & Drain Google Search Service Listing [Dkt. No. 10-2] | AA357 – AA358 |
| 01/13/2025 | Memorandum in Opposition to Revised Motion for Preliminary Injunction [Dkt. No. 18] | AA359 – AA379 |
| 01/13/2025 | Declaration of Klodian Belegu [Dkt. No. 18-1] | AA380 – AA386 |
| 01/13/2025 | Declaration of Cassidy Flavin [Dkt. No. 18-2] | AA387 – AA388 |
| 01/13/2025 | Exh. 1 - A Corp. Franchise Agreements [Dkt. 18-3] | AA389 – AA432 |
| 01/13/2025 | Exh. 2 – RM Water Damage Restoration LTD Certificate of Amendment for Domestic Corporations [Dkt. No. 18-4] | AA433 – AA434 |
| 01/13/2025 | Exh. 3 – Premium Service Brands Franchise Brands Web Page [Dkt. No. 18-5] | AA435 – AA437 |
| 01/13/2025 | Exh. 4 – November 12, 2019, Belegu Email to A Corp. Subject: QAC (Klod) [Dkt. No. 18-6] | AA438 – AA457 |

| | | |
|---|---|---|
| 01/13/2025 | Exh. 5 – November 13, 2019, A Corp. Response to Belegu Email Subject: QAC (Klod) [Dkt. No. 18-7] | AA458 – AA461 |
| 01/13/2025 | Exh. 6 – September 10, 2024, Email from A Corp. Re: Default and Final Notice [Dkt. No. 18-8] | AA462 – AA463 |
| 01/13/2025 | Exh. 7 – September 12, 2024, Email from A Corp. Re: Default and Final Notice [Dkt. No. 18-9] | AA464 – AA465 |
| 01/13/2025 | Exh. 8 – Royalty Summary Payments by Belegu and QAC [Dkt. No. 18-10] | AA466 – AA467 |
| 01/13/2025 | Exh. 9 – Rooterman Statement [Dkt. No. 18-11] | AA468 – AA469 |
| 01/13/2025 | Exh. 10 – Redirects and Google Search [Dkt. No. 18-12] | AA470 – AA478 |
| 01/13/2025 | Exh. 11 – USPTO Service Mark Principal Register [Dkt. No. 18-13] | AA479 – AA513 |
| 01/13/2025 | Exh. 12 – January 13, 2025, Rooterman Mark Information [Dkt. No. 18-14] | AA514 – AA516 |
| 01/13/2025 | Exh. 13 – May 6, 2010 USPTO Office Action for Rooter Man Mark [Dkt. No. 18-15] | AA517 – A520 |
| 01/13/2025 | Exh 14 – April 26, 2024 USPTO Nonfinal Office Action for 911 Sewer & Drain Trademark Application [Dkt. No. 18-16] | AA521 – AA527 |
| 01/21/2025 | Memorandum in Support of Revised Motion for Preliminary Injunction [Dkt. No. 22] | AA528 – AA544 |

| 01/21/2025 | Reply Declaration of Nathan King [Dkt. No. 22-1] | AA545 – AA577 |
| 01/21/2025 | Declaration of Jeffrey M. Rosin [Dkt. No. 22-2] | AA578 – AA581 |
| 01/29/2025 | Order on Motion for Preliminary Injunction and Expedited Hearing [Dkt. No. 23] | AA582 |
| 03/03/2025 | Plaintiff's Notice of Supplemental Authority [Dkt. No. 27] | AA583 – AA593 |
| 03/07/2025 | Transcript of January, 25, 2025 Motion Hearing [Dkt. No. 31] | AA594 |
| 03/07/2025 | Response to Notice of Supplemental Authority [Dkt. No. 33] | AA595 – AA597 |
| 03/11/2025 | Motion to Dismiss for Failure to State a Claim [Dkt. No. 34] | AA598 – AA614 |
| 04/11/2025 | Electronic Order [Dkt. No. 52] | AA615 |
| | Intentionally Omitted | AA616 – AA633 |
| 04/15/2025 | Motion to Stay Pending Appeal [Dkt. No. 53] | AA634 – AA636 |
| 04/15/2025 | Memorandum in Support of Motion to Stay Pending Appeal [Dkt. No. 54] | AA637 – AA644 |
| 04/15/2025 | Exh. 1 – Declaration of Jay M. Wolman [Dkt. No. 54-1] | AA645 – AA647 |
| 04/15/2025 | Exh. 2 – Rooterman Plumbing Franchise Webpage [Dkt. No. 54-2] | AA648 – AA653 |
| 04/15/2025 | Exh. 3 – Google Search Results [Dkt. No 54-3] | AA654 – AA659 |

| 04/15/2025 | Exh. 4 – Rooterman Home Page [Dkt. No. 54-4] | AA660 – AA665 |
| 04/15/2025 | Exh. 5 – Declaration of Klodian Belegu [Dkt. No. 54-5] | AA666 – AA668 |
| 04/22/2025 | Opposition to Motion to Stay Pending Appeal [Dkt. No. 58] | AA669 – AA671 |
| 04/22/2025 | Exh. 13 – April 22, 2025 Screenshot of 911 Sewer & Drain Webpage [Dkt No. 58-1] | AA672 – AA673 |
| 04/22/2025 | Exh. 14A – Google Review [Dkt. No. 58-2] | AA674 – AA676 |
| 04/22/2025 | Exh. 14B – Travis Hershner Deposition Excerpt [Dkt. No. 58-3] | AA677 – AA679 |
| 04/22/2025 | Exh. 15 – April 22, 2025 911 Sewer & Drain Blog Posts [Dkt. No. 58-4] | AA680 – AA702 |
| 04/22/2025 | Exh. 16 – April 22, 2025 Full Home Page of 911 Sewer & Drain Website [Dkt. No. 58-5] | AA703 – AA715 |
| 04/23/2025 | Response to Opposition to Motion to Stay Pending Appeal [Dkt. No. 59] | AA716 – AA719 |
| 04/23/2025 | Exh. A – Declaration of Sandro Paterno [Dkt. No. 59-1] | AA720 – AA722 |
| 04/23/2025 | Exh. B – Declaration of Klodian Belegu [Dkt. No. 59-2] | AA723 – AA726 |
| 04/23/2025 | Motion for Extension of Time to Post Bond [Dkt. 60] | AA727 – AA729 |
| 04/24/2025 | Declaration of Jeffrey M. Rosin In Support of Response to Opposition to | AA730 – AA732 |

| | Motion to Stay Pending Appeal [Dkt. No. 61] | |
|---|---|---|
| 04/24/2025 | Exh. 1 - Certificate of Inc, (Profit); 911 Plumbing and Restoration Inc. [Dkt. No. 61-1] | AA733 – AA735 |
| 04/24/2025 | Exh. 2 – March 12, 2025 Klodian Belegu Deposition Transcript [Dkt. No. 61-2] | AA736 – AA740 |
| 04/24/2025 | Exh. 3 – 911 Sewer & Drain A SMS Messages [Dkt. No. 61-3] | AA741 |
| 04/24/2025 | Exh. 4 – Rooter Man of NJ SMS Survey Message [Dtk. No 61-4] | AA742 |
| 04/24/2025 | Exh. 5 – Rooter Man of NJ Review Page [Dkt. No 61-5] | AA743 – AA744 |
| 04/24/2025 | Exh. 6 – April 2, 2024 Megan Belegu Deposition Transcript [Dkt. No. 61-6] | AA745 – AA747 |
| 04/24/2025 | Opposition to Motion for Extension of Time to Post Bond [Dkt. No. 62] | AA748 – AA750 |
| 04/29/2025 | Order for Motion to Stay Pending Appeal and Motion for Extension of Time to Post Bond [Dkt. No. 63] | AA751 |
| 05/20/2025 | Notice of Posting Bond and Request to Lift Suspension [Dkt. No. 87] | AA752 – AA753 |
| 05/20/2025 | Bond of Colonial Surety [Dkt. No. 87-1] | AA754 – AA758 |
| 05/20/2025 | Cash Security Agreement [Dkt. No. 87-2] | AA759 – AA765 |
| 05/22/2025 | Endorsed Order Allowing Notice of Posting Bond and Request to Lift Suspension on Injunction [Dkt. No. 88] | AA766 |

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| Klodian Belegu, Quality Air Care | ) |
| Corporation and RM Water Damage | ) |
| Restoration LTD | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Civil Action No.

## **VERIFIED COMPLAINT**

Plaintiff Rooterman, LLC, by its attorneys, O'Hagan Meyer, LLC, for its Verified

Complaint ("Complaint") against Defendants, Klodian Belegu, Quality Air Care Corporation and

RM Water Damage Restoration LTD, hereby alleges as follows:

## **INTRODUCTION**

1.      This is a case for trademark infringement and violation of post-franchise restrictive

covenants. Specifically, defendants are using, without permission or approval, the "Rooterman"

trademarks by, *inter alia,* their use of the website www.rootermanplumberservices.com for over

two months post-termination.[1] See Exhibit A hereto. Plaintiff, the owner of the Rooterman brand

since 2022, is the lawful holder of such trademarks as demonstrated herewith. See Exhibit B hereto.

Plaintiff's actual Rooterman website is www.rooterman.com. Defendant Belegu was warned on

---

[1] Following a failed mediation on December 4, 2024, it is possible defendants have now disabled this website. This matter continues to be monitored, however.

September 16, 2024 and on November 13, 2024, to cease and desist, but did not do so (but see Note 1 supra). In fact, defendant Belegu has been, individually, and through the corporate defendant, brazenly and unfairly competing not just through his use and misuse of Plaintiff's trademarks, but through the violation of his restrictive covenants, which all survived the termination of his franchise agreements. Plaintiff seeks injunctive and monetary relief as a result.

## PARTIES

2.      Plaintiff is the successor in interest to A. Corp.'s (a Massachusetts Corporation in Billerica) ownership of the "Rooterman" intellectual property rights, and plaintiff, Rooterman, LLC ("Rooterman") now owns all of those rights.

3.      Plaintiff acquired the Rooterman assets of A. Corp. from Donald MacDonald by way of an asset purchase agreement dated January 20, 2022 ("APA").

4.      Defendant Klodian Belegu ("Belegu") is a former Rooterman franchise owner, and upon information and belief, he resides in Toms River, New Jersey. He is the sole owner of defendant, Quality Air Care Corporation, a New Jersey Corporation, through which he also purchased franchises, but which purchases were guaranteed by him individually.

5.      Belegu is also the sole owner of the defendant corporation, RM Water Damage Restoration LTD which was established and registered with the New Jersey Secretary of State in December 2022.  As set forth below, Belegu is using RM Water Damage Restoration LTD in violation of his contractual and legal obligations and, therefore, RM Water Damage Restoration is liable as well.

2

**AA002**

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction arising from the claims asserted herein, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court can exercise supplemental jurisdiction over the contract claims that arise out of the same transactions and occurrences under 28 U.S.C. § 1367.  Moreover, the franchise contracts between the parties call for the application of Massachusetts law, where A. Corp. was based, and required court actions (if any) to be brought in a proper Massachusetts court. As such, venue is proper in this district pursuant to 28 U.S.C. § 1391.

## FACTS

7.     Rooterman has used its trademarks continuously in United States commerce since August 2, 1991.

8.     Rooterman's services have attained a substantial amount of sales throughout the United States.

9.     As the result of Rooterman's extensive and exclusive use of the Rooterman trademarks and wide-ranging national marketing efforts, the Rooterman trademarks are widely recognized by the general consuming public of the United States. The consuming public in the United States uses the Rooterman trademarks to identify Rooterman's services and associates the mark exclusively with Rooterman.

10.     The Rooterman trademarks are distinctive and famous within the meaning of 15 U.S.C. § 1225(c).

11.     Belegu became a multi-unit franchisee of A. Corp. buying a total of thirteen (13) franchise territories from September 2019 to January 2021:  9 territories in New Jersey, 3 territories

in New York and 1 in Pennsylvania.  Certain of these were purchased through his corporation, which he solely owned, defendant Quality Air Care Corporation, but when Belegu purchased franchises through such corporation, he personally guaranteed the obligations of the franchise.

12.    Belegu's 13 franchise agreements with Rooterman are summarized as follows:

(i)    A franchise agreement for the "Ocean County" territory in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, September 5, 2019 ("NJ-1").

(ii)    A franchise agreement for various zip codes in the counties of Essex, Monmouth, and various other counties in New Jersey, signed by Belegu in June 2020 ("NJ-2").

(iii)    A franchise agreement for the "Morris County" and "Passaic County" territories in New Jersey, signed by Belegu in August 2020 ("NJ-3").

(iv)    A franchise agreement for additional zip codes in Monmouth County and Ocean County New Jersey signed by Belegu and his corporation, Quality Air Care Corporation, in January 2021 ("NJ-4").

(v)    A franchise agreement for various zip codes in the "Hudson County" and "Essex County" territories in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, November 2019 ("NJ-5").

(vi)    A franchise agreement for "Somerset County" and for various zip codes in "Middlesex County" in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, November 2019 ("NJ-6").

(vii)    A franchise agreement for various zip codes in the "Hudson County" and "Essex County" territories in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, December 30, 2020 ("NJ-7").

(viii)    A franchise agreement for additional zip codes in the "Middlesex County" territory in New Jersey, signed by Belegu on December 30, 2020 ("NJ-8")

(ix)    A franchise agreement for the "Bergen County" territory in New Jersey, signed by Belegu and his corporation, Water Damage Solution of Bergen LLC in February 2020 ("NJ-9")

(x)    A franchise agreement for various zip codes in the "Rockland County" territory in New York, signed by Belegu in December 2020 ("NY-1").

(xi)    A franchise agreement for the "West Chester County" territory in New York, signed by Belegu and his corporation, Quality Air Care Corporation, September 2019 ("NY-2").

4

**AA004**

(xii)    A franchise agreement for various zip codes in the "Richmond County" territory in New York, signed by Belegu in June 2020 ("NY-3")

(xiii)    A franchise agreement for various zip codes in the "Bucks County" and "Montgomery County" territories in Pennsylvania, signed by Belegu in June 2020 ("PA-1")

All of Belegu's (or his solely owned entity, Quality Air Care Corporation's) franchise agreements contained identical relevant terms addressed herein, and one sample copy is attached hereto as Exhibit C.

13.    By notice dated September 16, 2024, all 13 franchise agreements were terminated as a result of default, following a default notice sent to Belegu on August 12, 2024, for his failure to pay royalties and other fees.

14.    Belegu failed to return any operations manuals or other confidential, proprietary and trade secret materials to Plaintiff upon the termination of his franchisees.

15.    Moreover, Plaintiff has become aware of Belegu misusing the Rooterman trademarks and competing in violation of the exclusivity/non-competition/non-solicitation/confidentiality protections in his franchise agreements. Specifically, Belegu does so through a company that goes by the name above, RM Water Damage Restoration LTD.  Exhibit A hereto details flagrant violations and misuse of numerous trademarks identified as owned by Plaintiff in Exhibit B using the website, www.rootermanplumberservices.com

16.    Belegu as franchisee was obligated to completely disassociate from the franchise and not use any trademarks of the franchise whatsoever, but he has failed and refused to do that. See Exhibit C Section 16(A)-(B). He was also obligated to return all proprietary manuals and materials that belonged to the franchisor as well, but he failed and refused to do that. Id. at Section 16(C); see also id. at Section 12.1.B.

17.     Each of Belegu's (or Quality Air Care Corporation's) franchise agreement carried a 3-year non-competition/non-solicitation restriction, and the area applicable was within 100 miles of the territory of the franchise and 100 miles of the territory of any other franchisee. See Exhibit C, Section 18.1. Each franchise agreement provided protections for the confidential information/trade secrets of the franchise system, as well as the mandate that these materials be returned upon termination. See Exhibit C Section 18.2, 16.C

18.     Defendants have been, since termination, flagrantly engaged in the identical business they were engaged in as franchisees of Rooterman, with no changes, and pervasive throughout the restricted territory. This is not just a trademark violation; it is a violation of the non-compete/non-solicit/misuse of confidential information and trade secrets inherent in the franchise. These trade secrets include, without limitation, the franchisor's methods of operation, pricing, customers, prospects, marketing and advertising plans and methods, and other sensitive and proprietary matters that Belegu would only know due to his former franchisee status.

19.     Defendant Belegu, individually and through his company, continues to use Rooterman trademarks and other intellectual property and while Exhibit A is one substantial such misuse, other misuses include, without limitation:

   a.   https://x.com/rootermannj

   b.   https://maps.app.goo.gl/d8x4Y4eMCPXoSZ46A

   c.   https://www.yelp.com/biz/Rooterman-of-nj-toms-river

   d.   https://www.homeadvisor.com/rated.RooterMan.130537299.html

20.     Further, it is even notable, curious and questionable that Belegu has chosen "RM" (the initials of Rooterman) to lead his company's name, RM Water Damage Restoration.  This RM is one of Plaintiff's franchise marks as well. See Exhibit B.

21.    Belegu even employs persons who hold themselves out as working for his company, and that this company is "d/b/a Rooterman".  See Exhibit D hereto.

22.    In no uncertain terms, Belegu was warned to cease and desist and to undertake all of his post-termination covenants referenced herein, by termination letter dated September 16, 2024. See Exhibit E hereto. Through at least December 4, 2024 (see Note 1 supra), Belegu failed and refused.  Upon information and belief, even if he has taken some steps to comply, he has not taken all step to comply.

## Count I: Violation of 15 U.S.C. § 1125

23.    Plaintiff repeats the allegations set forth above and below as if fully contained herein.

24.    Belegu's service marks and infringing domain names are identical or extremely similar to the famous Rooterman trademarks.

25.    Belegu knowingly and willfully had and has a bad faith intent to profit from the use of infringing domain names and the goodwill associated with the Rooterman trademarks.

26.    Belegu knowingly and willfully registered, renewed, and/or used infringing domain names, with content on the domains which are identical to, and/or confusingly similar to, the Rooterman trademarks in Exhibit B, which were distinctive and famous at the time of registration and renewal of the infringing domain names.

27.    Belegu had a bad faith intent in using the infringing domain names as evidenced by at least the following:

    a.    Belegu, as a former franchisee, knew of the A-Corp's trademark rights in the Rooterman trademarks;

7

**AA007**

  b. The infringing domain and use of trademarks on it are identical or nearly identical to the Rooterman trademarks; and

  c. Belegu intended to divert consumers seeking Rooterman's online location at rooterman.com to the infringing domain names by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the sites at the infringing domain names.

28. Belegu's use in commerce of the Rooterman trademarks and similar marks is likely to cause confusion, mistake, or deceive the public into believing that the infringing domain names, websites, and advertisements are authorized, sponsored or approved by Plaintiff.

29. Belegu's activities in registering, renewing, and/or using the infringing domain names are in violation of 15 U.S.C. § 1125(d).

30. Belegu's registration and use of the infringing domain names, and use of the infringing service marks, is greatly and irreparably damaging Rooterman and will continue to damage Rooterman, which has no adequate remedy at law, and which will continue until preliminarily and permanently enjoined by this Court.

31. Belegu's actions constitute unfair competition in violation of 15 U.S.C. § 1125(a).

32. As a direct and proximate result of Belegu's acts of unfair competition, Belegu has unfairly acquired and will continue to unfairly acquire income, profits and goodwill.

33. Belegu's unauthorized use of the Rooterman trademarks in the sale, advertising, and promotion of its goods and services causes dilution by blurring the distinctiveness, strength, and value of the famous Rooterman trademarks.

AA008

34.     Belegu's unauthorized use of the Rooterman trademarks, as alleged herein, with knowledge of Rooterman's famous mark, constitutes a willful intent to trade on the reputation and recognition of the famous Rooterman trademarks in violation of 15 U.S.C. § 1125(c).

35.     Belegu's actions in violation of 15 U.S.C. § 1125 are willful and in wanton disregard of the Plaintiff's rights in the Rooterman trademarks.

## Count II: Violation of 15 U.S.C. § 1114

36.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

37.     Plaintiff's federally registered Rooterman trademarks are distinctive marks that are associated with Rooterman and exclusively identify Rooterman's services to consumers. Plaintiff's federally registered Rooterman trademarks are distinctive and signified Rooterman as a source of services before Defendant used a reproduction, copy, or colorable imitation of the Rooterman trademarks.

38.     Belegu has used and continues to use the Rooterman trademarks or confusingly similar marks in its domain name, websites, and advertising for goods or services in commerce. This use is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of such goods or services. Belegu's actions constitute service mark infringement under 15 U.S.C. § 1114.

39.     Belegu's uses of the Rooterman trademarks are likely to cause initial interest confusion among users and potential users of Rooterman's services.

**AA009**

40.     Belegu's uses of the infringing service marks are greatly and irreparably damaging Rooterman and will continue to damage Rooterman, which has no adequate remedy at law, and which will continue until preliminarily and permanently enjoined by this Court.

41.     Belegu's actions in violation of 15 U.S.C. § 1114 are willful and in wanton disregard of the Plaintiff's rights in the Rooterman trademarks.

## Count III: Breach of Contract

42.     Plaintiff repeats the allegations set forth above and below as if fully contained herein.

43.     Plaintiff has 13 valid contracts with Belegu or his solely owned entity, Quality Air Care Corporation, acquired by and assigned to Plaintiff, reflected by the Franchise Agreements, each in the form of Exhibit C.

44.     Belegu breached or violated his contract(s) by using Plaintiff''s confidential and trade secret information post-termination, by failing to return proprietary and confidential materials to Plaintiff, by competing with Plaintiff post-termination (and, perhaps, pre-termination, as discovery may reveal), by soliciting Plaintiff's customers for Defendants' own separate business, and by failing to disassociate from Plaintiff's trademarks (and in contrast, continuing to associate with them and misuse them).

45.     As a result of these breaches of contract, Plaintiff suffered, and continues to suffer, ongoing damages in an amount to be proved at trial.

**AA010**

## VERIFICATION

I, Nathan King, General Counsel for Plaintiff, hereby state under oath, and under the pains and penalties of perjury, that I have personal knowledge of the facts above, and as to the accuracy of the exhibits hereto and representations about them. The above is true and correct to the best of my knowledge.

_Nathan King_

Nathan King

**AA011**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant as follows:

A.  A finding that Belegu has violated 15 U.S.C. §§ 1114 and 1125 by the acts complained of;

B.  A finding that Belegu has breached his contracts in the ways set forth above;

C.  Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, be temporarily, preliminarily, and permanently enjoined as follows and as permitted by such statutes above, as well as 15 U.S.C. § 1116:

   a.  From registering and/or using any domain name containing the words "ROOTERMAN" or any other confusingly similar words or phrases that infringe on the trademarks of Plaintiff in Exhibit B to the Complaint;

   b.  From imitating, copying or making unauthorized use of the distinctive Rooterman trademarks, trade names, and any other confusingly similar marks in Exhibit B to the Complaint;

   c.  From using any false designation of origin or false description which does, can, or is likely to, lead the trade or public to believe that any products, services, or materials, distributed or sold by Defendants, is in any manner associated or connected with Rooterman, or is offered, sold, manufactured, licensed, sponsored, approved, published, or authorized by Rooterman;

   d.  From engaging in any activity constituting an infringement of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same;

12

**AA012**

e.  From affixing, applying, annexing and/or using in connection with any accessories, clothing and other related goods and services any false designation of origin or any false description or representation of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same; and

f.  From violating any restrictive covenants, including the non-competition and non-solicitation covenant identified above.

D.  And, further, that Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, be Ordered to affirmatively:

a.  take immediate steps to transfer his infringing domain names, such as but not limited to, www.rootermanplumberservices.com to Plaintiff along with any others it may have registered that include the word "ROOTERMAN" or any other confusingly similar words, no later than within five (5) business days of this Court's Order;

b.  take immediate steps to transfer telephone numbers and any other third party or public references previously associated with any of Belegu's operations that utilized the Rooterman trademarks and trade names to Plaintiff, no later than within five (5) business days of this Court's Order.

c.  take immediate steps to return all manuals, proprietary, confidential or copyrighted materials of Plaintiff to Plaintiff, no later than within five (5) business days of this Court's Order.

d.  take immediate steps and best efforts to direct others, such as employees like those identified in Exhibit D to the Company, to take-down, remove, and cease and desist

13

**AA013**

claiming association with the Rooterman name, and report back to the Court with a Declaration under 28 U.S.C. Section 1746 no later than within five (5) business days of this Court's Order on the efforts taken in that regard.

e.   take immediate steps to preserve the status quo, retain and not destroy all individual records and all corporate records of Quality Air Care Corporation, and all records of RM Water Damage Restoration LTD, such that all of them can provide a complete and accurate accounting of all revenues derived since the termination of his franchise agreements, for purposes of calculating damages on the Counts in this Complaint.

E.   For Defendants' violations of 15 U.S.C. §§ 1114 and 1125, Plaintiff be awarded statutory damages under 15 U.S.C. § 1117 per violation, as the Court considers just, and premised upon an accounting of all revenues derived from the using and misusing of Plaintiff's trademarks in Exhibit B to the complaint; and that, upon an award of damages, damages be trebled under 15 U.S.C. § 1117 because of the willful and egregious nature of Defendants' activities;

F.   Award Plaintiff its costs in this action;

G.   Award Plaintiff treble damages and/or statutory damages, as well as its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117; and

H.   Grant Plaintiff all other relief to which it is entitled and such other or additional relief as this court deems just and proper.

I.   Cease and desist from using and misusing of Plaintiff's trademarks in Exhibit B to the complaint.

J.   Such other and further relief this Court deems necessary and proper.

14

**AA014**

Respectfully submitted,

ROOTERMAN, LLC

By its Counsel,

Dated: December 5, 2024

*Jeffrey M. Rosin*

Jeffrey M. Rosin, BBO# 629216
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com

AA015

# EXHIBIT A

**AA016**



📞 CALL US NOW!

Rooter Man of NJ is the number one choice for **professional plumbers** and **drain cleaners**. We offer fast, reliable services that will help you when it matters most!

Serving all of **New Jersey**, **Staten Island New York**, and **Bucks County Pennsylvania**



BOOK A PLU... ...R YOU

**AA017**

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f    𝕏    ⓘ    🔊



**24/7 EMERGENCY SERVICE**      **SERVICES** ⌄      **BLOG**      **CONTACT**

SCHEDULE SERVICE



RESIDENTIAL PLUMBING

Rooter-Man residential plumbers install, repair, and maintain pipes in the drainage system for homes.

**AA018**

12/4/24, 3:21 PM    Rooter Man of North Plumbing & Drain Cleaning | Free Estimates!

Case 1:24-cv-13015-PBS    Document 11    Filed 12/06/24    Page 19 of 88

CALL US NOW! | 24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  𝕏  ⊙  ⌐



CALL US NOW! | 24/7

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



## COMMERCIAL PLUMBING

Our commercial plumbers are specialized plumbers who work on retail & commercial businesses.

AA019



**CALL US NOW! |
24/7**

📞 **(888) 317-1702**    ✉ info@rootermanplumberservices.com    f 𝕏 ⊙ ⌥

**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

**SCHEDULE SERVICE**



EMERGENCY REPAIR

Our emergency plumbers can find the cause of backups, leaks, sump pump failures, and flooding fast!

# Rooter-Man Plumber Services

- 24/7 Emergency Plumbing Services
- Drain Cleaning & Clog Removal
- Garbage Disposal Services

AA020



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f   X   ⊙   ⧉

**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

**SCHEDULE SERVICE**

- And Much More!

VIEW ALL SERVICES



## 📞 NEED A 24/7 EMERGENCY PLUMBER?

Call Us Direct To Speak With One Of Our Coordinators & Have A Rooter Man of NJ Plumber Immediately Dispatched To Diagnose & Repair Your Plumbing Emergency!

**AA021**



📞 (888) 317-1702     ✉ info@rootermanplumberservices.com     f  X  ⊙  🔊

**24/7 EMERGENCY SERVICE**     **SERVICES** ⌄     **BLOG**     **CONTACT**

**SCHEDULE SERVICE**



# We Work With Your Budget

We understand that plumbing repairs and emergencies can incur unexpected costs which is why we strive to offer the lowest prices throughout New Jersey when compared to our competitors. We offer a service guarantee and same-day plumbing services.

CALL NOW TO SCHEDULE AN APPOINTMENT

# Schedule Your Same-Day Appointment & Let Us Do the Rest

We have plumbers available 24/7 ready to help you with almost any plumbing repair, clogged drain, leaky pipes, water damage & flooding, garbage disposals, toilets and much more!

SPEAK TO ONE OF OUR BOOKING AGENTS NOW

**AA022**






# Find A Rooter-Man Plu...
# You

Contact us now to quickly dispatch a certified Rooter-Man technician near you!

**CLICK HERE TO SCHEDULE**

# We Fix All Types Of Plumbing Problems

We know that you want the best for your home, family, and business, which is why we strive to provide quality workmanship. Our plumbing technicians are certified in inspections as well as repairs – guaranteed!

12/4/24, 3:21 PM

Case 1:24-cv-13015-PBS    Document 1    Filed 12/06/24    Page 24 of 88
Rooter Man of North Plumbing & Drain Cleaning Free Estimates





Learn More

## Leak Detection

We can help you locate the problem and repair it quickly and affordably.



Learn More

## Drain Cleaning

Rooter-Man has over 50+ years of experience unclogging drains of all types.

CALL US NOW! |
24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com   f  𝕏  ⊙  ⧉



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



Learn More

## Video Inspections

Video pipe inspections check the insides of pipes in your home or business.



Learn More

## Water Jetting

Affordable water jetting services that can immediately clear debris from your lines.

**AA025**



Learn More

## Toilet Repair

Rooter-Man provides a wide range of toilet repair and installation services.



Learn More

## Sump Pumps

We provide sump pump installation, maintenance, and repair services.

VIEW ALL SERVICES



CALL US NOW! | 24/7

📞 (888) 317-1702      ✉ info@rootermanplumberservices.com      🔵 𝕏 📷 📶

**24/7 EMERGENCY SERVICE**     SERVICES ⌄     BLOG     CONTACT

SCHEDULE SERVICE

out some of our reviews below; we think this will help make sure your decision about who handles your plumbing repairs goes smoothly (and without any surprises!).

# Latest Reviews



**Shore D.**

2/11/2024

Rooter man of nj is the best plumbing service I've ever used, the reason why is because of employees like Everest who was outstanding and very professional from every aspect I will most definitely be using this service again thank you so much

read more

**Elizabeth**

1/10/2024

I am very pleased with the quality of work and integrity of the Plummer sent out for the job. He showed up on a Friday night and diagnosed and repaired a major clog in my kitchen "P" pipe. He worked meticulously and took his time to make sure the clog was resolved. I high...

read more

**Mikel H.**

7/09/2024

Incredible service plumbing job was awesome!

# 24/7 "Plumber Near Me" Technicians You Can Trust

**AA027**





### NO HIDDEN FEES

We take pride in offering plumbing services with no trip charges (during regular business hours) and no hidden fees.



#### GUARANTEED WORKMANSHIP

Our friendly, professional plumbing technicians are ready to help the same day. Guaranteed to get you the prompt, effective service you deserve.



### SERVING YOUR AREA

Rooter-Man has local plumbers that serve your area 24/7. Don't hesitate to give us a call as we can dispatch a plumber to help the same day!

# Latest Blog Posts

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  ⊙  ⧉



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



## Find Reliable 24 Hour Sump Pump Repair Near Me

by Blog | Dec 4, 2024 | Plumber Services

```html Find Reliable 24 Hour Sump Pump Repair Near Me When it comes to safeguarding your home from potential water damage, having a reliable sump pump in place is crucial. Sump pumps play a vital role in redirecting excess water away from your foundation, especially...

read more



**AA029**

CALL US NOW! |
24/7



📞 (888) 317-1702   ✉ info@rootermanplumberservices.com   f ✕ ⦾ 📷 🔊

**24/7 EMERGENCY SERVICE**   **SERVICES** ⌄   **BLOG**   **CONTACT**

**SCHEDULE SERVICE**



### Finding a Natural Gas Plumber Near Me: Your Local Guide

by Blog | Dec 2, 2024 | Plumber Services

``` html Finding a Natural Gas plumber near me: Your Local Guide When it comes to maintaining the safety and efficiency of your home's gas systems, finding a reliable natural gas plumber near me is essential. Natural gas plumbing requires specialized knowledge and...

read more

« Older Entries

# WHY CHOOSE ROOTER MAN OF NJ?

In the plumbing business, experience matters. Our team of **certified plumbers** has successfully resolved countless emergencies. When you choose **Rooter Man of NJ**, you're choosing expertise, reliability, and peace of mind.

CALL US NOW! | 24/7

📞 (888) 317-1702   ✉ info@rootermanplumberservices.com   f  X  📷  📶



24/7 EMERGENCY SERVICE   SERVICES ⌄   BLOG   CONTACT

SCHEDULE SERVICE

## TO SCHEDULE SERVICE CLICK HERE

# ROOTER MAN OF NJ IS TRUSTED BY:

            

# AREAS WE SERVICE

Atlantic County | Bergen County | Burlington County | Camden County |
Cape May County | Cumberland County | Essex County | Gloucester
County | Hudson County | Hunterdon County | Mercer County | Middlesex
County | Monmouth County | Morris County | Ocean County | Passaic
County | Salem County | Somerset County | Sussex County | Union County
| Warren County

# *"Plumbers You Can Rely On."*

-5 Star Google Reivews

CALL NOW TO SCHEDULE

AA031

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  𝕏  ⊙  📡



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

## *"Plumbers You Can Rely On."*

-5 Star Google Reivews

CLICK HERE TO SCHEDULE



📞 (888) 317-1702   ✉ info@rootermanplumberservices.com   f  𝕏  ⊙  🔊

24/7 EMERGENCY SERVICE      SERVICES ⌄      BLOG      CONTACT

SCHEDULE SERVICE





**AA033**

CALL US NOW! | 24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



## QUICK LINKS

Plumber Services

24/7 Emergency Plumbers

Water Damage Restoration

Drain Cleaning

Pipe Repair Services

Sump Pump Repair & Installation

Leak Detection

Toilet Repair & Installation

Hydro Jetting / Water Jetting

Video Inspections

Sewer Pump Repair & Installation

Garbage Disposal Repair & Installation

## CONTACT US

Main Office:

**Rooter Man of NJ**

1049 Church Rd.

Toms River, NJ 08755

T. 888-317-1702

E. info@rootermanplumberservices.com

Hours:

Mon-Thurs: 5:00am – 10:00pm

Friday: 5:00am – 6:00pm

Saturday: 9:00am – 5:00pm

Sunday: 9:00am – 3:00pm

Serving all of New Jersey

 

📞 (888) 317-1702 ✉ info@rootermanplumberservices.com



24/7 EMERGENCY SERVICE   SERVICES ⌄   BLOG   CONTACT

SCHEDULE SERVICE



Copyright 2023 Rooter-Man Plumbing & Drain Cleaning. All rights Reserved.

Operated as an Independent Franchise All available services, hours of operations, pricing structure, and guarantees may vary by location.

**Privacy Policy**

**AA035**

# EXHIBIT B

AA036

# TRADEMARK ASSIGNMENT AGREEMENT

This Assignment Agreement effective January 20, 2022 is made by and between:

**A CORP.,** a Massachusetts stock corporation, having a principal office address located at 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862 (the "Assignor"); AND

**ROOTERMAN, LLC**, a Delaware limited liability company, having a principal office address located at 126 Garrett Street, Suite J, Charlottesville, Virginia 22902 (the "Assignee").

The Assignor and the Assignee are hereinafter referred to, individually, as "Party" and collectively, as "Parties".

WHEREAS, the Assignor is the proprietor and beneficial owner of the trademarks (the "Trademarks") of which the particulars are set forth as follows and in <u>Exhibit A</u> hereto:

"ROOTER-MAN"
Registration Date:  September 3, 1991
Registration No.:  1,655,782



"A ROOTER-MAN TO THE RESCUE"
Registration Date:  August 20, 1991
Registration No.:  1,654,512



"ROTOR-MAN"
Registration Date:  August 2, 1991
Registration No.:  1,848,341



**AA037**

"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date:  August 14, 2012
Registration No.: 4,189,503



**AA038**

"SEWER MAN"
Registration Date: January 18, 2000
Registration No. 2308796



"ROOTERMAN (words only)"
Registration Date: October 12, 2010
Registration No. 3,859,654



"ROOTERMAN TO THE RESCUE"
Registration Date: March 17, 2020
Registration No. 6,013,446



"RM"
Registration Date: March 17, 2020
Registration No. 6,013,441



**AA039**

"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,468



"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,470



The trademarks listed below were registered with Canadian Intellectual Property Office by A CORP.:

"ROOTER-MAN"
Registration Date: June 25, 2002
Registration No.: TMA563953



"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date: October 2, 2002
Registration No.: TMA568429



**AA040**

"SEWER MAN"
Application Date: October 2, 2019
Application No. 1988014



Whereas, The Assignee desires to acquire from the Assignor all of Assignor's right, title and interest in and to the Trademark registrations, together with the benefit of any use of the Trademarks by the Assignor, and the goodwill of the business relations to the Trademarks and to the wares or services associated with them, to hold unto the Assignee absolutely.

NOW THEREFORE, in consideration of the payment of $250,000 for federal registrations and $38,000 for state registrations, totaling Two Hundred Eighty-Eight Thousand Dollars ($288,000.00), and for good and valuable consideration, the receipt, sufficiency, and adequacy of which is hereby acknowledged the Assignor and the Assignee hereby agree as follows:

1.   The Assignor hereby sells, transfers and assigns to the Assignee, its successors and assigns, the Assignor's entire right, title and interest in and to the Trademark s application and/or registrations, together with (i) the benefit of any use of the Trademark by the Assignor (ii) the goodwill of the business relations to the Trademark and to the wares or services associated with it, (iii) all income, royalties and damages hereafter due or payable to Assignor with respect to the Trademark(s) to hold unto the Assignee absolutely. Nevertheless, Parties agree that Assignee shall not be entitled to any settlement proceeds and/or award in connection with *A Corp. v Palmetto Investments LLC, et al.,* United States District Court, District of Massachusetts, Civil Action No. 20-cv-11901-MLW.

2.   The Assignor incorporates by reference its ownership rights, representations, and warranties set forth in the Asset Purchase Agreement by and between A Corp., Donald MacDonald, as Beneficial Owner of A Corp., and Rooterman, LLC with respect to the Trademarks, subject to all conditions, limitations, limitations on liability and restrictions as set forth therein.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on their behalf by their duly authorized officers and representative on this 20th day of January 20, 2022.

For and on behalf of the Assignor:

**A Corp., a Massachusetts corporation**

DocuSigned by:

*Donald MacDonald*

5273E2256A59407...

Donald MacDonald, President

**AA041**

DocuSign Envelope ID: 0C7AE0CB-4E75-483A-AFEA-1898855298A8

## Exhibit A

### U.S. and Canadian Marks

| No. | Description | Registration Number | Notes |
|---|---|---|---|
| 1 | Rooterman Marketing and Advertising Promotions Materials | In Commerce Protection Only | P. 1-20 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 2 | Trademark (TM): Rooterman Plumbers to the Rescue (and Design) | 2433386 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 3 | TM: Sewer Man (and Design) | 2308796 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 4 | TM: A Rooterman to the Rescue (and Design) | 1654512 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 5 | Rooter-Man (and Design) | 1655782 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 6 | Termanator (and Design) | 1688486 | P. 22 , 70-71 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 7 | Shopper Saver | 1735676 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**AA042**

| 8 | Shopper Saver (and Design) | 1770022 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|---|---|---|---|
| 9 | Liquid Rooter | 1846083 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 10 | Rotor-Man (and Design) | 1848341 | P. 23 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 11 | Rooter-Man (Design Mark) | 3,859,654 | P. 24 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 12 | Rooter-Man (Design Mark) | 1,655,782 | P. 26 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 13 | Rooter-Man (Design Mark) | 1,654,512 | P. 29 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 14 | TM: Shopper Saver | 1,7355, 676 | P. 30 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 15 | TM: Liquid Rooter | 1,846,083 | P. 31 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**AA043**

| 16 | Service Mark (SM): Rotor-Man | 1,848,341 | P. 32 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|----|------------------------------|-----------|------------------------------------------------------------------|
| 17 | TM: Shopper Saver | 1,770,022 | P. 33 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 18 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA563,902 File No.: 1057892 | P. 34, 74-78 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 19 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA568,429 File No. 1057895 | P. 36 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 20 | SM: Sewer Man | 1,580,576 | P. 49 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 21 | SM: Sewer Man | 1,218,615 | P. 50 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 22 | SM: Sewer Man | 2,308,796 | P. 51 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 23 | SM: Termanator | 1,688,486 | P. 55 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 24 | SM: Rooterman "To The Rescue" | 6,013,446 | P. 56 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 25 | SM: RM Guy with Plunger | 6,027,468 | P. 57 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 26 | SM: RM Guy with Pipe Cleaner | 6,027,470 | P. 58 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 27 | SM: RM Logo | 6,013,441 | P. 59 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 28 | TM: Shopper Saver | 1,770,022 | P. 60, 68-69 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 29 | TM: Liquid Rooter | 1,846,083 | P. 61 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 30 | TM: Shopper Saver | 1,735,676 | P. 62, 66-67 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 31 | SM: Rooter-Man | 3,859,654 | P. 79 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 32 | **SM: Drain Pro** | 1664949 | P. 86-87 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 33 | **Rooterman Website Content 2014** | TX8-253-353 | P. 87-141 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**Seller also includes, by reference all marks, protections and materials set forth in Schedule 1 to Exhibit A of Rooterman APA dated January 20, 2022 pages 001-141, which is attached to this Assignment and incorporated in its entirety.**

**State Marks**

| A Corp. State Trademark Registrations | | | | | |
|---|---|---|---|---|---|
| State | Mark Registered | Registration Numbers | Registration and renewal dates | Expiration Dates | Comments |
| Alabama | N/A | N/A | N/A | N/A | |
| Alaska | RooterMan, man w/ pipe | 3924 | 27-Sep-05 | 27-Sep-10 | Expired |
| Arizona | RooterMan, man w/ pipe | 58161 | 9-Jun-14 | 9-Jun-24 | |
| Arkansas | RooterMan, man w/ pipe | 500001521 | 7-Feb-20 | 7-Feb-25 | |
| California | RooterMan, man w/ pipe | 52304 | 20-Oct-99 | 20-Oct-24 | |
| Colorado | N/A | N/A | N/A | N/A | |
| Connecticut | RooterMan, man w/ pipe | 39465648 | 25-Jun-20 | 25-Jun-25 | |
| Delaware | N/A | N/A | N/A | N/A | |
| Florida | RooterMan, man w/ pipe | T99000001430 | 5-Jul-19 | 1-Dec-24 | |
| Georgia | RooterMan, man w/ pipe | 1655782 | 3-Sep-91 | 3-Sep-01 | Expired |
| Hawaii | RooterMan, man w/ pipe | 4118950 | 1-Jul-18 | 30-Jun-23 | |
| Idaho | RooterMan, man w/ pipe | 18506 | 7-Jul-15 | 26-Sep-25 | |
| Illinois | RooterMan, man w/ | 84790 | 19-Nov-19 | 22-Feb-25 | |

|  | pipe |  |  |  |  |
|---|---|---|---|---|---|
| Indiana | RooterMan, man w/ pipe | 2000-0026 | 24-Feb-00 | 25-Feb-25 |  |
| Iowa | RooterMan, man w/ pipe | W01225995 | 14-May-19 | 14-May-24 |  |
| Kansas | RooterMan, man w/ pipe | 16967 | 28-Mar-20 | 28-Mar-25 |  |
| Kentucky | RooterMan, man w/ pipe | 17523 | 9-Jan-15 | 9-Jan-20 | Expired |
| Louisiana | RooterMan, man w/ pipe | 56-4798 | 9-Dec-99 | 9-Dec-29 |  |
| Maine | RooterMan, man w/ pipe | 20000097 | 28-May-19 | 20-Oct-39 |  |
| Maryland | RooterMan, man w/ pipe | 2000/00918 | 9-Jan-20 | 6-Mar-30 |  |
| Massachusetts | RooterMan, man w/ pipe | 57845 | 10-Jun-19 | 10-Jun-24 |  |
| Michigan | RooterMan, man w/ pipe | M02498 | 7-May-10 | 9-May-20 | Expired |
| Minnesota | RooterMan, man w/ pipe | 29736 | 14-Mar-00 | 14-Mar-20 |  |
| Mississippi | RooterMan, man w/ pipe | 14327 | 3-Apr-20 | 27-Mar-26 |  |
| Missouri | N/A | N/A | N/A | N/A |  |
| Montana | RooterMan, man w/ pipe | 5.042E+10 | 4-May-20 | 4-May-25 |  |
| Nebraska | N/A | N/A | N/A | N/A |  |
| Nevada | RooterMan, man w/ pipe | 202100034394-37 | 2-Mar-21 | 11-Mar-26 |  |
| New Hampshire | RooterMan, man w/ pipe | 5460 | 13-Dec-11 | 13-Dec-31 |  |
| New Jersey | N/A | N/A | N/A | N/A |  |
| New Mexico | N/A | N/A | N/A | N/A |  |
| New York | RooterMan, man w/ pipe | S24757 | 8-Dec-99 | 8-Dec-19 | Expired |
| North Carolina |  |  |  |  |  |
| North Dakota | RooterMan, man w/ pipe | 2549996 | 1-Feb-20 | 19-Mar-30 |  |
| Ohio | RooterMan, man w/ pipe | 1564852 | 9-Jun-15 | 9-Jun-25 |  |
| Oklahoma | RooterMan, man w/ pipe | N/A | 31-Dec-93 | 2-Nov-95 | Expired |
| Oregon | RooterMan, man w/ pipe | 33974 | 3-Jan-00 | 3-Jan-20 | Expired |
| Pennsylvania | RooterMan, man w/ pipe | 3342610 | 19-Sep-05 | 17-Jun-13 | Expired |

**AA047**

| | | | | | |
|---|---|---|---|---|---|
| Rhode Island | RooterMan, man w/ pipe | 19961004 | 22-Apr-16 | 10-Oct-26 | |
| South Carolina | RooterMan, man w/ pipe | 15851-R18715 | 13-Jan-17 | 10-Feb-22 | |
| South Dakota | RooterMan, man w/ pipe | 13408 | 2-Jul-21 | 2-Jul-25 | |
| Tennessee | RooterMan, man w/ pipe | 41812 | 20-Apr-20 | 20-Apr-25 | |
| Texas | RooterMan, man w/ pipe | 803743230 | 14-Jan-21 | 14-Jan-26 | |
| Utah | | | | | |
| Vermont | N/A | N/A | N/A | N/A | |
| Virginia | N/A | N/A | N/A | N/A | |
| Washington | RooterMan, man w/ pipe | 28436 | 8-Dec-20 | 16-Dec-25 | |
| West Virginia | RooterMan, man w/ pipe | 1006450 | 24-May-20 | 26-Feb-30 | |
| Wisconsin | N/A | N/A | N/A | N/A | |
| Wyoming | N/A | N/A | N/A | N/A | |

# EXHIBIT C

AA049

EXHIBIT B.1

# A CORP.

## ROOTER-MAN FRANCHISE AGREEMENT

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

# TABLE OF CONTENTS

| ITEMS | PAGE |
|---|---|
| A CORP FRANCHISE AGREEMENT | 1 |
| 1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS | 2 |
| 1.1 Date of Franchise Agreement | 2 |
| 1.2 Parties | 2 |
| 1.3 Licensed Territory | 2 |
| 1.4 Total Population | 2 |
| 1.5 Commencement Date | 2 |
| 1.6 Expiration Date | 2 |
| 1.7 Initial Franchise Fee | 2 |
| 1.8 Licensed Businesses | 2 |
| 1.9 Continuing Royalty | 2 |
| 1.10 Advertising Contribution | 2 |
| 1.11 Renewal Fee | 2 |
| 1.12 Transfer Fee | 2 |
| 1.13 Active Owners | 2 |
| 1.14 Franchise Termination Fee | 2 |
| 2. GRANT OF FRANCHISE | 3 |
| 2.1 Grant | 3 |
| 2.2 Limited License | 3 |
| 3. LICENSED TERRITORY | 3 |
| 3.1 Territory Defined | 3 |
| 3.2 Interterritorial Policy | 3 |
| 3.3 Rights Retained | 3 |
| 4. TERM OF FRANCHISE AGREEMENT, RENEWAL OPTION | 4 |
| 4.1 Term | 4 |
| 4.2 Renewal | 4 |
| 4.3 Notice Required by Law | 4 |
| 5. FRANCHISE FEE AND CONTINUING ROYALTY | 5 |
| 5.1 Initial Fee | 5 |
| 5.2 Continuing Royalty | 5 |
| 6. FRANCHISE SYSTEM MARKETING MATERIAL FUND | 5 |
| 6.1 Contribution by Franchisee | 5 |
| 6.2 Advertising Report | 5 |
| 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION | 5 |
| 7.1 Local Advertising | 5 |
| 7.2 Interterritorial Advertising | 6 |
| 7.3 Display | 7 |
| 7.4 Identity as Franchisee | 7 |
| 7.5 Sale of Franchise | 7 |
| 8. TRADEMARKS | 7 |
| 8.1 Grant of License | 7 |

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

AA051

| | | |
|---|---|---|
| 8.2 | Name of Business ........................................... | 7 |
| 8.3 | No Other Names ............................................ | 7 |
| 8.4 | Change of the Trademarks ................................ | 8 |
| 8.5 | Trademark Prosecution .................................... | 8 |
| **9.** | **TRAINING AND OPERATING ASSISTANCE** ................ | **8** |
| 9.1 | Initial Training Program ................................... | 8 |
| | A. The Program ............................................ | 8 |
| | B. Expenses ................................................ | 8 |
| | C. Waiver .................................................. | 8 |
| 9.2 | Staff Training .............................................. | 8 |
| 9.3 | Additional Assistance ...................................... | 9 |
| | A. Operating Manual ...................................... | 9 |
| | B. Grand Opening Promotional Program ................... | 9 |
| | C. Advertising Materials .................................. | 9 |
| | D. Seminars ............................................... | 9 |
| | E. On-Going Assistance and Supervision .................. | 9 |
| | F. Initial Sales Assistance ................................ | 9 |
| | G. Product Offerings ...................................... | 9 |
| **10.** | **FRANCHISE OFFICE LOCATION** ......................... | **9** |
| **11.** | **VEHICLES, EQUIPMENT AND SUPPLIES** .................. | **10** |
| 11.1 | Vehicles ................................................... | 10 |
| 11.2 | Equipment ................................................. | 10 |
| 11.3 | Uniforms .................................................. | 10 |
| **12.** | **OPERATION of the FRANCHISE** .......................... | **10** |
| 12.1 | Operations Manual ......................................... | 10 |
| | A. Incorporation of Operations Manual ................... | 10 |
| | B. Confidentiality of Operations Manual .................. | 10 |
| | C. Modifications ........................................... | 11 |
| 12.2 | Hours of Operation ........................................ | 11 |
| 12.3 | Resolution of Customer Problems ......................... | 11 |
| 12.4 | Cleaning and other Supplies ............................... | 11 |
| 12.5 | Franchise Management ..................................... | 11 |
| 12.6 | Insurance .................................................. | 11 |
| | A. Notice ................................................. | 12 |
| | B. Insurance and Step-In-Rights .......................... | 12 |
| 12.7 | Bookkeeping Standards .................................... | 12 |
| 12.8 | Franchisor Inspection ..................................... | 12 |
| 12.9 | Compliance with Law ...................................... | 12 |
| 12.10 | No Suggested Service Fees ................................ | 12 |
| 12.11 | Franchise Telephone Service and Directory Listings ....... | 12 |
| **13.** | **RECORDS** ................................................ | **13** |
| 13.1 | Sales Records and Tax Returns ............................ | 13 |
| 13.2 | Periodic Reports ........................................... | 13 |
| 13.3 | Additional Recording Systems ............................. | 13 |
| 13.4 | Inspection and Audit ...................................... | 13 |

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL .................................... 14
    14.1 Assignment by A CORP ................................................ 14
    14.2 Assignment by Franchisee ............................................ 14
        A. Permitted Transfers ................................................ 14
        B. Transfer Upon Death or Permanent Incapacity ........... 15
        C. Transfer to Franchisee's Corporation ...................... 15
        D. Non-Waiver of Claims ........................................ 16

15. DEFAULT AND TERMINATION ............................................... 16
    15.1 Immediate Termination .............................................. 16
    15.2 Termination with Notice ............................................. 17
    15.3 Conformity with Law ............................................... 18
    15.4 Cross Default ......................................................... 18
    15.5 Franchise Termination Option ..................................... 18

16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION ...... 19

17. STEP-IN-RIGHTS .............................................................. 20
    17.1 Cause for Step-In .................................................... 20
    17.2 Duties of Parties ..................................................... 20

18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS .................... 20
    18.1 Non-Competition ..................................................... 20
    18.2 Non-Disclosure ...................................................... 20

19. GENERAL CONDITIONS AND PROVISIONS .................................. 21
    19.1 Titles for Convenience .............................................. 21
    19.2 Entire Agreement .................................................... 21
    19.3 Amendment in Writing .............................................. 21
    19.4 Relationship .......................................................... 21
    19.5 No Waiver ............................................................ 21
    19.6 Governing Law ....................................................... 22
    19.7 Mediation and Arbitration .......................................... 22
    19.8 Notices ................................................................ 23
    19.9 Indemnification ...................................................... 24
    19.10 Limitation of Liability of A CORP ................................ 24
    19.11 Late Payment Fees .................................................. 24
    19.12 Survival of Covenants .............................................. 24

20. CAVEAT ....................................................................... 24

21. RELEASE ...................................................................... 25

APPENDIX 1 – LICENSED TERRITORY ........................................... 27
EXHIBIT A – GUARANTY OF PERFORMANCE ................................... 28
EXHIBIT B – POWER OF ATTORNEY ............................................ 29
EXHIBIT C – PROMISSORY NOTE ............................................... 30
EXHIBIT D – WAIVER OF TRAINING PROGRAM PARTICIPATION ............. 31
EXHIBIT E – AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT ..... 32

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

AA053

# A CORP.
# FRANCHISE AGREEMENT

**AGREEMENT** entered into this **24th** day of **September, 2019,** by and between:

**A CORP.**
a Massachusetts Corporation
268 Rangeway Road
Box 290
North Billerica, MA  01862
("A CORP.")

and

**Quality Air Care Corporation**
**692 Sussex Ct**
**Toms River, NJ 08753**

_____

**("FRANCHISEE")**

**WHEREAS:**

**A CORP.** has developed and is continuing to develop certain unique training, marketing and management methods relating to various service industries which offer services to the public through a franchise system (the " **A CORP. System** ") as it evolves from time to time; and

**A CORP.** has successfully established a reputation, demand and goodwill for its System under various registered names and marks which **A CORP.** owns, including without limitation, **Rooter-Man, Rooter-Man to the Rescue, Rotor-Man** and such other valuable trade names, service marks, trademarks, logotypes and designs (the "Trademarks") which **A CORP.** may develop and license for use through the **A CORP. System**; and

**A CORP.**'s trademarks and methods of operations and other business practices and policies relating to the operation of the **A CORP. System** (collectively the "Business System") constitute confidential and valuable trade secrets; and

**FRANCHISEE** desires to enter into the business of operating an **A CORP.** franchise utilizing some or all the Trademarks, the Business System and all advantages of the **A CORP. System** franchise program upon the terms and conditions contained in this agreement.

**THEREFORE**, in consideration of the mutual agreements, covenants and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to be bound legally as follows:

**AA054**

## 1.     FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS

| | | | |
|---|---|---|---|
| **1.1** | **Date of Franchise Agreement**: | | September 24, 2019 |
| **1.2** | **Parties**: | **FRANCHISOR:**<br>A CORP.<br>268 Rangeway Road<br>N. Billerica, Ma  01862 | **FRANCHISEE:**<br>Quality Air Care Corporation<br>692 Sussex Ct<br>Toms River, NJ 08753 |
| **1.3** | **Licensed Territory:** | | Defined in the attached Appendix 1 |
| **1.4** | **Total Population:** | | 292,729 |
| **1.5** | **Commencement Date:** | | September 24, 2019 |
| **1.6** | **Expiration Date:** | | September 24, 2024 |
| **1.7** | **Initial License Fee:** | | $3,975.00<br>($31.80 per thousand of population) |
| **1.8** | **Businesses Licensed (By Trademark):** | | **Rooter-Man<br>Rooter-Man to the Rescue<br>Rotor-Man** |
| **1.9** | **Continuing Royalty:** | | $220.00 per month.<br>($0.88 per  thousand of population) |
| **1.10** | **Marketing Fund Contribution:** | | $30.00 per month.<br>($ .12 per thousand of population monthly) |
| **1.10.1** | **Locally Optimized Website** | | $89.00 per month |
| **1.11** | **Franchise Renewal Fee:** | | $2500.00 |
| **1.12** | **Transfer Fee:** | | Greater of 5% of Franchise Selling Price or $2,500.00 |
| **1.13** | **Active Owners:** | | Klodian Belegu |
| **1.14** | **Franchisee Termination Fee: (Opt Out)** | | $25.00 per thousand population |

## 2.  GRANT OF FRANCHISE

**AA055**

2.1    **GRANT.**    **A CORP.** hereby grants to **FRANCHISEE**, and **FRANCHISEE** hereby accepts, a license to conduct the business listed in Section 1.8 (the "**A CORP.** System Franchise") for the term described below, according to the provisions of this Agreement and any related agreements.

2.2    **LIMITED LICENSE.**    This franchise is a limited grant of rights.  Upon termination for any reason or upon expiration of this Agreement, all rights of **FRANCHISEE** to operate the **A CORP.** System franchise shall cease and the license set forth above shall terminate.

3.  **LICENSED TERRITORY**

3.1    **TERRITORY DEFINED**

A.  The franchise granted by this Agreement to operate the **A CORP.** System franchise shall be within the Territory set forth in Section 1.3 (the "Territory").  **FRANCHISEE** shall offer the services of the **A CORP.** System franchise <u>only</u> in the Territory.

B.  **FRANCHISEE** agrees to diligently, faithfully and in a business like manner, promote, market and conduct the franchised business within the Territory so as to fully develop and maximize the business potential of the Territory and shall devote **FRANCHISEE's** full time, attention and best efforts to achieve that end.  **FRANCHISEE's** failure to do so shall be deemed a material breach of this Agreement as specified in Section 15.2.

C.  **FRANCHISEE** shall not engage in marketing activities or solicitation of business outside the Territory.  In order for **FRANCHISEE** to engage in such activities within an unlicensed territory, **FRANCHISEE** must execute a separate Franchise Agreement and pay an additional franchise fee.

D.  **FRANCHISEE** shall establish and maintain an office within the Territory to conduct his or her franchise.  **FRANCHISEE** shall not establish an office outside of the Territory.

E.  **A CORP.** agrees that during the term it will not license any other person or entity to operate the same **A CORP.** system franchise in the Territory, and will not itself establish the same **A CORP.** system franchise in the Territory.

3.2    **INTERTERRITORIAL POLICY.**  **A CORP.** shall have the right to adopt and implement policies and procedures prohibiting or strictly limiting **FRANCHISEE's** conduct and solicitation of business and marketing activities outside the Territory.  With the exception of interterritorial advertising, as described in Section 7.2 of this Agreement, **FRANCHISEE** is prohibited from advertising, soliciting or maintaining a business phone number or office outside of the Territory.

3.3    **RIGHTS RETAINED.**  Notwithstanding Section 3.2, **A CORP.** shall, however, have the right to:  a) refer work to other franchisees, to itself, its parent, subsidiary or affiliated companies or to unaffiliated subcontractors, whether within or outside of the Territory, which **FRANCHISEE** is not licensed, not equipped or not expressly authorized to render; and  b) sell, rent or authorize others to sell or rent, drain cleaning, products, and equipment, or render services which are not the subject of this Agreement within or outside of the Territory.

4.  **TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION**

**AA056**

4.1    **TERM**.  The term of this Franchise Agreement shall be 5 years from the date of execution of this Agreement, unless terminated sooner for a reason set forth in Section 15. At the expiration of this term, **FRANCHISEE** may exercise the Renewal Option set forth in Section 4.2.

4.2    **RENEWAL**.    **FRANCHISEE** shall have the option to renew this franchise for additional 10 year terms subject to the following conditions:

A.    **FRANCHISEE** shall give **A CORP.** written notice of his or her desire to exercise the option to continue as a franchisee no later than 6 months prior to the expiration of the initial term of this Agreement and each renewal term.

   **A CORP.** shall furnish **FRANCHISEE** with a copy of **A CORP.**'s then current Franchise Agreement (and related agreements), which Agreement **FRANCHISEE** must execute no later than 3 months prior to the expiration of this Agreement.  The Renewal Franchise Agreement shall not include an Initial License Fee but may include an increase in the Continuing Royalty and Marketing Contribution.  Such increase, if any, shall be calculated by multiplying the current fee by the percentage change in the Consumer Price Index (hereinafter, "Change In CPI") if any.  The Change In CPI shall be calculated using the formula set forth in Section 4.2 B.

B.    **A CORP.** shall calculate the Change In CPI by creating a fraction, the numerator of which is the Consumer Price Index for December of the most recently completed year and the denominator of which is the Consumer Price Index for December of the year in which the Franchise Agreement became effective.

   The fraction will then be determined by dividing the numerator by the denominator.  If the fraction is less than or equal to 1, then no change in fees will occur.  If the fraction is greater than 1 (a "CPI Increase"), then a Change in CPI shall have occurred in the amount of the CPI Increase.

C.    **FRANCHISEE** shall pay to **A CORP.** upon execution of the renewal Franchise Agreement, the Renewal Fee set forth in Section 1.11.

D.    Notwithstanding the foregoing, **FRANCHISEE** shall not have the right to exercise the Renewal Option unless **FRANCHISEE** has paid in full all monies then currently due to **A CORP.**, and no other default under the terms of this Agreement exists uncured.  **A CORP.** may elect to revoke the renewal option if **FRANCHISEE** shall have received 3 or more notices of default within any 12-month period during the initial term of this Agreement.

E.    As a condition to this renewal, **FRANCHISEE** shall be required to maintain the services that he is licensed for and to invest in the proper equipment or vehicles to provide those licensed services.

4.3    **NOTICE REQUIRED BY LAW**.  If applicable law requires that **A CORP.** give notice to **FRANCHISEE** prior to the expiration of the initial term, then the Franchise Agreement shall remain in effect on a month to month basis until **A CORP.** has given **FRANCHISEE** the notice required by applicable law.

## 5.  INITIAL LICENSE FEE AND CONTINUING ROYALTY

**AA057**

5.1 **INITIAL FEE. FRANCHISEE,** upon execution of this Agreement, shall pay to **A CORP.** the Initial License Fee set forth in Section 1.7. **FRANCHISEE** acknowledges that the sole consideration for such fee is the grant of the franchise. Such fee shall be fully earned upon execution of this Agreement and shall not be refunded or forgiven.

5.2 **CONTINUING ROYALTY. FRANCHISEE** shall pay to **A CORP.** each month the Continuing Royalty set forth in Section 1.9, subject to a $110.00 per unit each month. **FRANCHISEE** shall also pay to **A CORP.** each month the marketing fund contribution in the amount of $15.00 per unit. The Continuing Royalty will commence thirty (30) days after the execution of the Franchise Agreement. When **A CORP.** adopts an electronic funds transfer program, all Continuing Royalty payments shall be made by electronic funds transfer, pursuant to the program established and amended from time to time by **A CORP.** Each payment shall be accompanied by the financial reports specified in Section 13.2.

## 6. FRANCHISE SYSTEM MARKETING MATERIALS FUND

6.1 **CONTRIBUTION BY FRANCHISEE. FRANCHISEE** agrees to pay to **A CORP.** the Marketing Fund Contribution set forth in Section 1.10 for the design of marketing materials. **FRANCHISEE** shall pay such Marketing Fund Contribution in the same manner specified in Section 5.2. **A CORP.** shall have the sole right to determine how to expend these funds, and shall expend all Marketing Materials funds collected. All monies collected from **FRANCHISEE** pursuant to this Section shall be placed in a separate account.

6.2 **MARKETING MATERIALS FUND REPORT. A CORP.** shall furnish to **FRANCHISEE** within 90 days of each calendar year end, a Fund financial report for the preceding year, prepared and certified to be correct by an officer of **A CORP.**, setting forth the funds collected, and the expenditures made during such calendar year.

## 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION

7.1 **LOCAL ADVERTISING. FRANCHISEE** acknowledges that advertising and promotion represents the major source of new clientele for the **A CORP.** System franchise and a major expense of the franchise operation. **FRANCHISEE** shall formulate and effect local advertising and promotion subject to the format, content and media designations contained in the Operations Manual.

A. **FRANCHISEE** shall list itself in those telephone directories which are usually and customarily distributed in the Licensed Territory, under the appropriate headings, as designated by **A CORP. FRANCHISEE** shall not place advertisements or listings in telephone directories which are usually and customarily distributed only outside of the Licensed Territory. **FRANCHISEE** shall expend a minimum of 15% of the franchise's Gross Revenues on local advertising, which advertising will include yellow page listings, local newspaper advertising, marketing and sales materials and the Marketing Fund Contribution. For the purposes of this Agreement, the term "Gross Revenues" shall mean all revenues generated by **FRANCHISEE**'s business conducted upon, from, or with respect to **FRANCHISEE**'s franchise, whether such sales are evidenced by cash, check, credit, charge account or exchange. Gross Revenues shall include, without limitation, monies or credit received, for services, from the sale of products, from tangible property of every kind and nature, promotional or otherwise, and for other services performed by **FRANCHISEE** in

**AA058**

accordance with the Business System. Gross Revenues shall not include sales or service taxes or municipal or private disposal fees.

B.    **FRANCHISEE** understands and acknowledges that local and telephone directory advertising and internet advertising are the major sources of new clientele. At the end of the calendar year, **FRANCHISEE** must furnish proof to the **A CORP.** of all local advertising expenditures and copies of all advertisement used during that year ended. **A CORP** provides free listing of **FRANCHISEE** through **A CORP.**'s franchisor website at www.rooterman.com (the "Franchisor Website"). If **FRANCHISEE** desires to have a local optimized website to promote the System using **ACORP.**'s Trademarks, **FRANCHISEE** must use the internet advertisement services provided through the "Franchisor Website". Upon **FRANCHISEE**'s purchase of the **A CORP** System Franchise, **A CORP** shall design certain website pages linked to the Franchisor Website with **FRANCHISEE**'s information (the "**FRANCHISEE** Webpages") and shall activate the **FRANCHISEE** Webpages in a timely manner. To maintain the consistency of the brand image of **A CORP**, **FRANCHISEE** is not allowed to independently design, develop, and maintain any other locally optimized website or register any domain name using **A CORP's** trademarks including without limitation the Rooter Man trademark.

C.    **FRANCHISEE** agrees to advertise and promote actively and continuously the System and the Trademarks within the Licensed Territory. **A CORP.** reserves the right to direct **FRANCHISEE** to modify or discontinue advertisements that **A CORP.** believes to present a risk of misleading prospective customers as to the authorized services which **FRANCHISEE** can offer or to the territory in which **FRANCHISEE** can operate. **FRANCHISEE** shall promptly comply with any such directive.

7.2    **INTERTERRITORIAL ADVERTISING.** In areas (the "Region") where advertising media reach prospective clientele in more than 1 licensed territory, the franchisees operating in this Region may enter into an interterritorial advertising agreement (the "Interterritorial Agreement"). Such Interterritorial Agreements shall provide for the following:

A.    Advertising fees shall be shared by participating franchisees based upon the percentage of the Region's population that falls within each individual franchisee's Territory. The failure of **FRANCHISEE** to pay his pro rata share under an agreed-upon program shall be considered a default under this Franchise Agreement.

B.    The format, content and media designations chosen by the participating franchisees for use in the Region shall conform to those requirements specified by **A CORP.** in the Operations Manual; and

C.    **FRANCHISEE** shall indemnify **A CORP.** from and against any and all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly or indirectly out of or in connection with the operation of the Interterritorial Agreement.

D.    Local advertising shall be FRANCHSIEE's sole responsibility and FRANCHISEE shall not list A CORP. as a party of its local advertising agreement or as list A CORP. under any billing information.

7.3    **DISPLAY.** **FRANCHISEE** acknowledges that vehicle advertising is an important source

**AA059**

for promotion of the Trademarks and shall maintain all vehicles displaying such Trademarks in accordance with the standards established from time to time by **A CORP.** **FRANCHISEE** agrees to display prominently at all times on all of **FRANCHISEE's** vehicles such advertising and signage as shall be specified from time to time in the Operations Manual or in operating and marketing memoranda furnished by **A CORP.**

7.4     **IDENTITY AS FRANCHISEE.**     **FRANCHISEE** agrees that at all times and in all advertising, promotions, signage and other display materials, on its letterheads, business forms, and in all of **FRANCHISEE's** business dealings and to the general public, **FRANCHISEE** will identify himself only as an **A CORP.** System franchisee utilizing only the Trademarks licensed by this Agreement. **FRANCHISEE** further agrees that **FRANCHISEE** shall not identify himself as being **A CORP.**, a subsidiary, division, partner, joint venturer, agent or employee of **A CORP.** or of any other of **A CORP.'s** franchisees.

7.5     **SALE OF FRANCHISE.**   In the event that **FRANCHISEE** places advertising seeking a buyer for all or part of **FRANCHISEE's** franchise, **FRANCHISEE** shall not include nor allow use of any of the Trademarks to appear in such advertisement. **FRANCHISEE** may, however, describe the business in general generic terms. **FRANCHISEE** agrees to enforce this restriction on the activities of the **FRANCHISEE's** sales agent, broker or representative. In addition, the **FRANCHISEE** shall comply with the provisions of Section 14.2.

## 8. TRADEMARKS

8.1     **GRANT OF LICENSE.**   **A CORP.** hereby grants to **FRANCHISEE** the right during the term of this Agreement to use and display the Trademarks, set forth in Section 1.8, in accordance with this Agreement and the Operations Manual. **FRANCHISEE** acknowledges that the Trademarks which have been licensed exclusively by **A CORP.** are valid, and that valuable goodwill is attached to such Trademarks. All goodwill associated with the Trademarks, including the goodwill generated by **FRANCHISEE** and all other franchisees while conducting business under the Trademarks, is and shall remain the property of     **A CORP. FRANCHISEE** expressly agrees during the term of this Agreement and following the Agreement's expiration or termination, that **FRANCHISEE** shall not directly or indirectly contest or aid in contesting the validity or ownership of the Trademarks. **FRANCHISEE** shall not modify or use the Trademarks in any fashion, including without limitation on products, tools or supplies, unless authorized in a prior writing by **A CORP.** **FRANCHISEE** shall not file for or acquire any state, federal or international registration of the Trademarks or any trademark or service mark (or variation thereof) which is confusingly similar to the Trademarks including without limitation the Rooter Man trademark.

8.2     **NAME OF BUSINESS.**   If **FRANCHISEE** operates the franchise business through a corporation, **FRANCHISEE** shall not use the Trademarks, or any similar names, in its corporate name. Upon expiration or termination of this Agreement,   **A CORP.** may, if **FRANCHISEE** does not do so, execute in **FRANCHISEE's** name and on **FRANCHISEE's** behalf any and all documents necessary in **A CORP.'s** judgment to end and cause the discontinuance of **FRANCHISEE's** use of the Trademarks and **A CORP.** is hereby irrevocably appointed and designated as **FRANCHISEE's** attorney-in-fact to do so.

8.3     **NO OTHER NAMES.**   **FRANCHISEE** shall not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the franchise business without the express prior written consent of **A CORP.**

**AA060**

8.4     **CHANGE OF THE TRADEMARKS**.  If it appears to **A CORP.** that any of the names or marks are no longer viable commercially or legally, **A CORP.** has the right to change any of its names or marks to others of similar marketing impact.  In such event, **FRANCHISEE** agrees to cooperate with **A CORP.** in changing all signs, graphics, and supplies, including those painted onto **FRANCHISEE**'s vehicles.  **FRANCHISEE** agrees to assume all reasonable costs connected with such changes, and to effectuate such changes within the reasonable time frame established by **A CORP.**

## 8.5     TRADEMARK PROSECUTION

A.     In the event that **FRANCHISEE** shall learn that a third party, who not a licensee of **A CORP**, is using **A CORP'**s Trademarks or any variation, **FRANCHISEE** shall promptly notify **A CORP** of the facts relating to infringing use.

B.     With **A CORP'**s permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE'**s interest in the Trademark.  In the event that the **FRANCHISEE** chooses to bring action, and **A CORP**, in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE'**s Territory.

## 9.     TRAINING AND OPERATING ASSISTANCE

9.1     **INITIAL TRAINING PROGRAM**.  **A CORP** shall furnish, and **FRANCHISEE** shall complete to **A CORP'**s satisfaction, in its sole discretion exercised in good faith, **A CORP'**s training program on the operation of the **A CORP** System franchise.

A.     **THE PROGRAM.**     Such training shall consist of 2 days of instruction at **A CORP'**s headquarters or at such place or places designated by **A CORP**.  Participation of **FRANCHISEE** in the training program shall be required unless participation is waived by **A Corp** as specified in Section 9.1C below.  If **A CORP** determines that **FRANCHISEE** requires additional training, the **FRANCHISEE** shall attend such additional program at **FRANCHISEE'**s own expense.

B.     **EXPENSES. FRANCHISEE'**s shall be solely responsible for **FRANCHISEE'**s own travel, living expenses and salary during the training period.

C.     **WAIVER.**   **FRANCHISEE'**s participation in the **A CORP** training program, as described in Section 9.1A, may be waived by **A CORP** if **A CORP** determines in its sole discretion that **FRANCHISEE** has sufficient prior business experience to excuse him from participation in **A CORP'**s training program.

9.2     **STAFF TRAINING.**   **FRANCHISEE** shall implement a training program for his  other employees, in accordance with the training standards and procedures prescribed by **A CORP.** **FRANCHISEE** shall employ at all times during the term of this Agreement only employees so trained to offer the franchised services.  **FRANCHISEE** alone shall assume all expenses associated with staff training.

9.3     **ADDITIONAL ASSISTANCE.**     **A CORP** shall furnish **FRANCHISEE** with the

**AA061**

following additional operating assistance.

A.  **OPERATIONS MANUAL.**    A **CORP** will provide a copy of its Operations Manual (as defined in Section 12.1), which at all times will remain the property of **A CORP**, for use by **FRANCHISEE** in the operation of the **A CORP's** System franchise.

B.  **GRAND OPENING PROMOTIONAL PROGRAM.**    A **CORP** shall consult with **FRANCHISEE** concerning a grand opening promotional program, which program shall be conducted by **FRANCHISEE** at his or her sole cost and expense.

C.  **ADVERTISING MATERIALS.**    A **CORP** may, from time to time, at its discretion, develop and provide **FRANCHISEE** with the art work for advertising materials to be used by **FRANCHISEE** in the promotion of **FRANCHISEE's A CORP** System franchise.

D.  **SEMINARS.**    A **CORP** may from time to time, at its sole discretion, conduct refresher training seminars for the purpose of informing franchisee's of new developments and improvements in the Business System relating to various aspects of the franchise operations, including new product lines and profit centers, new marketing techniques, and revised operational and management standards and techniques.  Unless otherwise approve in writing by **A CORP**, **A CORP** shall have the right to require **FRANCHISEE** to attend at least 1 such seminar or a regional meeting during each year of this Agreement.  There shall be no additional charge for such seminars or meetings,  but all travel and living costs incurred by **FRANCHISEE** shall be borne by **FRANCHISEE.**

E.  **ON-GOING ASSISTANCE AND SUPERVISION.**    A **CORP** shall furnish to **FRANCHISEE** from time to time such operating assistance and training, as is, in **A CORP's** sole discretion, reasonably necessary.  Operating assistance and training may include, by way of illustration, advice and guidance with respect to modifications or additions in the Business System, new marketing programs, the establishment of administrative, bookkeeping, accounting and general operating procedures, and such other advice as shall reasonably pertain to the operation of the franchise.   **A CORP** retains the right to license additional services and programs which **FRANCHISEE** might offer to its customers.

F.  **INITIAL SALES ASSISTANCE.**   Upon **FRANCHISEE's** written request and **A CORP's** consent,    A **CORP** shall furnish, for not less than 2 days during the first weeks of **FRANCHISEE's** operations, a representative to train and assist **FRANCHISEE** and his sales staff by calling on prospective customers within the Territory.  **A CORP** shall require a reasonable fee for providing such initial sales assistance.  Such fee shall include, without limitation, all expenses incurred by **A CORP** in providing initial sales assistance.

G.  A **CORP** presently offers products through **A CORP's** affiliate, **Rooter-Man Corp.,** which is a supplier and distributor of various tools and supplies needed in the operation of a **Rooter-Man** franchise.  These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, logo patches, truck decals, and other such items. **FRANCHISEES** are not required to purchase these or any items from the **Rooter-Man Corp.** nor is A **CORP** or the **Rooter-Man Corp.** required to continue supplying, selling or distributing these or any items.

10.  **FRANCHISE OFFICE LOCATION.**    Since the location of **FRANCHISEE's** office is not an important aspect of the operation of the **A CORP** System franchise,  **FRANCHISEE** shall only be

**AA062**

obligated to secure an adequate facility to house **FRANCHISEE's** vehicles, equipment and supplies. Such facility must be located within the Territory and such facility shall comply with all local, state and federal regulations as well as A CORP's Operations Manual. Specifically, but without limitation, such facility shall be maintained by **FRANCHISEE** in strict compliance with all local, state and federal regulations pertaining to the storage of hazardous and non-hazardous chemicals.

## 11. VEHICLES, EQUIPMENT AND UNIFORMS

11.1    **VEHICLES.**  Prior to the commencement of business by **FRANCHISEE, FRANCHISEE** shall purchase or lease the number and variety of vehicles to be used in the operation of the A **CORP.** System franchise as reasonably prescribed by **A CORP.** All vehicles must meet A **CORP.**'s requirements for appearance, color and other appropriate specifications and must be fully equipped as required by the Operations Manual. **FRANCHISEE** expressly agrees to display all Trademarks required by A CORP. on such vehicles. All vehicles must be maintained in sound physical condition and the appearance of such vehicles must be well maintained at all times in order to uphold the integrity of the Trademarks. **FRANCHISEE** shall promptly, upon request, provide A CORP. with photographs, copies of invoices and other evidence satisfactory to A CORP., confirming that such vehicles conform to A **CORP.**'s specifications.

11.2    **EQUIPMENT.**  Prior to the commencement of the business, **FRANCHISEE** shall at its sole cost and expense lease or purchase, all of the tools, equipment, uniforms, drain cleaning products, supplies, computer equipment, software, forms and other equipment and materials recommended by A CORP., but purchased from suppliers of **FRANCHISEE**'s choice.

11.3    **UNIFORMS.**  In order to present a neat and clean appearance while performing the services of the A CORP. System franchise, **FRANCHISEE** and each employee of **FRANCHISEE** shall wear a uniform approved by A CORP.

## 12.    OPERATION OF THE FRANCHISE

12.1    **OPERATIONS  MANUAL.**    **FRANCHISEE** acknowledges that nationwide uniform standards of service are vital to the protection of the A CORP. System and the Trademarks, and are necessary to ensure that the public receives the quality of service associated with the A CORP. System and the Trademarks. **FRANCHISEE** therefore agrees that in order to protect the reputation and the goodwill associated with the Trademarks, and to maintain the uniform standards of operation by all A CORP. System franchisees, **FRANCHISEE** shall conduct the franchise in strict accordance with A CORP.'s proprietary Operations Manual (the "Operations Manual").

A.    **INCORPORATION OF OPERATIONS MANUAL.**  The Operations Manual is intended to further the purposes of this Agreement, and is specifically incorporated into this Agreement.

B.    **CONFIDENTIALITY OF OPERATIONS MANUAL.**  **FRANCHISEE** shall at all times treat as confidential and shall not at any time disclose, copy, duplicate, record or otherwise reproduce in whole or in part, or otherwise make available to an unauthorized person or persons, the contents of the Operations Manual. The Operations Manual, including all new updated and old superseded pages, shall at all times remain the sole property of A CORP. A **CORP.** shall amend and update the Operations Manual and shall provide such updated

**AA063**

version to **FRANCHISEE** at no cost to **FRANCHISEE**. **FRANCHISEE** agrees to insert all new pages immediately in their proper places and to remove completely the superseded pages at the same time for return to **A CORP.** **FRANCHISEE** shall promptly return the Operations Manual upon the expiration or other termination of this Agreement.

C. **MODIFICATIONS.** **FRANCHISEE** recognizes and agrees that **A CORP.** may from time to time change or modify its standards of operation, including the adoption of new procedures and programs, as outlined in the Operations Manual. **FRANCHISEE** shall accept and conform to such changes or modifications, and shall make all reasonable expenditures necessitated by the changes or modifications, within the time periods reasonably established by **A CORP.**

12.2 **HOURS OF OPERATION**. **FRANCHISEE** shall provide prompt and courteous service at all times during normal working hours and shall provide emergency service that will adequately meet the needs of customers for such service within the Licensed Territory. During customary business hours, **FRANCHISEE** agrees to have its telephone(s) answered by a trained employee. **FRANCHISEE** agrees to use a telephone answering service only after customary business hours.

12.3 **RESOLUTION OF CUSTOMER PROBLEMS**. **FRANCHISEE** and his employees shall provide prompt, competent and courteous service to customers. **FRANCHISEE** shall respond to any dissatisfied customers within 24 hours after the complaint is received, whenever possible.

12.4 **DRAIN CLEANING PRODUCTS AND OTHER SUPPLIES**. **FRANCHISEE** shall utilize only those drain cleaning products and other supplies, including forms, authorized by **A CORP.**

12.5 **FRANCHISEE MANAGEMENT**. **FRANCHISEE** shall at all times during the term of this Agreement operate the **A CORP.** System franchise on a full-time basis or employ on a full-time basis at least one trained individual. **FRANCHISEE** or such individual shall devote his entire time during normal business hours, as defined in the Operations Manual, to the management, operation and development of **FRANCHISEE's A CORP.** System franchise. The individual managing the franchise shall not engage in any other business or investment requiring active participation during normal business hours. **A CORP.** has entered into this Agreement in reliance upon the representation of **FRANCHISEE** that during the term of the Agreement, the individuals named in Section 1.14 will be the owners who are in active, full-time charge of **FRANCHISEE's** franchise and who are responsible for adhering to the terms of this Agreement.

12.6 **INSURANCE**. It is understood and agreed that the protection of the goodwill of the **A CORP.** system, Trademarks and the financial security of both **FRANCHISEE** and **A CORP.** requires the existence of public liability insurance coverage for **FRANCHISEE**. **FRANCHISEE** shall procure and maintain in full force and effect Commercial General Liability insurance coverage (including premises/operations coverage, product liability coverage, completed operations coverage and contractual liability coverage) and comprehensive motor vehicle liability insurance coverage (including hired and non-owned motor vehicle coverage) in the name of **FRANCHISEE**, with **A CORP.** named as an additional insured, at **FRANCHISEE's** sole cost and expense. The insurance coverage shall be in the following minimum amounts:

**AA064**

|   |   |   |
|---|---|---|
| 1. Bodily Injury | $1,000,000.00 | Each person |
|   | $1,000,000.00 | Each occurrence |
| 2. Property damage | $500,000.00 | Each occurrence |
| 3. Workers' Compensation coverage |   | As required by law |

As an alternative to the foregoing, **FRANCHISEE** may obtain a single limit policy in the amount of no less than $1,000,000.00.

**A. NOTICE.** All insurance purchased by **FRANCHISEE** shall provide that **A CORP.** be given at least 30 days prior written notice of any termination, amendment, cancellation or modification. **FRANCHISEE** shall promptly provide **A CORP.** with certificates of insurance evidencing such coverage no later than 14 days prior to the date that **FRANCHISEE** shall be open for business to the public, as well as annual certificates throughout the term of the franchise evidencing continuing coverage.

**B. INSURANCE AND STEP-IN-RIGHTS.** If **FRANCHISEE** fails or refuses to purchase insurance conforming to the standards and limits prescribed in Section 12.5, **FRANCHISEE** shall be in default of this Agreement as set forth in Section 15.2A and E.

**12.7 BOOKEEPING STANDARDS. FRANCHISEE,** all financial statements prepared by or for **FRANCHISEE,** and all reports submitted by **FRANCHISEE** shall conform to the current standards and requirements as described in the Operations Manual. All such bookkeeping and accounting records and financial statements, for such periods as may from time to time be prescribed in the Operations Manual, shall be made available for inspection by **A CORP.** during normal business hours.

**12.8 FRANCHISOR INSPECTION. A CORP.** shall have the right from time to time, and without prior notice to **FRANCHISEE** to send representatives to **FRANCHISEE'S** office in order to inspect **FRANCHISEE's** operations and records and to determine the faithfulness of **FRANCHISEE's** compliance with the provisions of this Agreement and the Operations Manual.

**12.9 COMPLIANCE WITH LAW. FRANCHISEE** shall operate his **A CORP.** System franchise in strict compliance with applicable laws, rules and regulations of all governmental authorities. **FRANCHISEE** shall comply with all applicable laws and regulations of the federal, state or local governments, and shall prepare and file all necessary tax returns, and pay promptly all taxes imposed upon **FRANCHISEE** and upon **FRANCHISEE's** franchised business. **FRANCHISEE** may be required to be licensed for some or all of the components of the **A CORP.** System and is solely responsible for securing and maintaining such licenses

**12.10 NO SUGGESTED SERVICE FEES. FRANCHISEE** acknowledges that any and all service fees included in the Operations Manual or other operating memoranda, are intended by **A CORP.** to be illustrative only and are not intended to be suggestive of fees to be charged by **FRANCHISEE** for particular services. **FRANCHISEE** further acknowledges that **A CORP.** does not set or enforce a fee schedule of any type. **FRANCHISEE,** in its sole discretion, shall determine the fees to be charged for licensed services performed under the **A CORP.** System.

**12.11 FRANCHISEE TELEPHONE SERVICE AND DIRECTORY LISTINGS. FRANCHISEE** shall at its sole expense maintain telephone service for the franchise and

**AA065**

shall have all of **FRANCHISEE**'s telephone numbers continuously listed and advertised in those "white pages" and "yellow page" directories which are usually and customarily distributed within the Licensed Territory, as **A CORP**. may designate or approve. All such listings shall be in the manner, style and type size and shall contain all other characteristics as **A CORP**. may designate in the Operations Manual or in operating memoranda. In all advertising placed by **FRANCHISEE** in which such listed numbers appear, there shall not appear any other telephone numbers subscribed for by **FRANCHISEE** for personal use or for the conduct of any other business. **FRANCHISEE** shall not, without **A CORP**.'s express written consent, cause or allow itself to be listed in any directories outside of the Territory. **A CORP**. shall have the right to recommend the type of telephone service, the number of telephone lines, and all matters related to the telephone service for the franchise, and **FRANCHISEE** shall promptly comply with all specifications and directives of **A CORP**. as established or modified from time to time. **FRANCHISEE** hereby irrevocably appoints **A CORP**. as its Attorney-in-Fact to assign all such telephone numbers to **A CORP**. and expressly authorizes the applicable telephone company to make such assignment upon termination or expiration of this Franchise Agreement. **FRANCHISEE** agrees to indemnify **A CORP**. as specified in Section 19.9.

13.  **RECORDS.**

13.1    **SALES RECORDS AND TAX RETURNS. FRANCHISEE** shall record all sales and shall keep and maintain accurate records. **FRANCHISEE** shall provide **A CORP**. annually with copies of federal, state and local (if applicable) income tax returns.

13.2    **PERIODIC REPORTS.** In order to assist and advise **FRANCHISEE** with respect to the operation of his business, **A CORP**. shall, at its sole discretion, require **FRANCHISEE** to furnish **A CORP**. within 15 days after the expiration of each calendar month with a profit and loss statement of the Franchise for the preceding calendar month. All such financial statements shall be prepared in accordance with the format established by **A CORP**. in the Operations Manual, and shall be certified by **FRANCHISEE** or in the case of a corporate **FRANCHISEE**, by **FRANCHISEE**'s chief executive officer or chief financial officer, as being true and correct and as being prepared in accordance with generally accepted accounting principles consistently applied from applicable period to period. In addition, within 90 days after the end of each calendar year, **FRANCHISEE** shall furnish **A CORP**. with an annual balance sheet, profit and loss statement and statement of changes in financial position, which have been certified as correct by **FRANCHISEE** and which have been prepared by an independent accountant. **A CORP**. agrees to maintain in confidence **FRANCHISEE**'s financial information and shall not disclose **FRANCHISEE**'s identity in connection with **FRANCHISEE**'s financial information.

13.3    **ADDITIONAL RECORDING SYSTEMS. FRANCHISEE** agrees to furnish to **A CORP**. all other information pertaining to the franchised business and clientele through the system developed by **A CORP**. or as **A CORP**. may, from time to time, specify in the Operations Manual. **A CORP**. shall be granted full and complete access to all records and information created by such system, including without limitation, by direct telephone, the Internet or other data communications links.

13.4    **INSPECTION AND AUDIT. FRANCHISEE** shall keep and preserve for 5 years all business records, including ledgers, credit card statements and other tax returns, bank statements, duplicate deposit slips and other evidence of gross revenues and business transactions for each such year. **A CORP**. shall have the right at any time during regular

business hours to enter **FRANCHISEE's** premises to inspect, audit and make copies of any books of accounts, bank statements, documents, records, tax returns, papers and files of **FRANCHISEE** relating to gross revenues and business transactions. Upon the request by **A CORP.**, **FRANCHISEE** shall make any such material available for inspection at **FRANCHISEE's** premises and **FRANCHISEE** shall allow **A CORP.** and its representatives to remove temporarily **FRANCHISEE's** records solely for copying, review and/or audit purposes. If **A CORP.** determines that there has been an underpayment of fees by **FRANCHISEE**, **FRANCHISEE** shall pay the amount of understatement plus interest at the rate of 18% per annum and the cost of the audit.

## 14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL

14.1    **ASSIGNMENT BY A CORP.**    **A CORP.** may freely transfer or assign its rights and obligations under this Agreement to any person, corporation or other entity. Such transfer or assignment shall be binding upon and inure to the benefit of **A CORP.**, its successors and assigns.

14.2    **ASSIGNMENT BY FRANCHISEE.**    **FRANCHISEE** acknowledges that the rights provided for in this Agreement are personal to **FRANCHISEE** and that this franchise has been granted by **A CORP.** in reliance upon the particular skills, knowledge and business ability of **FRANCHISEE**. **FRANCHISEE** agrees that he shall not sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in the assets of the franchise or **FRANCHISEE** collectively referred to herein as a "transfer" except as permitted herein. Any sale, assignment, transfer or encumbrance of this Agreement, of any of the rights granted under this Agreement, or in the ownership of the **FRANCHISE**, which is not in accordance with the terms and conditions provided in this Section 14.2 shall constitute a breach of this Agreement and shall permit **A CORP.** to terminate this Agreement immediately as provided for in Section 15.1 of this Agreement.

A.    **PERMITTED TRANSFERS.**    **A CORP.** shall not unreasonably withhold its consent to a Transfer of any interest of **FRANCHISEE** or the franchise, but shall, as a condition precedent to such consent, require that:

1.    **FRANCHISEE** first offers to sell such interest to **A CORP.** at the same price and on the same terms and conditions as it proposes to sell such interest to a third party. **FRANCHISEE** shall furnish a signed and notarized copy of the third party's offer to purchase. **A CORP.** shall have 30 days after receipt of such bona fide offer in which to exercise its right of first refusal. The failure by **A CORP.** to exercise its option shall in no way be construed to affect **A CORP.**'s decision to approve a proposed transferee. If **A CORP.** fails to exercise its option and the Franchise is not subsequently sold to the proposed transferee for any reason, **A CORP.** shall continue to have, upon the same conditions, a first option to purchase the Franchise upon the terms and conditions of a subsequent offer.    **A CORP.** shall have 30 additional days following **A CORP.**'s rejection of its right of first refusal to review the Transfer, based upon the qualifications set forth in Section 14.2A (4).

2.    All monetary obligations of **FRANCHISEE** to **A CORP.** as of the proposed date of the Transfer have been or will be paid as of such date.

3.    By the closing date for said transfer, **FRANCHISEE** shall have executed a general

**AA067**

release under seal, in a form satisfactory to **A CORP.**, of all claims against **A CORP.**, its stockholders, directors, officers, employees and assigns.

4. The transferee, in the reasonable judgment of **A CORP.**, has the financial resources, relevant work experience, character and ability to conduct successfully the business of the Franchise. The transferee shall fully disclose its financial position and obligations and other background information prior to any such Transfer.

5. The transferee shall execute **A CORP.**'s then current Franchise Agreement and related documents to govern the remaining term of the Franchise, including a copy of the Guaranty to this Agreement executed by each shareholder of the transferee, if the transferee is a corporation.

6. **FRANCHISEE** shall pay to **A CORP.** the Transfer Fee as set forth in Section 1.12; unless the transfer is to an immediate family member of **FRANCHISEE** (i.e., spouse, children or parents only); and

7. The transferee shall complete **A CORP.**'s training programs in the manner then required of new franchisees, and shall pay **A CORP.** the then required fee, unless **A CORP.** shall waive **FRANCHISEE**'s participation in the training program as specified in Section 9.1C.

B. **TRANSFER UPON DEATH OR PERMANENT INCAPACITY.** Immediately upon the death or permanent incapacity of **FRANCHISEE** or if **FRANCHISEE** is a corporation, upon its dissolution or upon the death of any person with a substantial or controlling interest in the Franchise, if requested by **FRANCHISEE**'s heirs, **A CORP.** or its agent, at its sole discretion shall be entitled to assume the operation of the Franchise in accordance with Section 17. As soon as possible thereafter, and in any event within a reasonable time, the executor, administrator, trustee or other representative of such person or entity shall transfer such interest to the heirs or beneficiaries or to a third party in accordance with Section 14.2 A above. **A CORP.**'s right to assume the operation of the Franchise shall continue until the Franchise has been transferred to an accepted transferee as provided in Section 14.2. **FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this subsection, including reasonable attorney's fees, and **A CORP.** shall receive the Transfer Fee (as specified in Section 1.12). However, if a franchise is transferred to a party who is a member of **Franchisee**'s immediate family, (i.e., spouse, children or parents only) who will continue the operation of the franchise under the terms of this Agreement, then no transfer fee shall be required. Permanent incapacity shall mean that **FRANCHISEE** cannot perform his duties under this Agreement for a period of 6 months or longer.

C. **TRANSFER TO FRANCHISEE'S CORPORATION.** If the proposed Transfer is to a corporation at least 75% percent of the stock of which is owned by **FRANCHISEE**, then **A CORP.** shall approve such Transfer provided that the transferee corporation meets the following requirements:

1. The Corporate charter and by-laws shall provide that its activities are limited to the operation of the Franchise. Copies of the charter, by-laws, any other agreements affecting stockholder rights, such as stock restriction agreements, and resolutions authorizing execution of this Agreement shall be delivered to **A CORP.** prior to execution of this Agreement, or when otherwise requested in writing by **A CORP.**

AA068

2. The ownership of the stock of such corporation shall be disclosed in writing prior to the execution of this Agreement and the charter and by-laws shall reflect that no stock shall be sold, transferred, pledged or otherwise similarly affected without compliance with this Agreement.

3. Each stock certificate shall bear the following legend: "THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN FRANCHISE AGREEMENT BETWEEN THE CORPORATION AND **A CORP.** REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND TO RESTRICTIVE PROVISIONS IN THE CHARTER OF THIS CORPORA TION."

4. The principal stockholders of **FRANCHISEE**, as determined by **A CORP.**, shall personally guarantee the payment and performance of all obligations of **FRANCHISEE** under this Agreement, and shall execute such documents as **A CORP.** may reasonably require to reflect such guaranty; and

5. In addition, **FRANCHISEE** must serve as the principal executive officer of the transferee corporation, all other shareholders of the transferee must meet the requirements of **A CORP.** and the transferee corporation must execute a new Franchise Agreement for the duration of the term, using **A CORP.**'s then current agreement. All acts and the delivery of all documents shall take place before the Transfer. Transfer to **A CORPORATION** shall be approved in a prior writing by **A CORP. FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this section, including reasonable attorney's fees.

D. **NON-WAIVER OF CLAIMS. A CORP.**'s consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims that it may have against **FRANCHISEE** or against any guarantor of this Agreement.

## 15. DEFAULT AND TERMINATION

15.1 **IMMEDIATE TERMINATION. FRANCHISEE** acknowledges that the occurrence of one or more of the following events would cause harm to the franchise system and thereby lessen its value. **FRANCHISEE** agrees that **A CORP.** shall have the right upon the occurrence of one of the following events to terminate this Agreement immediately upon notice:

A. If **FRANCHISEE** becomes insolvent or surrenders substantial control of the franchised business or a major portion of its assets by virtue of a voluntary or involuntary proceeding in bankruptcy or receivership, or by assignment for the benefit of creditors, or in the event of a similar circumstance or legal process, and such proceeding is not terminated within 30 days;

B. If **FRANCHISEE** attempts to sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in, or substantially all of the assets of the Franchise or **FRANCHISEE** except as permitted by Section 14.2;

C. If **FRANCHISEE** shall violate any provision of the Non-Competition Covenant contained in Section 18. 1;

16

**AA069**

D.  **If FRANCHISEE** shall violate any provision of the Non-Disclosure Covenant contained in Section 18.2;

E.  **If FRANCHISEE** makes any material misrepresentations relating to the acquisition of the Franchised Business;

F.  **If FRANCHISEE** is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that **A CORP.** believes is reasonably likely to have an adverse effect upon the Franchise, the Trademarks and their associated goodwill, or the **A CORP.** System; or

G.  **If FRANCHISEE** fails, for a period of 30 days after having received notification of noncompliance from **A CORP.** or any governmental or quasi-governmental agency or authority, to comply with any Federal, State or Local law or regulation applicable to the operation of the Franchised Business.

15.2  **TERMINATION WITH NOTICE. FRANCHISEE** acknowledges that the occurrence of one or more of the events specified in this Section 15.2 would cause harm to the franchise system and thereby lessen its value. Therefore, **FRANCHISEE** agrees that **A CORP.**, in addition to all other remedies at law or in equity, may terminate this Agreement if **FRANCHISEE** shall become in default of any provision of this Section 15.2 or any other provision of this Agreement, and if **FRANCHISEE** shall not cure such default within 30 calendar days for nonpayment of monies, or for other defaults after receipt of a written notice to cure from **A CORP.**, or for a longer period if so mandated by the laws of the state in which **FRANCHISEE** operates. In the event **FRANCHISEE** is in default of this Agreement within 12 months after a prior default (even if cured), and **A CORP.** has served **FRANCHISEE** with a Notice to Cure with respect to such prior default, upon notice, **A CORP.** may terminate this Agreement upon the occurrence of such subsequent default. **A CORP.** need not allow **FRANCHISEE** the opportunity to cure such subsequent default. In addition to the foregoing, **A CORP.** may, at its option, exercise its Step-In-Rights (as specified in Section 17) in the event of any default contained in this Section 15.2.

**FRANCHISEE** shall become in default under this Agreement:

A.  **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to **A CORP.** on the date due;

B.  **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other Franchisees under any Interterritorial Agreement (as specified in Section 7.2) on the date due;

C.  **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other creditors on the date due;

D.  **If FRANCHISEE** fails to submit reports or financial data which **A CORP.** requires under this Agreement, including but not limited to those specified in Section 13;

E.  **If FRANCHISEE** fails to obtain and maintain in effect the minimum insurance requirements specified in Section 12.6;

F.  Upon the closing of **FRANCHISEE's** operations for a period of 10 or more

consecutive days without the prior written approval of **A CORP**.;

**G.**   If **FRANCHISEE** fails to submit to binding arbitration of disputes as specified in Section 19.7;

**H.**   If **FRANCHISEE** changes any aspect of the **A CORP**. system or offers any service or product which has not been approved in a prior writing by **A CORP**.;

**I.**   IF **FRANCHISEE** fails to diligently, faithfully and in a business like manor, promote, market and conduct the Franchised Business within the Territory as specified in Section 3. 1B; or

**J.**   If **FRANCHISEE** fails to comply with any of the duties imposed by this Agreement, the Operations Manual or other operations memoranda issued by **A CORP**. including, without limitation, the failure to cure an operational problem.

**15.3**   **CONFORMITY WITH LAW.** Notwithstanding anything to the contrary contained in this Section, in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Franchise and the parties shall limit A CORP.'s rights of termination or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods required by such laws and regulations. **A CORP**. shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or dispute relating to this Agreement or its termination.

**A.**   **FRANCHISEE**   Shall be solely responsible for the conduct of its business and for compliance with all the laws, statutes, ordinances, orders or codes of any public or governmental authority pertaining to **FRANCHISEE** and its business operated pursuant hereto and for the payment of all taxes, permits, licenses and registration fees and other charges or assessments arising out of the establishment and operation of **FRANCHISEE'S** business.

**15.4**   **CROSS DEFAULT. If FRANCHISEE** shall be in default of any other agreement between **A CORP**. or its affiliated companies including, without limitation, any Promissory Note, then **FRANCHISEE** shall be deemed in default of this Agreement.

**15.5**   **FRANCHISEE TERMINATION OPTION. FRANCHISEE** shall have the option to terminate this Agreement, only during the initial five (5) year term, subject to adherence to the following terms and conditions:

**A.**   **FRANCHISEE** shall notify **A CORP**. in writing of his intent to terminate the Agreement no later than 90 days prior to the closing date for placement of advertisements in the yellow page book or books distributed in **FRANCHISEE's** Territory. If **FRANCHISEE** fails to notify A **CORP**. on or before such 90 day period commences, then **A CORP**. shall exercise its right pursuant to the Power of Attorney, Exhibit B, to retain all of **FRANCHISEE's** operating telephone numbers.

**B.**   **FRANCHISEE** shall pay in full all outstanding monies due to **A CORP**., and shall as well pay a one-time Franchisee Termination Fee as specified in Section 1. 14 herein.

**C.**   **FRANCHISEE** shall de-identify all aspects of **FRANCHISEE's** business operation,

**AA071**

including without limitation all forms of advertisements, all vehicle displays, and all invoices, business cards and forms, and shall choose a trade name or trade names which shall not be confusingly similar to **A CORP's** Trademarks or which might give the general public the impression that **FRANCHISEE** is continuing to operate under the **A CORP.** System. **FRANCHISEE** shall further comply with the terms of Section 16 below.

D.      Provided **FRANCHISEE** performs all of the foregoing obligations, **A CORP.** shall agree to waive its rights to enforce the non-competition covenant contained in Section 18.1 and its rights to enforce the Power of Attorney. If **FRANCHISEE** however, fails to perform any of the foregoing obligations or if **FRANCHISEE** attempts to utilize any aspect of **A CORP.**'s Trademarks or System, then **A CORP.** shall retain all rights of enforcement under Section 18.1.

## 16.    RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon termination or expiration of this Agreement, **FRANCHISEE** shall within 30 calendar days:

A.      Pay all Continuing Royalty Fees, Advertising Contributions and all other charges or debts owed to **A CORP.**, including the balance due on financing or other extension of credit granted or given by **A CORP** to **FRANCHISEE**.

B.      Cease to hold himself or herself out as an **A CORP.** System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by **A CORP.** and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the **A CORP.** office licensed by this Agreement and from all vehicles. **FRANCHISEE** shall contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisement, listings, or domains and, within 60 days, work to ensure that the change or deletion is completed.

C.      Return to **A CORP.** all manuals and printed materials belonging to **A CORP.** or bearing the Trademarks.

D.      Except with respect to termination under Section 15.5, at the option of **A CORP.**, **FRANCHISEE** shall:

     1.   Remove all equipment, furnishings and printed materials from the office premises; or
     2.   Sell such equipment, furnishings and printed materials to **A CORP.** at their then current fair market value, as determined by **A CORP.** In no event shall **A CORP.** be liable for payment to **FRANCHISEE** for intangibles including, without limitation, goodwill;
     3.   Assign to **A CORP.** the lease for the franchised premises; and
     4.   Execute such documents as **A CORP.** may reasonably require to effectuate termination of the Franchise and **FRANCHISEE**'s rights to use the Trademarks and the **A CORP.** System including, without limitation, release documents.

**A CORP.** retains the right to enforce the Power of Attorney executed in conjunction with this agreement.

## 17.    STEP-IN-RIGHTS

**AA072**

17.1    **CAUSE FOR STEP-IN.    A CORP.**, at its sole discretion, may exercise the following Step-In Rights in order to prevent an interruption of the Franchised Business which would cause harm to the franchise system and thereby lessen its value. In the event of **FRANCHISEE's** default (as specified in Section 15 herein) or in the event of the death or permanent incapacity of **FRANCHISEE** (as specified in Section 14.2 B), **FRANCHISEE** authorizes **A CORP.** to operate his franchise for as long as **A CORP**. shall deem necessary and practical or upon transfer to an approved franchisee under Section 14.2. Such Step-In Rights shall be exercised without waiver of any other rights or remedies which **A CORP**. may have under this Agreement.

17.2    **DUTIES OF PARTIES.    A CORP.** shall keep in a separate account all monies  generated by the operation of **FRANCHISEE's** business by **A CORP.'s** representatives. **A CORP**. shall deduct all expenses of the business, including reasonable compensation and expenses for **A CORP.'s** representatives from this separate account. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

18.    **NON-COMPETITION AND NON-DISCLOSURE COVENANTS**

18.1    **NON-COMPETITION.    FRANCHISEE** agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither **FRANCHISEE** nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the **A CORP**. System. Such obligation shall apply within the Territory, within 100 miles of the Territory or within 100 miles of any territory covered by another **FRANCHISEE** of **A CORP**. or operated by **A CORP.'s** affiliates. **FRANCHISEE** further agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, **FRANCHISEE** and the persons covered by this section shall not attempt to solicit for employment any person who is, at the time of such solicitation, employed by **A CORP**. or any other franchisee of **A CORP.**, nor induce any such person to leave his or her employment.  **FRANCHISEE** agrees that as a condition of his affiliation with **A CORP.**, its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by **A CORP. FRANCHISEE** acknowledges that such prohibitions are necessary to protect **A CORP.'s** trade secrets and to otherwise insure the integrity of the **A CORP.** System and the rights of **A CORP.'s** other franchisees. The amounts of time and distance set forth above may be deemed to be divisible into units of one month and one mile and may be reduced should a court find them to be unreasonable. **A CORP.**, in addition to such other rights it may have, shall have the right to injunctive relief to enforce its rights pursuant to this provision. The violation of this provision during the term of the Agreement shall result in the automatic termination of the franchise as specified in Section 15.1.

18.2    **NON-DISCLOSURE. FRANCHISEE** acknowledges that disclosure of any aspect of the System or duplication or disclosure of this Agreement, or the Operations Manual could substantially harm **A CORP., FRANCHISEE** and other franchisees of **A CORP. FRANCHISEE** agrees that at no time during or after the term of this Agreement or early termination for whatever reason will he or she disclose, either orally or in writing or by any other medium, or duplicate or in any way make available the contents of the Operations Manual, this Agreement, any other documents, videotapes, materials, or any trade secrets, formulas or other aspects of the System to any person, corporation or other entity other than

**AA073**

FRANCHISEE attorneys, accountants or similar parties. Such persons may have access to such materials only to the extent necessary for the transaction of business by FRANCHISEE. No such person shall be permitted to retain any software, materials or copies of or notes concerning any such materials. All of the foregoing shall be returned to **A CORP.** immediately upon termination or expiration of this Agreement. The prohibition of this section applies equally to all stockholders, directors, officers, and employees of **FRANCHISEE. A CORP.** shall have the right to injunctive relief to enforce the provisions of this Section. The violation of this provision during the term of the Agreement shall result in the automatic termination of the Franchise, as specified in Section 15. 1.

## 19. GENERAL CONDITIONS AND PROVISIONS

19.1 **TITLES FOR CONVENIENCE.** Section and paragraph titles used in this Agreement are for convenience only and are not deemed a part of the text.

19.2 **ENTIRE AGREEMENT.** This Agreement, including appendices and attachments, constitutes the entire agreement of the parties (and into which all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter are merged) and except as otherwise provided, there are no other oral or written understandings or agreements between the parties relating to the Franchise. Nevertheless, nothing in this Agreement or in any related agreement is intended to disclaim the representation that we have made in the franchise disclosure document.

19.3 **AMENDMENT IN WRITING.** No amendment or other modification of this Agreement shall be valid or binding on either party, unless reduced to writing and executed by the parties.

19.4 **RELATIONSHIP**
A. **FRANCHISEE** is an independent contractor and is not the agent, joint venturer, partner or employee of **A CORP.** and, except as expressly provided in this Agreement, **A CORP.** shall not be obligated by any agreements, representations or warranties made by **FRANCHISEE** to any person, nor with respect to any other action of **FRANCHISEE**, nor shall **A CORP.** be obligated for any damages or monetary obligations of any sort to any person whether caused by **FRANCHISEE**'s action, failure to act, negligence, or willful conduct.

B. Except as expressly set forth herein, **A CORP.** does not reserve control over nor take responsibility for the conduct or actions of any of **FRANCHISEE**'s owners, directors, or employees, nor shall **A CORP.** have any control over the employment, discharge, compensation or working conditions of any such owner, director or employee of **FRANCHISEE.**

C. **FRANCHISEE** shall identify himself in all aspects of his business operation, including on all forms and in all advertisements, as being: "Independently Owned and Operated".

19.5 **NO WAIVER.** No waiver by **A CORP.** of any breach or series of breaches or defaults in performance by **FRANCHISEE**, and no failure, refusal or neglect of **A CORP.** to exercise any right, power or option given to it or to insist upon strict compliance with or performance of **FRANCHISEE**'s obligations, under this Agreement or the Operations Manual, shall constitute a waiver of any provision of this Agreement or the Operations Manual with respect to any subsequent breach or a waiver by **A CORP.** of its right at any time thereafter to

**AA074**

require exact and strict compliance with the provisions of this Agreement.

19.6    **GOVERNING LAW.** This Agreement shall be governed and construed under and in accordance with the laws of the Commonwealth of Massachusetts. **A CORP** and **FRANCHISEE** agree that any action arising out of or relating to this agreement will be brought by the parties only in a Massachusetts state court of Middlesex County, Massachusetts or the United States District Court for the District of Massachusetts in Boston, Massachusetts. **A CORP** and **FRANCHISEE** hereby consent to the jurisdiction of such Courts and further agree to waive any rights or objections to the jurisdiction or venue of any such actions when filed in such courts. If any part or provision of this Agreement is held or declared invalid by a court of competent jurisdiction, such holding or declaration shall affect only that particular part or provision of this Agreement and all other parts or provisions of this Agreement shall continue in full force and effect.

19.7    **MEDIATION AND ARBITRATION. A CORP.** and **FRANCHISEE** agree as a condition to this Agreement to engage in mediation and arbitration prior to the commencement of any court action, except as set forth in Section 19.7 H. **FRANCHISEE**'s failure to submit to mediation and arbitration, shall be deemed a default under Section 15.2. If **A CORP.** must engage an attorney to enforce its rights under this Agreement, **FRANCHISEE** shall reimburse **A CORP.** for all of its reasonable attorney's fees, court costs and expenses incurred in connection with such legal action.

A.    Before the commencement of any arbitration, **FRANCHISEE** and **FRANCHISOR** shall submit to the following mediation process:

1.    **FRANCHISEE** shall promptly submit in writing the nature of his grievance with **A CORP.** along with any reasonable suggestions for the dispute's possible resolution; and

2.    Within 30 days, the **FRANCHISEE** shall attend a mediation meeting with **A CORP.** in Boston, Massachusetts to discuss in detail the dispute and to work towards its possible resolution. **A CORP.** shall select the mediator. **FRANCHISEE** and **A CORP.** shall share equally in the cost of the mediation session.

If the parties are unable to reach an amicable solution, then the dispute shall be submitted to arbitration as described below:

B.    Prior to any arbitration proceeding taking place, **A CORP.** and **FRANCHISEE** shall, have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect to the controversy or claim being arbitrated. These hearings shall be held in Boston, Massachusetts.

C.    Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claim that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. **A CORP.** and **FRANCHISEE** agree that arbitration shall be conducted on an individual and not a class-wide basis.

**AA075**

D. If, however, a court of competent jurisdiction determines that any such provisions of this Agreement are unlawful-in any way, such court may modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision of this Agreement by which this Agreement shall be governed by and construed under Massachusetts law, all issues relating to arbitration or the enforcement of this Agreement to arbitrate contained herein shall be governed by the United States Arbitration Act, 9 U.S.C. § I et seq., and the federal common law of arbitration.

E. Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. Except as provided for in Sections 19.9 and 19. 10,    A CORP. and FRANCHISEE (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damage sustained by it.

F. This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear. The arbitration proceedings shall take place in Boston, Massachusetts unless otherwise agreed by A CORP. and FRANCHISEE.

G. A CORP. and FRANCHISEE agree that no action (whether for arbitration, damages, injunctive, equitable or other relief, including but not limited to rescission) will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this agreement or otherwise, unless brought before the expiration of the earlier of 1 year after the date of discovery of the facts resulting in such alleged liability or obligation or 2 years after the date of the first act or omission giving rise to such alleged liability or obligation, except that where state or federal law mandates or makes possible by notice or otherwise a shorter period, such shorter period shall apply.

H. The obligation to arbitrate or mediate shall not be binding upon either party with respect to claims relating to A CORP.'s trademarks, service marks, patents or copyrights; request for temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

19.8    **NOTICES.**
All written notices to A CORP. permitted or required to be delivered by the provisions of this Agreement or the Operations Manual shall be deemed so delivered 3 days after being placed in the United States Mail, by Certified Mail, Return Receipt Requested, or by receipted overnight carrier to A CORP., 268 Rangeway Road, P.O. Box 290, N Billerica, Massachusetts 01862, Attn. President or to such other address or addresses as A CORP. shall from time to time designate in the Operations Manual or in writing to FRANCHISEE at the location described in Section 1.2 above, or to such other address as FRANCHISEE may from time to time designate in writing to A CORP.

19.9    **INDEMNIFICATION. FRANCHISEE** agrees to hold A CORP. harmless and indemnify A CORP. and its officers, agents and employees of and from all suits, actions, claims and

**AA076**

other proceedings brought by any and all persons or entities as a result of services, representations, conduct or work performed by **FRANCHISEE**, its agents, employees, subcontractors or assigns, or in the event **A CORP.** exercises the Step-In-Rights specified in Section 17. **FRANCHISEE** agrees to pay any and all expenses or fees, including reasonable attorney's fees, incurred by **A CORP.**, its affiliates, subsidiaries or agents, resulting from any and all claims brought by or against **FRANCHISEE**, its officers, directors, employees or stockholders.

**FRANCHISEE** shall indemnify and hold **A CORP.** harmless of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance of Exhibit B, Power of Attorney.

The above indemnification provisions shall not be construed, with regard to a particular claim, to apply to any claim where its operation would be against public policy. It is the intent of the provisions above to permit the maximum indemnification of **A CORP.** by **FRANCHISEE** as permitted by law.

19.10   **LIMITATION OF LIABILITY OF A CORP.   If A CORP.** shall be found liable to **FRANCHISEE** for any claim based upon this Agreement, **A CORP.**'s liability shall be limited to the amount of the initial Franchise Fee (specified in Section 1.7 herein) that has actually been paid by **FRANCHISEE** at the time of judgment.

In no event will **A CORP.**, any affiliate, agent, or employee of **A CORP.** be liable for any other damages including, but not limited to, loss of business, revenues or profits. **FRANCHISEE** agrees that this limitation of liability will apply to any claim **FRANCHISEE** shall have against **A CORP** limited to, claims based on contract violations, torts (such as negligence) or strict liability.

19.11   **LATE PAYMENT FEES.** If **FRANCHISEE** fails to pay **A CORP.** all or any portion of the Continuing Royalty, or Marketing Fund Contribution or any other obligation due to **A 1CORP.**, promptly when due, **FRANCHISEE** shall pay to **A CORP.** a late payment fee equal to 18% per annum of such delinquent payments. Notwithstanding the foregoing, if the amount of the late payment fee shall be greater than any such charge permitted by applicable law, such charge shall be reduced to an amount equal to the maximum lawful charge, it being the intention of the parties that such late charge shall in no event be greater than that permitted by law.

19.12   **SURVIVAL OF COVENANTS.**  The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of  this Agreement, shall be enforceable notwithstanding the expiration or other termination of this Agreement for any reason whatsoever.

20.    **CAVEAT**

The success of the business venture contemplated to be undertaken by **FRANCHISEE** by virtue of this Agreement is speculative and depends to a large extent upon the ability of **FRANCHISEE** as an independent business person as well as other factors.  **A CORP.** does not make any representation or warranty as to the potential success of the business venture contemplated by this Agreement.

**AA077**

**FRANCHISEE** recognizes and understands that he or she may incur other expenses and/or obligations as part of the initial investment in the franchised business or on an ongoing basis which the terms of this Agreement may not address, and which include without limitation initial equipment and supplies, advertising expenses, telephone, insurance, grand opening promotions and working capital necessary to commence operation.

**FRANCHISEE** acknowledges that he or she has read this Franchise Agreement as well as the Disclosure document, and that he or she has been give the opportunity to clarify provisions that he did not understand and to consult with an attorney or other professional advisor. **FRANCHISEE** represents that he or she understands and agrees to be bound by the terms, conditions and obligations of this Agreement.

**FRANCHISEE** acknowledges that he or she may have to prepare for and pass certain local and state mandated examinations in order to operate the Franchise. **FRANCHISEE** alone shall be responsible for the preparation and successful completion of all examinations.

**FRANCHISEE** acknowledges that he or she has entered into this Agreement after making an independent investigation of **A CORP.'s** operations and not upon a representation by **A CORP.** as to profits which **FRANCHISEE** might expect to realize. **FRANCHISEE** acknowledges that prior to the execution of this Agreement, **FRANCHISEE** has had the opportunity to contact existing franchisees of **A CORP.**

21.    **RELEASE**

**FRANCHISEE**, his heirs and assigns, hereby remises, releases and forever discharges **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, warranties, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which **FRANCHISEE**, his heirs and assigns now have or ever had against **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents, from the beginning of time until this day.

*[The remainder of the page intentionally left blank]*
*[Signature page follows on the next page]*

**IN WITNESS WHEREOF** the parties intending to be bound legally, have fully executed, sealed and delivered this Agreement as of the day and year first above written.

A CORP., FRANCHISOR

Witness

By: _____
Officer

_11-18-19_
Date

_____
Witness

By: **Quality Air Care Corporation, FRANCHISEE**

Officer – Klodian Belegu

_8-29-19_
Date

**AA079**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NY | West Chester | Amawalk | 10501 | 1,219 |
| NY | West Chester | Armonk | 10504 | 7,987 |
| NY | West Chester | Baldwin Place | 10505 | 851 |
| NY | West Chester | Bedford | 10506 | 5,790 |
| NY | West Chester | Bedford Hills | 10507 | 6,408 |
| NY | West Chester | Briarcliff Manor | 10510 | 9,988 |
| NY | West Chester | Buchanan | 10511 | 2,246 |
| NY | West Chester | Chappaqua | 10514 | 11,946 |
| NY | West Chester | Crompond | 10517 | 539 |
| NY | West Chester | Cross River | 10518 | 1,268 |
| NY | West Chester | Croton Falls | 10519 | 316 |
| NY | West Chester | Croton on Hudson | 10520 | 12,810 |
| NY | West Chester | Croton on Hudson | 10521 | 0 |
| NY | West Chester | Golden Bridge | 10526 | 1,809 |
| NY | West Chester | Granite Springs | 10527 | 908 |
| NY | West Chester | Hawthorne | 10532 | 4,931 |
| NY | West Chester | Jefferson Valley | 10535 | 555 |
| NY | West Chester | Katonah | 10536 | 10,739 |
| NY | West Chester | Lincondale | 10540 | 0 |
| NY | West Chester | Maryknoll | 10545 | 141 |
| NY | West Chester | Millwood | 10546 | 1,277 |
| NY | West Chester | Mohegan Lake | 10547 | 7,647 |
| NY | West Chester | Montrose | 10548 | 3,487 |
| NY | West Chester | Mount Kisco | 10549 | 16,638 |
| NY | West Chester | North Salem | 10560 | 4,737 |
| NY | West Chester | Ossining | 10562 | 31,796 |
| NY | West Chester | Peekskill | 10566 | 23,570 |
| NY | West Chester | Cortlandt Manor | 10567 | 19,929 |
| NY | West Chester | Pleasantville | 10570 | 12,680 |
| NY | West Chester | Pound Ridge | 10576 | 5,116 |
| NY | West Chester | Purdy's | 10578 | 681 |
| NY | West Chester | Shenorock | 10587 | 0 |
| NY | West Chester | Shrub Oak | 10588 | 2,282 |
| NY | West Chester | Somers | 10589 | 8,475 |
| NY | West Chester | South Salem | 10590 | 6,767 |
| NY | West Chester | Tarrytown | 10591 | 22,540 |
| NY | West Chester | Thornwood | 10594 | 5,117 |
| NY | West Chester | Valhalla | 10595 | 8,195 |
| NY | West Chester | Verplanck | 10596 | 1,729 |
| NY | West Chester | Waccabuc | 10597 | 968 |
| NY | West Chester | Yorktown Heights | 10598 | 28,647 |

**AA080**

Total Unit(s)[1] Population: 292,729

Initials: _____
A CORP

Date: _11-18-19_

Initials: _____
FRANCHISEE

Date: _9-29-18_

---

[1] One unit is equal to 125,000 populations.

Rooter Man Franchise Agreement.2019                    28

**AA081**

# EXHIBIT A

## GUARANTY OF PERFORMANCE

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____

Date: _____

By: _____

Date: _____

To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

**Quality Air Care Corporation, FRANCHISEE**

By: *P Bgebegu*
Klodian Belegu

Date: *9 - 23 - 19*

By: _____

Date: _____

**AA082**

# EXHIBIT D

**AA083**



# EXHIBIT E



September 16, 2024

**<u>VIA FEDEX AND EMAIL (qacpic@gmail.com</u>)**

Klodian Belegu
692 Sussex Court
Toms River, New Jersey  08753

### <u>RE: ROOTERMAN NOTICE OF TERMINATION</u>

Dear Mr. Belegu,

Reference is hereby made to those certain 13 franchise agreements (collectively hereinafter referred to as the "Franchise Agreements") between yourself and Rooterman, LLC ("Rooterman") for the operation of Rooterman franchised businesses in and around the state of New Jersey. This correspondence follows the Notice of Default and Demand for Cure ("Default Notice") you were sent on August 13, 2024, requiring you to bring your balance due and owing to Rooterman current within 30 calendar days.  You have failed to do so and as such, pursuant to the terms of your Franchise Agreements, **<u>all of your Franchise Agreements are terminated effective immediately.</u>**

As a result of this termination, I would remind you that you are required to **immediately comply** with all of the post-termination provisions of the Franchise Agreements, including your obligations to comply with the **covenant not to compete**, to **cease using our trademarks**, to **disconnect or assign to us all telephone numbers** you use in the operations of your franchised business, and **assigning us ownership of all google business profiles** you use in the operation of your franchised business (please use this email address for assigning such ownership to us: digital@premiumservicebrands.com).

Please understand that the last thing we wished to do was to terminate our franchise relationship with you, but your failure to meet your contractual obligations and cure your defaults specified in the Default Notice could not be ignored.  Rooterman hereby reserves all of its rights and remedies associated with your material default and the corresponding termination of your Franchise Agreements.

Should you have any questions, please do not hesitate to contact me.

Regards,

Nathan King
General Counsel

cc:    Finance (via Email)
       Paul Flick (via Email)
       Carter Purves (via Email)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Rooterman, LLC | Klodian Belegu, Quality Air Care Corporation and RM Water Damage Restoration |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant _____ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Jeffrey Rosin<br>O'Hagan Meyer, PLLC | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment & Enforcement of Judgment<br>151 Medicare Act<br>152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>153 Recovery of Overpayment of Veteran's Benefits<br>160 Stockholders' Suits<br>190 Other Contract<br>195 Contract Product Liability<br>196 Franchise | **PERSONAL INJURY**<br>310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers' Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Personal Injury - Medical Malpractice | 625 Drug Related Seizure of Property 21 USC 881<br>690 Other | 422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>820 Copyrights<br>830 Patent<br>835 Patent - Abbreviated New Drug Application<br>[X] 840 Trademark<br>880 Defend Trade Secrets Act of 2016 | 375 False Claims Act<br>376 Qui Tam (31 USC 3729(a))<br>400 State Reapportionment<br>410 Antitrust<br>430 Banks and Banking<br>450 Commerce<br>460 Deportation<br>470 Racketeer Influenced and Corrupt Organizations<br>480 Consumer Credit (15 USC 1681 or 1692)<br>485 Telephone Consumer Protection Act<br>490 Cable/Sat TV<br>850 Securities/Commodities/Exchange |
| | **PERSONAL INJURY**<br>365 Personal Injury - Product Liability<br>367 Health Care/Pharmaceutical Personal Injury Product Liability<br>368 Asbestos Personal Injury Product Liability | | | |
| **REAL PROPERTY** | **PERSONAL PROPERTY**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | **LABOR**<br>710 Fair Labor Standards Act<br>720 Labor/Management Relations<br>740 Railway Labor Act<br>751 Family and Medical Leave Act<br>790 Other Labor Litigation<br>791 Employee Retirement Income Security Act | **SOCIAL SECURITY**<br>861 HIA (1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g))<br>864 SSID Title XVI<br>865 RSI (405(g)) | 890 Other Statutory Actions<br>891 Agricultural Acts<br>893 Environmental Matters<br>895 Freedom of Information Act<br>896 Arbitration<br>899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>950 Constitutionality of State Statutes |
| 210 Land Condemnation<br>220 Foreclosure<br>230 Rent Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property | **CIVIL RIGHTS**<br>440 Other Civil Rights<br>441 Voting<br>442 Employment<br>443 Housing/Accommodations<br>445 Amer. w/Disabilities - Employment<br>446 Amer. w/Disabilities - Other<br>448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>463 Alien Detainee<br>510 Motions to Vacate Sentence<br>530 General<br>535 Death Penalty<br>**Other:**<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br>560 Civil Detainee - Conditions of Confinement | **FEDERAL TAX SUITS**<br>870 Taxes (U.S. Plaintiff or Defendant)<br>871 IRS—Third Party 26 USC 7609<br>**IMMIGRATION**<br>462 Naturalization Application<br>465 Other Immigration Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [ ] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC Sec. 1114, 1125

Brief description of cause:
Trademark Infringement and Breach of Contract

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ $500,000

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes  [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE _____ DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 12.5.24 | /s/ Jeffrey M. Rosin |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

AA087

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) Rooterman, LLC v. Klodian Belegu, et al

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

☐    I.    **160, 400, 410, 441, 535, 830\*, 835\*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.**

☑    II.    **110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820\*, 840\*, 895, 896, 899.**

☐    III.    **120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.**
         **\*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.**

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
     YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
     YES ☐    NO ☑

     If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
     YES ☐    NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
     YES ☐    NO ☑

7. Do <u>all</u> of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - <u>(See Local Rule 40.1(d)).</u>
     YES ☐    NO ☑

     A.    If yes, in which division do <u>all</u> of the non-governmental parties reside?
         Eastern Division ☐    Central Division ☐    Western Division ☐

     B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
         Eastern Division ☑    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
     YES ☐    NO ☐

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** Jeffrey Rosin

**ADDRESS** 140 Kendrick St, Building C, Needham MA 02494

**TELEPHONE NO.** 671-843-6801

**(CategoryForm11-2020.wpd )**

**AA088**

# EXHIBIT A

**AA089**



📞 CALL US NOW!

Rooter Man of NJ is the number one choice for **professional plumbers** and **drain cleaners**. We offer fast, reliable services that will help you when it matters most!

Serving all of **New Jersey**, **Staten Island New York**, and **Bucks County Pennsylvania**



BOOK A PLU...    ...D YOU

**AA090**

CALL US NOW! |
24/7




📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f    X    ⊙    ⌂



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



### RESIDENTIAL PLUMBING

Rooter-Man residential plumbers install, repair, and maintain pipes in the drainage system for homes.

**AA091**





## COMMERCIAL PLUMBING

Our commercial plumbers are specialized plumbers who work on retail & commercial businesses.

📞 (888) 317-1702   ✉ info@rootermanplumberservices.com   f  𝕏  ⊙  🔊



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



**EMERGENCY REPAIR**

Our emergency plumbers can find the cause of backups, leaks, sump pump failures, and flooding fast!

# Rooter-Man Plumber Services

- 24/7 Emergency Plumbing Services
- Drain Cleaning & Clog Removal
- Garbage Disposal Services

AA093


- And Much More!

VIEW ALL SERVICES



## 📞 NEED A 24/7 EMERGENCY PLUMBER?

Call Us Direct To Speak With One Of Our Coordinators & Have A Rooter Man of NJ Plumber Immediately Dispatched To Diagnose & Repair Your Plumbing Emergency!

**AA094**

CALL US NOW! | 24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f 𝕏 ⦿ ⌗



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



# We Work With Your Budget

We understand that plumbing repairs and emergencies can incur unexpected costs which is why we strive to offer the lowest prices throughout New Jersey when compared to our competitors. We offer a service guarantee and same-day plumbing services.

CALL NOW TO SCHEDULE AN APPOINTMENT

# Schedule Your Same-Day Appointment & Let Us Do the Rest

We have plumbers available 24/7 ready to help you with almost any plumbing repair, clogged drain, leaky pipes, water damage & flooding, garbage disposals, toilets and much more!

SPEAK TO ONE OF OUR BOOKING AGENTS NOW






# Find A Rooter-Man Plu... You

Contact us now to quickly dispatch a certified Rooter-Man technician near you!

CLICK HERE TO SCHEDULE

# We Fix All Types Of Plumbing Problems

We know that you want the best for your home, family, and business, which is why we strive to provide quality workmanship. Our plumbing technicians are certified in inspections as well as repairs – guaranteed!

AA096



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



Learn More

## Leak Detection

We can help you locate the problem and repair it quickly and affordably.



Learn More

## Drain Cleaning

Rooter-Man has over 50+ years of experience unclogging drains of all types.

**AA097**




Learn More

## Video Inspections

Video pipe inspections check the insides of pipes in your home or business.



Learn More

## Water Jetting

Affordable water jetting services that can immediately clear debris from your lines.

CALL US NOW! |
24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f    𝕏    📷    🔊



24/7 EMERGENCY SERVICE    SERVICES ˅    BLOG    CONTACT

SCHEDULE SERVICE



Learn More

# Toilet Repair

Rooter-Man provides a wide range of toilet repair and installation services.



Learn More

# Sump Pumps

We provide sump pump installation, maintenance, and repair services.

## VIEW ALL SERVICES

**AA099**



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    🔵 ✕ 🔵 🔵

**24/7 EMERGENCY SERVICE**     **SERVICES** ⌄     **BLOG**     **CONTACT**

SCHEDULE SERVICE



out some of our reviews below; we think this will help make sure your decision about who handles your plumbing repairs goes smoothly (and without any surprises!).

# Latest Reviews

**Shore D.**

2/11/2024

Rooter man of nj is the best plumbing service I've ever used, the reason why is because of employees like Everest who was outstanding and very professional from every aspect I will most definitely be using this service again thank you so much

read more

**Elizabeth**

1/10/2024

I am very pleased with the quality of work and integrity of the Plummer sent out for the job. He showed up on a Friday night and diagnosed and repaired a major clog in my kitchen "P" pipe. He worked meticulously and took his time to make sure the clog was resolved. I high...

read more

**Mikel H.**

7/09/2024

Incredible service plumbing job was awesome!

# 24/7 "Plumber Near Me" Technicians You Can Trust

**AA100**



CALL US NOW! | 24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  𝕏  ⊙  🗊

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE



### NO HIDDEN FEES

We take pride in offering plumbing services with no trip charges (during regular business hours) and no hidden fees.



### GUARANTEED WORKMANSHIP

Our friendly, professional plumbing technicians are ready to help the same day. Guaranteed to get you the prompt, effective service you deserve.



### SERVING YOUR AREA

Rooter-Man has local plumbers that serve your area 24/7. Don't hesitate to give us a call as we can dispatch a plumber to help the same day!

# Latest Blog Posts

AA101




### Find Reliable 24 Hour Sump Pump Repair Near Me

by Blog | Dec 4, 2024 | Plumber Services

```html Find Reliable 24 Hour Sump Pump Repair Near Me When it comes to safeguarding your home from potential water damage, having a reliable sump pump in place is crucial. Sump pumps play a vital role in redirecting excess water away from your foundation, especially...

read more





24/7 EMERGENCY SERVICE      SERVICES ⌄      BLOG      CONTACT

SCHEDULE SERVICE



## Finding a Natural Gas Plumber Near Me: Your Local Guide

by Blog | Dec 2, 2024 | Plumber Services

```html Finding a Natural Gas plumber near me: Your Local Guide When it comes to maintaining the safety and efficiency of your home's gas systems, finding a reliable natural gas plumber near me is essential. Natural gas plumbing requires specialized knowledge and...

read more

« Older Entries

# WHY CHOOSE ROOTER MAN OF NJ?

In the plumbing business, experience matters. Our team of **certified plumbers** has successfully resolved countless emergencies. When you choose **Rooter Man of NJ**, you're choosing expertise, reliability, and peace of mind.

**AA103**

📞 (888) 317-1702  ✉ info@rootermanplumberservices.com  f  X  📷  🔊



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

## TO SCHEDULE SERVICE CLICK HERE

# ROOTER MAN OF NJ IS TRUSTED BY:

        

## AREAS WE SERVICE

Atlantic County | Bergen County | Burlington County | Camden County | Cape May County | Cumberland County | Essex County | Gloucester County | Hudson County | Hunterdon County | Mercer County | Middlesex County | Monmouth County | Morris County | Ocean County | Passaic County | Salem County | Somerset County | Sussex County | Union County | Warren County

## *"Plumbers You Can Rely On."*

-5 Star Google Reivews

CALL NOW TO SCHEDULE

AA104



CALL US NOW! |
24/7

📞 (888) 317-1702     ✉ info@rootermanplumberservices.com     f  X  📷  🔊

24/7 EMERGENCY SERVICE        SERVICES ⌄        BLOG     CONTACT

SCHEDULE SERVICE

# *"Plumbers You Can Rely On."*

-5 Star Google Reivews

CLICK HERE TO SCHEDULE

**AA105**



📞 (888) 317-1702   ✉ info@rootermanplumberservices.com   f   𝕏   ⊙   ⌥

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE





AA106



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  ⌾  ⌁

**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

**SCHEDULE SERVICE**

## QUICK LINKS

Plumber Services

24/7 Emergency Plumbers

Water Damage Restoration

Drain Cleaning

Pipe Repair Services

Sump Pump Repair & Installation

Leak Detection

Toilet Repair & Installation

Hydro Jetting / Water Jetting

Video Inspections

Sewer Pump Repair & Installation

Garbage Disposal Repair & Installation

## CONTACT US

Main Office:

**Rooter Man of NJ**

1049 Church Rd.

Toms River, NJ 08755

T. 888-317-1702

E. info@rootermanplumberservices.com

Hours:

Mon-Thurs: 5:00am – 10:00pm

Friday: 5:00am – 6:00pm

Saturday: 9:00am – 5:00pm

Sunday: 9:00am – 3:00pm

Serving all of New Jersey

**AA107**

📞 (888) 317-1702   ✉ info@rootermanplumberservices.com    



**24/7 EMERGENCY SERVICE**   **SERVICES** ⌄   **BLOG**   **CONTACT**

**SCHEDULE SERVICE**



Copyright 2023 Rooter-Man Plumbing & Drain Cleaning. All rights Reserved.

Operated as an Independent Franchise All available services, hours of operations, pricing structure, and guarantees may vary by location.

**Privacy Policy**

**AA108**

# EXHIBIT B

**AA109**

# TRADEMARK ASSIGNMENT AGREEMENT

This Assignment Agreement effective January 20, 2022 is made by and between:

**A CORP.,** a Massachusetts stock corporation, having a principal office address located at 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862 (the "Assignor"); AND

**ROOTERMAN, LLC**, a Delaware limited liability company, having a principal office address located at 126 Garrett Street, Suite J, Charlottesville, Virginia 22902 (the "Assignee").

The Assignor and the Assignee are hereinafter referred to, individually, as "Party" and collectively, as "Parties".

WHEREAS, the Assignor is the proprietor and beneficial owner of the trademarks (the "Trademarks") of which the particulars are set forth as follows and in Exhibit A hereto:

"ROOTER-MAN"
Registration Date:  September 3, 1991
Registration No.:  1,655,782



"A ROOTER-MAN TO THE RESCUE"
Registration Date:  August 20, 1991
Registration No.:  1,654,512



"ROTOR-MAN"
Registration Date:  August 2, 1991
Registration No.:  1,848,341



**AA110**

"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date:  August 14, 2012
Registration No.: 4,189,503



**AA111**

"SEWER MAN"
Registration Date: January 18, 2000
Registration No. 2308796



"ROOTERMAN (words only)"
Registration Date: October 12, 2010
Registration No. 3,859,654



"ROOTERMAN TO THE RESCUE"
Registration Date: March 17, 2020
Registration No. 6,013,446



"RM"
Registration Date: March 17, 2020
Registration No. 6,013,441



**AA112**

"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,468



"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,470



The trademarks listed below were registered with Canadian Intellectual Property Office by A CORP.:

"ROOTER-MAN"
Registration Date: June 25, 2002
Registration No.:  TMA563953



"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date: October 2, 2002
Registration No.:  TMA568429



**AA113**

"SEWER MAN"
Application Date: October 2, 2019
Application No. 1988014



Whereas, The Assignee desires to acquire from the Assignor all of Assignor's right, title and interest in and to the Trademark registrations, together with the benefit of any use of the Trademarks by the Assignor, and the goodwill of the business relations to the Trademarks and to the wares or services associated with them, to hold unto the Assignee absolutely.

NOW THEREFORE, in consideration of the payment of $250,000 for federal registrations and $38,000 for state registrations, totaling Two Hundred Eighty-Eight Thousand Dollars ($288,000.00), and for good and valuable consideration, the receipt, sufficiency, and adequacy of which is hereby acknowledged the Assignor and the Assignee hereby agree as follows:

1. The Assignor hereby sells, transfers and assigns to the Assignee, its successors and assigns, the Assignor's entire right, title and interest in and to the Trademark s application and/or registrations, together with (i) the benefit of any use of the Trademark by the Assignor (ii) the goodwill of the business relations to the Trademark and to the wares or services associated with it, (iii) all income, royalties and damages hereafter due or payable to Assignor with respect to the Trademark(s) to hold unto the Assignee absolutely. Nevertheless, Parties agree that Assignee shall not be entitled to any settlement proceeds and/or award in connection with *A Corp. v Palmetto Investments LLC, et al.,* United States District Court, District of Massachusetts, Civil Action No. 20-cv-11901-MLW.

2. The Assignor incorporates by reference its ownership rights, representations, and warranties set forth in the Asset Purchase Agreement by and between A Corp., Donald MacDonald, as Beneficial Owner of A Corp., and Rooterman, LLC with respect to the Trademarks, subject to all conditions, limitations, limitations on liability and restrictions as set forth therein.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on their behalf by their duly authorized officers and representative on this 20th day of January 20, 2022.

For and on behalf of the Assignor:

**A Corp., a Massachusetts corporation**

DocuSigned by:

*Donald MacDonald*

5273E2256A59407...

Donald MacDonald, President

**AA114**

<u>Exhibit A</u>

<u>U.S. and Canadian Marks</u>

| No. | Description | Registration Number | Notes |
|-----|-------------|---------------------|-------|
| 1 | Rooterman Marketing and Advertising Promotions Materials | In Commerce Protection Only | P. 1-20 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 2 | Trademark (TM): Rooterman Plumbers to the Rescue (and Design) | 2433386 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 3 | TM: Sewer Man (and Design) | 2308796 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 4 | TM: A Rooterman to the Rescue (and Design) | 1654512 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 5 | Rooter-Man (and Design) | 1655782 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 6 | Termanator (and Design) | 1688486 | P. 22 , 70-71 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 7 | Shopper Saver | 1735676 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**AA115**

DocuSign Envelope ID: 0C7AE0CB-4575-483A-AF5A-1BB855298A8

| 8 | Shopper Saver (and Design) | 1770022 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|---|---|---|---|
| 9 | Liquid Rooter | 1846083 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 10 | Rotor-Man (and Design) | 1848341 | P. 23 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 11 | Rooter-Man (Design Mark) | 3,859,654 | P. 24 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 12 | Rooter-Man (Design Mark) | 1,655,782 | P. 26 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 13 | Rooter-Man (Design Mark) | 1,654,512 | P. 29 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 14 | TM: Shopper Saver | 1,7355, 676 | P. 30 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 15 | TM: Liquid Rooter | 1,846,083 | P. 31 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**AA116**

| 16 | Service Mark (SM): Rotor-Man | 1,848,341 | P. 32 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|----|------------------------------|-----------|------------------------------------------------------------------|
| 17 | TM: Shopper Saver | 1,770,022 | P. 33 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 18 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA563,902 File No.: 1057892 | P. 34, 74-78 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 19 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA568,429 File No. 1057895 | P. 36 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 20 | SM: Sewer Man | 1,580,576 | P. 49 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 21 | SM: Sewer Man | 1,218,615 | P. 50 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 22 | SM: Sewer Man | 2,308,796 | P. 51 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 23 | SM: Termanator | 1,688,486 | P. 55 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**AA117**

| 24 | SM: Rooterman "To The Rescue" | 6,013,446 | P. 56 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|----|-------------------------------|-----------|-----------------------------------------------------------------|
| 25 | SM: RM Guy with Plunger | 6,027,468 | P. 57 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 26 | SM: RM Guy with Pipe Cleaner | 6,027,470 | P. 58 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 27 | SM: RM Logo | 6,013,441 | P. 59 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 28 | TM: Shopper Saver | 1,770,022 | P. 60, 68-69 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 29 | TM: Liquid Rooter | 1,846,083 | P. 61 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 30 | TM: Shopper Saver | 1,735,676 | P. 62, 66-67 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 31 | SM: Rooter-Man | 3,859,654 | P. 79 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 32 | **SM: Drain Pro** | 1664949 | P. 86-87 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 33 | **Rooterman Website Content 2014** | TX8-253-353 | P. 87-141 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**Seller also includes, by reference all marks, protections and materials set forth in Schedule 1 to Exhibit A of Rooterman APA dated January 20, 2022 pages 001-141, which is attached to this Assignment and incorporated in its entirety.**

**State Marks**

| A Corp. State Trademark Registrations | | | | | |
|---|---|---|---|---|---|
| State | Mark Registered | Registration Numbers | Registration and renewal dates | Expiration Dates | Comments |
| Alabama | N/A | N/A | N/A | N/A | |
| Alaska | RooterMan, man w/ pipe | 3924 | 27-Sep-05 | 27-Sep-10 | Expired |
| Arizona | RooterMan, man w/ pipe | 58161 | 9-Jun-14 | 9-Jun-24 | |
| Arkansas | RooterMan, man w/ pipe | 500001521 | 7-Feb-20 | 7-Feb-25 | |
| California | RooterMan, man w/ pipe | 52304 | 20-Oct-99 | 20-Oct-24 | |
| Colorado | N/A | N/A | N/A | N/A | |
| Connecticut | RooterMan, man w/ pipe | 39465648 | 25-Jun-20 | 25-Jun-25 | |
| Delaware | N/A | N/A | N/A | N/A | |
| Florida | RooterMan, man w/ pipe | T99000001430 | 5-Jul-19 | 1-Dec-24 | |
| Georgia | RooterMan, man w/ pipe | 1655782 | 3-Sep-91 | 3-Sep-01 | Expired |
| Hawaii | RooterMan, man w/ pipe | 4118950 | 1-Jul-18 | 30-Jun-23 | |
| Idaho | RooterMan, man w/ pipe | 18506 | 7-Jul-15 | 26-Sep-25 | |
| Illinois | RooterMan, man w/ | 84790 | 19-Nov-19 | 22-Feb-25 | |

**AA119**

| | | | | | |
|---|---|---|---|---|---|
| | pipe | | | | |
| Indiana | RooterMan, man w/ pipe | 2000-0026 | 24-Feb-00 | 25-Feb-25 | |
| Iowa | RooterMan, man w/ pipe | W01225995 | 14-May-19 | 14-May-24 | |
| Kansas | RooterMan, man w/ pipe | 16967 | 28-Mar-20 | 28-Mar-25 | |
| Kentucky | RooterMan, man w/ pipe | 17523 | 9-Jan-15 | 9-Jan-20 | Expired |
| Louisiana | RooterMan, man w/ pipe | 56-4798 | 9-Dec-99 | 9-Dec-29 | |
| Maine | RooterMan, man w/ pipe | 20000097 | 28-May-19 | 20-Oct-39 | |
| Maryland | RooterMan, man w/ pipe | 2000/00918 | 9-Jan-20 | 6-Mar-30 | |
| Massachusetts | RooterMan, man w/ pipe | 57845 | 10-Jun-19 | 10-Jun-24 | |
| Michigan | RooterMan, man w/ pipe | M02498 | 7-May-10 | 9-May-20 | Expired |
| Minnesota | RooterMan, man w/ pipe | 29736 | 14-Mar-00 | 14-Mar-20 | |
| Mississippi | RooterMan, man w/ pipe | 14327 | 3-Apr-20 | 27-Mar-26 | |
| Missouri | N/A | N/A | N/A | N/A | |
| Montana | RooterMan, man w/ pipe | 5.042E+10 | 4-May-20 | 4-May-25 | |
| Nebraska | N/A | N/A | N/A | N/A | |
| Nevada | RooterMan, man w/ pipe | 202100034394-37 | 2-Mar-21 | 11-Mar-26 | |
| New Hampshire | RooterMan, man w/ pipe | 5460 | 13-Dec-11 | 13-Dec-31 | |
| New Jersey | N/A | N/A | N/A | N/A | |
| New Mexico | N/A | N/A | N/A | N/A | |
| New York | RooterMan, man w/ pipe | S24757 | 8-Dec-99 | 8-Dec-19 | Expired |
| North Carolina | | | | | |
| North Dakota | RooterMan, man w/ pipe | 2549996 | 1-Feb-20 | 19-Mar-30 | |
| Ohio | RooterMan, man w/ pipe | 1564852 | 9-Jun-15 | 9-Jun-25 | |
| Oklahoma | RooterMan, man w/ pipe | N/A | 31-Dec-93 | 2-Nov-95 | Expired |
| Oregon | RooterMan, man w/ pipe | 33974 | 3-Jan-00 | 3-Jan-20 | Expired |
| Pennsylvania | RooterMan, man w/ pipe | 3342610 | 19-Sep-05 | 17-Jun-13 | Expired |

**AA120**

| | | | | | |
|---|---|---|---|---|---|
| Rhode Island | RooterMan, man w/ pipe | 19961004 | 22-Apr-16 | 10-Oct-26 | |
| South Carolina | RooterMan, man w/ pipe | 15851-R18715 | 13-Jan-17 | 10-Feb-22 | |
| South Dakota | RooterMan, man w/ pipe | 13408 | 2-Jul-21 | 2-Jul-25 | |
| Tennessee | RooterMan, man w/ pipe | 41812 | 20-Apr-20 | 20-Apr-25 | |
| Texas | RooterMan, man w/ pipe | 803743230 | 14-Jan-21 | 14-Jan-26 | |
| Utah | | | | | |
| Vermont | N/A | N/A | N/A | N/A | |
| Virginia | N/A | N/A | N/A | N/A | |
| Washington | RooterMan, man w/ pipe | 28436 | 8-Dec-20 | 16-Dec-25 | |
| West Virginia | RooterMan, man w/ pipe | 1006450 | 24-May-20 | 26-Feb-30 | |
| Wisconsin | N/A | N/A | N/A | N/A | |
| Wyoming | N/A | N/A | N/A | N/A | |

**AA121**

# EXHIBIT C

**AA122**

EXHIBIT B.1

# A CORP.

## ROOTER-MAN FRANCHISE AGREEMENT

FA 4/18 -- Copyright © 2000-2018 A CORP.  All rights reserved.

**AA123**

# TABLE OF CONTENTS

| ITEMS | PAGE |
|---|---|
| A CORP FRANCHISE AGREEMENT | 1 |
| 1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS | 2 |
|     1.1 Date of Franchise Agreement | 2 |
|     1.2 Parties | 2 |
|     1.3 Licensed Territory | 2 |
|     1.4 Total Population | 2 |
|     1.5 Commencement Date | 2 |
|     1.6 Expiration Date | 2 |
|     1.7 Initial Franchise Fee | 2 |
|     1.8 Licensed Businesses | 2 |
|     1.9 Continuing Royalty | 2 |
|     1.10 Advertising Contribution | 2 |
|     1.11 Renewal Fee | 2 |
|     1.12 Transfer Fee | 2 |
|     1.13 Active Owners | 2 |
|     1.14 Franchise Termination Fee | 2 |
| 2. GRANT OF FRANCHISE | 3 |
|     2.1 Grant | 3 |
|     2.2 Limited License | 3 |
| 3. LICENSED TERRITORY | 3 |
|     3.1 Territory Defined | 3 |
|     3.2 Interterritorial Policy | 3 |
|     3.3 Rights Retained | 3 |
| 4. TERM OF FRANCHISE AGREEMENT, RENEWAL OPTION | 4 |
|     4.1 Term | 4 |
|     4.2 Renewal | 4 |
|     4.3 Notice Required by Law | 4 |
| 5. FRANCHISE FEE AND CONTINUING ROYALTY | 5 |
|     5.1 Initial Fee | 5 |
|     5.2 Continuing Royalty | 5 |
| 6. FRANCHISE SYSTEM MARKETING MATERIAL FUND | 5 |
|     6.1 Contribution by Franchisee | 5 |
|     6.2 Advertising Report | 5 |
| 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION | 5 |
|     7.1 Local Advertising | 5 |
|     7.2 Interterritorial Advertising | 6 |
|     7.3 Display | 7 |
|     7.4 Identity as Franchise | 7 |
|     7.5 Sale of Franchise | 7 |
| 8. TRADEMARKS | 7 |
|     8.1 Grant of License | 7 |

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

8.2   Name of Business .................................................................. 7
8.3   No Other Names .................................................................. 7
8.4   Change of the Trademarks .................................................. 8
8.5   Trademark Prosecution ....................................................... 8

9.    TRAINING AND OPERATING ASSISTANCE ............................ 8
9.1   Initial Training Program ...................................................... 8
      A. The Program ................................................................... 8
      B. Expenses ......................................................................... 8
      C. Waiver ............................................................................. 8
9.2   Staff Training ....................................................................... 8
9.3   Additional Assistance .......................................................... 9
      A. Operating Manual ........................................................... 9
      B. Grand Opening Promotional Program ............................ 9
      C. Advertising Materials ...................................................... 9
      D. Seminars ......................................................................... 9
      E. On-Going Assistance and Supervision ........................... 9
      F. Initial Sales Assistance .................................................... 9
      G. Product Offerings ........................................................... 9

10. FRANCHISE OFFICE LOCATION ........................................... 9

11. VEHICLES, EQUIPMENT AND SUPPLIES .............................. 10
      11.1   Vehicles ..................................................................... 10
      11.2   Equipment .................................................................. 10
      11.3   Uniforms .................................................................... 10

12. OPERATION of the FRANCHISE ........................................... 10
      12.1   Operations Manual ..................................................... 10
            A. Incorporation of Operations Manual ...................... 10
            B. Confidentiality of Operations Manual ..................... 10
            C. Modifications .......................................................... 11
      12.2   Hours of Operation .................................................... 11
      12.3   Resolution of Customer Problems ............................. 11
      12.4   Cleaning and other Supplies ...................................... 11
      12.5   Franchise Management ............................................... 11
      12.6   Insurance .................................................................... 11
            A. Notice ...................................................................... 12
            B. Insurance and Step-In-Rights ................................ 12
      12.7   Bookkeeping Standards .............................................. 12
      12.8   Franchisor Inspection ................................................ 12
      12.9   Compliance with Law ................................................ 12
      12.10  No Suggested Service Fees ........................................ 12
      12.11  Franchise Telephone Service and Directory Listings ......... 12

13. RECORDS ................................................................................ 13
13.1   Sales Records and Tax Returns .......................................... 13
13.2   Periodic Reports ................................................................ 13
13.3   Additional Recording Systems .......................................... 13
13.4   Inspection and Audit ......................................................... 13

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

**AA125**

**14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL** ........................................ 14
    14.1 Assignment by A CORP .................................................................... 14
    14.2 Assignment by Franchisee .............................................................. 14
        A. Permitted Transfers ............................................................. 14
        B. Transfer Upon Death or Permanent Incapacity ............. 15
        C. Transfer to Franchisee's Corporation ............................. 15
        D. Non-Waiver of Claims ........................................................ 16

**15. DEFAULT AND TERMINATION** ................................................................ 16
    15.1 Immediate Termination ................................................................... 16
    15.2 Termination with Notice ................................................................. 17
    15.3 Conformity with Law ...................................................................... 18
    15.4 Cross Default .................................................................................... 18
    15.5 Franchise Termination Option ....................................................... 18

**16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION** ...... 19

**17. STEP-IN-RIGHTS** ....................................................................................... 20
    17.1 Cause for Step-In ............................................................................. 20
    17.2 Duties of Parties ............................................................................... 20

**18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS** ................... 20
    18.1 Non-Competition .............................................................................. 20
    18.2 Non-Disclosure ................................................................................. 20

**19. GENERAL CONDITIONS AND PROVISIONS** ............................................. 21
    19.1 Titles for Convenience .................................................................... 21
    19.2 Entire Agreement ............................................................................ 21
    19.3 Amendment in Writing .................................................................... 21
    19.4 Relationship ...................................................................................... 21
    19.5 No Waiver .......................................................................................... 21
    19.6 Governing Law .................................................................................. 22
    19.7 Mediation and Arbitration .............................................................. 22
    19.8 Notices ............................................................................................... 23
    19.9 Indemnification ................................................................................. 24
    19.10 Limitation of Liability of A CORP ............................................... 24
    19.11 Late Payment Fees ......................................................................... 24
    19.12 Survival of Covenants .................................................................... 24

**20. CAVEAT** .................................................................................................... 24

**21. RELEASE** .................................................................................................. 25

**APPENDIX 1 – LICENSED TERRITORY** ............................................................. 27
**EXHIBIT A – GUARANTY OF PERFORMANCE** ................................................. 28
**EXHIBIT B – POWER OF ATTORNEY** ............................................................... 29
**EXHIBIT C – PROMISSORY NOTE** .................................................................... 30
**EXHIBIT D – WAIVER OF TRAINING PROGRAM PARTICIPATION** ................... 31
**EXHIBIT E – AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT** ...... 32

FA 4/18 -- Copyright © 2000-2018 A CORP. All rights reserved.

**AA126**

## A CORP.
## FRANCHISE AGREEMENT

**AGREEMENT** entered into this **24th** day of **September, 2019**, by and between:

**A CORP.**
a Massachusetts Corporation
268 Rangeway Road
Box 290
North Billerica, MA  01862
("A CORP.")

and

**Quality Air Care Corporation**
**692 Sussex Ct**
**Toms River, NJ 08753**

_____

**("FRANCHISEE")**

**WHEREAS:**

**A CORP.** has developed and is continuing to develop certain unique training, marketing and management methods relating to various service industries which offer services to the public through a franchise system (the " **A CORP. System** ") as it evolves from time to time; and

**A CORP.** has successfully established a reputation, demand and goodwill for its System under various registered names and marks which **A CORP.** owns, including without limitation, **Rooter-Man, Rooter-Man to the Rescue, Rotor-Man** and such other valuable trade names, service marks, trademarks, logotypes and designs (the "Trademarks") which **A CORP.** may develop and license for use through the **A CORP. System**; and

**A CORP.**'s trademarks and methods of operations and other business practices and policies relating to the operation of the **A CORP. System** (collectively the "Business System") constitute confidential and valuable trade secrets; and

**FRANCHISEE** desires to enter into the business of operating an **A CORP.** franchise utilizing some or all the Trademarks, the Business System and all advantages of the **A CORP. System** franchise program upon the terms and conditions contained in this agreement.

**THEREFORE**, in consideration of the mutual agreements, covenants and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to be bound legally as follows:

**AA127**

## 1.     FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS

| | | | |
|---|---|---|---|
| **1.1** | **Date of Franchise Agreement:** | | September 24, 2019 |
| **1.2** | **Parties:** | **FRANCHISOR:**<br>A CORP.<br>268 Rangeway Road<br>N. Billerica, Ma  01862 | **FRANCHISEE:**<br>Quality Air Care Corporation<br>692 Sussex Ct<br>Toms River, NJ 08753 |
| **1.3** | **Licensed Territory:** | | Defined in the attached Appendix 1 |
| **1.4** | **Total Population:** | | 292,729 |
| **1.5** | **Commencement Date:** | | September 24, 2019 |
| **1.6** | **Expiration Date:** | | September 24, 2024 |
| **1.7** | **Initial License Fee:** | | $3,975.00<br>($31.80 per thousand of population) |
| **1.8** | **Businesses Licensed (By Trademark):** | | **Rooter-Man**<br>**Rooter-Man to the Rescue**<br>**Rotor-Man** |
| **1.9** | **Continuing Royalty:** | | $220.00 per month.<br>($0.88 per  thousand of population) |
| **1.10** | **Marketing Fund Contribution:** | | $30.00 per month.<br>($ .12 per thousand of population monthly) |
| **1.10.1** | **Locally Optimized Website** | | $89.00 per month |
| **1.11** | **Franchise Renewal Fee:** | | $2500.00 |
| **1.12** | **Transfer Fee:** | | Greater of 5% of Franchise Selling Price or $2,500.00 |
| **1.13** | **Active Owners:** | | Klodian Belegu |
| **1.14** | **Franchisee Termination Fee: (Opt Out)** | | $25.00 per thousand population |

## 2.  GRANT OF FRANCHISE

**AA128**

**2.1     GRANT.   A CORP.** hereby grants to **FRANCHISEE**, and **FRANCHISEE** hereby accepts, a license to conduct the business listed in Section 1.8 (the "**A CORP.** System Franchise") for the term described below, according to the provisions of this Agreement and any related agreements.

**2.2     LIMITED LICENSE.**   This franchise is a limited grant of rights.  Upon termination for any reason or upon expiration of this Agreement, all rights of **FRANCHISEE** to operate the **A CORP.** System franchise shall cease and the license set forth above shall terminate.

## 3.  LICENSED TERRITORY

**3.1     TERRITORY DEFINED**

    **A.** The franchise granted by this Agreement to operate the **A CORP.** System franchise shall be within the Territory set forth in Section 1.3 (the "Territory").  **FRANCHISEE** shall offer the services of the **A CORP.** System franchise <u>only</u> in the Territory.

    **B.** **FRANCHISEE** agrees to diligently, faithfully and in a business like manner, promote, market and conduct the franchised business within the Territory so as to fully develop and maximize the business potential of the Territory and shall devote **FRANCHISEE's** full time, attention and best efforts to achieve that end.  **FRANCHISEE's** failure to do so shall be deemed a material breach of this Agreement as specified in Section 15.2.

    **C.** **FRANCHISEE** shall not engage in marketing activities or solicitation of business outside the Territory.  In order for **FRANCHISEE** to engage in such activities within an unlicensed territory, **FRANCHISEE** must execute a separate Franchise Agreement and pay an additional franchise fee.

    **D.** **FRANCHISEE** shall establish and maintain an office within the Territory to conduct his or her franchise.  **FRANCHISEE** shall not establish an office outside of the Territory.

    **E.** **A CORP.** agrees that during the term it will not license any other person or entity to operate the same **A CORP.** system franchise in the Territory, and will not itself establish the same **A CORP.** system franchise in the Territory.

**3.2     INTERTERRITORIAL POLICY.  A CORP.** shall have the right to adopt and implement policies and procedures prohibiting or strictly limiting **FRANCHISEE's** conduct and solicitation of business and marketing activities outside the Territory.  With the exception of interterritorial advertising, as described in Section 7.2 of this Agreement, **FRANCHISEE** is prohibited from advertising, soliciting or maintaining a business phone number or office outside of the Territory.

**3.3     RIGHTS RETAINED.**  Notwithstanding Section 3.2, **A CORP.** shall, however, have the right to:  a) refer work to other franchisees, to itself, its parent, subsidiary or affiliated companies or to unaffiliated subcontractors, whether within or outside of the Territory, which **FRANCHISEE** is not licensed, not equipped or not expressly authorized to render; and  b) sell, rent or authorize others to sell or rent, drain cleaning, products, and equipment, or render services which are not the subject of this Agreement within or outside of the Territory.

## 4.  TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION

**AA129**

4.1    **TERM.**  The term of this Franchise Agreement shall be 5 years from the date of execution of this Agreement, unless terminated sooner for a reason set forth in Section 15. At the expiration of this term, **FRANCHISEE** may exercise the Renewal Option set forth in Section 4.2.

4.2    **RENEWAL.**    **FRANCHISEE** shall have the option to renew this franchise for additional 10 year terms subject to the following conditions:

   A.    **FRANCHISEE** shall give **A CORP.** written notice of his or her desire to exercise the option to continue as a franchisee no later than 6 months prior to the expiration of the initial term of this Agreement and each renewal term.

   **A CORP.** shall furnish **FRANCHISEE** with a copy of **A CORP.**'s then current Franchise Agreement (and related agreements), which Agreement **FRANCHISEE** must execute no later than 3 months prior to the expiration of this Agreement.  The Renewal Franchise Agreement shall not include an Initial License Fee but may include an increase in the Continuing Royalty and Marketing Contribution.  Such increase, if any, shall be calculated by multiplying the current fee by the percentage change in the Consumer Price Index (hereinafter, "Change In CPI") if any.  The Change In CPI shall be calculated using the formula set forth in Section 4.2 B.

   B.    **A CORP.** shall calculate the Change In CPI by creating a fraction, the numerator of which is the Consumer Price Index for December of the most recently completed year and the denominator of which is the Consumer Price Index for December of the year in which the Franchise Agreement became effective.

   The fraction will then be determined by dividing the numerator by the denominator.  If the fraction is less than or equal to 1, then no change in fees will occur.  If the fraction is greater than 1 (a "CPI Increase"), then a Change in CPI shall have occurred in the amount of the CPI Increase.

   C.    **FRANCHISEE** shall pay to **A CORP.** upon execution of the renewal Franchise Agreement, the Renewal Fee set forth in Section 1.11.

   D.    Notwithstanding the foregoing, **FRANCHISEE** shall not have the right to exercise the Renewal Option unless **FRANCHISEE** has paid in full all monies then currently due to **A CORP.**, and no other default under the terms of this Agreement exists uncured.  **A CORP.** may elect to revoke the renewal option if **FRANCHISEE** shall have received 3 or more notices of default within any 12-month period during the initial term of this Agreement.

   E.    As a condition to this renewal, **FRANCHISEE** shall be required to maintain the services that he is licensed for and to invest in the proper equipment or vehicles to provide those licensed services.

4.3    **NOTICE REQUIRED BY LAW.**  If applicable law requires that **A CORP.** give notice to **FRANCHISEE** prior to the expiration of the initial term, then the Franchise Agreement shall remain in effect on a month to month basis until **A CORP.** has given **FRANCHISEE** the notice required by applicable law.

## 5.  INITIAL LICENSE FEE AND CONTINUING ROYALTY

**AA130**

5.1    **INITIAL FEE. FRANCHISEE**, upon execution of this Agreement, shall pay to **A CORP.** the Initial License Fee set forth in Section 1.7. **FRANCHISEE** acknowledges that the sole consideration for such fee is the grant of the franchise. Such fee shall be fully earned upon execution of this Agreement and shall not be refunded or forgiven.

5.2    **CONTINUING ROYALTY. FRANCHISEE** shall pay to **A CORP.** each month the Continuing Royalty set forth in Section 1.9, subject to a $110.00 per unit each month. **FRANCHISEE** shall also pay to **A CORP.** each month the marketing fund contribution in the amount of $15.00 per unit. The Continuing Royalty will commence thirty (30) days after the execution of the Franchise Agreement. When **A CORP.** adopts an electronic funds transfer program, all Continuing Royalty payments shall be made by electronic funds transfer, pursuant to the program established and amended from time to time by **A CORP.** Each payment shall be accompanied by the financial reports specified in Section 13.2.

## 6. FRANCHISE SYSTEM MARKETING MATERIALS FUND

6.1    **CONTRIBUTION BY FRANCHISEE. FRANCHISEE** agrees to pay to **A CORP.** the Marketing Fund Contribution set forth in Section 1.10 for the design of marketing materials. **FRANCHISEE** shall pay such Marketing Fund Contribution in the same manner specified in Section 5.2. **A CORP.** shall have the sole right to determine how to expend these funds, and shall expend all Marketing Materials funds collected. All monies collected from **FRANCHISEE** pursuant to this Section shall be placed in a separate account.

6.2    **MARKETING MATERIALS FUND REPORT. A CORP.** shall furnish to **FRANCHISEE** within 90 days of each calendar year end, a Fund financial report for the preceding year, prepared and certified to be correct by an officer of **A CORP.**, setting forth the funds collected, and the expenditures made during such calendar year.

## 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION

7.1    **LOCAL ADVERTISING. FRANCHISEE** acknowledges that advertising and promotion represents the major source of new clientele for the **A CORP.** System franchise and a major expense of the franchise operation. **FRANCHISEE** shall formulate and effect local advertising and promotion subject to the format, content and media designations contained in the Operations Manual.

A. **FRANCHISEE** shall list itself in those telephone directories which are usually and customarily distributed in the Licensed Territory, under the appropriate headings, as designated by **A CORP. FRANCHISEE** shall not place advertisements or listings in telephone directories which are usually and customarily distributed only outside of the Licensed Territory. **FRANCHISEE** shall expend a minimum of 15% of the franchise's Gross Revenues on local advertising, which advertising will include yellow page listings, local newspaper advertising, marketing and sales materials and the Marketing Fund Contribution. For the purposes of this Agreement, the term "Gross Revenues" shall mean all revenues generated by **FRANCHISEE**'s business conducted upon, from, or with respect to **FRANCHISEE**'s franchise, whether such sales are evidenced by cash, check, credit, charge account or exchange. Gross Revenues shall include, without limitation, monies or credit received, for services, from the sale of products, from tangible property of every kind and nature, promotional or otherwise, and for other services performed by **FRANCHISEE** in

**AA131**

accordance with the Business System. Gross Revenues shall not include sales or service taxes or municipal or private disposal fees.

**B.** **FRANCHISEE** understands and acknowledges that local and telephone directory advertising and internet advertising are the major sources of new clientele. At the end of the calendar year, **FRANCHISEE** must furnish proof to the **A CORP.** of all local advertising expenditures and copies of all advertisement used during that year ended. **A CORP** provides free listing of **FRANCHISEE** through **A CORP.**'s franchisor website at www.rooterman.com (the "Franchisor Website"). If **FRANCHISEE** desires to have a local optimized website to promote the System using **ACORP.**'s Trademarks, **FRANCHISEE** must use the internet advertisement services provided through the "Franchisor Website". Upon **FRANCHISEE**'s purchase of the **A CORP** System Franchise, **A CORP** shall design certain website pages linked to the Franchisor Website with **FRANCHISEE**'s information (the "**FRANCHISEE** Webpages") and shall activate the **FRANCHISEE** Webpages in a timely manner. To maintain the consistency of the brand image of **A CORP**, **FRANCHISEE** is not allowed to independently design, develop, and maintain any other locally optimized website or register any domain name using **A CORP's** trademarks including without limitation the Rooter Man trademark.

**C.** **FRANCHISEE** agrees to advertise and promote actively and continuously the System and the Trademarks within the Licensed Territory. **A CORP.** reserves the right to direct **FRANCHISEE** to modify or discontinue advertisements that **A CORP.** believes to present a risk of misleading prospective customers as to the authorized services which **FRANCHISEE** can offer or to the territory in which **FRANCHISEE** can operate. **FRANCHISEE** shall promptly comply with any such directive.

**7.2** **INTERTERRITORIAL ADVERTISING.** In areas (the "Region") where advertising media reach prospective clientele in more than 1 licensed territory, the franchisees operating in this Region may enter into an interterritorial advertising agreement (the "Interterritorial Agreement"). Such Interterritorial Agreements shall provide for the following:

**A.** Advertising fees shall be shared by participating franchisees based upon the percentage of the Region's population that falls within each individual franchisee's Territory. The failure of **FRANCHISEE** to pay his pro rata share under an agreed-upon program shall be considered a default under this Franchise Agreement.

**B.** The format, content and media designations chosen by the participating franchisees for use in the Region shall conform to those requirements specified by **A CORP.** in the Operations Manual; and

**C.** **FRANCHISEE** shall indemnify **A CORP.** from and against any and all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly or indirectly out of or in connection with the operation of the Interterritorial Agreement.

**D.** Local advertising shall be FRANCHSIEE's sole responsibility and FRANCHISEE shall not list A CORP. as a party of its local advertising agreement or as list A CORP. under any billing information.

**7.3** **DISPLAY.** **FRANCHISEE** acknowledges that vehicle advertising is an important source

**AA132**

for promotion of the Trademarks and shall maintain all vehicles displaying such Trademarks in accordance with the standards established from time to time by **A CORP.** **FRANCHISEE** agrees to display prominently at all times on all of **FRANCHISEE's** vehicles such advertising and signage as shall be specified from time to time in the Operations Manual or in operating and marketing memoranda furnished by **A CORP.**

7.4 **IDENTITY AS FRANCHISEE.** **FRANCHISEE** agrees that at all times and in all advertising, promotions, signage and other display materials, on its letterheads, business forms, and in all of **FRANCHISEE's** business dealings and to the general public, **FRANCHISEE** will identify himself only as an **A CORP.** System franchisee utilizing only the Trademarks licensed by this Agreement. **FRANCHISEE** further agrees that **FRAN-CHISEE** shall not identify himself as being **A CORP.**, a subsidiary, division, partner, joint venturer, agent or employee of **A CORP.** or of any other of **A CORP.'s** franchisees.

7.5 **SALE OF FRANCHISE.** In the event that **FRANCHISEE** places advertising seeking a buyer for all or part of **FRANCHISEE's** franchise, **FRANCHISEE** shall not include nor allow use of any of the Trademarks to appear in such advertisement. **FRANCHISEE** may, however, describe the business in general generic terms. **FRANCHISEE** agrees to enforce this restriction on the activities of the **FRANCHISEE's** sales agent, broker or representative. In addition, the **FRANCHISEE** shall comply with the provisions of Section 14.2.

## 8. TRADEMARKS

8.1 **GRANT OF LICENSE.** **A CORP.** hereby grants to **FRANCHISEE** the right during the term of this Agreement to use and display the Trademarks, set forth in Section 1.8, in accordance with this Agreement and the Operations Manual. **FRANCHISEE** acknowledges that the Trademarks which have been licensed exclusively by **A CORP.** are valid, and that valuable goodwill is attached to such Trademarks. All goodwill associated with the Trademarks, including the goodwill generated by **FRANCHISEE** and all other franchisees while conducting business under the Trademarks, is and shall remain the property of **A CORP.** **FRANCHISEE** expressly agrees during the term of this Agreement and following the Agreement's expiration or termination, that **FRANCHISEE** shall not directly or indirectly contest or aid in contesting the validity or ownership of the Trademarks. **FRANCHISEE** shall not modify or use the Trademarks in any fashion, including without limitation on products, tools or supplies, unless authorized in a prior writing by **A CORP.** **FRANCHISEE** shall not file for or acquire any state, federal or international registration of the Trademarks or any trademark or service mark (or variation thereof) which is confusingly similar to the Trademarks including without limitation the Rooter Man trademark.

8.2 **NAME OF BUSINESS.** If **FRANCHISEE** operates the franchise business through a corporation, **FRANCHISEE** shall not use the Trademarks, or any similar names, in its corporate name. Upon expiration or termination of this Agreement, **A CORP.** may, if **FRANCHISEE** does not do so, execute in **FRANCHISEE's** name and on **FRANCHISEE's** behalf any and all documents necessary in **A CORP.'s** judgment to end and cause the discontinuance of **FRANCHISEE's** use of the Trademarks and **A CORP.** is hereby irrevocably appointed and designated as **FRANCHISEE's** attorney-in-fact to do so.

8.3 **NO OTHER NAMES.** **FRANCHISEE** shall not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the franchise business without the express prior written consent of **A CORP.**

**AA133**

8.4     **CHANGE OF THE TRADEMARKS**.  If it appears to **A CORP.** that any of the names or marks are no longer viable commercially or legally, **A CORP.** has the right to change any of its names or marks to others of similar marketing impact.  In such event, **FRANCHISEE** agrees to cooperate with **A CORP.** in changing all signs, graphics, and supplies, including those painted onto **FRANCHISEE's** vehicles.  **FRANCHISEE** agrees to assume all reasonable costs connected with such changes, and to effectuate such changes within the reasonable time frame established by **A CORP.**

8.5     **TRADEMARK PROSECUTION**

A.     In the event that **FRANCHISEE** shall learn that a third party, who not a licensee of **A CORP**, is using **A CORP's** Trademarks or any variation, **FRANCHISEE** shall promptly notify **A CORP** of the facts relating to infringing use.

B.     With **A CORP's** permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE's** interest in the Trademark.  In the event that the **FRANCHISEE** chooses to bring action, and **A CORP**, in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE's** Territory.

9.  **TRAINING AND OPERATING ASSISTANCE**

9.1     **INITIAL TRAINING PROGRAM**.  **A CORP** shall furnish, and **FRANCHISEE** shall complete to **A CORP's** satisfaction, in its sole discretion exercised in good faith, **A CORP's** training program on the operation of the **A CORP** System franchise.

A.     **THE PROGRAM.**     Such training shall consist of 2 days of instruction at **A CORP's** headquarters or at such place or places designated by **A CORP**.   Participation of **FRANCHISEE** in the training program shall be required unless participation is waived by **A Corp** as specified in Section 9.1C below.  If **A CORP** determines that **FRANCHISEE** requires additional training, the **FRANCHISEE** shall attend such additional program at **FRANCHISEE's** own expense.

B.     **EXPENSES. FRANCHISEE's** shall be solely responsible for **FRANCHISEE's** own travel, living expenses and salary during the training period.

C.     **WAIVER.   FRANCHISEE's** participation in the **A CORP** training program, as described in Section 9.1A, may be waived by **A CORP** if **A CORP** determines in its sole discretion that **FRANCHISEE** has sufficient prior business experience to excuse him from participation in **A CORP's** training program.

9.2     **STAFF TRAINING.**   **FRANCHISEE** shall implement a training program for his  other employees, in accordance with the training standards and procedures prescribed by **A CORP.** **FRANCHISEE** shall employ at all times during the term of this Agreement only employees so trained to offer the franchised services.  **FRANCHISEE** alone shall assume all expenses associated with staff training.

9.3     **ADDITIONAL ASSISTANCE.**     **A CORP** shall furnish **FRANCHISEE** with the

**AA134**

following additional operating assistance.

**A.    OPERATIONS MANUAL.    A CORP** will provide a copy of its Operations Manual (as defined in Section 12.1), which at all times will remain the property of **A CORP**, for use by **FRANCHISEE** in the operation of the **A CORP's** System franchise.

**B.    GRAND OPENING PROMOTIONAL PROGRAM.    A CORP** shall consult with **FRANCHISEE** concerning a grand opening promotional program, which program shall be conducted by **FRANCHISEE** at his or her sole cost and expense.

**C.    ADVERTISING MATERIALS.    A CORP** may, from time to time, at its discretion, develop and provide **FRANCHISEE** with the art work for advertising materials to be used by **FRANCHISEE** in the promotion of **FRANCHISEE's A CORP** System franchise.

**D.    SEMINARS.    A CORP** may from time to time, at its sole discretion, conduct refresher training seminars for the purpose of informing franchisee's of new developments and improvements in the Business System relating to various aspects of the franchise operations, including new product lines and profit centers, new marketing techniques, and revised operational and management standards and techniques. Unless otherwise approve in writing by **A CORP**, **A CORP** shall have the right to require **FRANCHISEE** to attend at least 1 such seminar or a regional meeting during each year of this Agreement. There shall be no additional charge for such seminars or meetings, but all travel and living costs incurred by **FRANCHISEE** shall be borne by **FRANCHISEE**.

**E.    ON-GOING ASSISTANCE AND SUPERVISION.    A CORP** shall furnish to **FRANCHISEE** from time to time such operating assistance and training, as is, in **A CORP's** sole discretion, reasonably necessary. Operating assistance and training may include, by way of illustration, advice and guidance with respect to modifications or additions in the Business System, new marketing programs, the establishment of administrative, bookkeeping, accounting and general operating procedures, and such other advice as shall reasonably pertain to the operation of the franchise. **A CORP** retains the right to license additional services and programs which **FRANCHISEE** might offer to its customers.

**F.    INITIAL SALES ASSISTANCE.    Upon FRANCHISEE's** written request and **A CORP's** consent, **A CORP** shall furnish, for not less than 2 days during the first weeks of **FRANCHISEE's** operations, a representative to train and assist **FRANCHISEE** and his sales staff by calling on prospective customers within the Territory. **A CORP** shall require a reasonable fee for providing such initial sales assistance. Such fee shall include, without limitation, all expenses incurred by **A CORP** in providing initial sales assistance.

**G.    A CORP** presently offers products through **A CORP's** affiliate, **Rooter-Man Corp.**, which is a supplier and distributor of various tools and supplies needed in the operation of a **Rooter-Man** franchise. These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, logo patches, truck decals, and other such items. **FRANCHISEES** are not required to purchase these or any items from the **Rooter-Man Corp.** nor is A CORP or the **Rooter-Man Corp.** required to continue supplying, selling or distributing these or any items.

**10.    FRANCHISE OFFICE LOCATION.**    Since the location of **FRANCHISEE's** office is not an important aspect of the operation of the **A CORP** System franchise, **FRANCHISEE** shall only be

obligated to secure an adequate facility to house **FRANCHISEE's** vehicles, equipment and supplies. Such facility must be located within the Territory and such facility shall comply with all local, state and federal regulations as well as A CORP's Operations Manual. Specifically, but without limitation, such facility shall be maintained by **FRANCHISEE** in strict compliance with all local, state and federal regulations pertaining to the storage of hazardous and non-hazardous chemicals.

## 11. VEHICLES, EQUIPMENT AND UNIFORMS

**11.1    VEHICLES.**   Prior to the commencement of business by **FRANCHISEE, FRANCHISEE** shall purchase or lease the number and variety of vehicles to be used in the operation of the A **CORP.** System franchise as reasonably prescribed by **A CORP.**  All vehicles must meet A **CORP.'s** requirements for appearance, color and other appropriate specifications and must be fully equipped as required by the Operations Manual.  **FRANCHISEE** expressly agrees to display all Trademarks required by **A CORP.** on such vehicles.  All vehicles must be maintained in sound physical condition and the appearance of such vehicles must be well maintained at all times in order to uphold the integrity of the Trademarks.  **FRANCHISEE** shall promptly, upon request, provide **A CORP.** with photographs, copies of invoices and other evidence satisfactory to **A CORP.**, confirming that such vehicles conform to A **CORP.'s** specifications.

**11.2    EQUIPMENT.**   Prior to the commencement of the business, **FRANCHISEE** shall at its sole cost and expense lease or purchase, all of the tools, equipment, uniforms, drain cleaning products, supplies, computer equipment, software, forms and other equipment and materials recommended by A CORP., but purchased from suppliers of **FRANCHISEE's** choice.

**11.3    UNIFORMS.**  In order to present a neat and clean appearance while performing the services of the **A CORP.** System franchise, **FRANCHISEE** and each employee of **FRANCHISEE** shall wear a uniform approved by **A CORP.**

## 12.    OPERATION OF THE FRANCHISE

**12.1    OPERATIONS    MANUAL.**    **FRANCHISEE** acknowledges that nationwide uniform standards of service are vital to the protection of the A CORP. System and the Trademarks, and are necessary to ensure that the public receives the quality of service associated with the **A CORP.** System and the Trademarks.  **FRANCHISEE** therefore agrees that in order to protect the reputation and the goodwill associated with the Trademarks, and to maintain the uniform standards of operation by all **A CORP.** System franchisees, **FRANCHISEE** shall conduct the franchise in strict accordance with **A CORP.'s** proprietary Operations Manual (the "Operations Manual").

**A.  INCORPORATION OF OPERATIONS MANUAL.**   The Operations Manual is intended to further the purposes of this Agreement, and is specifically incorporated into this Agreement.

**B.  CONFIDENTIALITY OF OPERATIONS MANUAL.**  **FRANCHISEE** shall at all times treat as confidential and shall not at any time disclose, copy, duplicate, record or otherwise reproduce in whole or in part, or otherwise make available to an unauthorized person or persons, the contents of the Operations Manual.  The Operations Manual, including all new updated and old superseded pages, shall at all times remain the sole property of **A CORP.**  A **CORP.** shall amend and update the Operations Manual and shall provide such updated

**AA136**

version to **FRANCHISEE** at no cost to **FRANCHISEE**. **FRANCHISEE** agrees to insert all new pages immediately in their proper places and to remove completely the superseded pages at the same time for return to **A CORP**. **FRANCHISEE** shall promptly return the Operations Manual upon the expiration or other termination of this Agreement.

C.  **MODIFICATIONS**. **FRANCHISEE** recognizes and agrees that **A CORP.** may from time to time change or modify its standards of operation, including the adoption of new procedures and programs, as outlined in the Operations Manual. **FRANCHISEE** shall accept and conform to such changes or modifications, and shall make all reasonable expenditures necessitated by the changes or modifications, within the time periods reasonably established by **A CORP.**

12.2    **HOURS OF OPERATION**. **FRANCHISEE** shall provide prompt and courteous service at all times during normal working hours and shall provide emergency service that will adequately meet the needs of customers for such service within the Licensed Territory. During customary business hours, **FRANCHISEE** agrees to have its telephone(s) answered by a trained employee. **FRANCHISEE** agrees to use a telephone answering service only after customary business hours.

12.3    **RESOLUTION OF CUSTOMER PROBLEMS**. **FRANCHISEE** and his employees shall provide prompt, competent and courteous service to customers. **FRANCHISEE** shall respond to any dissatisfied customers within 24 hours after the complaint is received, whenever possible.

12.4    **DRAIN CLEANING PRODUCTS AND OTHER SUPPLIES**. **FRANCHISEE** shall utilize only those drain cleaning products and other supplies, including forms, authorized by **A CORP.**

12.5    **FRANCHISEE MANAGEMENT**. **FRANCHISEE** shall at all times during the term of this Agreement operate the **A CORP.** System franchise on a full-time basis or employ on a full-time basis at least one trained individual. **FRANCHISEE** or such individual shall devote his entire time during normal business hours, as defined in the Operations Manual, to the management, operation and development of **FRANCHISEE's A CORP.** System franchise. The individual managing the franchise shall not engage in any other business or investment requiring active participation during normal business hours. **A CORP.** has entered into this Agreement in reliance upon the representation of **FRANCHISEE** that during the term of the Agreement, the individuals named in Section 1.14 will be the owners who are in active, full-time charge of **FRANCHISEE's** franchise and who are responsible for adhering to the terms of this Agreement.

12.6    **INSURANCE**. It is understood and agreed that the protection of the goodwill of the **A CORP.** system, Trademarks and the financial security of both **FRANCHISEE** and **A CORP.** requires the existence of public liability insurance coverage for **FRANCHISEE**. **FRANCHISEE** shall procure and maintain in full force and effect Commercial General Liability insurance coverage (including premises/operations coverage, product liability coverage, completed operations coverage and contractual liability coverage) and comprehensive motor vehicle liability insurance coverage (including hired and non-owned motor vehicle coverage) in the name of **FRANCHISEE**, with **A CORP.** named as an additional insured, at **FRANCHISEE's** sole cost and expense. The insurance coverage shall be in the following minimum amounts:

**AA137**

| 1. Bodily Injury | $1,000,000.00 | Each person |
| | $1,000,000.00 | Each occurrence |
| 2. Property damage | $500,000.00 | Each occurrence |
| 3. Workers' Compensation coverage | | As required by law |

As an alternative to the foregoing, **FRANCHISEE** may obtain a single limit policy in the amount of no less than $1,000,000.00.

A. **NOTICE.** All insurance purchased by **FRANCHISEE** shall provide that **A CORP.** be given at least 30 days prior written notice of any termination, amendment, cancellation or modification. **FRANCHISEE** shall promptly provide **A CORP.** with certificates of insurance evidencing such coverage no later than 14 days prior to the date that **FRANCHISEE** shall be open for business to the public, as well as annual certificates throughout the term of the franchise evidencing continuing coverage.

B. **INSURANCE AND STEP-IN-RIGHTS.** If **FRANCHISEE** fails or refuses to purchase insurance conforming to the standards and limits prescribed in Section 12.5, **FRANCHISEE** shall be in default of this Agreement as set forth in Section 15.2A and E.

12.7 **BOOKEEPING STANDARDS. FRANCHISEE,** all financial statements prepared by or for **FRANCHISEE,** and all reports submitted by **FRANCHISEE** shall conform to the current standards and requirements as described in the Operations Manual. All such bookkeeping and accounting records and financial statements, for such periods as may from time to time be prescribed in the Operations Manual, shall be made available for inspection by **A CORP.** during normal business hours.

12.8 **FRANCHISOR INSPECTION. A CORP.** shall have the right from time to time, and without prior notice to **FRANCHISEE** to send representatives to **FRANCHISEE'S** office in order to inspect **FRANCHISEE's** operations and records and to determine the faithfulness of **FRANCHISEE's** compliance with the provisions of this Agreement and the Operations Manual.

12.9 **COMPLIANCE WITH LAW. FRANCHISEE** shall operate his **A CORP.** System franchise in strict compliance with applicable laws, rules and regulations of all governmental authorities. **FRANCHISEE** shall comply with all applicable laws and regulations of the federal, state or local governments, and shall prepare and file all necessary tax returns, and pay promptly all taxes imposed upon **FRANCHISEE** and upon **FRANCHISEE's** franchised business. **FRANCHISEE** may be required to be licensed for some or all of the components of the **A CORP.** System and is solely responsible for securing and maintaining such licenses

12.10 **NO SUGGESTED SERVICE FEES. FRANCHISEE** acknowledges that any and all service fees included in the Operations Manual or other operating memoranda, are intended by **A CORP.** to be illustrative only and are not intended to be suggestive of fees to be charged by **FRANCHISEE** for particular services. **FRANCHISEE** further acknowledges that **A CORP.** does not set or enforce a fee schedule of any type. **FRANCHISEE,** in its sole discretion, shall determine the fees to be charged for licensed services performed under the **A CORP.** System.

12.11 **FRANCHISEE TELEPHONE SERVICE AND DIRECTORY LISTINGS. FRANCHISEE** shall at its sole expense maintain telephone service for the franchise and

**AA138**

shall have all of **FRANCHISEE**'s telephone numbers continuously listed and advertised in those "white pages" and "yellow page" directories which are usually and customarily distributed within the Licensed Territory, as **A CORP**. may designate or approve. All such listings shall be in the manner, style and type size and shall contain all other characteristics as **A CORP**. may designate in the Operations Manual or in operating memoranda. In all advertising placed by **FRANCHISEE** in which such listed numbers appear, there shall not appear any other telephone numbers subscribed for by **FRANCHISEE** for personal use or for the conduct of any other business. **FRANCHISEE** shall not, without **A CORP**.'s express written consent, cause or allow itself to be listed in any directories outside of the Territory. **A CORP**. shall have the right to recommend the type of telephone service, the number of telephone lines, and all matters related to the telephone service for the franchise, and **FRANCHISEE** shall promptly comply with all specifications and directives of **A CORP**. as established or modified from time to time. **FRANCHISEE** hereby irrevocably appoints **A CORP**. as its Attorney-in-Fact to assign all such telephone numbers to **A CORP**. and expressly authorizes the applicable telephone company to make such assignment upon termination or expiration of this Franchise Agreement. **FRANCHISEE** agrees to indemnify **A CORP**. as specified in Section 19.9.

## 13. RECORDS.

**13.1** **SALES RECORDS AND TAX RETURNS. FRANCHISEE** shall record all sales and shall keep and maintain accurate records. **FRANCHISEE** shall provide **A CORP**. annually with copies of federal, state and local (if applicable) income tax returns.

**13.2** **PERIODIC REPORTS.** In order to assist and advise **FRANCHISEE** with respect to the operation of his business, **A CORP**. shall, at its sole discretion, require **FRANCHISEE** to furnish **A CORP**. within 15 days after the expiration of each calendar month with a profit and loss statement of the Franchise for the preceding calendar month. All such financial statements shall be prepared in accordance with the format established by **A CORP**. in the Operations Manual, and shall be certified by **FRANCHISEE** or in the case of a corporate **FRANCHISEE**, by **FRANCHISEE**'s chief executive officer or chief financial officer, as being true and correct and as being prepared in accordance with generally accepted accounting principles consistently applied from applicable period to period. In addition, within 90 days after the end of each calendar year, **FRANCHISEE** shall furnish **A CORP**. with an annual balance sheet, profit and loss statement and statement of changes in financial position, which have been certified as correct by **FRANCHISEE** and which have been prepared by an independent accountant. **A CORP**. agrees to maintain in confidence **FRANCHISEE**'s financial information and shall not disclose **FRANCHISEE**'s identity in connection with **FRANCHISEE**'s financial information.

**13.3** **ADDITIONAL RECORDING SYSTEMS. FRANCHISEE** agrees to furnish to **A CORP**. all other information pertaining to the franchised business and clientele through the system developed by **A CORP**. or as **A CORP**. may, from time to time, specify in the Operations Manual. **A CORP**. shall be granted full and complete access to all records and information created by such system, including without limitation, by direct telephone, the Internet or other data communications links.

**13.4** **INSPECTION AND AUDIT. FRANCHISEE** shall keep and preserve for 5 years all business records, including ledgers, credit card statements and other tax returns, bank statements, duplicate deposit slips and other evidence of gross revenues and business transactions for each such year. **A CORP**. shall have the right at any time during regular

**AA139**

business hours to enter **FRANCHISEE's** premises to inspect, audit and make copies of any books of accounts, bank statements, documents, records, tax returns, papers and files of **FRANCHISEE** relating to gross revenues and business transactions. Upon the request by **A CORP.**, **FRANCHISEE** shall make any such material available for inspection at **FRANCHISEE's** premises and **FRANCHISEE** shall allow **A CORP.** and its representatives to remove temporarily **FRANCHISEE's** records solely for copying, review and/or audit purposes. If **A CORP.** determines that there has been an underpayment of fees by **FRANCHISEE**, **FRANCHISEE** shall pay the amount of understatement plus interest at the rate of 18% per annum and the cost of the audit.

## 14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL

14.1    **ASSIGNMENT BY A CORP.**    **A CORP.** may freely transfer or assign its rights and obligations under this Agreement to any person, corporation or other entity. Such transfer or assignment shall be binding upon and inure to the benefit of **A CORP.**, its successors and assigns.

14.2    **ASSIGNMENT BY FRANCHISEE.**    **FRANCHISEE** acknowledges that the rights provided for in this Agreement are personal to **FRANCHISEE** and that this franchise has been granted by **A CORP.** in reliance upon the particular skills, knowledge and business ability of **FRANCHISEE**. **FRANCHISEE** agrees that he shall not sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in the assets of the franchise or **FRANCHISEE** collectively referred to herein as a "transfer" except as permitted herein. Any sale, assignment, transfer or encumbrance of this Agreement, of any of the rights granted under this Agreement, or in the ownership of the **FRANCHISE**, which is not in accordance with the terms and conditions provided in this Section 14.2 shall constitute a breach of this Agreement and shall permit **A CORP.** to terminate this Agreement immediately as provided for in Section 15.1 of this Agreement.

A.    **PERMITTED TRANSFERS.**    **A CORP.** shall not unreasonably withhold its consent to a Transfer of any interest of **FRANCHISEE** or the franchise, but shall, as a condition precedent to such consent, require that:

1.    **FRANCHISEE** first offers to sell such interest to **A CORP.** at the same price and on the same terms and conditions as it proposes to sell such interest to a third party. **FRANCHISEE** shall furnish a signed and notarized copy of the third party's offer to purchase. **A CORP.** shall have 30 days after receipt of such bona fide offer in which to exercise its right of first refusal. The failure by **A CORP.** to exercise its option shall in no way be construed to affect **A CORP.**'s decision to approve a proposed transferee. If **A CORP.** fails to exercise its option and the Franchise is not subsequently sold to the proposed transferee for any reason, **A CORP.** shall continue to have, upon the same conditions, a first option to purchase the Franchise upon the terms and conditions of a subsequent offer.    **A CORP.** shall have 30 additional days following **A CORP.**'s rejection of its right of first refusal to review the Transfer, based upon the qualifications set forth in Section 14.2A (4).

2.    All monetary obligations of **FRANCHISEE** to **A CORP.** as of the proposed date of the Transfer have been or will be paid as of such date.

3.    By the closing date for said transfer, **FRANCHISEE** shall have executed a general

**AA140**

release under seal, in a form satisfactory to **A CORP.**, of all claims against **A CORP.**, its stockholders, directors, officers, employees and assigns.

4. The transferee, in the reasonable judgment of **A CORP.**, has the financial resources, relevant work experience, character and ability to conduct successfully the business of the Franchise. The transferee shall fully disclose its financial position and obligations and other background information prior to any such Transfer.

5. The transferee shall execute **A CORP.**'s then current Franchise Agreement and related documents to govern the remaining term of the Franchise, including a copy of the Guaranty to this Agreement executed by each shareholder of the transferee, if the transferee is a corporation.

6. **FRANCHISEE** shall pay to **A CORP.** the Transfer Fee as set forth in Section 1.12; unless the transfer is to an immediate family member of **FRANCHISEE** (i.e., spouse, children or parents only); and

7. The transferee shall complete **A CORP.**'s training programs in the manner then required of new franchisees, and shall pay **A CORP.** the then required fee, unless **A CORP.** shall waive **FRANCHISEE**'s participation in the training program as specified in Section 9.1C.

B. **TRANSFER UPON DEATH OR PERMANENT INCAPACITY.** Immediately upon the death or permanent incapacity of **FRANCHISEE** or if **FRANCHISEE** is a corporation, upon its dissolution or upon the death of any person with a substantial or controlling interest in the Franchise, if requested by **FRANCHISEE**'s heirs, **A CORP.** or its agent, at its sole discretion shall be entitled to assume the operation of the Franchise in accordance with Section 17. As soon as possible thereafter, and in any event within a reasonable time, the executor, administrator, trustee or other representative of such person or entity shall transfer such interest to the heirs or beneficiaries or to a third party in accordance with Section 14.2 A above. **A CORP.**'s right to assume the operation of the Franchise shall continue until the Franchise has been transferred to an accepted transferee as provided in Section 14.2. **FRAN-CHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this subsection, including reasonable attorney's fees, and **A CORP.** shall receive the Transfer Fee (as specified in Section 1.12). However, if a franchise is transferred to a party who is a member of **Franchisee**'s immediate family, (i.e., spouse, children or parents only) who will continue the operation of the franchise under the terms of this Agreement, then no transfer fee shall be required. Permanent incapacity shall mean that **FRANCHISEE** cannot perform his duties under this Agreement for a period of 6 months or longer.

C. **TRANSFER TO FRANCHISEE'S CORPORATION.** If the proposed Transfer is to a corporation at least 75% percent of the stock of which is owned by **FRANCHISEE**, then **A CORP.** shall approve such Transfer provided that the transferee corporation meets the following requirements:

1. The Corporate charter and by-laws shall provide that its activities are limited to the operation of the Franchise. Copies of the charter, by-laws, any other agreements affecting stockholder rights, such as stock restriction agreements, and resolutions authorizing execution of this Agreement shall be delivered to **A CORP.** prior to execution of this Agreement, or when otherwise requested in writing by **A CORP.**

**AA141**

2. The ownership of the stock of such corporation shall be disclosed in writing prior to the execution of this Agreement and the charter and by-laws shall reflect that no stock shall be sold, transferred, pledged or otherwise similarly affected without compliance with this Agreement.

3. Each stock certificate shall bear the following legend: "THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN FRANCHISE AGREEMENT BETWEEN THE CORPORATION AND A CORP. REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND TO RESTRICTIVE PROVISIONS IN THE CHARTER OF THIS CORPORA TION."

4. The principal stockholders of **FRANCHISEE**, as determined by **A CORP.**, shall personally guarantee the payment and performance of all obligations of **FRANCHISEE** under this Agreement, and shall execute such documents as **A CORP.** may reasonably require to reflect such guaranty; and

5. In addition, **FRANCHISEE** must serve as the principal executive officer of the transferee corporation, all other shareholders of the transferee must meet the requirements of **A CORP.** and the transferee corporation must execute a new Franchise Agreement for the duration of the term, using **A CORP.'s** then current agreement. All acts and the delivery of all documents shall take place before the Transfer. Transfer to **A CORPORATION** shall be approved in a prior writing by **A CORP. FRANCHISEE** shall reimburse **A CORP.** for **A CORP.'s** reasonable expenses in connection with this section, including reasonable attorney's fees.

D. **NON-WAIVER OF CLAIMS. A CORP.'s** consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims that it may have against **FRANCHISEE** or against any guarantor of this Agreement.

## 15. DEFAULT AND TERMINATION

15.1 **IMMEDIATE TERMINATION. FRANCHISEE** acknowledges that the occurrence of one or more of the following events would cause harm to the franchise system and thereby lessen its value. **FRANCHISEE** agrees that **A CORP.** shall have the right upon the occurrence of one of the following events to terminate this Agreement immediately upon notice:

A. If **FRANCHISEE** becomes insolvent or surrenders substantial control of the franchised business or a major portion of its assets by virtue of a voluntary or involuntary proceeding in bankruptcy or receivership, or by assignment for the benefit of creditors, or in the event of a similar circumstance or legal process, and such proceeding is not terminated within 30 days;

B. If **FRANCHISEE** attempts to sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in, or substantially all of the assets of the Franchise or **FRANCHISEE** except as permitted by Section 14.2;

C. If **FRANCHISEE** shall violate any provision of the Non-Competition Covenant contained in Section 18. 1;

**AA142**

D. **If FRANCHISEE** shall violate any provision of the Non-Disclosure Covenant contained in Section 18.2;

E. **If FRANCHISEE** makes any material misrepresentations relating to the acquisition of the Franchised Business;

F. **If FRANCHISEE** is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that **A CORP.** believes is reasonably likely to have an adverse effect upon the Franchise, the Trademarks and their associated goodwill, or the **A CORP.** System; or

G. **If FRANCHISEE** fails, for a period of 30 days after having received notification of noncompliance from **A CORP.** or any governmental or quasi-governmental agency or authority, to comply with any Federal, State or Local law or regulation applicable to the operation of the Franchised Business.

15.2 **TERMINATION WITH NOTICE. FRANCHISEE** acknowledges that the occurrence of one or more of the events specified in this Section 15.2 would cause harm to the franchise system and thereby lessen its value. Therefore, **FRANCHISEE** agrees that **A CORP.**, in addition to all other remedies at law or in equity, may terminate this Agreement if **FRANCHISEE** shall become in default of any provision of this Section 15.2 or any other provision of this Agreement, and if **FRANCHISEE** shall not cure such default within 30 calendar days for nonpayment of monies, or for other defaults after receipt of a written notice to cure from **A CORP.**, or for a longer period if so mandated by the laws of the state in which **FRANCHISEE** operates. In the event **FRANCHISEE** is in default of this Agreement within 12 months after a prior default (even if cured), and **A CORP.** has served **FRANCHISEE** with a Notice to Cure with respect to such prior default, upon notice, **A CORP.** may terminate this Agreement upon the occurrence of such subsequent default. **A CORP.** need not allow **FRANCHISEE** the opportunity to cure such subsequent default. In addition to the foregoing, **A CORP.** may, at its option, exercise its Step-In-Rights (as specified in Section 17) in the event of any default contained in this Section 15.2.

**FRANCHISEE** shall become in default under this Agreement:

A. **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to **A CORP.** on the date due;

B. **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other Franchisees under any Interterritorial Agreement (as specified in Section 7.2) on the date due;

C. **If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other creditors on the date due;

D. **If FRANCHISEE** fails to submit reports or financial data which **A CORP.** requires under this Agreement, including but not limited to those specified in Section 13;

E. **If FRANCHISEE** fails to obtain and maintain in effect the minimum insurance requirements specified in Section 12.6;

F. Upon the closing of **FRANCHISEE's** operations for a period of 10 or more

**AA143**

consecutive days without the prior written approval of **A CORP.**;

**G.** If **FRANCHISEE** fails to submit to binding arbitration of disputes as specified in Section 19.7;

**H.** If **FRANCHISEE** changes any aspect of the **A CORP.** system or offers any service or product which has not been approved in a prior writing by **A CORP.**;

**I.** IF **FRANCHISEE** fails to diligently, faithfully and in a business like manor, promote, market and conduct the Franchised Business within the Territory as specified in Section 3. 1B; or

**J.** If **FRANCHISEE** fails to comply with any of the duties imposed by this Agreement, the Operations Manual or other operations memoranda issued by **A CORP.** including, without limitation, the failure to cure an operational problem.

**15.3** **CONFORMITY WITH LAW.** Notwithstanding anything to the contrary contained in this Section, in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Franchise and the parties shall limit A CORP.'s rights of termination or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods required by such laws and regulations. **A CORP.** shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or dispute relating to this Agreement or its termination.

**A.** **FRANCHISEE** Shall be solely responsible for the conduct of its business and for compliance with all the laws, statutes, ordinances, orders or codes of any public or governmental authority pertaining to **FRANCHISEE** and its business operated pursuant hereto and for the payment of all taxes, permits, licenses and registration fees and other charges or assessments arising out of the establishment and operation of **FRANCHISEE'S** business.

**15.4** **CROSS DEFAULT.** If **FRANCHISEE** shall be in default of any other agreement between **A CORP.** or its affiliated companies including, without limitation, any Promissory Note, then **FRANCHISEE** shall be deemed in default of this Agreement.

**15.5** **FRANCHISEE TERMINATION OPTION. FRANCHISEE** shall have the option to terminate this Agreement, only during the initial five (5) year term, subject to adherence to the following terms and conditions:

**A.** **FRANCHISEE** shall notify **A CORP.** in writing of his intent to terminate the Agreement no later than 90 days prior to the closing date for placement of advertisements in the yellow page book or books distributed in **FRANCHISEE's** Territory. If **FRANCHISEE** fails to notify A **CORP.** on or before such 90 day period commences, then **A CORP.** shall exercise its right pursuant to the Power of Attorney, Exhibit B, to retain all of **FRANCHISEE's** operating telephone numbers.

**B.** **FRANCHISEE** shall pay in full all outstanding monies due to **A CORP.**, and shall as well pay a one-time Franchisee Termination Fee as specified in Section 1. 14 herein.

**C.** **FRANCHISEE** shall de-identify all aspects of **FRANCHISEE's** business operation,

**AA144**

including without limitation all forms of advertisements, all vehicle displays, and all invoices, business cards and forms, and shall choose a trade name or trade names which shall not be confusingly similar to **A CORP's** Trademarks or which might give the general public the impression that **FRANCHISEE** is continuing to operate under the **A CORP.** System. **FRANCHISEE** shall further comply with the terms of Section 16 below.

**D.**   Provided **FRANCHISEE** performs all of the foregoing obligations, **A CORP.** shall agree to waive its rights to enforce the non-competition covenant contained in Section 18.1 and its rights to enforce the Power of Attorney. If **FRANCHISEE** however, fails to perform any of the foregoing obligations or if **FRANCHISEE** attempts to utilize any aspect of **A CORP.**'s Trademarks or System, then **A CORP.** shall retain all rights of enforcement under Section 18.1.

## 16.   RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon termination or expiration of this Agreement, **FRANCHISEE** shall within 30 calendar days:

**A.**   Pay all Continuing Royalty Fees, Advertising Contributions and all other charges or debts owed to **A CORP.**, including the balance due on financing or other extension of credit granted or given by **A CORP** to **FRANCHISEE.**

**B.**   Cease to hold himself or herself out as an **A CORP.** System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by **A CORP.** and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the **A CORP.** office licensed by this Agreement and from all vehicles. **FRANCHISEE** shall contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisement, listings, or domains and, within 60 days, work to ensure that the change or deletion is completed.

**C.**   Return to **A CORP.** all manuals and printed materials belonging to **A CORP.** or bearing the Trademarks.

**D.**   Except with respect to termination under Section 15.5, at the option of **A CORP.,** **FRANCHISEE** shall:

1.   Remove all equipment, furnishings and printed materials from the office premises; or
2.   Sell such equipment, furnishings and printed materials to **A CORP.** at their then current fair market value, as determined by **A CORP.** In no event shall **A CORP.** be liable for payment to **FRANCHISEE** for intangibles including, without limitation, goodwill;
3.   Assign to **A CORP.** the lease for the franchised premises; and
4.   Execute such documents as **A CORP.** may reasonably require to effectuate termination of the Franchise and **FRANCHISEE's** rights to use the Trademarks and the **A CORP.** System including, without limitation, release documents.

**A CORP.** retains the right to enforce the Power of Attorney executed in conjunction with this agreement.

## 17.   STEP-IN-RIGHTS

**AA145**

**17.1    CAUSE FOR STEP-IN.    A CORP.**, at its sole discretion, may exercise the following Step-In Rights in order to prevent an interruption of the Franchised Business which would cause harm to the franchise system and thereby lessen its value. In the event of **FRANCHISEE's** default (as specified in Section 15 herein) or in the event of the death or permanent incapacity of **FRANCHISEE** (as specified in Section 14.2 B), **FRANCHISEE** authorizes **A CORP.** to operate his franchise for as long as **A CORP.** shall deem necessary and practical or upon transfer to an approved franchisee under Section 14.2. Such Step-In Rights shall be exercised without waiver of any other rights or remedies which **A CORP.** may have under this Agreement.

**17.2    DUTIES OF PARTIES.    A CORP.** shall keep in a separate account all monies  generated by the operation of **FRANCHISEE's** business by **A CORP.'s** representatives. **A CORP.** shall deduct all expenses of the business, including reasonable compensation and expenses for **A CORP.'s** representatives from this separate account. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

## 18.    NON-COMPETITION AND NON-DISCLOSURE COVENANTS

**18.1    NON-COMPETITION.    FRANCHISEE** agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither **FRANCHISEE** nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the **A CORP.** System. Such obligation shall apply within the Territory, within 100 miles of the Territory or within 100 miles of any territory covered by another **FRANCHISEE** of **A CORP.** or operated by **A CORP.'s** affiliates. **FRANCHISEE** further agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, **FRANCHISEE** and the persons covered by this section shall not attempt to solicit for employment any person who is, at the time of such solicitation, employed by **A CORP.** or any other franchisee of **A CORP.**, nor induce any such person to leave his or her employment.  **FRANCHISEE** agrees that as a condition of his affiliation with **A CORP.**, its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by **A CORP. FRANCHISEE** acknowledges that such prohibitions are necessary to protect **A CORP.'s** trade secrets and to otherwise insure the integrity of the **A CORP.** System and the rights of **A CORP.'s** other franchisees. The amounts of time and distance set forth above may be deemed to be divisible into units of one month and one mile and may be reduced should a court find them to be unreasonable. **A CORP.**, in addition to such other rights it may have, shall have the right to injunctive relief to enforce its rights pursuant to this provision. The violation of this provision during the term of the Agreement shall result in the automatic termination of the franchise as specified in Section 15.1.

**18.2    NON-DISCLOSURE. FRANCHISEE** acknowledges that disclosure of any aspect of the System or duplication or disclosure of this Agreement, or the Operations Manual could substantially harm **A CORP.**, **FRANCHISEE** and other franchisees of **A CORP.** **FRANCHISEE** agrees that at no time during or after the term of this Agreement or early termination for whatever reason will he or she disclose, either orally or in writing or by any other medium, or duplicate or in any way make available the contents of the Operations Manual, this Agreement, any other documents, videotapes, materials, or any trade secrets, formulas or other aspects of the System to any person, corporation or other entity other than

**AA146**

FRANCHISEE attorneys, accountants or similar parties. Such persons may have access to such materials only to the extent necessary for the transaction of business by **FRANCHISEE**. No such person shall be permitted to retain any software, materials or copies of or notes concerning any such materials. All of the foregoing shall be returned to **A CORP.** immediately upon termination or expiration of this Agreement. The prohibition of this section applies equally to all stockholders, directors, officers, and employees of **FRANCHISEE**. **A CORP.** shall have the right to injunctive relief to enforce the provisions of this Section. The violation of this provision during the term of the Agreement shall result in the automatic termination of the Franchise, as specified in Section 15. 1.

## 19. GENERAL CONDITIONS AND PROVISIONS

**19.1    TITLES FOR CONVENIENCE.** Section and paragraph titles used in this Agreement are for convenience only and are not deemed a part of the text.

**19.2    ENTIRE AGREEMENT.** This Agreement, including appendices and attachments, constitutes the entire agreement of the parties (and into which all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter are merged) and except as otherwise provided, there are no other oral or written understandings or agreements between the parties relating to the Franchise. Nevertheless, nothing in this Agreement or in any related agreement is intended to disclaim the representation that we have made in the franchise disclosure document.

**19.3    AMENDMENT IN WRITING.** No amendment or other modification of this Agreement shall be valid or binding on either party, unless reduced to writing and executed by the parties.

**19.4    RELATIONSHIP**
**A.    FRANCHISEE** is an independent contractor and is not the agent, joint venturer, partner or employee of **A CORP.** and, except as expressly provided in this Agreement, **A CORP.** shall not be obligated by any agreements, representations or warranties made by **FRANCHISEE** to any person, nor with respect to any other action of **FRANCHISEE**, nor shall **A CORP.** be obligated for any damages or monetary obligations of any sort to any person whether caused by **FRANCHISEE**'s action, failure to act, negligence, or willful conduct.

**B.** Except as expressly set forth herein, **A CORP.** does not reserve control over nor take responsibility for the conduct or actions of any of **FRANCHISEE**'s owners, directors, or employees, nor shall      **A CORP.** have any control over the employment, discharge, compensation or working conditions of any such owner, director or employee of **FRANCHISEE**.

**C.    FRANCHISEE** shall identify himself in all aspects of his business operation, including on all forms and in all advertisements, as being: "Independently Owned and Operated".

**19.5    NO WAIVER.** No waiver by **A CORP.** of any breach or series of breaches or defaults in performance by **FRANCHISEE**, and no failure, refusal or neglect of **A CORP.** to exercise any right, power or option given to it or to insist upon strict compliance with or performance of **FRANCHISEE**'s obligations, under this Agreement or the Operations Manual, shall constitute a waiver of any provision of this Agreement or the Operations Manual with respect to any subsequent breach or a waiver by **A CORP.** of its right at any time thereafter to

**AA147**

require exact and strict compliance with the provisions of this Agreement.

19.6    **GOVERNING LAW.** This Agreement shall be governed and construed under and in accordance with the laws of the Commonwealth of Massachusetts. **A CORP** and **FRANCHISEE** agree that any action arising out of or relating to this agreement will be brought by the parties only in a Massachusetts state court of Middlesex County, Massachusetts or the United States District Court for the District of Massachusetts in Boston, Massachusetts. **A CORP** and **FRANCHISEE** hereby consent to the jurisdiction of such Courts and further agree to waive any rights or objections to the jurisdiction or venue of any such actions when filed in such courts. If any part or provision of this Agreement is held or declared invalid by a court of competent jurisdiction, such holding or declaration shall affect only that particular part or provision of this Agreement and all other parts or provisions of this Agreement shall continue in full force and effect.

19.7    **MEDIATION AND ARBITRATION. A CORP.** and **FRANCHISEE** agree as a condition to this Agreement to engage in mediation and arbitration prior to the commencement of any court action, except as set forth in Section 19.7 H. **FRANCHISEE**'s failure to submit to mediation and arbitration, shall be deemed a default under Section 15.2. If **A CORP.** must engage an attorney to enforce its rights under this Agreement, **FRANCHISEE** shall reimburse **A CORP.** for all of its reasonable attorney's fees, court costs and expenses incurred in connection with such legal action.

A.    Before the commencement of any arbitration, **FRANCHISEE** and **FRANCHISOR** shall submit to the following mediation process:

   1.    **FRANCHISEE** shall promptly submit in writing the nature of his grievance with **A CORP.** along with any reasonable suggestions for the dispute's possible resolution; and

   2.    Within 30 days, the **FRANCHISEE** shall attend a mediation meeting with **A CORP.** in Boston, Massachusetts to discuss in detail the dispute and to work towards its possible resolution. **A CORP.** shall select the mediator. **FRANCHISEE** and **A CORP.** shall share equally in the cost of the mediation session.

         If the parties are unable to reach an amicable solution, then the dispute shall be submitted to arbitration as described below:

B.    Prior to any arbitration proceeding taking place, **A CORP.** and **FRANCHISEE** shall, have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect to the controversy or claim being arbitrated. These hearings shall be held in Boston, Massachusetts.

C.    Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claim that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. **A CORP.** and **FRANCHISEE** agree that arbitration shall be conducted on an individual and not a class-wide basis.

**AA148**

D.  If, however, a court of competent jurisdiction determines that any such provisions of this Agreement are unlawful-in any way, such court may modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision of this Agreement by which this Agreement shall be governed by and construed under Massachusetts law, all issues relating to arbitration or the enforcement of this Agreement to arbitrate contained herein shall be governed by the United States Arbitration Act, 9 U.S.C. § I et seq., and the federal common law of arbitration.

E.  Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. Except as provided for in Sections 19.9 and 19. 10,    A CORP. and FRANCHISEE (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damage sustained by it.

F.  This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear. The arbitration proceedings shall take place in Boston, Massachusetts unless otherwise agreed by A CORP. and FRANCHISEE.

G.  A CORP. and FRANCHISEE agree that no action (whether for arbitration, damages, injunctive, equitable or other relief, including but not limited to rescission) will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this agreement or otherwise, unless brought before the expiration of the earlier of 1 year after the date of discovery of the facts resulting in such alleged liability or obligation or 2 years after the date of the first act or omission giving rise to such alleged liability or obligation, except that where state or federal law mandates or makes possible by notice or otherwise a shorter period, such shorter period shall apply.

H.  The obligation to arbitrate or mediate shall not be binding upon either party with respect to claims relating to A CORP.'s trademarks, service marks, patents or copyrights; request for temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

19.8  **NOTICES**.
All written notices to A CORP. permitted or required to be delivered by the provisions of this Agreement or the Operations Manual shall be deemed so delivered 3 days after being placed in the United States Mail, by Certified Mail, Return Receipt Requested, or by receipted overnight carrier to A CORP., 268 Rangeway Road, P.O. Box 290, N Billerica, Massachusetts 01862, Attn. President or to such other address or addresses as A CORP. shall from time to time designate in the Operations Manual or in writing to FRANCHISEE at the location described in Section 1.2 above, or to such other address as FRANCHISEE may from time to time designate in writing to A CORP.

19.9  **INDEMNIFICATION.  FRANCHISEE** agrees to hold A CORP. harmless and indemnify A CORP. and its officers, agents and employees of and from all suits, actions, claims and

**AA149**

other proceedings brought by any and all persons or entities as a result of services, representations, conduct or work performed by **FRANCHISEE**, its agents, employees, subcontractors or assigns, or in the event **A CORP**. exercises the Step-In-Rights specified in Section 17. **FRANCHISEE** agrees to pay any and all expenses or fees, including reasonable attorney's fees, incurred by **A CORP**., its affiliates, subsidiaries or agents, resulting from any and all claims brought by or against **FRANCHISEE**, its officers, directors, employees or stockholders.

**FRANCHISEE** shall indemnify and hold **A CORP**. harmless of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance of Exhibit B, Power of Attorney.

The above indemnification provisions shall not be construed, with regard to a particular claim, to apply to any claim where its operation would be against public policy. It is the intent of the provisions above to permit the maximum indemnification of **A CORP**. by **FRANCHISEE** as permitted by law.

**19.10  LIMITATION OF LIABILITY OF A CORP.**  If **A CORP**. shall be found liable to **FRANCHISEE** for any claim based upon this Agreement, **A CORP**.'s liability shall be limited to the amount of the initial Franchise Fee (specified in Section 1.7 herein) that has actually been paid by **FRANCHISEE** at the time of judgment.

In no event will **A CORP**., any affiliate, agent, or employee of **A CORP**. be liable for any other damages including, but not limited to, loss of business, revenues or profits. **FRANCHISEE** agrees that this limitation of liability will apply to any claim **FRANCHISEE** shall have against **A CORP** limited to, claims based on contract violations, torts (such as negligence) or strict liability.

**19.11  LATE PAYMENT FEES.** If **FRANCHISEE** fails to pay **A CORP**. all or any portion of the Continuing Royalty, or Marketing Fund Contribution or any other obligation due to **A 1CORP.**, promptly when due, **FRANCHISEE** shall pay to **A CORP**. a late payment fee equal to 18% per annum of such delinquent payments. Notwithstanding the foregoing, if the amount of the late payment fee shall be greater than any such charge permitted by applicable law, such charge shall be reduced to an amount equal to the maximum lawful charge, it being the intention of the parties that such late charge shall in no event be greater than that permitted by law.

**19.12  SURVIVAL OF COVENANTS.**  The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement, shall be enforceable notwithstanding the expiration or other termination of this Agreement for any reason whatsoever.

**20.     CAVEAT**

The success of the business venture contemplated to be undertaken by **FRANCHISEE** by virtue of this Agreement is speculative and depends to a large extent upon the ability of **FRANCHISEE** as an independent business person as well as other factors. **A CORP**. does not make any representation or warranty as to the potential success of the business venture contemplated by this Agreement.

**AA150**

**FRANCHISEE** recognizes and understands that he or she may incur other expenses and/or obligations as part of the initial investment in the franchised business or on an ongoing basis which the terms of this Agreement may not address, and which include without limitation initial equipment and supplies, advertising expenses, telephone, insurance, grand opening promotions and working capital necessary to commence operation.

**FRANCHISEE** acknowledges that he or she has read this Franchise Agreement as well as the Disclosure document, and that he or she has been give the opportunity to clarify provisions that he did not understand and to consult with an attorney or other professional advisor. **FRANCHISEE** represents that he or she understands and agrees to be bound by the terms, conditions and obligations of this Agreement.

**FRANCHISEE** acknowledges that he or she may have to prepare for and pass certain local and state mandated examinations in order to operate the Franchise. **FRANCHISEE** alone shall be responsible for the preparation and successful completion of all examinations.

**FRANCHISEE** acknowledges that he or she has entered into this Agreement after making an independent investigation of **A CORP.'s** operations and not upon a representation by **A CORP.** as to profits which **FRANCHISEE** might expect to realize. **FRANCHISEE** acknowledges that prior to the execution of this Agreement, **FRANCHISEE** has had the opportunity to contact existing franchisees of **A CORP.**

21. **RELEASE**

**FRANCHISEE**, his heirs and assigns, hereby remises, releases and forever discharges **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, warranties, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which **FRANCHISEE**, his heirs and assigns now have or ever had against **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents, from the beginning of time until this day.

*[The remainder of the page intentionally left blank]*
*[Signature page follows on the next page]*

**AA151**

**IN WITNESS WHEREOF** the parties intending to be bound legally, have fully executed, sealed and delivered this Agreement as of the day and year first above written.

**A CORP., FRANCHISOR**

By: _____

Witness

Officer

11-18-19
Date

By:    **Quality Air Care Corporation, FRANCHISEE**

_____

Witness

Officer – Klodian Belegu

8-29-19
Date

**AA152**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NY | West Chester | Amawalk | 10501 | 1,219 |
| NY | West Chester | Armonk | 10504 | 7,987 |
| NY | West Chester | Baldwin Place | 10505 | 851 |
| NY | West Chester | Bedford | 10506 | 5,790 |
| NY | West Chester | Bedford Hills | 10507 | 6,408 |
| NY | West Chester | Briarcliff Manor | 10510 | 9,988 |
| NY | West Chester | Buchanan | 10511 | 2,246 |
| NY | West Chester | Chappaqua | 10514 | 11,946 |
| NY | West Chester | Crompond | 10517 | 539 |
| NY | West Chester | Cross River | 10518 | 1,268 |
| NY | West Chester | Croton Falls | 10519 | 316 |
| NY | West Chester | Croton on Hudson | 10520 | 12,810 |
| NY | West Chester | Croton on Hudson | 10521 | 0 |
| NY | West Chester | Golden Bridge | 10526 | 1,809 |
| NY | West Chester | Granite Springs | 10527 | 908 |
| NY | West Chester | Hawthorne | 10532 | 4,931 |
| NY | West Chester | Jefferson Valley | 10535 | 555 |
| NY | West Chester | Katonah | 10536 | 10,739 |
| NY | West Chester | Lincondale | 10540 | 0 |
| NY | West Chester | Maryknoll | 10545 | 141 |
| NY | West Chester | Millwood | 10546 | 1,277 |
| NY | West Chester | Mohegan Lake | 10547 | 7,647 |
| NY | West Chester | Montrose | 10548 | 3,487 |
| NY | West Chester | Mount Kisco | 10549 | 16,638 |
| NY | West Chester | North Salem | 10560 | 4,737 |
| NY | West Chester | Ossining | 10562 | 31,796 |
| NY | West Chester | Peekskill | 10566 | 23,570 |
| NY | West Chester | Cortlandt Manor | 10567 | 19,929 |
| NY | West Chester | Pleasantville | 10570 | 12,680 |
| NY | West Chester | Pound Ridge | 10576 | 5,116 |
| NY | West Chester | Purdy's | 10578 | 681 |
| NY | West Chester | Shenorock | 10587 | 0 |
| NY | West Chester | Shrub Oak | 10588 | 2,282 |
| NY | West Chester | Somers | 10589 | 8,475 |
| NY | West Chester | South Salem | 10590 | 6,767 |
| NY | West Chester | Tarrytown | 10591 | 22,540 |
| NY | West Chester | Thornwood | 10594 | 5,117 |
| NY | West Chester | Valhalla | 10595 | 8,195 |
| NY | West Chester | Verplanck | 10596 | 1,729 |
| NY | West Chester | Waccabuc | 10597 | 968 |
| NY | West Chester | Yorktown Heights | 10598 | 28,647 |

**AA153**

Total Unit(s)[1] Population: 292,729

Initials: _A CORP_

Date: _11-18-19_

Initials: _FRANCHISEE_

Date: _9-29-19_

---

[1] One unit is equal to 125,000 populations.

**AA154**

## EXHIBIT A

## GUARANTY OF PERFORMANCE

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____

Date: _____

By: _____

Date: _____

To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

**Quality Air Care Corporation, FRANCHISEE**

By: _____
Klodian Belegu

Date: 9 - 23 - 19

By: _____

Date: _____

**AA155**

# EXHIBIT D



**Travis Hershner**
NJ Master Plumber/Manager at RM Water Damage Restoration ltd. d/b/a Rooter-Man
Toms River, New Jersey, United States · Contact info

RM Water Damage Restoration ltd. d/b/a Roote...

# EXHIBIT E

**AA158**



September 16, 2024

**VIA FEDEX AND EMAIL (qacpic@gmail.com)**

Klodian Belegu
692 Sussex Court
Toms River, New Jersey  08753

**RE: ROOTERMAN NOTICE OF TERMINATION**

Dear Mr. Belegu,

Reference is hereby made to those certain 13 franchise agreements (collectively hereinafter referred to as the "Franchise Agreements") between yourself and Rooterman, LLC ("Rooterman") for the operation of Rooterman franchised businesses in and around the state of New Jersey. This correspondence follows the Notice of Default and Demand for Cure ("Default Notice") you were sent on August 13, 2024, requiring you to bring your balance due and owing to Rooterman current within 30 calendar days.  You have failed to do so and as such, pursuant to the terms of your Franchise Agreements, **all of your Franchise Agreements are terminated effective immediately.**

As a result of this termination, I would remind you that you are required to **immediately comply** with all of the post-termination provisions of the Franchise Agreements, including your obligations to comply with the **covenant not to compete**, to **cease using our trademarks**, to **disconnect or assign to us all telephone numbers** you use in the operations of your franchised business, and **assigning us ownership of all google business profiles** you use in the operation of your franchised business (please use this email address for assigning such ownership to us: digital@premiumservicebrands.com).

Please understand that the last thing we wished to do was to terminate our franchise relationship with you, but your failure to meet your contractual obligations and cure your defaults specified in the Default Notice could not be ignored.  Rooterman hereby reserves all of its rights and remedies associated with your material default and the corresponding termination of your Franchise Agreements.

Should you have any questions, please do not hesitate to contact me.

Regards,

Nathan King
General Counsel

cc:    Finance (via Email)
       Paul Flick (via Email)
       Carter Purves (via Email)

**AA159**

JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Rooterman, LLC | Klodian Belegu, Quality Air Care Corporation and RM Water Damage Restoration |

| (b) County of Residence of First Listed Plaintiff _____ | County of Residence of First Listed Defendant _____ |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Jeffrey Rosin<br>O'Hagan Meyer, PLLC | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☒ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC Sec. 1114, 1125

Brief description of cause:
Trademark Infringement and Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ $500,000

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 12.5.24 | /s/ Jeffrey M. Rosin |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AA160

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) _Rooterman, LLC v. Klodian Belegu, et al_

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

    [ ]  I.  160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

    [✔]  II.  110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

    [ ]  III.  120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.
    *Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
    YES [ ]    NO [✔]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
    YES [ ]    NO [✔]
    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
    YES [ ]    NO [✔]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
    YES [ ]    NO [✔]

7. Do all of the parties in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
    YES [ ]    NO [✔]

    A.  If yes, in which division do all of the non-governmental parties reside?
    Eastern Division [ ]    Central Division [ ]    Western Division [ ]

    B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
    Eastern Division [✔]    Central Division [ ]    Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
    YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _Jeffrey Rosin_
ADDRESS _140 Kendrick St, Building C, Needham MA 02494_
TELEPHONE NO. _671-843-6801_

(CategoryForm11-2020.wpd )

**AA161**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| Rooterman, LLC | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:24-cv-13015 |
| | ) | |
| Klodian Belegu, Quality Air Care | ) | |
| Corporation and RM Water Damage | ) | |
| Restoration LTD | ) | |
| | ) | |
| *Defendants.* | ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED HEARING

Plaintiff, Rooterman LLC ("Plaintiff") by counsel, pursuant to Fed. R. Civ. P. 65(a), hereby moves this Honorable Court to issue a preliminary injunction against the Defendants, Klodian Belegu, Quality Air Care Corporation and RM Water Damage Restoration LTD (collectively, the "Defendants"), restraining and enjoining Defendants from the unauthorized use of the "Rooterman" trademarks, service marks, and other marks, all as detailed in Exhibit B to the Verified Complaint filed late afternoon December 5, 2024 (but docketed December 6, 2024) (the "Motion").

In support of the Motion, Plaintiff relies on the substance of its Verified Complaint (Dkt. No. 1), and on its Memorandum in Support of Motion for Preliminary Injunction and Expedited Hearing, filed herewith. In accordance with Fed. R. Civ. P. 65(c), Plaintiff agree, to the extent warranted by the circumstances of this case, to give security in an amount that the Court considers proper.

**AA162**

On December 5, 2024, Plaintiff gave Defendants e-mail notice of (and a copy of) the Verified Complaint), and further, Plaintiff gave Defendants email notice (and a copy of) this filing and request for expedited hearing. The undersigned counsel has been communicating directly with Klodian Belegu by email at the same address used for such notice for approximately two months. And, Mr. Belegu utilized that same address to communicate with the parties' mediator, as the parties attempted mediation on December 4, 2024. Thus, the undersigned counsel represents that it is reasonable to believe that Defendants have received a copy of the complaint by email.

Plaintiff further notes for the Court's information that a related American Arbitration Association ("AAA") case, Case No. 01-24-0009-0057, has been filed. While disputes between the parties are required to be arbitrated under their franchise agreement, there is an exception to that requirement where, as here, Plaintiff-franchisor seeks to enforce the alleged misuse of its intellectual property rights and breach of restrictive covenants. That said, there are also unpaid royalties alleged against Defendants-franchisees, and such matters are required to be exclusively litigated and resolved in Arbitration. For these reasons, a corresponding and related arbitration was simultaneously filed between the same parties herein.

Plaintiff respectfully requests that the Court set a hearing on this Motion as soon as possible. *See, e.g.*, *United States Dep't of Labor v. Wolf Run Mining Co., Inc.*, 452 F.3d 275, 281-82 (4th Cir. 2006) (affirming a preliminary injunction even where the enjoined party had less than 24-hours' notice); *see also Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1153-54 (10th Cir. 2001) (affirming preliminary injunction where three-days' notice was provided).

WHEREFORE, Plaintiff moves the Court to grant its Motion and issue a preliminary injunction, enjoining the Defendants with the proposed Order appended below.

**AA163**

ROOTERMAN, LLC

By Counsel

Dated: December 6, 2024

*Jeffrey M. Rosin*
Jeffrey M. Rosin, BBO# 629216
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C West
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 6th day of December 2024, the Plaintiff's Motion for Preliminary Injunction and Expedited Hearing was electronically filed.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*Jeffrey M. Rosin*
Jeffrey M. Rosin

**AA164**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action No. 1:24-cv-13015 |
| ) | |
| Klodian Belegu, Quality Air Care ) | |
| Corporation and RM Water Damage ) | |
| Restoration LTD ) | *PROPOSED DOCUMENT* |
| ) | |
| *Defendants.* ) | |

**ORDER**

Plaintiff Rooterman LLC, having shown due sole and exclusive ownership of the collective "Rooterman" trademarks, all as further described in Exhibit B to the Verified Complaint ("Complaint"), has come before the Court seeking expedited relief and a restraining Order under Fed. R. Civ. P. 65(a).  [Defendants were duly noticed and appeared OR did not appear].  I find a reasonable likelihood of success and a risk of irreparable harm.  Therefore:

It is hereby ORDERED.

A.  Defendant Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, are temporarily, preliminarily, and permanently enjoined as follows:

a.  From registering and/or using any domain name containing the words "ROOTERMAN" or any other confusingly similar words or phrases that infringe on the trademarks of Plaintiff in Exhibit B to the Complaint;

**AA165**

b.  From imitating, copying or making unauthorized use of the distinctive Rooterman trademarks, trade names, and any other confusingly similar marks in Exhibit B to the Complaint;

c.  From using any false designation of origin or false description which does, can, or is likely to, lead the trade or public to believe that any products, services, or materials, distributed or sold by Defendants, is in any manner associated or connected with the Rooterman trademarks, or is offered, sold, manufactured, licensed, sponsored, approved, published, or authorized by Plaintiff, as owner of the Rooterman trademarks;

d.  From engaging in any activity constituting an infringement of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same;

e.  From affixing, applying, annexing and/or using in connection with any accessories, clothing and other related goods and services any false designation of origin or any false description or representation of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same; and

f.  From violating any restrictive covenants, including the non-competition and non-solicitation covenants identified in Section 18 of Exhibit C to the Complaint.

FURTHER, it is hereby ORDERED

B.    Defendant Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them shall affirmatively:

a.  take immediate steps to transfer any and all domain names, such as but not limited to, www.rootermanplumberservices.com that infringe on Plainitff's trademarks to

**AA166**

Plaintiff along with any others it may have registered that include the word "ROOTERMAN" or any other confusingly similar words, no later than within __ business days of this Court's Order;

b.  take immediate steps to transfer telephone numbers and any other third party or public references previously associated with any of Belegu's operations that utilized the Rooterman trademarks and trade names to Plaintiff, no later than within ___ business days of this Court's Order.

c.  take immediate steps to return all manuals, proprietary, confidential or copyrighted materials of Plaintiff to Plaintiff, no later than within __ business days of this Court's Order.

d.  take immediate steps and best efforts to direct others, such as employees like those identified in Exhibit D to the Company, to take-down, remove, and cease and desist claiming association with the Rooterman name, and report back to the Court with a Declaration under 28 U.S.C. Section 1746 no later than ___ business days of this Court's Order on the efforts taken in that regard.

e.  take immediate steps to preserve the status quo, retain and not destroy all individual records and all corporate records of Quality Air Care Corporation, and all records of RM Water Damage Restoration LTD, such that all of them can provide a complete and accurate accounting of all revenues derived since the termination of Belegu's 13 franchise agreements.

SO ORDERED THIS __ DAY OF DECEMBER, 2024

_____

**AA167**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| Rooterman, LLC | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Docket No. 1:24-cv-13015 |
| | ) | |
| Klodian Belegu, Quality Air Care | ) | |
| Corporation and RM Water Damage | ) | |
| Restoration LTD | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## PLAINTIFF S MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION AND E  PEDITED   EARIN

Plaintiff Rooterman, LLC ("Rooterman") hereby submits this memorandum in support of

its motion for a preliminary injunction and expedited hearing (the "Motion").

## I.        INTRODUCTION

Plaintiff is requesting that the Court grant injunctive relief based on the substance of its

Verified Complaint. Specifically, Plaintiff seeks to restrain and enjoin Klodian Belegu, a former

Rooterman franchisee who, individually or through Quality Air Care Corporation (of which he

is/was sole owner) owned 13 franchise markets, from:  his individual (and/or through his defendant

corporations') ongoing unauthorized use and display of Plaintiff' trademarks, service marks, and

other marks; his individual (and/or through his defendant corporations'); his breaches of post-

franchise termination restrictive covenants; and his individual (and/or through his defendant

corporations') improper use of Plaintiff's confidential and trade secret information.

All of the relevant factors to be considered in granting a preliminary injunction are present:

(1) Plaintiff has a strong likelihood of success on the merits; (2) the relative harm to the

1

**AA168**

Defendants, if any, is outweighed by the irreparable harm that has occurred and will continue to occur to Plaintiff if the injunction is not granted; (3) the Defendants' unauthorized use of Plaintiff's trademarks, service marks, and other marks at issue harms the public interest; and, (4)  it is in the best interest of the public for the Court to grant the Motion.

## II.    FACTUAL BAC    ROUND

Rooterman is a national franchise brand, and has duly registered numerous trademarks, identified in Exhibit B to the Verified Complaint filed December 5, 2024. Rooterman grants franchises to qualified persons to establish and operate businesses that provide residential and commercial plumbing, drain, and related services to same which can include, without limitation, clean up/restoration services upon such things as water damage. Rooterman does so under a standard and unique system developed by the company. As part of the franchise agreement, Rooterman grants the right to use its federally-registered trade name, logo and other proprietary marks; *r  ided    e er,* that a franchisee must operate in accordance with Rooterman's uniform standards and meet the duties and requirements set forth by way of contract (*i e* , the applicable franchise agreement(s)) (the "Rooterman System").

Rooterman details its proprietary and unique Rooterman System in its various proprietary training operations manuals, and requires each franchisee to comply therewith. Rooterman supports and assists each franchised location, in part, by monitoring the franchisee's compliance with its standards, specifications, policies, and procedures.  This support and assistance enables Rooterman to duplicate the customer experience everywhere, and it also safeguards the goodwill, favorable reputation, and positive image associated with the Rooterman System and its logos, symbols, trademarks, and service marks.

**AA169**

Since its founding by A. Corp., which was acquired in early 2022, Rooterman has expended substantial amounts of time, money, and effort to create and promote its favorable reputation and positive image by, among other things, developing strong brand recognition of its distinctive color schemes, logos, and symbols as trademarks, and service marks to identify the source, origin, and sponsorship of its system's facilities and services, all of which are identified in Exhibit B to the Verified Complaint (the "Rooterman Marks"). Pursuant to the Rooterman franchise agreements, all right, title, and interest in the Rooterman Marks, as well as the logos, trade styles, color combinations, designs, signs, symbols, and slogans of Rooterman used by franchisees in their franchised businesses, are owned by and remain solely vested in Rooterman.

Belegu, either individually or through the defendant Quality Air Care Corporation he solely owned, owned 13 franchise markets, acquired from 2019-2021. A true and correct copy of an exemplar of the 13 franchise agreements is attached as Exhibit C to the Verified Complaint; however, as the Verified Complaint sets forth, all 12 others are identical in all relevant respects. Thus, Belegu had the right to use the Rooterman Marks in 13 territories, and he (or Quality Air Care Corporation) was bound by the provisions of those franchise agreements, and the provisions identified in Exhibit C to the Verified Complaint.

Belegu was sent a default notice on August 12, 2024 as a result of his failure to pay royalties and other fees, which was a violation of Section 15.2(A) of the franchise agreements. *ee* Verified Complaint, Exhibit C at § 15.2(A). This Section states in pertinent part: "Franchisee acknowledges that the occurrence of one or more of the events in this Section 15.2 would cause harm to the franchise and thereby lessen its value." *ee* Verified Complaint, Exhibit C at § 15.2(A). Belegu failed to cure this default within the 30 calendar days he was offered. As such, all 13 franchise

**AA170**

agreements were terminated by notice dated September 16, 2024, and a true and correct copy of that notice is attached as Exhibit E to the Verified Complaint.

Upon termination, Belegu was obligated to completely disassociate from the franchise, return any proprietary and/or confidential manuals or materials, and not use any of the Rooterman System Marks.  *ee* Verified Complaint, <u>Exhibit C</u> at § 16(B). The Franchise Agreements state in relevant part:

> Upon termination or expiration of this Agreement, Franchises shall within 30 calendar days . . . Cease to hold himself or herself out as an  Rooterman  System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by A Corp. and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the A Corp. office licensed by this Agreement and from all vehicles . . . and  Return to A Corp. all manuals and printed materials belonging to A Corp. or bearing the  Rooterman  Trademarks.

*ee* Verified Complaint, <u>Exhibit C</u> at §§ 16(B)-(C)

The Franchise Agreements also set forth certain protocols and procedures required of Belegu upon termination, including *inter alia*: (a) taking such action as may be required to ensure the change or deletion of the Rooterman Marks from internet advertisements, listings, or domains; (b) cease holding himself out as a Rooterman System franchise; (c) promptly returning all manuals and printed materials belonging to the Rooterman System or bearing the Rooterman Marks; (d) ceasing use of the Rooterman Marks, color combinations, designs, symbols and slogans.  *ee* Verified Complaint, <u>Exhibit C</u> at § 16.

Notably, the Franchise Agreements set forth a 3-year non-competition/non-solicitation restriction, and the area applicable was 100 miles of the territory of the franchise and 100 miles of the territory of any other franchisee.  *ee* Verified Complaint, <u>Exhibit C</u> at § 18.1. Notably, the Franchise Agreements state in relevant part:

**AA171**

> Franchisee agrees that as a condition of his affiliation with A Corp., its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by A Corp. Franchisee acknowledges that such prohibitions are necessary to protect A Corp's trade secrets and to otherwise insure the integrity of the Rooterman System and the rights of A Corp's other franchisees.

*ee* Verified Complaint, <u>Exhibit C</u> at § 18.1. Each franchise agreement provided protections for the confidential information/trade secrets of the Rooterman system, and mandated that these materials be returned upon termination. *ee* Verified Complaint, <u>Exhibit C</u> at §§ 16(C), 18.2.

The Franchise Agreements also provide Rooterman with a right to seek injunctive relief in the event of a violation of Rooterman's rights in relation to those marks. *ee* Verified Complaint, <u>Exhibit C</u> at §§ 18.1, 18.2.

However, Belegu has failed to comply with his obligations under the Franchise Agreements, including by: (a) failing to comply with the above obligations in full and return any operation manuals or other confidential, proprietary and trade secret materials to Plaintiff; (b) flagrantly misusing the Rooterman Marks as alleged in the Verified Complaint; and (c) directly and flagrantly competing and soliciting in violation of the exclusivity/non-competition/non-solicitation/confidentiality protections in the Franchise Agreements. Specifically, Belegu does so through a company that goes by the name above, "RM Water Damage Restoration LTD". Indeed, this Company is, in effect, the same operating entity Belegu formed while he was a franchisee (formed in December 2022 *i e ,* the same year Plaintiff purchased the Rooterman assets and franchise agreements from A. Corp.) Belegu has been, in essence, operating his full franchise business in 13 markets under another name.

Indeed, contrary to his post-termination obligations, Belegu and his entities continued to operate a Rooterman business displaying and advertising the Rooterman Marks. The most flagrant and offensive violation is the website, www.rootermanplumberservices.com, as indicated in

**AA172**

Exhibit A to the Complaint. This website was recently rerouted to a website, www.911SewerDrain.com.[1] Thus, it is possible Belegu has finally taken certain steps required, but not all of them, as there are multiple other matters to address, as detailed in Paragraph 19 of the Verified Complaint, including, without limitation:

     a.   https://x.com/rootermannj

     b.   https://maps.app.goo.gl/d8x4Y4eMCPXoSZ46A

     c.   https://www.yelp.com/biz/Rooterman-of-nj-toms-river

     d.   https://www.homeadvisor.com/rated.RooterMan.130537299.html

Further, it is even notable, curious and questionable that Belegu has chosen "RM" (the initials of Rooterman) to lead his company's name, RM Water Damage Restoration. This RM is one of Plaintiff's franchise marks as well. *ee* Verified Complaint, <u>Exhibit B</u>. Belegu even employs persons who hold themselves out as working for his company, and that this company is "d/b/a Rooterman". *ee* Verified Complaint, <u>Exhibit D</u>.

In short, Defendants continue to represent to the world that they are "Rooterman of New Jersey" when, since termination, they are most certainly not. Defendants use multiple trademarks of Rooterman, including even the "RM" logo, and Rooterman to the Rescue, throughout their website, and claim substantial goodwill for themselves that belongs to Rooterman.

---

[1]    Plaintiff continues to investigate this matter and, if appropriate, anticipates the possibility of amending the complaint to include this entity as a defendant. For example, as of this day, a Google search of "Rooterman of New Jersey" brings up an ad for 911 Sewer     Drain. (<u>See</u> Exhibit 1 hereto) This means that this company is still using Rooterman marks to direct traffic to Belegu's "new" website.

    Moreover, to the extent 911 Sewer     Drain is some new entity, it is notable that Belegu claims it has been operating since 2020. (<u>See</u> Exhibit 2 hereto) which would be in direct competition with Belegu's multiple franchises, purchased between 2019 and 2021.

**AA173**

This is not just a violation of the Lanham Act; it is a violation of the post-termination restrictive covenants in all 13 of Belegu's franchise agreements.

### III.    AR UMENT

A party seeking a preliminary injunction must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm without an injunction, that the balance of equities tips in its favor, and that an injunction serves the public interest. *inter    at ral  es Def    n il, n* , 555 U.S. 7, 20 (2008); *see als     et er   s   Mass  en ri a   n* , 32 F.4th 82, 85 (1st Cir. 2022).

Under 15 U.S.C. § 1116, federal courts can grant a preliminary injunction to enjoin activity that infringes federally registered trademarks. *P  lar   r    Pe si  , n* , 789 F.Supp.2d 219, 226 (D. Mass. 2011); *see als      le en, n      re  al*, 60 F.Supp.3d 272, 280 (D. Mass. 2014). The statute provides as follows: "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits . . .." 15 U.S.C. § 1116(a). Thus, the "likelihood of success on the merits" factor is especially important to the preliminary injunction determination. *ee* 15 U.S.C. § 1116(a); *Pe si  , n* , 789 F.Supp.2d at 226 (noting other factors for trademark infringement injunctions follow determinations of likelihood of consumer confusion); *D  n in  D  n ts   ran   ised  ests et    D  nas  n* , 53 F.Supp.3d 221, 227 (D. Mass. 2014) (finding likelihood of success on the merits the most significant factor).

As more-fully described below, and as shown by the Verified Complaint, Rooterman has established all four factors necessary for an Order granting the preliminary relief sought. Accordingly, Plaintiff's request for injunctive relief should be granted.

**AA174**

**A.    Rooter an a a Stron Li elihood of Succe on the Merit of it Clai**

A party seeking a preliminary injunction must show that it is likely to succeed on the merits. *et D nas n* , 53 F.Supp.3d at 227 (citing *i e f t e ra rld, n MD Med e s , n* , 645 F.3d 26, 32 (1st Cir. 2011)). To succeed on a trademark infringement and unfair competition claim, the "plaintiff must prove (1) the mark is entitled to trademark protection, and (2) use by another in commerce that is likely to cause confusion as to the source or sponsorship of the goods or services." *Pe si , n* , 789 F.Supp.2d at 226. Here, like in *Pe si , n* , Rooterman is entitled to trademark protection as it has distinctive federally registered trademarks. *d* (finding federal registration of a distinctive mark eligible for trademark protections); *see als , n as Printin , n* , 908 F.Supp. 37, 43 (D. Mass. 1995) (finding federal registration of marks prima facie evidence of exclusive right to use registered mark in commerce).

"While evidence of actual confusion is often deemed the best evidence of possible future confusion' proof of actual confusion is not essential to finding likelihood of confusion." *rin en is it r M radin r* , 443 F.3d 112, 120 (1st Cir. 2006) (quoting *ttre i, Ma ta r* , 436 F.3d 32, 40 (1st Cir. 2006)). Consequently, the owner of the registered trademark is entitled to relief if use of the contested mark is likely to cause such a likelihood of confusion. *d* ; *see P Per anent Ma e , n astin ressi n , n* , 543 U.S. 111, 117 (2004).

Typically, the First circuit employs an eight-part test to determine whether a likelihood of confusion exists in trademark infringement cases *ee Pe les ed a an Pe le s nited an* , 672 F.3d 1, 10 (1st Cir. 2012) (quoting *Pi n ns de Me ani e de Pre isi n P lar id r* , 657 F.2d 482, 487 (1st Cir. 1981)).

**AA175**

However, the traditional likelihood of confusion analysis is generally unnecessary in the context of a suit against a former franchisee for the continued use of the plaintiff's trademarks. As this Court has stated: "In cases where the use of the franchisor's mark is uncontroverted, a likelihood of consumer confusion is presumed." *re al*, 60 F.Supp.3d at 289-280 (D. Mass. 2014); <u>see</u> also *r es nt l*        , 2013 U.S. Dist. LEXIS 66235 at  4 (D. Mass. May 9, 2013) ("It is unnecessary to wade individually through the eight factors informing a  likelihood of confusion' analysis here, where a franchisee has persisted in unauthorized use of her former franchisor's trademark to operate a business identical to that of her formally licensed franchise.").

Notably, this Court has previously held that " t he continued use of a trademark after breach of a franchise agreement is alone dispositive of the infringement issue." *D n in  D n ts n      a  tra D n ts,  n* , 139 F.Supp.2d 147, 158 (D. Mass. 2001); *see als*      , 2013 U.S. Dist. LEXIS 66235 at  4 (finding former franchisee's continued unauthorized use of franchise trademark "without doubt likely to sow consumer confusion"); *antasti   a s ran  ise   r al  ders  n* , 2019 U.S. Dist. LEXIS 241162 at  6 (D. Mass. Jul. 31, 2019) ("Consumer confusion is presumed, however, in cases where a former franchisee continues to use its franchisor's marks and hold itself out as an authorized franchise when that is no longer the case.").

In this case, the Defendants have continuously used the Rooterman Marks since the Franchise Agreements were terminated. First, and most egregiously, the Defendants have brazenly continued to conduct business using the "Rooterman" trademarks, intellectual property, and name by, *inter alia*, their use of the website www.rootermanplumberservices.com for over two months post-termination.  *ee* Verified Complaint, at <u>Exhibit A</u>; *id*  at   1, 15. This website, and other infringing websites, purport to show that Defendants hold themselves out as an authorized Rooterman franchise, even though the Franchise Agreements were terminated pursuant to

AA176

Belegu's failure to cure defaults.  *ee id* at    13, 15, 19. Notably, Defendants employ persons who hold themselves out as working for "RM Water Damage Restoration," and that this company is "d/b/a Rooterman".  *ee* Verified Complaint, <u>Exhibit D</u>.

Indeed, defendants continue to have a Twitter handle, Google Maps address, Yelp reference, and Home Advisor page identifying themselves as Rooterman of New Jersey in Toms River, New Jersey.  *ee* Verified Complaint,    19. Terminated as of September 16, 2024, the post-termination use of the Rooterman Marks was both expressly prohibited under the Franchise Agreements and an intentional violation of the Lanham Act. Moreover, it gives the confusing and erroneous impression that it is Plaintiff that is the entity conducting business from those sites, when Plaintiff is clearly not. It is completely plausible (and logical) that consumers will erroneously believe the Defendants' work is being carried out under the Rooterman name.  This is inappropriate as a matter of contract and trademark law, and also a matter of great concern should the work not meet Rooterman's quality and brand standards. Such confusion and contact will result in considerable and irreparable harm to Rooterman's business and its relationship with customers.  *ee  a   tra D n ts,  n* , 139 F.Supp.2d at 158 (continued use of a trademark post-franchise termination dispositive of trademark infringement).

Under these circumstances, the Defendants' practice of continued infringement on the Rooterman Marks after the termination of the Franchise Agreements is likely to cause confusion among consumers as to the relationship between Rooterman and the Defendants. This Court should recognize that Rooterman has met its burden of establishing a strong likelihood of success on its trademark infringement claim, as well as irreparable harm under the logic of the cases above that in the area of trademark law, showing a likelihood of success on the merits will drive the irreparable harm inquiry as well.

**AA177**

Rooterman is also likely to succeed on its claims because the Defendants agreed to refrain from any such infringement by and through the Franchise Agreements, yet have clearly violated these provisions. The Defendants' continued use of the intellectual property, trademark, and trade dress constitutes a clear violation of Sections 16 and 18 of the Franchise Agreements, which explicitly requires immediate cessation of use of the Rooterman Marks after termination. *ee* Verified Complaint,    16-17; 44. Defendants have even additionally failed to return proprietary and confidential franchise manuals and other materials to Plaintiff. *d* There remain multiple internet listings still tied to Belegu in Toms River, New Jersey, meaning further that the Defendants have failed to "contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisements, listings, or domains" as required by Section 16(B) of the Franchise Agreements. *d* at   19.

Plaintiff has established likelihood of success on the merits of its claim for breach of contractual and notably, Defendants acknowledged and agreed, pursuant to Sections 18.1 and 18.2 of the Franchise Agreements, that if they failed to perform any of the aforementioned obligations, as required by the Franchise Agreements, Rooterman would be entitled to preliminary injunctive relief, as well as other remedies. *ee* Verified Complaint, <u>Exhibit C</u>, at § 18. *ee       tl  nstr  ents, n       a  er*, 188 F.3d 38, 49 (2d Cir. 1999) (factoring into its analysis the parties' agreement in their contract that a breach would cause irreparable injury), citing   *i  r  itle  ns    en*, 173 F.3d 63, 69 (2d Cir. 1999) (parties' contractual provisions pertaining to agreement to injunctive relief entitled to some weight in the analysis of whether to grant injunctive relief); *see als      ealt , n       e ere*, Civil Action No. 12-1678-PG, 2013 U.S. Dist. LEXIS 135070 (D.P.R. Sept. 19, 2013).

**AA178**

Accordingly, for this reason as well, the relief requested by Rooterman in its Motion should be granted.

**B.    Rooter an ill e Irre ara l ar ed A ent Thi Court rantin It Motion for A Preli inar In unction**

Without injunctive relief, Rooterman will suffer immediate and irreparable injury as a result of the Defendants' continued unauthorized use of the Rooterman Marks.  In the trademark context, 15 U.S.C. § 1116(a) creates a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits for a violation of any right of a registrant of a mark registered in the Patent and Trademark Office. 15 U.S.C. § 1116(a); *see als rit rt r ittle, n* , 944 F.Supp. 95, 98 (D. Mass. 1996) (quoting *n rete Ma iner lassi a n rna ents, n* , 843 F.2d 600, 611 (1st Cir. 1988) ("If the plaintiffs can show a likelihood of success on the merits, "irreparable harm is usually presumed."); *re al*, 60 F.Supp.3d at 289-280 ("In cases where the use of the franchisor's mark is uncontroverted, a likelihood of consumer confusion is presumed."). Courts recognize that irreparable injury occurs when two businesses use the same or similar trademarks and, as the First Circuit has stated: "every customer diverted to a defendant may be an undetectable loss, even a permanent one, to the plaintiff. Thus, a presumption of irreparable injury makes some sense." *Dial Dantia a a*, 425 F.3d 1, 4 (1st Cir. 2005).

Here, Plaintiff has established a strong likelihood of success on the merits because the Defendants have illegally continued the unauthorized use of the Rooterman Marks. Thus, irreparable harm should be presumed, and Rooterman should be found to have satisfied the second factor of the four-part test. Even without that presumption, courts have found that the loss of customer goodwill and business relationships that are a consequence of unfair competition constitute irreparable harm. *iete Des Pr d its estle, asa el etia, n* , 982 F.2d 633,

**AA179**

640 (1st Cir. 1992) ("By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified, and, thus, the trademark owner cannot adequately be compensated."); , 2013 U.S. Dist. LEXIS 66235 at  6 (holding that where former franchisee continues to use franchisor's trademark to "operate a business identical to that of her formerly licensed franchise," the franchisor "suffers harm to its goodwill and reputation, and is unable to protect its other franchisees from the actions of  defendant  while she holds herself out to be a legitimate . . . franchise."); *re  al*, 60 F.Supp.3d at 280-81 (holding franchisor "will be unable to protect the quality of its brand in the absence of a consensual and ongoing franchisor-franchisee relationship" where former franchisee continued to use franchise trademarks).

Indeed, the First Circuit holds: " b y its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly this kind of harm is often held to be irreparable."  *ss  i  ns  f  ar  i  ,  n     a  arat, n* , 102 F.3d 12, 20 (1st Cir. 1996); *see als     n  M  M si  nt  t   enen a* , 2009 U.S. Dist. LEXIS 115734, at  4 (D. Mass. Dec. 7, 2009) ("Once copyright infringement is established, irreparable injury is generally presumed, as is the conclusion that monetary damages alone are inadequate to compensate plaintiffs."); *see als     a  er,* 188 F.3d at 49 (factoring into its analysis the parties' agreement in their contract that a breach would cause irreparable injury),

In this case, Defendants' misuse of the Rooterman Marks has resulted in Rooterman losing control over a number of proprietary items, and over the quality of goods and services provided under the Rooterman Marks in Belegu's markets, thereby resulting in clear irreparable harm to

**AA180**

Plaintiff and its trademarks. This Court should find that Rooterman has met its burden of establishing irreparable harm absent injunctive relief.[2]

### C.   A Preli inar In unction  ill Not Cau e  ar  to An one Other Than The Offendin Defendant    hich Doe Not Out ei h the  ar  to Plaintiff

The harm Rooterman will continue to suffer to its goodwill, reputation, and established customer base without a preliminary injunction far outweighs any harm the Defendants will suffer, if any, should such injunctive relief be granted. In fact, the only potential harm to Defendants are lost profits resulting from their misuse of the Rooterman Marks and violation of the restrictive covenants to which they are bound. This is not irreparable at all. This is, at best, a monetary consequence of Defendants' brazen and intentional conduct.[3]

Moreover, as one court noted, this type of argument deserves no weight, as harm in the form of lost profits where a former franchisee utilizes a franchisor's trademarks without permission, is not entitled to consideration in assessing the harm caused by an injunction. *ee et  D nas n* , 53 F.Supp.3d at 232 (finding former franchisee's potential of lost profits alone does not constitute sufficient hardship); *see als  lassi  a n  rna ents, n* , 843 F.2d at 611 ("Where the only hardship that the defendant will suffer is lost profits from an activity which

---

[2]    In  *le en, n   re al,* the Court partially denied the plaintiff's motion for preliminary injunction as to enforcement of the franchise agreement's "non-compete clause," rejecting the argument that there was irreparable harm as a result of lost profits from a single franchise location selling convenience products. *ee  re al,* 60 F.Supp.3d at 283-286. This is not Plaintiff's argument here. Plaintiff's argument here is in light with  *r es nt l  ee  r es nt l,* 2013 U.S. Dist. LEXIS 66235, at  6 (finding non-compete agreement necessary to protect franchisor's business, especially where franchisee "acknowledged as much in the Franchise Agreement").

[3]    Notably, as set forth in the Motion filed herewith, Defendants also ceased paying royalties to Plaintiff and owe Plaintiff substantial royalties, a matter which will be arbitrated.  In this regard, Defendants undertook a very calculated path to deprive Plaintiff of revenues, retain revenue they should not retain, and continue to use Plaintiff's trademarks and compete in violation of their restrictive covenants post-default and termination.  If anything, any "monetary" harm that may be claimed by Defendants to oppose the Motion should be balanced against the financial harm to Plaintiff that Defendants already caused.

**AA181**

has been shown likely to be infringing, such an argument in defense merits little equitable consideration.'"). And, in a related context, the Second Circuit has rejected any such argument Defendants might make here, holding that prohibiting a party from deliberately infringing upon another party s trade dress does not give the usurping party "any standing to complain that his vested interests will be disturbed." *M    ine    r      a    els,* 69 F.2d 76, 78 (1934) (Hand, J.).

For these reasons, the balance of the equities favors Rooterman, and a preliminary injunction should be issued.

**D.    A  reli  inar  in unction   ill  er  e the  u  lic intere t.**

The public will benefit from the issuance of a preliminary injunction because it will require the Defendants to disassociate and distinguish their business from Rooterman in every way, and not just "some" ways. See, e.g., Footnote 1, <u>supra</u>  Defendants will not be allowed to represent Rooterman in any way, and when members of the public seek out Rooterman, they will not be misdirected to an entity that is not actually Rooterman.  Rooterman customers and members of the public who desire to use well-established Rooterman branded services will actually receive what they wanted to receive.

Notably, where an injunction would halt confusion in the marketplace, public policy weighs in favor of preliminary injunctive relief. *ee   re  al,* 60 F.Supp.3d at 282 (quoting *ert er  , n    Pre isi n Pr d  ts, n  ,* 832 F.2d 697, 700 (1st Cir. 1987) ("Given the societal value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names, courts are in agreement that preventing customer confusion is clearly in the public interest."); *see als      et  D nas n  ,* 53 F.Supp.3d at 232 (finding public interest lies in favor of granting a preliminary injunction where former franchisee

**AA182**

refused to pay renewal fees and continued to operate as a legitimate franchise and use franchise trademarks).

For these reasons, this fourth factor weighs in favor of Plaintiff's requested injunctive relief as well.

## IV.    CONCLUSION

For all of the foregoing reasons, the Motion should be granted in its entirety, and Plaintiff awarded the injunctive relief sought and set forth in its Proposed Order attached to its Motion.

Respectfully submitted,

ROOTERMAN, LLC

By its counsel

Dated: December 6, 2024

*Jeffrey M. Rosin*

Jeffrey M. Rosin, BBO# 629216
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com

16

**AA183**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of December 2024, the Plaintiff's Memorandum in Support of Its Motion for Preliminary Injunction and Expedited Hearing was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

<div style="text-align: right;">

*Jeffrey M. Rosin*

Jeffrey M. Rosin

</div>

**AA184**

# EXHIBIT 1

**AA185**



# EXHIBIT 2

**AA187**







**911 Sewer & Drain**

Overview   Services   Reviews   Updates   Photos

"Clear clogged piping to sink answered all my concerns and questions quite pricey"

View more reviews

From 911 Sewer & Drain

"At 911 Sewer & Drain, located at 1049 Church Road, Toms River, New Jersey, excellence is the standard. Founded in 2020, this plumbing powerhouse specializes in resolving drain blockages and intricate plumbing challenges efficiently and effectively. Their skilled technicians navigate the intricate world of plumbing, ensuring a seamless experience for customers. Whether it's a stubborn clog or a complex plumbing issue, 911 Sewer & Drain is here to take on the challenge and restore balance to your plumbing system, delivering a plumbing experience that sets the benchmark for reliability, professionalism, and customer satisfaction."

Details

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Civil Action No. 1:24-cv-13015 |
| ) | |
| Klodian Belegu, Quality Air Care ) | |
| Corporation, RM Water Damage ) | |
| Restoration LTD and 911 Sewer    Drain ) | |
| Corporation. ) | |
| *Defendants.* ) | |
| ) | |

## **VERIFIED COMPLAINT**

Plaintiff Rooterman, LLC, by its attorneys, O'Hagan Meyer, LLC, for its Verified Complaint ("Complaint") against Defendants, Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD, and 911 Sewer    Drain Corporation, hereby alleges as follows:

## **INTRODUCTION**

1.    This is a case for trademark infringement and violation of post-franchise restrictive covenants. Specifically, defendants are using, without permission or approval, the "Rooterman" trademarks by, *inter alia,* their use of the website www.rootermanplumberservices.com for over two months post-termination.[1] See Exhibit A hereto. Plaintiff, the owner of the Rooterman brand since 2022, is the lawful holder of such trademarks as demonstrated herewith. See Exhibit B hereto. Plaintiff's actual Rooterman website is www.rooterman.com. Defendant Belegu was warned on

---

[1] Following a failed mediation on December 4, 2024, Respondents have now disabled this website. However, the website now directs users to another of Respondents' websites, 911sewerdrain.com. Thus, it is reasonable to conclude that Respondents continue to use the Rooterman trademarks to direct traffic to their entity 911 Sewer    Drain.

**AA189**

September 16, 2024 and on November 13, 2024, to cease and desist, but did not do so (but see Note 1 supra). In fact, defendant Belegu has been, individually, and through the corporate defendant, brazenly and unfairly competing not just through his use and misuse of Plaintiff's trademarks, but through the violation of his restrictive covenants, which all survived the termination of his franchise agreements. Plaintiff seeks injunctive and monetary relief as a result.

## PARTIES

2.      Plaintiff is the successor in interest to A. Corp.'s (a Massachusetts Corporation in Billerica) ownership of the "Rooterman" intellectual property rights, and plaintiff, Rooterman, LLC ("Rooterman") now owns all of those rights.

3.      Plaintiff acquired the Rooterman assets of A. Corp. from Donald MacDonald by way of an asset purchase agreement dated January 20, 2022 ("APA").

4.      Defendant Klodian Belegu ("Belegu") is a former Rooterman franchise owner, and upon information and belief, he resides in Toms River, New Jersey. He is the sole owner of defendant, Quality Air Care Corporation, a New Jersey Corporation, through which he also purchased franchises, but which purchases were guaranteed by him individually.

5.      Belegu is also the sole owner of the defendant corporation, RM Water Damage Restoration LTD which was established and registered with the New Jersey Secretary of State in December 2022. He is also the sole owner of 911 Sewer    Drain Corporation, https://911sewerdrain.com/, incorporated in New Jersey on February 8, 2024, which has competed, and looks to directly compete (and is currently apparently trying to franchise its brand to further compete with Rooterman). As set forth below, Belegu is using these entities in violation of his

2

contractual and legal obligations and, therefore, 911 Sewer    Drain, and RM Water Damage Restoration are liable as well.

## JURISDICTION AND VENUE

6.    This Court has federal question jurisdiction arising from the claims asserted herein, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338. This Court can exercise supplemental jurisdiction over the contract claims that arise out of the same transactions and occurrences under 28 U.S.C. § 1367.  Moreover, the franchise contracts between the parties call for the application of Massachusetts law, where A. Corp. was based and multiple franchisor services were performed for Belegu/his entities; such franchise contracts also required court actions (if any) to be brought in a proper Massachusetts court. As such, personal jurisdiction and venue is proper in this district.

## FACTS

7.    Rooterman has used its trademarks continuously in United States commerce since August 2, 1991.

8.    Rooterman has hundreds of locations, and its services have attained a substantial amount of sales throughout the United States.

9.    As the result of Rooterman's extensive and exclusive use of the Rooterman trademarks and wide-ranging national marketing efforts, the Rooterman trademarks are widely recognized by the general consuming public of the United States. The consuming public in the

3

**AA191**

United States uses the Rooterman trademarks to identify Rooterman's services and associates the mark exclusively with Rooterman.

10.     The Rooterman trademarks are distinctive and famous within the meaning of 15 U.S.C. § 1225(c).

11.     Belegu became a multi-unit franchisee of A. Corp. buying a total of thirteen (13) franchise territories from September 2019 to January 2021:  9 territories in New Jersey, 3 territories in New York and 1 in Pennsylvania.  Certain of these were purchased through his corporation, which he solely owned, defendant Quality Air Care Corporation, but when Belegu purchased franchises through such corporation, he personally guaranteed the obligations of the franchise.

12.     Belegu's 13 franchise agreements with Rooterman are summarized as follows:

(i)     A franchise agreement for the "Ocean County" territory in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, September 5, 2019 ("NJ-1").

(ii)     A franchise agreement for various zip codes in the counties of Essex, Monmouth, and various other counties in New Jersey, signed by Belegu in June 2020 ("NJ-2").

(iii)     A franchise agreement for the "Morris County" and "Passaic County" territories in New Jersey, signed by Belegu in August 2020 ("NJ-3").

(iv)     A franchise agreement for additional zip codes in Monmouth County and Ocean County New Jersey signed by Belegu and his corporation, Quality Air Care Corporation, in January 2021 ("NJ-4").

(v)     A franchise agreement for various zip codes in the "Hudson County" and "Essex County" territories in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, November 2019 ("NJ-5").

(vi)     A franchise agreement for "Somerset County" and for various zip codes in "Middlesex County" in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, November 2019 ("NJ-6").

(vii)     A franchise agreement for various zip codes in the "Hudson County" and "Essex County" territories in New Jersey, signed by Belegu and his corporation, Quality Air Care Corporation, December 30, 2020 ("NJ-7").

4

(viii)    A franchise agreement for additional zip codes in the "Middlesex County" territory in New Jersey, signed by Belegu on December 30, 2020 ("NJ-8")

(ix)    A franchise agreement for the "Bergen County" territory in New Jersey, signed by Belegu and his corporation, Water Damage Solution of Bergen LLC in February 2020 ("NJ-9")

(x)    A franchise agreement for various zip codes in the "Rockland County" territory in New York, signed by Belegu in December 2020 ("NY-1")

(xi)    A franchise agreement for the "West Chester County" territory in New York, signed by Belegu and his corporation, Quality Air Care Corporation, September 2019 ("NY-2").

(xii)    A franchise agreement for various zip codes in the "Richmond County" territory in New York, signed by Belegu in June 2020 ("NY-3")

(xiii)    A franchise agreement for various zip codes in the "Bucks County" and "Montgomery County" territories in Pennsylvania, signed by Belegu in June 2020 ("PA-1")

All of Belegu's (or his solely owned entity, Quality Air Care Corporation's) franchise agreements contained identical relevant terms addressed herein, and one sample copy is attached hereto as Exhibit C.

13.    By notice dated September 16, 2024, all 13 franchise agreements were terminated as a result of default, following a default notice sent to Belegu on August 12, 2024, for his failure to pay royalties and other fees.

14.    Belegu (and/or his applicable entity) failed to return any operations manuals or other confidential, proprietary and trade secret materials to Plaintiff upon the termination of the franchisees.

15.    Moreover, Plaintiff has become aware of Belegu misusing the Rooterman trademarks and competing in violation of the exclusivity/non-competition/non-solicitation/confidentiality protections in his franchise agreements. Specifically, Belegu does so

through a company that goes by the name above, RM Water Damage Restoration LTD and/or 911 Sewer    Drain.  Exhibit A hereto details flagrant violations and misuse of numerous trademarks identified    as    owned    by    Plaintiff    in    Exhibit    B    using    the    website, www.rootermanplumberservices.com.

16.    Belegu notably applied to register a trademark for 911 Sewer    Drain on or about April 8, 2022, within a few months of Plaintiff's acquisition of A. Corp's interest in Rooterman. See Exhibit D hereto. The 911 Sewer    Drain mark was first used in commerce on or about February 26, 2024, just before Belegu (and/or his applicable entity) began a continued failure to pay applicable royalties and fees under such franchise agreements.

17.    The website for 911 Sewer    Drain, www.911sewerdrain.com, also contains blog posts dating back to August 10, 2023. See Exhibit E, hereto. Notably, a 911 Sewer    Drain post, dated February 7, 2024, states: "For comprehensive water damage restoration and emergency response services in New Jersey and New York, trust the expertise of 911 Sewer    Drain." See Exhibit F, hereto.

18.    As such, it is reasonable to conclude that Belegu (and/or his applicable entity) began diverting customers, misusing and misappropriating confidential information and trade secrets, and competing directly with Rooterman well before the Franchise Agreements were terminated.

19.    Belegu (and/or his applicable entity) as franchisee was obligated to completely disassociate from the franchise and not use any trademarks of the franchise whatsoever, but has failed and refused to do that. See Exhibit C Section 16(A)-(B). Belegu (and/or his applicable entity)

was also obligated to return all proprietary manuals and materials that belonged to the franchisor as well, but failed and refused to do that. Id. at Section 16(C); see also id. at Section 12.1.B.

20.     Each of Belegu's (or Quality Air Care Corporation's) franchise agreement carried a 3-year non-competition/non-solicitation restriction, and the area applicable was within 100 miles of the territory of the franchise and 100 miles of the territory of any other franchisee. See Exhibit C, Section 18.1. Each franchise agreement provided protections for the confidential information/trade secrets of the franchise system, as well as the mandate that these materials be returned upon termination. See Exhibit C Section 18.2, 16.C

21.     Pursuant to Section 18.1 of the Franchise Agreements:

"Franchisee agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither Franchisee nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the A Corp. System."

22.     Rooterman provides a variety of plumbing, sewer, and drain cleaning services, including emergency plumbing services, drain cleaning, sewer line repair and replacement, water heater repair and installation, toilet repair and installation, garbage disposal repair and installation, sump pump repair and installation, leak detection, waterproofing, water softener repair and installation, and pipe repair and replacement, among other services. See  er i es, Rooterman, https://www.rooterman.com/services/ (last visited Dec. 16, 2024).

23.     Belegu (and/or his applicable entity) have and continue to be directly engaged in services comprising the Rooterman System. According to its own website, 911 Sewer    Drain provides services such as emergency plumbing services, drain cleaning, sewer line repair and

replacement, water heater repair and installation, toilet repair and installation, garbage disposal repair and installation, sump pump repair and installation, leak detection, and pipe repair and replacement, among other services. See Exhibit G hereto.

24.    According to its own website, 911 Sewer    Drain conducts business throughout the state of New Jersey and in New York. See Exhibit F. This is a clear violation of the non-compete/non-solicitation restrictive covenants in the Franchise Agreements because these services are rendered within the restricted area.

25.    Moreover, the 911 Sewer    Drain website further advertises Franchise Opportunities. The website states, in relevant part: "Join a thriving network of motivated entrepreneurs who have discovered the lucrative business of sewer and drain services along with water damage restoration. With our robust support system and industry expertise, you'll be equipped to excel and build a thriving business." See Exhibit G.

26.    Pursuant to Section 19.7 of the Franchise Agreements, Franchisee is required to reimburse Franchisor for all of its reasonable attorney's fees, court costs, and expenses incurred in connection with Franchisor's action to enforce its rights under the Franchise Agreements.

27.    Belegu (and/or his applicable entity) have been, since termination, flagrantly engaged in the identical business they were engaged in as franchisees of Rooterman, with no changes, and pervasive throughout the restricted territory. This is not just a trademark violation; it is a violation of the non-compete/non-solicit/misuse of confidential information and trade secrets inherent in the franchise. These trade secrets include, without limitation, the franchisor's methods of operation, pricing, customers, prospects, marketing and advertising plans and methods, and

other sensitive and proprietary matters that Belegu would only know due to his former franchisee status.

28.    Defendant Belegu, individually and through his companies, continues to use Rooterman trademarks and other intellectual property and while Exhibit A is one substantial such misuse, other misuses include, without limitation:

   a.  https://x.com/rootermannj

   b.  https://maps.app.goo.gl/d8x4Y4eMCPXoSZ46A

   c.  https://www.yelp.com/biz/Rooterman-of-nj-toms-river

   d.  https://www.homeadvisor.com/rated.RooterMan.130537299.html

29.    Belegu uses the Rooterman marks and names unlawfully to also direct consumers to his competing businesses. The Facebook and Google pages for 911 Sewer     Drain were created on former Rooterman pages, and still contain references to the Rooterman marks and names. See Exhibit H hereto; See Exhibit I hereto. It is reasonable to conclude that a consumer would believe that there is a connection between 911 Sewer     Drain and Rooterman.

30.    Further, it is even notable, curious and questionable that Belegu has chosen "RM" (the initials of Rooterman) to lead his company's name, RM Water Damage Restoration.  This RM is one of Plaintiff's franchise marks as well. See Exhibit B.

31.    Belegu even employs persons who hold themselves out as working for his company, and that this company is "d/b/a Rooterman".  See Exhibit J hereto.

32.    In no uncertain terms, Belegu was warned to cease and desist and to undertake all of his post-termination covenants referenced herein, by termination letter dated September 16, 2024. See Exhibit K hereto. Through at least December 4, 2024 (see Note 1 supra), Belegu failed

and refused.  Upon information and belief, even if Belegu has taken some steps to comply since that time, he has not taken all step to comply.

## Count I: Violation of 15 U.S.C. § 1125  all Defendant

33.    Plaintiff repeats the allegations set forth above and below as if fully contained herein.

34.    Belegu's and/or his entities' service marks and infringing domain names are identical or extremely similar to the famous Rooterman trademarks.

35.    Belegu and/or his entities knowingly and willfully had and has a bad faith intent to profit from the use of infringing domain names and the goodwill associated with the Rooterman trademarks.

36.    Belegu and/or his entities knowingly and willfully registered, renewed, and/or used infringing domain names, with content on the domains which are identical to, and/or confusingly similar to, the Rooterman trademarks in Exhibit B, which were distinctive and famous at the time of registration  and renewal of the infringing domain names.

37.    Belegu and/or his entities had a bad faith intent in using the infringing domain names as evidenced by at least the following:

      a.    Belegu, as a former franchisee, knew of the A-Corp's trademark rights in the Rooterman trademarks;

      b.    The infringing domain and use of trademarks on it are identical or nearly identical to the Rooterman trademarks; and

      c.    Belegu and/or his entities intended to divert consumers seeking Rooterman's online location at rooterman.com to the infringing domain names by

AA198

creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the sites at the infringing domain names.

38.     Belegu's and/or his entities' use in commerce of the Rooterman trademarks and similar marks is likely to cause confusion, mistake, or deceive the public into believing that the infringing domain names, websites, and advertisements are authorized, sponsored or approved by Plaintiff.

39.     Belegu's and/or his entities' activities in registering, renewing, and/or using the infringing domain names are in violation of 15 U.S.C. § 1125(d).

40.     Belegu's and/or his entities' registration and use of the infringing domain names, and use of the infringing service marks, is greatly and irreparably damaging Rooterman and will continue to damage Rooterman, which has no adequate remedy at law, and which will continue until preliminarily and permanently enjoined by this Court.

41.     Belegu's and/or his entities' actions constitute unfair competition in violation of 15 U.S.C. § 1125(a).

42.     As a direct and proximate result of Belegu's acts of unfair competition, Belegu and/or his entities' have unfairly acquired and will continue to unfairly acquire income, profits and goodwill.

43.     Belegu's and/or his entities' unauthorized use of the Rooterman trademarks in the sale, advertising, and promotion of its goods and services causes dilution by blurring the distinctiveness, strength, and value of the famous Rooterman trademarks.

44.     Belegu's and/or his entities' unauthorized use of the Rooterman trademarks, as alleged herein, with knowledge of Rooterman's famous mark, constitutes a willful intent to trade

11

on the reputation and recognition of the famous Rooterman trademarks in violation of 15 U.S.C. § 1125(c).

45.    Belegu's and/or his entities' actions in violation of 15 U.S.C. § 1125 are willful and in wanton disregard of the Plaintiff's rights in the Rooterman trademarks.

### Count II: Violation of 15 U.S.C. § 1114  all Defendant

46.    Plaintiff repeats the allegations set forth above and below as if fully contained herein.

47.    Plaintiff's federally registered Rooterman trademarks are distinctive marks that are associated with Rooterman and exclusively identify Rooterman's services to consumers. Plaintiff's federally registered Rooterman trademarks are distinctive and signified Rooterman as a source of services before Defendant used a reproduction, copy, or colorable imitation of the Rooterman trademarks.

48.    Belegu and/or his entities' have used and continues to use the Rooterman trademarks or confusingly similar marks in its domain name, websites, and advertising for goods or services in commerce. This use is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of such goods or services. Belegu's and/or his entities' actions constitute service mark infringement under 15 U.S.C. § 1114.

49.    Belegu's and/or his entities' uses of the Rooterman trademarks are likely to cause initial interest confusion among users and potential users of Rooterman's services.

AA200

50.    Belegu's and/or his entities' uses of the infringing service marks are greatly and irreparably damaging Rooterman and will continue to damage Rooterman, which has no adequate remedy at law, and which will continue until preliminarily and permanently enjoined by this Court.

51.    Belegu's and/or his entities' actions in violation of 15 U.S.C. § 1114 are willful and in wanton disregard of the Plaintiff's rights in the Rooterman trademarks.

### Count III: Breach of Contract

52.    Plaintiff repeats the allegations set forth above and below as if fully contained herein.

53.    Plaintiff has 13 valid contracts with Belegu or his solely owned entity, Quality Air Care Corporation, acquired by and assigned to Plaintiff, reflected by the Franchise Agreements, each in the form of Exhibit C.

54.    Belegu breached or violated his contract(s) by, either directly or through the Defendant entities, using Plaintiff's confidential and trade secret information post-termination, by failing to return proprietary and confidential materials to Plaintiff, by competing with Plaintiff post-termination (and, perhaps, pre-termination, as discovery may reveal), by soliciting Plaintiff's customers for Defendants' own separate business, and by failing to disassociate from Plaintiff's trademarks (and in contrast, continuing to associate with them and misuse them).

55.    As a result of these breaches of contract, Plaintiff suffered, and continues to suffer, ongoing damages in an amount to be proved at trial.

**VERIFICATION**

I, Nathan King, General Counsel for Plaintiff, hereby state under oath, this 16th day of

December, 2024, and under the pains and penalties of perjury, that I have personal knowledge of

the facts above, and as to the accuracy of the exhibits hereto and representations about them.

The above is true and correct to the·best of my knowledge.

Nathan King

14

AA202

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendants Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer   Drain Corporation as follows:

A. A finding that Belegu and/or the Defendant entities have violated 15 U.S.C. §§ 1114 and 1125 by the acts complained of;

B. A finding that Belegu and/or the Defendant entities have breached contracts that Belegu and/or Quality Air Care Corporation entered in the ways set forth above;

C. Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, be temporarily, preliminarily, and permanently enjoined as follows and as permitted by such statutes above, as well as 15 U.S.C. § 1116:

   a. From registering and/or using any domain name containing the words "ROOTERMAN" or any other confusingly similar words or phrases that infringe on the trademarks of Plaintiff in Exhibit B to the Complaint;

   b. From imitating, copying or making unauthorized use of the distinctive Rooterman trademarks, trade names, and any other confusingly similar marks in Exhibit B to the Complaint;

   c. From using any false designation of origin or false description which does, can, or is likely to, lead the trade or public to believe that any products, services, or materials, distributed or sold by Defendants, is in any manner associated or

15

connected with Rooterman, or is offered, sold, manufactured, licensed, sponsored, approved, published, or authorized by Rooterman;

d.  From engaging in any activity constituting an infringement of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same;

e.  From affixing, applying, annexing and/or using in connection with any accessories, clothing and other related goods and services any false designation of origin or any false description or representation of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same; and

f.  From violating any restrictive covenants, including the non-competition and non-solicitation covenant identified above.

D.  And, further, that Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, be Ordered to affirmatively:

a.  take immediate steps to transfer his infringing domain names, such as but not limited to, www.rootermanplumberservices.com to Plaintiff along with any others it may have registered that include the word "ROOTERMAN" or any other confusingly similar words, no later than within five (5) business days of this Court's Order;

b.  take immediate steps to transfer telephone numbers and any other third party or public references previously associated with any of Belegu's operations that utilized the Rooterman trademarks and trade names to Plaintiff, no later than within five (5) business days of this Court's Order.

16

**AA204**

c.  take immediate steps to return all manuals, proprietary, confidential or copyrighted materials of Plaintiff to Plaintiff, no later than within five (5) business days of this Court's Order.

d.  take immediate steps and best efforts to direct others, such as employees like those identified in Exhibit J to the Company, to take-down, remove, and cease and desist claiming association with the Rooterman name, and report back to the Court with a Declaration under 28 U.S.C. Section 1746 no later than within five (5) business days of this Court's Order on the efforts taken in that regard.

e.  take immediate steps to preserve the status quo, retain and not destroy all individual records and all corporate records of Quality Air Care Corporation, and all records of RM Water Damage Restoration LTD and 911 Sewer    Drain Corporation, such that all of them can provide a complete and accurate accounting of all revenues derived since their organization and incorporation in New Jersey, and also since the termination of the franchise agreements, for purposes of calculating damages on the Counts in this Complaint.

E.  For Defendants' violations of 15 U.S.C. §§ 1114 and 1125, Plaintiff be awarded statutory damages under 15 U.S.C. § 1117 per violation, as the Court considers just, and premised upon an accounting of all revenues derived from the using and misusing of Plaintiff's trademarks in Exhibit B to the complaint; and that, upon an award of damages, damages be trebled under 15 U.S.C. § 1117 because of the willful and egregious nature of Defendants' activities;

F.  Award Plaintiff its costs in this action;

17

**AA205**

G. Award Plaintiff treble damages and/or statutory damages, as well as its reasonable attorneys' fees pursuant to 15 U.S.C. § 1117 and attorneys' fees for Plaintiff needing to enforce its rights under the franchise agreement; and

H. Grant Plaintiff all other relief to which it is entitled and such other or additional relief as this court deems just and proper.

I. Cease and desist from using and misusing of Plaintiff's trademarks in Exhibit B to the complaint.

J. Such other and further relief this Court deems necessary and proper.


Respectfully submitted,

ROOTERMAN, LLC

By its Counsel,


Dated: December 16, 2024

_Jeffrey M. Rosin_

Jeffrey M. Rosin, BBO# 629216
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com

18

AA206

# EXHIBIT A

AA207



📞 CALL US NOW!

Rooter Man of NJ is the number one choice for **professional plumbers** and **drain cleaners**. We offer fast, reliable services that will help you when it matters most!

Serving all of **New Jersey**, **Staten Island New York**, and **Bucks County Pennsylvania**



BOOK A PLUMBER YOU

**AA208**







## RESIDENTIAL PLUMBING

Rooter-Man residential plumbers install, repair, and maintain pipes in the drainage system for homes.

CALL US NOW! | 24/7

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  𝕏  ⊙  ᴙ



**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

**SCHEDULE SERVICE**



COMMERCIAL PLUMBING

Our commercial plumbers are specialized plumbers who work on retail & commercial businesses.



24/7 EMERGENCY SERVICE     SERVICES ⌄     BLOG     CONTACT

SCHEDULE SERVICE



EMERGENCY REPAIR

Our emergency plumbers can find the cause of backups, leaks, sump pump failures, and flooding fast!

# Rooter-Man Plumber Services

- 24/7 Emergency Plumbing Services
- Drain Cleaning & Clog Removal
- Garbage Disposal Services

**AA211**

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  X  ⊙  🔊



24/7 EMERGENCY SERVICE     SERVICES ⌄     BLOG     CONTACT

SCHEDULE SERVICE

- And Much More!

VIEW ALL SERVICES



## 📞 NEED A 24/7 EMERGENCY PLUMBER?

Call Us Direct To Speak With One Of Our Coordinators & Have A Rooter Man of NJ
Plumber Immediately Dispatched To Diagnose & Repair Your Plumbing
Emergency!

**AA212**

📞 (888) 317-1702        ✉ info@rootermanplumberservices.com        f  𝕏  ⦿  ⧉



24/7 EMERGENCY SERVICE        SERVICES ⌄        BLOG        CONTACT

SCHEDULE SERVICE



# We Work With Your Budget

We understand that plumbing repairs and emergencies can incur unexpected costs which is why we strive to offer the lowest prices throughout New Jersey when compared to our competitors. We offer a service guarantee and same-day plumbing services.

CALL NOW TO SCHEDULE AN APPOINTMENT

# Schedule Your Same-Day Appointment & Let Us Do the Rest

We have plumbers available 24/7 ready to help you with almost any plumbing repair, clogged drain, leaky pipes, water damage & flooding, garbage disposals, toilets and much more!

SPEAK TO ONE OF OUR BOOKING AGENTS NOW

**AA213**

📞 (888) 317-1702        ✉ info@rootermanplumberservices.com        f  X  📷  🔊



24/7 EMERGENCY SERVICE        SERVICES ⌄        BLOG        CONTACT

SCHEDULE SERVICE





# Find A Rooter-Man Plumber Near You

Contact us now to quickly dispatch a certified Rooter-Man technician near you!

CLICK HERE TO SCHEDULE

# We Fix All Types Of Plumbing Problems

We know that you want the best for your home, family, and business, which is why we strive to provide quality workmanship. Our plumbing technicians are certified in inspections as well as repairs – guaranteed!



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f 𝕏 ⊙ 🔗

**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

**SCHEDULE SERVICE**



Learn More

## Leak Detection

We can help you locate the problem and repair it quickly and affordably.



Learn More

## Drain Cleaning

Rooter-Man has over 50+ years of experience unclogging drains of all types.

📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  🐦  📷  🔗



**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

**SCHEDULE SERVICE**



Learn More

## Video Inspections

Video pipe inspections check the insides of pipes in your home or business.



Learn More

## Water Jetting

Affordable water jetting services that can immediately clear debris from your lines.

**AA216**



24/7 EMERGENCY SERVICE     SERVICES ⌄     BLOG     CONTACT

SCHEDULE SERVICE



Learn More

## Toilet Repair

Rooter-Man provides a wide range of toilet repair and installation services.



Learn More

## Sump Pumps

We provide sump pump installation, maintenance, and repair services.

VIEW ALL SERVICES



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

out some of our reviews below; we think this will help make sure your decision about
who handles your plumbing repairs goes smoothly (and without any surprises!).

# Latest Reviews



**Shore D.**

2/11/2024

Rooter man of nj is the best plumbing service I've ever used, the reason why is because of
employees like Everest who was outstanding and very professional from every aspect I will
most definitely be using this service again thank you so much

read more

**Elizabeth**

1/10/2024

I am very pleased with the quality of work and integrity of the Plummer sent out for the job.
He showed up on a Friday night and diagnosed and repaired a major clog in my kitchen "P"
pipe. He worked meticulously and took his time to make sure the clog was resolved. I high...

read more

**Mikel H.**

7/09/2024

Incredible service plumbing job was awesome!

# 24/7 "Plumber Near Me" Technicians You Can Trust

**AA218**

CALL US NOW! |
24/7



📞 (888) 317-1702    ✉️ info@rootermanplumberservices.com    f 𝕏 ⊙ ⌇

**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

SCHEDULE SERVICE



### NO HIDDEN FEES

We take pride in offering plumbing services with no trip charges (during regular business hours) and no hidden fees.



### GUARANTEED WORKMANSHIP

Our friendly, professional plumbing technicians are ready to help the same day. Guaranteed to get you the prompt, effective service you deserve.



### SERVING YOUR AREA

Rooter-Man has local plumbers that serve your area 24/7. Don't hesitate to give us a call as we can dispatch a plumber to help the same day!

# Latest Blog Posts




## Find Reliable 24 Hour Sump Pump Repair Near Me

by Blog | Dec 4, 2024 | Plumber Services

```html Find Reliable 24 Hour Sump Pump Repair Near Me When it comes to safeguarding your home from potential water damage, having a reliable sump pump in place is crucial. Sump pumps play a vital role in redirecting excess water away from your foundation, especially...

read more



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f   X   ⊙   🔊



**24/7 EMERGENCY SERVICE**    **SERVICES** ⌄    **BLOG**    **CONTACT**

**SCHEDULE SERVICE**



### Finding a Natural Gas Plumber Near Me: Your Local Guide

by Blog | Dec 2, 2024 | Plumber Services

``` ``` html Finding a Natural Gas plumber near me: Your Local Guide When it comes to maintaining the safety and efficiency of your home's gas systems, finding a reliable natural gas plumber near me is essential. Natural gas plumbing requires specialized knowledge and...

read more

**« Older Entries**

# WHY CHOOSE ROOTER MAN OF NJ?

In the plumbing business, experience matters. Our team of **certified plumbers** has successfully resolved countless emergencies. When you choose **Rooter Man of NJ**, you're choosing expertise, reliability, and peace of mind.



📞 (888) 317-1702    ✉ info@rootermanplumberservices.com    f  𝕏  ⬡  📶

24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

## TO SCHEDULE SERVICE CLICK HERE

# ROOTER MAN OF NJ IS TRUSTED BY:

        

# AREAS WE SERVICE

Atlantic County | Bergen County | Burlington County | Camden County | Cape May County | Cumberland County | Essex County | Gloucester County | Hudson County | Hunterdon County | Mercer County | Middlesex County | Monmouth County | Morris County | Ocean County | Passaic County | Salem County | Somerset County | Sussex County | Union County | Warren County

# "Plumbers You Can Rely On."

-5 Star Google Reivews

CALL NOW TO SCHEDULE

AA222



24/7 EMERGENCY SERVICE    SERVICES ⌄    BLOG    CONTACT

SCHEDULE SERVICE

# "Plumbers You Can Rely On."

-5 Star Google Reivews

CLICK HERE TO SCHEDULE

**AA223**



24/7 EMERGENCY SERVICE          SERVICES ⌄          BLOG          CONTACT

SCHEDULE SERVICE





📞 (888) 317-1702　✉ info@rootermanplumberservices.com　f　X　📷　🔊



**24/7 EMERGENCY SERVICE**　**SERVICES ⌄**　**BLOG**　**CONTACT**

SCHEDULE SERVICE

## QUICK LINKS

Plumber Services

24/7 Emergency Plumbers

Water Damage Restoration

Drain Cleaning

Pipe Repair Services

Sump Pump Repair & Installation

Leak Detection

Toilet Repair & Installation

Hydro Jetting / Water Jetting

Video Inspections

Sewer Pump Repair & Installation

Garbage Disposal Repair & Installation

## CONTACT US

Main Office:

**Rooter Man of NJ**

1049 Church Rd.

Toms River, NJ 08755

T. 888-317-1702

E. info@rootermanplumberservices.com

Hours:

Mon-Thurs: 5:00am – 10:00pm

Friday: 5:00am – 6:00pm

Saturday: 9:00am – 5:00pm

Sunday: 9:00am – 3:00pm

Serving all of New Jersey



📞 (888) 317-1702     ✉ info@rootermanplumberservices.com      



24/7 EMERGENCY SERVICE     SERVICES ⌄     BLOG     CONTACT

SCHEDULE SERVICE



Copyright 2023 Rooter-Man Plumbing & Drain Cleaning. All rights Reserved.

Operated as an Independent Franchise All available services, hours of operations, pricing structure, and guarantees may vary by location.

**Privacy Policy**

**AA226**

# EXHIBIT B

**AA227**

# TRADEMARK ASSIGNMENT AGREEMENT

This Assignment Agreement effective January 20, 2022 is made by and between:

**A CORP.,** a Massachusetts stock corporation, having a principal office address located at 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862 (the "Assignor"); AND

**ROOTERMAN, LLC**, a Delaware limited liability company, having a principal office address located at 126 Garrett Street, Suite J, Charlottesville, Virginia 22902 (the "Assignee").

The Assignor and the Assignee are hereinafter referred to, individually, as "Party" and collectively, as "Parties".

WHEREAS, the Assignor is the proprietor and beneficial owner of the trademarks (the "Trademarks") of which the particulars are set forth as follows and in <u>Exhibit A</u> hereto:

"ROOTER-MAN"
Registration Date:  September 3, 1991
Registration No.:  1,655,782



"A ROOTER-MAN TO THE RESCUE"
Registration Date:  August 20, 1991
Registration No.:  1,654,512



"ROTOR-MAN"
Registration Date:  August 2, 1991
Registration No.:  1,848,341



**AA228**

"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date:  August 14, 2012
Registration No.: 4,189,503



"SEWER MAN"
Registration Date: January 18, 2000
Registration No. 2308796



"ROOTERMAN (words only)"
Registration Date: October 12, 2010
Registration No. 3,859,654



"ROOTERMAN TO THE RESCUE"
Registration Date: March 17, 2020
Registration No. 6,013,446



"RM"
Registration Date: March 17, 2020
Registration No. 6,013,441



DocuSign Envelope ID: 0C7AE0CB-4E75-483A-AEEA-18B855298A8

"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,468



"RM (and design)"
Registration Date: April 7, 2020
Registration No. 6,027,470



The trademarks listed below were registered with Canadian Intellectual Property Office by A CORP.:

"ROOTER-MAN"
Registration Date: June 25, 2002
Registration No.:  TMA563953



"ROOTER-MAN PLUMBERS TO THE RESCUE"
Registration Date: October 2, 2002
Registration No.:  TMA568429



**AA231**

"SEWER MAN"
Application Date: October 2, 2019
Application No. 1988014



Whereas, The Assignee desires to acquire from the Assignor all of Assignor's right, title and interest in and to the Trademark registrations, together with the benefit of any use of the Trademarks by the Assignor, and the goodwill of the business relations to the Trademarks and to the wares or services associated with them, to hold unto the Assignee absolutely.

NOW THEREFORE, in consideration of the payment of $250,000 for federal registrations and $38,000 for state registrations, totaling Two Hundred Eighty-Eight Thousand Dollars ($288,000.00), and for good and valuable consideration, the receipt, sufficiency, and adequacy of which is hereby acknowledged the Assignor and the Assignee hereby agree as follows:

1.  The Assignor hereby sells, transfers and assigns to the Assignee, its successors and assigns, the Assignor's entire right, title and interest in and to the Trademark s application and/or registrations, together with (i) the benefit of any use of the Trademark by the Assignor (ii) the goodwill of the business relations to the Trademark and to the wares or services associated with it, (iii) all income, royalties and damages hereafter due or payable to Assignor with respect to the Trademark(s) to hold unto the Assignee absolutely. Nevertheless, Parties agree that Assignee shall not be entitled to any settlement proceeds and/or award in connection with *A Corp. v Palmetto Investments LLC, et al.,* United States District Court, District of Massachusetts, Civil Action No. 20-cv-11901-MLW.

2.  The Assignor incorporates by reference its ownership rights, representations, and warranties set forth in the Asset Purchase Agreement by and between A Corp., Donald MacDonald, as Beneficial Owner of A Corp., and Rooterman, LLC with respect to the Trademarks, subject to all conditions, limitations, limitations on liability and restrictions as set forth therein.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on their behalf by their duly authorized officers and representative on this 20th day of January 20, 2022.

For and on behalf of the Assignor:

**A Corp., a Massachusetts corporation**

DocuSigned by:

*Donald MacDonald*

5273E2256A59407...

Donald MacDonald, President

**AA232**

## Exhibit A

### U.S. and Canadian Marks

| No. | Description | Registration Number | Notes |
|-----|-------------|---------------------|-------|
| 1 | Rooterman Marketing and Advertising Promotions Materials | In Commerce Protection Only | P. 1-20 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 2 | Trademark (TM): Rooterman Plumbers to the Rescue (and Design) | 2433386 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 3 | TM: Sewer Man (and Design) | 2308796 | P. 21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 4 | TM: A Rooterman to the Rescue (and Design) | 1654512 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 5 | Rooter-Man (and Design) | 1655782 | P.21 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 6 | Termanator (and Design) | 1688486 | P. 22 , 70-71 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 7 | Shopper Saver | 1735676 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**AA233**

| 8 | **Shopper Saver (and Design)** | 1770022 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|---|---|---|---|
| 9 | **Liquid Rooter** | 1846083 | P. 22 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 10 | **Rotor-Man (and Design)** | 1848341 | P. 23 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 11 | **Rooter-Man (Design Mark)** | 3,859,654 | P. 24 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 12 | **Rooter-Man (Design Mark)** | 1,655,782 | P. 26 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 13 | **Rooter-Man (Design Mark)** | 1,654,512 | P. 29 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 14 | **TM: Shopper Saver** | 1,7355, 676 | P. 30 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 15 | **TM: Liquid Rooter** | 1,846,083 | P. 31 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 16 | Service Mark (SM): Rotor-Man | 1,848,341 | P. 32 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|----|------------------------------|-----------|------------------------------------------------------------------|
| 17 | TM: Shopper Saver | 1,770,022 | P. 33 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 18 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA563,902 File No.: 1057892 | P. 34, 74-78 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 19 | Canadian Mark: Rotor-Man Plumbers to the Rescue | TMA568,429 File No. 1057895 | P. 36 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 20 | SM: Sewer Man | 1,580,576 | P. 49 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 21 | SM: Sewer Man | 1,218,615 | P. 50 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 22 | SM: Sewer Man | 2,308,796 | P. 51 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 23 | SM: Termanator | 1,688,486 | P. 55 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**AA235**

| 24 | SM: Rooterman "To The Rescue" | 6,013,446 | P. 56 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
|----|-------------------------------|-----------|-------------------------------------------------------------------|
| 25 | SM: RM Guy with Plunger | 6,027,468 | P. 57 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 26 | SM: RM Guy with Pipe Cleaner | 6,027,470 | P. 58 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 27 | SM: RM Logo | 6,013,441 | P. 59 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 28 | TM: Shopper Saver | 1,770,022 | P. 60, 68-69 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 29 | TM: Liquid Rooter | 1,846,083 | P. 61 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 30 | TM: Shopper Saver | 1,735,676 | P. 62, 66-67 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 31 | SM: Rooter-Man | 3,859,654 | P. 79 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

| 32 | **SM: Drain Pro** | 1664949 | P. 86-87 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |
| 33 | **Rooterman Website Content 2014** | TX8-253-353 | P. 87-141 of Schedule 1 to Exhibit A of Rooterman APA dated 1.20.22 |

**Seller also includes, by reference all marks, protections and materials set forth in Schedule 1 to Exhibit A of Rooterman APA dated January 20, 2022 pages 001-141, which is attached to this Assignment and incorporated in its entirety.**

**State Marks**

| A Corp. State Trademark Registrations | | | | | |
|---|---|---|---|---|---|
| State | Mark Registered | Registration Numbers | Registration and renewal dates | Expiration Dates | Comments |
| Alabama | N/A | N/A | N/A | N/A | |
| Alaska | RooterMan, man w/ pipe | 3924 | 27-Sep-05 | 27-Sep-10 | Expired |
| Arizona | RooterMan, man w/ pipe | 58161 | 9-Jun-14 | 9-Jun-24 | |
| Arkansas | RooterMan, man w/ pipe | 500001521 | 7-Feb-20 | 7-Feb-25 | |
| California | RooterMan, man w/ pipe | 52304 | 20-Oct-99 | 20-Oct-24 | |
| Colorado | N/A | N/A | N/A | N/A | |
| Connecticut | RooterMan, man w/ pipe | 39465648 | 25-Jun-20 | 25-Jun-25 | |
| Delaware | N/A | N/A | N/A | N/A | |
| Florida | RooterMan, man w/ pipe | T99000001430 | 5-Jul-19 | 1-Dec-24 | |
| Georgia | RooterMan, man w/ pipe | 1655782 | 3-Sep-91 | 3-Sep-01 | Expired |
| Hawaii | RooterMan, man w/ pipe | 4118950 | 1-Jul-18 | 30-Jun-23 | |
| Idaho | RooterMan, man w/ pipe | 18506 | 7-Jul-15 | 26-Sep-25 | |
| Illinois | RooterMan, man w/ | 84790 | 19-Nov-19 | 22-Feb-25 | |

**AA237**

| | pipe | | | | |
|---|---|---|---|---|---|
| Indiana | RooterMan, man w/ pipe | 2000-0026 | 24-Feb-00 | 25-Feb-25 | |
| Iowa | RooterMan, man w/ pipe | W01225995 | 14-May-19 | 14-May-24 | |
| Kansas | RooterMan, man w/ pipe | 16967 | 28-Mar-20 | 28-Mar-25 | |
| Kentucky | RooterMan, man w/ pipe | 17523 | 9-Jan-15 | 9-Jan-20 | Expired |
| Louisiana | RooterMan, man w/ pipe | 56-4798 | 9-Dec-99 | 9-Dec-29 | |
| Maine | RooterMan, man w/ pipe | 20000097 | 28-May-19 | 20-Oct-39 | |
| Maryland | RooterMan, man w/ pipe | 2000/00918 | 9-Jan-20 | 6-Mar-30 | |
| Massachusetts | RooterMan, man w/ pipe | 57845 | 10-Jun-19 | 10-Jun-24 | |
| Michigan | RooterMan, man w/ pipe | M02498 | 7-May-10 | 9-May-20 | Expired |
| Minnesota | RooterMan, man w/ pipe | 29736 | 14-Mar-00 | 14-Mar-20 | |
| Mississippi | RooterMan, man w/ pipe | 14327 | 3-Apr-20 | 27-Mar-26 | |
| Missouri | N/A | N/A | N/A | N/A | |
| Montana | RooterMan, man w/ pipe | 5.042E+10 | 4-May-20 | 4-May-25 | |
| Nebraska | N/A | N/A | N/A | N/A | |
| Nevada | RooterMan, man w/ pipe | 202100034394-37 | 2-Mar-21 | 11-Mar-26 | |
| New Hampshire | RooterMan, man w/ pipe | 5460 | 13-Dec-11 | 13-Dec-31 | |
| New Jersey | N/A | N/A | N/A | N/A | |
| New Mexico | N/A | N/A | N/A | N/A | |
| New York | RooterMan, man w/ pipe | S24757 | 8-Dec-99 | 8-Dec-19 | Expired |
| North Carolina | | | | | |
| North Dakota | RooterMan, man w/ pipe | 2549996 | 1-Feb-20 | 19-Mar-30 | |
| Ohio | RooterMan, man w/ pipe | 1564852 | 9-Jun-15 | 9-Jun-25 | |
| Oklahoma | RooterMan, man w/ pipe | N/A | 31-Dec-93 | 2-Nov-95 | Expired |
| Oregon | RooterMan, man w/ pipe | 33974 | 3-Jan-00 | 3-Jan-20 | Expired |
| Pennsylvania | RooterMan, man w/ pipe | 3342610 | 19-Sep-05 | 17-Jun-13 | Expired |

**AA238**

| Rhode Island | RooterMan, man w/ pipe | 19961004 | 22-Apr-16 | 10-Oct-26 | |
| South Carolina | RooterMan, man w/ pipe | 15851-R18715 | 13-Jan-17 | 10-Feb-22 | |
| South Dakota | RooterMan, man w/ pipe | 13408 | 2-Jul-21 | 2-Jul-25 | |
| Tennessee | RooterMan, man w/ pipe | 41812 | 20-Apr-20 | 20-Apr-25 | |
| Texas | RooterMan, man w/ pipe | 803743230 | 14-Jan-21 | 14-Jan-26 | |
| Utah | | | | | |
| Vermont | N/A | N/A | N/A | N/A | |
| Virginia | N/A | N/A | N/A | N/A | |
| Washington | RooterMan, man w/ pipe | 28436 | 8-Dec-20 | 16-Dec-25 | |
| West Virginia | RooterMan, man w/ pipe | 1006450 | 24-May-20 | 26-Feb-30 | |
| Wisconsin | N/A | N/A | N/A | N/A | |
| Wyoming | N/A | N/A | N/A | N/A | |

**AA239**

# EXHIBIT C

**AA240**

EXHIBIT B.1

A CORP.

ROOTER-MAN FRANCHISE AGREEMENT

FA 4/18 -- Copyright © 2000-2018 A CORP.  All rights reserved.

**AA241**

## TABLE OF CONTENTS

| ITEMS | PAGE |
|---|---|
| A CORP FRANCHISE AGREEMENT | 1 |
| 1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS ................. | 2 |
|     1.1 Date of Franchise Agreement ............................... | 2 |
|     1.2 Parties ............................................. | 2 |
|     1.3 Licensed Territory ................................. | 2 |
|     1.4 Total Population ................................... | 2 |
|     1.5 Commencement Date ................................. | 2 |
|     1.6 Expiration Date.................................... | 2 |
|     1.7 Initial Franchise Fee .............................. | 2 |
|     1.8 Licensed Businesses ............................... | 2 |
|     1.9 Continuing Royalty ................................ | 2 |
|     1.10 Advertising Contribution ......................... | 2 |
|     1.11 Renewal Fee ...................................... | 2 |
|     1.12 Transfer Fee ..................................... | 2 |
|     1.13 Active Owners .................................... | 2 |
|     1.14 Franchise Termination Fee ........................ | 2 |
| | |
| 2. GRANT OF FRANCHISE ................................... | 3 |
|     2.1 Grant ............................................. | 3 |
|     2.2 Limited License ................................... | 3 |
| | |
| 3. LICENSED TERRITORY ................................... | 3 |
|     3.1 Territory Defined ................................. | 3 |
|     3.2 Interterritorial Policy .......................... | 3 |
|     3.3 Rights Retained .................................. | 3 |
| | |
| 4. TERM OF FRANCHISE AGREEMENT, RENEWAL OPTION ........... | 4 |
|     4.1 Term .............................................. | 4 |
|     4.2 Renewal ........................................... | 4 |
|     4.3 Notice Required by Law ............................ | 4 |
| | |
| 5. FRANCHISE FEE AND CONTINUING ROYALTY ................. | 5 |
|     5.1 Initial Fee ....................................... | 5 |
|     5.2 Continuing Royalty ................................ | 5 |
| | |
| 6. FRANCHISE SYSTEM MARKETING MATERIAL FUND ............. | 5 |
|     6.1 Contribution by Franchisee ....................... | 5 |
|     6.2 Advertising Report ............................... | 5 |
| | |
| 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION .... | 5 |
|     7.1 Local Advertising ................................. | 5 |
|     7.2 Interterritorial Advertising ..................... | 6 |
|     7.3 Display............................................ | 7 |
|     7.4 Identity as Franchisee ........................... | 7 |
|     7.5 Sale of Franchise ................................ | 7 |
| | |
| 8. TRADEMARKS .......................................... | 7 |
|     8.1 Grant of License .................................. | 7 |

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

8.2  Name of Business ................................................... 7
8.3  No Other Names .................................................. 7
8.4  Change of the Trademarks ....................................... 8
8.5  Trademark Prosecution .......................................... 8

9.    TRAINING AND OPERATING ASSISTANCE ........................ 8
9.1  Initial Training Program ........................................ 8
     A. The Program ................................................. 8
     B. Expenses .................................................... 8
     C. Waiver ..................................................... 8
9.2  Staff Training .................................................. 8
9.3  Additional Assistance .......................................... 9
     A. Operating Manual ........................................... 9
     B. Grand Opening Promotional Program ........................ 9
     C. Advertising Materials ....................................... 9
     D. Seminars ................................................... 9
     E. On-Going Assistance and Supervision ....................... 9
     F. Initial Sales Assistance ..................................... 9
     G. Product Offerings ........................................... 9

10. FRANCHISE OFFICE LOCATION .................................. 9

11. VEHICLES, EQUIPMENT AND SUPPLIES .......................... 10
    11.1  Vehicles .................................................. 10
    11.2  Equipment ................................................ 10
    11.3  Uniforms ................................................. 10

12. OPERATION of the FRANCHISE ................................. 10
    12.1  Operations Manual ........................................ 10
          A. Incorporation of Operations Manual .................... 10
          B. Confidentiality of Operations Manual .................. 10
          C. Modifications .......................................... 11
    12.2  Hours of Operation ....................................... 11
    12.3  Resolution of Customer Problems ......................... 11
    12.4  Cleaning and other Supplies .............................. 11
    12.5  Franchise Management ..................................... 11
    12.6  Insurance ................................................ 11
          A. Notice ................................................ 12
          B. Insurance and Step-In-Rights .......................... 12
    12.7  Bookkeeping Standards .................................... 12
    12.8  Franchisor Inspection .................................... 12
    12.9  Compliance with Law ..................................... 12
    12.10  No Suggested Service Fees .............................. 12
    12.11  Franchise Telephone Service and Directory Listings ..... 12

13. RECORDS ..................................................... 13
13.1  Sales Records and Tax Returns ............................... 13
13.2  Periodic Reports ............................................. 13
13.3  Additional Recording Systems ................................ 13
13.4  Inspection and Audit ........................................ 13

FA 4/18 – Copyright © 2000-2018 A CORP.  All rights reserved.

**AA243**

**14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL** ........................... 14
    14.1  Assignment by A CORP ........................................... 14
    14.2  Assignment by Franchisee ...................................... 14
        A.  Permitted Transfers ........................................ 14
        B.  Transfer Upon Death or Permanent Incapacity ......... 15
        C.  Transfer to Franchisee's Corporation ................... 15
        D.  Non-Waiver of Claims ...................................... 16

**15. DEFAULT AND TERMINATION** ...................................... 16
    15.1  Immediate Termination ......................................... 16
    15.2  Termination with Notice ....................................... 17
    15.3  Conformity with Law .......................................... 18
    15.4  Cross Default ................................................. 18
    15.5  Franchise Termination Option ................................. 18

**16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION** ...... 19

**17. STEP-IN-RIGHTS** ................................................ 20
    17.1  Cause for Step-In ............................................. 20
    17.2  Duties of Parties ............................................. 20

**18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS** .................. 20
    18.1  Non-Competition ............................................... 20
    18.2  Non-Disclosure ................................................ 20

**19. GENERAL CONDITIONS AND PROVISIONS** ............................ 21
    19.1  Titles for Convenience ........................................ 21
    19.2  Entire Agreement .............................................. 21
    19.3  Amendment in Writing .......................................... 21
    19.4  Relationship .................................................. 21
    19.5  No Waiver ..................................................... 21
    19.6  Governing Law ................................................. 22
    19.7  Mediation and Arbitration ..................................... 22
    19.8  Notices ....................................................... 23
    19.9  Indemnification ............................................... 24
    19.10 Limitation of Liability of A CORP ............................. 24
    19.11 Late Payment Fees ............................................. 24
    19.12 Survival of Covenants ......................................... 24

**20. CAVEAT** ....................................................... 24

**21. RELEASE** ...................................................... 25

**APPENDIX 1 – LICENSED TERRITORY** .................................. 27
**EXHIBIT A – GUARANTY OF PERFORMANCE** .............................. 28
**EXHIBIT B – POWER OF ATTORNEY** .................................... 29
**EXHIBIT C – PROMISSORY NOTE** ...................................... 30
**EXHIBIT D – WAIVER OF TRAINING PROGRAM PARTICIPATION** ............. 31
**EXHIBIT E – AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT** .... 32

FA 4/18 – Copyright © 2000-2018 A CORP. All rights reserved.

**AA244**

# A CORP.
# FRANCHISE AGREEMENT

**AGREEMENT** entered into this **24th** day of **September, 2019**, by and between:

**A CORP.**
a Massachusetts Corporation
268 Rangeway Road
Box 290
North Billerica, MA  01862
("A CORP.")

and

**Quality Air Care Corporation**
**692 Sussex Ct**
**Toms River, NJ 08753**

_____

**("FRANCHISEE")**

**WHEREAS:**

    **A CORP.** has developed and is continuing to develop certain unique training, marketing and management methods relating to various service industries which offer services to the public through a franchise system (the " **A CORP. System** ") as it evolves from time to time; and

    **A CORP.** has successfully established a reputation, demand and goodwill for its System under various registered names and marks which **A CORP.** owns, including without limitation, **Rooter-Man, Rooter-Man to the Rescue, Rotor-Man** and such other valuable trade names, service marks, trademarks, logotypes and designs (the "Trademarks") which **A CORP.** may develop and license for use through the **A CORP. System**; and

    **A CORP.'s** trademarks and methods of operations and other business practices and policies relating to the operation of the **A CORP.** System (collectively the "Business System") constitute confidential and valuable trade secrets; and

    **FRANCHISEE** desires to enter into the business of operating an **A CORP.** franchise utilizing some or all the Trademarks, the Business System and all advantages of the **A CORP.** System franchise program upon the terms and conditions contained in this agreement.

    **THEREFORE,** in consideration of the mutual agreements, covenants and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to be bound legally as follows:

**AA245**

# 1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS

| | | | |
|---|---|---|---|
| **1.1** | **Date of Franchise Agreement:** | | September 24, 2019 |
| **1.2** | **Parties:** | **FRANCHISOR:**<br>A CORP.<br>268 Rangeway Road<br>N. Billerica, Ma 01862 | **FRANCHISEE:**<br>Quality Air Care Corporation<br>692 Sussex Ct<br>Toms River, NJ 08753 |
| **1.3** | **Licensed Territory:** | | Defined in the attached Appendix 1 |
| **1.4** | **Total Population:** | | 292,729 |
| **1.5** | **Commencement Date:** | | September 24, 2019 |
| **1.6** | **Expiration Date:** | | September 24, 2024 |
| **1.7** | **Initial License Fee:** | | $3,975.00<br>($31.80 per thousand of population) |
| **1.8** | **Businesses Licensed (By Trademark):** | | **Rooter-Man**<br>**Rooter-Man to the Rescue**<br>**Rotor-Man** |
| **1.9** | **Continuing Royalty:** | | $220.00 per month.<br>($0.88 per thousand of population) |
| **1.10** | **Marketing Fund Contribution:** | | $30.00 per month.<br>($ .12 per thousand of population monthly) |
| **1.10.1** | **Locally Optimized Website** | | $89.00 per month |
| **1.11** | **Franchise Renewal Fee:** | | $2500.00 |
| **1.12** | **Transfer Fee:** | | Greater of 5% of Franchise Selling Price or $2,500.00 |
| **1.13** | **Active Owners:** | | Klodian Belegu |
| **1.14** | **Franchisee Termination Fee: (Opt Out)** | | $25.00 per thousand population |

# 2. GRANT OF FRANCHISE

**AA246**

2.1 **GRANT. A CORP.** hereby grants to **FRANCHISEE**, and **FRANCHISEE** hereby accepts, a license to conduct the business listed in Section 1.8 (the "**A CORP.** System Franchise") for the term described below, according to the provisions of this Agreement and any related agreements.

2.2 **LIMITED LICENSE.** This franchise is a limited grant of rights. Upon termination for any reason or upon expiration of this Agreement, all rights of **FRANCHISEE** to operate the **A CORP.** System franchise shall cease and the license set forth above shall terminate.

## 3. LICENSED TERRITORY

3.1 **TERRITORY DEFINED**

A. The franchise granted by this Agreement to operate the **A CORP.** System franchise shall be within the Territory set forth in Section 1.3 (the "Territory"). **FRANCHISEE** shall offer the services of the **A CORP.** System franchise <u>only</u> in the Territory.

B. **FRANCHISEE** agrees to diligently, faithfully and in a business like manner, promote, market and conduct the franchised business within the Territory so as to fully develop and maximize the business potential of the Territory and shall devote **FRANCHISEE's** full time, attention and best efforts to achieve that end. **FRANCHISEE's** failure to do so shall be deemed a material breach of this Agreement as specified in Section 15.2.

C. **FRANCHISEE** shall not engage in marketing activities or solicitation of business outside the Territory. In order for **FRANCHISEE** to engage in such activities within an unlicensed territory, **FRANCHISEE** must execute a separate Franchise Agreement and pay an additional franchise fee.

D. **FRANCHISEE** shall establish and maintain an office within the Territory to conduct his or her franchise. **FRANCHISEE** shall not establish an office outside of the Territory.

E. **A CORP.** agrees that during the term it will not license any other person or entity to operate the same **A CORP.** system franchise in the Territory, and will not itself establish the same **A CORP.** system franchise in the Territory.

3.2 **INTERTERRITORIAL POLICY. A CORP.** shall have the right to adopt and implement policies and procedures prohibiting or strictly limiting **FRANCHISEE's** conduct and solicitation of business and marketing activities outside the Territory. With the exception of interterritorial advertising, as described in Section 7.2 of this Agreement, **FRANCHISEE** is prohibited from advertising, soliciting or maintaining a business phone number or office outside of the Territory.

3.3 **RIGHTS RETAINED.** Notwithstanding Section 3.2, **A CORP.** shall, however, have the right to: a) refer work to other franchisees, to itself, its parent, subsidiary or affiliated companies or to unaffiliated subcontractors, whether within or outside of the Territory, which **FRANCHISEE** is not licensed, not equipped or not expressly authorized to render; and b) sell, rent or authorize others to sell or rent, drain cleaning, products, and equipment, or render services which are not the subject of this Agreement within or outside of the Territory.

## 4. TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION

**AA247**

4.1    **TERM.**  The term of this Franchise Agreement shall be 5 years from the date of execution of this Agreement, unless terminated sooner for a reason set forth in Section 15. At the expiration of this term, **FRANCHISEE** may exercise the Renewal Option set forth in Section 4.2.

4.2    **RENEWAL.**    **FRANCHISEE** shall have the option to renew this franchise for additional 10 year terms subject to the following conditions:

A.  **FRANCHISEE** shall give **A CORP.** written notice of his or her desire to exercise the option to continue as a franchisee no later than 6 months prior to the expiration of the initial term of this Agreement and each renewal term.

   **A CORP.** shall furnish **FRANCHISEE** with a copy of **A CORP.**'s then current Franchise Agreement (and related agreements), which Agreement **FRANCHISEE** must execute no later than 3 months prior to the expiration of this Agreement.  The Renewal Franchise Agreement shall not include an Initial License Fee but may include an increase in the Continuing Royalty and Marketing Contribution.  Such increase, if any, shall be calculated by multiplying the current fee by the percentage change in the Consumer Price Index (hereinafter, "Change In CPI") if any.  The Change In CPI shall be calculated using the formula set forth in Section 4.2 B.

B.  **A CORP.** shall calculate the Change In CPI by creating a fraction, the numerator of which is the Consumer Price Index for December of the most recently completed year and the denominator of which is the Consumer Price Index for December of the year in which the Franchise Agreement became effective.

   The fraction will then be determined by dividing the numerator by the denominator.  If the fraction is less than or equal to 1, then no change in fees will occur.  If the fraction is greater than 1 (a "CPI Increase"), then a Change in CPI shall have occurred in the amount of the CPI Increase.

C.  **FRANCHISEE** shall pay to **A CORP.** upon execution of the renewal Franchise Agreement, the Renewal Fee set forth in Section 1.11.

D.  Notwithstanding the foregoing, **FRANCHISEE** shall not have the right to exercise the Renewal Option unless **FRANCHISEE** has paid in full all monies then currently due to **A CORP.**, and no other default under the terms of this Agreement exists uncured.  **A CORP.** may elect to revoke the renewal option if **FRANCHISEE** shall have received 3 or more notices of default within any 12-month period during the initial term of this Agreement.

E.  As a condition to this renewal, **FRANCHISEE** shall be required to maintain the services that he is licensed for and to invest in the proper equipment or vehicles to provide those licensed services.

4.3    **NOTICE REQUIRED BY LAW.**  If applicable law requires that **A CORP.** give notice to **FRANCHISEE** prior to the expiration of the initial term, then the Franchise Agreement shall remain in effect on a month to month basis until **A CORP.** has given **FRANCHISEE** the notice required by applicable law.

5.  **INITIAL LICENSE FEE AND CONTINUING ROYALTY**

**AA248**

5.1    **INITIAL FEE.  FRANCHISEE**, upon execution of this Agreement, shall pay to **A CORP.** the Initial License Fee set forth in Section 1.7.  **FRANCHISEE** acknowledges that the sole consideration for such fee is the grant of the franchise.  Such fee shall be fully earned upon execution of this Agreement and shall not be refunded or forgiven.

5.2    **CONTINUING ROYALTY.  FRANCHISEE** shall pay to **A CORP.** each month the Continuing Royalty set forth in Section 1.9, subject to a $110.00 per unit each month. **FRANCHISEE** shall also pay to **A CORP.** each month the marketing fund contribution in the amount of $15.00 per unit. The Continuing Royalty will commence thirty (30) days after the execution of the Franchise Agreement.  When **A CORP.** adopts an electronic funds transfer program, all Continuing Royalty payments shall be made by electronic funds transfer, pursuant to the program established and amended from time to time by **A CORP.** Each payment shall be accompanied by the financial reports specified in Section 13.2.

## 6.    FRANCHISE SYSTEM MARKETING MATERIALS FUND

6.1    **CONTRIBUTION BY FRANCHISEE.  FRANCHISEE** agrees to pay to **A CORP.** the Marketing Fund Contribution set forth in Section 1.10 for the design of marketing materials. **FRANCHISEE** shall pay such Marketing Fund Contribution in the same manner specified in Section 5.2.  **A CORP.** shall have the sole right to determine how to expend these funds, and shall expend all Marketing Materials funds collected.   All monies collected from **FRANCHISEE** pursuant to this Section shall be placed in a separate account.

6.2    **MARKETING MATERIALS FUND REPORT.  A CORP.** shall furnish to **FRANCHISEE** within 90 days of each calendar year end, a Fund financial report for the preceding year, prepared and certified to be correct by an officer of **A CORP.**, setting forth the funds collected, and the expenditures made during such calendar year.

## 7.    FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION

7.1    **LOCAL ADVERTISING.  FRANCHISEE** acknowledges that advertising and promotion represents the major source of new clientele for the **A CORP.** System franchise and a major expense of the franchise operation.    **FRANCHISEE** shall formulate and effect local advertising and promotion subject to the format, content and media designations contained in the Operations Manual.

A.  **FRANCHISEE** shall list itself in those telephone directories which are usually and customarily distributed in the Licensed Territory, under the appropriate headings, as designated by **A CORP.**    **FRANCHISEE** shall not place advertisements or listings in telephone directories which are usually and customarily distributed only outside of the Licensed Territory.  **FRANCHISEE** shall expend a minimum of 15% of the franchise's Gross Revenues on local advertising, which advertising will include yellow page listings, local newspaper advertising, marketing and sales materials and the Marketing Fund Contribution.  For the purposes of this Agreement, the term "Gross Revenues" shall mean all revenues generated by **FRANCHISEE**'s business conducted upon, from, or with respect to **FRANCHISEE**'s franchise, whether such sales are evidenced by cash, check, credit, charge account or exchange.  Gross Revenues shall include, without limitation, monies or credit received, for services, from the sale of products, from tangible property of every kind and nature, promotional or otherwise, and for other services performed by **FRANCHISEE** in

**AA249**

accordance with the Business System. Gross Revenues shall not include sales or service taxes or municipal or private disposal fees.

**B.**    **FRANCHISEE** understands and acknowledges that local and telephone directory advertising and internet advertising are the major sources of new clientele. At the end of the calendar year, **FRANCHISEE** must furnish proof to the **A CORP.** of all local advertising expenditures and copies of all advertisement used during that year ended. **A CORP** provides free listing of **FRANCHISEE** through **A CORP.**'s franchisor website at www.rooterman.com (the "Franchisor Website"). If **FRANCHISEE** desires to have a local optimized website to promote the System using **ACORP.**'s Trademarks, **FRANCHISEE** must use the internet advertisement services provided through the "Franchisor Website". Upon **FRANCHISEE**'s purchase of the **A CORP** System Franchise, **A CORP** shall design certain website pages linked to the Franchisor Website with **FRANCHISEE**'s information (the "**FRANCHISEE** Webpages") and shall activate the **FRANCHISEE** Webpages in a timely manner. To maintain the consistency of the brand image of **A CORP**, **FRANCHISEE** is not allowed to independently design, develop, and maintain any other locally optimized website or register any domain name using **A CORP's** trademarks including without limitation the Rooter Man trademark.

**C.**    **FRANCHISEE** agrees to advertise and promote actively and continuously the System and the Trademarks within the Licensed Territory. **A CORP.** reserves the right to direct **FRANCHISEE** to modify or discontinue advertisements that **A CORP.** believes to present a risk of misleading prospective customers as to the authorized services which **FRANCHISEE** can offer or to the territory in which **FRANCHISEE** can operate. **FRANCHISEE** shall promptly comply with any such directive.

**7.2**    **INTERTERRITORIAL ADVERTISING.** In areas (the "Region") where advertising media reach prospective clientele in more than 1 licensed territory, the franchisees operating in this Region may enter into an interterritorial advertising agreement (the "Interterritorial Agreement"). Such Interterritorial Agreements shall provide for the following:

**A.**    Advertising fees shall be shared by participating franchisees based upon the percentage of the Region's population that falls within each individual franchisee's Territory. The failure of **FRANCHISEE** to pay his pro rata share under an agreed-upon program shall be considered a default under this Franchise Agreement.

**B.**    The format, content and media designations chosen by the participating franchisees for use in the Region shall conform to those requirements specified by **A CORP.** in the Operations Manual; and

**C.**    **FRANCHISEE** shall indemnify **A CORP.** from and against any and all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly or indirectly out of or in connection with the operation of the Interterritorial Agreement.

**D.**    Local advertising shall be FRANCHSIEE's sole responsibility and FRANCHISEE shall not list A CORP. as a party of its local advertising agreement or as list A CORP. under any billing information.

**7.3**    **DISPLAY.** **FRANCHISEE** acknowledges that vehicle advertising is an important source

**AA250**

for promotion of the Trademarks and shall maintain all vehicles displaying such Trademarks in accordance with the standards established from time to time by **A CORP.** **FRANCHISEE** agrees to display prominently at all times on all of **FRANCHISEE's** vehicles such advertising and signage as shall be specified from time to time in the Operations Manual or in operating and marketing memoranda furnished by **A CORP.**

7.4    **IDENTITY AS FRANCHISEE.**    **FRANCHISEE** agrees that at all times and in all advertising, promotions, signage and other display materials, on its letterheads, business forms, and in all of **FRANCHISEE's** business dealings and to the general public, **FRANCHISEE** will identify himself only as an **A CORP.** System franchisee utilizing only the Trademarks licensed by this Agreement. **FRANCHISEE** further agrees that **FRAN-CHISEE** shall not identify himself as being **A CORP.**, a subsidiary, division, partner, joint venturer, agent or employee of **A CORP.** or of any other of **A CORP.'s** franchisees.

7.5    **SALE OF FRANCHISE.**    In the event that **FRANCHISEE** places advertising seeking a buyer for all or part of **FRANCHISEE's** franchise, **FRANCHISEE** shall not include nor allow use of any of the Trademarks to appear in such advertisement. **FRANCHISEE** may, however, describe the business in general generic terms. **FRANCHISEE** agrees to enforce this restriction on the activities of the **FRANCHISEE's** sales agent, broker or representative. In addition, the **FRANCHISEE** shall comply with the provisions of Section 14.2.

## 8. TRADEMARKS

8.1    **GRANT OF LICENSE.**    **A CORP.** hereby grants to **FRANCHISEE** the right during the term of this Agreement to use and display the Trademarks, set forth in Section 1.8, in accordance with this Agreement and the Operations Manual. **FRANCHISEE** acknowledges that the Trademarks which have been licensed exclusively by **A CORP.** are valid, and that valuable goodwill is attached to such Trademarks. All goodwill associated with the Trademarks, including the goodwill generated by **FRANCHISEE** and all other franchisees while conducting business under the Trademarks, is and shall remain the property of    **A CORP. FRANCHISEE** expressly agrees during the term of this Agreement and following the Agreement's expiration or termination, that **FRANCHISEE** shall not directly or indirectly contest or aid in contesting the validity or ownership of the Trademarks. **FRANCHISEE** shall not modify or use the Trademarks in any fashion, including without limitation on products, tools or supplies, unless authorized in a prior writing by **A CORP.** **FRANCHISEE** shall not file for or acquire any state, federal or international registration of the Trademarks or any trademark or service mark (or variation thereof) which is confusingly similar to the Trademarks including without limitation the Rooter Man trademark.

8.2    **NAME OF BUSINESS.**    If **FRANCHISEE** operates the franchise business through a corporation, **FRANCHISEE** shall not use the Trademarks, or any similar names, in its corporate name. Upon expiration or termination of this Agreement, **A CORP.** may, if **FRANCHISEE** does not do so, execute in **FRANCHISEE's** name and on **FRANCHISEE's** behalf any and all documents necessary in **A CORP.'s** judgment to end and cause the discontinuance of **FRANCHISEE's** use of the Trademarks and **A CORP.** is hereby irrevocably appointed and designated as **FRANCHISEE's** attorney-in-fact to do so.

8.3    **NO OTHER NAMES.**    **FRANCHISEE** shall not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the franchise business without the express prior written consent of **A CORP.**

**AA251**

8.4 **CHANGE OF THE TRADEMARKS**. If it appears to **A CORP.** that any of the names or marks are no longer viable commercially or legally, **A CORP.** has the right to change any of its names or marks to others of similar marketing impact. In such event, **FRANCHISEE** agrees to cooperate with **A CORP.** in changing all signs, graphics, and supplies, including those painted onto **FRANCHISEE's** vehicles. **FRANCHISEE** agrees to assume all reasonable costs connected with such changes, and to effectuate such changes within the reasonable time frame established by **A CORP.**

8.5 **TRADEMARK PROSECUTION**

A. In the event that **FRANCHISEE** shall learn that a third party, who not a licensee of **A CORP**, is using **A CORP's** Trademarks or any variation, **FRANCHISEE** shall promptly notify **A CORP** of the facts relating to infringing use.

B. With **A CORP's** permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE's** interest in the Trademark. In the event that the **FRANCHISEE** chooses to bring action, and **A CORP**, in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE's** Territory.

9. **TRAINING AND OPERATING ASSISTANCE**

9.1 **INITIAL TRAINING PROGRAM**. **A CORP** shall furnish, and **FRANCHISEE** shall complete to **A CORP's** satisfaction, in its sole discretion exercised in good faith, **A CORP's** training program on the operation of the **A CORP** System franchise.

A. **THE PROGRAM.** Such training shall consist of 2 days of instruction at **A CORP's** headquarters or at such place or places designated by **A CORP**. Participation of **FRANCHISEE** in the training program shall be required unless participation is waived by **A Corp** as specified in Section 9.1C below. If **A CORP** determines that **FRANCHISEE** requires additional training, the **FRANCHISEE** shall attend such additional program at **FRANCHISEE's** own expense.

B. **EXPENSES. FRANCHISEE's** shall be solely responsible for **FRANCHISEE's** own travel, living expenses and salary during the training period.

C. **WAIVER.** **FRANCHISEE's** participation in the **A CORP** training program, as described in Section 9.1A, may be waived by **A CORP** if **A CORP** determines in its sole discretion that **FRANCHISEE** has sufficient prior business experience to excuse him from participation in **A CORP's** training program.

9.2 **STAFF TRAINING.** **FRANCHISEE** shall implement a training program for his other employees, in accordance with the training standards and procedures prescribed by **A CORP.** **FRANCHISEE** shall employ at all times during the term of this Agreement only employees so trained to offer the franchised services. **FRANCHISEE** alone shall assume all expenses associated with staff training.

9.3 **ADDITIONAL ASSISTANCE.** **A CORP** shall furnish **FRANCHISEE** with the

**AA252**

following additional operating assistance.

A.   **OPERATIONS MANUAL.**    A **CORP** will provide a copy of its Operations Manual (as defined in Section 12.1), which at all times will remain the property of **A CORP**, for use by **FRANCHISEE** in the operation of the **A CORP's** System franchise.

B.   **GRAND OPENING PROMOTIONAL PROGRAM.**    A **CORP** shall consult with **FRANCHISEE** concerning a grand opening promotional program, which program shall be conducted by **FRANCHISEE** at his or her sole cost and expense.

C.   **ADVERTISING MATERIALS.**    A **CORP** may, from time to time, at its discretion, develop and provide **FRANCHISEE** with the art work for advertising materials to be used by **FRANCHISEE** in the promotion of **FRANCHISEE's A CORP** System franchise.

D.   **SEMINARS.**    A **CORP** may from time to time, at its sole discretion, conduct refresher training seminars for the purpose of informing franchisee's of new developments and improvements in the Business System relating to various aspects of the franchise operations, including new product lines and profit centers, new marketing techniques, and revised operational and management standards and techniques.  Unless otherwise approve in writing by **A CORP**, **A CORP** shall have the right to require **FRANCHISEE** to attend at least 1 such seminar or a regional meeting during each year of this Agreement.  There shall be no additional charge for such seminars or meetings,  but all travel and living costs incurred by **FRANCHISEE** shall be borne by **FRANCHISEE.**

E.   **ON-GOING ASSISTANCE AND SUPERVISION.**    A **CORP** shall furnish to **FRANCHISEE** from time to time such operating assistance and training, as is, in **A CORP's** sole discretion, reasonably necessary.  Operating assistance and training may include, by way of illustration, advice and guidance with respect to modifications or additions in the Business System, new marketing programs, the establishment of administrative, bookkeeping, accounting and general operating procedures, and such other advice as shall reasonably pertain to the operation of the franchise.   A **CORP** retains the right to license additional services and programs which **FRANCHISEE** might offer to its customers.

F.   **INITIAL SALES ASSISTANCE.**    Upon **FRANCHISEE's** written request and **A CORP's** consent,    A **CORP** shall furnish, for not less than 2 days during the first weeks of **FRANCHISEE's** operations, a representative to train and assist **FRANCHISEE** and his sales staff by calling on prospective customers within the Territory.  A **CORP** shall require a reasonable fee for providing such initial sales assistance.  Such fee shall include, without limitation, all expenses incurred by **A CORP** in providing initial sales assistance.

G.   A **CORP** presently offers products through **A CORP's** affiliate, **Rooter-Man Corp.,** which is a supplier and distributor of various tools and supplies needed in the operation of a **Rooter-Man** franchise.  These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, logo patches, truck decals, and other such items. **FRANCHISEES** are not required to purchase these or any items from the **Rooter-Man Corp.** nor is A **CORP** or the **Rooter-Man Corp.** required to continue supplying, selling or distributing these or any items.

10. **FRANCHISE OFFICE LOCATION.**    Since the location of **FRANCHISEE's** office is not an important aspect of the operation of the **A CORP** System franchise,  **FRANCHISEE** shall only be

**AA253**

obligated to secure an adequate facility to house **FRANCHISEE's** vehicles, equipment and supplies. Such facility must be located within the Territory and such facility shall comply with all local, state and federal regulations as well as A CORP's Operations Manual. Specifically, but without limitation, such facility shall be maintained by **FRANCHISEE** in strict compliance with all local, state and federal regulations pertaining to the storage of hazardous and non-hazardous chemicals.

## 11. VEHICLES, EQUIPMENT AND UNIFORMS

11.1    **VEHICLES.** Prior to the commencement of business by **FRANCHISEE, FRANCHISEE** shall purchase or lease the number and variety of vehicles to be used in the operation of the A **CORP.** System franchise as reasonably prescribed by **A CORP.** All vehicles must meet A **CORP.**'s requirements for appearance, color and other appropriate specifications and must be fully equipped as required by the Operations Manual. **FRANCHISEE** expressly agrees to display all Trademarks required by A **CORP.** on such vehicles. All vehicles must be maintained in sound physical condition and the appearance of such vehicles must be well maintained at all times in order to uphold the integrity of the Trademarks. **FRANCHISEE** shall promptly, upon request, provide A **CORP.** with photographs, copies of invoices and other evidence satisfactory to A **CORP.**, confirming that such vehicles conform to A **CORP.**'s specifications.

11.2    **EQUIPMENT.** Prior to the commencement of the business, **FRANCHISEE** shall at its sole cost and expense lease or purchase, all of the tools, equipment, uniforms, drain cleaning products, supplies, computer equipment, software, forms and other equipment and materials recommended by A CORP., but purchased from suppliers of **FRANCHISEE**'s choice.

11.3    **UNIFORMS.** In order to present a neat and clean appearance while performing the services of the A CORP. System franchise, **FRANCHISEE** and each employee of **FRANCHISEE** shall wear a uniform approved by A CORP.

## 12. OPERATION OF THE FRANCHISE

12.1    **OPERATIONS MANUAL.** **FRANCHISEE** acknowledges that nationwide uniform standards of service are vital to the protection of the A CORP. System and the Trademarks, and are necessary to ensure that the public receives the quality of service associated with the A CORP. System and the Trademarks. **FRANCHISEE** therefore agrees that in order to protect the reputation and the goodwill associated with the Trademarks, and to maintain the uniform standards of operation by all A CORP. System franchisees, **FRANCHISEE** shall conduct the franchise in strict accordance with A CORP.'s proprietary Operations Manual (the "Operations Manual").

A.    **INCORPORATION OF OPERATIONS MANUAL.** The Operations Manual is intended to further the purposes of this Agreement, and is specifically incorporated into this Agreement.

B.    **CONFIDENTIALITY OF OPERATIONS MANUAL.** **FRANCHISEE** shall at all times treat as confidential and shall not at any time disclose, copy, duplicate, record or otherwise reproduce in whole or in part, or otherwise make available to an unauthorized person or persons, the contents of the Operations Manual. The Operations Manual, including all new updated and old superseded pages, shall at all times remain the sole property of A CORP. A CORP. shall amend and update the Operations Manual and shall provide such updated

**AA254**

version to **FRANCHISEE** at no cost to **FRANCHISEE**. **FRANCHISEE** agrees to insert all new pages immediately in their proper places and to remove completely the superseded pages at the same time for return to **A CORP**. **FRANCHISEE** shall promptly return the Operations Manual upon the expiration or other termination of this Agreement.

C.  **MODIFICATIONS**. **FRANCHISEE** recognizes and agrees that **A CORP**. may from time to time change or modify its standards of operation, including the adoption of new procedures and programs, as outlined in the Operations Manual. **FRANCHISEE** shall accept and conform to such changes or modifications, and shall make all reasonable expenditures necessitated by the changes or modifications, within the time periods reasonably established by **A CORP.**

12.2    **HOURS OF OPERATION**. **FRANCHISEE** shall provide prompt and courteous service at all times during normal working hours and shall provide emergency service that will adequately meet the needs of customers for such service within the Licensed Territory. During customary business hours, **FRANCHISEE** agrees to have its telephone(s) answered by a trained employee. **FRANCHISEE** agrees to use a telephone answering service only after customary business hours.

12.3    **RESOLUTION OF CUSTOMER PROBLEMS**. **FRANCHISEE** and his employees shall provide prompt, competent and courteous service to customers. **FRANCHISEE** shall respond to any dissatisfied customers within 24 hours after the complaint is received, whenever possible.

12.4    **DRAIN CLEANING PRODUCTS AND OTHER SUPPLIES**. **FRANCHISEE** shall utilize only those drain cleaning products and other supplies, including forms, authorized by **A CORP.**

12.5    **FRANCHISEE MANAGEMENT**. **FRANCHISEE** shall at all times during the term of this Agreement operate the **A CORP**. System franchise on a full-time basis or employ on a full-time basis at least one trained individual. **FRANCHISEE** or such individual shall devote his entire time during normal business hours, as defined in the Operations Manual, to the management, operation and development of **FRANCHISEE's A CORP**. System franchise. The individual managing the franchise shall not engage in any other business or investment requiring active participation during normal business hours. **A CORP**. has entered into this Agreement in reliance upon the representation of **FRANCHISEE** that during the term of the Agreement, the individuals named in Section 1.14 will be the owners who are in active, full-time charge of **FRANCHISEE's** franchise and who are responsible for adhering to the terms of this Agreement.

12.6    **INSURANCE**. It is understood and agreed that the protection of the goodwill of the **A CORP**. system, Trademarks and the financial security of both **FRANCHISEE** and **A CORP**. requires the existence of public liability insurance coverage for **FRANCHISEE**. **FRANCHISEE** shall procure and maintain in full force and effect Commercial General Liability insurance coverage (including premises/operations coverage, product liability coverage, completed operations coverage and contractual liability coverage) and comprehensive motor vehicle liability insurance coverage (including hired and non-owned motor vehicle coverage) in the name of **FRANCHISEE**, with **A CORP**. named as an additional insured, at **FRANCHISEE's** sole cost and expense. The insurance coverage shall be in the following minimum amounts:

| | | |
|---|---|---|
| 1. Bodily Injury | $1,000,000.00 | Each person |
| | $1,000,000.00 | Each occurrence |
| 2. Property damage | $500,000.00 | Each occurrence |
| 3. Workers' Compensation coverage | | As required by law |

As an alternative to the foregoing, **FRANCHISEE** may obtain a single limit policy in the amount of no less than $1,000,000.00.

**A. NOTICE.** All insurance purchased by **FRANCHISEE** shall provide that **A CORP.** be given at least 30 days prior written notice of any termination, amendment, cancellation or modification. **FRANCHISEE** shall promptly provide **A CORP.** with certificates of insurance evidencing such coverage no later than 14 days prior to the date that **FRANCHISEE** shall be open for business to the public, as well as annual certificates throughout the term of the franchise evidencing continuing coverage.

**B. INSURANCE AND STEP-IN-RIGHTS.** If **FRANCHISEE** fails or refuses to purchase insurance conforming to the standards and limits prescribed in Section 12.5, **FRANCHISEE** shall be in default of this Agreement as set forth in Section 15.2A and E.

**12.7 BOOKEEPING STANDARDS. FRANCHISEE,** all financial statements prepared by or for **FRANCHISEE,** and all reports submitted by **FRANCHISEE** shall conform to the current standards and requirements as described in the Operations Manual. All such bookkeeping and accounting records and financial statements, for such periods as may from time to time be prescribed in the Operations Manual, shall be made available for inspection by **A CORP.** during normal business hours.

**12.8 FRANCHISOR INSPECTION. A CORP.** shall have the right from time to time, and without prior notice to **FRANCHISEE** to send representatives to **FRANCHISEE'S** office in order to inspect **FRANCHISEE's** operations and records and to determine the faithfulness of **FRANCHISEE's** compliance with the provisions of this Agreement and the Operations Manual.

**12.9 COMPLIANCE WITH LAW. FRANCHISEE** shall operate his **A CORP.** System franchise in strict compliance with applicable laws, rules and regulations of all governmental authorities. **FRANCHISEE** shall comply with all applicable laws and regulations of the federal, state or local governments, and shall prepare and file all necessary tax returns, and pay promptly all taxes imposed upon **FRANCHISEE** and upon **FRANCHISEE's** franchised business. **FRANCHISEE** may be required to be licensed for some or all of the components of the **A CORP.** System and is solely responsible for securing and maintaining such licenses

**12.10 NO SUGGESTED SERVICE FEES. FRANCHISEE** acknowledges that any and all service fees included in the Operations Manual or other operating memoranda, are intended by **A CORP.** to be illustrative only and are not intended to be suggestive of fees to be charged by **FRANCHISEE** for particular services. **FRANCHISEE** further acknowledges that **A CORP.** does not set or enforce a fee schedule of any type. **FRANCHISEE,** in its sole discretion, shall determine the fees to be charged for licensed services performed under the **A CORP.** System.

**12.11 FRANCHISEE TELEPHONE SERVICE AND DIRECTORY LISTINGS. FRANCHISEE** shall at its sole expense maintain telephone service for the franchise and

**AA256**

shall have all of **FRANCHISEE**'s telephone numbers continuously listed and advertised in those "white pages" and "yellow page" directories which are usually and customarily distributed within the Licensed Territory, as **A CORP**. may designate or approve. All such listings shall be in the manner, style and type size and shall contain all other characteristics as **A CORP**. may designate in the Operations Manual or in operating memoranda. In all advertising placed by **FRANCHISEE** in which such listed numbers appear, there shall not appear any other telephone numbers subscribed for by **FRANCHISEE** for personal use or for the conduct of any other business. **FRANCHISEE** shall not, without **A CORP**.'s express written consent, cause or allow itself to be listed in any directories outside of the Territory. **A CORP**. shall have the right to recommend the type of telephone service, the number of telephone lines, and all matters related to the telephone service for the franchise, and **FRANCHISEE** shall promptly comply with all specifications and directives of **A CORP**. as established or modified from time to time. **FRANCHISEE** hereby irrevocably appoints **A CORP**. as its Attorney-in-Fact to assign all such telephone numbers to **A CORP**. and expressly authorizes the applicable telephone company to make such assignment upon termination or expiration of this Franchise Agreement. **FRANCHISEE** agrees to indemnify **A CORP**. as specified in Section 19.9.

## 13. RECORDS.

**13.1    SALES RECORDS AND TAX RETURNS. FRANCHISEE** shall record all sales and shall keep and maintain accurate records. **FRANCHISEE** shall provide **A CORP**. annually with copies of federal, state and local (if applicable) income tax returns.

**13.2    PERIODIC REPORTS.** In order to assist and advise **FRANCHISEE** with respect to the operation of his business, **A CORP**. shall, at its sole discretion, require **FRANCHISEE** to furnish **A CORP**. within 15 days after the expiration of each calendar month with a profit and loss statement of the Franchise for the preceding calendar month. All such financial statements shall be prepared in accordance with the format established by **A CORP**. in the Operations Manual, and shall be certified by **FRANCHISEE** or in the case of a corporate **FRANCHISEE**, by **FRANCHISEE**'s chief executive officer or chief financial officer, as being true and correct and as being prepared in accordance with generally accepted accounting principles consistently applied from applicable period to period. In addition, within 90 days after the end of each calendar year, **FRANCHISEE** shall furnish **A CORP**. with an annual balance sheet, profit and loss statement and statement of changes in financial position, which have been certified as correct by **FRANCHISEE** and which have been prepared by an independent accountant. **A CORP**. agrees to maintain in confidence **FRANCHISEE**'s financial information and shall not disclose **FRANCHISEE**'s identity in connection with **FRANCHISEE**'s financial information.

**13.3    ADDITIONAL RECORDING SYSTEMS. FRANCHISEE** agrees to furnish to **A CORP**. all other information pertaining to the franchised business and clientele through the system developed by **A CORP**. or as **A CORP**. may, from time to time, specify in the Operations Manual. **A CORP**. shall be granted full and complete access to all records and information created by such system, including without limitation, by direct telephone, the Internet or other data communications links.

**13.4    INSPECTION AND AUDIT. FRANCHISEE** shall keep and preserve for 5 years all business records, including ledgers, credit card statements and other tax returns, bank statements, duplicate deposit slips and other evidence of gross revenues and business transactions for each such year. **A CORP**. shall have the right at any time during regular

**AA257**

business hours to enter **FRANCHISEE's** premises to inspect, audit and make copies of any books of accounts, bank statements, documents, records, tax returns, papers and files of **FRANCHISEE** relating to gross revenues and business transactions. Upon the request by **A CORP., FRANCHISEE** shall make any such material available for inspection at **FRANCHISEE's** premises and **FRANCHISEE** shall allow **A CORP.** and its representatives to remove temporarily **FRANCHISEE's** records solely for copying, review and/or audit purposes. If **A CORP.** determines that there has been an underpayment of fees by **FRANCHISEE, FRANCHISEE** shall pay the amount of understatement plus interest at the rate of 18% per annum and the cost of the audit.

## 14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL

14.1    **ASSIGNMENT BY A CORP.**    **A CORP.** may freely transfer or assign its rights and obligations under this Agreement to any person, corporation or other entity. Such transfer or assignment shall be binding upon and inure to the benefit of **A CORP.**, its successors and assigns.

14.2    **ASSIGNMENT BY FRANCHISEE.**    **FRANCHISEE** acknowledges that the rights provided for in this Agreement are personal to **FRANCHISEE** and that this franchise has been granted by **A CORP.** in reliance upon the particular skills, knowledge and business ability of **FRANCHISEE. FRANCHISEE** agrees that he shall not sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in the assets of the franchise or **FRANCHISEE** collectively referred to herein as a "transfer" except as permitted herein. Any sale, assignment, transfer or encumbrance of this Agreement, of any of the rights granted under this Agreement, or in the ownership of the **FRANCHISE**, which is not in accordance with the terms and conditions provided in this Section 14.2 shall constitute a breach of this Agreement and shall permit **A CORP.** to terminate this Agreement immediately as provided for in Section 15.1 of this Agreement.

A.    **PERMITTED TRANSFERS.**    **A CORP.** shall not unreasonably withhold its consent to a Transfer of any interest of **FRANCHISEE** or the franchise, but shall, as a condition precedent to such consent, require that:

1.    **FRANCHISEE** first offers to sell such interest to **A CORP.** at the same price and on the same terms and conditions as it proposes to sell such interest to a third party. **FRANCHISEE** shall furnish a signed and notarized copy of the third party's offer to purchase. **A CORP.** shall have 30 days after receipt of such bona fide offer in which to exercise its right of first refusal. The failure by **A CORP.** to exercise its option shall in no way be construed to affect **A CORP.'s** decision to approve a proposed transferee. If **A CORP.** fails to exercise its option and the Franchise is not subsequently sold to the proposed transferee for any reason, **A CORP.** shall continue to have, upon the same conditions, a first option to purchase the Franchise upon the terms and conditions of a subsequent offer.    **A CORP.** shall have 30 additional days following **A CORP.'s** rejection of its right of first refusal to review the Transfer, based upon the qualifications set forth in Section 14.2A (4).

2.    All monetary obligations of **FRANCHISEE** to **A CORP.** as of the proposed date of the Transfer have been or will be paid as of such date.

3.    By the closing date for said transfer, **FRANCHISEE** shall have executed a general

**AA258**

release under seal, in a form satisfactory to **A CORP.**, of all claims against **A CORP.**, its stockholders, directors, officers, employees and assigns.

4. The transferee, in the reasonable judgment of **A CORP.**, has the financial resources, relevant work experience, character and ability to conduct successfully the business of the Franchise. The transferee shall fully disclose its financial position and obligations and other background information prior to any such Transfer.

5. The transferee shall execute **A CORP.**'s then current Franchise Agreement and related documents to govern the remaining term of the Franchise, including a copy of the Guaranty to this Agreement executed by each shareholder of the transferee, if the transferee is a corporation.

6. **FRANCHISEE** shall pay to **A CORP.** the Transfer Fee as set forth in Section 1.12; unless the transfer is to an immediate family member of **FRANCHISEE** (i.e., spouse, children or parents only); and

7. The transferee shall complete **A CORP.**'s training programs in the manner then required of new franchisees, and shall pay **A CORP.** the then required fee, unless **A CORP.** shall waive **FRANCHISEE**'s participation in the training program as specified in Section 9.1C.

B. **TRANSFER UPON DEATH OR PERMANENT INCAPACITY.** Immediately upon the death or permanent incapacity of **FRANCHISEE** or if **FRANCHISEE** is a corporation, upon its dissolution or upon the death of any person with a substantial or controlling interest in the Franchise, if requested by **FRANCHISEE**'s heirs, **A CORP.** or its agent, at its sole discretion shall be entitled to assume the operation of the Franchise in accordance with Section 17. As soon as possible thereafter, and in any event within a reasonable time, the executor, administrator, trustee or other representative of such person or entity shall transfer such interest to the heirs or beneficiaries or to a third party in accordance with Section 14.2 A above. **A CORP.**'s right to assume the operation of the Franchise shall continue until the Franchise has been transferred to an accepted transferee as provided in Section 14.2. **FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this subsection, including reasonable attorney's fees, and **A CORP.** shall receive the Transfer Fee (as specified in Section 1.12). However, if a franchise is transferred to a party who is a member of **Franchisee**'s immediate family, (i.e., spouse, children or parents only) who will continue the operation of the franchise under the terms of this Agreement, then no transfer fee shall be required. Permanent incapacity shall mean that **FRANCHISEE** cannot perform his duties under this Agreement for a period of 6 months or longer.

C. **TRANSFER TO FRANCHISEE'S CORPORATION.** If the proposed Transfer is to a corporation at least 75% percent of the stock of which is owned by **FRANCHISEE**, then **A CORP.** shall approve such Transfer provided that the transferee corporation meets the following requirements:

1. The Corporate charter and by-laws shall provide that its activities are limited to the operation of the Franchise. Copies of the charter, by-laws, any other agreements affecting stockholder rights, such as stock restriction agreements, and resolutions authorizing execution of this Agreement shall be delivered to **A CORP.** prior to execution of this Agreement, or when otherwise requested in writing by **A CORP.**

**AA259**

2.  The ownership of the stock of such corporation shall be disclosed in writing prior to the execution of this Agreement and the charter and by-laws shall reflect that no stock shall be sold, transferred, pledged or otherwise similarly affected without compliance with this Agreement.

3.  Each stock certificate shall bear the following legend:  "THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN FRANCHISE AGREEMENT BETWEEN THE CORPORATION AND A CORP. REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND TO RESTRICTIVE PROVISIONS IN THE CHARTER OF THIS CORPORA TION."

4.  The principal stockholders of **FRANCHISEE**, as determined by **A CORP.**, shall personally guarantee the payment and performance of all obligations of **FRANCHISEE** under this Agreement, and shall execute such documents as **A CORP.** may reasonably require to reflect such guaranty; and

5.  In addition, **FRANCHISEE** must serve as the principal executive officer of the transferee corporation, all other shareholders of the transferee must meet the requirements of **A CORP.** and the transferee corporation must execute a new Franchise Agreement for the duration of the term, using **A CORP.**'s then current agreement.  All acts and the delivery of all documents shall take place before the Transfer.  Transfer to **A CORPORATION** shall be approved in a prior writing by **A CORP. FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this section, including reasonable attorney's fees.

D.  **NON-WAIVER OF CLAIMS. A CORP.**'s consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims that it may have against **FRANCHISEE** or against any guarantor of this Agreement.

## 15.    DEFAULT AND TERMINATION

15.1    **IMMEDIATE TERMINATION. FRANCHISEE** acknowledges that the occurrence of one or more of the following events would cause harm to the franchise system and thereby lessen its value. **FRANCHISEE** agrees that **A CORP.** shall have the right upon the occurrence of one of the following events to terminate this Agreement immediately upon notice:

A.  If **FRANCHISEE** becomes insolvent or surrenders substantial control of the franchised business or a major portion of its assets by virtue of a voluntary or involuntary proceeding in bankruptcy or receivership, or by assignment for the benefit of creditors, or in the event of a similar circumstance or legal process, and such proceeding is not terminated within 30 days;

B.  If **FRANCHISEE** attempts to sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in, or substantially all of the assets of the Franchise or FRANCHISEE except as permitted by Section 14.2;

C.  If **FRANCHISEE** shall violate any provision of the Non-Competition Covenant contained in Section 18. 1;

**AA260**

**D. If FRANCHISEE** shall violate any provision of the Non-Disclosure Covenant contained in Section 18.2;

**E. If FRANCHISEE** makes any material misrepresentations relating to the acquisition of the Franchised Business;

**F. If FRANCHISEE** is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that A CORP. believes is reasonably likely to have an adverse effect upon the Franchise, the Trademarks and their associated goodwill, or the A CORP. System; or

**G. If FRANCHISEE** fails, for a period of 30 days after having received notification of noncompliance from A CORP. or any governmental or quasi-governmental agency or authority, to comply with any Federal, State or Local law or regulation applicable to the operation of the Franchised Business.

**15.2    TERMINATION WITH NOTICE. FRANCHISEE** acknowledges that the occurrence of one or more of the events specified in this Section 15.2 would cause harm to the franchise system and thereby lessen its value. Therefore, **FRANCHISEE** agrees that **A CORP.**, in addition to all other remedies at law or in equity, may terminate this Agreement if **FRANCHISEE** shall become in default of any provision of this Section 15.2 or any other provision of this Agreement, and if **FRANCHISEE** shall not cure such default within 30 calendar days for nonpayment of monies, or for other defaults after receipt of a written notice to cure from **A CORP.**, or for a longer period if so mandated by the laws of the state in which **FRANCHISEE** operates. In the event **FRANCHISEE** is in default of this Agreement within 12 months after a prior default (even if cured), and **A CORP.** has served **FRANCHISEE** with a Notice to Cure with respect to such prior default, upon notice, **A CORP.** may terminate this Agreement upon the occurrence of such subsequent default. **A CORP.** need not allow **FRANCHISEE** the opportunity to cure such subsequent default. In addition to the foregoing, **A CORP.** may, at its option, exercise its Step-In-Rights (as specified in Section 17) in the event of any default contained in this Section 15.2.

**FRANCHISEE** shall become in default under this Agreement:

**A.** If **FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to **A CORP.** on the date due;

**B.** If **FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other Franchisees under any Interterritorial Agreement (as specified in Section 7.2) on the date due;

**C.** If **FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other creditors on the date due;

**D.** If **FRANCHISEE** fails to submit reports or financial data which **A CORP.** requires under this Agreement, including but not limited to those specified in Section 13;

**E.** If **FRANCHISEE** fails to obtain and maintain in effect the minimum insurance requirements specified in Section 12.6;

**F.** Upon the closing of **FRANCHISEE's** operations for a period of 10 or more

**AA261**

consecutive days without the prior written approval of **A CORP.**;

**G.**    If **FRANCHISEE** fails to submit to binding arbitration of disputes as specified in Section 19.7;

**H.**    If **FRANCHISEE** changes any aspect of the **A CORP.** system or offers any service or product which has not been approved in a prior writing by **A CORP.**;

**I.**    IF **FRANCHISEE** fails to diligently, faithfully and in a business like manor, promote, market and conduct the Franchised Business within the Territory as specified in Section 3. 1B; or

**J.**    If **FRANCHISEE** fails to comply with any of the duties imposed by this Agreement, the Operations Manual or other operations memoranda issued by **A CORP.** including, without limitation, the failure to cure an operational problem.

**15.3**    **CONFORMITY WITH LAW.** Notwithstanding anything to the contrary contained in this Section,  in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Franchise and the parties shall limit A CORP.'s rights of termination or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods required by such laws and regulations. **A CORP.** shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or dispute relating to this Agreement or its termination.

**A.**    **FRANCHISEE**   Shall be solely responsible for the conduct of its business and for compliance with all the laws, statutes, ordinances, orders or codes of any public or governmental authority pertaining to **FRANCHISEE** and its business operated pursuant hereto and for the payment of all taxes, permits, licenses and registration fees and other charges or assessments arising out of the establishment and operation of **FRANCHISEE'S** business.

**15.4**    **CROSS DEFAULT. If FRANCHISEE** shall be in default of any other agreement between **A CORP.** or its affiliated companies including, without limitation, any Promissory Note, then **FRANCHISEE** shall be deemed in default of this Agreement.

**15.5**    **FRANCHISEE TERMINATION OPTION. FRANCHISEE** shall have the option to terminate this Agreement, only during the initial five (5) year term, subject to adherence to the following terms and conditions:

**A.**    **FRANCHISEE** shall notify **A CORP.** in writing of his intent to terminate the Agreement no later than 90 days prior to the closing date for placement of advertisements in the yellow page book or books distributed in **FRANCHISEE's** Territory. If **FRANCHISEE** fails to notify A **CORP.** on or before such 90 day period commences, then **A CORP.** shall exercise its right pursuant to the Power of Attorney, Exhibit B, to retain all of **FRANCHISEE's** operating telephone numbers.

**B.**    **FRANCHISEE** shall pay in full all outstanding monies due to **A CORP.**, and shall as well pay a one-time Franchisee Termination Fee as specified in Section 1. 14 herein.

**C.**    **FRANCHISEE** shall de-identify all aspects of **FRANCHISEE's** business operation,

AA262

including without limitation all forms of advertisements, all vehicle displays, and all invoices, business cards and forms, and shall choose a trade name or trade names which shall not be confusingly similar to **A CORP's** Trademarks or which might give the general public the impression that **FRANCHISEE** is continuing to operate under the **A CORP.** System. **FRANCHISEE** shall further comply with the terms of Section 16 below.

**D.**     Provided **FRANCHISEE** performs all of the foregoing obligations, **A CORP.** shall agree to waive its rights to enforce the non-competition covenant contained in Section 18.1 and its rights to enforce the Power of Attorney. If **FRANCHISEE** however, fails to perform any of the foregoing obligations or if **FRANCHISEE** attempts to utilize any aspect of **A CORP.'s** Trademarks or System, then **A CORP.** shall retain all rights of enforcement under Section 18.1.

## 16.     RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon termination or expiration of this Agreement, **FRANCHISEE** shall within 30 calendar days:

**A.**     Pay all Continuing Royalty Fees, Advertising Contributions and all other charges or debts owed to **A CORP.**, including the balance due on financing or other extension of credit granted or given by **A CORP** to **FRANCHISEE.**

**B.**     Cease to hold himself or herself out as an **A CORP.** System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by **A CORP.** and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the **A CORP.** office licensed by this Agreement and from all vehicles. **FRANCHISEE** shall contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisement, listings, or domains and, within 60 days, work to ensure that the change or deletion is completed.

**C.**     Return to **A CORP.** all manuals and printed materials belonging to **A CORP.** or bearing the Trademarks.

**D.**     Except with respect to termination under Section 15.5, at the option of **A CORP.**, **FRANCHISEE** shall:

1.     Remove all equipment, furnishings and printed materials from the office premises; or
2.     Sell such equipment, furnishings and printed materials to **A CORP.** at their then current fair market value, as determined by **A CORP.** In no event shall **A CORP.** be liable for payment to **FRANCHISEE** for intangibles including, without limitation, goodwill;
3.     Assign to **A CORP.** the lease for the franchised premises; and
4.     Execute such documents as **A CORP.** may reasonably require to effectuate termination of the Franchise and **FRANCHISEE's** rights to use the Trademarks and the **A CORP.** System including, without limitation, release documents.

**A CORP.** retains the right to enforce the Power of Attorney executed in conjunction with this agreement.

## 17.     STEP-IN-RIGHTS

**AA263**

**17.1    CAUSE FOR STEP-IN.    A CORP.**, at its sole discretion, may exercise the following Step-In Rights in order to prevent an interruption of the Franchised Business which would cause harm to the franchise system and thereby lessen its value. In the event of **FRANCHISEE's** default (as specified in Section 15 herein) or in the event of the death or permanent incapacity of **FRANCHISEE** (as specified in Section 14.2 B), **FRANCHISEE** authorizes **A CORP.** to operate his franchise for as long as **A CORP.** shall deem necessary and practical or upon transfer to an approved franchisee under Section 14.2. Such Step-In Rights shall be exercised without waiver of any other rights or remedies which **A CORP.** may have under this Agreement.

**17.2    DUTIES OF PARTIES.    A CORP.** shall keep in a separate account all monies generated by the operation of **FRANCHISEE's** business by **A CORP.'s** representatives. **A CORP.** shall deduct all expenses of the business, including reasonable compensation and expenses for **A CORP.'s** representatives from this separate account. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

## 18.    NON-COMPETITION AND NON-DISCLOSURE COVENANTS

**18.1    NON-COMPETITION.    FRANCHISEE** agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither **FRANCHISEE** nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the **A CORP.** System. Such obligation shall apply within the Territory, within 100 miles of the Territory or within 100 miles of any territory covered by another **FRANCHISEE** of **A CORP.** or operated by **A CORP.'s** affiliates. **FRANCHISEE** further agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, **FRANCHISEE** and the persons covered by this section shall not attempt to solicit for employment any person who is, at the time of such solicitation, employed by **A CORP.** or any other franchisee of **A CORP.**, nor induce any such person to leave his or her employment. **FRANCHISEE** agrees that as a condition of his affiliation with **A CORP.**, its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by **A CORP. FRANCHISEE** acknowledges that such prohibitions are necessary to protect **A CORP.'s** trade secrets and to otherwise insure the integrity of the **A CORP.** System and the rights of **A CORP.'s** other franchisees. The amounts of time and distance set forth above may be deemed to be divisible into units of one month and one mile and may be reduced should a court find them to be unreasonable. **A CORP.**, in addition to such other rights it may have, shall have the right to injunctive relief to enforce its rights pursuant to this provision. The violation of this provision during the term of the Agreement shall result in the automatic termination of the franchise as specified in Section 15.1.

**18.2    NON-DISCLOSURE. FRANCHISEE** acknowledges that disclosure of any aspect of the System or duplication or disclosure of this Agreement, or the Operations Manual could substantially harm **A CORP., FRANCHISEE** and other franchisees of **A CORP.** **FRANCHISEE** agrees that at no time during or after the term of this Agreement or early termination for whatever reason will he or she disclose, either orally or in writing or by any other medium, or duplicate or in any way make available the contents of the Operations Manual, this Agreement, any other documents, videotapes, materials, or any trade secrets, formulas or other aspects of the System to any person, corporation or other entity other than

**AA264**

FRANCHISEE attorneys, accountants or similar parties. Such persons may have access to such materials only to the extent necessary for the transaction of business by **FRANCHISEE**. No such person shall be permitted to retain any software, materials or copies of or notes concerning any such materials. All of the foregoing shall be returned to **A CORP**. immediately upon termination or expiration of this Agreement. The prohibition of this section applies equally to all stockholders, directors, officers, and employees of **FRANCHISEE**. **A CORP**. shall have the right to injunctive relief to enforce the provisions of this Section. The violation of this provision during the term of the Agreement shall result in the automatic termination of the Franchise, as specified in Section 15. 1.

## 19. GENERAL CONDITIONS AND PROVISIONS

19.1 **TITLES FOR CONVENIENCE**. Section and paragraph titles used in this Agreement are for convenience only and are not deemed a part of the text.

19.2 **ENTIRE AGREEMENT**. This Agreement, including appendices and attachments, constitutes the entire agreement of the parties (and into which all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter are merged) and except as otherwise provided, there are no other oral or written understandings or agreements between the parties relating to the Franchise. Nevertheless, nothing in this Agreement or in any related agreement is intended to disclaim the representation that we have made in the franchise disclosure document.

19.3 **AMENDMENT IN WRITING**. No amendment or other modification of this Agreement shall be valid or binding on either party, unless reduced to writing and executed by the parties.

19.4 **RELATIONSHIP**
   A. **FRANCHISEE** is an independent contractor and is not the agent, joint venturer, partner or employee of **A CORP**. and, except as expressly provided in this Agreement, **A CORP**. shall not be obligated by any agreements, representations or warranties made by **FRANCHISEE** to any person, nor with respect to any other action of **FRANCHISEE**, nor shall **A CORP**. be obligated for any damages or monetary obligations of any sort to any person whether caused by **FRANCHISEE**'s action, failure to act, negligence, or willful conduct.

   B. Except as expressly set forth herein, **A CORP**. does not reserve control over nor take responsibility for the conduct or actions of any of **FRANCHISEE**'s owners, directors, or employees, nor shall **A CORP**. have any control over the employment, discharge, compensation or working conditions of any such owner, director or employee of **FRANCHISEE**.

   C. **FRANCHISEE** shall identify himself in all aspects of his business operation, including on all forms and in all advertisements, as being: "Independently Owned and Operated".

19.5 **NO WAIVER**. No waiver by **A CORP**. of any breach or series of breaches or defaults in performance by **FRANCHISEE**, and no failure, refusal or neglect of **A CORP**. to exercise any right, power or option given to it or to insist upon strict compliance with or performance of **FRANCHISEE**'s obligations, under this Agreement or the Operations Manual, shall constitute a waiver of any provision of this Agreement or the Operations Manual with respect to any subsequent breach or a waiver by **A CORP**. of its right at any time thereafter to

**AA265**

require exact and strict compliance with the provisions of this Agreement.

19.6    **GOVERNING LAW.** This Agreement shall be governed and construed under and in accordance with the laws of the Commonwealth of Massachusetts. **A CORP** and **FRANCHISEE** agree that any action arising out of or relating to this agreement will be brought by the parties only in a Massachusetts state court of Middlesex County, Massachusetts or the United States District Court for the District of Massachusetts in Boston, Massachusetts. **A CORP** and **FRANCHISEE** hereby consent to the jurisdiction of such Courts and further agree to waive any rights or objections to the jurisdiction or venue of any such actions when filed in such courts. If any part or provision of this Agreement is held or declared invalid by a court of competent jurisdiction, such holding or declaration shall affect only that particular part or provision of this Agreement and all other parts or provisions of this Agreement shall continue in full force and effect.

19.7    **MEDIATION AND ARBITRATION. A CORP.** and **FRANCHISEE** agree as a condition to this Agreement to engage in mediation and arbitration prior to the commencement of any court action, except as set forth in Section 19.7 H. **FRANCHISEE**'s failure to submit to mediation and arbitration, shall be deemed a default under Section 15.2. If **A CORP.** must engage an attorney to enforce its rights under this Agreement, **FRANCHISEE** shall reimburse **A CORP.** for all of its reasonable attorney's fees, court costs and expenses incurred in connection with such legal action.

A.    Before the commencement of any arbitration, **FRANCHISEE** and **FRANCHISOR** shall submit to the following mediation process:

1.    **FRANCHISEE** shall promptly submit in writing the nature of his grievance with **A CORP.** along with any reasonable suggestions for the dispute's possible resolution; and

2.    Within 30 days, the **FRANCHISEE** shall attend a mediation meeting with **A CORP.** in Boston, Massachusetts to discuss in detail the dispute and to work towards its possible resolution. **A CORP.** shall select the mediator. **FRANCHISEE** and **A CORP.** shall share equally in the cost of the mediation session.

If the parties are unable to reach an amicable solution, then the dispute shall be submitted to arbitration as described below:

B.    Prior to any arbitration proceeding taking place, **A CORP.** and **FRANCHISEE** shall, have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect to the controversy or claim being arbitrated. These hearings shall be held in Boston, Massachusetts.

C.    Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claim that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. **A CORP.** and **FRANCHISEE** agree that arbitration shall be conducted on an individual and not a class-wide basis.

**AA266**

D.  If, however, a court of competent jurisdiction determines that any such provisions of this Agreement are unlawful-in any way, such court may modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision of this Agreement by which this Agreement shall be governed by and construed under Massachusetts law, all issues relating to arbitration or the enforcement of this Agreement to arbitrate contained herein shall be governed by the United States Arbitration Act, 9 U.S.C. § I et seq., and the federal common law of arbitration.

E.  Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. Except as provided for in Sections 19.9 and 19. 10,    **A CORP**. and **FRANCHISEE** (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damage sustained by it.

F.  This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear. The arbitration proceedings shall take place in Boston, Massachusetts unless otherwise agreed by **A CORP**. and **FRANCHISEE.**

G.  **A CORP**. and **FRANCHISEE** agree that no action (whether for arbitration, damages, injunctive, equitable or other relief, including but not limited to rescission) will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this agreement or otherwise, unless brought before the expiration of the earlier of 1 year after the date of discovery of the facts resulting in such alleged liability or obligation or 2 years after the date of the first act or omission giving rise to such alleged liability or obligation, except that where state or federal law mandates or makes possible by notice or otherwise a shorter period, such shorter period shall apply.

H.  The obligation to arbitrate or mediate shall not be binding upon either party with respect to claims relating to **A CORP**.'s trademarks, service marks, patents or copyrights; request for temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

19.8  **NOTICES**.
All written notices to **A CORP**. permitted or required to be delivered by the provisions of this Agreement or the Operations Manual shall be deemed so delivered 3 days after being placed in the United States Mail, by Certified Mail, Return Receipt Requested, or by receipted overnight carrier to **A CORP**., 268 Rangeway Road, P.O. Box 290, N Billerica, Massachusetts 01862, Attn. President or to such other address or addresses as **A CORP**. shall from time to time designate in the Operations Manual or in writing to **FRANCHISEE** at the location described in Section 1.2 above, or to such other address as **FRANCHISEE** may from time to time designate in writing to **A CORP**.

19.9  **INDEMNIFICATION. FRANCHISEE** agrees to hold **A CORP**. harmless and indemnify **A CORP**. and its officers, agents and employees of and from all suits, actions, claims and

**AA267**

other proceedings brought by any and all persons or entities as a result of services, representations, conduct or work performed by **FRANCHISEE**, its agents, employees, subcontractors or assigns, or in the event **A CORP**. exercises the Step-In-Rights specified in Section 17. **FRANCHISEE** agrees to pay any and all expenses or fees, including reasonable attorney's fees, incurred by **A CORP**., its affiliates, subsidiaries or agents, resulting from any and all claims brought by or against **FRANCHISEE**, its officers, directors, employees or stockholders.

**FRANCHISEE** shall indemnify and hold **A CORP**. harmless of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance of Exhibit B, Power of Attorney.

The above indemnification provisions shall not be construed, with regard to a particular claim, to apply to any claim where its operation would be against public policy. It is the intent of the provisions above to permit the maximum indemnification of **A CORP**. by **FRANCHISEE** as permitted by law.

19.10 **LIMITATION OF LIABILITY OF A CORP.** If **A CORP**. shall be found liable to **FRANCHISEE** for any claim based upon this Agreement, **A CORP**.'s liability shall be limited to the amount of the initial Franchise Fee (specified in Section 1.7 herein) that has actually been paid by **FRANCHISEE** at the time of judgment.

In no event will **A CORP**., any affiliate, agent, or employee of **A CORP**. be liable for any other damages including, but not limited to, loss of business, revenues or profits. **FRANCHISEE** agrees that this limitation of liability will apply to any claim **FRANCHISEE** shall have against **A CORP** limited to, claims based on contract violations, torts (such as negligence) or strict liability.

19.11 **LATE PAYMENT FEES.** If **FRANCHISEE** fails to pay **A CORP**. all or any portion of the Continuing Royalty, or Marketing Fund Contribution or any other obligation due to **A 1CORP**., promptly when due, **FRANCHISEE** shall pay to **A CORP**. a late payment fee equal to 18% per annum of such delinquent payments. Notwithstanding the foregoing, if the amount of the late payment fee shall be greater than any such charge permitted by applicable law, such charge shall be reduced to an amount equal to the maximum lawful charge, it being the intention of the parties that such late charge shall in no event be greater than that permitted by law.

19.12 **SURVIVAL OF COVENANTS.** The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement, shall be enforceable notwithstanding the expiration or other termination of this Agreement for any reason whatsoever.

20. **CAVEAT**

The success of the business venture contemplated to be undertaken by **FRANCHISEE** by virtue of this Agreement is speculative and depends to a large extent upon the ability of **FRANCHISEE** as an independent business person as well as other factors. **A CORP**. does not make any representation or warranty as to the potential success of the business venture contemplated by this Agreement.

**AA268**

**FRANCHISEE** recognizes and understands that he or she may incur other expenses and/or obligations as part of the initial investment in the franchised business or on an ongoing basis which the terms of this Agreement may not address, and which include without limitation initial equipment and supplies, advertising expenses, telephone, insurance, grand opening promotions and working capital necessary to commence operation.

**FRANCHISEE** acknowledges that he or she has read this Franchise Agreement as well as the Disclosure document, and that he or she has been give the opportunity to clarify provisions that he did not understand and to consult with an attorney or other professional advisor. **FRANCHISEE** represents that he or she understands and agrees to be bound by the terms, conditions and obligations of this Agreement.

**FRANCHISEE** acknowledges that he or she may have to prepare for and pass certain local and state mandated examinations in order to operate the Franchise. **FRANCHISEE** alone shall be responsible for the preparation and successful completion of all examinations.

**FRANCHISEE** acknowledges that he or she has entered into this Agreement after making an independent investigation of **A CORP.'s** operations and not upon a representation by **A CORP.** as to profits which **FRANCHISEE** might expect to realize. **FRANCHISEE** acknowledges that prior to the execution of this Agreement, **FRANCHISEE** has had the opportunity to contact existing franchisees of **A CORP.**

## 21.    RELEASE

**FRANCHISEE**, his heirs and assigns, hereby remises, releases and forever discharges **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, warranties, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which **FRANCHISEE**, his heirs and assigns now have or ever had against **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents, from the beginning of time until this day.

*[The remainder of the page intentionally left blank]*
*[Signature page follows on the next page]*

**AA269**

**IN WITNESS WHEREOF** the parties intending to be bound legally, have fully executed, sealed and delivered this Agreement as of the day and year first above written.

**A CORP., FRANCHISOR**

By: _____

_____
Witness

Officer

_____
Date    11-18-19

By: **Quality Air Care Corporation, FRANCHISEE**

_____
Witness

Officer – Klodian Belegu

_____
Date    8-29-19

**AA270**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|---|---|---|---|---|
| NY | West Chester | Amawalk | 10501 | 1,219 |
| NY | West Chester | Armonk | 10504 | 7,987 |
| NY | West Chester | Baldwin Place | 10505 | 851 |
| NY | West Chester | Bedford | 10506 | 5,790 |
| NY | West Chester | Bedford Hills | 10507 | 6,408 |
| NY | West Chester | Briarcliff Manor | 10510 | 9,988 |
| NY | West Chester | Buchanan | 10511 | 2,246 |
| NY | West Chester | Chappaqua | 10514 | 11,946 |
| NY | West Chester | Crompond | 10517 | 539 |
| NY | West Chester | Cross River | 10518 | 1,268 |
| NY | West Chester | Croton Falls | 10519 | 316 |
| NY | West Chester | Croton on Hudson | 10520 | 12,810 |
| NY | West Chester | Croton on Hudson | 10521 | 0 |
| NY | West Chester | Golden Bridge | 10526 | 1,809 |
| NY | West Chester | Granite Springs | 10527 | 908 |
| NY | West Chester | Hawthorne | 10532 | 4,931 |
| NY | West Chester | Jefferson Valley | 10535 | 555 |
| NY | West Chester | Katonah | 10536 | 10,739 |
| NY | West Chester | Lincondale | 10540 | 0 |
| NY | West Chester | Maryknoll | 10545 | 141 |
| NY | West Chester | Millwood | 10546 | 1,277 |
| NY | West Chester | Mohegan Lake | 10547 | 7,647 |
| NY | West Chester | Montrose | 10548 | 3,487 |
| NY | West Chester | Mount Kisco | 10549 | 16,638 |
| NY | West Chester | North Salem | 10560 | 4,737 |
| NY | West Chester | Ossining | 10562 | 31,796 |
| NY | West Chester | Peekskill | 10566 | 23,570 |
| NY | West Chester | Cortlandt Manor | 10567 | 19,929 |
| NY | West Chester | Pleasantville | 10570 | 12,680 |
| NY | West Chester | Pound Ridge | 10576 | 5,116 |
| NY | West Chester | Purdy's | 10578 | 681 |
| NY | West Chester | Shenorock | 10587 | 0 |
| NY | West Chester | Shrub Oak | 10588 | 2,282 |
| NY | West Chester | Somers | 10589 | 8,475 |
| NY | West Chester | South Salem | 10590 | 6,767 |
| NY | West Chester | Tarrytown | 10591 | 22,540 |
| NY | West Chester | Thornwood | 10594 | 5,117 |
| NY | West Chester | Valhalla | 10595 | 8,195 |
| NY | West Chester | Verplanck | 10596 | 1,729 |
| NY | West Chester | Waccabuc | 10597 | 968 |
| NY | West Chester | Yorktown Heights | 10598 | 28,647 |

**AA271**

Total Unit(s)[1] Population: 292,729

Initials: _____        Initials: _____
          **A CORP**                       **FRANCHISEE**

Date: _11-18-19_                  Date: _9-29-18_

---

[1] One unit is equal to 125,000 populations.

**AA272**

**EXHIBIT A**

**GUARANTY OF PERFORMANCE**

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____

Date: _____

By: _____

Date: _____

To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

**Quality Air Care Corporation, FRANCHISEE**

By: Klodian Belegu

Date: 9 - 23 - 19

By: _____

Date: _____

**AA273**

# EXHIBIT D

**Generated on:** This page was generated by TSDR on 2024-12-11 13:32:26 EST

**Mark:** 911 SEWER & DRAIN

911 Sewer & Drain

| | | | |
|---|---|---|---|
| **US Serial Number:** 97346878 | | **Application Filing Date:** | Apr. 05, 2022 |
| **Filed as TEAS Plus:** Yes | | **Currently TEAS Plus:** | Yes |
| **Register:** Principal | | | |
| **Mark Type:** Service Mark | | | |

**TM5 Common Status Descriptor:** 

DEAD/APPLICATION/Refused/Dismissed or Invalidated

This trademark application was refused, dismissed, or invalidated by the Office and this application is no longer active.

**Status:** Abandoned because the applicant failed to respond or filed a late response to an Office action. To view all documents in this file, click on the Trademark Document Retrieval link at the top of this page.

**Status Date:** Nov. 13, 2024

**Publication Date:** Feb. 28, 2023 **Notice of Allowance Date:** Apr. 25, 2023

**Date Abandoned:** Oct. 28, 2024

## Mark Information

**Mark Literal Elements:** 911 SEWER & DRAIN

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 4 - STANDARD CHARACTER MARK

**Disclaimer:** "SEWER & DRAIN"

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** Drain and sewer cleaning and rootering services; Drain cleaning services; Plumbing services

**International Class(es):** 037 - Primary Class

**U.S Class(es):** 100, 103, 106

**Class Status:** ACTIVE

**First Use:** Feb. 08, 2024

**Use in Commerce:** Feb. 26, 2024

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | No | **Currently Use:** | No |
| **Filed ITU:** | Yes | **Currently ITU:** | Yes |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

| | |
|---|---|
| **Owner Name:** | Klodian Belegu |
| **Owner Address:** | 692 Sussex Ct<br>Toms River, NEW JERSEY UNITED STATES 08753 |
| **Legal Entity Type:** INDIVIDUAL | **Citizenship:** ALBANIA |

## Attorney/Correspondence Information

**Attorney of Record**

| | |
|---|---|
| **Attorney Name:** | Sandro Paterno |
| **Attorney Primary Email Address:** | info@paternoandassociates.com |
| **Attorney Email Authorized:** | Yes |

**Correspondent**

| | |
|---|---|
| **Correspondent Name/Address:** | Sandro Paterno<br>Paterno & Associates P.C.<br>11 Broadway, Suite 865<br>New York, NEW YORK United States 10004 |
| **Phone:** | 2012329202 |
| **Correspondent e-mail:** | info@paternoandassociates.com |
| **Correspondent e-mail Authorized:** | Yes |

**Domestic Representative - Not Found**

## Prosecution History

| Date | Description | Proceeding Number |
|---|---|---|
| Nov. 13, 2024 | ABANDONMENT NOTICE E-MAILED - FAILURE TO RESPOND | |
| Nov. 13, 2024 | ABANDONMENT - FAILURE TO RESPOND OR LATE RESPONSE | |
| Jul. 02, 2024 | APPLICATION EXTENSION GRANTED/RECEIPT PROVIDED | |
| Jul. 02, 2024 | APPLICATION EXTENSION TO RESPONSE PERIOD - RECEIVED | |
| Apr. 26, 2024 | NOTIFICATION OF NON-FINAL ACTION E-MAILED | |
| Apr. 26, 2024 | NON-FINAL ACTION E-MAILED | |
| Apr. 26, 2024 | SU - NON-FINAL ACTION - WRITTEN | |
| Apr. 02, 2024 | STATEMENT OF USE PROCESSING COMPLETE | |
| Mar. 11, 2024 | USE AMENDMENT FILED | |
| Apr. 02, 2024 | CASE ASSIGNED TO INTENT TO USE PARALEGAL | |
| Mar. 11, 2024 | TEAS STATEMENT OF USE RECEIVED | |
| Mar. 11, 2024 | TEAS WITHDRAWAL OF ATTORNEY RECEIVED-FIRM RETAINS | |
| Mar. 11, 2024 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Mar. 11, 2024 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Mar. 11, 2024 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |
| Nov. 13, 2023 | ASSIGNED TO EXAMINER | |
| Oct. 27, 2023 | NOTICE OF APPROVAL OF EXTENSION REQUEST E-MAILED | |
| Oct. 24, 2023 | SOU EXTENSION 1 GRANTED | |
| Oct. 24, 2023 | SOU EXTENSION 1 FILED | |
| Oct. 24, 2023 | SOU TEAS EXTENSION RECEIVED | |
| Apr. 25, 2023 | NOA E-MAILED - SOU REQUIRED FROM APPLICANT | |
| Feb. 28, 2023 | OFFICIAL GAZETTE PUBLICATION CONFIRMATION E-MAILED | |
| Feb. 28, 2023 | PUBLISHED FOR OPPOSITION | |
| Feb. 08, 2023 | NOTIFICATION OF NOTICE OF PUBLICATION E-MAILED | |
| Jan. 25, 2023 | APPROVED FOR PUB - PRINCIPAL REGISTER | |
| Jan. 25, 2023 | EXAMINER'S AMENDMENT ENTERED | |
| Jan. 25, 2023 | NOTIFICATION OF EXAMINERS AMENDMENT E-MAILED | |
| Jan. 25, 2023 | EXAMINERS AMENDMENT E-MAILED | |
| Jan. 25, 2023 | EXAMINERS AMENDMENT -WRITTEN | |
| Jan. 23, 2023 | ASSIGNED TO EXAMINER | |
| Jul. 25, 2022 | TEAS CHANGE OF CORRESPONDENCE RECEIVED | |
| Jul. 25, 2022 | ATTORNEY/DOM.REP.REVOKED AND/OR APPOINTED | |
| Jul. 25, 2022 | TEAS REVOKE/APP/CHANGE ADDR OF ATTY/DOM REP RECEIVED | |

**AA276**

Apr. 09, 2022     NEW APPLICATION OFFICE SUPPLIED DATA ENTERED
Apr. 08, 2022     NEW APPLICATION ENTERED

# TM Staff and Location Information

| TM Staff Information | |
|---|---|
| **TM Attorney:** COPELAND, ASHTON | **Law Office Assigned:** LAW OFFICE 111 |

| File Location | |
|---|---|
| **Current Location:** TMO LAW OFFICE 111 | **Date in Location:** Nov. 13, 2024 |

**AA277**

# EXHIBIT E

AA278





# Blog





## Solve Stubborn Drain Clogs with New Jersey's Top Solutions

by blog | Jan 25, 2024 | Drain Cleaning & Clog Removal

Are you tired of dealing with stubborn drain clogs in your home or business? In this article, we will discuss the warning signs of stubborn drain clogs, tips for preventing them, and the benefits of high-pressure water jetting for clearing out tough blockages. We'll...

**read more**



## 7 Common Toilet Problems Every New Jersey Homeowner Should Know

by blog | Jan 24, 2024 | Toilets

Are you a homeowner in New Jersey? If so, you may have encountered some common toilet problems at one point or another. Ignoring these issues can lead to bigger problems down the line, so it's important to understand the signs of potential toilet problems and how to...

**read more**





## Water Damage Restoration – Key Things To Know

by Administrator | Aug 10, 2023 | Water Damage Restoration

Water damage restoration is a vital topic for every homeowner to understand. When it comes to water damage in the home, a little knowledge can go a long way in preventing and addressing potential issues. In this blog post, we will explore what water damage is, how it...

**read more**





**AA282**

Quick Toilet Repair Services: Solving New Jersey Plumbing
Emergencies

by blog | Jan 25, 2024 | Toilets

**read more**



Eco-Friendly Toilets: The Key to Water Conservation in New Jersey
Homes

by blog | Jan 24, 2024 | Toilets

Are you considering renovating your bathroom to be more eco-friendly? Water-saving
toilets could be the perfect solution for your New Jersey home. In this article, we will
explore the benefits of eco-friendly bathroom renovations, including how they can
benefit the...

**read more**



**AA283**



## Emergency Plumbing 101: Tackling Unexpected Issues with Confidence

by Administrator | Aug 10, 2023 | Emergency Plumbing

When it comes to plumbing, some issues just can't wait. We've all been there – a burst pipe flooding your home, a malfunctioning water heater leaving you without hot water, or a clogged toilet causing chaos in your bathroom. These are the moments when you need the...

**read more**





## The Complete Guide to Toilet Repair and Installation in New Jersey – Expert Tips and Tricks

by blog | Jan 24, 2024 | Toilets

Are you facing issues with your toilet and wondering about the cost and process of repair or installation? Look no further! In this ultimate guide, we break down the costs associated with toilet repair and installation in New Jersey, discuss the factors that affect...

**read more**





## The Unseen Heroes: Why Homeowners Need Professional Plumbing Services

by Administrator | Aug 10, 2023 | Plumber Services

Having a functional and well-maintained plumbing system is an essential aspect of any home. From delivering clean water for daily activities to disposing of waste efficiently, a reliable plumbing system ensures comfort, convenience, and a healthy living environment....

**read more**



Next Entries »



Copyright 2024 911 Sewer & Drain. All rights reserved. All available services, hours of operations, pricing structure, and guarantees may vary by location.

# EXHIBIT F

AA287



**911 SEWER & DRAIN**

📞 (800) 295-5798    ✉ info@911sewerdrain.com



# Emergency Response How Nj Water Damage Companies Can Save Your Home

by blog | Feb 7, 2024 | Water Damage Restoration | 0 comments





**AA288**

Case 1:24-cv-13015-PBS   Document 7-6   Filed 12/16/24   Page 3 of 11



Has your home been affected by water damage in New Jersey or New York? Whether it's from a burst pipe, flooding, or sewage backup, immediate action is crucial in minimizing the damage.

In this article, we will explore the specialized emergency response and water damage restoration services available in these areas. From 24/7 immediate response for water cleanup to expertise in handling various types of water damage, we'll discuss the processes, equipment, and customer satisfaction guarantees offered by these professional companies. Whether you're in Northern New Jersey or New York, these services are here to help you with your water damage restoration needs.

## Key Takeaways:

- NJ water damage companies offer 24/7 immediate response for water cleanup and restoration to prevent further damage to your home.
- They specialize in handling various types of water damage and have the expertise and equipment to efficiently remove and dry water, even in basements.
- With a commitment to customer satisfaction and certifications in water damage restoration, these companies guarantee quality service in Northern New Jersey and New York.

## Emergency Response and Water Damage Restoration in New Jersey and New York

When **water damage** strikes, prompt action is crucial to mitigate the impact on your property. For comprehensive **water damage restoration** and emergency response services in **New Jersey** and **New York**, trust the expertise of 911 Sewer & Drain.

**AA289**

ServiceMaster QuickResponse and Consolidated Environmental offer a rapid 24/7 emergency response to deal with water damage swiftly and effectively. This minimizes further destruction and potential health risks. Their team of skilled professionals has the necessary expertise and advanced equipment to handle all aspects of restoration efficiently.

Serving the Bergen County and surrounding areas, they are committed to providing prompt, reliable, and thorough services to restore your property to its pre-damaged condition.

# 24/7 Immediate Response for Water Cleanup and Restoration

Our team is dedicated to providing 24/7 immediate response for water cleanup and restoration, ensuring that no time is wasted when addressing water damage emergencies in New Jersey and New York.

## Live Person Assistance and Rapid Response Time

Our live person assistance ensures that you receive immediate support and guidance, complemented by our rapid **response time** to address water damage situations effectively and efficiently.

Have you ever experienced a water-related emergency that required immediate attention? We understand the stress and urgency that comes with such situations. That's why our team of certified professionals is dedicated to providing personalized assistance and expert guidance in a timely manner.

Whether it's a burst pipe, flooding, or any other water-related crisis, our quick response time ensures that skilled help is on its way to mitigate and remediate the damage. We take pride in being the go-to service providers for handling such emergencies, offering not only a fast turnaround but also a human touch for reassurance.



## Serving New Jersey, New York, and Surrounding Areas

We proudly serve the communities of New Jersey, New York, including **Bergen County** and the surrounding areas, offering comprehensive water damage restoration and emergency response solutions.

At our company, our certified professionals and dedicated service providers prioritize delivering swift and efficient water damage restoration services. Our commitment lies in ensuring the safety and well-being of residents in New Jersey, New York, and the surrounding regions.

With an extensive **coverage area**, our team is well-equipped to address water damage issues in a timely manner. We utilize industry-leading techniques and advanced equipment to restore

AA290

properties to their pre-loss conditions, whether it's a residential or commercial property. Our experts are prepared to handle any scale of **emergency response** with precision and care.

## Specialized Services for Flood Damage Restoration

Our **specialized services** are tailored to address the unique challenges of flood damage restoration, utilizing the expertise of our certified technicians and the resources of ServiceMaster QuickResponse and Consolidated Environmental.

In terms of dealing with the aftermath of a flood, experience and professional knowledge are essential. Our certified technicians are trained to handle all aspects of flood damage restoration, from assessing the extent of the damage to implementing comprehensive restoration plans.

We understand that each situation is unique, and that's why we take a personalized approach to every project. ServiceMaster QuickResponse and Consolidated Environmental provide the backing and resources necessary to ensure that our specialized services are carried out efficiently and effectively.

## Expertise in Handling Various Types of Water Damage

Our team possesses **extensive expertise** in handling a wide range of water damage scenarios, ensuring that each restoration process is approached with precision and professionalism.

From minor leaks to major flooding, our team is skilled in managing diverse water damage situations. We prioritize **professionalism** in every step of the restoration process, striving for prompt and reliable outcomes.



With our attention to detail, **precision** is applied to thoroughly assess and address the extent of damage, delivering effective solutions tailored to each unique case. Our commitment to excellence drives us to stay updated with the latest industry standards, utilizing advanced techniques and equipment to ensure comprehensive restoration.

## Professional Water Removal and Cleanup Process

Our professional **water removal and cleanup process** is meticulously executed by our certified technicians, delivering thorough restoration and peace of mind to property owners in New Jersey and New York.

Our certified technicians undergo rigorous training to handle water removal and cleanup processes with precision and expertise. They utilize state-of-the-art equipment and advanced techniques to ensure thorough restoration of properties.

From assessing the extent of water damage to implementing tailored solutions, our team meticulously attends to every detail. Property owners can rely on our swift response and

**AA291**

efficient execution, minimizing the impact of water damage on their premises.

We prioritize customer satisfaction and believe in going the extra mile to provide a seamless and hassle-free experience during the restoration process.

## Phases of Water Damage Restoration Process

The **water damage restoration process** encompasses distinct phases, each managed by our team of professionals and certified technicians to ensure comprehensive restoration in New Jersey and New York.

The assessment phase involves a thorough inspection of the damaged property to determine the extent of the water damage and devise an effective restoration plan. Subsequently, extraction and drying activities are meticulously conducted to remove standing water, dehumidify the affected areas, and prevent mold growth.

Our certified technicians utilize advanced equipment and techniques to expedite this crucial phase.

Following successful water extraction, the restoration phase commences, encompassing repairs, sanitization, and restoration of damaged structures and belongings. Our team works diligently to restore the property to its pre-damaged state, providing efficient and reliable service throughout the process.

## Types of Equipment Used for Water Removal and Drying

Our **water removal and drying** processes are supported by state-of-the-art equipment, managed by our dedicated professionals to ensure efficient restoration in New Jersey and New York.

We utilize advanced **moisture detection equipment** to accurately locate and assess water damage, allowing our team to strategize the best approach for effective **water extraction**.

Our **industrial-grade drying systems** expedite the drying process, preventing mold and structural damage. Our skilled technicians meticulously monitor the **humidity levels** and employ cutting-edge techniques for thorough drying.

This dedication to detail and use of the latest technology sets us apart, consistently delivering outstanding results for our clients.

## Efficient Sewage Cleanup and Removal Services

Our efficient **sewage cleanup and removal** services are delivered by our experienced professionals, ensuring a thorough restoration process in New Jersey and New York.

With years of expertise in handling sewage cleanup and removal, our team is adept at swiftly assessing the situation, containing the damage, and implementing effective remediation

**AA292**

measures.

We understand the urgency and delicacy of these situations, which is why our professionals work diligently to restore your property to its pre-incident condition. Utilizing advanced equipment and proven techniques, we strive to minimize disruptions while maximizing efficiency.

Our comprehensive approach addresses not only the visible effects of sewage damage but also the underlying issues to prevent future occurrences.

## Customer Satisfaction and Testimonials

Our commitment to **customer satisfaction** is evidenced by the glowing testimonials from property owners in New Jersey and New York, reflecting our dedication to exemplary restoration services.

These testimonials serve as a testament to our unwavering dedication to delivering exceptional **restoration services** that meet and exceed our customers' expectations.

Consistently praised for our professionalism, attention to detail, and rapid response, we take pride in restoring peace of mind for property owners during challenging times.

Our team's expertise and compassionate approach set us apart as the preferred choice for those in need of reliable restoration solutions.

## Service Guarantee and Certifications

Our **service guarantee** and **industry certifications** exemplify our unwavering commitment to delivering top-tier restoration services in New Jersey and New York.



At our company, we prioritize adhering to strict industry standards and investing in continual training and education. This ensures that our team is equipped with the latest techniques and knowledge to handle any restoration project with expertise. Our certifications, including [relevant certification names], serve as a testament to our dedication to excellence and proficiency in the field.

Furthermore, we stand behind our work with a service guarantee. We are confident in the quality of our services and if for any reason our customers are not satisfied, we will make it right. This guarantee provides our customers with complete peace of mind throughout the restoration process.

## Areas Served in Northern New Jersey and New York

Our services extend to **Northern New Jersey and New York**, addressing property damage with the expertise of our professional teams and the resources of ServiceMaster

**AA293**

QuickResponse and Consolidated Environmental.

At our company, we have specialized teams ready to handle a wide range of property damage challenges. These include water damage, fire and smoke damage, mold remediation, and more. Our approach is centered around our customers, ensuring that we address each concern with precision and care. Whether it's a residential property or a commercial establishment, we leave no stone unturned with our comprehensive solutions. We are committed to providing **high-quality service** and a quick response to help restore your peace of mind when faced with unexpected property damage.

## Specialization in Basement Water Damage Cleanup

We specialize in **thorough basement water damage cleanup**, leveraging the expertise of our restoration professionals to ensure comprehensive restoration in New Jersey and New York.

Our seasoned team is adept at addressing the multifaceted challenges posed by water damage in basements. Their in-depth knowledge and advanced techniques enable them to swiftly assess the extent of the damage, effectively remove excess water, and implement targeted drying and dehumidification processes.

We understand the importance of remedying underlying causes to prevent future issues. With a meticulous approach, we thoroughly sanitize and restore affected areas, ensuring a safe and healthy environment for you and your family. Trust our professionals to deliver unmatched expertise and professionalism in every step of your basement water damage cleanup and restoration process.

## Prevention and Causes of Water Damage



Understanding the prevention and causes of water damage is essential in safeguarding properties in New Jersey and New York, and our professionals are well-equipped to provide insights and solutions.

Water damage can result from various sources, such as burst pipes, leaks, floods, and natural disasters. It is crucial to address these issues promptly to mitigate potential structural damage, mold growth, and health hazards.

Our professional team specializes in assessing and diagnosing the root causes of water damage, utilizing advanced techniques and equipment to accurately detect hidden moisture and restore affected areas. By understanding the contributing factors and implementing preventative measures, property owners can minimize the risk of water damage and maintain the integrity of their investments.

# Frequently Asked Questions

## What is emergency response and how can NJ water damage companies save my home?

Emergency response refers to the immediate actions taken to address a crisis or disaster, such as water damage in your home. NJ water damage companies are equipped with the necessary tools and expertise to quickly and efficiently restore your home and prevent further damage.

## Why is it important to hire a water damage company for emergency response?

Water damage can be extensive and cause significant structural damage to your home if not addressed promptly. Hiring a professional water damage company ensures that the problem is handled correctly and reduces the risk of further damage or mold growth.



## What are the steps taken by NJ water damage companies during emergency response?

NJ water damage companies follow a standard protocol for emergency response, which includes assessing the extent of the damage, extracting water, drying and dehumidifying the affected areas, and sanitizing and restoring your home to its pre-damaged condition.

## Can NJ water damage companies work with my insurance company?

Yes, most water damage companies in NJ have experience working with insurance companies and can assist with the claims process. They can provide documentation and detailed reports of the damage and the restoration process to help with your insurance claim.

# How quickly should I contact a water damage company for emergency response?

It's crucial to contact a water damage company as soon as possible to minimize the damage and prevent any potential health hazards. Most companies offer 24/7 emergency services, so don't hesitate to call them immediately.

# Are there any preventive measures I can take to avoid water damage in my home?

Yes, there are steps you can take to prevent water damage in your home, such as regularly inspecting and maintaining your plumbing and roof, fixing any leaks, and ensuring proper drainage around your property. It's also a good idea to have a plan in place in case of an emergency, such as knowing the location of your water shut-off valve.

## Related Posts



Prevent Costly Repairs: Sump Pump Maintenance Tips Near Me



Sump Pump Repair Near Me: Preventing Basement Floods



DIY or Professional? Finding the Best Plumbing Repair Near Me



Revive Your Basement: Find Top Sump Pump Repair Near Me



Sump Pump Repair Near Me: Essential for Protecting Your Home's Foundation



Affordable and Reliable Plumbing Repair Near Me – Your Go-To Source





**AA296**

Copyright 2024 911 Sewer & Drain. All rights reserved. All available services, hours of operations, pricing structure, and guarantees may vary by location.



# EXHIBIT G

**AA298**

☰

**AA299**

**24/7** Local Plumbing Services

# 911 Sewer & Drain
## Emergency Plumbing & Drain Cleaning

Whether it's a clogged drain, burst pipe, or a sewage backup, we're at your service to restore order and comfort to your home or business.

SCHEDULE SERVICE

Welcome to **911 Sewer & Drain**

Your trusted partner in Emergency Plumbing and Drain Cleaning services. When plumbing disasters strike, we're the professionals you can rely on, 24/7.

At 911 Sewer & Drain, we understand that plumbing emergencies can happen at any time, disrupting your life and causing stress. Our team of skilled plumbers and technicians are equipped with the latest tools and expertise to handle any plumbing crisis with speed and efficiency.

**AA301**



Emergency Plumbers

Introducing our Local Emergency Plumbing Services at 911 Sewer & Drain, your trusted partner in handling plumbing problems 24/7. With our advanced tools and expertise, you can rely on us to fix your problem fast and efficiently. Contact us now for all your emergency plumbing needs.

LEARN MORE

**AA302**



## Leak Repair

Our professional team of plumbers are available 24/7 to handle your home
plumbing needs swiftly and efficiently. With advanced tools and extensive
knowledge, our expert technicians can quickly fix any leak or burst pipe.
Contact us now and let 911 Sewer & Drain get you fixed fast!

LEARN MORE

**AA303**



## Drain Cleaning

Need help with drain cleaning and clog removal? Our team of experts are available around the clock. Count on us to quickly address any plumbing problem you may have, from stubborn clogs to complete drain cleaning. Contact us now for all your drain cleaning needs.

LEARN MORE

**AA304**

# Best-in-Class Emergency Plumbing Services

Introducing our comprehensive range of plumbing services. From routine maintenance to complex repairs, we have you covered. Our skilled team of plumbers is equipped to handle any job with precision and expertise. Whether it's fixing leaky faucets, installing state-of-the-art water heaters, or tackling challenging sewer line issues, we are committed to delivering exceptional results.

With a focus on efficiency and customer satisfaction, we strive to provide the highest quality service in a timely manner. Trust in our expertise to ensure your plumbing needs are met with excellence. Contact us today for all your plumbing requirements and discover the difference of 911 Sewer & Drain.

**Services:**

- 24/7 Emergency Plumbing Services
- Drain Cleaning
- Water Heater Repair/Installation
- Sewer Line Repair/Replacement
- Pipe Leaks
- Toilet Repair/Installation
- Garbage Disposal Repair/Installation
- Sump Pump Repair/Installation
- Water Leak Detection

SCHEDULE SERVICE NOW

**AA305**



**AA306**

# Franchise Opportunities

Explore the extraordinary opportunity to become a 911 Sewer & Drain franchise and unlock boundless potential. Join a thriving network of motivated entrepreneurs who have discovered the lucrative business of sewer and drain services along with water damage restoration. With our robust support system and industry expertise, you'll be equipped to excel and build a thriving business.

Step into a world where customer satisfaction is paramount, and trust is earned through exceptional service. Embrace this remarkable chance to enjoy the freedom and rewards of owning your own franchise.

LEARN MORE

# Blog

AA307



## Discover the Best Mold Assessment Services Near You for a Healthier Home

by blog | Dec 11, 2024 | Water Damage Restoration

When it comes to maintaining a healthy living environment, ensuring your home is free of mold is crucial.Mold can lead to various health issues, from allergies to more serious respiratory complications, making the need for professional inspection and cleanup...

read more

**AA308**



## Find Affordable Mold Testing in Sayreville: Protect Your Home Today!

by blog | Dec 10, 2024 | Water Damage Restoration

Mold can be a stealthy intruder in your home, creeping into corners and hidden spaces without warning.Not only is it unsightly, but it poses serious health risks, especially for children, the elderly, and those with respiratory issues.If you live in Sayreville and...

read more

**AA309**



## Essential Guide to Pre-Renovation Mold Inspection in New Brunswick

by blog | Dec 10, 2024 | Water Damage Restoration

Planning a renovation project can be both exciting and overwhelming.Whether you're refreshing a room or undertaking a full-scale remodel, there's one crucial step that often gets overlooked: pre-renovation mold inspection in New Brunswick.Why is this so important, you...

read more

« Older Entries

Contact Us

**800-295-5798** 📞

911 Sewer & Drain

1049 Church Rd.

Toms River, NJ 08753

**AA311**

Why Us

About Us

Blog

Own a Franchise





Accepted forms of payment.



Copyright 2024 911 Sewer & Drain. All rights reserved. All available services, hours of operations, pricing structure, and guarantees may vary by location.

**AA312**

# EXHIBIT H

**AA313**









**AA314**

 

**RooterMan | Plumbing Services**

Trust **RooterMan** for repair and replacement of gas, electric and tankless water heaters. Explore this Service. This is what we do. **RooterMan** To The Rescue!

Services · RooterMan Plumbing... · About · Schedule Service

 RooterMan
https://www.rooterman.com › new-jersey › area-served ⋮

**Plumbing | Plumber | Drain Cleaning | Midland Park, NJ**

**RooterMan** plumber's offer drain cleaning & plumbing services in Midland Park, **NJ**. Find the best plumber and plumbing services near you with **RooterMan**.

 RooterMan
https://www.rooterman.com › new-jersey › services ⋮

**Plumbing Services | Plumber in New Jersey**

**New Jersey Rooterman** Services. **RooterMan** is a local plumbing, sewer, and drain cleaning company with over 50+ years of experience.

 MapQuest
https://www.mapquest.com › ... › Toms River ⋮

**Rooterman of New Jersey, Toms River, NJ 08755, US**

**RooterMan of New Jersey** remains the number one choice for professional plumbing, sewer, and drain cleaning services.

 RooterMan
https://www.rooterman.com › new-jersey › area-served ⋮

**Plumbing | Plumber | Drain Cleaning | Montvale, NJ**

**Rooterman** local plumbers have been providing affordable residential and commercial septic pumping services for over 50+ years. Call to schedule service! Read ...

 HomeAdvisor
https://www.homeadvisor.com › ... › Plumbers ⋮

**Rooter Man Of NJ, LLC | Toms River, NJ 08753**

Excellent same day service and price. James was excellent, didn't leave until everything was perfect.
4.7        (7)

## People also ask ⋮

Does the state of NJ use a collection agency?

Does Roto Rooter guarantee their work near me?

What percent of NJ is in poverty?

What does a rooter do?

Feedback

 Yelp
https://www.yelp.com › ... › Home Services › Plumbing ⋮

**Rooter-Man - Lincoln Park, NJ**

Very friendly,prompt with expert technician.My water went down,.**Rooterman** tech diagnosed the pilot was bad and replaced it. Helpful 0. Helpful 1. Thanks 0.
5.0        (1)

## People also search for ⋮

**AA315**



| Rooterman of nj **complaints** | Rooter Man New Orleans |
| Rooterman of nj **prices** | Zoom Drain CT |
| **Rooter man charlottesville** | Plumbing services |

1  2  3  4  5  6  7  8  9  10      Next

**Waltham, Massachusetts** - Based on your past activity - Update location

Help    Send feedback    Privacy    Terms

**AA316**

# EXHIBIT I

AA317


     
3




# 911 Sewer and Drain

671 likes • 702 followers

Call Now    💬 Message    👍 Like

Posts    About    Mentions    **Reviews**    Followers    Photos    More ▾     ···

## Do you recommend 911 Sewer and Drain?

Yes             No

## 100% recommend (8 Reviews) ◼

Roseann Pirollo Flanagan 🌟 recommends 911 Sewer and Drain.    ···
November 5, 2021 · 🌐

Just used Rooter Man for a plugged up kitchen sink drain line. Andy the technician was polite, clean working, and explained two options that would correct the issue before starting. Once he did start was finished up quickly and no more plugged drain. Clean up everything after finishing







**Albena Roger Dasilva** recommends 911 Sewer and Drain.
October 25, 2021 ·

Arrived on time and did a excellent Work at my house , very professional.  I will use them again.

❤ 1                                                          3 comments

Like                    Comment                    Share

Most relevant

911 Sewer and Drain
Thank you for your kind review, we look forward to working together again!

3y    Like    Reply

**Indhira Luciano** recommends 911 Sewer and Drain.
May 25, 2021 ·

Profesional staff. Efficient work.

3 comments

Like                    Comment                    Share

911 Sewer and Drain
Thank you for your business, Indhira! We look forward to working together again!

3y    Like    Reply

**Victoria Turk** recommends 911 Sewer and Drain.
May 12, 2021 ·

Arrived on time and did a professional job of unclogging my drain.

1 comment

Like                    Comment                    Share

      3 


**911 Sewer and Drain**
Thank you for using Rooter Man, Victoria! Next time you have a clog, Andy will be there to help you! 💪

3y   **Like**   **Reply**

         

**AA321**

# EXHIBIT J



# EXHIBIT K



September 16, 2024

**<u>VIA FEDEX AND EMAIL (qacpic@gmail.com)</u>**

Klodian Belegu
692 Sussex Court
Toms River, New Jersey  08753

**<u>RE: ROOTERMAN NOTICE OF TERMINATION</u>**

Dear Mr. Belegu,

Reference is hereby made to those certain 13 franchise agreements (collectively hereinafter referred to as the "Franchise Agreements") between yourself and Rooterman, LLC ("Rooterman") for the operation of Rooterman franchised businesses in and around the state of New Jersey. This correspondence follows the Notice of Default and Demand for Cure ("Default Notice") you were sent on August 13, 2024, requiring you to bring your balance due and owing to Rooterman current within 30 calendar days.  You have failed to do so and as such, pursuant to the terms of your Franchise Agreements, **<u>all of your Franchise Agreements are terminated effective immediately.</u>**

As a result of this termination, I would remind you that you are required to **immediately comply** with all of the post-termination provisions of the Franchise Agreements, including your obligations to comply with the **covenant not to compete**, to **cease using our trademarks**, to **disconnect or assign to us all telephone numbers** you use in the operations of your franchised business, and **assigning us ownership of all google business profiles** you use in the operation of your franchised business (please use this email address for assigning such ownership to us: digital@premiumservicebrands.com).

Please understand that the last thing we wished to do was to terminate our franchise relationship with you, but your failure to meet your contractual obligations and cure your defaults specified in the Default Notice could not be ignored.  Rooterman hereby reserves all of its rights and remedies associated with your material default and the corresponding termination of your Franchise Agreements.

Should you have any questions, please do not hesitate to contact me.

Regards,

Nathan King
General Counsel

cc:   Finance (via Email)
      Paul Flick (via Email)
      Carter Purves (via Email)

**AA325**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Rooterman, LLC

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Jeffrey Rosin

O'Hagan Meyer, PLLC

## DEFENDANTS

Klodian Belegu, Quality Air Care Corporation and RM Water Damage Restoration

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury - Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated New Drug Application<br>☒ 840 Trademark<br>☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC 3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit (15 USC 1681 or 1692)<br>☐ 485 Telephone Consumer Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee - Conditions of Confinement | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act<br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 |
| | | | | ☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 USC Sec. 1114, 1125

Brief description of cause:
Trademark Infringement and Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ $500,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE 12.5.24

SIGNATURE OF ATTORNEY OF RECORD /s/ Jeffrey M. Rosin

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AA326

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) Rooterman, LLC v. Klodian Belegu, et al

_____

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

☐　I.　160, 400, 410, 441, 535, 830*, 835*, 850, 880, 891, 893, R.23, REGARDLESS OF NATURE OF SUIT.

☑　II.　110, 130, 190, 196, 370, 375, 376, 440, 442, 443, 445, 446, 448, 470, 751, 820*, 840*, 895, 896, 899.

☐　III.　120, 140, 150, 151, 152, 153, 195, 210, 220, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 367, 368, 371, 380, 385, 422, 423, 430, 450, 460, 462, 463, 465, 480, 485, 490, 510, 530, 540, 550, 555, 560, 625, 690, 710, 720, 740, 790, 791, 861-865, 870, 871, 890, 950.

*Also complete AO 120 or AO 121. for patent, trademark or copyright cases.

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐　NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

YES ☐　NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐　NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐　NO ☑

7. Do all of the parties  in this action, excluding governmental agencies of the United States and the Commonwealth of Massachusetts ("governmental agencies"),  residing in Massachusetts reside in the same division? -  (See Local Rule 40.1(d)).

YES ☐　NO ☑

A.　If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☐　Central Division ☐　Western Division ☐

B.　If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☑　Central Division ☐　Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

YES ☐　NO ☐

**(PLEASE TYPE OR PRINT)**
**ATTORNEY'S NAME** Jeffrey Rosin
_____
**ADDRESS** 140 Kendrick St, Building C, Needham MA 02494
_____
**TELEPHONE NO.** 671-843-6801
_____

**(CategoryForm11-2020.wpd )**

**AA327**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| Klodian Belegu, Quality Air Care | ) |
| Corporation, RM Water Damage | ) |
| Restoration LTD, and 911 Sewer    Drain | ) |
| Corporation | ) |
| *Defendants.* | ) |
| | ) |

Civil Action No. 1:24-cv-13015

## PLAINTIFFS' REVISED MOTION FOR PRELIMINARY INJUNCTION TO CONFORM TO AMENDED COMPLAINT FILED DECEM  ER

Plaintiff, Rooterman LLC ("Plaintiff") by counsel, pursuant to Fed. R. Civ. P. 65(a), hereby moves this Honorable Court to issue a preliminary injunction against the Defendants, Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD, and 911 Sewer Drain Corporation (collectively, the "Defendants"), restraining and enjoining Defendants from the unauthorized use of the "Rooterman" trademarks, service marks, and other marks, all as detailed in Exhibit B to the Verified Amended Complaint filed December 16, 2024, and to restrict Belegu (either individually, or through his entities) from competing and soliciting and using Plaintiff's confidential and proprietary information in violation of the restrictive covenants in his terminated franchise agreements.

In support of the Motion, Plaintiff relies on the substance of its Verified Amended Complaint (Dkt. No. 7), and on its Revised Memorandum in Support of Motion for Preliminary Injunction, filed herewith. In accordance with Fed. R. Civ. P. 65(c), Plaintiff agree, to the extent

**AA328**

warranted by the circumstances of this case, to give security in an amount that the Court considers proper.

On December 16, 2024, Plaintiff gave Defendants e-mail notice of (and a copy of) the Verified Amended Complaint, and further, Plaintiff gave Defendants email notice (and a copy of) this filing.. The undersigned counsel has been communicating directly with Klodian Belegu by email at the same address used for such notice for approximately two months. And, Mr. Belegu utilized that same address to communicate with the parties' mediator, as the parties attempted mediation on December 4, 2024. Thus, the undersigned counsel represents that it is reasonable to believe that Defendants have received a copy of the amended complaint by email. Moreover, on December 18, 2024, the undersigned received a telephone call from counsel who claimed they would be entering an appearance for Defendants, Mark J. Randazza Esq. at the Randazza Legal Group, via his associate, Kylie Werk, Esq. Accordingly, a courtesy copy of this Motion has been served prior to such counsel filing their anticipated notice of appearance.

Plaintiff further notes for the Court's information that a related American Arbitration Association ("AAA") case, Case No. 01-24-0009-0057, has been filed. While disputes between the parties are required to be arbitrated under their franchise agreement, there is an exception to that requirement where, as here, Plaintiff-franchisor seeks to enforce the alleged misuse of its intellectual property rights and breach of restrictive covenants. That said, there are also unpaid royalties alleged against Defendants-franchisees, and such matters are required to be exclusively litigated and resolved in Arbitration. For these reasons, a corresponding and related arbitration was simultaneously filed between the same parties herein.

Plaintiff understands that this Court has set a hearing on the prior withdrawn Motion for January 9, 2025.  Plaintiff requests that same date be held for this revised Motion, but notes that

**AA329**

anticipated counsel for Defendants is requesting an assented to new time for such Motion in light of a conflict, so Plaintiff hereby informs the Court that there may be an assented to motion in that regard to follow.

WHEREFORE, Plaintiff moves the Court to grant its Motion and issue a preliminary injunction, enjoining the Defendants with the proposed Order appended below.

ROOTERMAN, LLC

By Counsel

Dated: December 19, 2024

*Jeffrey M. Rosin*
Jeffrey M. Rosin, BBO# 629216
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C West
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of December 2024, the Plaintiff's revised Motion for Preliminary Injunction and Expedited Hearing was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*Jeffrey M. Rosin*
Jeffrey M. Rosin

**AA330**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC          ) | |
|            ) | |
| *Plaintiff,*       ) | |
|            ) | |
| v.           ) | Civil Action No. 1:24-cv-13015 |
|            ) | |
| Klodian Belegu, Quality Air Care   ) | |
| Corporation and RM Water Damage   ) | |
| Restoration LTD      ) | *PROPOSED DOCUMENT* |
|            ) | |
| *Defendants.*     ) | |
|            ) | |

**ORDER**

Plaintiff Rooterman LLC, having shown due sole and exclusive ownership of the collective "Rooterman" trademarks, all as further described in Exhibit B to the Verified Amended Complaint ("Complaint"), has come before the Court seeking expedited relief and a restraining Order under Fed. R. Civ. P. 65(a).  [Defendants were duly noticed and appeared OR did not appear].  I find a reasonable likelihood of success and a risk of irreparable harm. Therefore:

It is hereby ORDERED.

1.  Defendant Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them, are temporarily, preliminarily, and permanently enjoined as follows:

**AA331**

a.  From registering and/or using any domain name containing the words "ROOTERMAN" or any other confusingly similar words or phrases that infringe on the trademarks of Plaintiff in Exhibit B to the Complaint;

b.  From imitating, copying or making unauthorized use of the distinctive Rooterman trademarks, trade names, and any other confusingly similar marks in Exhibit B to the Complaint;

c.  From using any false designation of origin or false description which does, can, or is likely to, lead the trade or public to believe that any products, services, or materials, distributed or sold by Defendants, is in any manner associated or connected with the Rooterman trademarks, or is offered, sold, manufactured, licensed, sponsored, approved, published, or authorized by Plaintiff, as owner of the Rooterman trademarks;

d.  From engaging in any activity constituting an infringement of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same;

e.  From affixing, applying, annexing and/or using in connection with any accessories, clothing and other related goods and services any false designation of origin or any false description or representation of the Rooterman trademarks or trade names or Plaintiff's sole rights to use or exploit the same; andFrom violating any restrictive covenants, including the non-competition and non-solicitation covenants identified in Section 18 of Exhibit C to the Amended Complaint within the same counties in which Belegu and/or Quality Air Care Corporation did business as franchisees, specifically, the counties of: Bergen County, Ocean County, Essex County, Monmouth County, Morris County, Hudson County, Middlesex County, Passaic

**AA332**

County, and Somerset County in New Jersey Bergen County in New Jersey; Rockland County, Richmond County and West Chester County in New York, and Bucks County and Montgomery County in Pennsylvania.

FURTHER, it is hereby ORDERED

2.    Defendant Belegu, his principals, agents, servants, employees, attorneys, successors, assigns, and all persons in privity, active concert or participation with them shall affirmatively:

a.  take immediate steps to transfer any and all domain names, such as but not limited to, www.rootermanplumberservices.com that infringe on Plaintiff's trademarks to Plaintiff along with any others it may have registered that include the word "ROOTERMAN" or any other confusingly similar words, no later than within __ business days of this Court's Order;

b.  take immediate steps to transfer telephone numbers and any other third party or public references previously associated with any of Belegu's operations that utilized the Rooterman trademarks and trade names to Plaintiff, no later than within ___ business days of this Court's Order.

c.  take immediate steps to return all manuals, proprietary, confidential or copyrighted materials of Plaintiff to Plaintiff, no later than within __ business days of this Court's Order.

d.  take immediate steps and best efforts to direct others, such as employees like those identified in Exhibit D to the Company, to take-down, remove, and cease and desist claiming association with the Rooterman name, and report back to the Court with

**AA333**

a Declaration under 28 U.S.C. Section 1746 no later than ___ business days of this Court's Order on the efforts taken in that regard.

e. take immediate steps to preserve the status quo, retain and not destroy all individual records and all corporate records of Quality Air Care Corporation, and all records of RM Water Damage Restoration LTD, such that all of them can provide a complete and accurate accounting of all revenues derived since the termination of Belegu's 13 franchise agreements.

f. take immediate action to cease and desist violating the restrictive covenants, as Ordered in item 1.f above, in the following counties in New Jersey, New York and Pennsylvania:  Bergen County, Ocean County, Essex County, Monmouth County, Morris County, Hudson County, Middlesex County, Passaic County, and Somerset County in New Jersey Bergen County in New Jersey; Rockland County, Richmond County and West Chester County in New York, and Bucks County and Montgomery County in Pennsylvania. *See* Verified Complaint,   12.

SO ORDERED THIS __ DAY OF JANUARY, 2025

_____

**AA334**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Rooterman, LLC</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>    *Plaintiff,*</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td> v.</td><td>)</td><td>Docket No. 1:24-cv-13015</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Klodian Belegu, Quality Air Care</td><td>)</td><td></td></tr>
<tr><td>Corporation, RM Water Damage</td><td>)</td><td></td></tr>
<tr><td>Restoration LTD and 911 Sewer   Drain</td><td>)</td><td></td></tr>
<tr><td>Corporation.)</td><td></td><td></td></tr>
<tr><td>    *Defendants*.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
</table>

## PLAINTIFF S REVISED MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION TO CONFORM  IT  AMENDED COMPLAINT FILED DECEMBER 1  2 24

Plaintiff Rooterman, LLC ("Rooterman") hereby submits this memorandum in support of its motion for a preliminary injunction and expedited hearing (the "Motion").

### I.  INTRODUCTION

Plaintiff is requesting that the Court grant injunctive relief based on the substance of its Verified Amended Complaint. Specifically, Plaintiff seeks to restrain and enjoin Klodian Belegu, a former Rooterman franchisee who, individually or through Quality Air Care Corporation (of which he is/was sole owner) owned 13 franchise markets, from: (a) his individual (and/or through his defendant corporations') ongoing unauthorized use and display of Plaintiff' trademarks, service marks, and other marks; (b) his individual (and/or through his defendant corporations') solicitation of Plaintiff's customers for Defendants' own separate business; (c) his clear breaches of post-franchise termination restrictive covenants while he competes in the identical business and identical territories he served in his franchise capacity; and his individual (and/or through his

1

**AA335**

defendant corporations') improper continued use of Plaintiff's confidential and trade secret information, as he has failed to return any of that proprietary information to Plaintiff..

All of the relevant factors to be considered in granting a preliminary injunction are present: (1) Plaintiff has a strong likelihood of success on the merits of each of its two claims; (2) the relative harm to the Defendants, if any, is outweighed by the irreparable harm that has occurred and will continue to occur to Plaintiff if the injunction is not granted; (3) the Defendants' unauthorized use of Plaintiff's trademarks, service marks, and other marks at issue harms the public interest; and, (4)  it is in the best interest of the public for the Court to grant the Motion.

## II.     FACTUAL BAC     ROUND

Rooterman is a national franchise brand, and has duly registered numerous trademarks, identified in Exhibit B to the Verified Amended Complaint filed December 16, 2024. Rooterman grants franchises to qualified persons to establish and operate businesses that provide residential and commercial plumbing, drain, and related services to same which can include, without limitation, clean up/restoration services upon such things as water damage. Rooterman does so under a uniform and standard, but unique franchise system developed by the company. As part of the franchise agreement, Rooterman grants the right to use its federally-registered trade name, logo and other proprietary marks to franchisees; *r   ided      e er,* that a franchisee must operate in accordance with Rooterman's uniform standards and meet the duties and requirements set forth by way of contract (*i e* , the applicable franchise agreement(s)) (the "Rooterman System").

Rooterman details the Rooterman System in its various proprietary training operations manuals, and requires each franchisee to comply therewith. Rooterman supports and assists each franchised location, in part, by monitoring the franchisee's compliance with its standards, specifications, policies, and procedures.  This support and assistance enables Rooterman to

**AA336**

duplicate the customer experience everywhere, and it also safeguards the goodwill, favorable reputation, and positive image associated with the Rooterman System and its logos, symbols, trademarks, and service marks.

Since its founding by A. Corp., which was acquired by Plaintiff in early 2022, Rooterman has expended substantial amounts of time, money, and effort to continue to develop and promote its reputation and goodwill by, among other things, developing strong brand recognition of its distinctive color schemes, logos, and symbols as trademarks, and service marks to identify the source, origin, and sponsorship of its system's facilities and services, all of which are identified in Exhibit B to the Verified Complaint (the "Rooterman Marks"). Pursuant to the Rooterman franchise agreements, Rooterman makes clear that all right, title, and interest in the Rooterman Marks, as well as the logos, trade styles, color combinations, designs, signs, symbols, and slogans of Rooterman used by franchisees in their franchised businesses, are owned by and remain solely vested in Rooterman and such trademarks can only be used by permission from Rooterman.

Belegu, either individually or through the defendant Quality Air Care Corporation he solely owned, owned 13 franchise markets, acquired from 2019-2021. A true and correct copy of an exemplar of the 13 franchise agreements is attached as Exhibit C to the Verified Complaint; however, as the Verified Complaint sets forth, all 12 others are identical in all relevant respects. Thus, Belegu had the right to use the Rooterman Marks in 13 territories, each identified in the Verified Complaint, and he (or Quality Air Care Corporation) was bound by the provisions of those franchise agreements, and the provisions identified in Exhibit C to the Verified Complaint.

Belegu was sent a default notice on August 12, 2024 as a result of his failure to pay royalties and other fees, which was a violation of Section 15.2(A) of the franchise agreements. *ee* Verified Complaint, Exhibit C at § 15.2(A). This Section states in pertinent part: "Franchisee acknowledges

**AA337**

that the occurrence of one or more of the events in this Section 15.2 would cause harm to the franchise and thereby lessen its value." *ee* Verified Complaint, <u>Exhibit C</u> at § 15.2(A). Belegu failed to cure this default within the 30 calendar days he was offered. As such, all 13 franchise agreements were terminated by notice dated September 16, 2024, and a true and correct copy of that notice is attached as Exhibit K to the Verified Complaint.

Upon termination, Belegu was obligated to completely disassociate from the franchise, return any proprietary and/or confidential manuals or materials, and not use any of the Rooterman System Marks. *ee* Verified Complaint, <u>Exhibit C</u> at § 16(B). The Franchise Agreements state in relevant part:

> Upon termination or expiration of this Agreement, Franchises shall within 30 calendar days . . . Cease to hold himself or herself out as an Rooterman System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by A Corp. and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the A Corp. office licensed by this Agreement and from all vehicles . . . and Return to A Corp. all manuals and printed materials belonging to A Corp. or bearing the Rooterman Trademarks.

*ee* Verified Complaint, <u>Exhibit C</u> at §§ 16(B)-(C)

The Franchise Agreements also set forth certain protocols and procedures required of Belegu upon termination, including *inter alia*: (a) taking such action as may be required to ensure the change or deletion of the Rooterman Marks from internet advertisements, listings, or domains; (b) cease holding himself out as a Rooterman System franchise; (c) promptly returning all manuals and printed materials belonging to the Rooterman System or bearing the Rooterman Marks; (d) ceasing use of the Rooterman Marks, color combinations, designs, symbols and slogans. *ee* Verified Complaint, <u>Exhibit C</u> at § 16.

Notably, the Franchise Agreements set forth a 3-year non-competition/non-solicitation restriction, and the area applicable was 100 miles of the territory of the franchise and 100 miles of

**AA338**

the territory of any other franchisee.   *ee* Verified Complaint, <u>Exhibit C</u> at § 18.1. Notably, the

Franchise Agreements state in relevant part:

> Franchisee agrees that as a condition of his affiliation with A Corp., its key
> personnel and stockholders, if applicable, shall execute covenants not to compete
> embodying these terms on forms provided by A Corp. Franchisee acknowledges
> that such prohibitions are necessary to protect A Corp's trade secrets and to
> otherwise insure the integrity of the  Rooterman  System and the rights of A Corp's
> other franchisees.

 *ee* Verified Complaint, <u>Exhibit C</u> at § 18.1. Each franchise agreement provided protections for

the confidential information/trade secrets of the Rooterman system, and mandated that these

materials be returned upon termination.   *ee* Verified Complaint, <u>Exhibit C</u> at §§ 16(C), 18.2.

The Franchise Agreements also provide Rooterman with a right to seek injunctive relief in

the event of a violation of Rooterman's rights in relation to those marks.   *ee* Verified Complaint,

<u>Exhibit C</u> at §§ 18.1, 18.2.

However, Belegu has failed to comply with his obligations under the Franchise

Agreements, including by: (a) failing to comply with the above obligations in full and return any

operation manuals or other confidential, proprietary and trade secret materials to Plaintiff; (b)

flagrantly misusing the Rooterman Marks as alleged in the Verified Complaint; and (c) directly

and flagrantly competing and soliciting in violation of the exclusivity/non-competition/non-

solicitation/confidentiality protections in the Franchise Agreements. Specifically, Belegu does so

through a company that goes by the name above, "RM Water Damage Restoration LTD" and/or

"911 Sewer     Drain". Indeed, these Companies are, in effect, the same operating entities Belegu

formed while he was a franchisee (formed in December 2022    *i e ,* the same year Plaintiff

purchased the Rooterman assets and franchise agreements from A. Corp.) Belegu has been, in

essence, operating his full franchise business in 13 markets under another name.

**AA339**

Those 13 franchise markets are as follows: Bergen County, Ocean County, Essex County, Monmouth County, Morris County, Hudson County, Middlesex County, Passaic County, and Somerset County in New Jersey Bergen County in New Jersey; Rockland County, Richmond County and West Chester County in New York, and Bucks County and Montgomery County in Pennsylvania. *ee* Verified Complaint,   12.

Belegu (and/or his applicable entity) have and continue to be directly engaged in services comprising the Rooterman System within the identical area of his former franchise counties, which is the restricted area for the restrictive covenants at issue. *ee* Verified Complaint, Exhibit F (911 Sewer   Drain conducting business throughout New Jersey and in New York). Indeed, Belegu, through his Defendant corporations, have and continue to provide the same services as Rooterman, including emergency plumbing services, drain cleaning, sewer line repair and replacement, water heater repair and installation, toilet repair and installation, garbage disposal repair and installation, sump pump repair and installation, leak detection, and pipe repair and replacement, among other services. *ee* Verified Complaint, Exhibit G. Notably, Belegu applied to register a trademark for 911 Sewer   Drain on or about April 8, 2022, within a few months of Plaintiff's acquisition of A. Corp's interest in Rooterman. *ee* Verified Complaint, Exhibit D. These marks were first used in commerce on or about February 26, 2024, just before Belegu (and/or his applicable entity) began a continued failure to pay applicable royalties and fees under such Franchise Agreements. *d* Moreover, the 911 Sewer   Drain website contains blog posts dating back to August 10, 2023. *ee* Verified Complaint, Exhibit E. It is reasonable to believe that Belegu, through his Defendant corporations, began to compete directly and solicit customers from Plaintiff well before the termination of the franchise agreements. It is reasonable to believe that Belegu has intentionally,

**AA340**

and willfully, breached the covenants of his franchise agreements since right after Plaintiff acquired the assets of A. Corp.

Indeed, contrary to his post-termination obligations, Belegu and his entities even continued to operate a Rooterman business displaying and advertising the Rooterman Marks. The most flagrant and offensive violation is the website, www.rootermanplumberservices.com, as indicated in Exhibit A to the Amended Complaint. This website was recently rerouted to a website, www.911SewerDrain.com.[1] Moreover, Belegu continues to use the Rooterman marks and names to unlawfully direct customers to his competing businesses. The Facebook and Google pages for 911 Sewer    Drain were created on former Rooterman pages, and still contain references to the Rooterman marks and names.  ee Verified Complaint, Exhibit H; id , Exhibit I. Thus, it is possible Belegu has finally taken certain steps required, but not all of them, as there are multiple other matters to address, as detailed in Paragraph 28 of the Verified Complaint, including, without limitation:

    a.  https://x.com/rootermannj

    b.  https://maps.app.goo.gl/d8x4Y4eMCPXoSZ46A

    c.  https://www.yelp.com/biz/Rooterman-of-nj-toms-river

    d.  https://www.homeadvisor.com/rated.RooterMan.130537299.html

Further, it is even notable, curious and questionable that Belegu has chosen "RM" (the initials of Rooterman) to lead his company's name, RM Water Damage Restoration.  This RM is

---

[1]    As of this day, a Google search of "Rooterman of New Jersey" brings up an ad for 911 Sewer    Drain. (See Exhibit 1 hereto) This means that this company is still using Rooterman marks to direct traffic to Belegu's "new" website.

Moreover, to the extent 911 Sewer    *Drain* is some new entity, it is notable that Belegu claims it has been operating since 2020. (See Exhibit 2 hereto) which would be in direct competition with Belegu's multiple franchises, purchased between 2019 and 2021.

**AA341**

one of Plaintiff's franchise marks as well.   *ee* Verified Complaint, <u>Exhibit B</u>. Belegu even employs

persons who hold themselves out as working for his company, and that this company is "d/b/a

Rooterman".   *ee* Verified Complaint, <u>Exhibit J</u>.

In short, Defendants continue to represent to the world that they are "Rooterman of New

Jersey" when, since termination, they are most certainly not. Defendants use multiple trademarks

of Rooterman, including even the "RM" logo, and Rooterman to the Rescue, throughout their

website, and claim substantial goodwill for themselves that belongs to Rooterman. Defendants

continue to be directly engaged in services comprising the Rooterman system within the restricted

area. Furthermore, Defendants have and continue to unfairly compete with Plaintiff and use

Plaintiff's confidential and trade secret information post-termination.

This is not just a violation of the Lanham Act; it is a violation of the post-termination

restrictive covenants in all 13 of Belegu's franchise agreements.

### III.    AR  UMENT

A party seeking a preliminary injunction must show that it is likely to succeed on the merits,

that it is likely to suffer irreparable harm without an injunction, that the balance of equities tips in

its favor, and that an injunction serves the public interest.   *inter     at ral  es Def     n il,*

*n* , 555 U.S. 7, 20 (2008); *see als       et er    s   Mass  en ri a  n* , 32 F.4th 82, 85

(1st Cir. 2022).

Under 15 U.S.C. § 1116, federal courts can grant a preliminary injunction to enjoin activity

that infringes federally registered trademarks. *P  lar    r    Pe si  ,  n* , 789 F.Supp.2d 219,

226 (D. Mass. 2011); *see als       le en, n     re al*, 60 F.Supp.3d 272, 280 (D. Mass. 2014).

The statute provides as follows: "A plaintiff seeking any such injunction shall be entitled to a

rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the

**AA342**

merits . . .." 15 U.S.C. § 1116(a). Thus, the "likelihood of success on the merits" factor is especially important to the preliminary injunction determination. *ee* 15 U.S.C. § 1116(a); *Pe si , n* , 789 F.Supp.2d at 226 (noting other factors for trademark infringement injunctions follow determinations of likelihood of consumer confusion); *D n in D n ts ran ised ests*

*et D nas n* , 53 F.Supp.3d 221, 227 (D. Mass. 2014) (finding likelihood of success on the merits the most significant factor).

As more-fully described below, and as shown by the Verified Complaint, Rooterman has established all four factors necessary for an Order granting the preliminary relief sought. Accordingly, Plaintiff's request for injunctive relief should be granted.

### A.    Rooter an a a Stron Li elihood of Succe on the Merit of it Clai

A party seeking a preliminary injunction must show that it is likely to succeed on the merits. *et D nas n* , 53 F.Supp.3d at 227 (citing *i e f t e ra rld, n MD Med e s , n* , 645 F.3d 26, 32 (1st Cir. 2011)). To succeed on a trademark infringement and unfair competition claim, the "plaintiff must prove (1) the mark is entitled to trademark protection, and (2) use by another in commerce that is likely to cause confusion as to the source or sponsorship of the goods or services." *Pe si , n* , 789 F.Supp.2d at 226. Here, like in *Pe si , n* , Rooterman is entitled to trademark protection as it has distinctive federally registered trademarks. *d* (finding federal registration of a distinctive mark eligible for trademark protections); *see als , n as Printin , n* , 908 F.Supp. 37, 43 (D. Mass. 1995) (finding federal registration of marks prima facie evidence of exclusive right to use registered mark in commerce).

"While evidence of actual confusion is often deemed the best evidence of possible future confusion' proof of actual confusion is not essential to finding likelihood of confusion." *rin en*

9

**AA343**

*is  it  r  M  radin  r*, 443 F.3d 112, 120 (1st Cir. 2006) (quoting *ttre i,*

*Ma ta  r*, 436 F.3d 32, 40 (1st Cir. 2006)). Consequently, the owner of the registered

trademark is entitled to relief if use of the contested mark is likely to cause such a likelihood of

confusion. *d*; *see  P Per anent Ma e , n  astin  ressi n , n* , 543 U.S. 111, 117

(2004).

Typically, the First circuit employs an eight-part test to determine whether a likelihood of

confusion exists in trademark infringement cases *ee Pe les ed a an Pe le s nited*

*an* , 672 F.3d 1, 10 (1st Cir. 2012) (quoting *Pi n ns de Me ani e de Pre isi n P lar id*

*r* , 657 F.2d 482, 487 (1st Cir. 1981)).

However, the traditional likelihood of confusion analysis is generally unnecessary in the

context of a suit against a former franchisee for the continued use of the plaintiff's trademarks. As

this Court has stated: "In cases where the use of the franchisor's mark is uncontroverted, a

likelihood of consumer confusion is presumed." *re al*, 60 F.Supp.3d at 289-280 (D. Mass.

2014); see also *r es nt l* , 2013 U.S. Dist. LEXIS 66235 at 4 (D. Mass. May 9, 2013)

("It is unnecessary to wade individually through the eight factors informing a likelihood of

confusion' analysis here, where a franchisee has persisted in unauthorized use of her former

franchisor's trademark to operate a business identical to that of her formally licensed franchise.").

Notably, this Court has previously held that " t he continued use of a trademark after

breach of a franchise agreement is alone dispositive of the infringement issue." *D n in D n ts*

*n  a tra D n ts, n* , 139 F.Supp.2d 147, 158 (D. Mass. 2001); *see als* , 2013 U.S.

Dist. LEXIS 66235 at 4 (finding former franchisee's continued unauthorized use of franchise

trademark "without doubt likely to sow consumer confusion"); *antasti a s ran ise r*

*al ders n* , 2019 U.S. Dist. LEXIS 241162 at 6 (D. Mass. Jul. 31, 2019) ("Consumer

**AA344**

confusion is presumed, however, in cases where a former franchisee continues to use its franchisor's marks and hold itself out as an authorized franchise when that is no longer the case.").

In this case, the Defendants have continuously used the Rooterman Marks since the Franchise Agreements were terminated. First, and most egregiously, the Defendants have brazenly continued to conduct business using the "Rooterman" trademarks, intellectual property, and name by, *inter alia*, their use of the website www.rootermanplumberservices.com for over two months post-termination. *ee* Verified Complaint, at Exhibit A; *id* at  1, 15. This website, and other infringing websites, purport to show that Defendants hold themselves out as an authorized Rooterman franchise, even though the Franchise Agreements were terminated pursuant to Belegu's failure to cure defaults. *ee id* at  13, 15, 19, 32. Notably, Defendants employ persons who hold themselves out as working for "RM Water Damage Restoration," and that this company is "d/b/a Rooterman". *ee* Verified Complaint, Exhibit J.

Indeed, defendants continued to have a Twitter handle, Google Maps address, Yelp reference, and Home Advisor page identifying themselves as Rooterman of New Jersey in Toms River, New Jersey. *ee* Verified Complaint,  19.[2] Defendants further have had, post-franchise termination, a Google Maps address and Facebook page with references to the Rooterman marks and names. *ee* Verified Complaint,  29. Terminated as of September 16, 2024, the post-termination use of the Rooterman Marks was both expressly prohibited under the Franchise Agreements and an intentional violation of the Lanham Act. Moreover, it gives the confusing and erroneous impression that it is Plaintiff that is the entity conducting business from those sites, when Plaintiff is clearly not. It also gives the confusing and erroneous impression that Plaintiff

---

[2]     While Belegu is taking steps to make further changes since receiving copies of Plaintiffs' court papers, this should not foreclose the entry of a Court Order requested here, as the Court Order will help ensure that all violations of Plaintiff's rights, whatever they may be, must cease.

**AA345**

connected with the Defendant corporations, when Plaintiff is clearly not. It is completely plausible (and logical) that consumers did (and will continue to) erroneously believe the Defendants' work is being carried out under the Rooterman name.  This is inappropriate as a matter of contract and trademark law, and also a matter of great concern should the work not meet Rooterman's quality and brand standards. Such confusion and contact will result in considerable and irreparable harm to Rooterman's business and its relationship with customers.  *ee  a   tra D n ts,  n* , 139 F.Supp.2d at 158 (continued use of a trademark post-franchise termination dispositive of trademark infringement).

Under these circumstances, the Defendants' practice of continued infringement on the Rooterman Marks after the termination of the Franchise Agreements is likely to cause confusion among consumers as to the relationship between Rooterman and the Defendants. This Court should recognize that Rooterman has met its burden of establishing a strong likelihood of success on its trademark infringement claim, as well as irreparable harm under the logic of the cases above that in the area of trademark law, showing a likelihood of success on the merits will drive the irreparable harm inquiry as well.

Rooterman is also likely to succeed on its claims because the Defendants agreed to refrain from any such infringement by and through the Franchise Agreements, yet have clearly violated these provisions.  The Defendants' continued use of the intellectual property, trademark, and trade dress constitutes a clear violation of Sections 16 and 18 of the Franchise Agreements, which explicitly requires immediate cessation of use of the Rooterman Marks after termination.  *ee* Verified Complaint,     19-21; 54. Defendants have even additionally failed to return proprietary and confidential franchise manuals and other materials to Plaintiff.  *d*  There remain multiple internet listings still tied to Belegu in Toms River, New Jersey, meaning further that the Defendants

**AA346**

have failed to "contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisements, listings, or domains" as required by Section 16(B) of the Franchise Agreements. *d* at 19.

The Defendants further continue to unfairly compete with Plaintiff within the restricted area, in violation of Section 18.1 of the Franchise Agreement. *d* at 20-25; *id*, Exhibit F. The Defendants are directly engaged in services comprising the Rooterman System, including services such as emergency plumbing services, drain cleaning, sewer line repair and replacement, water heater repair and installation, toilet repair and installation, garbage disposal repair and installation, sump pump repair and installation, leak detection, and pipe repair and replacement, among other services. *d* 22-23; *id*, Exhibit G. They do so through RM Water Damage Restoration and/or 911 Sewer Drain, literally doing the exact same thing, in the exact same territories where Belegu and/or Quality Air Corporation had their franchise rights. Moreover, the 911 Sewer Drain website further advertises Franchise Opportunities. *d* 25; *id*, Exhibit G.

Plaintiff notes that the Proposed Order it seeks is only to cease and desist violating restrictive covenants in the identical counties in which Belegu and/or Quality Air Care Corporation did business and had rights as franchisees. With this Proposed Order, Plaintiff is asking for relief that is less than what the franchise agreements permit, as such franchise agreements required restrictions within 100 miles of any such counties as well.

For these reasons, Plaintiff has also established likelihood of success on the merits of its claim for breach of contractual obligation. Notably, Defendants acknowledged and agreed, pursuant to Sections 18.1 and 18.2 of the Franchise Agreements, that if they failed to perform any of the aforementioned obligations, as required by the Franchise Agreements, Rooterman would be

**AA347**

entitled to preliminary injunctive relief, as well as other remedies.   *ee* Verified Complaint, <u>Exhibit C</u>, at § 18.  *ee   tl  nstr  ents, n    a er*, 188 F.3d 38, 49 (2d Cir. 1999) (factoring into its analysis the parties' agreement in their contract that a breach would cause irreparable injury), citing  *i  r  itle  ns        en*, 173 F.3d 63, 69 (2d Cir. 1999) (parties' contractual provisions pertaining to agreement to injunctive relief entitled to some weight in the analysis of whether to grant injunctive relief); *see als        ealt , n      e ere*, Civil Action No. 12-1678-PG, 2013 U.S. Dist. LEXIS 135070 (D.P.R. Sept. 19, 2013).

Accordingly, because there is a likelihood of success on the merits of both of Plaintiff's claims, this basis for the relief requested by Rooterman in its Motion is warranted.

**B.    Rooter an  ill e Irre ara l   ar ed A ent Thi Court rantin It Motion for A Preli  inar  In unction**

Without injunctive relief, Rooterman will suffer immediate and irreparable injury as a result of the Defendants' continued unauthorized use of the Rooterman Marks, and violation of their restrictive covenants.  In the trademark context, 15 U.S.C. § 1116(a) creates a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits for a violation of any right of a registrant of a mark registered in the Patent and Trademark Office. 15 U.S.C. § 1116(a); *see als   rit   rt r    ittle, n ,* 944 F.Supp. 95, 98 (D. Mass. 1996) (quoting  *n rete Ma iner      lassi  a n rna ents, n ,* 843 F.2d 600, 611 (1st Cir. 1988) ("If the plaintiffs can show a likelihood of success on the merits, "irreparable harm is usually presumed."); *re al,* 60 F.Supp.3d at 289-280 ("In cases where the use of the franchisor's mark is uncontroverted, a likelihood of consumer confusion is presumed."). Courts recognize that irreparable injury occurs when two businesses use the same or similar trademarks and, as the First Circuit has stated: "every customer diverted to a defendant may be an undetectable loss, even a

**AA348**

permanent one, to the plaintiff. Thus, a presumption of irreparable injury makes some sense." *Dial* *Dantia* *a* *a*, 425 F.3d 1, 4 (1st Cir. 2005).

Here, Plaintiff has established a strong likelihood of success on the merits because the Defendants have illegally continued the unauthorized use of the Rooterman Marks and competed directly in the identical counties where Belegu and/or Quality Air Care Corporation were franchisees (in fact, they did so for some time, and appear to be continuing to do so, using the very same Rooterman trademarks). Thus, irreparable harm should be presumed, and Rooterman should be found to have satisfied the second factor of the four-part test. Even without that presumption, courts have found that the loss of customer goodwill and business relationships that are a consequence of unfair competition constitute irreparable harm. *iete Des Pr d its estle,*

*asa el etia, n* , 982 F.2d 633, 640 (1st Cir. 1992) ("By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified, and, thus, the trademark owner cannot adequately be compensated."); , 2013 U.S. Dist. LEXIS 66235 at 6 (holding that where former franchisee continues to use franchisor's trademark to "operate a business identical to that of her formerly licensed franchise," the franchisor "suffers harm to its goodwill and reputation, and is unable to protect its other franchisees from the actions of defendant while she holds herself out to be a legitimate . . . franchise."); *re al*, 60 F.Supp.3d at 280-81 (holding franchisor "will be unable to protect the quality of its brand in the absence of a consensual and ongoing franchisor-franchisee relationship" where former franchisee continued to use franchise trademarks).

Indeed, the First Circuit holds: " b y its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable." *ss i ns f ar i , n a arat, n* , 102 F.3d 12, 20 (1st Cir.

**AA349**

1996); *see als    n M M si    nt t    enen a* , 2009 U.S. Dist. LEXIS 115734, at  4

(D. Mass. Dec. 7, 2009) ("Once copyright infringement is established, irreparable injury is

generally presumed, as is the conclusion that monetary damages alone are inadequate to

compensate plaintiffs."); *see als    a  er,* 188 F.3d at 49 (factoring into its analysis the parties'

agreement in their contract that a breach would cause irreparable injury),

In this case, Defendants' misuse of the Rooterman Marks has resulted and will continue to

result in Rooterman losing control over a number of proprietary items, and over the quality of

goods and services provided under the Rooterman Marks in Belegu's markets, thereby resulting

in clear irreparable harm to Plaintiff and its trademarks. This is exactly what the restrictive

covenants in Belegu's (and his entity's) franchise agreement were designed to protect against, and

it is a fair and legitimate business interest to seek to protect. Moreover, the Defendants' direct

competition with Rooterman and flagrant misuse of trade secrets will further result in clear

irreparable harm to Plaintiff. This Court should find that Rooterman has met its burden of

establishing irreparable harm absent injunctive relief.[3]

### C.    A Preli  inar  In unction    ill Not Cau e  ar   to An one Other Than The <u>Offendin  Defendant    hich Doe  Not Out  ei h the  ar   to Plaintiff</u>

The harm Rooterman will continue to suffer to its goodwill, reputation, and established

customer base without a preliminary injunction far outweighs any harm the Defendants will suffer,

if any, should such injunctive relief be granted. In fact, the only potential harm to Defendants are

---

[3]    In    *le en, n    re  al,* the Court partially denied the plaintiff's motion for preliminary injunction as to enforcement of the franchise agreement's "non-compete clause," rejecting the argument that there was irreparable harm as a result of lost profits from a single franchise location selling convenience products. *ee   re  al,* 60 F.Supp.3d at 283-286. This is not Plaintiff's argument here.  Plaintiff's argument here is in light with    *r  es  nt l  ee   r  es  nt l,* 2013 U.S. Dist. LEXIS 66235, at   6 (finding non-compete agreement necessary to protect franchisor's business, especially where franchisee "acknowledged as much in the Franchise Agreement").

**AA350**

lost profits resulting from their misuse of the Rooterman Marks, trade secrets, and confidential information, and violation of the restrictive covenants to which they are bound. This is not irreparable at all. This is, at best, a monetary consequence of Defendants' brazen and intentional conduct.[4] To the extent Belegu and his entities are, by Court Order, restricted, he may certainly suffer harm, but that harm in the loss of his own goodwill but that will be the exact harm that the restrictive covenants were designed to tell him he would not be able to have.  That is, Belegu could not "change the sign on the door" and just start taking all of the goodwill that was Plaintiff's investment in those markets for his own purposes.

Moreover, as one court noted, any monetary harm to Belegu or his entities deserves no weight, as harm in the form of lost profits where a former franchisee utilizes a franchisor's trademarks without permission, is not entitled to consideration in assessing the harm caused by an injunction. *ee      et   D nas  n* , 53 F.Supp.3d at 232 (finding former franchisee's potential of lost profits alone does not constitute sufficient hardship); *see als      lassi   a n  rna ents,  n* , 843 F.2d at 611 ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense  merits little equitable consideration.'"). And, in a related context, the Second Circuit has rejected any such argument  Defendants  might  make  here,  holding  that  prohibiting  a  party  from deliberately infringing upon another party s trade dress does not give the usurping party "any

---

[4]      Notably, as set forth in the Motion filed herewith, Defendants also ceased paying royalties to Plaintiff and owe Plaintiff substantial royalties, a matter which will be arbitrated.  In this regard, Defendants undertook a very calculated path to deprive Plaintiff of revenues, retain revenue they should not retain, and continue to use Plaintiff's trademarks and compete in violation of their restrictive covenants post-default and termination.  If anything, any "monetary" harm that may be claimed by Defendants to oppose the Motion should be balanced against the financial harm to Plaintiff that Defendants already caused.

**AA351**

standing to complain that his vested interests will be disturbed." *M       ine   r      a   els,* 69

F.2d 76, 78 (1934) (Hand, J.).

Moreover, as indicated above, Plaintiff is seeking <u>less than</u> it is entitled to with its

restrictive covenants, and <u>only</u> seeking an Order that restrains Belegu in the identical counties in

which he did business, and not seeking an Order that restrains Belegu within a 100 mile radius

thereof.  In this regard, there is less harm to Defendants by way of Plaintiff's proposed more

narrowly tailored preliminary Order.[5]

For these reasons, the balance of the equities favors Rooterman, and a preliminary

injunction should be issued.

**D.    <u>A  reli  inar  in unction   ill  er e the  u  lic intere t.</u>**

The public will benefit from the issuance of a preliminary injunction because it will require

the Defendants to disassociate and distinguish their business from Rooterman in every way, and

not just "some" ways. <u>See, e.g.</u>, Footnote 1, <u>supra</u>  Defendants will not be allowed to represent

Rooterman in any way, and when members of the public seek out Rooterman, they will not be

misdirected to an entity that is not actually Rooterman.  Rooterman customers and members of the

public who desire to use well-established Rooterman branded services will actually receive what

they wanted to receive.

Notably, where an injunction would halt confusion in the marketplace, public policy

weighs in favor of preliminary injunctive relief. *ee    re  al*, 60 F.Supp.3d at 282 (quoting

*ert er  , n     Pre isi n Pr d   ts, n  *, 832 F.2d 697, 700 (1st Cir. 1987) ("Given the societal

---

[5]    Defendants request this without waiver (as all modifications to the franchise agreements must be in writing and signed by the parties, per Section 19.3 of Exhibit C to the Verified Amended Complaint). Defendants expressly reserve all rights to seek further relief if discovery so requires.  Indeed, Belegu is currently looking to franchise 911 Sewer     Drain, and because 911 Sewer     Drain is a direct competitor this, in and of itself, threatens to harm Plaintiff well beyond the actual counties where Defendants do business.

**AA352**

value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names, courts are in agreement that preventing customer confusion is clearly in the public interest."); *see als        et    D nas  n* , 53 F.Supp.3d at 232 (finding public interest lies in favor of granting a preliminary injunction where former franchisee refused to pay renewal fees and continued to operate as a legitimate franchise and use franchise trademarks).

For these reasons, this fourth factor weighs in favor of Plaintiff's requested injunctive relief as well.

## IV.    CONCLUSION

For all of the foregoing reasons, the Motion should be granted in its entirety, and Plaintiff awarded the injunctive relief sought and set forth in its Proposed Order attached to its Amended Motion.

Respectfully submitted,

ROOTERMAN, LLC

By its counsel

Dated: December 19, 2024

*Jeffrey M. Rosin*

Jeffrey M. Rosin, BBO# 629216
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com

**AA353**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of December 2024, *Plaintiff s Me    rand    in      rt  f ts M  ti  n f r Preli  inar   n   n ti  n and    edited   earin* was electronically filed.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*Jeffrey M. Rosin*
Jeffrey M. Rosin

**AA354**

# EXHIBIT 1

**AA355**



# EXHIBIT 2

**AA357**





911 Sewer & Drain
4.6 ★★★★★ (344) · Plumber · 3+ years in business
Open · Closes 6PM · Toms River, NJ · (800) 295-5798
Onsite services

Website   Directions   Call   Share



# 911 Sewer & Drain

Website

Overview    Services    Reviews    Updates    Photos

"Clear clogged piping to sink answered all my concerns and questions quite pricey"

View more reviews

## From 911 Sewer & Drain

"At 911 Sewer & Drain, located at 1049 Church Road, Toms River, New Jersey, excellence is the standard. Founded in 2020, this plumbing powerhouse specializes in resolving drain blockages and intricate plumbing challenges efficiently and effectively. Their skilled technicians navigate the intricate world of plumbing, ensuring a seamless experience for customers. Whether it's a stubborn clog or a complex plumbing issue, 911 Sewer & Drain is here to take on the challenge and restore balance to your plumbing system, delivering a plumbing experience that sets the benchmark for reliability, professionalism, and customer satisfaction."

## Details

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br><br>                    Defendants. | Civil Action No. 1:24-cv-13015<br><br>**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S REVISED MOTION FOR A PRELIMINARY INJUNCTION** |

        The holding company that took over the Rooterman brand failed to perform its obligations to Mr. Belegu and Quality Air Care Corporation.  Now it seeks to stop Defendants from engaging in ordinary competition, in violation of Massachusetts law, and attempt to enforce nonexistent and otherwise unenforceable marks under the Lanham Act.  The Court should not be led astray by Plaintiff's shell game, wherein it vaguely points to a list of marks it owns, and Defendants should not be enjoined from engaging in their business, especially as no marks are being infringed upon.  Plaintiff's Revised Motion for Preliminary Injunction (ECF No. 9) should, therefore, be denied.

## 1.0    Factual Background

        In 2019 & 2020,[1] Defendants Klodian Belegu and Quality Air Care Corporation ("QAC"), along with non-party Water Damage Solution of Bergen, LLC, executed a series of franchise agreements with non-party A Corp.  *See* Verified First Amended Complaint ("FAC", ECF No. 7) at  ¶ 13 and Ex. C thereto.  At no time were Defendants 911 Sewer & Drain Corporation or Water

---

[1] One agreement, for Monmouth and Ocean Counties, was dated September 10, 2020, with a commencement date of August 19, 2020, but was not executed until January of 2021.  *See* **Exhibit 1**; Declaration of Belegu ("Belegu Decl.") at ¶¶ 3-4.

Damage Restoration Ltd f/k/a RM Water Damage Restoration Ltd[2] parties to any franchise agreement.  Declaration of Klodian Belegu ("Belegu Decl.") at ¶ 5.  On or about January 20, 2022, A Corp sold its assets to Plaintiff Rooterman, LLC.  *See* FAC at ¶ 3.  Rooterman, LLC, is but one of the businesses owned by Premium Service Brands ("PSB"), which also owns 360˚ Painting, ProLift Garage Doors, Maid Right, Kitchen Wise & Closet Wise, Window Gang, Rubbish Works Junk Removal, The Grout Medic, and House Doctors.  *See* Belegu Decl. at ¶¶ 8-9; **Exhibit 3**.[3] At all relevant times, PSB's agents operated Plaintiff Rooterman and all of Mr. Belegu's communications with Plaintiff were through PSB agents.  Belegu Decl. ¶ 10.

Mr. Belegu invested hundreds of thousands of dollars in advertising to build up his franchises; he had no interest in losing them.  *See* Belegu Decl. at ¶ 11.  PSB, however, appeared only interested in cutting corners and refused or failed to take action necessary for Mr. Belegu and QAC to succeed.  For example, in January 2023, Mr. Belegu found that the Google business result for "Rooter-Man" in Lakewood, New Jersey (one of the franchise territories) had a phone number of (732) 905-5477, which was the phone number for a competitor and prior franchisee.  *Id.* at ¶ 12. This was not an isolated listing—dozens of Google listings for Belegu & QAC Rooterman territories had phone numbers that did not direct to the actual franchisee.  *Id.* at ¶ 13.

And although things got worse upon the PSB acquisition, it was not run much better under A Corp.; Mr. Belegu had to send A Corp. an email showing a series of Google listings for QAC territories advertising "Rooterman" that were not, in fact, QAC listings.  *Id.* at ¶¶ 14-15; **Exhibit 4**.Rather than taking action, A Corp. told Mr. Belegu to try to handle it himself.  Belegu Decl. at ¶¶ 16-17; **Exhibit 5**.

---

[2]This entity changed its name on December 27, 2024.  *See* **Exhibit 2**; Belegu Decl. at ¶¶ 5-7.
[3] Available at https://www.premiumservicebrands.com/franchise-brands/

On February 26, 2024, PSB's marketing employees held a virtual meeting with a number of franchisees to review PSB's failures, including its deficient website. Belegu Decl. at ¶ 18. One of the most significant issues was the lack of micro-sites. *Id.* at ¶ 19. A micro-site helps a customer locate a local service provider; a customer from Lakewood, NJ (or wherever), might not want to hire a service provider, like Rooterman, that shows a NY, NJ & PA territory. *Id.* at ¶ 20. However, if there is a site for Rooterman of Ocean County, NJ, the Lakewood customer would feel that they are getting a local technician who can serve their needs. *Id.* at ¶ 21. When A Corp. ran the franchise, Mr. Belegu and QAC developed and set up their own websites, and A Corp. worked with Mr. Belegu on at least 22 micro-sites. *Id.* at ¶ 22. PSB, through Plaintiff, prohibited this and took over all website marketing. *Id.* at ¶ 23. In the process, on November 15, 2023, PSB/Plaintiff eliminated Mr. Belegu & QAC's micro-sites. *Id.* at ¶ 24-25; *see also* **Exhibit 6**. After numerous complaints, approximately half of the necessary micro-sites were launched by PSB/Plaintiff on May 19, 2024. Belegu Decl. at ¶ 26-27; *see also* **Exhibit 7**.

Despite this, and despite an arbitrary increase of $1,332 per month, Mr. Belegu and QAC continued to make their necessary payments. *See* Belegu Decl. at ¶¶ 28-29; *see also* **Exhibit 8**. PBS/Plaintiff, however, also maintained a separate accounting system that purported to double-bill Mr. Belegu and QAC monthly, with it indicating that a balance was owed. *See* Belegu Decl. at ¶¶ 30-31; *see also* **Exhibit 9**.

On September 16, 2024, Plaintiff terminated all 13 agreements based on a purported "default[.]" FAC at ¶ 13. Since then, Mr. Belegu and QAC ceased using the Rooterman name and Plaintiff's alleged marks. *See* Belegu Decl. at ¶ 32. Despite it not even being a franchisee, and being engaged in an entirely different line of business than Rooterman's services, Mr. Belegu

even removed the "RM" from Defendant Water Damage Restoration's name.[4]  *See* Belegu Decl. at ¶ 33.  This is despite Plaintiff not owning a word mark for "RM"—the "RM" marks identified (ECF No. 7-2) are for Reg. Nos. 6,013,441; 6,027,468; and 6,027,470 are in Class 37  (Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning and rootering services) and none are for just the letters "RM"—all are stylized or part of a logo.  Anything remaining, such as the Google, Yelp, and HomeAdvisor listings Plaintiff complains about (FAC at ¶ 28 (a), (b), and (c)) or in Mr. Hershner's LinkedIn profile (FAC at ¶ 31 and Ex. J. thereto (ECF No. 7-10)) are not under any of the defendants' control. *See* Belegu Decl. at ¶ 34.  Defendants do not control the comments to the 911 Sewer & Drain Google Business listing (FAC at ¶ 29 and Ex. I thereto (ECF No. 7-8) or the comments to the 911 Sewer and Drain Facebook page (FAC at ¶ 29 and Ex. H thereto (ECF No. 7-9).[5]  *See* Belegu Decl. at ¶ 35.  And Defendants do not have control over the X/Twitter handle identified in the complaint, and efforts to have X/Twitter address the issue were made.   *See*  Belegu  Decl.  at  ¶  36.    Nor  are  Defendants  using  the www.rootermanplumberservices.com  domain  for  marketing  or  advertising  purposes,  and  once Google has completed the task of updating Mr. Belegu's personally-owned website links to the new domain, he will gladly transfer it to Plaintiff.[6]  *See* Belegu Decl. at ¶ 37.

---

[4] R and M are the initials of the first names of Mr. Belegu's wife's parents, as well as the inverse of his wife's initials.

[5] In fact, Plaintiff is complaining that Mr. Belegu did what he was supposed to do—stop using the Rooterman name in those Google and Facebook listings.  Plaintiff is simply upset that Mr. Belegu generated goodwill based on the services provided (nothing Plaintiff or A Corp did).

[6] If he does it before Google completes the task, he will lose the benefit of tens of thousands of dollars spent on the website, independent of anything to do with the "Rooterman" name.  *See* Belegu Decl. at ¶¶ 38-39;  *see also*,  **Exhibit 10**, Google, *Redirects and Google Search*, https://developers.google.com/search/docs/crawling-indexing/301-redirects?hl=en&visit_id=638720510627603247-834812934&rd=1.    The  purpose  is  not  to generate revenue from the "Rooterman" name but rather ensure that Google properly locates the content owned by Mr. Belegu, none of which has the Rooterman name affixed to it.

## 2.0    Legal Standard

A preliminary injunction must (1) state the reasons why it issued; (2) state its specific terms; and (3) describe in reasonable detail the act or acts restrained or required. Fed. R. Civ. P. 65(d). Injunctive relief should only be issued if: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm if the injunction did not issue; (3) the balance of equities tips in plaintiff's favor; and (4) the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). None of these factors favor Rooterman.

## 3.0    Analysis

Neither the Lanham Act nor contract claims are enforceable. Rooterman has identified no irreparable harm; its only *theoretical* harm is monetary. The equities tip in favor of Defendants, two of whom did not even have a relationship with Plaintiff. The public interest disfavors the requested injunctive relief. Simply put, Plaintiff is not entitled to injunctive relief. If an injunction must issue, it must be on a bond that would fully compensate Defendants for their lost income (and, as that lawsuits such as these often stretch on for years, it would be in the millions of dollars).

### 3.1    Rooterman Will Not Succeed on the Merits

Rooterman seeks to enforce unspecified, unregistered, and unenforceable service marks it has failed to police and for which it has granted a naked license. It also seeks to enforce a non-compete clause in a contract that is unenforceable due to prior material breach and for the clause's violation of Massachusetts law. Plaintiff has no likelihood of success on the merits.

#### 3.1.1    Rooterman's Lanham Act Claims are not Meritorious

In the FAC, Plaintiff brings claims for purported violation of 15 U.S.C. § 1125(a), (c) & (d) (Count I) and for purported violation of 15 U.S.C. § 1114 (Count II). In the motion, however,

Plaintiff does not assert a likelihood of success under Section 1125(c) or (d), so those will not be addressed.  The Section 1125(a) and 1114 claims lack merit.

As to Section 1125(a), Plaintiff alleges that Defendants' (without specifying which) "registration and use of the infringing domain names, and use of the infringing service marks" "constitutes unfair competition in violation of 15 U.S.C. § 1125(a)."  FAC at ¶¶ 40-41.  And as to Section 1114, Plaintiff only generically alleges that Defendants (again, without specifying which) "have used and continue[] to use the Rooterman trademarks or confusingly similar marks in its domain name, websites, and advertising for goods or services in commerce."  FAC at ¶ 48.  The only domain name identified in the FAC and the motion is www.rootermanplumberservices.com. FAC at ¶¶ 1 & 15 and Ex. A thereto (ECF No. 7-1).  As noted above, the only alleged use of a claimed mark is in the domain name, the Twitter handle, the former name of Water Damage Restoration (which doesn't compete with Rooterman), and in content controlled by third-parties (Google, Yelp, LinkedIn, etc.).

The alleged infringer's continued use of the mark is central to the inquiry. *Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 34 (1st Cir. 2008).  Plaintiff's request for injunctive relief as to the domain, handle, and former business name is moot.  "Article III limits federal court jurisdiction to 'cases' and 'controversies.' U.S. Const. art. III, § 2." *O'Neil v. Canton Police Dep't*, 116 F.4th 25, 30 (1st Cir. 2024).  "The mootness doctrine is based in the Article III jurisdictional requirements. Mootness occurs when subsequent events unfold such that standing no longer exists." *Id.* (citation omitted).  A claim is moot when "[t]here is simply 'no ongoing conduct left for the court to enjoined.'" *Id.* at 31, quoting *Am. C. L. Union of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 (1st Cir. 2013).  Plaintiff attempts to sidestep mootness in a footnote, arguing that an injunction would nevertheless "help ensure that all violations of

Plaintiff's rights, whatever they may be, must cease." (ECF No. 10 at 11 n. 2). However, that is not how Constitutional standing works, otherwise everyone could come into court, seeking an injunction against a theoretical, unspecified future injury. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) as quoted in *O'Neil, supra* at 31 ("no standing existed where alleged injury was 'based on hypothetical future harm that is not certainly impending.'") And, where a defendant has "made clear that they do not wish to continue using the plaintiffs' trademarks" there is "neither a likelihood of success on the merits nor a prospect of irreparable harm." *RE/MAX of New Eng., Inc. v. Prestige Real Estate, Inc*., 2014 U.S. Dist. LEXIS 91499, at *4 (D. Mass. July 7, 2014).

Similarly, the claim as to the Yelp, Google, Facebook, and HomeAdvisor matters is non-redressable by the requested injunction. "The redressability element of standing requires that the plaintiff allege that a favorable resolution of its claim would likely redress the professed injury. This means that it cannot be merely speculative that, if a court grants the requested relief, the injury will be redressed." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc*., 958 F.3d 38, 47 (1st Cir. 2020) (cleaned up). In *Dantzler,* the plaintiffs failed to prove redressability because their injury "depend[ed] in large part, if not in total, on the conduct of [nonparty] ocean freight carriers" and it was "far from certain" a court order would change that conduct. 958 F.3d at 47. Here, an injunction against the defendants would not change what the third-parties post.

Neither can Plaintiff succeed in its claims against Water Damage Restoration Ltd ("WDR") and 911 Sewer & Drain Corporation ("911"); they are New Jersey based non-parties to the franchise agreements and Plaintiff is attempting to reverse veil pierce without establishing the necessary elements. There is "no published case recognizing reverse veil piercing under New Jersey law." *Russo v. Creations by Stefano*, 2020 N.J. Super. Unpub. LEXIS 1615, at *14 n.10 (Super. Ct. App. Div. Aug. 20, 2020). New Jersey federal courts have recognized such a claim

Opposition to Plaintiff's Renewed Motion for Preliminary Injunction
1:24-cv-13015

**AA365**

and utilize the same factors for both traditional and reverse veil piercing. *See Bowers v. Taylor*, 2024 U.S. Dist. LEXIS 132419, at *13 (D.N.J. June 28, 2024).    In New Jersey, "two elements must be shown to pierce the corporate veil: 'First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist. Second, the circumstances must indicate that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417, 425 (D.N.J. 2019) (quoting *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 679 (D.N.J. 2009)).  Plaintiff makes no allegation as to unity of interest and ownership that would suggest WDR or 911 no longer have separate personalities from Mr. Belegu.  Nor do circumstances to recognize their individuality sanction a fraud or promote injustice.  Similarly, "[t]he Massachusetts Supreme Judicial Court has never explicitly, or even inferentially, adopted reverse veil piercing in any form." *Shea v. Millett*, 2019 U.S. Dist. LEXIS 6390, at *6 (D. Mass. Jan. 14, 2019) (cleaned up).  Assuming, *arguendo*, such a claim exits, in Massachusetts, courts holistically consider twelve factors when determining whether piercing the corporate veil is appropriate:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

*Id.* at * 7 *quoting AG v. M.C.K., Inc*., 432 Mass. 546, 736 N.E.2d 373, 380 n.19 (Mass. 2000).  Plaintiff makes no attempt to allege any of these in the FAC and argues none of it in the motion, except to note Mr. Belegu's ownership.  Thus, Plaintiff is unlikely to succeed in its claims against WDR or 911 based solely on what Mr. Belegu may have done.

Even if Plaintiff had standing to seek injunctive relief or it could engage in reverse veil piercing, its claims under §§ 1114 & 1125(a) fail. As noted by Plaintiff, Rooterman "must prove (1) the mark is entitled to trademark protection, and (2) use by another in commerce that is likely to cause confusion as to the source or sponsorship of the goods or services." ECF No. 10 at 9, quoting *Polar Corp. v. PepsiCo, Inc*., 789 F. Supp. 2d 219, 226 (D. Mass. 2011). As noted above, none of the defendants are using any mark that Plaintiff claims rights in. All of the cases cited by Plaintiff require continued use, which is absent here. At most, there was a single domain name and a twitter handle, which are no longer being used. And as to Water Damage Restoration, it must be noted that Plaintiff's own caselaw shows that the likelihood of confusion analysis argument only applies in the operation of "a business identical to that of her form[erly] licensed franchise." ECF No. 10 at 10, quoting *Curves Int'l v. Fox*, 2013 U.S. Dist. LEXIS 66235, at *4 (D. Mass. May 9, 2013). At no point was Water Damage Restoration f/k/a RM Water Damage Restoration engaged in the plumbing and drainage business. *See* Belegu Decl. at ¶ 40.

More important, Plaintiffs alleged marks are not entitled to protection. First, Plaintiff handwaves over its Exhibit B to the FAC (ECF No. 7-2) without identifying which mark it alleges is being infringed. At no point, however, does Plaintiff allege that any of the design marks referenced in Exhibit B were infringed. Crucially, unlike its better-known competitor, Roto-Rooter,[7] Plaintiff does not have a word mark; it only has design marks. "This is an important distinction. The ownership of a word mark entitles the owner exclusive rights in the word for the class of goods specified on the trademark. In contrast, ownership of a design mark limits the owner's rights exclusively to the specific design trademarked." *Rise Basketball Skill Dev., LLC v. K Mart Corp*., 2017 U.S. Dist. LEXIS 179695, at *8-9 (N.D. Cal. Oct. 27, 2017) citing *Pom*

---

[7] Reg. No. 1221194.

Opposition to Plaintiff's Renewed Motion for Preliminary Injunction
1:24-cv-13015

**AA367**

*Wonderful FFL v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014). In fact, "[s]tandard character registrations 'are federal mark registrations that make no claim to any particular font style, color, or size of display.'" *Pom Wonderful, supra* at 1125, quoting *Citigroup Inc. v. Capital City Bank Grp., Inc.*, 637 F.3d 1344, 1349 (Fed. Cir. 2011). That is, "because a word registered in standard characters is not limited to any particular rendition of the mark, the registration covers the word per se." *Pom Wonderful, supra* at 1125 (cleaned up) citing *In re Mighty Leaf Tea*, 601 F.3d 1342, 1348 (Fed. Cir. 2010) and 3 McCarthy on Trademarks and Unfair Competition § 19:58 (4th ed.) (updated Sept. 2014); *see also* 37 C.F.R. § 2.52(a); Trademark Manual of Examining Procedure ("TMEP") § 1207.01(c)(iii) ("If a mark (in either an application or a registration) is presented in standard characters, the owner of the mark is not limited to any particular depiction of the mark."). None of Plaintiff's claimed marks are word/standard character marks; they are all design marks. *See* Composite **Exhibit 11**; Declaration of Cassidy Flavin ("Flavin Decl.") at ¶¶ 3-4. In fact, only an apparent early franchisee, Rooterman, Inc. of Ohio, ever filed, and then abandoned, an application for a word mark in "Rooterman", Serial No. 73456290. *See* **Exhibit 12**; Flavin Decl. at ¶¶ 5-6. Thus, Plaintiff has no exclusive rights in just the words "Rooterman" or "RM." Simply put, Plaintiff does not claim Defendants infringed any of the designs; it only claims infringement in "Rooterman" and "RM," but since it lacks registration in those marks, Defendants cannot violate rights that Plaintiff does not possess.

Assuming *arguendo* there is some valid registration for the words, any rights it may have had have been lost. The mark is not distinctive. In Reg. No. 3859654 for a stylized rendering of "Rooter * Man," Plaintiff's predecessor in interest explicitly disclaimed the word "rooter" as the Examining Attorney for the U.S.P.T.O, determined "rooter" was merely "descriptive of applicant's services, which feature rooter-based plumbing and cleaning services – indeed, various third parties

have previously disclaimed the same term for the same (or related) services." **Exhibit 13**; Flavin Decl. at ¶¶ 7-8.   Presumably, this is why the basic word mark application was abandoned—one cannot acquire incontestable rights in a mark "which is the generic name for the goods or services or a portion thereof, for which it is registered."  15 U.S.C. § 1065(4).  A rooter man is a man who performs rootering services; there can be nothing more generic than that.

To the extent that Plaintiff or A Corp. had rights in any claimed marks, they were lost due to the naked license granted to Mr. Belegu and other franchisees.  *See Barcamerica Int'l USA Trust v. Tyfield Importers, Inc*., 289 F.3d 589, 596 (9th Cir. 2002) ("[W]here the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case *the owner would be estopped from asserting rights to the trademark.*" (emphasis added) (quotation marks and citation omitted)).  A registration may be canceled "at any time if the registered mark . . . has been abandoned," 15 U.S.C. § 1064(3) (1994), and a mark shall be deemed abandoned "when any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name of the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark," id. § 1127.  As explained in *Blake v. Prof'l Coin Grading Serv*.:

> Naked licensing refers to the abandonment of a mark "by allowing others to use the mark without exercising 'reasonable control over the nature and quality of the goods, services, or business on which the [mark] is used by the licensee.'" *Eva's Bridal Ltd. V. Halanick Enters., Inc*., 639 F.3d 788, 789 (7th Cir. 2011) (quoting Restatement (Third) of Unfair Competition § 33 (1995)); *see Rey v. Lafferty*, 990 F.2d 1379, 1392 n.10 (1st Cir. 1993). "To be a valid license, the licensor must adequately control the quality of the goods and services provided by the licensee under the mark." *Boathouse Grp., Inc. v. TigerLogic Corp*., 777 F. Supp. 2d 243, 250 (D. Mass. 2011) (Gorton, J.). "[F]ailure to control the quality of licensed goods can constitute an abrogation of the licensor's duty to protect the informational value of the mark," and the trademark holder may lose protection of the mark. *Rey*, 990 F.2d at 1392 n.10 (citations omitted).

898 F. Supp. 2d 365, 385 n.13 (D. Mass. 2012) (Young, J.). "[I]t is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor." *Barcamerica*, 289 F.3d at 598 (citation omitted). In *Barcamerica,* the plaintiff was deemed to have granted a naked license in a wine's name by failing to sample, in any organized way, an adequate number of bottles bearing the mark, and thus failed to exercise quality control. The same type of failure to control occurred here. Mr. Belegu and QAC were given their franchises and neither A Corp. nor Plaintiff took any steps to exercise quality control, ignoring the right to inspect operations and records retained in Section 12.8 of the franchise agreement. Belegu Decl. at ¶ 41. They never inspected the work performed. *Id.* at ¶ 42. They never accompanied employees on the job to ensure that services were performed to expectations. *Id.* at ¶ 43. In fact, they set no expectations and provided absolutely no training in performing the rootering and plumbing services marketed under the Rooter-Man name. *Id.* at ¶ 44. They cannot be found to have exercised reasonable control because they exercised no control. *Id.* at ¶ 45. Even though the franchise agreement (ECF No. 7-3 at § 11) purported to direct which vehicles, equipment, and uniforms should be used, A Corp and Plaintiff did not actually undertake to do so. *Id.* at ¶ 46. Thus, Plaintiff's trademark rights, if any, were lost to abandonment through their naked license.

Whichever mark is at issue is subject to cancellation pursuant to 15 U.S.C. §§ 1064 & 1119 for failure to police. To establish the defense of abandonment by failure to police a trademark, "it is necessary to show either the owner's intent to abandon the mark, or a course of conduct on the part of the owner causing the mark to become generic or lose its significance as a mark." *Hermes Int'l v. Lederer de Paris Fifth Avenue, Inc*., 219 F.3d 104, 110 (2d Cir. 2000). Here, Plaintiff and

A Corp. were given numerous opportunities to address former franchisees who were reaping the benefits of Mr. Belegu and QAC's territories through the Google listings using the Rooter Man name. They failed to act, requiring Mr. Belegu to attempt to take it into his own hands. Belegu Decl. at ¶ 47. It was A Corp. and Plaintiff's responsibility to police the marks, not Mr. Belegu's, and by throwing up their hands, they abandoned the marks, failing to police them.

For all of the foregoing reasons, Plaintiff is not likely to succeed on the merits of its Lanham Act claims at issue and it is not entitled to injunctive relief.

### 3.1.2    Rooterman's Contract Claim is Meritless

In its third count, Plaintiff brings a claim for breach of contract, allegedly using confidential information/trade secrets, failing to return proprietary information, competing post-termination, soliciting customers, and "failing to disassociate from Plaintiff's trademarks[.]" FAC at ¶ 54. In the motion, however, Plaintiff is only claiming a likelihood of success on the trademark issue and for purported violation of Section 18.1 of the Franchise Agreement—competition in the counties where Mr. Belegu and QAC previously had franchise territories. ECF No. 10 at 12-13.

As for the trademark issue, it is moot or otherwise non-redressable for the reasons set forth above.[8] Neither are Mr. Belegu or QAC liable for breach of the non-compete agreement. Although Mr. Belegu applied for a service mark in 911 Sewer & Drain (word mark) in 2022 and organized 911 Sewer & Drain Corporation in February 2024, this was for cautionary purposes; 911 Sewer & Drain did not begin active operations until after the franchise agreements were terminated. *See* Belegu Decl. at ¶ 48. In fact, one need only look at the USPTO application, Serial No. 97346878,

---

[8] Plaintiff also gives lip service to a claim that proprietary and/or confidential materials were not returned, but none are identified. To the extent Plaintiff is referring to out-of-date, generic business operation materials received from A Corp., Mr. Belegu is happy to provide them to Plaintiff and such does not require a court order.

which shows that a) the mark had not been yet used in commerce, and Mr. Belegu's specimen was refused because he could not show the mark actually being used in commerce. **Exhibit 14**; Flavin Decl. at ¶¶ 9-10.

Now, Mr. Belegu operates 911. Assuming, *arguendo*, such violates Section 18.1 of the franchise agreement, which purports to prohibit Mr. Belegu from "directly or indirectly engag[ing] in, hold[ing] any interest in, or be[ing] involved in any way with any of the services comprising the A CORP. System" for 3 years, within 100 miles of any A Corp. (now Rooterman) territory (FAC Ex. C (ECF No. 7-3)), that provision is unenforceable.

Section 19.6 states that agreement is governed by and construed under Massachusetts law. In Massachusetts, a non-compete provision in a franchise agreement is enforceable only if "it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." *Boulanger v. Dunkin' Donuts, Inc*., 442 Mass. 635, 639, 815 N.E.2d 572 (2004). Notably, "[a] covenant not to compete designed to protect a party from ordinary competition does not protect a legitimate business interest." *Id.* at 641. "Courts will not enforce non-compete provisions if their sole purpose is to limit ordinary competition." *RE/MAX*, 2014 U.S. Dist. LEXIS 91499, at *5. In *Boulanger*, the non-compete was deemed enforceable because Dunkin' Donuts had a legitimate interest in protecting confidential information, which

> "included operating manuals and similar information contained in videotapes, CD-ROMs, and websites; recipes for coffee and baked goods; financial information and data; marketing and promotion strategy; new product development; and the location of sites for new stores and building plans. [And] district meetings were held several times a year, often involving the dissemination of confidential information such as financial data and profitability of particular stores, new product development, and marketing and promotion strategies."

442 Mass. At 642. In contrast, the non-compete in *RE/MAX* was unenforceable because there were "no trade secrets involved here" and the best argument was that the former franchisee only knew

Opposition to Plaintiff's Renewed Motion for Preliminary Injunction
1:24-cv-13015

**AA372**

its "general business strategies" without any convincing evidence that the defendants' good will was due to RE/MAX branding or methods, as opposed to the work and personal relationship of the franchisee. 2014 U.S. Dist. LEXIS 91499, at *7. Although Plaintiff's motion (and the FAC) repeatedly uses the terms "confidential information" and "trade secrets," the purported nature of this alleged confidential information and/or trade secrets is absent from the record. *See, generally*, ECF Nos. 7 & 10.

There are no trade secrets or confidential information here. Neither A Corp. nor Plaintiff provided Mr. Belegu or QAC with the training program described in Section 9.1 of the Agreement. Even what the franchise agreement purports to be confidential—the franchise agreement itself (Section 18.2)—is not, else Plaintiff would have filed a redacted version or sought to file it under seal. And despite Section 18.2 mentioning "formulas," there are no formulas here—in fact, what set Mr. Belegu's and QAC's rootering business apart from competitors was the service provided and the uncommon use of jet machines and cameras, which is not something that came from A Corp. or Plaintiff. *See* Belegu Decl. at ¶ 49. In short, the non-compete is unenforceable as it only protects against ordinary competition.

Plaintiff is otherwise unlikely to succeed. It comes to this Court with unclean hands[9]. "An employer may act so arbitrarily and unreasonably in exercising his right of termination that a court of equity will refuse aid in enforcing for his benefit other parts of the contract." *Econ. Grocery Stores Corp. v. McMenamy*, 290 Mass. 549, 552, 195 N.E. 747, 748 (1935) (refusing to enforce a

---

[9] While unclean hands is ordinarily not a defense to an action at law for breach of contract, *Likousas v. Makris*, 99 Mass. App. Ct. 1128, 170 N.E.3d 356 (2021), Plaintiff is seeking the equitable remedy of a preliminary injunction and equitable defenses should apply at this stage. "The unclean-hands doctrine, like other equitable defenses, is appropriately considered by a court in determining whether to issue a preliminary injunction." *Great Lakes Consortium v. Michigan*, 2006 U.S. Dist. LEXIS 93942, at *16-17 (W.D. Mich. Dec. 29, 2006).

non-compete where employee's efforts built up department prior to arbitrary termination). Here, it was Mr. Belegu and QAC that built up the business without the necessary assistance of PSB/Plaintiff. *See* Belegu Decl. at ¶ 50. Rather than performing its end of the bargain, Plaintiff unreasonably terminated the agreements, likely so that it could charge a successor franchisee a higher fee, based on the goodwill created by Mr. Belegu and QAC.

Similarly, "[i]t is well established that a material breach by one party excuses the other party from further performance under the contract." *Ward v. Am. Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100, 443 N.E.2d 1342, 1343 (1983). Mr. Belegu repeatedly gave A Corp. and Plaintiff notice of potential infringement under Section 8.5(A) of the Agreement. *See* Belegu Decl. at  51. At no point did A Corp. or Plaintiff take action to protect any marks or grant Mr. Belegu or QAC permission under Section 8.5(B) to do so themselves. *See* Belegu Decl. at ¶ 52. By failing to act, A Corp. and Plaintiff essentially granted a license to others to operate a Rooterman franchise in Mr. Belegu/QAC's territories, in violation of Section 3.1(E). As noted, at no point did A Corp. or Plaintiff provide the training promised in Section 9.1. At no point did A Corp. or Plaintiff provide the Additional Assistance of the Grand Opening Promotional Program (9.3(A)), Seminars (9.3(D)), On-Going Assistance and Supervision (9.3(E)), Initial Sales Assistance (9.3(F)), or the tools and supplies (9.3(G)). *See* Belegu Decl. at ¶ 53. And Plaintiff utterly failed to replace the microsites as promised. *See* Belegu Decl. at ¶ 54. Thus, due to these prior material breaches, the agreements are unenforceable. In sum, Plaintiff lacks any likelihood of success on the merits of its claims.

### 3.2    Plaintiff Does Not Face Irreparable Harm

Plaintiff has failed to show irreparable harm. "[A] preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm." *Ross-Simons of Warwick, Inc. v.*

*Baccarat, Inc.,* 102 F.3d 12, 19 (1st Cir. 1996). As to the contract claim, Plaintiff simply claims that "direct competition with Rooterman and flagrant misuse of trade secrets" would cause irreparable harm. ECF No. 10 at 16. No trade secrets were identified, let alone alleged to have been misused. "That is, they have not shown the inadequacy of a damages remedy." *RE/MAX,* 2014 U.S. Dist. LEXIS 91499, at *7 *citing Charlesbank Equity Fund II v. Blinds To Go, Inc*., 370 F.3d 151, 162 (1st Cir. 2004).

Similarly, as to the purported Lanham Act claim, where a defendant has "made clear that they do not wish to continue using the plaintiffs' trademarks" then the plaintiff has not demonstrated "a prospect of irreparable harm. *RE/MAX,* 2014 U.S. Dist. LEXIS 91499, at *7 citing *Boston Duck Tours, supra*. Defendants are using none of Plaintiff's actual registered marks and they have no intent to use them.

### 3.3    The Balance of Equities Favors Defendants

Two of the defendants were not franchisees, and it would be wholly inequitable to enjoin them for the alleged acts of others. Moreover, Plaintiff's arguments as to the balance of equities otherwise lacks merit.

This is not a case of Defendants claiming lost profits by not being allowed to infringe—they are not infringing. They are not using any "trade secrets" or "confidential information"—Plaintiff has identified no such use. Thus, Plaintiff's case citations are inapposite.

While Plaintiff claims that Mr. Belegu cannot just "change the sign on the door" to reap "Plaintiff's investment in those markets", Plaintiff made no such investment and offers no evidence of such, merely argument of counsel. All of the labor and effort was by Mr. Belegu and QAC; it would be inequitable for this Court to disregard that. As in *McMenamy, supra*, it was Mr. Belegu and QAC who built up the business in the territories, not Plaintiff. In fact, A Corp. and

Plaintiff worked against Mr. Belegu and QAC, failing to stop Google from directing those searching for "Rooterman" to its former franchisees, rather than to Mr. Belegu or QAC. Defendants built up their customer base despite A Corp./Plaintiff, not because of them.

Although Plaintiff correctly cites to *Dunkin' Donuts Franchised Rests. LLC v. Wometco Donas Inc*., which stated that the "potential of lost profits alone does not constitute sufficient hardship for this inquiry, *Wometco* was incomplete in its statement of the law. 53 F. Supp. 3d 221, 232 (D. Mass. 2014). *Wometco* directly cited to *Concrete Machinery Co., Inc. v. Classic Lawn Ornaments, Inc*., 843 F.2d 600, 612 (1st Cir. 1988), in support of that proposition. That was a case where the First Circuit was addressing the harm of allowing a likely copyright infringer to continue infringing. However, the First Circuit then qualified the issue by reaffirming that "a court's findings regarding likelihood of success … should be placed in the scales when it weighs the balance of the harms. … [I]t allows consideration of relative hardships to be a significant, and perhaps determinative, factor when the defendant has shown it may suffer significant harm and the plaintiff has made only a marginal showing of likelihood of success." 843 F.2d at 612. Here, Plaintiff failed to show any likelihood of success on any claim and, where Plaintiff seeks to put three out of the four defendants out of business (under the meritless non-compete claim). Thus, the balance favors Defendants.

### 3.4    Injunctive Relief is Not in the Public Interest

Defendants are not representing themselves as Rooterman, thus there is no confusion in the marketplace. Plaintiff's reliance on *Wometco* is, once more, misplaced, as no defendant is operating under the franchisor's name, unlike the defendant in *Wometco*. Even the *Wometco* defendant was not barred from operating a coffee shop—they just could not hold themselves out as a Dunkin' Donuts.

Rather, as *Wometco* observed, "[i]f there is no measurable effect on the public interest, the Court relies more heavily on the other criteria." 53 F. Supp. 3d at 232 citing *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 102 F.3d 12, 15 (1st Cir. 1996). The proposed injunction only benefits Plaintiff, it does not benefit the public. If anything, it harms the public because it would deprive the public of the services they've come to expect from Mr. Belegu. There is a shortage of plumbers available for the public to retain.[10] This is an endemic problem and the plaintiff seeks to remove a plumbing company from circulation and availability for what? To exact an advantage in litigation? That is not in the public interest.

Thus, as the other factors favor Defendants, the Court should rely more heavily on those.

### 3.5    A Significant Bond Should be Required

Rule 65 provides that a court cannot enter injunctive relief unless the moving party "gives security in the amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). In other words, a bond should be required if the enjoined party will suffer any harm from the issuance of the injunction. *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 285 (4th Cir. 2002).

When a plaintiff seeks to enforce a non-compete agreement, an appropriate bond is the monetary loss that would be suffered. *See, e.g., Aspect Software, Inc. v. Barnett*, 787 F. Supp. 2d 118, 132 (D. Mass. 2011)(setting $500,000 bond, equivalent to the salary the employee would

---

[10]  *See* Samantha DeAlmeida Roman, *It's no joke: Shortage of plumbers could clog up economy*, ROINJ (June 4, 2024), https://www.roi-nj.com/2024/06/04/opinion/op-ed/its-no-joke-shortage-of-plumbers-could-clog-up-economy/ ; Andrew Dorn, *Labor crisis: Why is there a shortage of plumbers and electricians?,* NEWSNATION (April 11, 2024), https://www.newsnationnow.com/us-news/education/labor-shortage-trades-jobs-plumber-electrican/ ; Enda Curran, *US Plumbing Shortage Is a Generational Problem*, BLOOMBERG (March 14, 2024), https://www.bloomberg.com/news/newsletters/2024-03-14/plumbing-jobs-available-as-retirements-outnumber-apprentices .

Opposition to Plaintiff's Renewed Motion for Preliminary Injunction
1:24-cv-13015

**AA377**

otherwise enjoy).  If the Court does see fit to issue a preliminary injunction, then the bond should be at least a year's lost income for Defendants.  Such is at least $3,000,000.  Belegu Decl. at ¶ 55.

## 4.0    Conclusion

PSB squeezed out highly successful franchisees, and it can now profit off the goodwill Mr. Belegu and QAC created.  The Court should not go further and penalize them for having had the audacity to demand what they were entitled to.  There is no mark to enforce—there is no word mark and the issue is moot—and the marks have otherwise been abandoned for naked license and failure to enforce.  The non-compete agreement is unenforceable as it only prohibits ordinary competition, Plaintiff comes with unclean hands, and Plaintiff committed a prior material breach. There is no irreparable harm.  The balance of equities favors Defendants.  The public has no interest in the injunction, and in fact has an interest in it *not* being entered.  If one must be granted, a bond of $3,000,000.00 should be required.

WHEREFORE Defendants respectfully request the motion be DENIED.

Dated: January 13, 2025.                    Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

*Attorneys for Defendants.*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 13, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

<u>/s/ Marc J. Randazza</u>
Marc J. Randazza

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Rooterman, LLC,<br><br>                Plaintiff,<br><br>     v.<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br><br>                Defendants. | Civil Action No. 1:24-cv-13015<br><br>**DECLARATION OF<br>KLODIAN BELEGU** |

I, Klodian Belegu, hereby declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.      I am a Defendant in the above-captioned matter. I make this declaration in support of Defendants' Opposition to Plaintiff's Revised Motion for a Preliminary Injunction (the "opposition").

3.      In 2019 & 2020,  Defendants Klodian Belegu and Quality Air Care Corporation ("QAC"), along with non-party Water Damage Solution of Bergen, LLC, executed a series of franchise agreements with non-party A Corp. One agreement, for Monmouth and Ocean Counties, was dated September 10, 2020, with a commencement date of August 19, 2020, but was not executed until January of 2021.

4.      A true and correct copy of the foregoing Agreement is filed herewith as **Exhibit 1**.

5.      At no time were Defendants 911 Sewer & Drain Corporation or Water Damage Restoration Ltd f/k/a RM Water Damage Restoration Ltd parties to any franchise agreement.

**AA380**

6.      This entity changed its name on December 27, 2024.

7.      A true and correct copy of the Name Change Certificate is filed herewith as **Exhibit 2**.

8.      Upon information and belief, Rooterman, LLC, is but one of the businesses owned by Premium Service Brands ("PSB"), which also owns 360˚ Painting, ProLift Garage Doors, Maid Right, Kitchen Wise & Closet Wise, Window Gang, Rubbish Works Junk Removal, The Grout Medic, and House Doctors.

9.      A true and correct copy of the webpage available at https://www.premiumservicebrands.com/franchise-brands/ is filed herewith as **Exhibit 3**.

10.     At all relevant times, PSB's agents operated Plaintiff Rooterman and all of my communications with Plaintiff were through PSB agents.

11.     Individually and through QAC, I invested hundreds of thousands of dollars in advertising to build up my franchises; he had no interest in losing them.

12.     In January 2023, I found that the Google business result for "Rooter-Man" in Lakewood, New Jersey (one of the franchise territories) had a phone number of (732) 905-5477, which was the phone number for a competitor and prior franchisee.

13.     This was not an isolated listing—dozens of Google listings for mine & QAC Rooterman territories had phone numbers that did not direct to the actual franchisee.

14.     Although things got worse upon the PSB acquisition, it was not run much better under A Corp.; I had to send A Corp. an email showing a series of Google listings for QAC territories advertising "Rooterman" that were not, in fact, QAC listings.

15.     A true and correct copy of that 11/12/19 email is attached hereto as **Exhibit 4**.

16.     Rather than taking action, A Corp. told me to try to handle it myself.

17.     A true and correct copy of that 11/13/19 email is attached hereto as **Exhibit 5**.

18.     On February 26, 2024, PSB's marketing employees held a virtual meeting with a number of franchisees to review PSB's failures, including its deficient website.

19.     One of the most significant issues was the lack of micro-sites.

20.     A micro-site helps a customer locate a local service provider; a customer from Lakewood, NJ (or wherever), might not want to hire a service provider, like Rooterman, that shows a NY, NJ & PA territory.

21.     For example, if there is a micro-site for Rooterman of Ocean County, NJ, the Lakewood customer would feel that they are getting a local technician who can serve their needs.

22.     When A Corp. ran the franchise, I  and QAC developed and set up our own websites, and A Corp. worked with me on at least 22 micro-sites.

23.     PSB, through Plaintiff, prohibited this and took over all website marketing.

24.     On November 15, 2023, PSB/Plaintiff eliminated my & QAC's micro-sites.

25.     A true and correct copy of the 9/10/2024 email is attached hereto as **Exhibit 6**.

26.     After numerous complaints, only approximately half of the necessary micro-sites were launched by PSB/Plaintiff on May 19, 2024.

27.     A true and correct copy of the 9/12/2024 email is attached hereto as **Exhibit 7**.

28.     Despite the breached by Rooterman, and despite an arbitrary increase of $1,332 per month, I and QAC continued to make our necessary payments.

29.     A true and correct copy of the Green Royalty Summary is attached hereto as **Exhibit 8**.

30.     PBS/Plaintiff, however, also maintained a separate accounting system that purported to double-bill me and QAC monthly, with it indicating that a balance was owed.

31.    A true and correct copy of the 9/13/2024 statement is attached hereto as **Exhibit 9**.

32.    On September 16, 2024, Plaintiff terminated all 13 agreements based on a purported "default[.]" FAC at ¶ 13. Since then, I and QAC ceased using the Rooterman name and Plaintiff's alleged marks.

33.    Despite it not even being a franchisee, and being engaged in an entirely different line of business than Rooterman's services, I even removed the "RM" from Defendant Water Damage Restoration's name.

34.    This is despite Plaintiff not owning a word mark for "RM"—the "RM" marks identified (ECF No. 7-2) are for Reg. Nos. 6,013,441; 6,027,468; and 6,027,470 are in Class 37 (Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning and rootering services) and none are for just the letters "RM"—all are stylized or part of a logo. Anything remaining, such as the Google, Yelp, and HomeAdvisor listings Plaintiff complains about (FAC at ¶ 28 (a), (b), and (c)) or in Mr. Hershner's LinkedIn profile (FAC at ¶ 31 and Ex. J. thereto (ECF No. 7-10)) are not under any of the defendants' control.

35.    Defendants do not control the comments to the 911 Sewer & Drain Google Business listing (FAC at ¶ 29 and Ex. I thereto (ECF No. 7-8) or the comments to the 911 Sewer and Drain Facebook page (FAC at ¶ 29 and Ex. H thereto (ECF No. 7-9).

36.    Defendants do not have control over the X/Twitter handle identified in the complaint, and efforts to have X/Twitter address the issue were made.

37.    Nor are Defendants using the www.rootermanplumberservices.com domain for marketing or advertising purposes, and once Google has completed the task of updating my personally-owned website links to the new domain, I will gladly transfer it to Plaintiff.

38.     If I make the transfer before Google completes the task, I will lose the benefit of tens of thousands of dollars spent on the website, independent of anything to do with the "Rooterman" name.

39.     A true and correct copy of the *Redirect and Google Search* Google page is attached hereto as **Exhibit 10**.

40.     At no point was Water Damage Restoration f/k/a RM Water Damage Restoration engaged in the plumbing and drainage business.

41.     I and QAC were given our franchises and neither A Corp. nor Plaintiff took any steps to exercise quality control, ignoring the right to inspect operations and records retained in Section 12.8 of the franchise agreement.

42.     Plaintiff and A Corp. never inspected the work performed.

43.     Plaintiff and A Corp. never accompanied employees on the job to ensure that services were performed to expectations.

44.     In fact, Plaintiff and A Corp. set no expectations and provided absolutely no training in performing the rootering and plumbing services marketed under the Rooter-Man name.

45.     Plaintiff and A Corp. cannot be found to have exercised reasonable control because they exercised no control.

46.     Even though the franchise agreement (ECF No. 7-3 at § 11) purported to direct which vehicles, equipment, and uniforms should be used, A Corp and Plaintiff did not actually undertake to do so.

47.     Plaintiff and A Corp. were given numerous opportunities to address former franchisees who were reaping the benefits of mine and QAC's territories through the Google

listings using the Rooter Man name. They failed to act, requiring me to attempt to take it into my own hands.

48. Although I applied for a service mark in 911 Sewer & Drain (word mark) in 2022 and organized 911 Sewer & Drain Corporation in February 2024, this was for cautionary purposes; 911 Sewer & Drain did not begin active operations until after the franchise agreements were terminated.

49. Even what the franchise agreement purports to be confidential—the franchise agreement itself (Section 18.2)—is not, else, upon information and belief, Plaintiff would have filed a redacted version or sought to file it under seal. And despite Section 18.2 mentioning "formulas," there are no formulas here—in fact, what sets my and QAC's rootering business apart from competitors was the service provided and the uncommon use of jet machines and cameras, which is not something that came from A Corp. or Plaintiff.

50. It was I and QAC who built up the business without the necessary assistance of PSB/Plaintiff.

51. I repeatedly gave A Corp. and Plaintiff notice of potential infringement under Section 8.5(A) of the Agreement.

52. At no point did A Corp. or Plaintiff take action to protect any marks or grant me or QAC permission under Section 8.5(B) to do so themselves.

53. At no point did A Corp. or Plaintiff provide the training promised in Section 9.1. At no point did A Corp. or Plaintiff provide the Additional Assistance of the Grand Opening Promotional Program (9.3(A)), Seminars (9.3(D)), On-Going Assistance and Supervision (9.3(E)), Initial Sales Assistance (9.3(F)), or the tools and supplies (9.3(G)).

54. Plaintiff utterly failed to replace the microsites as promised.

55.     If the Court does see fit to issue a preliminary injunction, then the bond should be at least a year's lost income for Defendants.  Such is at least $ 3,000,000.00

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 1-13-2025                    By: _____
                                        Klodian Belegu

RANDAZZA | LEGAL GROUP

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Rooterman, LLC, <br><br> Plaintiff, <br><br> v. <br><br> Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation. <br><br> Defendants. | Civil Action No. 1:24-cv-13015 <br><br> **DECLARATION OF CASSIDY FLAVIN** |

I, Cassidy Flavin, hereby declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.      I am a Paralegal at Randazza Legal Group, PLLC, counsel for Defendants in the above-captioned matter. I make this declaration in support of Defendants' Opposition to Plaintiff's Revised Motion for a Preliminary Injunction (the "opposition").

3.      On January 13, 2025, I used the USPTO Trademark Search system to view the Registration Certificates of the trademarks listed in Exhibit B to the Complaint (ECF No. 1-2).

4.      A true and correct copy of those Registration Certificates are filed herewith as Composite **Exhibit 11**.

5.      On January 13, 2025, I used the USPTO Trademark Search system to view the status of an application for a word mark in "Rooterman", Serial No. 73456290.

6.      A true and correct copy of the "status" page for Serial No. 73456290 is attached hereto as **Exhibit 12**.

**AA387**

7.    On January 13, 2025, I used the USPTO Trademark Search system to view the Office Action for word mark "ROOTER MAN", Serial No. 3859654.

8.    A true and correct copy of the Office Action for Serial No. 3859654 is attached hereto as **Exhibit 13**.

9.    On January 13, 2025, I used the USPTO Trademark Search system to view the Nonfinal Office Action for mark "911 SEWER & DRAIN", Serial No. 97346878.

10.    A true and correct copy of the Nonfinal Office Action for Serial No. 97346878 is attached hereto as **Exhibit 14**.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Jan. 13, 2025

By: _____
Cassidy Flavin

# **<u>Exhibit 1</u>**

**AA389**

A CORP.

**ROOTER-MAN FRANCHISE AGREEMENT**

FA 4/20 – Copyright © 2000-2020 A CORP. All rights reserved.

## TABLE OF CONTENTS

| ITEMS | PAGE |
|---|---|
| A CORP FRANCHISE AGREEMENT | 1 |
| 1. FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS | 2 |
| 1.1 Date of Franchise Agreement | 2 |
| 1.2 Parties | 2 |
| 1.3 Licensed Territory | 2 |
| 1.4 Total Population | 2 |
| 1.5 Commencement Date | 2 |
| 1.6 Expiration Date | 2 |
| 1.7 Initial Franchise Fee | 2 |
| 1.8 Licensed Businesses | 2 |
| 1.9 Continuing Royalty | 2 |
| 1.10 Advertising Contribution | 2 |
| 1.11 Renewal Fee | 2 |
| 1.12 Transfer Fee | 2 |
| 1.13 Active Owners | 2 |
| 1.14 Franchise Termination Fee | 2 |
| 2. GRANT OF FRANCHISE | 3 |
| 2.1 Grant | 3 |
| 2.2 Limited License | 3 |
| 3. LICENSED TERRITORY | 3 |
| 3.1 Territory Defined | 3 |
| 3.2 Interterritorial Policy | 3 |
| 3.3 Rights Retained | 3 |
| 4. TERM OF FRANCHISE AGREEMENT, RENEWAL OPTION | 4 |
| 4.1 Term | 4 |
| 4.2 Renewal | 4 |
| 4.3 Notice Required by Law | 4 |
| 5. FRANCHISE FEE AND CONTINUING ROYALTY | 5 |
| 5.1 Initial Fee | 5 |
| 5.2 Continuing Royalty | 5 |
| 6. FRANCHISE SYSTEM MARKETING MATERIAL FUND | 5 |
| 6.1 Contribution by Franchisee | 5 |
| 6.2 Advertising Report | 5 |
| 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION | 5 |
| 7.1 Local Advertising | 5 |
| 7.2 Interterritorial Advertising | 6 |
| 7.3 Display | 7 |
| 7.4 Identity as Franchisee | 7 |
| 7.5 Sale of Franchise | 7 |
| 8. TRADEMARKS | 7 |
| 8.1 Grant of License | 7 |

FA 4/20 – Copyright © 2000-2020 A CORP. All rights reserved.

AA391

8.2   Name of Business ............................................................. 7
8.3   No Other Names ............................................................. 7
8.4   Change of the Trademarks .................................................. 8
8.5   Trademark Prosecution ..................................................... 8

9.    TRAINING AND OPERATING ASSISTANCE ...................................... 8
      9.1 Initial Training Program ................................................ 8
            A. The Program ...................................................... 8
            B. Expenses ......................................................... 8
            C. Waiver ........................................................... 8
      9.2  Staff Training ....................................................... 8
      9.3  Additional Assistance ................................................ 9
            A. Operating Manual ................................................. 9
            B. Grand Opening Promotional Program ................................ 9
            C. Advertising Materials ............................................ 9
            D. Seminars ......................................................... 9
            E. On-Going Assistance and Supervision .............................. 9
            F. Initial Sales Assistance ......................................... 9
            G. Product Offerings ................................................ 9

10. FRANCHISE OFFICE LOCATION .................................................. 10

11. VEHICLES, EQUIPMENT AND SUPPLIES ........................................... 10
      11.1  Vehicles ............................................................ 10
      11.2  Equipment ........................................................... 10
      11.3  Uniforms ............................................................ 10

12. OPERATION of the FRANCHISE ................................................. 10
      12.1  Operations Manual ................................................... 10
            A. Incorporation of Operations Manual ............................... 10
            B. Confidentiality of Operations Manual ............................. 10
            C. Modifications .................................................... 11
      12.2  Hours of Operation .................................................. 11
      12.3  Resolution of Customer Problems ..................................... 11
      12.4  Cleaning and other Supplies ......................................... 11
      12.5  Franchise Management ................................................ 11
      12.6  Insurance ........................................................... 11
            A. Notice ........................................................... 12
            B. Insurance and Step-In-Rights ..................................... 12
      12.7  Bookkeeping Standards ............................................... 12
      12.8  Franchisor Inspection ............................................... 12
      12.9  Compliance with Law ................................................. 12
      12.10  No Suggested Service Fees .......................................... 12
      12.11  Franchise Telephone Service and Directory Listings ................. 13

13. RECORDS ................................................................... 13
13.1  Sales Records and Tax Returns ............................................ 13
13.2  Periodic Reports ......................................................... 13
13.3 Additional Recording Systems .............................................. 13
13.4 Inspection and Audit ...................................................... 13

FA 4/20 – Copyright © 2000-2020 A CORP. All rights reserved.

14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL ............................................... 14
    14.1 Assignment by A CORP ............................................................... 14
    14.2 Assignment by Franchisee ............................................................ 14
        A. Permitted Transfers ............................................................ 14
        B. Transfer Upon Death or Permanent Incapacity ..................... 15
        C. Transfer to Franchisee's Corporation ................................. 15
        D. Non-Waiver of Claims ...................................................... 16

15. DEFAULT AND TERMINATION ..................................................................... 16
    15.1 Immediate Termination ............................................................... 16
    15.2 Termination with Notice ............................................................. 17
    15.3 Conformity with Law ................................................................. 18
    15.4 Cross Default ............................................................................ 18
    15.5 Franchise Termination Option ...................................................... 18

16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION ...... 19

17. STEP-IN-RIGHTS ......................................................................................... 20
    17.1 Cause for Step-In ...................................................................... 20
    17.2 Duties of Parties ....................................................................... 20

18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS ........................... 20
    18.1 Non-Competition ....................................................................... 20
    18.2 Non-Disclosure ......................................................................... 20

19. GENERAL CONDITIONS AND PROVISIONS ................................................... 21
    19.1 Titles for Convenience ............................................................... 21
    19.2 Entire Agreement ...................................................................... 21
    19.3 Amendment in Writing ............................................................... 21
    19.4 Relationship ............................................................................. 21
    19.5 No Waiver ............................................................................... 21
    19.6 Governing Law ......................................................................... 22
    19.7 Mediation and Arbitration .......................................................... 22
    19.8 Notices ................................................................................... 23
    19.9 Indemnification ........................................................................ 24
    19.10 Limitation of Liability of A CORP .............................................. 24
    19.11 Late Payment Fees ................................................................... 24
    19.12 Survival of Covenants ............................................................... 24

20. CAVEAT ..................................................................................................... 24

21. RELEASE ................................................................................................... 25

APPENDIX 1 – LICENSED TERRITORY ............................................................... 27
EXHIBIT A – GUARANTY OF PERFORMANCE ...................................................... 28
EXHIBIT B – POWER OF ATTORNEY ................................................................... 29
EXHIBIT C – PROMISSORY NOTE ....................................................................... 30
EXHIBIT D – WAIVER OF TRAINING PROGRAM PARTICIPATION ......................... 31
EXHIBIT E -- AUTHORIZATION TO CHARGE CREDIT CARD OR CHECKING ACCOUNT ..... 32

FA 4/20 – Copyright © 2000-2020 A CORP. All rights reserved.

**AA393**

## A CORP.
## FRANCHISE AGREEMENT

**AGREEMENT** entered into this **10th** day of **September, 2020**, by and between:

**A CORP.**
a Massachusetts Corporation
268 Rangeway Road
Box 290
North Billerica, MA  01862
("**A CORP.**")

and

**Quality Air Care Corporation**
**692 Sussex Ct**
**Toms River, NJ 08753**

("**FRANCHISEE**")

**WHEREAS:**

**A CORP.** has developed and is continuing to develop certain unique training, marketing and management methods relating to various service industries which offer services to the public through a franchise system (the " **A CORP. System** ") as it evolves from time to time; and

**A CORP.** has successfully established a reputation, demand and goodwill for its System under various registered names and marks which **A CORP.** owns, including without limitation, **Rooter-Man, Rooter-Man to the Rescue, Rotor-Man** and such other valuable trade names, service marks, trademarks, logotypes and designs (the "Trademarks") which **A CORP.** may develop and license for use through the **A CORP. System**; and

**A CORP.**'s trademarks and methods of operations and other business practices and policies relating to the operation of the **A CORP.** System (collectively the "Business System") constitute confidential and valuable trade secrets; and

**FRANCHISEE** desires to enter into the business of operating an **A CORP.** franchise utilizing some or all the Trademarks, the Business System and all advantages of the **A CORP.** System franchise program upon the terms and conditions contained in this agreement.

**THEREFORE**, in consideration of the mutual agreements, covenants and promises contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree to be bound legally as follows:

**AA394**

1.    **FUNDAMENTAL FRANCHISE AGREEMENT PROVISIONS**

| | | |
|---|---|---|
| **1.1** | **Date of Franchise Agreement**: | September 10, 2020 |
| **1.2** | **Parties**:    **FRANCHISOR:**<br>A CORP.<br>268 Rangeway Road<br>N. Billerica, Ma 01862 | **FRANCHISEE:**<br>Quality Air Care Corporation<br>692 Sussex Ct<br>Toms River, NJ 08753 |
| **1.3** | **Licensed Territory**: | Defined in the attached Appendix 1 |
| **1.4** | **Total Population**: | 501,008 |
| **1.5** | **Commencement Date**: | August 19, 2020 |
| **1.6** | **Expiration Date**: | August 19, 2025 |
| **1.7** | **Initial License Fee**: | $7,950.00<br>($31.80 per thousand of population) |
| **1.8** | **Businesses Licensed (By Trademark)**: | **Rooter-Man**<br>**Rooter-Man to the Rescue**<br>**Rotor-Man** |
| **1.9** | **Continuing Royalty**: | $520.00 per month.<br>($1.04 per thousand of population) |
| **1.10** | **Marketing Fund Contribution**: | $60.00 per month.<br>($ .12 per thousand of population monthly) |
| **1.10.1** | **Locally Optimized Website** | $89.00 per month |
| **1.11** | **Franchise Renewal Fee**: | $2500.00 |
| **1.12** | **Transfer Fee**: | Greater of 5% of Franchise Selling Price or $2,500.00 |
| **1.13** | **Active Owners**: | Klodian Belegu |
| **1.14** | **Franchisee Termination Fee: (Opt Out)** | $25.00 per thousand population |

2.  **GRANT OF FRANCHISE**

**AA395**

2.1 **GRANT**. **A CORP.** hereby grants to **FRANCHISEE**, and **FRANCHISEE** hereby accepts, a license to conduct the business listed in Section 1.8 (the "**A CORP.** System Franchise") for the term described below, according to the provisions of this Agreement and any related agreements.

2.2 **LIMITED LICENSE**. This franchise is a limited grant of rights. Upon termination for any reason or upon expiration of this Agreement, all rights of **FRANCHISEE** to operate the **A CORP.** System franchise shall cease and the license set forth above shall terminate.

## 3. LICENSED TERRITORY

### 3.1 TERRITORY DEFINED

A. The franchise granted by this Agreement to operate the **A CORP.** System franchise shall be within the Territory set forth in Section 1.3 (the "Territory"). **FRANCHISEE** shall offer the services of the **A CORP.** System franchise **only** in the Territory.

B. **FRANCHISEE** agrees to diligently, faithfully and in a business like manner, promote, market and conduct the franchised business within the Territory so as to fully develop and maximize the business potential of the Territory and shall devote **FRANCHISEE's** full time, attention and best efforts to achieve that end. **FRANCHISEE's** failure to do so shall be deemed a material breach of this Agreement as specified in Section 15.2.

C. **FRANCHISEE** shall not engage in marketing activities or solicitation of business outside the Territory. In order for **FRANCHISEE** to engage in such activities within an unlicensed territory, **FRANCHISEE** must execute a separate Franchise Agreement and pay an additional franchise fee.

D. **FRANCHISEE** shall establish and maintain an office within the Territory to conduct his or her franchise. **FRANCHISEE** shall not establish an office outside of the Territory.

E. **A CORP.** agrees that during the term it will not license any other person or entity to operate the same **A CORP.** system franchise in the Territory, and will not itself establish the same **A CORP.** system franchise in the Territory.

3.2 **INTERTERRITORIAL POLICY**. **A CORP.** shall have the right to adopt and implement policies and procedures prohibiting or strictly limiting **FRANCHISEE's** conduct and solicitation of business and marketing activities outside the Territory. With the exception of interterritorial advertising, as described in Section 7.2 of this Agreement, **FRANCHISEE** is prohibited from advertising, soliciting or maintaining a business phone number or office outside of the Territory.

3.3 **RIGHTS RETAINED**. Notwithstanding Section 3.2, **A CORP.** shall, however, have the right to: a) refer work to other franchisees, to itself, its parent, subsidiary or affiliated companies or to unaffiliated subcontractors, whether within or outside of the Territory, which **FRANCHISEE** is not licensed, not equipped or not expressly authorized to render; and b) sell, rent or authorize others to sell or rent, drain cleaning, products, and equipment, or render services which are not the subject of this Agreement within or outside of the Territory.

## 4. TERM OF FRANCHISE AGREEMENT AND RENEWAL OPTION

**AA396**

**4.1**    **TERM**.  The term of this Franchise Agreement shall be 5 years from the date of execution of this Agreement, unless terminated sooner for a reason set forth in Section 15. At the expiration of this term, **FRANCHISEE** may exercise the Renewal Option set forth in Section 4.2.

**4.2**    **RENEWAL**.    **FRANCHISEE** shall have the option to renew this franchise for additional 10 year terms subject to the following conditions:

    **A.** **FRANCHISEE** shall give **A CORP.** written notice of his or her desire to exercise the option to continue as a franchisee no later than 6 months prior to the expiration of the initial term of this Agreement and each renewal term.

    **A CORP.** shall furnish **FRANCHISEE** with a copy of **A CORP.**'s then current Franchise Agreement (and related agreements), which Agreement **FRANCHISEE** must execute no later than 3 months prior to the expiration of this Agreement.  The Renewal Franchise Agreement shall not include an Initial License Fee but may include an increase in the Continuing Royalty and Marketing Contribution.  Such increase, if any, shall be calculated by multiplying the current fee by the percentage change in the Consumer Price Index (hereinafter, "Change In CPI") if any.  The Change In CPI shall be calculated using the formula set forth in Section 4.2 B.

    **B.** **A CORP.** shall calculate the Change In CPI by creating a fraction, the numerator of which is the Consumer Price Index for December of the most recently completed year and the denominator of which is the Consumer Price Index for December of the year in which the Franchise Agreement became effective.

    The fraction will then be determined by dividing the numerator by the denominator.  If the fraction is less than or equal to 1, then no change in fees will occur.  If the fraction is greater than 1 (a "CPI Increase"), then a Change in CPI shall have occurred in the amount of the CPI Increase.

    **C.** **FRANCHISEE** shall pay to **A CORP.** upon execution of the renewal Franchise Agreement, the Renewal Fee set forth in Section 1.11.

    **D.** Notwithstanding the foregoing, **FRANCHISEE** shall not have the right to exercise the Renewal Option unless **FRANCHISEE** has paid in full all monies then currently due to **A CORP.**, and no other default under the terms of this Agreement exists uncured.  **A CORP.** may elect to revoke the renewal option if **FRANCHISEE** shall have received 3 or more notices of default within any 12-month period during the initial term of this Agreement.

    **E.** As a condition to this renewal, **FRANCHISEE** shall be required to maintain the services that he is licensed for and to invest in the proper equipment or vehicles to provide those licensed services.

**4.3**    **NOTICE REQUIRED BY LAW**.  If applicable law requires that A **CORP.** give notice to **FRANCHISEE** prior to the expiration of the initial term, then the Franchise Agreement shall remain in effect on a month to month basis until **A CORP.** has given **FRANCHISEE** the notice required by applicable law.

## 5. INITIAL LICENSE FEE AND CONTINUING ROYALTY

**AA397**

5.1  **INITIAL FEE. FRANCHISEE**, upon execution of this Agreement, shall pay to **A CORP.** the Initial License Fee set forth in Section 1.7. **FRANCHISEE** acknowledges that the sole consideration for such fee is the grant of the franchise. Such fee shall be fully earned upon execution of this Agreement and shall not be refunded or forgiven.

5.2  **CONTINUING ROYALTY. FRANCHISEE** shall pay to **A CORP.** each month the Continuing Royalty set forth in Section 1.9, subject to a $110.00 per unit each month. **FRANCHISEE** shall also pay to **A CORP.** each month the marketing fund contribution in the amount of $15.00 per unit. The Continuing Royalty will commence thirty (30) days after the execution of the Franchise Agreement. When **A CORP.** adopts an electronic funds transfer program, all Continuing Royalty payments shall be made by electronic funds transfer, pursuant to the program established and amended from time to time by **A CORP.** Each payment shall be accompanied by the financial reports specified in Section 13.2.

## 6. FRANCHISE SYSTEM MARKETING MATERIALS FUND

6.1  **CONTRIBUTION BY FRANCHISEE. FRANCHISEE** agrees to pay to **A CORP.** the Marketing Fund Contribution set forth in Section 1.10 for the design of marketing materials. **FRANCHISEE** shall pay such Marketing Fund Contribution in the same manner specified in Section 5.2. **A CORP.** shall have the sole right to determine how to expend these funds, and shall expend all Marketing Materials funds collected. All monies collected from **FRANCHISEE** pursuant to this Section shall be placed in a separate account.

6.2  **MARKETING MATERIALS FUND REPORT. A CORP.** shall furnish to **FRANCHISEE** within 90 days of each calendar year end, a Fund financial report for the preceding year, prepared and certified to be correct by an officer of **A CORP.**, setting forth the funds collected, and the expenditures made during such calendar year.

## 7. FRANCHISEE ADVERTISING, PROMOTION AND IDENTIFICATION

7.1  **LOCAL ADVERTISING. FRANCHISEE** acknowledges that advertising and promotion represents the major source of new clientele for the **A CORP.** System franchise and a major expense of the franchise operation. **FRANCHISEE** shall formulate and effect local advertising and promotion subject to the format, content and media designations contained in the Operations Manual.

A. **FRANCHISEE** shall list itself in those telephone directories which are usually and customarily distributed in the Licensed Territory, under the appropriate headings, as designated by **A CORP.** **FRANCHISEE** shall not place advertisements or listings in telephone directories which are usually and customarily distributed only outside of the Licensed Territory. **FRANCHISEE** shall expend a minimum of 15% of the franchise's Gross Revenues on local advertising, which advertising will include yellow page listings, local newspaper advertising, marketing and sales materials and the Marketing Fund Contribution. For the purposes of this Agreement, the term "Gross Revenues" shall mean all revenues generated by **FRANCHISEE's** business conducted upon, from, or with respect to **FRANCHISEE's** franchise, whether such sales are evidenced by cash, check, credit, charge account or exchange. Gross Revenues shall include, without limitation, monies or credit received, for services, from the sale of products, from tangible property of every kind and nature, promotional or otherwise, and for other services performed by **FRANCHISEE** in

**AA398**

accordance with the Business System. Gross Revenues shall not include sales or service taxes or municipal or private disposal fees.

B.     **FRANCHISEE** understands and acknowledges that local and telephone directory advertising and internet advertising are the major sources of new clientele. At the end of the calendar year, **FRANCHISEE** must furnish proof to the **A CORP.** of all local advertising expenditures and copies of all advertisement used during that year ended. **A CORP** provides free listing of **FRANCHISEE** through **A CORP.**'s franchisor website at www.rooterman.com (the "Franchisor Website"). If **FRANCHISEE** desires to have a local optimized website to promote the System using **ACORP.**'s Trademarks, **FRANCHISEE** must use the internet advertisement services provided through the "Franchisor Website". Upon **FRANCHISEE**'s purchase of the **A CORP** System Franchise, **A CORP** shall design certain website pages linked to the Franchisor Website with **FRANCHISEE**'s information (the "**FRANCHISEE** Webpages") and shall activate the **FRANCHISEE** Webpages in a timely manner. To maintain the consistency of the brand image of **A CORP**, **FRANCHISEE** is not allowed to independently design, develop, and maintain any other locally optimized website or register any domain name using **A CORP's** trademarks including without limitation the Rooter Man trademark.

C.     **FRANCHISEE** agrees to advertise and promote actively and continuously the System and the Trademarks within the Licensed Territory. **A CORP.** reserves the right to direct **FRANCHISEE** to modify or discontinue advertisements that **A CORP.** believes to present a risk of misleading prospective customers as to the authorized services which **FRANCHISEE** can offer or to the territory in which **FRANCHISEE** can operate. **FRANCHISEE** shall promptly comply with any such directive.

7.2     **INTERTERRITORIAL ADVERTISING**. In areas (the "Region") where advertising media reach prospective clientele in more than 1 licensed territory, the franchisees operating in this Region may enter into an interterritorial advertising agreement (the "Interterritorial Agreement"). Such Interterritorial Agreements shall provide for the following:

A.     Advertising fees shall be shared by participating franchisees based upon the percentage of the Region's population that falls within each individual franchisee's Territory. The failure of **FRANCHISEE** to pay his pro rata share under an agreed-upon program shall be considered a default under this Franchise Agreement.

B.     The format, content and media designations chosen by the participating franchisees for use in the Region shall conform to those requirements specified by **A CORP.** in the Operations Manual; and

C.     **FRANCHISEE** shall indemnify **A CORP.** from and against any and all claims, demands, losses, damages (including punitive damages), costs, suits, judgments, penalties, expenses and liabilities of any kind or nature arising directly or indirectly out of or in connection with the operation of the Interterritorial Agreement.

D.     Local advertising shall be FRANCHSIEE's sole responsibility and FRANCHISEE shall not list A CORP. as a party of its local advertising agreement or as list A CORP. under any billing information.

7.3     **DISPLAY**. **FRANCHISEE** acknowledges that vehicle advertising is an important source

**AA399**

for promotion of the Trademarks and shall maintain all vehicles displaying such Trademarks in accordance with the standards established from time to time by **A CORP.** **FRANCHISEE** agrees to display prominently at all times on all of **FRANCHISEE's** vehicles such advertising and signage as shall be specified from time to time in the Operations Manual or in operating and marketing memoranda furnished by **A CORP.**

7.4 **IDENTITY AS FRANCHISEE.** **FRANCHISEE** agrees that at all times and in all advertising, promotions, signage and other display materials, on its letterheads, business forms, and in all of **FRANCHISEE's** business dealings and to the general public, **FRANCHISEE** will identify himself only as an **A CORP.** System franchisee utilizing only the Trademarks licensed by this Agreement. **FRANCHISEE** further agrees that **FRAN-CHISEE** shall not identify himself as being **A CORP.**, a subsidiary, division, partner, joint venturer, agent or employee of **A CORP.** or of any other of **A CORP.'s** franchisees.

7.5 **SALE OF FRANCHISE.** In the event that **FRANCHISEE** places advertising seeking a buyer for all or part of **FRANCHISEE's** franchise, **FRANCHISEE** shall not include nor allow use of any of the Trademarks to appear in such advertisement. **FRANCHISEE** may, however, describe the business in general generic terms. **FRANCHISEE** agrees to enforce this restriction on the activities of the **FRANCHISEE's** sales agent, broker or representative. In addition, the **FRANCHISEE** shall comply with the provisions of Section 14.2.

## 8. TRADEMARKS

8.1 **GRANT OF LICENSE.** **A CORP.** hereby grants to **FRANCHISEE** the right during the term of this Agreement to use and display the Trademarks, set forth in Section 1.8, in accordance with this Agreement and the Operations Manual. **FRANCHISEE** acknowledges that the Trademarks which have been licensed exclusively by **A CORP.** are valid, and that valuable goodwill is attached to such Trademarks. All goodwill associated with the Trademarks, including the goodwill generated by **FRANCHISEE** and all other franchisees while conducting business under the Trademarks, is and shall remain the property of **A CORP.** **FRANCHISEE** expressly agrees during the term of this Agreement and following the Agreement's expiration or termination, that **FRANCHISEE** shall not directly or indirectly contest or aid in contesting the validity or ownership of the Trademarks. **FRANCHISEE** shall not modify or use the Trademarks in any fashion, including without limitation on products, tools or supplies, unless authorized in a prior writing by **A CORP.** **FRANCHISEE** shall not file for or acquire any state, federal or international registration of the Trademarks or any trademark or service mark (or variation thereof) which is confusingly similar to the Trademarks including without limitation the Rooter Man trademark.

8.2 **NAME OF BUSINESS.** If **FRANCHISEE** operates the franchise business through a corporation, **FRANCHISEE** shall not use the Trademarks, or any similar names, in its corporate name. Upon expiration or termination of this Agreement, **A CORP.** may, if **FRANCHISEE** does not do so, execute in **FRANCHISEE's** name and on **FRANCHISEE's** behalf any and all documents necessary in **A CORP.'s** judgment to end and cause the discontinuance of **FRANCHISEE's** use of the Trademarks and **A CORP.** is hereby irrevocably appointed and designated as **FRANCHISEE's** attorney-in-fact to do so.

8.3 **NO OTHER NAMES.** **FRANCHISEE** shall not display the trademark, service mark, trade name, insignia or logotype of any other person, firm or corporation in connection with the franchise business without the express prior written consent of **A CORP.**

Rooter Man Franchise Agreement.2019                7

**AA400**

8.4    **CHANGE OF THE TRADEMARKS**.  If it appears to **A CORP.** that any of the names or marks are no longer viable commercially or legally, **A CORP.** has the right to change any of its names or marks to others of similar marketing impact.  In such event, **FRANCHISEE** agrees to cooperate with **A CORP.** in changing all signs, graphics, and supplies, including those painted onto **FRANCHISEE**'s vehicles.  **FRANCHISEE** agrees to assume all reasonable costs connected with such changes, and to effectuate such changes within the reasonable time frame established by **A CORP.**

**8.5    TRADEMARK PROSECUTION**

   A.    In the event that **FRANCHISEE** shall learn that a third party, who not a licensee of **A CORP,** is using **A CORP's** Trademarks or any variation, **FRANCHISEE** shall promptly notify **A CORP** of the facts relating to infringing use.

   B.    With **A CORP's** permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE**'s interest in the Trademark.  In the event that the **FRANCHISEE** chooses to bring action, and **A CORP,** in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE's** Territory.

**9.  TRAINING AND OPERATING ASSISTANCE**

   9.1    **INITIAL TRAINING PROGRAM**.  **A CORP** shall furnish, and **FRANCHISEE** shall complete to **A CORP's** satisfaction, in its sole discretion exercised in good faith, **A CORP's** training program on the operation of the **A CORP** System franchise.

   A.    **THE PROGRAM.**    Such training shall consist of 2 days of instruction at **A CORP's** headquarters or at such place or places designated by **A CORP**.    Participation of **FRANCHISEE** in the training program shall be required unless participation is waived by **A Corp** as specified in Section 9.1C below.  If **A CORP** determines that **FRANCHISEE** requires additional training, the **FRANCHISEE** shall attend such additional program at **FRANCHISEE's** own expense.

   B.    **EXPENSES. FRANCHISEE's** shall be solely responsible for **FRANCHISEE's** own travel, living expenses and salary during the training period.

   C.    **WAIVER.**    **FRANCHISEE's** participation in the **A CORP** training program, as described in Section 9.1A, may be waived by **A CORP** if **A CORP** determines in its sole discretion that **FRANCHISEE** has sufficient prior business experience to excuse him from participation in **A CORP's** training program.

   9.2    **STAFF TRAINING.**    **FRANCHISEE** shall implement a training program for his other employees, in accordance with the training standards and procedures prescribed by **A CORP.** **FRANCHISEE** shall employ at all times during the term of this Agreement only employees so trained to offer the franchised services.  **FRANCHISEE** alone shall assume all expenses associated with staff training.

   9.3    **ADDITIONAL ASSISTANCE.**    **A CORP** shall furnish **FRANCHISEE** with the

**AA401**

following additional operating assistance.

A.  **OPERATIONS MANUAL.**    A **CORP** will provide a copy of its Operations Manual (as defined in Section 12.1), which at all times will remain the property of **A CORP**, for use by **FRANCHISEE** in the operation of the **A CORP's** System franchise.

B.  **GRAND OPENING PROMOTIONAL PROGRAM.**    A **CORP** shall consult with **FRANCHISEE** concerning a grand opening promotional program, which program shall be conducted by **FRANCHISEE** at his or her sole cost and expense.

C.  **ADVERTISING MATERIALS.**    A **CORP** may, from time to time, at its discretion, develop and provide **FRANCHISEE** with the art work for advertising materials to be used by **FRANCHISEE** in the promotion of **FRANCHISEE's A CORP** System franchise.

D.  **SEMINARS.**    A **CORP** may from time to time, at its sole discretion, conduct refresher training seminars for the purpose of informing franchisee's of new developments and improvements in the Business System relating to various aspects of the franchise operations, including new product lines and profit centers, new marketing techniques, and revised operational and management standards and techniques. Unless otherwise approve in writing by **A CORP,** **A CORP** shall have the right to require **FRANCHISEE** to attend at least 1 such seminar or a regional meeting during each year of this Agreement. There shall be no additional charge for such seminars or meetings, but all travel and living costs incurred by **FRANCHISEE** shall be borne by **FRANCHISEE.**

E.  **ON-GOING ASSISTANCE AND SUPERVISION.**    A **CORP** shall furnish to **FRANCHISEE** from time to time such operating assistance and training, as is, in **A CORP's** sole discretion, reasonably necessary. Operating assistance and training may include, by way of illustration, advice and guidance with respect to modifications or additions in the Business System, new marketing programs, the establishment of administrative, bookkeeping, accounting and general operating procedures, and such other advice as shall reasonably pertain to the operation of the franchise. **A CORP** retains the right to license additional services and programs which **FRANCHISEE** might offer to its customers.

F.  **INITIAL SALES ASSISTANCE.**    Upon **FRANCHISEE's** written request and **A CORP's** consent,    A **CORP** shall furnish, for not less than 2 days during the first weeks of **FRANCHISEE's** operations, a representative to train and assist **FRANCHISEE** and his sales staff by calling on prospective customers within the Territory. **A CORP** shall require a reasonable fee for providing such initial sales assistance. Such fee shall include, without limitation, all expenses incurred by **A CORP** in providing initial sales assistance.

G.  **A CORP** presently offers products through **A CORP's** affiliate, **Rooter-Man Corp.,** which is a supplier and distributor of various tools and supplies needed in the operation of a **Rooter-Man** franchise. These tools and supplies consist of drain cleaning machines, cables, cutters, various hand tools, drain cleaning products, logo patches, truck decals, and other such items. **FRANCHISEES** are not required to purchase these or any items from the **Rooter-Man Corp.** nor is **A CORP** or the **Rooter-Man Corp.** required to continue supplying, selling or distributing these or any items.

10.  **FRANCHISE OFFICE LOCATION.**    Since the location of **FRANCHISEE's** office is not an important aspect of the operation of the **A CORP** System franchise, **FRANCHISEE** shall only be

**AA402**

obligated to secure an adequate facility to house **FRANCHISEE's** vehicles, equipment and supplies. Such facility must be located within the Territory and such facility shall comply with all local, state and federal regulations as well as A CORP's Operations Manual. Specifically, but without limitation, such facility shall be maintained by **FRANCHISEE** in strict compliance with all local, state and federal regulations pertaining to the storage of hazardous and non-hazardous chemicals.

## 11. VEHICLES, EQUIPMENT AND UNIFORMS

**11.1** **VEHICLES**. Prior to the commencement of business by **FRANCHISEE**, **FRANCHISEE** shall purchase or lease the number and variety of vehicles to be used in the operation of the **A CORP.** System franchise as reasonably prescribed by **A CORP.** All vehicles must meet **A CORP.**'s requirements for appearance, color and other appropriate specifications and must be fully equipped as required by the Operations Manual. **FRANCHISEE** expressly agrees to display all Trademarks required by **A CORP.** on such vehicles. All vehicles must be maintained in sound physical condition and the appearance of such vehicles must be well maintained at all times in order to uphold the integrity of the Trademarks. **FRANCHISEE** shall promptly, upon request, provide **A CORP.** with photographs, copies of invoices and other evidence satisfactory to **A CORP.**, confirming that such vehicles conform to **A CORP.**'s specifications.

**11.2** **EQUIPMENT**. Prior to the commencement of the business, **FRANCHISEE** shall at its sole cost and expense lease or purchase, all of the tools, equipment, uniforms, drain cleaning products, supplies, computer equipment, software, forms and other equipment and materials recommended by **A CORP.**, but purchased from suppliers of **FRANCHISEE**'s choice.

**11.3** **UNIFORMS**. In order to present a neat and clean appearance while performing the services of the **A CORP.** System franchise, **FRANCHISEE** and each employee of **FRANCHISEE** shall wear a uniform approved by **A CORP.**

## 12. OPERATION OF THE FRANCHISE

**12.1** **OPERATIONS MANUAL**. **FRANCHISEE** acknowledges that nationwide uniform standards of service are vital to the protection of the **A CORP.** System and the Trademarks, and are necessary to ensure that the public receives the quality of service associated with the **A CORP.** System and the Trademarks. **FRANCHISEE** therefore agrees that in order to protect the reputation and the goodwill associated with the Trademarks, and to maintain the uniform standards of operation by all **A CORP.** System franchisees, **FRANCHISEE** shall conduct the franchise in strict accordance with **A CORP.**'s proprietary Operations Manual (the "Operations Manual").

**A. INCORPORATION OF OPERATIONS MANUAL.** The Operations Manual is intended to further the purposes of this Agreement, and is specifically incorporated into this Agreement.

**B. CONFIDENTIALITY OF OPERATIONS MANUAL.** **FRANCHISEE** shall at all times treat as confidential and shall not at any time disclose, copy, duplicate, record or otherwise reproduce in whole or in part, or otherwise make available to an unauthorized person or persons, the contents of the Operations Manual. The Operations Manual, including all new updated and old superseded pages, shall at all times remain the sole property of **A CORP.** **A CORP.** shall amend and update the Operations Manual and shall provide such updated

**AA403**

version to **FRANCHISEE** at no cost to **FRANCHISEE**. **FRANCHISEE** agrees to insert all new pages immediately in their proper places and to remove completely the superseded pages at the same time for return to **A CORP. FRANCHISEE** shall promptly return the Operations Manual upon the expiration or other termination of this Agreement.

C. **MODIFICATIONS. FRANCHISEE** recognizes and agrees that **A CORP.** may from time to time change or modify its standards of operation, including the adoption of new procedures and programs, as outlined in the Operations Manual. **FRANCHISEE** shall accept and conform to such changes or modifications, and shall make all reasonable expenditures necessitated by the changes or modifications, within the time periods reasonably established by **A CORP.**

12.2 **HOURS OF OPERATION**. **FRANCHISEE** shall provide prompt and courteous service at all times during normal working hours and shall provide emergency service that will adequately meet the needs of customers for such service within the Licensed Territory. During customary business hours, **FRANCHISEE** agrees to have its telephone(s) answered by a trained employee. **FRANCHISEE** agrees to use a telephone answering service only after customary business hours.

12.3 **RESOLUTION OF CUSTOMER PROBLEMS**. **FRANCHISEE** and his employees shall provide prompt, competent and courteous service to customers. **FRANCHISEE** shall respond to any dissatisfied customers within 24 hours after the complaint is received, whenever possible.

12.4 **DRAIN CLEANING PRODUCTS AND OTHER SUPPLIES**. **FRANCHISEE** shall utilize only those drain cleaning products and other supplies, including forms, authorized by **A CORP.**

12.5 **FRANCHISEE MANAGEMENT**. **FRANCHISEE** shall at all times during the term of this Agreement operate the **A CORP.** System franchise on a full-time basis or employ on a full-time basis at least one trained individual. **FRANCHISEE** or such individual shall devote his entire time during normal business hours, as defined in the Operations Manual, to the management, operation and development of **FRANCHISEE's A CORP.** System franchise. The individual managing the franchise shall not engage in any other business or investment requiring active participation during normal business hours. **A CORP.** has entered into this Agreement in reliance upon the representation of **FRANCHISEE** that during the term of the Agreement, the individuals named in Section 1.14 will be the owners who are in active, full-time charge of **FRANCHISEE's** franchise and who are responsible for adhering to the terms of this Agreement.

12.6 **INSURANCE**. It is understood and agreed that the protection of the goodwill of the **A CORP.** system, Trademarks and the financial security of both **FRANCHISEE** and **A CORP.** requires the existence of public liability insurance coverage for **FRANCHISEE**. **FRANCHISEE** shall procure and maintain in full force and effect Commercial General Liability insurance coverage (including premises/operations coverage, product liability coverage, completed operations coverage and contractual liability coverage) and comprehensive motor vehicle liability insurance coverage (including hired and non-owned motor vehicle coverage) in the name of **FRANCHISEE**, with **A CORP.** named as an additional insured, at **FRANCHISEE's** sole cost and expense. The insurance coverage shall be in the following minimum amounts:

**AA404**

| 1. Bodily Injury | $1,000,000.00 | Each person |
| | $1,000,000.00 | Each occurrence |
| 2. Property damage | $500,000.00 | Each occurrence |
| 3. Workers' Compensation coverage | | As required by law |

As an alternative to the foregoing, **FRANCHISEE** may obtain a single limit policy in the amount of no less than $1,000,000.00.

**A. NOTICE.** All insurance purchased by **FRANCHISEE** shall provide that **A CORP.** be given at least 30 days prior written notice of any termination, amendment, cancellation or modification. **FRANCHISEE** shall promptly provide **A CORP.** with certificates of insurance evidencing such coverage no later than 14 days prior to the date that **FRANCHISEE** shall be open for business to the public, as well as annual certificates throughout the term of the franchise evidencing continuing coverage.

**B. INSURANCE AND STEP-IN-RIGHTS.** If **FRANCHISEE** fails or refuses to purchase insurance conforming to the standards and limits prescribed in Section 12.5, **FRANCHISEE** shall be in default of this Agreement as set forth in Section 15.2A and E.

**12.7 BOOKEEPING STANDARDS. FRANCHISEE,** all financial statements prepared by or for **FRANCHISEE,** and all reports submitted by **FRANCHISEE** shall conform to the current standards and requirements as described in the Operations Manual. All such bookkeeping and accounting records and financial statements, for such periods as may from time to time be prescribed in the Operations Manual, shall be made available for inspection by **A CORP.** during normal business hours.

**12.8 FRANCHISOR INSPECTION. A CORP.** shall have the right from time to time, and without prior notice to **FRANCHISEE** to send representatives to **FRANCHISEE'S** office in order to inspect **FRANCHISEE's** operations and records and to determine the faithfulness of **FRANCHISEE's** compliance with the provisions of this Agreement and the Operations Manual.

**12.9 COMPLIANCE WITH LAW. FRANCHISEE** shall operate his **A CORP.** System franchise in strict compliance with applicable laws, rules and regulations of all governmental authorities. **FRANCHISEE** shall comply with all applicable laws and regulations of the federal, state or local governments, and shall prepare and file all necessary tax returns, and pay promptly all taxes imposed upon **FRANCHISEE** and upon **FRANCHISEE's** franchised business. **FRANCHISEE** may be required to be licensed for some or all of the components of the **A CORP.** System and is solely responsible for securing and maintaining such licenses

**12.10 NO SUGGESTED SERVICE FEES. FRANCHISEE** acknowledges that any and all service fees included in the Operations Manual or other operating memoranda, are intended by **A CORP.** to be illustrative only and are not intended to be suggestive of fees to be charged by **FRANCHISEE** for particular services. **FRANCHISEE** further acknowledges that **A CORP.** does not set or enforce a fee schedule of any type. **FRANCHISEE,** in its sole discretion, shall determine the fees to be charged for licensed services performed under the **A CORP.** System.

**12.11 FRANCHISEE TELEPHONE SERVICE AND DIRECTORY LISTINGS. FRANCHISEE** shall at its sole expense maintain telephone service for the franchise and

**AA405**

shall have all of **FRANCHISEE**'s telephone numbers continuously listed and advertised in those "white pages" and "yellow page" directories which are usually and customarily distributed within the Licensed Territory, as **A CORP.** may designate or approve. All such listings shall be in the manner, style and type size and shall contain all other characteristics as **A CORP.** may designate in the Operations Manual or in operating memoranda. In all advertising placed by **FRANCHISEE** in which such listed numbers appear, there shall not appear any other telephone numbers subscribed for by **FRANCHISEE** for personal use or for the conduct of any other business. **FRANCHISEE** shall not, without **A CORP.**'s express written consent, cause or allow itself to be listed in any directories outside of the Territory. **A CORP.** shall have the right to recommend the type of telephone service, the number of telephone lines, and all matters related to the telephone service for the franchise, and **FRANCHISEE** shall promptly comply with all specifications and directives of **A CORP.** as established or modified from time to time. **FRANCHISEE** hereby irrevocably appoints **A CORP.** as its Attorney-in-Fact to assign all such telephone numbers to **A CORP.** and expressly authorizes the applicable telephone company to make such assignment upon termination or expiration of this Franchise Agreement. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

## 13. RECORDS.

13.1 **SALES RECORDS AND TAX RETURNS. FRANCHISEE** shall record all sales and shall keep and maintain accurate records. **FRANCHISEE** shall provide **A CORP.** annually with copies of federal, state and local (if applicable) income tax returns.

13.2 **PERIODIC REPORTS.** In order to assist and advise **FRANCHISEE** with respect to the operation of his business, **A CORP.** shall, at its sole discretion, require **FRANCHISEE** to furnish **A CORP.** within 15 days after the expiration of each calendar month with a profit and loss statement of the Franchise for the preceding calendar month. All such financial statements shall be prepared in accordance with the format established by **A CORP.** in the Operations Manual, and shall be certified by **FRANCHISEE** or in the case of a corporate **FRANCHISEE**, by **FRANCHISEE**'s chief executive officer or chief financial officer, as being true and correct and as being prepared in accordance with generally accepted accounting principles consistently applied from applicable period to period. In addition, within 90 days after the end of each calendar year, **FRANCHISEE** shall furnish **A CORP.** with an annual balance sheet, profit and loss statement and statement of changes in financial position, which have been certified as correct by **FRANCHISEE** and which have been prepared by an independent accountant. **A CORP.** agrees to maintain in confidence **FRANCHISEE**'s financial information and shall not disclose **FRANCHISEE**'s identity in connection with **FRANCHISEE**'s financial information.

13.3 **ADDITIONAL RECORDING SYSTEMS. FRANCHISEE** agrees to furnish to **A CORP.** all other information pertaining to the franchised business and clientele through the system developed by **A CORP.** or as **A CORP.** may, from time to time, specify in the Operations Manual. **A CORP.** shall be granted full and complete access to all records and information created by such system, including without limitation, by direct telephone, the Internet or other data communications links.

13.4 **INSPECTION AND AUDIT. FRANCHISEE** shall keep and preserve for 5 years all business records, including ledgers, credit card statements and other tax returns, bank statements, duplicate deposit slips and other evidence of gross revenues and business transactions for each such year. **A CORP.** shall have the right at any time during regular

**AA406**

business hours to enter **FRANCHISEE's** premises to inspect, audit and make copies of any books of accounts, bank statements, documents, records, tax returns, papers and files of **FRANCHISEE** relating to gross revenues and business transactions. Upon the request by **A CORP.**, **FRANCHISEE** shall make any such material available for inspection at **FRANCHISEE's** premises and **FRANCHISEE** shall allow **A CORP.** and its representatives to remove temporarily **FRANCHISEE's** records solely for copying, review and/or audit purposes. If **A CORP.** determines that there has been an underpayment of fees by **FRANCHISEE, FRANCHISEE** shall pay the amount of understatement plus interest at the rate of 18% per annum and the cost of the audit.

## 14. ASSIGNMENT AND RIGHT OF FIRST REFUSAL

**14.1    ASSIGNMENT BY A CORP.**    **A CORP.** may freely transfer or assign its rights and obligations under this Agreement to any person, corporation or other entity. Such transfer or assignment shall be binding upon and inure to the benefit of **A CORP.**, its successors and assigns.

**14.2    ASSIGNMENT BY FRANCHISEE.**    **FRANCHISEE** acknowledges that the rights provided for in this Agreement are personal to **FRANCHISEE** and that this franchise has been granted by **A CORP.** in reliance upon the particular skills, knowledge and business ability of **FRANCHISEE**. **FRANCHISEE** agrees that he shall not sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in the assets of the franchise or **FRANCHISEE** collectively referred to herein as a "transfer" except as permitted herein. Any sale, assignment, transfer or encumbrance of this Agreement, of any of the rights granted under this Agreement, or in the ownership of the **FRANCHISE**, which is not in accordance with the terms and conditions provided in this Section 14.2 shall constitute a breach of this Agreement and shall permit **A CORP.** to terminate this Agreement immediately as provided for in Section 15.1 of this Agreement.

**A. PERMITTED TRANSFERS.**    **A CORP.** shall not unreasonably withhold its consent to a Transfer of any interest of **FRANCHISEE** or the franchise, but shall, as a condition precedent to such consent, require that:

**1.** **FRANCHISEE** first offers to sell such interest to **A CORP.** at the same price and on the same terms and conditions as it proposes to sell such interest to a third party. **FRANCHISEE** shall furnish a signed and notarized copy of the third party's offer to purchase. **A CORP.** shall have 30 days after receipt of such bona fide offer in which to exercise its right of first refusal. The failure by **A CORP.** to exercise its option shall in no way be construed to affect **A CORP.**'s decision to approve a proposed transferee. If **A CORP.** fails to exercise its option and the Franchise is not subsequently sold to the proposed transferee for any reason, **A CORP.** shall continue to have, upon the same conditions, a first option to purchase the Franchise upon the terms and conditions of a subsequent offer.    **A CORP.** shall have 30 additional days following **A CORP.**'s rejection of its right of first refusal to review the Transfer, based upon the qualifications set forth in Section 14.2A (4).

**2.** All monetary obligations of **FRANCHISEE** to **A CORP.** as of the proposed date of the Transfer have been or will be paid as of such date.

**3.** By the closing date for said transfer, **FRANCHISEE** shall have executed a general

**AA407**

release under seal, in a form satisfactory to **A CORP.**, of all claims against **A CORP.**, its stockholders, directors, officers, employees and assigns.

4. The transferee, in the reasonable judgment of **A CORP.**, has the financial resources, relevant work experience, character and ability to conduct successfully the business of the Franchise. The transferee shall fully disclose its financial position and obligations and other background information prior to any such Transfer.

5. The transferee shall execute **A CORP.**'s then current Franchise Agreement and related documents to govern the remaining term of the Franchise, including a copy of the Guaranty to this Agreement executed by each shareholder of the transferee, if the transferee is a corporation.

6. **FRANCHISEE** shall pay to **A CORP.** the Transfer Fee as set forth in Section 1.12; unless the transfer is to an immediate family member of **FRANCHISEE** (i.e., spouse, children or parents only); and

7. The transferee shall complete **A CORP.**'s training programs in the manner then required of new franchisees, and shall pay **A CORP.** the then required fee, unless **A CORP.** shall waive **FRANCHISEE's** participation in the training program as specified in Section 9.1C.

B. **TRANSFER UPON DEATH OR PERMANENT INCAPACITY.** Immediately upon the death or permanent incapacity of **FRANCHISEE** or if **FRANCHISEE** is a corporation, upon its dissolution or upon the death of any person with a substantial or controlling interest in the Franchise, if requested by **FRANCHISEE**'s heirs, **A CORP.** or its agent, at its sole discretion shall be entitled to assume the operation of the Franchise in accordance with Section 17. As soon as possible thereafter, and in any event within a reasonable time, the executor, administrator, trustee or other representative of such person or entity shall transfer such interest to the heirs or beneficiaries or to a third party in accordance with Section 14.2 A above. **A CORP.**'s right to assume the operation of the Franchise shall continue until the Franchise has been transferred to an accepted transferee as provided in Section 14.2. **FRAN-CHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this subsection, including reasonable attorney's fees, and **A CORP.** shall receive the Transfer Fee (as specified in Section 1.12). However, if a franchise is transferred to a party who is a member of **Franchisee**'s immediate family, (i.e., spouse, children or parents only) who will continue the operation of the franchise under the terms of this Agreement, then no transfer fee shall be required. Permanent incapacity shall mean that **FRANCHISEE** cannot perform his duties under this Agreement for a period of 6 months or longer.

C. **TRANSFER TO FRANCHISEE'S CORPORATION.** If the proposed Transfer is to a corporation at least 75% percent of the stock of which is owned by **FRANCHISEE**, then **A CORP.** shall approve such Transfer provided that the transferee corporation meets the following requirements:

1. The Corporate charter and by-laws shall provide that its activities are limited to the operation of the Franchise. Copies of the charter, by-laws, any other agreements affecting stockholder rights, such as stock restriction agreements, and resolutions authorizing execution of this Agreement shall be delivered to **A CORP.** prior to execution of this Agreement, or when otherwise requested in writing by **A CORP.**

**AA408**

2. The ownership of the stock of such corporation shall be disclosed in writing prior to the execution of this Agreement and the charter and by-laws shall reflect that no stock shall be sold, transferred, pledged or otherwise similarly affected without compliance with this Agreement.

3. Each stock certificate shall bear the following legend: "THE TRANSFER OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN FRANCHISE AGREEMENT BETWEEN THE CORPORATION AND **A CORP.** REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND TO RESTRICTIVE PROVISIONS IN THE CHARTER OF THIS CORPORA TION."

4. The principal stockholders of **FRANCHISEE**, as determined by **A CORP.**, shall personally guarantee the payment and performance of all obligations of **FRANCHISEE** under this Agreement, and shall execute such documents as **A CORP.** may reasonably require to reflect such guaranty; and

5. In addition, **FRANCHISEE** must serve as the principal executive officer of the transferee corporation, all other shareholders of the transferee must meet the requirements of **A CORP.** and the transferee corporation must execute a new Franchise Agreement for the duration of the term, using **A CORP.**'s then current agreement. All acts and the delivery of all documents shall take place before the Transfer. Transfer to **A CORPORATION** shall be approved in a prior writing by **A CORP. FRANCHISEE** shall reimburse **A CORP.** for **A CORP.**'s reasonable expenses in connection with this section, including reasonable attorney's fees.

D. **NON-WAIVER OF CLAIMS. A CORP.**'s consent to a transfer of any interest in the Franchise granted herein shall not constitute a waiver of any claims that it may have against **FRANCHISEE** or against any guarantor of this Agreement.

## 15. DEFAULT AND TERMINATION

15.1 **IMMEDIATE TERMINATION. FRANCHISEE** acknowledges that the occurrence of one or more of the following events would cause harm to the franchise system and thereby lessen its value. **FRANCHISEE** agrees that **A CORP.** shall have the right upon the occurrence of one of the following events to terminate this Agreement immediately upon notice:

A. If **FRANCHISEE** becomes insolvent or surrenders substantial control of the franchised business or a major portion of its assets by virtue of a voluntary or involuntary proceeding in bankruptcy or receivership, or by assignment for the benefit of creditors, or in the event of a similar circumstance or legal process, and such proceeding is not terminated within 30 days;

B. If **FRANCHISEE** attempts to sell, assign, transfer, give, mortgage, pledge or otherwise encumber any interest in, or substantially all of the assets of the Franchise or FRANCHISEE except as permitted by Section 14.2;

C. If **FRANCHISEE** shall violate any provision of the Non-Competition Covenant contained in Section 18. 1;

**AA409**

**D. If FRANCHISEE** shall violate any provision of the Non-Disclosure Covenant contained in Section 18.2;

**E. If FRANCHISEE** makes any material misrepresentations relating to the acquisition of the Franchised Business;

**F. If FRANCHISEE** is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that A CORP. believes is reasonably likely to have an adverse effect upon the Franchise, the Trademarks and their associated goodwill, or the A CORP. System; or

**G. If FRANCHISEE** fails, for a period of 30 days after having received notification of noncompliance from A CORP. or any governmental or quasi -governmental agency or authority, to comply with any Federal, State or Local law or regulation applicable to the operation of the Franchised Business.

**15.2    TERMINATION WITH NOTICE. FRANCHISEE** acknowledges that the occurrence of one or more of the events specified in this Section 15.2 would cause harm to the franchise system and thereby lessen its value. Therefore, **FRANCHISEE** agrees that **A CORP.**, in addition to all other remedies at law or in equity, may terminate this Agreement if **FRANCHISEE** shall become in default of any provision of this Section 15.2 or any other provision of this Agreement, and if **FRANCHISEE** shall not cure such default within 30 calendar days for nonpayment of monies, or for other defaults after receipt of a written notice to cure from **A CORP.**, or for a longer period if so mandated by the laws of the state in which **FRANCHISEE** operates. In the event **FRANCHISEE** is in default of this Agreement within 12 months after a prior default (even if cured), and **A CORP.** has served **FRANCHISEE** with a Notice to Cure with respect to such prior default, upon notice, **A CORP.** may terminate this Agreement upon the occurrence of such subsequent default. **A CORP.** need not allow **FRANCHISEE** the opportunity to cure such subsequent default. In addition to the foregoing, **A CORP.** may, at its option, exercise its Step-In-Rights (as specified in Section 17) in the event of any default contained in this Section 15.2.

**FRANCHISEE** shall become in default under this Agreement:

**A.    If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to **A CORP.** on the date due;

**B.    If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other Franchisees under any Interterritorial Agreement (as specified in Section 7.2) on the date due;

**C.    If FRANCHISEE** fails, refuses or neglects to pay promptly all monies owing to other creditors on the date due;

**D.    If FRANCHISEE** fails to submit reports or financial data which **A CORP.** requires under this Agreement, including but not limited to those specified in Section 13;

**E.    If FRANCHISEE** fails to obtain and maintain in effect the minimum insurance requirements specified in Section 12.6;

**F.    **Upon the closing of **FRANCHISEE's** operations for a period of 10 or more

**AA410**

consecutive days without the prior written approval of **A CORP.**;

    **G.**    If **FRANCHISEE** fails to submit to binding arbitration of disputes as specified in Section 19.7;

    **H.**    If **FRANCHISEE** changes any aspect of the **A CORP.** system or offers any service or product which has not been approved in a prior writing by **A CORP.**;

    **I.**    **IF FRANCHISEE** fails to diligently, faithfully and in a business like manor, promote, market and conduct the Franchised Business within the Territory as specified in Section 3. 1B; or

    **J.**    If **FRANCHISEE** fails to comply with any of the duties imposed by this Agreement, the Operations Manual or other operations memoranda issued by **A CORP.** including, without limitation, the failure to cure an operational problem.

**15.3**    **CONFORMITY WITH LAW.** Notwithstanding anything to the contrary contained in this Section, in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Franchise and the parties shall limit A CORP.'s rights of termination or shall require longer notice periods than those set forth above, this Agreement shall be deemed amended to conform to the minimum notice periods required by such laws and regulations. **A CORP.** shall not, however, be precluded from contesting the validity, enforceability or application of such laws or regulations in any action, hearing or dispute relating to this Agreement or its termination.

    **A.**    **FRANCHISEE**  Shall be solely responsible for the conduct of its business and for compliance with all the laws, statutes, ordinances, orders or codes of any public or governmental authority pertaining to **FRANCHISEE** and its business operated pursuant hereto and for the payment of all taxes, permits, licenses and registration fees and other charges or assessments arising out of the establishment and operation of **FRANCHISEE'S** business.

**15.4**    **CROSS DEFAULT.** If **FRANCHISEE** shall be in default of any other agreement between **A CORP.** or its affiliated companies including, without limitation, any Promissory Note, then **FRANCHISEE** shall be deemed in default of this Agreement.

**15.5**    **FRANCHISEE TERMINATION OPTION. FRANCHISEE** shall have the option to terminate this Agreement, only during the initial five (5) year term, subject to adherence to the following terms and conditions:

    **A.**    **FRANCHISEE** shall notify **A CORP.** in writing of his intent to terminate the Agreement no later than 90 days prior to the closing date for placement of advertisements in the yellow page book or books distributed in **FRANCHISEE**'s Territory. If **FRANCHISEE** fails to notify **A CORP.** on or before such 90 day period commences, then **A CORP.** shall exercise its right pursuant to the Power of Attorney, Exhibit B, to retain all of **FRANCHISEE**'s operating telephone numbers.

    **B.**    **FRANCHISEE** shall pay in full all outstanding monies due to **A CORP.**, and shall as well pay a one-time Franchisee Termination Fee as specified in Section 1. 14 herein.

    **C.**    **FRANCHISEE** shall de-identify all aspects of **FRANCHISEE**'s business operation,

**AA411**

including without limitation all forms of advertisements, all vehicle displays, and all invoices, business cards and forms, and shall choose a trade name or trade names which shall not be confusingly similar to **A CORP's** Trademarks or which might give the general public the impression that **FRANCHISEE** is continuing to operate under the **A CORP.** System. **FRANCHISEE** shall further comply with the terms of Section 16 below.

**D.** Provided **FRANCHISEE** performs all of the foregoing obligations, **A CORP.** shall agree to waive its rights to enforce the non-competition covenant contained in Section 18.1 and its rights to enforce the Power of Attorney. If **FRANCHISEE** however, fails to perform any of the foregoing obligations or if **FRANCHISEE** attempts to utilize any aspect of **A CORP.**'s Trademarks or System, then **A CORP.** shall retain all rights of enforcement under Section 18.1.

## 16. RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon termination or expiration of this Agreement, **FRANCHISEE** shall within 30 calendar days:
**A.** Pay all Continuing Royalty Fees, Advertising Contributions and all other charges or debts owed to **A CORP.**, including the balance due on financing or other extension of credit granted or given by **A CORP** to **FRANCHISEE.**

**B.** Cease to hold himself or herself out as an **A CORP.** System franchise, cease the use of the Trademarks, logos, designs, materials, methods, promotional materials whether or not furnished by **A CORP.** and all other advertising, including without limitation, all forms of telephone directory advertising, and remove all signs, and Trademarks, in whatever form, from the location of the **A CORP.** office licensed by this Agreement and from all vehicles. FRANCHISEE shall contact the internet service provider or website, which provide internet advertisement services, and request the change or deletion of the Trademarks, logos, and designs from the internet advertisement, listings, or domains and, within 60 days, work to ensure that the change or deletion is completed.

**C.** Return to **A CORP.** all manuals and printed materials belonging to **A CORP.** or bearing the Trademarks.

**D.** Except with respect to termination under Section 15.5, at the option of **A CORP., FRANCHISEE** shall:

1. Remove all equipment, furnishings and printed materials from the office premises; or
2. Sell such equipment, furnishings and printed materials to **A CORP.** at their then current fair market value, as determined by **A CORP.** In no event shall **A CORP.** be liable for payment to **FRANCHISEE** for intangibles including, without limitation, goodwill;
3. Assign to **A CORP.** the lease for the franchised premises; and
4. Execute such documents as **A CORP.** may reasonably require to effectuate termination of the Franchise and **FRANCHISEE**'s rights to use the Trademarks and the **A CORP.** System including, without limitation, release documents.

**A CORP.** retains the right to enforce the Power of Attorney executed in conjunction with this agreement.

## 17. STEP-IN-RIGHTS

**AA412**

17.1 **CAUSE FOR STEP-IN.** A **CORP.**, at its sole discretion, may exercise the following Step-In Rights in order to prevent an interruption of the Franchised Business which would cause harm to the franchise system and thereby lessen its value. In the event of **FRANCHISEE's** default (as specified in Section 15 herein) or in the event of the death or permanent incapacity of **FRANCHISEE** (as specified in Section 14.2 B), **FRANCHISEE** authorizes **A CORP.** to operate his franchise for as long as **A CORP.** shall deem necessary and practical or upon transfer to an approved franchisee under Section 14.2. Such Step-In Rights shall be exercised without waiver of any other rights or remedies which **A CORP.** may have under this Agreement.

17.2 **DUTIES OF PARTIES.** A **CORP.** shall keep in a separate account all monies generated by the operation of **FRANCHISEE's** business by **A CORP.**'s representatives. **A CORP.** shall deduct all expenses of the business, including reasonable compensation and expenses for **A CORP.**'s representatives from this separate account. **FRANCHISEE** agrees to indemnify **A CORP.** as specified in Section 19.9.

## 18. NON-COMPETITION AND NON-DISCLOSURE COVENANTS

18.1 **NON-COMPETITION.** **FRANCHISEE** agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, neither **FRANCHISEE** nor any of his family members or its officers, directors, other key personnel, employees or stockholders, if applicable, shall directly or indirectly engage in, hold any interest in, or be involved in any way with any of the services comprising the **A CORP.** System. Such obligation shall apply within the Territory, within 100 miles of the Territory or within 100 miles of any territory covered by another **FRANCHISEE** of **A CORP.** or operated by **A CORP.**'s affiliates. **FRANCHISEE** further agrees that from the date hereof until 3 years following the termination of the Franchise for whatever reason and expiration, **FRANCHISEE** and the persons covered by this section shall not attempt to solicit for employment any person who is, at the time of such solicitation, employed by **A CORP.** or any other franchisee of **A CORP.**, nor induce any such person to leave his or her employment. **FRANCHISEE** agrees that as a condition of his affiliation with **A CORP.**, its key personnel and stockholders, if applicable, shall execute covenants not to compete embodying these terms on forms provided by **A CORP.** **FRANCHISEE** acknowledges that such prohibitions are necessary to protect **A CORP.**'s trade secrets and to otherwise insure the integrity of the **A CORP.** System and the rights of **A CORP.**'s other franchisees. The amounts of time and distance set forth above may be deemed to be divisible into units of one month and one mile and may be reduced should a court find them to be unreasonable. A **CORP.**, in addition to such other rights it may have, shall have the right to injunctive relief to enforce its rights pursuant to this provision. The violation of this provision during the term of the Agreement shall result in the automatic termination of the franchise as specified in Section 15.1.

18.2 **NON-DISCLOSURE. FRANCHISEE** acknowledges that disclosure of any aspect of the System or duplication or disclosure of this Agreement, or the Operations Manual could substantially harm **A CORP., FRANCHISEE** and other franchisees of **A CORP. FRANCHISEE** agrees that at no time during or after the term of this Agreement or early termination for whatever reason will he or she disclose, either orally or in writing or by any other medium, or duplicate or in any way make available the contents of the Operations Manual, this Agreement, any other documents, videotapes, materials, or any trade secrets, formulas or other aspects of the System to any person, corporation or other entity other than

**AA413**

FRANCHISEE attorneys, accountants or similar parties. Such persons may have access to such materials only to the extent necessary for the transaction of business by FRANCHISEE. No such person shall be permitted to retain any software, materials or copies of or notes concerning any such materials. All of the foregoing shall be returned to A CORP. immediately upon termination or expiration of this Agreement. The prohibition of this section applies equally to all stockholders, directors, officers, and employees of FRANCHISEE. A CORP. shall have the right to injunctive relief to enforce the provisions of this Section. The violation of this provision during the term of the Agreement shall result in the automatic termination of the Franchise, as specified in Section 15. 1.

## 19. GENERAL CONDITIONS AND PROVISIONS

**19.1** **TITLES FOR CONVENIENCE.** Section and paragraph titles used in this Agreement are for convenience only and are not deemed a part of the text.

**19.2** **ENTIRE AGREEMENT.** This Agreement, including appendices and attachments, constitutes the entire agreement of the parties (and into which all prior negotiations, commitments, representations and undertakings of the parties with respect to the subject matter are merged) and except as otherwise provided, there are no other oral or written understandings or agreements between the parties relating to the Franchise. Nevertheless, nothing in this Agreement or in any related agreement is intended to disclaim the representation that we have made in the franchise disclosure document.

**19.3** **AMENDMENT IN WRITING.** No amendment or other modification of this Agreement shall be valid or binding on either party, unless reduced to writing and executed by the parties.

### 19.4 RELATIONSHIP

**A.** **FRANCHISEE** is an independent contractor and is not the agent, joint venturer, partner or employee of **A CORP**. and, except as expressly provided in this Agreement, **A CORP**. shall not be obligated by any agreements, representations or warranties made by **FRANCHISEE** to any person, nor with respect to any other action of **FRANCHISEE**, nor shall **A CORP**. be obligated for any damages or monetary obligations of any sort to any person whether caused by **FRANCHISEE's** action, failure to act, negligence, or willful conduct.

**B.** Except as expressly set forth herein, **A CORP**. does not reserve control over nor take responsibility for the conduct or actions of any of **FRANCHISEE's** owners, directors, or employees, nor shall **A CORP**. have any control over the employment, discharge, compensation or working conditions of any such owner, director or employee of **FRANCHISEE**.

**C.** **FRANCHISEE** shall identify himself in all aspects of his business operation, including on all forms and in all advertisements, as being: "Independently Owned and Operated".

**19.5** **NO WAIVER.** No waiver by **A CORP**. of any breach or series of breaches or defaults in performance by **FRANCHISEE**, and no failure, refusal or neglect of **A CORP**. to exercise any right, power or option given to it or to insist upon strict compliance with or performance of **FRANCHISEE's** obligations, under this Agreement or the Operations Manual, shall constitute a waiver of any provision of this Agreement or the Operations Manual with respect to any subsequent breach or a waiver by **A CORP**. of its right at any time thereafter to

21

**AA414**

require exact and strict compliance with the provisions of this Agreement.

19.6    **GOVERNING LAW**. This Agreement shall be governed and construed under and in accordance with the laws of the Commonwealth of Massachusetts.    **A CORP** and **FRANCHISEE** agree that any action arising out of or relating to this agreement will be brought by the parties only in a Massachusetts state court of Middlesex County, Massachusetts or the United States District Court for the District of Massachusetts in Boston, Massachusetts.    **A CORP** and **FRANCHISEE** hereby consent to the jurisdiction of such Courts and further agree to waive any rights or objections to the jurisdiction or venue of any such actions when filed in such courts.    If any part or provision of this Agreement is held or declared invalid by a court of competent jurisdiction, such holding or declaration shall affect only that particular part or provision of this Agreement and all other parts or provisions of this Agreement shall continue in full force and effect.

19.7    **MEDIATION AND ARBITRATION. A CORP**. and **FRANCHISEE** agree as a condition to this Agreement to engage in mediation and arbitration prior to the commencement of any court action, except as set forth in Section 19.7 H.    **FRANCHISEE**'s failure to submit to mediation and arbitration, shall be deemed a default under Section 15.2. If **A CORP**. must engage an attorney to enforce its rights under this Agreement, **FRANCHISEE** shall reimburse **A CORP**. for all of its reasonable attorney's fees, court costs and expenses incurred in connection with such legal action.

A.    Before the commencement of any arbitration, **FRANCHISEE** and **FRANCHISOR** shall submit to the following mediation process:

   1.    **FRANCHISEE** shall promptly submit in writing the nature of his grievance with  A CORP.  along with any reasonable suggestions for the dispute's possible resolution;  and

   2.    Within 30 days, the **FRANCHISEE** shall attend a mediation meeting with **A CORP**. in Boston, Massachusetts to discuss in detail the dispute and to work towards its possible resolution. **A CORP**. shall select the mediator. **FRANCHISEE** and **A CORP**. shall share equally in the cost of the mediation session.

   If the parties are unable to reach an amicable solution, then the dispute shall be submitted to arbitration as described below:

B.    Prior to any arbitration proceeding taking place, **A CORP**. and **FRANCHISEE** shall, have the arbitrator conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect to the controversy or claim being arbitrated. These hearings shall be held in Boston, Massachusetts.

C.    Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claim that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. **A CORP**. and **FRANCHISEE** agree that arbitration shall be conducted on an individual and not a class-wide basis.

**AA415**

**D.** If, however, a court of competent jurisdiction determines that any such provisions of this Agreement are unlawful in any way, such court may modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provision of this Agreement by which this Agreement shall be governed by and construed under Massachusetts law, all issues relating to arbitration or the enforcement of this Agreement to arbitrate contained herein shall be governed by the United States Arbitration Act, 9 U.S.C. § I et seq., and the federal common law of arbitration.

**E.** Judgment upon an arbitration award may be entered in any court having competent jurisdiction and shall be binding, final and non-appealable. Except as provided for in Sections 19.9 and 19. 10, **A CORP.** and **FRANCHISEE** (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damage sustained by it.

**F.** This arbitration provision shall be deemed to be self-executing and shall remain in full force and effect after expiration or termination of this Agreement. In the event either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear. The arbitration proceedings shall take place in Boston, Massachusetts unless otherwise agreed by **A CORP.** and **FRANCHISEE.**

**G.** **A CORP.** and **FRANCHISEE** agree that no action (whether for arbitration, damages, injunctive, equitable or other relief, including but not limited to rescission) will be maintained by any party to enforce any liability or obligation of the other party, whether arising from this agreement or otherwise, unless brought before the expiration of the earlier of 1 year after the date of discovery of the facts resulting in such alleged liability or obligation or 2 years after the date of the first act or omission giving rise to such alleged liability or obligation, except that where state or federal law mandates or makes possible by notice or otherwise a shorter period, such shorter period shall apply.

**H.** The obligation to arbitrate or mediate shall not be binding upon either party with respect to claims relating to **A CORP.**'s trademarks, service marks, patents or copyrights; request for temporary restraining orders, preliminary injunctions or other procedures in a court of competent jurisdiction to obtain interim relief when deemed necessary by such court to preserve the status quo or prevent irreparable injury pending resolution by arbitration of the actual dispute between the parties.

**19.8** **NOTICES.**
All written notices to **A CORP.** permitted or required to be delivered by the provisions of this Agreement or the Operations Manual shall be deemed so delivered 3 days after being placed in the United States Mail, by Certified Mail, Return Receipt Requested, or by receipted overnight carrier to **A CORP.**, 268 Rangeway Road, P.O. Box 290, N Billerica, Massachusetts 01862, Attn. President or to such other address or addresses as **A CORP.** shall from time to time designate in the Operations Manual or in writing to **FRANCHISEE** at the location described in Section 1.2 above, or to such other address as **FRANCHISEE** may from time to time designate in writing to **A CORP.**

**19.9** **INDEMNIFICATION. FRANCHISEE** agrees to hold **A CORP.** harmless and indemnify **A CORP.** and its officers, agents and employees of and from all suits, actions, claims and

**AA416**

other proceedings brought by any and all persons or entities as a result of services, representations, conduct or work performed by **FRANCHISEE**, its agents, employees, subcontractors or assigns, or in the event **A CORP**. exercises the Step-In-Rights specified in Section 17. **FRANCHISEE** agrees to pay any and all expenses or fees, including reasonable attorney's fees, incurred by **A CORP**., its affiliates, subsidiaries or agents, resulting from any and all claims brought by or against **FRANCHISEE**, its officers, directors, employees or stockholders.

**FRANCHISEE** shall indemnify and hold **A CORP**. harmless of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses and liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance of Exhibit B, Power of Attorney.

The above indemnification provisions shall not be construed, with regard to a particular claim, to apply to any claim where its operation would be against public policy. It is the intent of the provisions above to permit the maximum indemnification of **A CORP**. by **FRANCHISEE** as permitted by law.

19.10 **LIMITATION OF LIABILITY OF A CORP.** If **A CORP**. shall be found liable to **FRANCHISEE** for any claim based upon this Agreement, **A CORP**.'s liability shall be limited to the amount of the initial Franchise Fee (specified in Section 1.7 herein) that has actually been paid by **FRANCHISEE** at the time of judgment.

In no event will **A CORP**., any affiliate, agent, or employee of **A CORP**. be liable for any other damages including, but not limited to, loss of business, revenues or profits. **FRANCHISEE** agrees that this limitation of liability will apply to any claim **FRANCHISEE** shall have against **A CORP** limited to, claims based on contract violations, torts (such as negligence) or strict liability.

19.11 **LATE PAYMENT FEES**. If **FRANCHISEE** fails to pay **A CORP.** all or any portion of the Continuing Royalty, or Marketing Fund Contribution or any other obligation due to **A 1CORP.**, promptly when due, **FRANCHISEE** shall pay to **A CORP.** a late payment fee equal to 18% per annum of such delinquent payments. Notwithstanding the foregoing, if the amount of the late payment fee shall be greater than any such charge permitted by applicable law, such charge shall be reduced to an amount equal to the maximum lawful charge, it being the intention of the parties that such late charge shall in no event be greater than that permitted by law.

19.12 **SURVIVAL OF COVENANTS.** The covenants contained in this Agreement which, by their terms, require performance by the parties after the expiration or termination of this Agreement, shall be enforceable notwithstanding the expiration or other termination of this Agreement for any reason whatsoever.

20. **CAVEAT**

The success of the business venture contemplated to be undertaken by **FRANCHISEE** by virtue of this Agreement is speculative and depends to a large extent upon the ability of **FRANCHISEE** as an independent business person as well as other factors. **A CORP.** does not make any representation or warranty as to the potential success of the business venture contemplated by this Agreement.

**AA417**

**FRANCHISEE** acknowledges that he or she has entered into this Agreement after making an independent investigation of **A CORP.**'s operations and not upon a representation by **A CORP.** as to profits which **FRANCHISEE** might expect to realize. **FRANCHISEE** acknowledges that prior to the execution of this Agreement, **FRANCHISEE** has had the opportunity to contact existing franchisees of **A CORP.**

## 21. RELEASE

**FRANCHISEE**, his heirs and assigns, hereby remises, releases and forever discharges **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents of and from all debts, demands, actions, causes of action, suits, accounts, covenants, contracts, warranties, agreements, damages and any and all claims, demands and liabilities whatsoever of every name and nature, both in law and in equity, which **FRANCHISEE**, his heirs and assigns now have or ever had against **A CORP.**, its affiliated companies, their principals, officers, directors, employees and agents, from the beginning of time until this day.

*[The remainder of the page intentionally left blank]*
*[Signature page follows on the next page]*

**AA418**

**IN WITNESS WHEREOF** the parties intending to be bound legally, have fully executed, sealed and delivered this Agreement as of the day and year first above written.

A CORP., FRANCHISOR

By: _____
Witness              Officer

_____
Date   01/12/21

By:    **Quality Air Care Corporation, FRANCHISEE**

_____
Witness

_____
Officer – Klodian Belegu

01/11/2021
_____
Date

**AA420**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Monmouth | Red Bank | 07701 | 23,813 |
| NJ | Monmouth | Shrewsbury | 07702 | 3,809 |
| NJ | Monmouth | Fort Monmouth | 07703 | 690 |
| NJ | Monmouth | Fair Haven | 07704 | 6,133 |
| NJ | Monmouth | Allenhurst | 07711 | 1,533 |
| NJ | Monmouth | Asbury Park | 07712 | 39,158 |
| NJ | Monmouth | Deal | 07723 | 1,020 |
| NJ | Monmouth | Eatontown | 07724 | 21,710 |
| NJ | Monmouth | Englishtown | 07726 | 42,508 |
| NJ | Monmouth | Freehold | 07728 | 56,527 |
| NJ | Monmouth | Lincroft | 07738 | 6,095 |
| NJ | Monmouth | Little Silver | 07739 | 5,938 |
| NJ | Monmouth | Long Branch | 07740 | 31,038 |
| NJ | Monmouth | Monmouth Beach | 07750 | 3,279 |
| NJ | Monmouth | Oakhurst | 07755 | 6,363 |
| NJ | Monmouth | Oceanport | 07757 | 5,356 |
| NJ | Monmouth | West Long Branch | 07764 | 8,097 |
| NJ | Monmouth | Belmar | 07715 | 0 |
| NJ | Monmouth | Avon By the Sea | 07717 | 1,901 |
| NJ | Monmouth | Belmar | 07719 | 21,538 |
| NJ | Monmouth | Bradley Beach | 07720 | 4,298 |
| NJ | Monmouth | Colts Neck | 07722 | 10,209 |
| NJ | Monmouth | Farmingdale | 07727 | 7,050 |
| NJ | Monmouth | Howell | 07731 | 38,304 |
| NJ | Monmouth | Neptune | 07753 | 37,554 |
| NJ | Monmouth | Neptune | 07754 | 0 |
| NJ | Monmouth | Ocean Grove | 07756 | 3,342 |
| NJ | Monmouth | Spring Lake | 07762 | 8,403 |
| NJ | Monmouth | Allentown | 08501 | 6,582 |
| NJ | Monmouth | Millstone Township | 08510 | 5,231 |
| NJ | Monmouth | Cream Ridge | 08514 | 4,477 |
| NJ | Monmouth | Imlaystown | 08526 | 0 |
| NJ | Monmouth | Millstone Township | 08535 | 5,385 |
| NJ | Monmouth | Roosevelt | 08555 | 877 |
| NJ | Monmouth | Allenwood | 08720 | 843 |
| NJ | Monmouth | Brielle | 08730 | 4,774 |
| NJ | Monmouth | Manasquan | 08736 | 12,578 |
| NJ | Monmouth | Sea Grit | 08750 | 3,528 |
| NJ | Ocean | Jackson | 08527 | 54,392 |
| NJ | Ocean | New Egypt | 08533 | 6,945 |

AA423

Total Unit(s)[1] Population: 501,008

Initials: _____
**A CORP**

Date: 01/12/21

Initials: _____
**FRANCHISEE**

Date: 01/11/2021

Initials: _____
**FRANCHISEE**

Date: _____

---

[1] One unit is equal to 125,000 populations.

**AA424**

## EXHIBIT A

### GUARANTY OF PERFORMANCE

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____

Date: _____

By: _____

Date: _____

To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

**Quality Air Care Corporation, FRANCHISEE**

By: *Klodian Belegu*
_____
Klodian Belegu

Date: 01/11/2021
_____

By: _____

Date: _____

**AA426**

## EXHIBIT B

## POWER OF ATTORNEY

I, **Klodian Belegu**, doing business as **RooterMan** or any successor entity, in the City of **Toms River**, in the County of **Ocean**, and in the State of **New Jersey**, hereby appoint Donald MacDonald of **A CORP.**, 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862, or his designated successor, as my Attorney-In-Fact to act in my capacity to do any and all of the following:

1. To act in my place and stead with any telephone service company and any telephone listing and advertising directory company in order to transfer to **A CORP.** or its designee, all right, title and interest I may have in such telephone numbers or telephone directory listings and advertising relating to any franchise granted to me by **A CORP.** or to direct the telephone service company to disconnect such telephone numbers.

2. To perform all other acts necessary to be done in regard to such powers.

3. To appoint a substitute attorney to perform any of the acts that my attorney by this instrument is authorized to perform, with the right to revoke such appointment of substituted attorney.

   The rights, powers and authority of my Attorney-In-Fact herein granted shall commence and be in full force and effect on **September 10, 2020,** and, in consideration of the franchise granted to me, shall be irrevocable.

This Power of Attorney shall include a full indemnification of **A CORP.** by the signatory below of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses or liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on this Exhibit B, Power of Attorney.

**A CORP.** shall be entitled to obtain equitable relief to enforce this Power of Attorney. The signatory below agrees to pay all attorneys' fees and costs incurred in connection with enforcement of this Power of Attorney.

By: _Klodian Belegu_____

Klodian Belegu

Date: 01/11/2021_____

**AA428**

AA429

## EXHIBIT B

## POWER OF ATTORNEY

I, **Klodian Belegu**, doing business as **RooterMan** or any successor entity, in the City of **Toms River,** in the County of **Ocean**, and in the State of **New Jersey,** hereby appoint Donald MacDonald of **A CORP.**, 268 Rangeway Road, P.O. Box 290, North Billerica, MA 01862, or his designated successor, as my Attorney-In-Fact to act in my capacity to do any and all of the following:

1.   To act in my place and stead with any telephone service company and any telephone listing and advertising directory company in order to transfer to **A CORP.** or its designee, all right, title and interest I may have in such telephone numbers or telephone directory listings and advertising relating to any franchise granted to me by **A CORP.** or to direct the telephone service company to disconnect such telephone numbers.

2.   To perform all other acts necessary to be done in regard to such powers.

3.   To appoint a substitute attorney to perform any of the acts that my attorney by this instrument is authorized to perform, with the right to revoke such appointment of substituted attorney.

The rights, powers and authority of my Attorney-In-Fact herein granted shall commence and be in full force and effect on **September 10, 2020,** and, in consideration of the franchise granted to me, shall be irrevocable.

This Power of Attorney shall include a full indemnification of **A CORP.** by the signatory below of and from any claim made by any telephone company, telephone directory publisher and other related persons or entities with which **FRANCHISEE** conducts business, including all costs, damages, attorney's fees, expenses or liabilities which may be incurred or sustained in connection with or as a result of any action taken in reliance on this Exhibit B, Power of Attorney.

**A CORP.** shall be entitled to obtain equitable relief to enforce this Power of Attorney. The signatory below agrees to pay all attorneys' fees and costs incurred in connection with enforcement of this Power of Attorney.

By:    _____

Klodian Belegu

Date:   _____

**AA430**

## EXHIBIT C

## PROMISSORY NOTE

$_____                                                   _____, 2020

For value received and in consideration of a Franchise Agreement signed between the parties dated

_____, **2020**, **FRANCHISEE** promises to pay to the order of **A CORP.** ("Holder") at 268

Rangeway Road, North Billerica, MA 01862 the sum of _____ ($_____) Dollars plus interest

accruing at the ANNUAL PERCENTAGE RATE (APR) of twelve percent (12%).

The payments shall be made as follows:        (Please refer to loan analysis at Exhibit E.)

| | |
|---|---|
| Principal Amount Financed: | $ |
| Annual Interest: | 12% |
| Duration of Loan: | 5 years |
| Start Date of Loan: | |
| Monthly Payment: | $ |
| Total Number of Payments: | 60 |
| Principal Amount: | $ |
| Finance Charges: | |
| Total Cost: | $ |

In no event shall any monies continue to be owing after _____, **2025**. Any unpaid balance may be pre-paid at any time without penalty.

If the note is not paid in full each month when due, if a proceeding in bankruptcy, receivership or insolvency shall be instituted by or against the undersigned, or if the underlying Franchise Agreement for which the parties have entered into this Promissory Note is terminated for any reason, then the entire amount of this note shall become due and payable immediately, and the payment and acceptance of any sum on account of this note shall not be considered a waiver of such right of election.

If the note shall not be paid when due and shall be placed by the Holder in the hands of any agent or attorney for collection through legal proceedings or otherwise, the undersigned will pay to the Holder the costs and reasonable expenses of collection, including without limitation, reasonable attorney's fees.

The undersigned hereby acknowledges receipt of a filled-in copy of this note.

_____        _____
**A CORP.**                                               **FRANCHISEE**

_____        _____
Witness                                                    Witness

**AA432**

# **Exhibit 2**

**AA433**

**New Jersey Division of Revenue & Enterprise Services**
**Certificate of Amendment for Domestic Corporations**
**NJSA 14A:9-2**
**New Jersey Profit Corporation Act**

```
                           State of New Jersey
                        Department of the Treasury
                  Division of Revenue & Enterprise Servi
                          Business Amendments
                                 Filed

                     Validation Number: 4264615912
                          12/27/24 11:20:42

                          Verify this certificate online at
                 https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cer
```

This Domestic Corporation filed with the Division of Revenue and Enterprise Services to amend its Certificate of Formation. The filer is responsible for ensuring strict compliance with NJSA 14A:9-2.

1. Name of Domestic Corporation: RM WATER DAMAGE RESTORATION LTD

2. Business ID Number: 0450894893

3. Date of the Filing of the Original Certificate: 12/05/2022

4. Amendments:

   Article 1, Business Name is amended as follows:

   Previous Name: RM WATER DAMAGE RESTORATION LTD
   Amended Name:  WATER DAMAGE RESTORATION LTD

6. Adoption Proceedings:

 Shares Outstanding at Time of Adoption: 1000
 Voting For: 100
 Voting Against: 100
 Date of Adoption: 12/27/2024

The undersigned represent(s) that this filing complies with State law as detailed in NJSA 14A:9-2 and that they are authorized to sign this form on behalf of the NJ Domestic Corporation on December 27, 2024.

   **Signature**

   KLODIAN BELEGU, PRESIDENT

**AA434**

# **Exhibit 3**

**AA435**



# FRANCHISE BRANDS

🏠 > Franchise Brands

## OUR PREMIUM SERVICE BRANDS

**Industry Leaders in Home Service Franchising**

In the past, customers utilized home service companies when they lacked the ability, skill, or resources to complete a job themselves. These days, homeowners and business would often rather save time by paying someone else to complete a task. With Premium Service Brands, our customers have access to expert help in nine distinct verticals. As a franchise, you'll lead your own team of employees and subcontractors to provide exceptional work and excellent customer service.

**360° PAINTING: A VIBRANT OPPORTUNITY**

Our painting franchise offers you an opportunity for a scalable business with a low initial investment. Clients include both commercial and residential property owners for projects inside and out. As a franchisee, you'll have access to our innovative technology and methods that will help you run your business efficiently and cost-effectively so that you can maximize your earnings.

**PROLIFT GARAGE DOORS: OPENING THE DOOR TO SUCCESS**

Professional garage door repairs and applications for residential and commercial properties make for a sought-after yet often underserved service market. Our garage door franchise opportunity sets you up for success through extensive training, advanced technology, proven sales techniques, and smart operational procedures. We even offer our findings on employee recruiting and retention.

**MAID RIGHT: EXCELLENCE IN THE INDUSTRY**

Are you a natural go-getter? Have you always dreamed of owning your own business, but you're not sure where to start? Maid Right offers a unique opportunity for cleaning pros looking to own their own business. We provide expert training in marketing, customer acquisition and give you the tools to build a strong financial backbone to your company.

**KITCHEN WISE & CLOSET WISE: ENHANCING HOME CONVENIENCE & COMFORT**

Elegant home solutions are becoming increasingly popular as demand for beautiful home spaces extends to inside their closets, pantries, and drawers. Our kitchen franchise is here to cater to this growing market. As a Kitchen Wise & Closet Wise franchisee, you'll help homeowners transform their kitchen, bathrooms, and pantries. With no industry experience necessary, we'll provide the training and support you need so that you can confidently help your clients intelligently transform their living spaces and simplify their lives.

**WINDOW GANG: AMERICA'S BEST WINDOW CLEANING FRANCHISE**

It's not our low startup costs or low royalty rates that make us the #1 window cleaning franchise in the nation, but our commitment to owner-operators that set us apart. When you join Window Gang, you're truly part of the family. We understand that if our owner's lives aren't made better through their businesses, they will be unable to provide service beyond expectations. Our support system and close-knit community provide you with the most comprehensive dependable support systems available.

We've been best in the category 5 years in a row by Entrepreneur magazine and have been ranked in the Franchise 500 for over 20 years straight for one simple reason: we treat our franchise like family!

**RUBBISH WORKS: FILLING A GROWING NEED**

As more Americans decide to live with less and embrace the decluttering trend, the need for junk removal and dumpster rental services is on the rise. Rubbish Works is ready to answer the growing demand. Since 2009, we have been helping home and business owners get rid of junk and other rubbish in an eco-friendly manner. We have adopted company standards and created comprehensive processes to ensure a positive, seamless experience for our customers. With ongoing support and marketing resources, franchise owners are able to quickly grow their business and build a brighter future for themselves and their families.

**THE GROUT MEDIC: BRINGING GROUT AND TILE BACK TO LIFE**

With over 30 years of experience, The Grout Medic leads the tile and grout cleaning and restoration market, using and innovating the most cutting-edge products, equipment and techniques to bring



### FRANCHISE BRANDS

360° Painting

ProLift Garage Doors

Maid Right

Kitchen Wise & Closet Wise

Window Gang

Rubbish Works Junk Removal

The Grout Medic

House Doctors

RooterMan



### AVAILABLE TERRITORIES

Check out our interactive map and learn about the available territories near you!

**GO NOW!** →



| | VIDEOS | **Contact Us** |

WHY US    WHY FRANCHISE?    FRANCHISE BRANDS    AVAILABLE TERRITORIES

House Doctors has been helping homeowners with home repair for over 20 years! Today, as well as offering professional handyman services, the company is leading the way with the introduction of online scheduling, new product installations, and an increasing number of home improvement options for the growing 'do it for me' society. House Doctors franchisees do not swing a hammer but are managers who lead teams of technicians operating in the growing 'on demand' home services market. Become a part of the House Doctors home improvement and handyman franchise network and build your team of craftsmen to service this growing $400 billion industry.

**ROOTERMAN**: TO THE RESCUE

RooterMan is the top plumbing and drain cleaning franchise in North America for a reason. With over 50 years of experience, RooterMan offers fast and dependable plumbing, sewer, and drain services at a reasonable rate. Voted the #1 Plumbing Franchise by Entrepreneur Magazine for 18 consecutive years. RooterMan is an established name with a proven franchise model. As a RooterMan franchisee, you'll have all the tools necessary to succeed in a thriving industry.

Take the first step and contact Premium Services Brands by filling out a contact form to request more information. We can't wait to learn more about you and welcome you to our franchise family!



*"It's been satisfying to do something that is simpler than what we did in corporate life but more ..."*



**ANGELA CLAYTON**

● ○ ○    **READ MORE** →



## LEARN MORE ABOUT OWNING A HOME SERVICE FRANCHISE

| First Name | Last Name |
| Phone | |
| Email | |
| City | State ▾ | Zip Code |
| Please Select a Brand ▾ | | |

Message

**$50,000 Liquid Capital Required**

**SUBMIT INFORMATION**

ABOUT    WHY FRANCHISE?    OUR BRANDS    AVAILABLE TERRITORIES    GET STARTED    SITE MAP    PRIVACY POLICY    ADA NOTICE    PSB JOBS



# **<u>Exhibit 4</u>**

AA438





**From:** Klodian Belegu 
**Date:** November 12, 2019 at 2:23:28 PM EST
**To:** crystal mccormick <crystal@rooterman.com>
**Subject: QAC (Klod)**

**AA439**



AA440



**AA441**



**AA442**









**AA444**

https://mail.google.com/mail/u/0/?ik=1f69046b81&view=pt&search=all&permthid=thread-f:1819286245830742428&simpl=msg-f:1819286245830742428&simpl=…    6/19





AA446



**AA447**







**AA450**







**AA453**



**AA454**



**AA455**



Klodian Belegu

orp

AA456

**AA457**

# **<u>Exhibit 5</u>**

**AA458**



**From:** crystal mccormick <crystal@rooterman.com>
**Date:** November 13, 2019 at 9:20:21 AM EST
**To:** Klodian Belegu
**Subject: Re: QAC (Klod)**

Hi Klod,
So those look like google listings, you should be able to go and
request a change on them and change the phone number, you will
probably have to provide your mailing address and google will send a
post card with a pin #. This is there way to verify your a real person
with a real business and not someone just trying to take over the
market entirely. When you go to the listing it should say claim
listing or update info. Let me know if you have any questions.
Thanks,
Crystal

On Tue, Nov 12, 2019 at 2:23 PM Klodian Belegu                    wrote:

**AA459**

AA460

Klodian Belegu

Quality Air Care Corp

--
Thank -you,
Crystal McCormick
Director of Franchising
1-800-700-8062
www.rooterman.com

# **<u>Exhibit 6</u>**

**AA462**

From: Carter Purves >
To: Klodian Belegu >
Cc: Nathan King > Paul Flick > John Deal >
September 10, 2024 at 6:43 PM

# Re: Rooterman - DEFAULT and FINAL NOTICE (ATTENTION REQUIRED)

Klod,

Please see your 12 Provided RooterMan.com websites. It comprises of the 11 active areas serviced 1 for each contract (in blue) and the overarching state of NJ service area website (In Red) :

https://www.rooterman.com/atlantic-cumberland-cape-may/
https://www.rooterman.com/bergen-county/
https://www.rooterman.com/greater-bucks-county/
https://www.rooterman.com/hudson/
https://www.rooterman.com/mercer-middlesex-somerset/
https://www.rooterman.com/new-jersey/
https://www.rooterman.com/ocean-monmouth/
https://www.rooterman.com/passaic-morris/
https://www.rooterman.com/salem-glouchester/
https://www.rooterman.com/sussex/
https://www.rooterman.com/union/
https://www.rooterman.com/essex-hudson/

The issue where the websites got folded from the original 12 occurred on November 15th, 2023 during the launch of our new website. Once the issue was brought to our attention the additional 11 websites were launched on May 19th, 2024. The amount that was overcharged in website hosting fees between November 15th, 2023, and May 19th, 2024 upon the launch of the additional 11 micro-sites was credited against your outstanding royalty balance before we had issued a default notice. Given this, you still owe a total of $59,047.58 in arrears for unpaid royalties as of September 6th, 2024.

Thank you,
Carter



**Carter Purves**
Premium Service Brands
RooterMan - Brand Lead
O: 434.995.5582

www.premiumservicebrands.com
www.kids-lift.org

 

**AA463**

# **<u>Exhibit 7</u>**

**AA464**

9:32

**‹ All Inboxes**



**From: Carter Purves** ›
To: **Klodian Belegu** ›
Cc: **Paul Flick** › **Nathan King** › **John Deal** ›
September 12, 2024 at 2:33 PM

## Re: Rooterman - DEFAULT and FINAL NOTICE (ATTENTION REQUIRED)

Klod,

Previous to the recent website launch on November 15th, 2023 you were billed for 12 micro-sites, upon looking into what micro-sites they were previous to launch it appears you had 22 Micro-sites as this was the micro-site setup we inherited from A-corp. Previous administration billed based on the number of franchise agreements and outlined website hosting fees like we presently do and provide you in terms of micro-site structure. Yet previous to this November 15th, 2023 website launch it appears we hosted 22 micro sites yet billed you for nearly half that.

They were the following links previous to being combined into a single microsite:

rooterman.com/bergen-county
rooterman.com/northern-nj
rooterman.com/jersey
rooterman.com/richmond-county-ny
rooterman.com/levittown-county-pa
rooterman.com/atlantic-county-nj
rooterman.com/toms-river-nj
rooterman.com/warren-county-nj
rooterman.com/salem-county-nj
rooterman.com/sussex-county-nj
rooterman.com/hunterdon-county-nj
rooterman.com/camden-county-nj
rooterman.com/cape-may-county-nj
rooterman.com/burlington-county-nj
rooterman.com/gloucester-county-nj
rooterman.com/cedar-brook-nj
rooterman.com/union-county-nj
rooterman.com/mercer-county-nj
rooterman.com/jersey-city-nj
rooterman.com/wallpack-center-nj
rooterman.com/ossining-ny
rooterman.com/new-brunswick-nj

-Carter

**AA465**

# **<u>Exhibit 8</u>**

**AA466**



**ROYALTY SUMMARY**

Items **1 - 12** of 12   View Per Page **20** ▾

| | INVOICE ID | REPORT ID | INVOICE DATE | REPORT PERIOD | ROYALTY ($) | AD FUND ($) | ROYALTY SERVICE ($) | ROYALTY PRODUCT ($) | CALL CENTER FEE/SERVICES FEE ($) | TECHNOLOGY FEE ($) | TECHNICIAN FEE (BASE RATE) ($) | LATE FEE ($) | ADDITIONAL FEES ($) | TOTAL TAX ON INVOICE AMOUNT ($) | INVOICE AMOUNT ($) | OPEN BALANCE ($) | TOTAL SALES ($) | PAYMENT STATUS | EFT DATE | ACTION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ | 033777 | 033702 | 08/14/2024 | Jul 2024 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,391.93 | 0.00 | 0.00 | Fully Paid | 08/14/2024 | ••• |
| ☐ | 032291 | 032218 | 07/14/2024 | Jun 2024 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,391.93 | 0.00 | 0.00 | Fully Paid | 07/14/2024 | ••• |
| ☐ | 030974 | 030899 | 06/14/2024 | May 2024 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,391.93 | 0.00 | 0.00 | Fully Paid | 06/14/2024 | ••• |
| ☐ | 029604 | 029529 | 05/14/2024 | Apr 2024 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,391.93 | 0.00 | 0.00 | Fully Paid | 05/14/2024 | ••• |
| ☐ | 028238 | 028163 | 04/14/2024 | Mar 2024 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,391.93 | 0.00 | 0.00 | Fully Paid | 04/14/2024 | ••• |
| ☐ | 026929 | 026854 | 03/14/2024 | Feb 2024 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,391.93 | 0.00 | 0.00 | Fully Paid | 03/14/2024 | ••• |
| ☐ | 025737 | 025662 | 02/14/2024 | Jan 2024 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 3,462.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,391.93 | 0.00 | 0.00 | Fully Paid | 02/14/2024 | ••• |
| ☐ | 024292 | 024217 | 01/14/2024 | Dec 2023 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 2,130.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,059.93 | 0.00 | 0.00 | Fully Paid | 01/14/2024 | ••• |
| ☐ | 023271 | 023196 | 12/22/2023 | Nov 2023 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 2,130.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,059.93 | 0.00 | 0.00 | Fully Paid | 12/22/2023 | ••• |
| ☐ | 021618 | 021618 | 11/14/2023 | Oct 2023 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 2,130.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,059.93 | 0.00 | 0.00 | Fully Paid | 11/14/2023 | ••• |
| ☐ | 020296 | 020296 | 10/14/2023 | Sep 2023 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 2,130.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,059.93 | 0.00 | 0.00 | Fully Paid | 10/14/2023 | ••• |
| ☐ | 019137 | 019137 | 09/14/2023 | Aug 2023 | 6,952.10 | 977.83 | 0.00 | 0.00 | 0.00 | 2,130.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10,059.93 | 0.00 | 0.00 | Fully Paid | 09/14/2023 | ••• |

**AA467**

# **<u>Exhibit 9</u>**

**AA468**

# Statement

**Premium Service Brands, LLC**
Rooterman
DE
United States

| | |
|---|---|
| **Date** | 9/13/2024 |
| **Amount Due** | $59,047.58 |
| **Amount Encl.** | |
| **Currency** | US Dollar |
| **Subsidiary** | Rooterman |

**Bill To**

| Date | Description | Charge | Payment | Balance |
|---|---|---|---|---|
| 2/1/2024 | Balance Forward | | | 10,159.93 |
| 2/1/2024 | Payment #PYMT11979 | | 10,159.93 | 0.00 |
| 2/1/2024 | Invoice #INV12932 | 11,391.93 | | 11,391.93 |
| 2/5/2024 | Journal #JE4007 | 10,159.93 | | 21,551.86 |
| 2/5/2024 | Invoice #INV12323 | 100.00 | | 21,651.86 |
| 2/6/2024 | Payment #PYMT11992 | | 5,129.96 | 16,521.90 |
| 2/20/2024 | Payment #PYMT12565 | | 11,391.93 | 5,129.97 |
| 2/20/2024 | Journal #JE4556 | 11,391.93 | | 16,521.90 |
| 2/20/2024 | Invoice #INV12999 | 100.00 | | 16,621.90 |
| 3/1/2024 | Invoice #INV14005 | 11,391.93 | | 28,013.83 |
| 3/1/2024 | Payment #PYMT13048 | | 16,621.90 | 11,391.93 |
| 3/19/2024 | Journal #JE5665 | 11,391.93 | | 22,783.86 |
| 3/21/2024 | Payment #PYMT13596 | | 11,391.93 | 11,391.93 |
| 3/22/2024 | Payment #PYMT13739 | | 11,391.93 | 0.00 |
| 3/26/2024 | Journal #JE5951 | 11,391.93 | | 11,391.93 |
| 3/26/2024 | Invoice #INV14602 | 100.00 | | 11,491.93 |
| 4/1/2024 | Invoice #INV15265 | 11,391.93 | | 22,883.86 |
| 4/8/2024 | Payment #PYMT14393 | | 11,491.93 | 11,391.93 |
| 4/9/2024 | Journal #JE6279 | 11,491.93 | | 22,883.86 |
| 4/18/2024 | Payment #PYMT14808 | | 11,391.93 | 11,491.93 |
| 4/18/2024 | Invoice #INV15465 | 100.00 | | 11,591.93 |
| 4/18/2024 | Journal #JE6839 | 11,391.93 | | 22,983.86 |
| 4/26/2024 | Payment #PYMT15247 | | 11,491.93 | 11,491.93 |
| 4/30/2024 | Journal #JE7023 | 11,491.93 | | 22,983.86 |
| 5/1/2024 | Invoice #INV16558 | 11,391.93 | | 34,375.79 |
| 5/20/2024 | Journal #JE8050 | 11,391.93 | | 45,767.72 |
| 5/20/2024 | Payment #PYMT16079 | | 11,391.93 | 34,375.79 |
| 6/1/2024 | Invoice #INV17745 | 11,391.93 | | 45,767.72 |
| 6/19/2024 | Payment #PYMT17263 | | 11,391.93 | 34,375.79 |
| 6/20/2024 | Journal #JE10323 | 11,391.93 | | 45,767.72 |
| 7/1/2024 | Invoice #INV19235 | 11,391.93 | | 57,159.65 |
| 7/19/2024 | Payment #PYMT18732 | | 11,391.93 | 45,767.72 |
| 7/19/2024 | Journal #JE10441 | 11,391.93 | | 57,159.65 |
| 7/31/2024 | Journal #JE10686 | | 9,504.00 | 47,655.65 |
| 8/1/2024 | Invoice #INV20512 | 11,391.93 | | 59,047.58 |
| 8/19/2024 | Journal #JE11567 | 11,391.93 | | 70,439.51 |
| 8/20/2024 | Payment #PYMT19954 | | 11,391.93 | 59,047.58 |

| Current | 1-30 Days | 31-60 Days | 61-90 Days | Over 90 Days | Amount Due |
|---|---|---|---|---|---|
| 0.00 | 11,391.93 | 1,887.93 | 11,391.93 | 34,375.79 | $59,047.58 |

**AA469**

# **<u>Exhibit 10</u>**

**AA470**

**We're now on LinkedIn**: For news and resources from Google Search on making your site discoverable, underline follow us on LinkedIn (https://www.linkedin.com/showcase/googlesearchcentral/).

# Redirects and Google Search

Redirecting URLs is the practice of resolving an existing URL to a different one, effectively telling your visitors and Google Search that a page has a new location. Redirects are particularly useful in the following circumstances:

- You've moved your site to a new domain, and you want to make the transition as seamless as possible.

- People access your site through several different URLs. If, for example, your home page can be reached in multiple ways (for instance, `https://example.com/home`, `http://home.example.com`, or `https://www.example.com`), it's a good idea to pick one of those URLs as your preferred (canonical (/search/docs/crawling-indexing/consolidate-duplicate-urls#definition)) destination, and use redirects to send traffic from the other URLs to your preferred URL.

- You're merging two websites and want to make sure that links to outdated URLs are redirected to the correct pages.

- You removed a page and you want to send users to a new page.

If you're using a platform like Blogger or Shopify, the platform may already have built-in redirect solutions. Try searching for help articles (for example, search for "blogger redirects").

## Overview of redirect types

While your users generally won't be able to tell the difference between the different types of redirects, Google Search uses redirects as a strong or weak signal that the redirect target should be canonical. Choosing a redirect depends on how long you expect the redirect will be in place and what page you want Google Search to show in search results:

- **Permanent redirects**: Show the new redirect target in search results.

- **Temporary redirects**: Show the source page in search results.

AA471

The following table explains the various ways you can use to set up permanent and temporary redirects, ordered by how likely Google is able to interpret correctly (for example, a server side redirect has the highest chance of being interpreted correctly by Google). Choose the redirect type that works for your situation and site:

**Redirect types**

| Permanent | Googlebot follows the redirect, and the indexing pipeline uses the redirect as a **strong** signal that the redirect target should be canonical (/search/docs/crawling-indexing/consolidate-duplicate-urls#definition). |
| | |
| | ♀ Use permanent redirects when you're sure that the redirect won't be reverted. |
| | `HTTP 301 (moved permanently)` / `HTTP 308 (moved permanently)` — Set up server-side redirects (#serverside). |
| | `meta refresh` (0 seconds) / HTTP refresh (0 seconds) — Set up `meta refresh` redirects (#metarefresh). |
| | JavaScript `location` — Set up JavaScript redirects (#jslocation). |
| | ⚠ Only use JavaScript redirects if you can't do server-side or `meta refresh` redirects. |
| | Crypto redirect — Learn more about crypto redirects (#cryptoredirects). |
| | ⚠ Don't rely on crypto redirects for letting search engines know that your content has moved unless you have no other choice. |
| Temporary | Googlebot follows the redirect, and the indexing pipeline uses the redirect as a **weak** signal that the redirect target should be canonical. |
| | `HTTP 302 (found)` / `HTTP 303 (see other)` / `HTTP 307 (temporary redirect)` — Set up server-side redirects (#serverside). |

AA472

| | `meta refresh` (more than 0 seconds) | Set up `meta refresh` redirects (#metarefresh). |
| | `HTTP refresh` (more than 0 seconds) | |

## Server-side redirects

Setting up server-side redirects requires access to the server configuration files (for example, the `.htaccess` file on Apache) or setting the redirect headers with server-side scripts (for example, PHP). You can create both permanent and temporary redirects on the server side.

### Permanent server-side redirects

If you need to change the URL of a page as it is shown in search engine results, we recommend that you use a permanent server-side redirect whenever possible. This is the best way to ensure that Google Search and people are directed to the correct page. The `301` and `308` status codes mean that a page has permanently moved to a new location.




Processing 301 redirects

### Temporary server-side redirects

If you just want to send users to a different page temporarily, use a temporary redirect. This will also ensure that Google keeps the old URL in its results for a longer time. For example, if a service your site offers is temporarily unavailable, you can set up a temporary redirect to send users to a page that explains what's happening, without compromising the original URL in search results.

### Implement server-side redirects

The implementation of server-side redirects depends on your hosting and server environment, or the scripting language of your site's backend.

To set up a permanent redirect with PHP, use the `header()` function. You must set the headers before sending anything to the screen:

**AA473**

Case 1:24-cv-13015-RBS   Document 18-12   Filed 01/13/25   Page 5 of 9

```
header('HTTP/1.1 301 Moved Permanently');
header('Location: https://www.example.com/newurl');
exit();
```

Similarly, here's an example of how to set up a temporary redirect with PHP:

```
header('HTTP/1.1 302 Found');
header('Location: https://www.example.com/newurl');
exit();
```

If you have access to your web server configuration files, you may be able to write the redirect rules yourself. Follow your web server's guides:

- **Apache:** Consult the Apache `.htaccess` Tutorial (https://httpd.apache.org/docs/2.0/howto/htaccess.html), the Apache URL Rewriting Guide (https://httpd.apache.org/docs/2.0/misc/rewriteguide.html), and the Apache `mod_alias` documentation (https://httpd.apache.org/docs/current/mod/mod_alias.html). For example, you can use `mod_alias` to set up the simplest form of redirects:

  ```
  # Permanent redirect:
  Redirect permanent "/old" "https://example.com/new"

  # Temporary redirect:
  Redirect temp "/two-old" "https://example.com/two-new"
  ```

  For more complex redirects, use `mod_rewrite`. For example:

  ```
  RewriteEngine on
  # redirect the service page to a new page with a permanent redirect
  RewriteRule   "^/service$"  "/about/service"  [R=301]

  # redirect the service page to a new page with a temporary redirect
  RewriteRule   "^/service$"  "/about/service"  [R]
  ```

- **NGINX:** Read about Creating NGINX Rewrite Rules (https://www.nginx.com/blog/creating-nginx-rewrite-rules/) on the NGINX blog. As with Apache, you

AA474

have multiple choices to create redirects. For example:

```
location = /service {
  # for a permanent redirect
  return 301 $scheme://example.com/about/service

  # for a temporary redirect
  return 302 $scheme://example.com/about/service
}
```

For more complex redirects, use the `rewrite` rule:

```
location = /service {
  # for a permanent redirect
  rewrite service?name=$1 ^service/offline/([a-z]+)/?$ permanent;

  # for a temporary redirect
  rewrite service?name=$1 ^service/offline/([a-z]+)/?$ redirect;
}
```

- For all other web servers, check with your server manager or hoster, or search for guides on your favorite search engine (for example, search for "LiteSpeed redirects").

# `meta refresh` and its HTTP equivalent

If server-side redirects (#serverside) aren't possible to implement on your platform, `meta refresh` redirects may be a viable alternative. Google differentiates between two kinds of `meta refresh` redirects:

- **Instant `meta refresh` redirect**: Triggers as soon as the page is loaded in a browser. Google Search interprets instant `meta refresh` redirects as permanent redirects.

- **Delayed `meta refresh` redirect**: Triggers only after an arbitrary number of seconds set by the site owner. Google Search interprets delayed `meta refresh` redirects as temporary redirects.

Place the `meta refresh` redirect either in the `<head>` element in the HTML or in the HTTP header with server-side code. For example, here's an instant `meta refresh` redirect in the `<head>` element in the HTML:

**AA475**

Case 1:24-cv-13015-RBS    Document 18-12    Filed 01/13/25    Page 7 of 9

```
<!doctype html>
<html>
  <head>
  <meta http-equiv="refresh" content="0; url=https://example.com/newlocation">
  <title>Example title</title>
  <!--...-->
```

Here's an example of the HTTP header equivalent, which you can inject with server-side scripts:

```
HTTP/1.1 200 OK
Refresh: 0; url=https://www.example.com/newlocation
...
```

To create a delayed redirect, which is interpreted as a temporary redirect by Google, set the `content` attribute to the number of seconds that the redirect should be delayed:

```
<!doctype html>
<html>
  <head>
  <meta http-equiv="refresh" content="5; url=https://example.com/newlocation">
  <title>Example title</title>
  <!--...-->
```

# JavaScript `location` redirects

Google Search interprets and executes JavaScript using the Web Rendering Service once crawling of the URL has completed.

Only use JavaScript redirects if you can't do server-side or `meta refresh` redirects. While Google attempts to render every URL Googlebot crawled, rendering may fail for various reasons. This means that if you set a JavaScript redirect, Google might never see it if rendering of the content failed.

To set up a JavaScript redirect, set the `location` property to the redirect target URL in a script block in the HTML head. For example:

**AA476**

```
<!doctype html>
<html>
  <head>
    <script>
      window.location.href = "https://www.example.com/newlocation";
    </script>
    <title>Example title</title>
    <!--...-->
```

# Crypto redirects

If you can't implement any of the traditional redirect methods, you should still make an effort to let your users know that the page or its content has moved. The simplest way to do this is to add a link pointing to the new page accompanied by a short explanation. For example:

```
<a href="https://newsite.example.com/newpage.html">We moved! Find the content on our new site!</a>
```

This helps users find your new site and Google may understand this as a crypto redirect, (like the Loch Ness monster, its existence may be disputed; not all search engines may recognize this pseudo-redirect as an official redirect).

Don't rely on crypto redirects for letting search engines know that your content has moved unless you have no other choice. Contact your hosting provider for help with traditional redirects before resorting to crypto redirects.

# Alternate versions of a URL

When you redirect a URL, Google keeps track of both the redirect source (the old URL) and the redirect target (the new URL). One of the URLs will be the canonical (/search/docs/crawling-indexing/consolidate-duplicate-urls); which one, depends on signals such as whether the redirect was temporary or permanent. The other URL becomes an *alternate name* of the canonical URL. Alternate names are different versions of a canonical URL that users might recognize and trust more. Alternate names may appear in search results when a user's query hints that they might trust the old URL more.

**AA477**

For example, if you underline{moved to a new domain name}
(/search/docs/crawling-indexing/site-move-with-url-changes), it's very likely that Google will continue to occasionally show the old URLs in the results, even though the new URLs are already indexed. This is normal and as users get used to the new domain name, the alternate names will fade away without you doing anything.

Except as otherwise noted, the content of this page is licensed under the Creative Commons Attribution 4.0 License (https://creativecommons.org/licenses/by/4.0/), and code samples are licensed under the Apache 2.0 License (https://www.apache.org/licenses/LICENSE-2.0). For details, see the Google Developers Site Policies (https://developers.google.com/site-policies). Java is a registered trademark of Oracle and/or its affiliates.

Last updated 2024-10-31 UTC.

**AA478**

# **<u>Exhibit 11</u>**

Int. Cl.: 37

Prior U.S. Cl.: 103

## United States Patent and Trademark Office

Reg. No. 1,218,615
Registered Nov. 30, 1982

## SERVICE MARK
### Principal Register



Sewer-Man Inc. (Massachusetts corporation)
32 Rio Vista St.
North Billerica, Mass. 01862

For: SERVICES OF CLEANING OF SEPTIC SYSTEMS, CLEARING CLOGGED PIPES & DRAINS, REPAIRING SEPTIC SYSTEM, in CLASS 37 (U.S. Cl. 103).

First use Jul. 4, 1976; in commerce Jul. 4, 1976.

The word "Sewer" is disclaimed apart from the mark as shown.

The shading and lining is a feature of the mark, and does not indicate color.

Ser. No. 294,905, filed Jan. 29, 1981.

H. M. FISHER, Examining Attorney

**AA480**

Int. Cl.: 37

Prior U.S. Cl.: 103

## United States Patent and Trademark Office

Reg. No. 1,580,576
Registered Jan. 30, 1990

### SERVICE MARK
### PRINCIPAL REGISTER



SEWER-MAN INC. (MASSACHUSETTS CORPO-
RATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC
SYSTEMS AND CLEARING CLOGGED PIPES
AND DRAINS, IN CLASS 37 (U.S. CL. 103).

FIRST USE 7-4-1976; IN COMMERCE
7-4-1976.
THE LINING SHOWN IN THE DRAWING IS
A FEATURE OF THE MARK AND IS NOT IN-
TENDED TO INDICATE COLOR.

SER. NO. 73-807,591, FILED 6-19-1989.

WAI BUI ZEE, EXAMINING ATTORNEY

**AA481**

Int. Cl.: 16

Prior U.S. Cl.: 38

Reg. No. 1,735,676

## United States Patent and Trademark Office

Registered Nov. 24, 1992

## TRADEMARK
### PRINCIPAL REGISTER

## SHOPPER SAVER

A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: FLYERS CONTAINING COUPONS AND ADVERTISING, IN CLASS 16 (U.S. CL. 38)

FIRST USE 7-1-1992; IN COMMERCE 7-1-1992.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SHOPPER", APART FROM THE MARK AS SHOWN.

SN 74-078,901, FILED 7-13-1990.

JEFFREY R. COHEN, EXAMINING ATTORNEY

**AA482**

Int. Cl.: 16

Prior U.S. Cl.: 38

Reg. No. 1,735,676

## United States Patent and Trademark Office
Registered Nov. 24, 1992

## TRADEMARK
### PRINCIPAL REGISTER

## SHOPPER SAVER

A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: FLYERS CONTAINING COUPONS AND ADVERTISING, IN CLASS 16 (U.S. CL. 38)

FIRST USE 7-1-1992; IN COMMERCE 7-1-1992.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SHOPPER", APART FROM THE MARK AS SHOWN.

SN 74-078,901, FILED 7-13-1990.

JEFFREY R. COHEN, EXAMINING ATTORNEY

**AA483**

**Int. Cl.: 37**

**Prior U.S. Cl.: 103**

**United States Patent and Trademark Office**

Reg. No. 1,688,486
Registered May 19, 1992

### SERVICE MARK
#### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

   FOR: PEST CONTROL SERVICES, IN CLASS
37 (U.S. CL. 103).

FIRST USE 7-31-1990; IN COMMERCE
7-31-1990.

   SN 74-079,481, FILED 7-18-1990.

MICHAEL LEVY, EXAMINING ATTORNEY

AA484

**Int. Cl.: 37**

**Prior U.S. Cl.: 103**

Reg. No. 1,688,486

## United States Patent and Trademark Office

Registered May 19, 1992

### SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: PEST CONTROL SERVICES, IN CLASS
37 (U.S. CL. 103).

FIRST USE 7-31-1990; IN COMMERCE
7-31-1990.

SN 74-079,481, FILED 7-18-1990.

MICHAEL LEVY, EXAMINING ATTORNEY

**AA485**

Int. Cl.: 37

Prior U.S. Cl.: 103

**United States Patent and Trademark Office**

Reg. No. 1,654,512

Registered Aug. 20, 1991

## SERVICE MARK
### PRINCIPAL REGISTER



"TO THE RESCUE"

A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 10862

FOR: CLEANING AND REPAIRING SEPTIC SYSTEMS AND CLEARING CLOGGED PIPES AND DRAINS, IN CLASS 37 (U.S. CL. 103).

FIRST USE 1-11-1981; IN COMMERCE 1-11-1981.

SER. NO. 74-080,639, FILED 7-23-1990.

MICHAEL LEVY, EXAMINING ATTORNEY

AA486

Int. Cl.: 37

Prior U.S. Cl.: 103

**United States Patent and Trademark Office**

Reg. No. 1,654,512
Registered Aug. 20, 1991

## SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 10862

　　FOR: CLEANING AND REPAIRING SEPTIC SYSTEMS AND CLEARING CLOGGED PIPES AND DRAINS, IN CLASS 37 (U.S. CL. 103).

FIRST USE 1–11–1981; IN COMMERCE 1–11–1981.

SER. NO. 74–080,639, FILED 7–23–1990.

MICHAEL LEVY, EXAMINING ATTORNEY

AA487

Int. Cl.: 37

Prior U.S. Cl.: 103

**United States Patent and Trademark Office**

Reg. No. 1,655,782
Registered Sep. 3, 1991

## SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
263 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC SYSTEMS AND CLEARING CLOGGED PIPES AND DRAINS, IN CLASS 37 (U.S. CL. 103).

FIRST USE 1–11–1981; IN COMMERCE 6–12–1981.

THE LINING IS A FEATURE OF THE MARK AND DOES NOT INDICATE COLOR.

SER. NO. 74–103,556, FILED 10–5–1990.

MICHAEL LEVY, EXAMINING ATTORNEY

Int. Cl.: 37

Prior U.S. Cl.: 103

**United States Patent and Trademark Office**

Reg. No. 1,655,782
Registered Sep. 3, 1991

## SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
263 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC
SYSTEMS AND CLEARING CLOGGED PIPES
AND DRAINS, IN CLASS 37 (U.S. CL. 103).

FIRST USE 1–11–1981; IN COMMERCE
6–12–1981.
THE LINING IS A FEATURE OF THE MARK
AND DOES NOT INDICATE COLOR.

SER. NO. 74–103,556, FILED 10–5–1990.

MICHAEL LEVY, EXAMINING ATTORNEY

**AA489**

Int. Cl.: 37

Prior U.S. Cl.: 103

Reg. No. 1,848,341

## United States Patent and Trademark Office
Registered Aug. 2, 1994

### SERVICE MARK
#### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
P.O. BOX 290
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC SYSTEMS AND CLEARING CLOGGED PIPES AND DRAINS, IN CLASS 37 (U.S. CL. 103).
FIRST USE 2–22–1992; IN COMMERCE 2–22–1992.

OWNER OF U.S. REG. NOS. 1,649,709, 1,654,512, AND 1,655,782.

THE LINING SHOWN IN THE DRAWING IS A FEATURE OF THE MARK AND DOES NOT INDICATE COLOR.

SN 74–234,954, FILED 12–31–1991.

J. CHILDRESS, EXAMINING ATTORNEY

Int. Cl.: 37

Prior U.S. Cl.: 103

## United States Patent and Trademark Office

Reg. No. 1,848,341
Registered Aug. 2, 1994

### SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
P.O. BOX 290
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC SYSTEMS AND CLEARING CLOGGED PIPES AND DRAINS, IN CLASS 37 (U.S. CL. 103).
FIRST USE 2-22-1992; IN COMMERCE 2-22-1992.

OWNER OF U.S. REG. NOS. 1,649,709, 1,654,512, AND 1,655,782.
THE LINING SHOWN IN THE DRAWING IS A FEATURE OF THE MARK AND DOES NOT INDICATE COLOR.

SN 74-234,954, FILED 12-31-1991.

J. CHILDRESS, EXAMINING ATTORNEY

AA491

Int. Cl.: 16

Prior U.S. Cl.: 38

## United States Patent and Trademark Office

Reg. No. 1,770,022
Registered May 11, 1993

## TRADEMARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: MAGAZINES, NEWSLETTERS AND DIRECTORIES CONTAINING COUPONS, ADVERTISEMENTS AND ARTICLES OF INTEREST IN THE FIELD OF CONSUMER PURCHASING, IN CLASS 16 (U.S. CL. 38).

FIRST USE 7–1–1992; IN COMMERCE 7–1–1992.

THE MARK CONSISTS IN PART OF A SINGLE DOLLAR SIGN REPLACING THE INITIAL LETTER "S" IN THE WORDS "SHOPPER SAVER".

SER. NO. 74–297,886, FILED 7–23–1992.

KATHLEEN COONEY, EXAMINING ATTORNEY

AA492

Int. Cl.: 16

Prior U.S. Cl.: 38

**United States Patent and Trademark Office**

Reg. No. 1,770,022
Registered May 11, 1993

## TRADEMARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: MAGAZINES, NEWSLETTERS AND DIRECTORIES CONTAINING COUPONS, ADVERTISEMENTS AND ARTICLES OF INTEREST IN THE FIELD OF CONSUMER PURCHASING, IN CLASS 16 (U.S. CL. 38).

FIRST USE 7-1-1992; IN COMMERCE 7-1-1992.

THE MARK CONSISTS IN PART OF A SINGLE DOLLAR SIGN REPLACING THE INITIAL LETTER "S" IN THE WORDS "SHOPPER SAVER".

SER. NO. 74-297,886, FILED 7-23-1992.

KATHLEEN COONEY, EXAMINING ATTORNEY

Int. Cl.: 16

Prior U.S. Cl.: 38

## United States Patent and Trademark Office

Reg. No. 1,770,022

Registered May 11, 1993

## TRADEMARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: MAGAZINES, NEWSLETTERS AND DIRECTORIES CONTAINING COUPONS, ADVERTISEMENTS AND ARTICLES OF INTEREST IN THE FIELD OF CONSUMER PURCHASING, IN CLASS 16 (U.S. CL. 38).

FIRST USE 7–1–1992; IN COMMERCE 7–1–1992.

THE MARK CONSISTS IN PART OF A SINGLE DOLLAR SIGN REPLACING THE INITIAL LETTER "S" IN THE WORDS "SHOPPER SAVER".

SER. NO. 74–297,886, FILED 7–23–1992.

KATHLEEN COONEY, EXAMINING ATTORNEY

AA494

**Int. Cl.: 1**

**Prior U.S. Cl.: 6**

## United States Patent and Trademark Office

Reg. No. 1,846,083
Registered July 19, 1994

### TRADEMARK
### PRINCIPAL REGISTER

## LIQUID ROOTER

A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: DRAIN CLEANING AGENT, IN CLASS 1 (U.S. CL. 6).
FIRST USE 4-22-1993; IN COMMERCE 4-22-1993.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LIQUID", APART FROM THE MARK AS SHOWN.

SN 74-325,033, FILED 10-23-1992.

DARLENE BULLOCK, EXAMINING ATTORNEY

**AA495**

Int. Cl.: 1

Prior U.S. Cl.: 6

## United States Patent and Trademark Office

Reg. No. 1,846,083
Registered July 19, 1994

## TRADEMARK
### PRINCIPAL REGISTER

## LIQUID ROOTER

A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: DRAIN CLEANING AGENT, IN CLASS 1 (U.S. CL. 6).

FIRST USE 4–22–1993; IN COMMERCE 4–22–1993.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LIQUID", APART FROM THE MARK AS SHOWN.

SN 74–325,033, FILED 10–23–1992.

DARLENE BULLOCK, EXAMINING ATTOR-NEY

AA496

Int. Cl.: 1

Prior U.S. Cl.: 6

## United States Patent and Trademark Office

Reg. No. 1,846,083
Registered July 19, 1994

## TRADEMARK
### PRINCIPAL REGISTER

## LIQUID ROOTER

A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: DRAIN CLEANING AGENT, IN CLASS
1 (U.S. CL. 6).
FIRST USE 4-22-1993; IN COMMERCE
4-22-1993.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "LIQUID", APART FROM THE
MARK AS SHOWN.

SN 74-325,033, FILED 10-23-1992.

DARLENE BULLOCK, EXAMINING ATTOR-
NEY

AA497

Int. Cl.: 1

Prior U.S. Cl.: 6

## United States Patent and Trademark Office

Reg. No. 1,846,083
Registered July 19, 1994

### TRADEMARK
#### PRINCIPAL REGISTER

## LIQUID ROOTER

A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: DRAIN CLEANING AGENT, IN CLASS 1 (U.S. CL. 6).

FIRST USE 4-22-1993; IN COMMERCE 4-22-1993.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "LIQUID", APART FROM THE MARK AS SHOWN.

SN 74-325,033, FILED 10-23-1992.

DARLENE BULLOCK, EXAMINING ATTORNEY

AA498

Int. Cl.: 37

Prior U.S. Cls.: 100, 103 and 106

**United States Patent and Trademark Office**

Reg. No. 2,308,796

Registered Jan. 18, 2000

## SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC SYSTEMS AND CLEARING CLOGGED PIPES AND DRAINS, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

FIRST USE 7–4–1976; IN COMMERCE 7–4–1976.

OWNER OF U.S. REG. NO. 1,848,341.

THE LINING SHOWN IN THE DRAWING IS A FEATURE OF THE MARK AND DOES NOT INDICATE COLOR.

SER. NO. 75–533,725, FILED 8–10–1998.

KEVON CHISOLM, EXAMINING ATTORNEY

**AA499**

Int. Cl.: 37

Prior U.S. Cls.: 100, 103 and 106

**United States Patent and Trademark Office**

Reg. No. 2,308,796

Registered Jan. 18, 2000

## SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC SYSTEMS AND CLEARING CLOGGED PIPES AND DRAINS, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

FIRST USE 7–4–1976; IN COMMERCE 7–4–1976.

OWNER OF U.S. REG. NO. 1,848,341.

THE LINING SHOWN IN THE DRAWING IS A FEATURE OF THE MARK AND DOES NOT INDICATE COLOR.

SER. NO. 75–533,725, FILED 8–10–1998.

KEVON CHISOLM, EXAMINING ATTORNEY

AA500

Int. Cl.: 37

Prior U.S. Cls.: 100, 103 and 106

## United States Patent and Trademark Office

Reg. No. 2,433,386

Registered Mar. 6, 2001

### SERVICE MARK
### PRINCIPAL REGISTER



A CORP. (MASSACHUSETTS CORPORATION)
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: CLEANING AND REPAIRING SEPTIC SYS-
TEMS AND CLEARING CLOGGED PIPES AND
DRAINS, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

FIRST USE 2-0-1999; IN COMMERCE 2-0-1999.

OWNER OF U.S. REG. NOS. 1,654,512, 1,655,782,
AND 1,848,341.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "PLUMBERS", APART FROM THE
MARK AS SHOWN.

SER. NO. 75-903,773, FILED 1-27-2000.

ELIZABETH J. WINTER, EXAMINING ATTORNEY

AA501





**Reg. No. 3,859,654**

**Registered Oct. 12, 2010**

**Int. Cl.: 37**

**SERVICE MARK**

**PRINCIPAL REGISTER**

A CORP. (MASSACHUSETTS CORPORATION), DBA ROOTER MAN
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: DRAIN AND SEWER CLEANING AND ROOTERING SERVICES; DRAIN CLEANING SERVICES; PLUMBING CONTRACTOR SERVICES; PLUMBING SERVICES; SEPTIC TANK CLEANING; SEPTIC TANK PUMPING AND CLEANING, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

FIRST USE 2-22-1978; IN COMMERCE 6-12-1981.

OWNER OF U.S. REG. NOS. 1,654,512, 1,655,782, AND 2,433,386.

THE COLOR(S) RED, WHITE, AND BLUE IS/ARE CLAIMED AS A FEATURE OF THE MARK.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "ROOTER", APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF THE WORDING "ROOTER MAN" IN STYLIZED AND UPPER-CASE LETTERS AS DEMONSTRATED IN THE SAMPLE. THE LETTERS IN THE WORD "ROOTER" ARE IN SOLID RED. THE LETTERS IN WORD "MAN" ARE BLUE LINED AROUND THE WHITE LETTERS. THE TWO WORDS ARE CONNECTED BY A BLUE DOT.

SER. NO. 77-923,448, FILED 1-29-2010.

MARC LEIPZIG, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

**AA502**





**Reg. No. 3,859,654**

**Registered Oct. 12, 2010**

**Int. Cl.: 37**

**SERVICE MARK**

**PRINCIPAL REGISTER**

A CORP. (MASSACHUSETTS CORPORATION), DBA ROOTER MAN
268 RANGEWAY ROAD
NORTH BILLERICA, MA 01862

FOR: DRAIN AND SEWER CLEANING AND ROOTERING SERVICES; DRAIN CLEANING SERVICES; PLUMBING CONTRACTOR SERVICES; PLUMBING SERVICES; SEPTIC TANK CLEANING; SEPTIC TANK PUMPING AND CLEANING, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

FIRST USE 2-22-1978; IN COMMERCE 6-12-1981.

OWNER OF U.S. REG. NOS. 1,654,512, 1,655,782, AND 2,433,386.

THE COLOR(S) RED, WHITE, AND BLUE IS/ARE CLAIMED AS A FEATURE OF THE MARK.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "ROOTER", APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF THE WORDING "ROOTER MAN" IN STYLIZED AND UPPER-CASE LETTERS AS DEMONSTRATED IN THE SAMPLE. THE LETTERS IN THE WORD "ROOTER" ARE IN SOLID RED. THE LETTERS IN WORD "MAN" ARE BLUE LINED AROUND THE WHITE LETTERS. THE TWO WORDS ARE CONNECTED BY A BLUE DOT.

SER. NO. 77-923,448, FILED 1-29-2010.

MARC LEIPZIG, EXAMINING ATTORNEY



Director of the United States Patent and Trademark Office

**AA503**



# United States of America
## United States Patent and Trademark Office

**Reg. No. 4,189,503**
**Registered Aug. 14, 2012**

A CORP (MASSACHUSETTS CORPORATION), DBA ROOTER MAN
268 RANGEWAY ROAD
N. BILLERICA, MA 01862

**Int. Cl.: 37**

FOR: DRAIN AND SEWER CLEANING AND ROOTERING SERVICES; DRAIN CLEANING SERVICES; MAINTAINING SEPTIC SYSTEMS; PUMPING SEPTIC TANKS; SEPTIC TANK CLEANING; SEPTIC TANK PUMPING AND CLEANING; PLUMBING, IN CLASS 37 (U.S. CLS. 100, 103 AND 106).

**SERVICE MARK**

**PRINCIPAL REGISTER**

FIRST USE 2-28-1999; IN COMMERCE 2-28-1999.

OWNER OF U.S. REG. NOS. 1,654,512, 1,655,782, AND 1,848,341.

THE COLOR(S) RED, WHITE, BLUE, YELLOW, BROWN, AND TAN IS/ARE CLAIMED AS A FEATURE OF THE MARK.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "PLUMBERS", APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF A MAN WEARING A RED CAPE WITH A YELLOW SHIRT, BLUE PANTS, RED GLOVES AND RED BOOTS WITH BLUE SOLES AND A TAN COLORED FACE AND BROWN HAIR, WITH THE MAN ENTIRELY OUTLINED IN BLUE WITH BLUE FEATURES. THE MAN APPEARS TO BE RUNNING, HOLDING A RED SNAKING DEVICE, WHICH IS INSERTED INTO A BLUE DRAINPIPE PUSHING A HORIZONTAL BLUE LINE WITH THE WORDS "ROOTER MAN" WRITTEN ABOVE THE DRAINPIPE, WITH THE WORD "ROOTER" AND THE DOT BETWEEN THE WORDS IN RED AND THE WORD "MAN" IN WHITE OUTLINED IN BLUE. THE WORD "PLUMBERS" IS IN BLUE UNDER THE MAN AND "TO THE RESCUE" IS IN BLUE UNDER THE DRAINPIPE.

SER. NO. 85-451,056, FILED 10-19-2011.

LINDSEY RUBIN, EXAMINING ATTORNEY

Director of the United States Patent and Trademark Office

**AA504**

<div style="border:1px solid black; padding:10px; text-align:center;">

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

</div>

**Requirements in the First Ten Years***
**What and When to File:**

> *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  *See* 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.*  *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse)  **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

<div style="border:1px solid black; padding:10px; text-align:center;">

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or reminder of these filing requirements.**

</div>

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  *See* 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**AA505**

# United States of America

## United States Patent and Trademark Office



**Reg. No. 6,027,468**

**Registered Apr. 07, 2020**

**Int. Cl.: 37**

**Service Mark**

**Principal Register**

A Corp.  (MASSACHUSETTS CORPORATION), DBA Rooter Man
268 Rangeway Road
North Billerica, MASSACHUSETTS 01862

CLASS 37: Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning
and rootering services

FIRST USE 1-19-2018; IN COMMERCE 1-19-2018

The color(s) red, blue, yellow, brown, white, black, and beige is/are claimed as a feature of
the mark.

The mark consists of a man with brown hair and eyebrows, blue and white eyes, a brown nose
and smile. The face and hand are in beige and outlined in brown. The man is wearing a
yellow cape, red top and blue pants suite, a black belt with a white buckle and red boots all
outlined in black. The suit has a blue circle with white letters "R" and "M" all outlined in red.
The man is holding a red and beige plunger outlined in brown.

SER. NO. 88-589,957, FILED 08-23-2019



*Andrei Lanem*

Director of the United States
Patent and Trademark Office



**AA506**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

**AA507**

# United States of America
## United States Patent and Trademark Office



**Reg. No. 6,027,470**

**Registered Apr. 07, 2020**

**Int. Cl.: 37**

**Service Mark**

**Principal Register**

A Corp. (MASSACHUSETTS CORPORATION), DBA Rooter Man
268 Rangeway Rd.
North Billerica, MASSACHUSETTS 01862

CLASS 37: Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning and rootering services

FIRST USE 1-19-2018; IN COMMERCE 1-19-2018

The color(s) red, blue, yellow, brown, white, black, and beige are claimed as a feature of the mark.

The mark consists of a man with brown hair and eyebrows, blue and white eyes, a brown nose and smile. The face and hand are in beige and outlined in brown. The man is wearing a yellow cape, red top and blue pants suit, a black belt with a white buckle and red boots all outlined in black. The red top has a blue circle with white letters "R" and "M" all outlined in red. The man is holding a red and white cable in his right hand.

SER. NO. 88-590,039, FILED 08-23-2019



Director of the United States
Patent and Trademark Office



**AA508**

```
REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION

WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
         DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.
```

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an  Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date).  The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO.  Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

**AA509**

# United States of America

## United States Patent and Trademark Office



**Reg. No. 6,013,441**

**Registered Mar. 17, 2020**

**Int. Cl.: 37**

**Service Mark**

**Principal Register**

A Corp.  (MASSACHUSETTS CORPORATION), DBA Rooter Man
268 Rangeway Rd.
North Billerica, MASSACHUSETTS 01862

CLASS 37: Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning and rootering services

FIRST USE 6-26-2019; IN COMMERCE 6-26-2019

The color(s) red, blue, white and black is/are claimed as a feature of the mark.

The mark consists of four circles with one within another from outside to inside: black, red, black and blue. Two solid white italic upper case letters "R" and "M" all outlined in red are within the center of the blue circle.

SER. NO. 88-590,108, FILED 08-23-2019



Director of the United States
Patent and Trademark Office

**AA510**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

- *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. See 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.\* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. See 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. See 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE: A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO. To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic Application System (TEAS) Correspondence Address and Change of Owner Address Forms available at** http://www.uspto.gov.

**AA511**

# United States of America

## United States Patent and Trademark Office



**Reg. No. 6,013,446**

**Registered Mar. 17, 2020**

**Int. Cl.: 37**

**Service Mark**

**Principal Register**

A Corp. (MASSACHUSETTS CORPORATION), DBA Rooter Man
268 Rangeway Rd.
North Billerica, MASSACHUSETTS 01862

CLASS 37: Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning and rootering services

FIRST USE 2-22-1978; IN COMMERCE 6-12-1981

The color(s) red, blue and white is/are claimed as a feature of the mark.

The mark consists of the phrases "ROOTERMAN" on the top and "TO THE RESCUE" at the bottom all in stylized and upper-case letters with a drainage pipe between the two wordings. The letters in the wording "ROOTER" are in solid red. The letters in the wording "MAN" are blue around the white letters. The letters in the phrase "TO THE RESCUE" are all in solid blue. The drainage pipe is white and outlined in blue with a red and white drainage cable inserted into the pipe.

SER. NO. 88-590,168, FILED 08-23-2019



Director of the United States
Patent and Trademark Office

**AA512**

> ### REQUIREMENTS TO MAINTAIN YOUR FEDERAL TRADEMARK REGISTRATION
>
> ### WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.

**Requirements in the First Ten  Years***
**What and When to File:**

- *First Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date.  See 15 U.S.C. §§1058, 1141k.  If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

- *Second Filing Deadline:*  You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between the 9th and 10th years after the registration date.* See 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods***
**What and When to File:**

- You must file a Declaration of Use (or Excusable Nonuse) and an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.*

**Grace Period Filings***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:**  The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the United States Patent and Trademark Office (USPTO). The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations.  See 15 U.S.C. §§1058, 1141k.  However, owners of international registrations do not file renewal applications at the USPTO.  Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the  World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration.  See 15 U.S.C. §1141j.  For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE:  Fees and requirements for maintaining registrations are subject to change.  Please check the USPTO website for further information.  With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

**NOTE:  A courtesy e-mail reminder of USPTO maintenance filing deadlines will be sent to trademark owners/holders who authorize e-mail communication and maintain a current e-mail address with the USPTO.  To ensure that e-mail is authorized and your address is current, please use the Trademark Electronic  Application System (TEAS) Correspondence  Address and Change of Owner  Address Forms available at** http://www.uspto.gov.

**AA513**

# **<u>Exhibit 12</u>**

**AA514**

**Generated on:** This page was generated by TSDR on 2025-01-13 13:54:26 EST

**Mark:** ROOTERMAN

| | | | |
|---|---|---|---|
| **US Serial Number:** | 73456290 | **Application Filing Date:** | Dec. 09, 1983 |
| **Register:** | Principal | | |
| **Mark Type:** | Service Mark | | |

**TM5 Common Status Descriptor:** 

DEAD/APPLICATION/Refused/Dismissed or Invalidated

This trademark application was refused, dismissed, or invalidated by the Office and this application is no longer active.

**Status:** Abandoned because the applicant failed to respond or filed a late response to an Office action. To view all documents in this file, click on the Trademark Document Retrieval link at the top of this page.

**Status Date:** Sep. 30, 1985

**Date Abandoned:** Sep. 14, 1985

## Mark Information

**Mark Literal Elements:** ROOTERMAN

**Standard Character Claim:** Yes. The mark consists of standard characters without claim to any particular font style, size, or color.

**Mark Drawing Type:** 1 - TYPESET WORD(S) /LETTER(S) /NUMBER(S)

## Goods and Services

**Note:**
The following symbols indicate that the registrant/owner has amended the goods/services:
- Brackets [..] indicate deleted goods/services;
- Double parenthesis ((..)) identify any goods/services not claimed in a Section 15 affidavit of incontestability; and
- Asterisks *..* identify additional (new) wording in the goods/services.

**For:** SEWER AND DRAIN CLEANING

**International Class(es):** 037 - Primary Class      **U.S Class(es):** 103

**Class Status:** ABANDONED

**First Use:** Sep. 30, 1980      **Use in Commerce:** Dec. 15, 1980

## Basis Information (Case Level)

| | | | |
|---|---|---|---|
| **Filed Use:** | Yes | **Currently Use:** | Yes |
| **Filed ITU:** | No | **Currently ITU:** | No |
| **Filed 44D:** | No | **Currently 44D:** | No |
| **Filed 44E:** | No | **Currently 44E:** | No |
| **Filed 66A:** | No | **Currently 66A:** | No |
| **Filed No Basis:** | No | **Currently No Basis:** | No |

## Current Owner(s) Information

**AA515**

**Owner Name:** ROOTERMAN, INC.

**Owner Address:** 3392 AMBERWAY COURT
CINCINNATI, OHIO UNITED STATES 45239

**Legal Entity Type:** CORPORATION  **State or Country** OHIO
**Where Organized:**

## Attorney/Correspondence Information

### Attorney of Record

**Attorney Name:** KEVIN J. HOPPER

### Correspondent

**Correspondent** KEVIN J HOPPER
**Name/Address:** DOUGLAS, PETTIT AND HOPPER CO
228 MILL ST
MILFORD, OHIO UNITED STATES 45150

### Domestic Representative - Not Found

## Prosecution History

| Date | Description | Proceeding Number |
|------|-------------|-------------------|
| Sep. 30, 1985 | ABANDONMENT - FAILURE TO RESPOND OR LATE RESPONSE | |
| Mar. 13, 1985 | NON-FINAL ACTION MAILED | |
| May 07, 1984 | LETTER OF SUSPENSION MAILED | |
| Apr. 27, 1984 | ASSIGNED TO EXAMINER | |

## TM Staff and Location Information

### TM Staff Information

**TM Attorney:**   **Law Office** data usage
**Assigned:**

### File Location

**Current Location:** FILE REPOSITORY (FRANCONIA)  **Date in Location:** Oct. 10, 1985

**AA516**

# **<u>Exhibit 13</u>**

**AA517**

| To: | A Corp. (Lj@jennyliulaw.com) |
|---|---|
| Subject: | U.S. TRADEMARK APPLICATION NO. 77923448 - ROOTER MAN - N/A |
| Sent: | 5/6/2010 5:19:31 PM |
| Sent As: | ECOM115@USPTO.GOV |
| Attachments: | |

## UNITED STATES PATENT AND TRADEMARK OFFICE

**SERIAL NO**:     77/923448

**MARK**: ROOTER MAN

**CORRESPONDENT ADDRESS**:
JENNY LIU
JENNY J. LIU LAW OFFICE
PO BOX 290
NORTH BILLERICA, MA 01862-0290

# *77923448*

**RESPOND TO THIS ACTION:**
http://www.uspto.gov/teas/eTEASpageD.htm

**GENERAL TRADEMARK INFORMATION:**
http://www.uspto.gov/main/trademarks.htm

**APPLICANT**:     A Corp.

**CORRESPONDENT'S REFERENCE/DOCKET NO** :
N/A

**CORRESPONDENT E-MAIL ADDRESS**:
Lj@jennyliulaw.com

## OFFICE ACTION

TO AVOID ABANDONMENT, THE OFFICE MUST RECEIVE A PROPER RESPONSE TO THIS OFFICE ACTION WITHIN 6 MONTHS OF THE ISSUE/MAILING DATE.

**ISSUE/MAILING DATE: 5/6/2010**

The referenced application has been reviewed by the assigned trademark examining attorney.  Applicant must respond timely and completely to the issue(s) below.  15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

No Conflicting Marks Noted
 The trademark examining attorney has searched the Office's  database of registered and pending marks and has found no conflicting marks that would bar registration under Trademark Act Section 2(d).  TMEP §704.02; *see* 15 U.S.C. §1052(d).

Claim of Ownership
If applicant is the owner of U.S. Registration Nos. 1654512, 1655782 and 2433386, then applicant must submit a claim of ownership.  *See* 37 C.F.R. §2.36; TMEP §812.  The following standard format is suggested:

**Applicant is the owner of U.S. Registration Nos. 1654512, 1655782 and 2433386.**

Underline: Disclaimer Required
The Office can require an applicant to disclaim an unregistrable part of a mark consisting of particular wording, symbols, numbers, design elements or combinations thereof.  15 U.S.C. §1056(a).  Under Trademark Act Section 2(e), the Office can refuse registration of an entire mark if the entire mark is merely descriptive, deceptively misdescriptive, or primarily geographically descriptive of the goods.  15 U.S.C. §1052(e). Thus, the Office may require an applicant to disclaim a portion of a mark that, when used in connection with the goods or services, is merely descriptive, deceptively misdescriptive, primarily geographically descriptive, or otherwise unregistrable (e.g., generic).  *See* TMEP §§1213, 1213.03.

**AA518**

Failure to comply with a disclaimer requirement can result in a refusal to register the entire mark.  TMEP §1213.01(b).

A "disclaimer" is a statement that applicant does not claim exclusive rights to an unregistrable component of a mark.   TMEP §1213.  A disclaimer does not affect the appearance of the applied-for mark.  *See* TMEP §1213.10.

Applicant must insert a disclaimer of "ROOTER" in the application because it is descriptive of applicant's services, which feature rooter-based plumbing and cleaning services – indeed, various third parties have previously disclaimed the same term for the same (or related) services (*see* attached).  *See* 15 U.S.C. §1056(a); TMEP §§1213, 1213.03(a).

The following is the accepted standard format for a disclaimer:

>        No claim is made to the exclusive right to use "ROOTER" apart from the mark as shown.

TMEP §1213.08(a)(i).

**Response by Telephone Suggested**
**Applicant is encouraged to telephone the assigned trademark examining attorney to resolve the issues raised in this Office action.**

 TEAS PLUS APPLICANTS MUST SUBMIT DOCUMENTS ELECTRONICALLY OR SUBMIT FEE:  Applicants who filed their application online using the reduced-fee TEAS Plus application must continue to submit certain documents online using TEAS, including responses to Office actions.  For a complete list of these documents, see TMEP §819.02(b).  In addition, such applicants must accept correspondence from the Office via e-mail throughout the examination process and must maintain a valid e-mail address.  37 C.F.R. §2.23(a)(2); TMEP §§819, 819.02(a).  TEAS Plus applicants who do not meet these requirements must submit an additional fee of $50 per international class of goods and/or services.  37 C.F.R. §2.6(a)(1)(iv); TMEP §819.04.  Responding by telephone to authorize an examiner's amendment will not incur this additional fee.

/Marc J. Leipzig/
Law Office 115
**Trademark Examining Attorney**
Phone:  (571) 272-2104

**RESPOND TO THIS ACTION:** Applicant should file a response to this Office action online using the form at
http://www.uspto.gov/teas/eTEASpageD.htm, waiting 48-72 hours if applicant received notification of the Office action via e-mail.  For *technical* assistance with the form, please e-mail TEAS@uspto.gov.  For questions about the Office action itself, please contact the assigned examining attorney.  **Do not respond to this Office action by e-mail; the USPTO does not accept e-mailed responses.**

If responding by paper mail, please include the following information: the application serial number, the mark, the filing date and the name, title/position, telephone number and e-mail address of the person signing the response.  Please use the following address: Commissioner for Trademarks, P.O. Box 1451, Alexandria, VA 22313-1451.

**STATUS CHECK:** Check the status of the application at least once every six months from the initial filing date using the USPTO Trademark Applications and Registrations Retrieval (TARR) online system at http://tarr.uspto.gov.  When conducting an online status check, print and maintain a copy of the complete TARR screen.  If the status of your application has not changed for more than six months, please contact the assigned examining attorney.

**AA519**

| | |
|---|---|
| **To:** | A Corp. (Lj@jennyliulaw.com) |
| **Subject:** | U.S. TRADEMARK APPLICATION NO. 77923448 - ROOTER MAN - N/A |
| **Sent:** | 5/6/2010 5:19:34 PM |
| **Sent As:** | ECOM115@USPTO.GOV |
| **Attachments:** | |

## IMPORTANT NOTICE REGARDING YOUR TRADEMARK APPLICATION

**Your trademark application (Serial No. 77923448) has been reviewed. The examining attorney assigned by the United States Patent and Trademark Office ("USPTO") has written a letter (an "Office action") on 5/6/2010 to which you must respond (*unless the Office letter specifically states that no response is required*). Please follow these steps:**

**1. Read** the Office letter by clicking on this **link** http://tmportal.uspto.gov/external/portal/tow?DDA=Y&serial_number=77923448&doc_type=OOA&mail_date=20100506 **OR** go to **http://tmportal.uspto.gov/external/portal/tow** and enter your serial number to access the Office letter. If you have difficulty accessing the Office letter, contact **TDR@uspto.gov**.

**PLEASE NOTE**: The Office letter may not be immediately available but will be viewable within 24 hours of this e-mail notification.

**2. Contact** the examining attorney who reviewed your application if you have any questions about the content of the Office letter (contact information appears at the end thereof).

**3. Respond** within 6 months, calculated from 5/6/2010 (*or sooner if specified in the Office letter*), using the Trademark Electronic Application System (TEAS) **Response to Office Action form**. If you have difficulty using TEAS, contact **TEAS@uspto.gov**.

### ALERT:

**Failure to file any required response by the applicable deadline will result in the ABANDONMENT (loss) of your application.**

**Do NOT hit "Reply" to this e-mail notification, or otherwise attempt to e-mail your response, as the USPTO does NOT accept e-mailed responses.**

**AA520**

# **<u>Exhibit 14</u>**

AA521

| | |
|---|---|
| **To:** | Sandro Paterno(info@paternoandassociates.com) |
| **Subject:** | U.S. Trademark Application Serial No. 97346878 - 911 SEWER & DRAIN |
| **Sent:** | April 26, 2024 06:40:15 PM EDT |
| **Sent As:** | tmng.notices@uspto.gov |

**Attachments**

## United States Patent and Trademark Office (USPTO)
### Office Action (Official Letter) About Applicant's Trademark Application

**U.S. Application Serial No.** 97346878

**Mark:** 911 SEWER & DRAIN

**Correspondence Address:**
Mary Garner
Paterno & Associates P.C.
11 Broadway, Suite 865
New York NY 10004
UNITED STATES

**Applicant:** Klodian Belegu

**Reference/Docket No.** N/A

**Correspondence Email Address:** info@paternoandassociates.com

# NONFINAL OFFICE ACTION

**Response deadline.** File a response to this nonfinal Office action within three months of the "Issue date" below to avoid abandonment of the application. Review the Office action and respond using one of the links to the appropriate electronic forms in the "How to respond" section below.

**Request an extension.** For a fee, applicant may request one three-month extension of the response deadline prior to filing a response. The request must be filed within three months of the "Issue date" below. If the extension request is granted, the USPTO must receive applicant's response to this letter within six months of the "Issue date" to avoid abandonment of the application.

**Issue date:** April 26, 2024

## Introduction

The statement of use has been reviewed by the assigned trademark examining attorney. Applicant must respond timely and completely to the issue below. 15 U.S.C. §1062(b); 37 C.F.R. §§2.62(a), 2.65(a); TMEP §§711, 718.03.

**AA522**

The Office has reassigned this application to the undersigned trademark examining attorney.

**Summary of Issues**

- Specimen Refusal - Mark not Shown on Specimen

**Specimen Refusal - Mark not Shown on Specimen**

**Mark not shown on specimen.** Registration is refused because the applied-for mark does not appear anywhere on the specimen for International Class 037; thus, the specimen does not show the applied-for mark as actually used in commerce for each international class. Trademark Act Sections 1 and 45, 15 U.S.C. §§1051, 1127; 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a), 1301.04(f)(i), (g)(i). An application based on Trademark Act Section 1(a) must include a specimen showing the applied-for mark as actually used in commerce for each international class of goods and/or services identified in the statement of use. 15 U.S.C. §1051(a)(1); 37 C.F.R. §§2.34(a)(1)(iv), 2.56(a); TMEP §§904, 904.07(a).

Specifically, the applied-for-mark, "911 SEWER & DRAIN" does not appear on the submitted specimen.

**Examples of specimens.** Specimens for goods include a photograph of (1) the actual goods bearing the mark; (2) an actual container, packaging, tag or label for the goods bearing the mark; or (3) a point-of-sale display showing the mark directly associated with the goods. *See* 37 C.F.R. §2.56(b)(1), (c); TMEP §904.03(a)-(m). A webpage specimen submitted as a display associated with the goods must show the mark in association with a picture or textual description of the goods and include information necessary for ordering the goods. TMEP §904.03(i); *see* 37 C.F.R. §2.56(b)(1), (c).

Specimens for services must show a direct association between the mark and the services and include: (1) copies of advertising and marketing material, (2) a photograph of business signage or billboards, or (3) materials showing the mark in the sale, rendering, or advertising of the services. *See* 37 C.F.R. §2.56(b)(2), (c); TMEP §1301.04(a), (h)(iv)(C).

Any webpage printout or screenshot submitted as a specimen must include the webpage's URL and the date it was accessed or printed on the specimen itself, within the TEAS form that submits the specimen, or in a verified statement under 37 C.F.R. §2.20 or 28 U.S.C. §1746 in a later-filed response. *See* 37 C.F.R. §2.56(c); TMEP §§904.03(i), 1301.04(a).

**Response option.** Applicant may respond to this refusal by submitting, for each applicable international class, a different specimen (a verified "substitute" specimen) that (a) was in actual use in commerce prior to the expiration of the deadline for filing the statement of use and (b) shows the mark in actual use in commerce for the goods and/or services identified in the statement of use. A "verified substitute specimen" is a specimen that is accompanied by the following statement made in a signed affidavit or supported by a declaration under 37 C.F.R. §2.20: "The substitute (or new, or originally submitted, if appropriate) specimen(s) was/were in use in commerce prior to expiration of the filing deadline for filing a statement of use." The substitute specimen cannot be accepted without this statement.

Applicant may not withdraw the statement of use. *See* 37 C.F.R. §2.88(f); TMEP §1109.17.

**AA523**

For an overview of this response option and instructions on how to submit a different specimen using the online Trademark Electronic Application System (TEAS) form, see the Specimen webpage.

<u>Response Options to Refusals</u>

Although applicant's mark has been refused registration, applicant may respond to the refusal(s) by submitting evidence and arguments in support of registration.

**<u>Response Guidelines</u>**

**Response guidelines.** For this application to proceed, applicant must explicitly address each refusal and/or requirement in this Office action. For a refusal, applicant may provide written arguments and evidence against the refusal, and may have other response options if specified above. For a requirement, applicant should set forth the changes or statements. Please see the Responding to Office Actions webpage for more information and tips on responding.

Please call or email the assigned trademark examining attorney with questions about this Office action. Although an examining attorney cannot provide legal advice, the examining attorney can provide additional explanation about the refusal(s) and/or requirement(s) in this Office action. *See* TMEP §§705.02, 709.06.

The USPTO does not accept emails as responses to Office actions; however, emails can be used for informal communications and are included in the application record. *See* 37 C.F.R. §§2.62(c), 2.191; TMEP §§304.01-.02, 709.04-.05.

**How to respond.** File a **response form to this nonfinal Office action** or file a **request form for an extension of time to file a response**.

/Ashton Copeland/
Ashton Copeland
Examining Attorney
LO111--LAW OFFICE 111
(571) 270-0690
Ashton.Copeland@uspto.gov

# RESPONSE GUIDANCE

- **Missing the deadline for responding to this letter will cause the application to abandon.** A response or extension request must be received by the USPTO before 11:59 p.m. **Eastern Time** of the last day of the response deadline. Trademark Electronic Application System (TEAS) system availability could affect an applicant's ability to timely respond. For help resolving technical issues with TEAS, email TEAS@uspto.gov.

- **Responses signed by an unauthorized party** are not accepted and can **cause the application to**

**AA524**

**abandon.** If applicant does not have an attorney, the response must be signed by the individual applicant, all joint applicants, or someone with <u>legal authority to bind a juristic applicant</u>. If applicant has an attorney, the response must be signed by the attorney.

- If needed, **find contact information for the supervisor** of the office or unit listed in the signature block.

**AA525**

United States Patent and Trademark Office (USPTO)

# USPTO OFFICIAL NOTICE

Office Action (Official Letter) has issued
on April 26, 2024 for
**U.S. Trademark Application Serial No. 97346878**

A USPTO examining attorney has reviewed your trademark application and issued an Office action.  You must respond to this Office action to avoid your application abandoning.  Follow the steps below.

**(1)  Read the Office action**.  This email is NOT the Office action.

**(2)  Respond to the Office action by the deadline** using the Trademark Electronic Application System (TEAS).  Your response, or extension request, must be received by the USPTO on or before 11:59 p.m. **Eastern Time** of the last day of the response deadline.  Otherwise, your application will be abandoned.  See the Office action itself regarding how to respond.

**(3)  Direct general questions** about using USPTO electronic forms, the USPTO website, the application process, the status of your application, and whether there are outstanding deadlines to the Trademark Assistance Center (TAC).

After reading the Office action, address any question(s) regarding the specific content to the USPTO examining attorney identified in the Office action.

# GENERAL GUIDANCE

- **Check the status of your application periodically** in the Trademark Status & Document Retrieval (TSDR) database to avoid missing critical deadlines.

- **Update your correspondence email address** to ensure you receive important USPTO notices about your application.

- **Beware of trademark-related scams**.  Protect yourself from people and companies that may try to take financial advantage of you.  Private companies may call you and pretend to be the USPTO or may send you communications that resemble official USPTO documents to trick you.  We will never request your credit card number or social security number over the phone.  Verify the correspondence originated from us by using your serial number in our database, TSDR, to confirm that it appears under the "Documents" tab, or contact the Trademark Assistance Center.

- **Hiring a U.S.-licensed attorney**.  If you do not have an attorney and are not required to

**AA526**

have one under the trademark rules, we encourage you to hire a U.S.-licensed attorney specializing in trademark law to help guide you through the registration process.  The USPTO examining attorney is not your attorney and cannot give you legal advice, but rather works for and represents the USPTO in trademark matters.

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC<br><br>   *Plaintiff,*<br><br> v.<br><br>Klodian Belegu, Quality Air Care<br>Corporation, RM Water Damage<br>Restoration LTD and 911 Sewer Drain<br>Corporation.<br>   *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Docket No. 1:24-cv-13015

**LEAVE TO FILE GRANTED
ON JANUARY 21, 2025**

## PLAINTIFF S REPLY MEMORANDUM IN FURT ER SUPPORT OF ITS  MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Rooterman, LLC ("Rooterman") hereby submits this reply memorandum ("Reply") in further support of its motion for a preliminary injunction ("Motion").

### I.  INTRODUCTION

Defendants' Opposition to Rooterman's Motion ("Opposition") is notable for what it admits, and also for what it fails to address. What is generally clear from the Opposition is that Defendants (via defendant Klodian Belegu, who individually owns all corporate defendants) are scrambling to try to stop using the Rooterman trademarks, but still have not finished, and still believe there are certain things they should never have to do. Thus, the proposed Court Order Plaintiff requests is critical to protect its rights.

Indeed, Belegu's process of disassociating started approximately two months ago, even though Belegu's franchises were terminated approximately four months ago. Ways that Belegu continues to try to disassociate include removing the "RM" from his company name on December

1

**AA528**

27, 2024 (after he retained counsel and filed a motion for additional time to respond to Plaintiff's Motion. (See Docket No. 13)).[1] That said, there is much more to be done and Belegu continues to refuse to do much of it. From the evidence submitted by Plaintiff that, for example, with the rootermanplumberservices.com website (attached as Exhibit A to the Motion), and other internet activity which Belegu unabashedly acknowledges and seems to want to continue, Defendants improperly used and continue to use Plaintiff's trademarks and engage in flagrant competition in violation of Belegu's franchise covenants. Belegu even admits to a failure to return Plaintiff's confidential manuals for operating the Rooterman business. (See Opposition at 13, n.8) But as the Reply Declaration details herewith, there is much more that has not been returned. (See Reply Decl of N.King herewith,    7, 9) And, Belegu continues to confuse the market by not turning over domains, data and URLs pertaining to 911 Sewer    Drain business that are confusing the market about whether that business is actually a Rooterman business. (Id.    5, Exhibits C and D; id.    8, Exhibit E)[2]

Indeed, a disturbing way Belegu's Opposition addresses his and other Defendants' breach of Plaintiff's statutory and contractual rights is to beg for permission to finish up misusing them right now. In this respect, Belegu's Declaration refers generally to transferring "URLs" to some new website, instead of the offending website, and he pleads that if this process were interrupted now, he would lose tens of thousands of dollars, but he provides no details about these efforts at all. (See Opposition, Exhibit 1 thereto, Belegu Decl,    37-39) And, the bottom line is that Belegu is admitting that he has a number of "URLs" that are apparently misdirecting something now,

---

[1]    This does not change the fact that RM Water Damage is Belegu's competing corporation even if the RM is removed, as Rooterman's brand includes water damage restoration as part of its offerings. See Reply Decl. of N. King, filed herewith,    4 (www.rooterman.com/services/restoration)
[2]    What Belegu is referring to here is entirely unclear. He cannot excuse his behavior with a lack of evidence, nor with his claim that his offending actions are "controlled by third parties." (See Opposition at 6) He has a duty to take actions to cease and desist all offending behavior.

**AA529**

though what those URLs are is a mystery, and neither Belegu's Declaration nor Defendants' Opposition identifies them. This, among other things, makes the relief requested by Plaintiff more critical because the evidence presented and reasonable inferences thereon show that some or all of such URL's were (or still are) using the Rooterman marks and they are now apparently "redirecting" Google users to some new website, presumably 911 Sewer    Drain, which directly competes with Rooterman.

Defendants' effort to try to throw "sand" at the matter by bringing up things that happened in 2019/2020/2021 before Premium Service Brands purchased the Rooterman assets and trademarks from A. Corp. in 2022 are irrelevant. Also irrelevant is the half-hearted argument Rooterman did not adequately build or assist with "micro-sites." Micro-sites were admittedly a marketing experiment and effort with A. Corp., but even the correspondence about those micro-sites attached as Exhibits to Defendants' Opposition demonstrate Plaintiff making efforts to cooperate and sort those matters out with Belegu during the term of his franchise relationship. That is a natural business partnership between franchisor and franchisee who look to collaborate on effective marketing.[3] However, given Defendants' protests about those matters and apparent frustration by Belegu that he invested heavily in those micro-sites  *ile  e   as a fran   isee*, a substantial question arises as to whether he is still using any of those micro-sites because he considers them "his" despite the franchisor contractually owning all intellectual property and materials developed during the term of the franchise. (See Exhibit C to the Amended Complaint,

---

[3]     A franchisor has an absolute right, as well as a duty, to control marketing system-wide. See 16 C.F.R. § 436.1(h) (defining a franchise by, among other things, the requirement upon a franchisor to exercise a "significant degree of control" over the franchisee's methods of operation). In fact here, as in many franchise relationships, this was a contractual right as well. See Amended Complaint, Exhibit C thereto, § 7 (detailing the franchisor's right to control all marketing and advertising), § 12.1.C (detailing the franchisor's right to modify and adopt new procedures and programs)).

AA530

§§ 7.1B, 16B)

In sum and substance, Defendants' Opposition not only admits Belegu's violation of Plaintiff's statutory and contractual trademark rights, but also, the effort to excuse doing so confirms Belegu's (and all corporate Defendants, which he solely owns) willful and wrongful intent. At this time, based on the Verified Complaint and Belegu's admissions in his Opposition, it is clear that Defendants are unabashedly competing with Rooterman in the identical markets Belegu and his entities owned franchises, and Plaintiff has good evidence to infer and support how discovery will reveal they have been doing so since the inception of Defendants' competing corporations.[4] In this regard, despite Defendants' untenable arguments to the contrary, noncompetition agreements are very much validated and upheld by courts in the franchise context, particularly upon the termination of a franchise relationship. Indeed, where would Dunkin Brands be, for example, if every donut franchise could terminate and simply change the signage to "Dippin Donuts." Trademarks, branding, goodwill, and reputation would be reduced to mere library books on a shelf, and franchisees would have unfettered ability to buy in, learn, and then leave, taking all of the franchisor's investment and goodwill with them. That is exactly what Belegu did here with RM Water Damage Restoration and 911 Sewer    Drain, and what he now protests he somehow had the right to do, and it is highly improper. To excuse such an unabashed breach of contract, Defendants' Opposition boldly claims that Plaintiff has no "legitimate business interest" in stopping Belegu from competing. Caselaw is quite clear otherwise.

Once again, Plaintiff is not seeking extraordinary relief with its Motion. Plaintiff is seeking

---

[4]     Plaintiff reminds this Court, however, that beyond the request for injunctive relief, permitted by Exhibit C to the Amended Complaint outside of arbitration, these matters will be litigated in the separate AAA arbitration commenced by Plaintiff to address all of defendants statutory and contractual violations. This action was commenced to obtain injunctive relief only, and if such relief is granted, Plaintiff will seek a stay of matters herein pending arbitration.

**AA531**

relief that any franchisor would rightfully want, and that is both statutorily and contractually available to it: cease and desist using Plaintiff's trademarks, return Plaintiff's proprietary and confidential information, and cease and desist from competing with Plaintiff in the identical markets where Belegu owned his franchises. Plaintiff is not even asking Belegu or his entities to cease and desist competing 100 miles from Belegu's former franchise territories, though it readily could ask for that contractually. (See Amended Complaint,    20, citing Exhibit C, §18.1) Thus, even the relief Plaintiff requests is narrowly tailored and confined to protect its legitimate business interest in the most narrow of ways: *i e*, its goodwill and customers in only the zip codes in which Belegu was a franchisee, identified herewith. (<u>See</u> Reply Decl of N.King filed herewith,    3, Exhibit B thereto)

## II.    NOTABLE FACTUAL FAILURES    IT   BELE   U S RESPONSE

From Page 1 of Defendants' Opposition, there are flagrant misstatements. Among them is the comment on Page 1 that Plaintiff "vaguely points to a list of marks it owns" and "no marks are being infringed on." Then, on Page 3, Defendants state that "since then  the termination of Belegu's franchise agreements on September 16, 2024 , Belegu and QAC ceased using the Rooterman name and Plaintiff's alleged marks." (<u>See also</u> <u>id.</u> Opposition, p.9)  Exhibit A to the Amended Complaint belies this: *i e*, Belegu's website, Rootermanplumberservices.com was, as of December 4, 2024, plastered with Plaintiff's trademarks. This is nearly 3 months after Belegu's franchise agreements were terminated September 16, 2024. In other words, from September 17th to at least December 4, 2024, Belegu was continuing to use Plaintiff's trademarks and confuse the market. The specific trademark he is using is reflected on p.3 of Exhibit B to the Amended Complaint (*i e*, the "Rooterman  To The Rescue'" logo, trademarked March 17, 2020; Reg. No. 6,013,446). There is nothing "vague" about that, and there is clear infringement of Plaintiff's

**AA532**

marks in that activity. Title 15 of the U.S. Code, Section 1125(a), forbids the use of, among other

things, "any word, term, name  etc.  " likely to cause confusion, or mistake or deceive in the market,

and that is precisely what Belegu has done. The "rootermanplumberservices.com" website now

even redirects to 911 Sewer    Drain to this day. (<u>See</u> Reply Decl of N.King filed herewith,    8,

Exhibit E thereto) Along similar lines, Exhibit 1 to Plaintiff's Memorandum in Support of its

Motion shows the insertion of the words "Rooterman of New Jersey" into a Google search page,

and Belegu's competing corporation, defendant 911 Sewer    Drain, appearing. And, Exhibit 2 to

Plaintiff's Memorandum shows 911 Sewer    Drain's business being exactly the same business as

Rooterman.[5] Thus, it is false for Belegu to state on pp. 3-4 in his Opposition: "Despite it not even

being a franchisee, and being engaged in an entirely different line of business than Rooterman's

services," Belegu has taken supposed all proper steps. He has not. His company, 911 Sewer

Drain, is engaged in an identical business as Rooterman.

       If Belegu is not making flagrant misstatements of fact in his Opposition, he is arguing

proverbial "red-herrings." For example, Belegu argues that two corporate defendants (911 Sewer

    Drain, and RM Water Damage Restoration) were not part of Belegu's many franchise

agreements. (<u>See</u> Opposition at 2) Belegu appears to be trying to position his case in a way that he

can establish a separate corporation to infringe on Plaintiff's marks *d rin   is fran ise*

*relati ns i  and after  ard* and rightfully compete with Plaintiff all along. Not so. A party to a

restrictive covenant cannot escape the covenant by forming a corporation to compete instead. That

would make a mockery of every restrictive covenant.

       As another example of a "red-herring," Belegu purports to present evidence that Rooterman

somehow did not pursue others who were violating their contractual obligations, referencing a

phone number in Lakewood, New Jersey, and other Google listings that did not direct traffic to

---

[5] Compare Amended Complaint,    22 (listing Rooterman services) and    23 (listing 911 Sewer    Drain services).

**AA533**

Rooterman franchises. There is zero factual support for Belegu's statements but, in any event, and much of it appears to pre-date Plaintiff's acquisition of A.Corp. (See Opposition at 2) That said, as set forth in the Reply Decl of Plainitff's General Counsel herewith, Rooterman (even when owned by A. Corp. has taken numerous steps to enforce its trademarks (far from abandoning them, as Belegu argues) (See Reply Decl of N.King, filed herewith   2, Exhibit A thereto, and Reply Decl of J.Rosin, filed herewith))

     Belegu even engages in a tortured argument to try to set up a dispute about the use of the letters "RM" and whether they are a word or a design mark.[6] (See Opposition at p. 4) This is all beside the point. What the use of the RM letters reflects is Belegu's clear attempt to confuse and present this as a Rooterman business when it was not. And notably, Belegu reflects his consciousness of that wrongdoing by acknowledging changing that RM name on December 27, 2024, after being sued, reading Plaintiff's complaint, and hiring counsel to defend.

     The only argument that appears not to be filled with misstatements or red-herrings comes within one that has them. That is, Belegu falsely argues that he is no longer using "rootermanplumberservices.com" for "marketing or advertising," yet, he attests that there are "personally-owned website links" he is having Google update to a new website domain. (See Opposition at p. 4). That is a subject for substantial discovery. *a  tl    at are t ese s    sed ers nall   ned  e site lin s    at  rds and  rases d t e  se   en did  e reate t e    as it d rin  is fran ise relati ns i*  If so, worth pointing out, Plaintiff can claim a right, title and interest in them, both by way of its existing trademark rights, and pursuant to Exhibit C to the Amended Complaint, Section 8.1. That Belegu is now treating them as his own,

---

[6]    Belegu claims in Footnote 4 of his Opposition that Belegu's in-laws initials and his wife's initials backwards are "RM." A more reasonable inference is that the "RM" was intended to confuse the public that the entity was associated with Rooterman, which does have a design mark reflecting "RM" in a colorful circle. (See Amended Complaint, Exhibit B thereto, at p.4)

**AA534**

when they may not be, and that he has not returned them or turned them over to the franchisor, and that he is using them to redirect the public to his competing entity(ies) is part of the problem Plaintiff seeks to stop with its proposed Order.

Ultimately, apparently understanding at least part of his wrongdoing, Belegu pleads for mercy and time to make the changes he claims he is making with Google, since he will supposedly "lose the benefit of tens of thousands of dollars spent on the website www.rootermanplumberservices.com ." (See Opposition at 4, n. 6) But here is where Plaintiff's case remains strong as well. Belegu admits spending tens of thousands of dollars building the very website that flagrantly misused Plaintiff's trademarks and continues to this day to do so. (See Reply Decl of N.King, filed herewith,   8)  However, it is Plaintiff who is entitled to the fruits of that investment, not Belegu. His statutory and contractual obligation was to disassociate completely upon termination of his franchises, and not misuse trademarks and intellectual property to compete. To use a metaphor, if the rootermanplumberservices.com website were a vehicle, Belegu had (and has) no right whatsoever to remove the engine, and strip all of its parts and tires, and leave the franchisor with merely the shell body. He must return his all components of his business that rely on "Rooterman" to the franchisor, and he must not compete in violation of his restrictive covenant.

This Court should enter the proposed Order Plaintiff seeks.

### III.    AR UMENT

**A. Defendant   Ar u ent  That Plaintiff Doe  Not Sho   A Li elihood of Succe   On the Merit  of it  Section 1125 a  and Section 1114 Clai    I nore The E idence**

Plaintiff first argues that Plaintiff has not shown any "use" of its trademarks. That, of course, requires one to ignore all of the evidence summarized above. What Belegu has done, and continues to do reflects a clear violation of Section 1125(a) and, under Section 1114(1)(a)-(b),

**AA535**

Belegu and his offending defendant corporations are liable. <u>See</u>            *at re s Pr d  ts,  n*

*le  ent Man fa t rin  Partner,  n* , 2024 WL 13452228 (E.D.N.Y. March 29, 2024)

(holding former co-owners redirection of URL to new website violation of Lanham Act)

Belegu's competing businesses that have used and misused Plaintiff's trademarks include

his website, rootermanplumberservices.com, 911 Sewer    Drain, and "RM" Water Damage

Restoration, even if the "RM" was removed three weeks ago (as it has always been a corollary to

the Rooterman business that franchisees could augment their businesses as franchisees by

engaging in water damage restoration, a typical further problem in the event of a clogged drain,

<u>see</u> Reply Decl of N.King,   4).[7]

Arguing that Plaintiff's case is "moot", as Defendants do on Page 6 of their Opposition,

is meritless. It literally requires the Court to read Belegu's Declaration, accept conclusory

statements in it at face value, ignore the lack of evidentiary support for multiple statements, have

no questions for cross-examination, and conclude that "because Belegu said so," there is no more

infringement occurring. Yet, such a line of logic is belied by Belegu's own Declaration, which

itself states that he is still working with Google to finish up what he needs to do to protect his

investment in <u>rootermanplumberservices.com</u>. Along similar lines, while Belegu states that he

has contracted X/Twitter to "address the issue," he provides no information about when these

efforts were taken or what they entail. (<u>See</u> Belegu Decl,   36). This, in part, is why the

injunction and Order is needed. With Belegu having flagrantly misused Plaintiff's trademarks,

and with his continued protests about what he still needs to do, the Court should be very clear

with its Order that, whatever he is doing, to the extent it continues to misuse Plaintiff's

---

[7] Rooterman, through their authorized franchisees, offer leak detection services and restoration services for water, fire, and mold damage. <u>See</u>   *er  i  es*, Rooterman, <u>https://www.rooterman.com/services/</u> (last visited Dec. 16, 2024); <u>see also</u> Exhibit C to the Amended Complaint, § 8.3.

**AA536**

trademarks, it must cease. Plaintiff is hardly asking for "moot" relief. It is asking this Court to recognize that Belegu's very disjointed and difficult to follow declaration, unsupported by any actual evidence, does not prove his innocence at all. Indeed, the proposed Order Plaintiff seeks asks that Belegu takes the steps required by the Order, and then report back to the Court with a status report about those steps. That is exactly what 15 U.S.C. §1116(a) contemplates.[8]

Defendants' positioning of Plaintiff's case as a request for "reverse veil piercing" is off base. That is not what Plaintiff seeks at all.  Here, and clearly, RM Water Damage Restoration and 911 Sewer     Drain are Belegu's competing corporations. As noted above, even if rootermanplumberservices.com is typed into the Google search box, once "enter" is pressed on the keyboard, the website that appears is 911SewerDrain.com. (See Reply Decl of N.King, filed herewith,  8) That is not just likely to cause confusion; it is a certainty to cause confusion.

Defendants' argument pertaining to Plaintiff's supposed "abandonment" of its marks fares no better and is readily refuted herewith by the evidence that Plaintiff routinely protects its trademarks. (See Reply Decl of N.King, filed herewith,  2)[9] Of course, Belegu's argument also ignores this very case, whereby on September 16, 2024, when his franchise agreements were terminated, he was told to cease and desist using the Rooterman marks (see Amended Complaint, Exhibit K), and when the undersigned sent follow-up communications that were ignored by Belegu as well. (See Reply Decl of J. Rosin, Exhibit 1 thereto) All of these efforts reflect Plaintiff duly enforcing its trademark rights and not abandoning them.

---

[8]     See §1116(a) noting the ability of a court to issue an injunction and that "Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction."

[9]     While Belegu's partly complains about what A. Corp. did or did not do, any such claims lapsed by way of a contractual limitations period, and such arguments are waived. (See Amended Complaint, Exhibit C thereto, Section 19.7.G)

Belegu's arguments that there is no likelihood of success on the merits of Plaintiff's contract claim, for breach of the non-competition clauses, or failure to return Plaintiff's confidential and proprietary information also lack merit. As an initial matter, Belegu admits not returning Plaintiff's confidential information. (See Opposition at 13, n.8) And, there is substantial confidential information and other matters (such as Rooterman phone numbers) he is responsible for returning that he has not returned. (See Reply Decl of N.King,    7, 9) While Belegu defends against the breach of his non-compete by arguing that 911 Sewer    Drain Corporation, which formed in 2022, "did not begin active operations" until after his franchise agreements were terminated, (see Opposition at p.13), that claim is subject to substantial doubt, given the registration of its marks in 2022 and active work organizing it in 2024. (Id.) Regardless, it proves Belegu's violation of the non-competition clause. Indeed, as set forth above and in the Reply Declaration of Nathan King, 911 Sewer    Drain is the re-routed business of rootermanplumberservices.com. It is plainly a competing entity. At the bottom of its website, 911sewerdrain.com, it even references the ability to own a franchise in its name. Make no mistake, Belegu has engaged in a wholesale effort to build his very own "Rooterman," which is exactly that a franchise restrictive covenant guards against.

Belegu's back-up arguments consist of defenses that Plaintiff has "unclean hands" and/or was allegedly the first to breach the contracts. (See Opposition at 16) Neither of those arguments are supported with any clear detail demonstrating that they will be dispositive defenses. But most of the arguments pertain to occurrences by A.Corp., and as noted about in Footnote 9, any such defenses of inaction or breach by A.Corp. prior to plaintiff's acquisition in 2022, would be barred by the contractual 1-year limitations period in Belegu's franchise agreements. (See Amended Complaint, Exhibit C thereto, at Section 19.7.G)

AA538

**B. Defendant    alf Pa e Ar u  ent That Plaintiff Cannot Sho   Irre ara le   ar
De er e  A  out The Sa  e Attention**

Plaintiff demonstrated in its opening Memorandum how, if there is trademark infringement, there should be a rebuttable presumption of irreparable harm. (See Motion/Memorandum at pp. 10-12); see also El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395 (2nd Cir. 1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder s trademark."). Moreover, the Supreme Judicial Court of Massachusetts has recognized that a franchisee competing with its franchisor is irreparable harm because it bespeaks the improper use of confidential information, trade secrets and goodwill that a former franchisee possesses but might be "impossible to prove." Boulanger v. Dunkin Donuts, Inc., 442 Mass. 635, 643, n.12 (2004); see also K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Circ. 1989) (" H arm to goodwill, like harm to reputation, is the type of harm not readily measurable or fully compensable in damages - and for that reason, more likely to be found  irreparable. ").

Given the likelihood of success on the merits of Plaintiff's claims, but Defendants half-page attention to arguing there is no irreparable harm, it is safe to conclude that Defendants cannot overcome the presumption that should be applicable here. That Belegu has submitted a self-serving affidavit that he supposedly does not "wish to continue" using Plaintiff's trademarks is nothing more than a whisper in the wind, particularly when in his own submission, Belegu pleads for additional time to stop using Plaintiff's trademarks. (See Opposition at 4, n.6, citing Belegu Decl at    38-39) That Belegu pleads for mercy pertaining to his business does not change the direct harm to Plaintiff's goodwill he is harming by competing in the exact zip codes he was a franchisee.

**AA539**

Per <u>Boulanger</u> and other authority cited by Plaintiff, in the franchise context, this is necessarily irreparable harm.

**C. Bele u  Re ainin  Ar u  ent  De er e Little Attention A    ell**

Clear from Belegu's Opposition and his Declaration, he feels justified in what he did. He bought 13 franchise markets and invested in them. But, he did not feel that his franchisor was doing all it could to support him. To combat this, he set up competing corporations, RM Water Damage Restoration, and 911 Sewer    Drain, and either immediately diverted business away from his franchise or, alternatively, when he was fully ready to launch, he stopped paying royalties to his franchisor and devoted all of his time to his competing businesses. Then, when his franchise agreements were terminated, he continued to use the Rooterman name, marks, and associated goodwill to drive business to his competing businesses. Despite demand, he did not start doing anything to change until he was sued and hired counsel.

There is nothing "inequitable" in issuing the Order requested by Plaintiff.  Quite the contrary, doing so ensures that Defendants cannot literally do the identical thing in the identical markets, when Belegu's contracts say he cannot. In fact, requiring that he cease and desist using trademarks and competing in those identical markets -- and, again, not reaching 100 miles outside of those markets, which Plaintiff has the right to do -- is itself a voluntary offer of a "balancing of equities" in Defendants' favor.  In his regard, Plaintiff seeks merely to protect the goodwill and loyalty of the customers in the precise markets Belegu had franchises, and not 100 miles further. That is a tipping of the scales that should weigh heavily in Plaintiff's favor on this favor. <u>See, e.g.</u> <u>Boulanger</u>, 442 Mass. at 644 (recognizing that in the business context, particularly when the business relationship terminates (in this case by sale), an expansive geographic restriction in a non-compete would be viewed as more likely reasonable) (citations omitted)).

**AA540**

Belegu's claim that the public would be harmed if he could not provide plumbing and drain services is pure conjecture. Simply doing a Google search for plumbers in Toms River, NJ, where Belegu's principal office lies, yields a plethora of plumbers throughout New Jersey. Moreover, to the extent there is any need for a plumber in this or any other market, new businesses can emerge to fill that need. Certainly, the public has an equal interest in new and local plumbers being welcomed to Toms River, and elsewhere, or national plumbing competitors expanding to meet a local need. Indeed, there are trade schools throughout New Jersey, for example, turning out more hopeful and future plumbers by the year. https://eastwick.edu/hohokus-school-of-trades/; https://www.lincolntech.edu/campus/south-plainfield-nj If anything, the public interest strongly favors a marketplace that welcomes them, and not one by which Belegu has a choke-hold.

### D. **Defendant   Re ue t For A    Million Bond I  An O  erreach**

Defendants request for a   3 million bond in their Opposition is a transparent request for the Court to monetarily punish Plaintiff. That aside, the request is premised upon a conclusory claim about Defendants' supposed year of income. Belegu does not attach any books or records to support that claim of income. He also does not even tie the claim to all Defendant corporations or just one or more of them. Moreover, he fails to set forth whether this is a gross number, or net income.

A court has wide discretion in determining whether to require the posting of a bond, and a court can choose to issue an injunction with no bond. See Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 782-783 (10th Cir. 1964). One factor that can sway a court not to require a bond is whether the plaintiff obtaining the injunction can pay for any damages caused by the wrongful issuance of an injunction. Id.; see also Anderson Foreign Motors, Inc. v. New England Toyota Distributors, Inc., 475 F. Supp. 973, 990 (D. Mass. 1979) (noting discretion under Rule 65(c) and

**AA541**

lack of evidence that plaintiff could pay damages from any wrongfully issued injunction as a reason to hold a subsequent hearing on the amount of an appropriate bond). Here, as Belegu's own affidavit acknowledges, plaintiff Rooterman is one of many franchises owned by Premium Service Brands. There is no evidence that Rooterman is underfunded. In fact, it has been a top franchise for over 20 years and there are over 450 locations in the United States. See _tt s l in fran ise r ter an fa at is t e ist r f r ter an at d es t rr l li e f r t e l in fran ise fa_ It is speculative to suggest at this stage that (a) Defendants would have to completely cease doing business as a result of the injunction requested, particularly since Plaintiff is not looking to enforce the 100 mile radius it could enforce, (b) issuing the injunction restricting Defendants from competing in the identical franchise territories previously owned by Belegu would, in any way, be wrongful (indeed, as noted above, Belegu's arguments about a lack of legitimate business interests, unclean hands, or prior breach, have no merit at all), or that (c) if the injunction were somehow wrongful, Plaintiff could not pay damages Belegu could actually prove were tied to the wrongful issuance of the injunction.

For this reason, this Court should exercise its discretion and issue an injunction without the requirement for posting any bond or, at best, require a token bond to respect this component of the Rule of Civil Procedure.

## IV.    CONCLUSION

For all of the additional reasons set forth above, the Motion should be granted in its entirety, and Plaintiff awarded the injunctive relief sought and set forth in its Proposed Order attached to its Amended Motion.

**AA542**

Respectfully submitted,

ROOTERMAN, LLC

By its counsel

Dated: January 21, 2025

*Jeffrey Rosin*

Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

**AA543**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of January 2025, *Plaintiff's e l Me rand in rt er rt f ts M ti n f r Preli inar n n ti n* was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

*Jeffrey Rosin*
Jeffrey M. Rosin

**AA544**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| Rooterman, LLC | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | )  Civil Action No. 1:24-cv-13015 |
| | ) |
| Klodian Belegu, Quality Air Care | ) |
| Corporation, RM Water Damage | ) |
| Restoration LTD and 911 Sewer    Drain | ) |
| Corporation. | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**<u>REPLY DECLARATION OF NATHAN KING</u>**

Pursuant to 28 U.S.C. § 1746, I, Nathan King, declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

1. I am the General Counsel of Plaintiff. I submit this declaration in support of Plaintiff's Reply Memorandum in Further Support Of Its Motion for Preliminary Injunction.

2. Rooterman, LLC has taken numerous efforts to enforce its trademarks around the country. In the recent years, Rooterman has filed two other lawsuits against former franchisees who continued to hold themselves out as a Rooterman franchisee and infringed on the Plaintiff's name and marks. This includes A Corp. DBA Rooterman v. Palmetto Group Investment, docket no. 1:20-cv-11901-MLW (D. Mass. 2020) and A Corp. v. America's Plumbing    Sewer, LLC, docket no. 1:22-cv-10915-IT (D. Mass. 2022)  Rooterman's outside counsel even wrote to Belegu and explained some of its efforts to enforce its trademarks to Belegu in a letter dated March 20, 2023, attached hereto as **<u>Exhibit A</u>** (referencing cease and desists and other efforts to enforce

**AA545**

trademarks in 2020, 2021 and 2022). In the last year alone, I too have sent at least six cease and desist letters to person and/or former franchisees in New Jersey, California and Ohio who are believed to be infringing on Rooterman's marks, and we continue to work on satisfactory actions by the recipients of such letters at this time. Once such situation is close to requiring another lawsuit. In this regard, Rooterman also considers this very lawsuit its effort to enforce its trademarks. As Exhibit K to the Amended Complaint shows, Rooterman made demands to Belegu starting September 16, 2024 that Belegu cease and desist using trademarks, and transfer domain names back to Rooterman. His failure to adhere to these demands, despite follow up notices from outside counsel November 13, and November 22, 2024, has necessitated this lawsuit. In short, far from abandoning its trademarks, Rooterman vigorously enforces them. Moreover, Rooterman communicates routinely with trademark counsel about its trademark applications and the status of its existing marks, and any updates needed.

3.  Belegu and/or his corporation, Quality Air Care Corporation, entered into 13 franchise agreements to do business as Rooterman in various counties and zip codes throughout New Jersey, New York, and Pennsylvania. Appendix 1 to each such Franchise Agreements details include the specific counties and/or zip codes of the licensed territories. Attached hereto as **Exhibit B** hereto is a true and accurate copy of each "Appendix 1" page from each of the 13 Franchise Agreements. This is intended to articulate for the court exactly where Plaintiff seeks an Order pertaining to its restrictive covenants.

4.  Rooterman's marks are not only for plumbing and drains, but a corollary to that business to that is for franchisees to offer and provide restoration services. See

**AA546**

www.rooterman.com/services/restoration Franchisees are encouraged to build their businesses by doing that. As such, as the Rooterman website duly shows, restoration services are part of the Rooterman brand offerings as well. This made "RM Water Damage Restoration" an improper competing corporation from the start, and that same scenario with that company exists now, even if "RM" has been removed from the name. In like kind, the same situation exists with 911 Sewer    Drain.

5.  Notably, there is a Google review on the "911 Sewer    Drain" listing, posted by Shenelle LaPierre, that states her insurance company dispatched "Rooter man Plumbing and Restoration" to service her home after her hot water heater failed and flooded her house. Attached hereto as **Exhibit C** is a true and accurate copy of this google review. There are countless other reviews of that company that reference Rooterman. For example, there is another Google review on the "911 Sewer    Drain" listing, posted by William Wild. There is a "Response from the owner" that states "Thank you for taking time to review Rooter Man of NJ, William " Attached hereto as **Exhibit D** is a true and accurate copy of this google review. There are also numerous other responses from 911 Sewer    Drain responding as "Rooter Man of NJ." Clearly, Belegu is using this entity in violation of his franchise obligations, and also to create confusion in the market.

6.  In fact, the 911 Sewer    Drain Facebook page has numerous postings, starting from February 22, **2021** to May 3, 2023, which holds the company out to be "Rooter Man of NJ" and provide direct links to www.rootermanplumberservices.com.

7.  To this day, Belegu has not turned over any of his Google business profiles, numerous of which reference Rooterman and belong to the brand, nor his phone number or any of his offending domains.

8.  Even today, as of the date of this affidavit, when rootermanplumberservices.com is typed into the address bar on the internet, the URL redirects to the website for 911 Sewer & Drain, 911sewerdrain.com. Attached hereto as **Exhibit E** is a true and accurate copy of screen shots which show this redirection.

9.  Moreover, as of this day, Belegu has not returned his franchise Operations Manual, the Rooterman Marketing Essentials Playbook, list of vendor contacts, Home Show presentation materials, phone scripts, all provided to him in 2022 and duly noted to be confidential. The return of all of this is required by his franchise agreements, Sections 18.2

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17th DAY OF JANUARY, 2025

_____
Nathan King

#5655612v1

# EXHIBIT A

# Jenny J. Liu's Law Office
### Attorney & Counsellor at Law
#### www.Jennyliulaw.com

P.O. Box 290
North Billerica, MA 01862

Tele: (978) 670-0718
Fax: (978) 663-0061
lj@jennyliulaw.com

Date:   March 20, 2023

By Email and Priority Mail
qacpic@gmail.com

Klodian Belegu
Quality Air Care Corporation
692 Sussex Ct.
Toms River, NJ 08753

RE:    Unauthorized Rooter Man listings

Dear Mr. Belegu,

This is to follow up to our telephone conversation on March 15, 2023. Based on our phone conversation, my understanding was that: (i) currently there were certain Google Rooter Man advertisements or listings in your licensed territory believed to be a former Rooter Man franchisee named Chris Bailey, which caused damages to your business; (ii) you reported to A Corp certain unauthorized internet Rooter Man ads and listing in 2020 and/or 2021; (iii) subsequently you also provided a list of many unauthorized Rooter Man internet ads and/or listings to A Corp. You wanted to follow up what A Corp. did in response to your reports and share with you the information which may help your counsel in your lawsuit against the infringers.

As you requested, I forwarded our conversation to Mr. Donald MacDonald and had a chance to confer with Mr. MacDonald and Ms. Charlene MacDonald. After search and review of my files and the files in the possession of A Corp., it appears that A Corp. took the following actions in response to your above said reports:

1. In June of 2020 and during the transaction for you to buy the Rooter Man territory from another Rooter Man franchise named Arbina Asani, A Corp. discovered that there were some unauthorized Rooter Man ads and/or listings by a former Rooter Man franchisee. On June 11, 2020, on behalf of A Corp., I sent said former franchisee a cease and desist letter and demanded him to stop the unauthorized ads and listings.

2. In August of 2020, on behalf of A Corp., I had multiple email correspondence with Chris Bailey and demanded him to de-identify himself as a Rooter Man business. Mr. Bailey indicated that he would comply with A Corp.'s demand.

3. On June 8, 2021, after we received your report of the unauthorized use of the Rooter Man mark by a former employee of your Rooter Man franchise, on behalf of A Corp. I sent said former employee a cease and desist letter.

1

**AA550**

4. On June 11, 2021, after we received your report of the unauthorized use of the Sewer Man mark by an infringer, on behalf of A Corp. I sent said infringer a cease and desist letter.

5. With respect to your report of a list of unauthorized Google Rooter Man ads and listings, said list was received by A Corp. in July of 2022. Charlene and Crystal spent a lot of time to contact each phone number on the list to verify the status of the ads and listings. In January of 2022, the Rooter Man franchise was sold, and all the then current franchise agreements were forwarded to the new franchisor, the Rooterman LLC and Premium Services Brand (collectively the "PSB"). As such, after Crystal and Charlene verified the status of above said ads and listing, they forwarded this matter to PSB.

6. Mr. MacDonald contacted PSB about your recent complaint of unauthorized Rooter Man ads and listings.

Your Rooter Man franchise agreement, Section 8.5 (B) provides the following:

> **"B.** With **A CORP's** permission, **FRANCHISEE** may institute litigation to protect **FRANCHISEE's** interest in the Trademark. In the event that the **FRANCHISEE** chooses to bring action, and **A CORP**, in its sole discretion, grants permission, **FRANCHISEE** shall be responsible for all costs of litigation and shall have a right to any damages collected for infringing use in **FRANCHISEE's** Territory."

Accordingly, with respect to your intent to file a lawsuit against the persons or entities who are not Rooter Man franchises and advertised as Rooter Man in your licensed areas, A Corp. is willing to help you by sharing the documents in its possession in support of your claims. However, A Corp. does not own the Rooter Man trademarks anymore and cannot initiate a trademark infringement action against the infringers. PSB as the current owner of the Rooter Man marks has the right and discretion how to enforce its trademark rights.

Thank you for your attention to this letter and please feel free to contact me if you have any questions.

Very truly yours,

Jenny Liu

Cc: Russell Kruse (via email rkruse@premiumservicebrands.com)
Paul Flick (via email pflick@premiumservicebrands.com)

2

**AA551**

# EXHIBIT B

AA552

**APPENDIX 1**

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|---|---|---|---|---|
| NJ | Ocean | Barnegat | 08005 | 22,448 |
| NJ | Ocean | Barnegat Light | 08006 | 518 |
| NJ | Ocean | Beach Haven | 08008 | 6,975 |
| NJ | Ocean | Manahawkin | 08050 | 24,285 |
| NJ | Ocean | Tuckerton | 08087 | 24,104 |
| NJ | Ocean | West Creek | 08092 | 3,673 |
| NJ | Ocean | Lakewood | 08701 | 92,843 |
| NJ | Ocean | Bayville | 08721 | 20,512 |
| NJ | Ocean | Beachwood | 08722 | 11,045 |
| NJ | Ocean | Brick | 08723 | 31,641 |
| NJ | Ocean | Brick | 08724 | 42,352 |
| NJ | Ocean | Forked River | 08731 | 20,009 |
| NJ | Ocean | Island Heights | 08732 | 1,484 |
| NJ | Ocean | Lakehurst | 08733 | 2,752 |
| NJ | Ocean | Lanoka Harbor | 08734 | 7,651 |
| NJ | Ocean | Lavallette | 08735 | 3,114 |
| NJ | Ocean | Mantoloking | 08738 | 1,042 |
| NJ | Ocean | Normandy Beach | 08739 | 0 |
| NJ | Ocean | Ocean Gate | 08740 | 2,010 |
| NJ | Ocean | Pine Beach | 08741 | 2,488 |
| NJ | Ocean | Point Pleasant Beach | 08742 | 24,405 |
| NJ | Ocean | Seaside Heights | 08751 | 4,212 |
| NJ | Ocean | Seaside Park | 08752 | 2,074 |
| NJ | Ocean | Toms River | 08753 | 63,678 |
| NJ | Ocean | Toms River | 08754 | 0 |
| NJ | Ocean | Toms River | 08755 | 25,302 |
| NJ | Ocean | Toms River | 08756 | 0 |
| NJ | Ocean | Toms River | 08757 | 33,217 |
| NJ | Ocean | Waretown | 08758 | 7,043 |
| NJ | Ocean | Manchestser Township | 08759 | 33,263 |

Total Unit(s)[1] Population: 514,140

Initials: _____
**A CORP**

Date: 09|12|19

Initials: _____
**FRANCHISEE**

Date: 9 -5 -19

[1] One unit is equal to 125,000 populations.

**AA553**

# APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Atlantic | All | All | 269,918 |
| NJ | Burlington | All | All | 448,596 |
| NJ | Camden | All | All | 510,719 |
| NJ | Cape May | All | All | 93,553 |
| NJ | Cumberland | All | All | 152,538 |
| NJ | Gloucester | All | All | 292,206 |
| NJ | Hunterdon | All | All | 125,059 |
| NJ | Mercer | All | All | 374,733 |
| NJ | Salem | All | All | 62,792 |
| NJ | Sussex | All | All | 141,682 |
| NJ | Union | All | All | 563,892 |
| NJ | Warren | All | All | 106,798 |
| NJ | Essex | Maplewood | 07040 | 23,876 |
| NJ | Essex | Millburn | 07041 | 6,868 |
| NJ | Essex | Short Hills | 07078 | 13,250 |
| NJ | Essex | South Orange | 07079 | 16,316 |
| NJ | Essex | Newark | 07101 | 0 |
| NJ | Essex | Newark | 07102 | 12,579 |
| NJ | Essex | Newark | 07103 | 32,698 |
| NJ | Essex | Newark | 07104 | 50,478 |
| NJ | Essex | Newark | 07105 | 46,983 |
| NJ | Essex | Newark | 07106 | 31,298 |
| NJ | Essex | Newark | 07107 | 37,650 |
| NJ | Essex | Newark | 07108 | 24,386 |
| NJ | Essex | Newark | 07111 | 53,942 |
| NJ | Essex | Newark | 07112 | 26,417 |
| NJ | Essex | Newark | 07114 | 14,748 |
| NJ | Essex | Newark | 07175 | 0 |
| NJ | Essex | Newark | 07184 | 0 |
| NJ | Essex | Newark | 07188 | 0 |
| NJ | Essex | Newark | 07189 | 0 |
| NJ | Essex | Newark | 07192 | 0 |
| NJ | Essex | Newark | 07193 | 0 |
| NJ | Essex | Newark | 07195 | 0 |
| NJ | Essex | Newark | 07198 | 0 |
| NJ | Essex | Newark | 07199 | 0 |
| NJ | Monmouth | Adelphia | 07710 | 0 |
| NJ | Monmouth | Atlantic Highlands | 07716 | 8,574 |
| NJ | Monmouth | Belford | 07718 | 6,263 |
| NJ | Monmouth | Cliffwood | 07721 | 2,974 |
| NJ | Monmouth | Hazlet | 07730 | 17,396 |
| NJ | Monmouth | Highlands | 07732 | 5,189 |
| NJ | Monmouth | Holmdel | 07733 | 16,849 |
| NJ | Monmouth | Keansburg | 07734 | 13,269 |

**AA554**

| NJ | Monmouth | Keyport | 07735 | 19,569 |
| NJ | Monmouth | Leonardo | 07737 | 4,264 |
| NJ | Monmouth | Marlboro | 07746 | 18,666 |
| NJ | Monmouth | Matawan | 07747 | 30,770 |
| NJ | Monmouth | Middletown | 07748 | 28,030 |
| NJ | Monmouth | Morganville | 07751 | 19,736 |
| NJ | Monmouth | Navesink | 07752 | 0 |
| NJ | Monmouth | Port Monmouth | 07758 | 4,967 |
| NJ | Monmouth | Rumson | 07760 | 9,283 |
| NJ | Monmouth | Tennent | 07763 | 0 |
| NJ | Monmouth | Wickatunk | 07765 | 0 |
| NJ | Monmouth | Eatontown | 07799 | 0 |

Total Unit(s)[1] Population: 4,208,504

Initials: _____
          **A CORP**

Date:   6-9-2020

Initials: _____
          **FRANCHISEE**

Date:   6-2-2020

Initials: _____
          **FRANCHISEE**

Date:   _____

---

[1] One unit is equal to 125,000 populations.

Rooter Man Franchise Agreement.2020          28

**AA555**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Morris | All | All | 499,693 |
| NJ | Passaic | All | All | 71,247 |

Total Unit(s)[1] Population: 570,940

Initials: _A CORP_

Date: 08-21 2020

Initials: _KB_

**FRANCHISEE**

Date: 8-11-2020

Initials: _____

**FRANCHISEE**

Date: _____

---

[1] One unit is equal to 125,000 populations.

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Monmouth | Red Bank | 07701 | 23,813 |
| NJ | Monmouth | Shrewsbury | 07702 | 3,809 |
| NJ | Monmouth | Fort Monmouth | 07703 | 690 |
| NJ | Monmouth | Fair Haven | 07704 | 6,133 |
| NJ | Monmouth | Allenhurst | 07711 | 1,533 |
| NJ | Monmouth | Asbury Park | 07712 | 39,158 |
| NJ | Monmouth | Deal | 07723 | 1,020 |
| NJ | Monmouth | Eatontown | 07724 | 21,710 |
| NJ | Monmouth | Englishtown | 07726 | 42,508 |
| NJ | Monmouth | Freehold | 07728 | 56,527 |
| NJ | Monmouth | Lincroft | 07738 | 6,095 |
| NJ | Monmouth | Little Silver | 07739 | 5,938 |
| NJ | Monmouth | Long Branch | 07740 | 31,038 |
| NJ | Monmouth | Monmouth Beach | 07750 | 3,279 |
| NJ | Monmouth | Oakhurst | 07755 | 6,363 |
| NJ | Monmouth | Oceanport | 07757 | 5,356 |
| NJ | Monmouth | West Long Branch | 07764 | 8,097 |
| NJ | Monmouth | Belmar | 07715 | 0 |
| NJ | Monmouth | Avon By the Sea | 07717 | 1,901 |
| NJ | Monmouth | Belmar | 07719 | 21,538 |
| NJ | Monmouth | Bradley Beach | 07720 | 4,298 |
| NJ | Monmouth | Colts Neck | 07722 | 10,209 |
| NJ | Monmouth | Farmingdale | 07727 | 7,050 |
| NJ | Monmouth | Howell | 07731 | 38,304 |
| NJ | Monmouth | Neptune | 07753 | 37,554 |
| NJ | Monmouth | Neptune | 07754 | 0 |
| NJ | Monmouth | Ocean Grove | 07756 | 3,342 |
| NJ | Monmouth | Spring Lake | 07762 | 8,403 |
| NJ | Monmouth | Allentown | 08501 | 6,582 |
| NJ | Monmouth | Millstone Township | 08510 | 5,231 |
| NJ | Monmouth | Cream Ridge | 08514 | 4,477 |
| NJ | Monmouth | Imlaystown | 08526 | 0 |
| NJ | Monmouth | Millstone Township | 08535 | 5,385 |
| NJ | Monmouth | Roosevelt | 08555 | 877 |
| NJ | Monmouth | Allenwood | 08720 | 843 |
| NJ | Monmouth | Brielle | 08730 | 4,774 |
| NJ | Monmouth | Manasquan | 08736 | 12,578 |
| NJ | Monmouth | Sea Grit | 08750 | 3,528 |
| NJ | Ocean | Jackson | 08527 | 54,392 |
| NJ | Ocean | New Egypt | 08533 | 6,945 |

**AA557**

Total Unit(s)[1] Population: 501,008

Initials: _____
**A CORP**

Date:  01 | 12 | 21

Initials: _KB_____
**FRANCHISEE**

Date:  01/11/2021

Initials: _____
**FRANCHISEE**

Date: _____

---

[1] One unit is equal to 125,000 populations.

**AA558**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|---|---|---|---|---|
| NJ | Hudson | Bayonne | 07002 | 63,031 |
| NJ | Hudson | Hoboken | 07030 | 50,005 |
| NJ | Hudson | Weehawken | 07086 | 12,554 |
| NJ | Hudson | Union City | 07087 | 66,515 |
| NJ | Hudson | West New York | 07093 | 60,884 |
| NJ | Hudson | Jersey City | 07097 | 0 |
| NJ | Hudson | Jersey City | 07302 | 36,352 |
| NJ | Hudson | Jersey City | 07303 | 0 |
| NJ | Hudson | Jersey City | 07304 | 41,233 |
| NJ | Hudson | Jersey City | 07305 | 60,104 |
| NJ | Hudson | Jersey City | 07306 | 52,669 |
| NJ | Hudson | Jersey City | 07307 | 43,812 |
| NJ | Hudson | Jersey City | 07308 | 0 |
| NJ | Hudson | Jersey City | 07310 | 12,838 |
| NJ | Hudson | Jersey City | 07311 | 522 |
| NJ | Hudson | Jersey City | 07395 | 0 |
| NJ | Hudson | Jersey City | 07399 | 0 |

Total Unit(s)[1] Population: 500,519

Initials: _A CORP_

Date: 11-18-19

Initials: _KB FRANCHISEE_

Date: 11-13-19

---

[1] One unit is equal to 125,000 populations.

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Somerset | All | All | 288,967 |
| NJ | Middlesex | Dunellen | 08812 | 14,296 |
| NJ | Middlesex | Kendall Park | 08824 | 12,115 |
| NJ | Middlesex | Middlesex | 08846 | 13,635 |
| NJ | Middlesex | Monmouth Junction | 08852 | 17,220 |
| NJ | Middlesex | Piscataway | 08854 | 55,961 |
| NJ | Middlesex | Piscataway | 08855 | 0 |
| NJ | Middlesex | New Brunswick | 08901 | 55,223 |
| NJ | Middlesex | North Brunswick | 08902 | 41,153 |
| NJ | Middlesex | New Brunswick | 08903 | 0 |
| NJ | Middlesex | Highland Park | 08904 | 13,982 |
| NJ | Middlesex | New Brunswick | 08906 | 0 |
| NJ | Middlesex | New Brunswick | 08933 | 0 |
| NJ | Middlesex | New Brunswick | 08989 | 0 |

Total Unit(s)[1] Population: 512,552

Initials: _____       Initials: _____
**A CORP**                      **FRANCHISEE**

Date: _11 - 18 - 19_            Date: _11 - 13 - 19_

---

[1] One unit is equal to 125,000 populations.

**AA560**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Hudson | Harrison | 07029 | 16,026 |
| NJ | Hudson | Kearny | 07032 | 40,684 |
| NJ | Hudson | North Bergen | 07047 | 60,773 |
| NJ | Hudson | Secaucus | 07094 | 16,264 |
| NJ | Hudson | Secaucus | 07096 | 0 |
| NJ | Hudson | Kearny | 07099 | 0 |
| NJ | Essex | Fairfield | 07004 | 7,440 |
| NJ | Essex | Caldwell | 07006 | 24,812 |
| NJ | Essex | Caldwell | 07007 | 0 |
| NJ | Essex | Cedar Grove | 07009 | 12,411 |
| NJ | Essex | East Orange | 07017 | 35,945 |
| NJ | Essex | East Orange | 07018 | 28,322 |
| NJ | Essex | East Orange | 07019 | 0 |
| NJ | Essex | Essex Fells | 07021 | 2,091 |
| NJ | Essex | Glen Ridge | 07028 | 7,618 |
| NJ | Essex | Livingston | 07039 | 29,358 |
| NJ | Essex | Montclair | 07042 | 25,599 |
| NJ | Essex | Montclair | 07043 | 12,138 |
| NJ | Essex | Verona | 07044 | 13,584 |
| NJ | Essex | Orange | 07050 | 30,074 |
| NJ | Essex | Orange | 07051 | 0 |
| NJ | Essex | West Orange | 07052 | 46,182 |
| NJ | Essex | Roseland | 07068 | 5,819 |
| NJ | Essex | Bloomfield | 07003 | 47,312 |
| NJ | Essex | Belleville | 07109 | 35,897 |
| NJ | Essex | Nutley | 07110 | 28,351 |

Total Unit(s)[1] Population: 526,700

Initials: _____
**A CORP**

Date: _01- 08-21_

Initials: _KB_
**FRANCHISEE**

Date: _12-30-2020_

---

[1] One unit is equal to 125,000 populations.

**AA561**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Middlesex | Avenel | 07001 | 16,305 |
| NJ | Middlesex | Carteret | 07008 | 22,844 |
| NJ | Middlesex | Port Reading | 07064 | 3,723 |
| NJ | Middlesex | Colonia | 07067 | 18,036 |
| NJ | Middlesex | Sewaren | 07077 | 2,766 |
| NJ | Middlesex | South Plainfield | 07080 | 23,377 |
| NJ | Middlesex | Woodbridge | 07095 | 19,844 |
| NJ | Middlesex | Cranbury | 08512 | 10,105 |
| NJ | Middlesex | Plainsboro | 08536 | 20,073 |
| NJ | Middlesex | Dayton | 08810 | 8,401 |
| NJ | Middlesex | East Brunswick | 08816 | 46,298 |
| NJ | Middlesex | Edison | 08817 | 44,621 |
| NJ | Middlesex | Edison | 08818 | 0 |
| NJ | Middlesex | Edison | 08820 | 39,590 |
| NJ | Middlesex | Helmetta | 08828 | 2,178 |
| NJ | Middlesex | Iselin | 08830 | 18,459 |
| NJ | Middlesex | Monroe Township | 08831 | 45,620 |
| NJ | Middlesex | Keasbey | 08832 | 2,863 |
| NJ | Middlesex | Edison | 08837 | 15,847 |
| NJ | Middlesex | Metuchen | 08840 | 16,558 |
| NJ | Middlesex | Milltown | 08850 | 8,281 |
| NJ | Middlesex | Old Bridge | 08857 | 39,898 |
| NJ | Middlesex | Parlin | 08859 | 21,526 |
| NJ | Middlesex | Perth Amboy | 08861 | 53,099 |
| NJ | Middlesex | Perth Amboy | 08862 | 0 |
| NJ | Middlesex | Fords | 08863 | 12,320 |
| NJ | Middlesex | Sayreville | 08871 | 0 |
| NJ | Middlesex | Sayreville | 08872 | 18,811 |
| NJ | Middlesex | South Amboy | 08879 | 23,537 |
| NJ | Middlesex | South River | 08882 | 16,008 |
| NJ | Middlesex | Spotswood | 08884 | 8,257 |
| NJ | Middlesex | Edison | 08899 | 0 |

Total Unit(s)[1] Population: 579,245

Initials: _____
**A CORP**

Date: _01·08·21_

Initials: _KD_
**FRANCHISEE**

Date: _12-30-2020_

[1] One unit is equal to 125,000 populations.

**AA562**

# APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NJ | Bergen | All | All | 925,328 |

Total Unit(s)[1] Population: 925,328

Initials: _____
A CORP

Date: 6-9-2020

Initials: _____
**FRANCHISEE**

Date: 02-14-2020

Initials: _____
**FRANCHISEE**

Date: 2-11-2020

---

[1] One unit is equal to 125,000 populations.

**AA563**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NY | Rockland | Palisades | 10964 | 1,472 |
| NY | Rockland | Tappan | 10983 | 5,532 |
| NY | Rockland | Orangeburg | 10962 | 5,950 |
| NY | Rockland | Pearl River | 10965 | 14,791 |
| NY | Rockland | Blauvelt | 10913 | 5,532 |
| NY | Rockland | Nyack | 10960 | 15,093 |
| NY | Rockland | Palisades | 10994 | 1,472 |
| NY | Rockland | Bardonia | 10954 | 23,045 |
| NY | Rockland | Spring Valley | 10977 | 59,048 |
| NY | Rockland | New City | 10956 | 31,521 |
| NY | Rockland | Valley Cottage | 10989 | 9,293 |
| NY | Rockland | Congers | 10920 | 8,554 |
| NY | Rockland | Haverstraw | 10927 | 11,910 |
| NY | Rockland | Garnerville | 10923 | 8,732 |
| NY | Rockland | West Haverstraw | 10993 | 4,769 |
| NY | Rockland | Stony Point | 10980 | 13,383 |
| NY | Rockland | Tomkins Cove | 10986 | 1,974 |
| NY | Rockland | Thiells | 10984 | 2,842 |
| NY | Rockland | Pomona | 10970 | 9,993 |
| NY | Rockland | Sparkill | 10976 | 2,258 |
| NY | Rockland | Piermont | 10968 | 2,353 |
| NY | Rockland | Monsey | 10952 | 38,917 |

Total Unit(s)[1] Population: 278,434

Initials: _____
**A CORP**

Date: 01-08-21

Initials: _KB_
**FRANCHISEE**

Date: 12-30-2020

---

[1] One unit is equal to 125,000 populations.

**AA564**

## EXHIBIT A

## GUARANTY OF PERFORMANCE

The undersigned, who each own 5% or more of **FRANCHISEE**, jointly and severally guaranty the performance of **FRANCHISEE** pursuant to this Franchise Agreement.

By: _____KBelog_____

       Klodian Belegu

Date: _____12-30-2020_____

By: _____

Date: _____

To Be Executed By Principal Stockholder(s) If Franchisee Is a Corporation.

The undersigned, principal stockholder(s) of the above Franchisee, for value received, hereby absolutely and unconditionally guarantee(s) full performance and payment when due of all of Franchisee's obligations to A CORP pursuant to the above Agreement.

## XX, FRANCHISEE

By: _____

Date: _____

By: _____

Date: _____

**AA565**

# APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|---|---|---|---|---|
| NY | West Chester | Amawalk | 10501 | 1,219 |
| NY | West Chester | Armonk | 10504 | 7,987 |
| NY | West Chester | Baldwin Place | 10505 | 851 |
| NY | West Chester | Bedford | 10506 | 5,790 |
| NY | West Chester | Bedford Hills | 10507 | 6,408 |
| NY | West Chester | Briarcliff Manor | 10510 | 9,988 |
| NY | West Chester | Buchanan | 10511 | 2,246 |
| NY | West Chester | Chappaqua | 10514 | 11,946 |
| NY | West Chester | Crompond | 10517 | 539 |
| NY | West Chester | Cross River | 10518 | 1,268 |
| NY | West Chester | Croton Falls | 10519 | 316 |
| NY | West Chester | Croton on Hudson | 10520 | 12,810 |
| NY | West Chester | Croton on Hudson | 10521 | 0 |
| NY | West Chester | Golden Bridge | 10526 | 1,809 |
| NY | West Chester | Granite Springs | 10527 | 908 |
| NY | West Chester | Hawthorne | 10532 | 4,931 |
| NY | West Chester | Jefferson Valley | 10535 | 555 |
| NY | West Chester | Katonah | 10536 | 10,739 |
| NY | West Chester | Lincondale | 10540 | 0 |
| NY | West Chester | Maryknoll | 10545 | 141 |
| NY | West Chester | Millwood | 10546 | 1,277 |
| NY | West Chester | Mohegan Lake | 10547 | 7,647 |
| NY | West Chester | Montrose | 10548 | 3,487 |
| NY | West Chester | Mount Kisco | 10549 | 16,638 |
| NY | West Chester | North Salem | 10560 | 4,737 |
| NY | West Chester | Ossining | 10562 | 31,796 |
| NY | West Chester | Peekskill | 10566 | 23,570 |
| NY | West Chester | Cortlandt Manor | 10567 | 19,929 |
| NY | West Chester | Pleasantville | 10570 | 12,680 |
| NY | West Chester | Pound Ridge | 10576 | 5,116 |
| NY | West Chester | Purdy's | 10578 | 681 |
| NY | West Chester | Shenorock | 10587 | 0 |
| NY | West Chester | Shrub Oak | 10588 | 2,282 |
| NY | West Chester | Somers | 10589 | 8,475 |
| NY | West Chester | South Salem | 10590 | 6,767 |
| NY | West Chester | Tarrytown | 10591 | 22,540 |
| NY | West Chester | Thornwood | 10594 | 5,117 |
| NY | West Chester | Valhalla | 10595 | 8,195 |
| NY | West Chester | Verplanck | 10596 | 1,729 |
| NY | West Chester | Waccabuc | 10597 | 968 |
| NY | West Chester | Yorktown Heights | 10598 | 28,647 |

**AA566**

Total Unit(s)[1] Population: 292,729

Initials: _____
A CORP

Date:  _11-18-19_

Initials: _____
FRANCHISEE

Date:  _9-29-19_

---

[1] One unit is equal to 125,000 populations.

**AA567**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| NY | Richmond | All | All | 468,730 |

Total Unit(s)[1] Population: 468,730

Initials: _____
**A CORP**

Date: 6-9-2020

Initials: _____
**FRANCHISEE**

Date: 6-2-2020

Initials: _____
**FRANCHISEE**

Date: _____

---

[1] One unit is equal to 125,000 populations.

**AA568**

## APPENDIX 1

The Licensed Territory defined below is granted to **FRANCHISEE** on the condition that **FRANCHISEE** performs the obligations set forth in the Agreement to which this Appendix is attached:

| STATE | COUNTY | CITY/TOWN | ZIP CODES | POPULATION |
|-------|--------|-----------|-----------|------------|
| PA | Bucks | Jamison | 18929 | 9,306 |
| PA | Bucks | Newtown | 18940 | 28,825 |
| PA | Bucks | Richboro | 18954 | 9,745 |
| PA | Bucks | Southampton | 18966 | 37,999 |
| PA | Bucks | Warminster | 18974 | 40,953 |
| PA | Bucks | Warrington | 18976 | 19,795 |
| PA | Bucks | Washington Crossing | 18977 | 4,291 |
| PA | Bucks | Wycombe | 18980 | 510 |
| PA | Bucks | Bristol | 19007 | 21,125 |
| PA | Bucks | Bensalem | 19020 | 55,493 |
| PA | Bucks | Croydon | 19021 | 10,074 |
| PA | Bucks | Fairless Hills | 19030 | 12,122 |
| PA | Bucks | Lanhorne | 19047 | 35,056 |
| PA | Bucks | Fort Washington | 19048 | 0 |
| PA | Bucks | Fort Washington | 19049 | 0 |
| PA | Bucks | Feasterville Trevose | 19053 | 25,966 |
| PA | Bucks | Levittown | 19054 | 17,437 |
| PA | Bucks | Levittown | 19055 | 13,924 |
| PA | Bucks | Levittown | 19056 | 15,486 |
| PA | Bucks | Levittown | 19057 | 17,191 |
| PA | Bucks | Levittown | 19058 | 0 |
| PA | Bucks | Morrisville | 19067 | 51,334 |
| PA | Montgomery | Abington | 19001 | 17,020 |
| PA | Montgomery | Huntington Valley | 19006 | 21,423 |
| PA | Montgomery | Cheltenham | 19012 | 6,670 |
| PA | Montgomery | Dresher | 19025 | 5,395 |
| PA | Montgomery | Elkins Park | 19027 | 19,067 |
| PA | Montgomery | Flourtown | 19031 | 4,700 |
| PA | Montgomery | Fort Washington | 19034 | 5,999 |
| PA | Montgomery | Glenside | 19038 | 31,595 |
| PA | Montgomery | Hatboro | 19040 | 20,536 |
| PA | Montgomery | Horsham | 19044 | 15,853 |
| PA | Montgomery | Jenkintown | 19046 | 17,809 |
| PA | Montgomery | Oreland | 19075 | 7,354 |
| PA | Montgomery | Will Grove | 19090 | 18,832 |
| PA | Montgomery | Wyncote | 19095 | 7,063 |

Total Unit(s)[1] Population: 625,948

---

[1] One unit is equal to 125,000 populations.

**AA569**

Initials: _____
**A CORP**

Date:  6-9-2020

Initials: _____
**FRANCHISEE**

Date:  6-2-2020

Initials: _____
**FRANCHISEE**

Date: _____

**AA570**

# EXHIBIT C

← Search Google Maps    🔍  ✕

□ Saved

**911 Sewer & Drain**
Plumber
Toms River
**PLACE DETAILS**




Shenelle LaPierre

⋮

★☆☆☆☆  2 months ago

Zero stars. Do not work with this company, they are scammers, will tell you one thing and do the opposite. April 2024 my hot water heater failed and Cinch (Home warranty) dispatched Rooter man Plumbing and Restoration to service my home. The plumber was supposed to assess the HW heater and restoration team for the water damage. Plumber deemed the HW heater needed to be replaced, fine. The Restoration people removed my carpet, fine, that was ruined by water damage. They had the audacity to take my rubber gym tiles, ceiling tiles, entry way doors, door hinges, removed my metal pipe for drying venting and anything else they deemed necessary without consulting me. Took my stuff and hauled it away in their vans before I noticed my belongings were gone. Their workers shut off my water because they didn't drain the water heater and assumed insurance would cover me for room and board. The "so called owner" came to my home, insisted the damage was a category 2 when insurance deemed category 1 based on their numbers. Ceiling tiles weren't wet and no one told them to dispose of everything other than the carpet. Then audaciously invoiced my insurance company for over $70k of work which was never quoted prior to doing the work. Now there is white residue everywhere in my basement from whatever **AA572** "solution" they used meanwhile Donovan claimed Dawn dish soap was their cleaning agent against mold

# EXHIBIT D



←    Search Google Maps    Q    ✕

**911 Sewer & Drain**
Plumber
Toms River
**PLACE DETAILS**

 William Wild

⋮

★★★★★ a year ago

They arrived quickly and explained the process
completely. They offered a few possible solutions to
help solve the issue. They were friendly and worked
quickly and solved the issue. I would call them again if I
had another problem.

👍 Like     ⌁ Share

**Response from the owner** a year ago
Thank you for taking time to review Rooter Man of
NJ, William! We're thrilled to hear you had a
wonderful experience and that your problem was
solved quickly. It's great to know we provided helpful
information on potential solutions as well - our team
is always here if you have any other plumbing
emergencies in the future. Your feedback is
invaluable and I'm just glad it was all positive this
time around! Thanks again for choosing us!

**AA574**

# EXHIBIT E

**AA575**





AA577

UNITED STATES DISTRICT COURT
THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Rooterman, LLC | ) |
| | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| Klodian Belegu, Quality Air Care | ) |
| Corporation, RM Water Damage | ) |
| Restoration LTD and 911 Sewer    Drain | ) |
| Corporation. | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

Civil Action No. 1:24-cv-13015

## DECLARATION OF JEFFREY M. ROSIN

Pursuant to 28 U.S.C. 1746, I, Jeffrey M. Rosin, declare (or certify, verify, or state) under the penalties of perjury that the foregoing is true and correct.

1. I am a partner in the law firm of O'Hagan Meyer, and serve as counsel for Plaintiff Rooterman, LLC in the above-captioned case. I submit this declaration in support of Plaintiff's Reply Memorandum in Further Support of Its Motion for Preliminary Injunction.

2. On September 16, 2024, when Mr. Belegu's franchise agreements were terminated, he was told to cease and desist using the Rooterman marks. That communication is attached as Exhibit K to the Amended Complaint.

3. I sent follow-up communications to Mr. Belegu about this matter on November 13, 2024, and on November 22, 2024. A true and correct copy of those communications is attached hereto as <u>Exhibit 1</u>.

Dated: January 17, 2025

*Jeffrey M. Rosin*
Jeffrey M. Rosin

**AA578**

# EXHIBIT 1

**AA579**

**Jeff Rosin**

From:           Jeff Rosin
Sent:           Friday, November 22, 2024 11:02 AM
To:             Klodian Belegu
Cc:             Kathryn Vassall
Subject:        FOLLOW UP  Cease and Desist [IMAN-ACTIVE.FID529980]
Attachments:    Belegu.Rooter Man franchise posting.png

Mr. Belegu:

In light of the mediator postponing our mediation, we did not have the chance to confer with you about these matters raised, or hear from you in response to them. Thus, and given it has been more than 1 week already, I request a prompt response (by the close of business Monday) as to your intentions on these matters. These matters are not of the nature requiring mediation, and we can proceed directly in court if the need arises. Currently, given your misuse of the company's intellectual property, and your activities in violation of your agreement not to compete, we are planning to file in court to address these matters. Thus, it is imperative you respond as required.

I understand from the mediator that you may have counsel (though that counsel was apparently not going to appear at the mediation). If you do have counsel, and wish for me to speak directly with your counsel, please provide that contact information to me today.

Thank you.
Jeff

From: Jeff Rosin
Sent: Wednesday, November 13, 2024 7:17 PM
To: Klodian Belegu <GacFic@gmail.com>
Cc: Kathryn Vassall <kvassall@chasanmeyer.com>
Subject: Cease and Desist

Mr. Belegu

I write on behalf of Premium Service Brands ("PSB"), which owns the Rooter-Man franchise system.

We are aware of you, directly or indirectly through "Megan Rachel" in the past two months, seeking to harm the Rooter-Man franchise system, and misrepresenting that you still own Rooter-Man of New Jersey. (Please see the attached in that regard, believed to be communicated on September 26, 2024). You are, by doing this, as well as other actions, violating Rooter-Man's trademarks, copyrights, and harming the goodwill associated with them.

1

**AA580**

Please be on notice that this matter is part of the dispute that will be addressed in the upcoming mediation with you, and before mediator, Arthur Pressman.

You must immediately cease and desist all of this improper usage and PSB is entitled to damages and its attorneys' fees incurred in enforcement of these rights. 15 U.S.C. § 1117(a).

Please confirm your prompt cooperation in attending to this matter.

**Jeffrey M. Rosin**
Managing Partner, Boston Office
140 Kendrick Street | Bldg. C | Needham | MA | 02494
PH 617.843.6800 | DIR 617.843.6801

https://rootermanplumberservices.com
https://x.com/rootermann
https://maps.app.goo.gl/J8x4Y4aMCBXoSZ46A



O'HAGAN MEYER

ATTORNEYS ▴ ADVISORS

California ▴ Colorado ▴ Delaware ▴ District of Columbia ▴ Georgia ▴ Illinois
Maryland ▴ Massachusetts ▴ Michigan ▴ Nevada ▴ New Jersey ▴ New York
North Carolina ▴ Oregon ▴ Pennsylvania ▴ Virginia ▴ Washington

**Mansfield Rule™**
Certified 2023

OHaganMeyer.com

O'HAGAN MEYER          2024
RECOGNIZED BY
Best Lawyers

**AA581**

2

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 1/29/2025 at 4:23 PM EST and filed on 1/29/2025

| | |
|---|---|
| **Case Name:** | Rooterman LLC v. Belegu et al |
| **Case Number:** | 1:24-cv-13015-PBS |
| **Filer:** | |
| **Document Number:** | 23(No document attached) |

**Docket Text:**
**Electronic Clerk's Notes for proceedings held before District Judge Patti B. Saris:**

**Motion Hearing held on 1/29/2025 by video re [2] MOTION for Preliminary Injunction *and Expedited Hearing* filed by Rooterman LLC.**

**ORDERED:**

**Limited discovery to start immediately.**

**Defendant shall file a declaration by 2/28/2025.**

**All materials referenced in the franchise agreements must be returned.**

**Parties shall meet and confer re: possibility of settlement.**

**Status Report shall be filed by 2/12/2025.**

**Motion for Preliminary Injunction taken under advisement.**

**(Atty present: Rosin, Valdez, Wolman)**

**(Court Reporter: Lee Marzilli at leemarz47@gmail.com.) (MM)**

**1:24-cv-13015-PBS Notice has been electronically mailed to:**

Jeffrey M. Rosin     jrosin@ohaganmeyer.com, kvassall@ohaganmeyer.com, lvaldez@ohaganmeyer.com

Marc J. Randazza     mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman     jmw@randazza.com, ecf@randazza.com

Lisbeth Valdez     lvaldez@ohaganmeyer.com

**1:24-cv-13015-PBS Notice will not be electronically mailed to:**

**AA582**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC                                )<br><br>        *Plaintiff,*                        )<br><br>    v.                                              )<br><br>Klodian Belegu, Quality Air Care         )<br>Corporation, RM Water Damage          )<br>Restoration LTD and 911 Sewer & Drain )<br>Corporation.                                       )<br>                *Defendants.*                  )<br><br>_____) | Docket No. 1:24-cv-13015 |

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff, Rooterman, LLC ("Rooterman"), hereby submits this Notice of Supplemental Authority as further authority to address an argument of Defendants that lacks merit.  As background,  in the Answer and Counterclaims of Defendants Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain (collectively, "Defendants"), Defendants argue that Plaintiff's breach of contract claims (*i.e.,* its claims for breach of restrictive covenants and other breaches) are not properly asserted against 911 Sewer & Drain Corporation and/or Water Damage Restoration Ltd because neither was a party to the Franchise Agreements containing such terms. However, as Plaintiff has already argued, that is of no consequence, since Mr. Belegu, who was bound by the franchise agreements, owns both of those other corporations. In further support of Plaintiff's argument, Plaintiff gives notice of the following supplemental authority, attached hereto. See Alexander & Alexander, Inc. v. Danahy, 21 Mass. App. Ct. 488, 500 (1986) (discussing and citing cases for the principle that third party entities can be enjoined from violating noncompetition agreements even if they did not sign). In Danahy, the individual who signed the covenants was bound by the covenants (like Belegu here)

**AA583**

was president of the non-party entity, played a dominant role at the non-party entity, could exert influence over the non-party entity's activities, and was closely identified with the non-party entity in the mind of the public. Id. Thus, the non-party entity was properly bound to the same obligations as the individual who signed the covenants.

Respectfully submitted,

ROOTERMAN, LLC

By its Counsel

Dated: March 3, 2025

/s/ Jeffrey Rosin
Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

2

**AA584**

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of March 2025, *Plaintiff's Notice of Supplemental Authority* was electronically filed.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

<div align="right">

*/s/ Jeffrey Rosin*
Jeffrey M. Rosin

</div>

#5879487v1

**AA585**

# EXHIBIT A

## *Alexander & Alexander, Inc. v. Danahy*

Appeals Court of Massachusetts, Middlesex

November 8, 1985, Argued ; January 23, 1986, Decided

M. No. 85-202

**Reporter**

21 Mass. App. Ct. 488 *; 488 N.E.2d 22 **; 1986 Mass. App. LEXIS 1363 ***

ALEXANDER & ALEXANDER, INC. v. ROBERT F. DANAHY & another [1]

**Prior History: [***1]** Civil action commenced in the Superior Court Department on November 20, 1984.

A motion for a preliminary injunction was heard by *Paul K. Connolly*, J.

**Disposition:** *So ordered*.

## Syllabus

Although in an action to enforce a noncompetition agreement some of the allegations in the verified complaint signed by the plaintiff's managing vice president were made not on personal knowledge but on information and belief and the complaint was not supported by affidavits, the judge was not thereby barred from issuing a preliminary injunction, where in addition to the complaint the judge had before him extensive memoranda and various affidavits filed by the defendants which provided sufficient facts to warrant issuance of the injunction. [493-494]

The fact that an insurance brokerage firm waited seventeen months after a former employee left to join a competing firm before bringing an action to enforce the terms of an agreement not to compete did not preclude issuance of an injunction, where the employee had given assurances that he would abide by the agreement, where there were negotiations about [***2] a modification of the agreement, and where the employee's breach of the agreement was not apparent for more than a year after he had left the firm. [494-495]

The validity of covenants against competition contained in an agreement whereby an insurance brokerage firm acquired all the assets of an insurance agency and employed the agency's owner was to be determined according to the standards applicable to covenants against competition arising out of the sale of a business, rather than covenants in an employment agreement. [495-497]

In an action by an insurance brokerage firm seeking to enforce covenants against competition contained in an agreement between the firm and the defendant whereby the firm had acquired all the assets of an insurance agency and had employed the defendant, and the defendant had agreed for a period of five years after termination of his employment with the firm to refrain from certain acts of competition, the judge did not err in issuing a preliminary injunction to enforce the terms of the covenants, including a five-year ban on doing business with or accepting or receiving business from customers and actively solicited prospective customers of the agency [***3] or the firm. [498-499]

In an action by an insurance brokerage firm seeking to enforce a noncompetition agreement against a former employee and a corporation engaged in the insurance brokerage business, the judge did not err in enjoining the corporation from violating the noncompetition agreement, even though the corporation was not a party to it, where the corporation knew the full extent of the agreement when it hired the individual defendant as its president, where the individual defendant was in a position to exert influence over the corporation's activities, and where the injunction did no more than prevent the corporation from obtaining benefits from its president's violation of the noncompetition convenants. [499-501]

In an action by an insurance brokerage firm against a former employee and a corporation engaged in the insurance brokerage business to enjoin violation of a noncompetition agreement between the plaintiff and the individual defendant, the judge did not abuse his discretion in issuing a preliminary injunction against the defendants based on his balancing of the risk of harm to the parties in light of their respective chances of success on the merits, even [***4] though he failed to make any reference to the effect of the injunction on the

---

[1] Rollins Burdick Hunter of Massachusetts, Inc.

**AA587**

Case 1:24-cv-13015-PBS    Document 27    Filed 03/03/25    Page 6 of 11

21 Mass. App. Ct. 488, *488; 488 N.E.2d 22, **22; 1986 Mass. App. LEXIS 1363, ***4

public interest.  [501]

**Counsel:** *John K. Markey*, for Rollins Burdick Hunter of Massachusetts, Inc.

*Jerome Gotkin* (*Steven M. Sayers & Gordon P. Katz* with him), for the plaintiff.

*Paul W. Goodrich, James J. Moran, Jr., & Joanne P. Keating*, for Robert F. Danahy, submitted a brief.

*Richard D. Glovsky & Sharon D. Meyers*, for Kevin M. Daly, submitted a brief.

**Judges:** Grant, Armstrong, & Fine, JJ.

**Opinion by:** FINE

## Opinion

 [*489]  [**25]  This case involves a dispute among several major forces in the insurance brokerage business in Massachusetts.  A Superior Court judge allowed a motion for a preliminary injunction to enforce covenants not to compete. A single justice of this court modified the injunction. From the order as further modified (see note 4, *infra*) the defendants have appealed. We  [*490]  apply the standards for appellate review of the issuance of a preliminary injunction set forth in *Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 615-616 (1980)*. Thus, while we accord weight to the judge's exercise of discretion, to the extent that the order was based upon [***5]  documentary evidence, we draw our own conclusions. See *Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 25-26 (1981)*. The conclusions we have drawn lead us to affirm.

The plaintiff, Alexander & Alexander, Inc. (A&A), a Massachusetts corporation, is an insurance brokerage firm operating in Massachusetts.  It is a wholly owned subsidiary of Alexander & Alexander Services, Inc. (A&AS), a Maryland corporation engaged in the insurance brokerage business nationwide and overseas. On November 20, 1984, A&A filed suit against Robert F. Danahy and his employer, Rollins Burdick Hunter of Massachusetts, Inc. (RBH). [2] RBH, a Massachusetts

corporation engaged in the insurance brokerage business in Massachusetts, is also a subsidiary of a large national insurance agency (Combined Insurance Company of America).  RBH is a competitor of A&A's.

 [***6]  A&A made the following allegations in its complaint.  In 1979, Danahy was president and principal stockholder of the John T. Keyes Insurance Agency, Inc. (KIA).  On August 3, 1979, A&A, A&AS, KIA and Danahy agreed to an arrangement which in its essence accomplished a transfer to A&A of all of KIA's assets, including its good will, in exchange for stock in A&AS worth approximately $ 2,200,000.    The written agreement covering this transaction included the following provisions:

 [*491]  5.5.2 For a period of five years after termination of [Danahy's] employment with A&A, [Danahy] will not, directly or indirectly, solicit, sell, serve, divert or receive insurance business to or from any customer or actively solicited prospective customer of KIA as of [August 3, 1979];

5.5.3 For a period of five years after termination of [Danahy's] employment with A&A, [Danahy] will not, directly or indirectly, solicit, sell, serve, divert or receive insurance agency, insurance brokerage, actuarial, or employee-benefit reporting business to or from any corporation, partnership or other person which was a customer or actively solicited prospective customer or any A&AS office [***7]  in which [Danahy] worked on a full-time basis within one year prior to termination of his employment and which customer or prospect was such a customer or prospect of A&AS within one year prior to the date of such termination.

Also included in the agreement was a provision that A&A would be entitled to an injunction restraining any breach of the covenants. KIA thereafter dissolved, and the A&AS shares were distributed to KIA's shareholders, consisting of Danahy and members of his family. Danahy personally received A&AS stock worth approximately $ 1,500,000.

---

[2] Kevin M. Daly, also a former A&A employee and now an

employee of RBH, was also named as a defendant.  He was included in the preliminary injunction, and he joined in the appeal.  However, by stipulation between Daly and A&A, the suit against Daly has been dismissed, and he has agreed to abide by the noncompetition covenant which was part of his employment agreement with A&A.  Because of that stipulation, and because Daly (unlike Danahy) is a salesman and not in a managerial position at RBH, we view a continuation of the injunction against RBH concerning Daly's covenant not to compete as unnecessary.

Case 1:24-cv-13015-PBS     Document 27     Filed 03/03/25     Page 7 of 11

21 Mass. App. Ct. 488, *491; 488 N.E.2d 22, **25; 1986 Mass. App. LEXIS 1363, ***7

Upon the execution of the agreement, Danahy became employed by A&A. First he worked as a senior vice president and, for a short time in 1983, as president. Throughout his employment with A&A, [**26] Danahy was active in producing insurance business. In the spring of 1983, while still an A&A employee, Danahy was awarded additional stock in A&A's parent company. In consideration for that stock and for his continued employment by A&A, on May 24, 1983, Danahy executed an additional noncompetition agreement. It provided that for two years after the termination of his employment with [*492] A&A [3] he would not [***8] "in any capacity whatsoever . . . solicit, sell, service, divert, accept or receive" insurance business from any customer or active prospect of A&A's which he had handled, serviced, or solicited during the two years prior to the termination of his employment.

On June 28, 1983, Danahy notified A&A by letter that he was resigning from A&A to join RBH. RBH was aware of Danahy's noncompetition agreements. In his letter of resignation, Danahy wrote, "In my new position with another respected insurance broker, I will fully comply with all contractual commitments to A&A." The next day, Danahy began work as president of RBH and, since [***9] at least July 30, 1984, he has also been a director of that company. At various times after his departure from A&A and before suit was filed, Danahy attempted unsuccessfully to negotiate exceptions to the noncompetition covenants. Assurance was given by Danahy to A&A that he would not violate the agreements. Nevertheless, for the benefit of himself and RBH, according to A&A's allegations, Danahy has violated the covenants and continues to do so. The alleged violations include soliciting from, and conducting business with, A&A customers and prospective customers, and encouraging one Edward W. Marvel, Jr., a former A&A employee, to join RBH.

The plaintiff's complaint was signed by the managing vice president of A&A, who verified that all the allegations were true to his personal knowledge, except for those relating to KIA's liquidation and violations of the covenants, which allegations he believed to be true.

The motion for preliminary injunctive relief against

Danahy and RBH was heard on November 26, 1984. In addition to the verified complaint, the judge had before him extensive memoranda and various affidavits filed by the defendants. In addition, the judge was presented with [***10] a copy of an advertisement [*493] for RBH which all parties conceded had appeared in the Boston Globe and elsewhere in the summer of 1984. Photographs of Danahy (identifying him as president of RBH), Marvel, and Kevin M. Daly, another former A&A employee (see note 2, *supra*), appeared in the advertisement along with a list of new RBH accounts, among which were some former A&A clients. On December 14, 1984, the judge entered an order enjoining both Danahy and RBH from violating the terms of the noncompetition covenants. In a careful memorandum of decision, the judge considered the likelihood of A&A's success on the merits and balanced the risk of irreparable harm to the plaintiff against the risk of harm to the defendants. A motion by RBH for reconsideration, supported by additional affidavits, was heard on January 2, 1985, and denied. After a hearing before a single justice of this court, the injunction was modified on January 29, 1985, so as to refer only to customers specified on lists which were to be provided by A&A, which lists were to be treated as confidential. We were informed at oral argument that such a list has been agreed to by the parties. It includes A&A's [***11] customers as of the relevant date and slightly in excess of one hundred of A&A's active prospects. The single justice also remanded the case to the motion judge for further consideration of the issue of security under *Mass.R.Civ.P. 65(c)*, *365 Mass. 833 (1974)*. On remand, [**27] a surety bond in the amount of $ 500,000 was ordered and filed by A&A. [4]

*Preliminary Matters.*

We deal first with two issues raised by the defendants on appeal which do not go to the merits of the controversy. The defendants argue first that the factual material before the court provided insufficient support for issuance of the injunction because some of the allegations in the verified complaint were made not on personal knowledge but on information and belief, and the complaint was not supported by affidavits.

None of the parties requested [***12] an evidentiary hearing. A preliminary injunction is usually based upon affidavits, but it [*494] may be based upon a verified

---

[3] That two-year period has now expired. Thus, the question of the validity of the preliminary injunction, insofar as it prohibited violations of that covenant, is moot. No argument has been made that the injunction should be extended to give A&A the benefit of having the covenant *enforced* for a full two-year period. See *Wells v. Wells, 9 Mass. App. Ct. 321, 328 (1980)*.

[4] The order was again modified in the Superior Court on March 14, 1985, with A&A's assent, to allow RBH to accept insurance business from two companies on the agreed list of customers.

Case 1:24-cv-13015-PBS    Document 27    Filed 03/03/25    Page 8 of 11

21 Mass. App. Ct. 488, *494; 488 N.E.2d 22, **27; 1986 Mass. App. LEXIS 1363, ***12

complaint. _Mass.R.Civ.P. 65_. See _K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087, 1088 (9th Cir. 1972)_. The defendants' contention would have merit if all that supported the order were allegations made on information and belief. See _Bowles v. Montgomery Ward & Co., 143 F.2d 38, 42 (7th Cir. 1944)_; _Marshall Durbin Farms Inc. v. National Farmers Organization, Inc., 446 F.2d 353, 357 (5th Cir. 1971)_. That is not the case here, however. The facts alleged in the verified complaint on the basis of personal knowledge establish the existence of the noncompetition agreements and the background circumstances. The facts are not controverted. Nor is the fact of RBH's newspaper advertisements controverted or the correspondence in which the parties discussed the agreements after Danahy joined RBH. The verified complaint and the affidavits together clearly establish that RBH and A&A are in competition with each other; that Danahy serves as RBH's president and is involved in the production of new business; that RBH, under Danahy's direction, **[***13]** intends to compete with A&A for A&A's active prospects, and with A&A's existing customers for different insurance product lines; that Danahy, as RBH's president, had contact with representatives of at least one of A&A's former customers; that Marvel, for over twelve years a broker employed by A&A, left A&A and joined RBH as a broker in December of 1983; and that RBH had knowledge of the relevant terms of Danahy's noncompetition agreements with A&A.

That the allegations of widespread violations of the covenants by Danahy were based only on information and belief in these circumstances ought not to defeat A&A's right to preliminary injunctive relief. One would not expect an A&A official to possess extensive direct personal knowledge of those facts. Moreover, the purpose of the injunction is to prevent whatever future violations are likely to occur.

Further, the defendants argue that it was not proper to award A&A injunctive relief because it waited seventeen months after Danahy joined RBH before bringing this action. Unexplained delay in seeking relief for allegedly wrongful conduct may indicate an absence of irreparable harm and may make an injunction **[*495]** based upon that **[***14]** conduct inappropriate. See _USAchem, Inc. v. Goldstein, 512 F.2d 163, 168-169 (2d Cir. 1975)_; _Klauber Bros. v. Lady Marlene Brassiere Corp., 285 F. Supp. 806, 808 (S.D.N.Y. 1968)_; 11 Wright & Miller, Federal Practice & Procedure: Civil § 2948, at 438 (1973). The delay here was not without justification, however. When he terminated with A&A in June of 1983, Danahy assured his former employer that

he would abide by his contractual commitments not to compete. A&A could reasonably rely on that assurance until it had knowledge to the contrary. Beginning in the summer of 1983, there was an effort made by Danahy to negotiate a modification of the covenants. It wasn't until October 2, 1984, that one former client wrote A&A to say that it had switched its business to RBH. The RBH advertisement featuring Danahy, Marvel and Daly began to appear in August of 1984. Suit was filed in November, 1984, accompanied by an immediate **[**28]** request for an injunction. The period covered by the agreements being a finite one, the defendants apparently benefited from the delay. In any event, what delay there was was not so egregious as to form the basis for denial of any injunctive **[***15]** relief. Parties to a business dispute deserve praise, not penalty, for attempting to negotiate their differences before knocking on the courthouse door.

_The Merits_.

We caution at the outset that our comments deal only with the likelihood of A&A's ultimate success on the merits. A full trial of the issues is contemplated. Evidence may unfold at the trial on any of the issues discussed justifying a different result.

1. _Whether the covenants not to compete should be viewed primarily as arising out of the sale of the business or out of the employment relationship_. The covenants in issue were included in the written agreement for the sale of the business. But the agreement also contemplated that Danahy would be employed by A&A, and the period during which the covenants were to run was to begin with the termination of that employment. Thus, the covenants not to compete arose out of an arrangement that had aspects of both a sale of a business and a contract of employment.

**[*496]** It is important to identify at the outset to which aspect of the arrangement the covenants not to compete primarily related. This is because there are considerations which dictate that **[***16]** noncompetition covenants arising out of the sale of a business be enforced more liberally than such covenants arising out of an employer-employee relationship. See _Wells v. Wells, 9 Mass. App. Ct. 321 (1980)_, and authorities cited at 324-325; _Restatement (Second) of Contracts § 188_ (1981). In the former situation there is more likely to be equal bargaining power between the parties; the proceeds of the sale generally enable the seller to support himself

Case 1:24-cv-13015-PBS    Document 27    Filed 03/03/25    Page 9 of 11

21 Mass. App. Ct. 488, *496; 488 N.E.2d 22, **28; 1986 Mass. App. LEXIS 1363, ***16

temporarily without the immediate practical need to enter into competition with his former business; and a seller is usually paid a premium for agreeing not to compete with the buyer. Where the sale of the business includes good will, as this sale did, a broad noncompetition agreement may be necessary to assure that the buyer receives that which he purchased. Even in the absence of an express covenant not to compete, in such circumstances an agreement by the seller not to depreciate the value of good will may be implied so as to prevent the seller from taking back that which he purported to sell. *Tobin v. Cody, 343 Mass. 716, 720-724 (1962)*. *United Tool & Industrial Supply Co. v. Torrisi, 356 Mass. 103, [***17] 106-107 (1969)*. *Mohawk Maintenance Co. v. Kessler, 52 N.Y.2d 276, 283-287 (1981)*. On the other hand, an ordinary employee typically has only his own labor or skills to sell and often is not in a position to bargain with his employer. Postemployment restraints in such cases must be scrutinized carefully to see that they go no further than necessary to protect an employer's legitimate interests, such as trade secrets or confidential customer information. See *Marine Contractors Co. v. Hurley, 365 Mass. 280, 287-288 (1974)*; *National Hearing Aid Centers, Inc. v. Avers, 2 Mass. App. Ct. 285, 288-291 (1974)*.

It is not at all unusual for the seller of a business to join the new enterprise in an employment capacity. There are obvious advantages to both sides which flow from such an arrangement. It enables the purchaser to carry on the old business with the least possible dislocation and loss of good will. Established **[*497]** customers of the business sold could be expected to patronize the successor business. And such an arrangement provides the seller with the opportunity to be productive in the work with which he is familiar, and to gain income.

We have **[***18]** no difficulty reaching the conclusion that, in reviewing the present covenants, we should apply the standards applicable to covenants arising out of the sale of a business. *Pitman v. J.C. Pitman & [**29] Sons, 324 Mass. 371, 374 (1949)*. Accord *Kraft Agency, Inc. v. Delmonico, 110 A.D.2d 177, 182-183 (N.Y. 1985)*. See Levin, Non-Competition Covenants in New England: Part II, 40 B.U.L. Rev. 210, 227-228 (1960). Good will is of great importance in the insurance brokerage business. Customers have repeated and multiple insurance needs. Prompt service, integrity, and loyalty are of some importance to customers who would tend to rely on key personnel who have demonstrated those qualities in the past. A broad noncompetition agreement would be an important part of any agreement

to sell an insurance agency. The agreement of which the covenants were part provided that the covenants were "granted to A&A to protect [the] good will" enjoyed by A&A and that the covenants were "not severable from such good will." True, it was the good will of KIA which was sold, and that good will may have diminished to some extent over the years following the dissolution of that corporation. **[***19]** Nevertheless, Danahy's association with A&A during those years must have meant that some of KIA's good will remained. Moreover, the usual inequality of bargaining power between employer and employee was not present when these noncompetition covenants were entered into. The proceeds of the sale provided an ample cushion for Danahy for the period during which the covenant was to be in effect, whether that period be the five years immediately following the sale or some five-year period after Danahy's employment with A&A ceased. In short, the covenants not to compete were treated as an integral part of the agreement for the sale of the business, and there is no reason for us to view them as something other than what they purport to be.

**[*498]** 2. *Validity of the covenants*. Our characterization of the covenants as ones arising primarily out of the sale of a business does not necessarily lead us to conclude that the covenants would be fully enforceable as written. Although we look less critically at such covenants, and although the elements that must be considered differ, any covenant restricting competition is to be enforced only to the extent that it is reasonable in time **[***20]** and space, necessary to protect legitimate interests, and not an obstruction of the public interest. See *Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102-103 (1979)*; *Wells v. Wells, 9 Mass. App. Ct. at 323-325*. We proceed to examine the defendants' claim of unreasonableness in terms of these criteria.

Considering the magnitude of the sale, the significance of good will to this type of business, and the high level position Danahy held in both business entities, we are not convinced that five years is an unreasonably long period for the covenant to run. We note, however, that only a temporary order is in issue. Trial may be had well within the five-year period. On a more complete record a judge may determine that the longest period the covenants could reasonably run would be something less than five years. If so, there will be time later to shape the appropriate form of injunctive relief.

It was not unreasonable to include prospective customers within the ban. A&A had a legitimate interest

Case 1:24-cv-13015-PBS     Document 27     Filed 03/03/25     Page 10 of 11

21 Mass. App. Ct. 488, *498; 488 N.E.2d 22, **29; 1986 Mass. App. LEXIS 1363, ***20

in extending its business to them.  See *Wells v. Wells, 9 Mass. App. Ct. at 326*; *Kroeger v. Stop & Shop Cos., 13 Mass. App. Ct. 310, 317 (1982)*. The references [***21] in the covenants to A&A's customers, without distinguishing the particular kind of insurance purchased by the customer through A&A, do not make the covenants unreasonably broad.  A&A would have a legitimate expectation that it might in the future sell an existing customer a new line of insurance.

The most troublesome claim is that the covenants are unreasonably restrictive because they prevent Danahy from *receiving* business even in the absence of any direct or indirect participation by him in obtaining the business for RBH.  Thus, if a present or former customer of KIA or A&A should wish, because of genuine dissatisfaction with A&A or another insurance [*499] [**30] firm, to move its business, Danahy would, by the terms of the covenant, be barred from accepting that business.  There is conflicting authority as to enforceability of covenants not to compete to the extent that they prohibit merely accepting or receiving business.  For cases holding that such acts may be enjoined, see *Girard v. Rebsamen Ins. Co., 14 Ark. App. 154 (1985)*, and *Kraft Agency, Inc. v. Delmonico, 110 A.D.2d at 185*. For cases holding that such injunctive relief is improper, all of [***22] which cases, however, concern covenants arising out of employment relationships not involving the sale of a business, see *Evans Labs. v. Melder & Cingolani, 262 Ark. 868, 871 (1978)*, *Singer v. Habif, Arogeti & Wynn P.C., 250 Ga. 376, 377 (1982)*, and *Diamond Match Division v. Bernstein, 196 Neb. 452 (1976)*.

As a practical matter, the difference between accepting and receiving business, on the one hand, and indirectly soliciting on the other, may be more metaphysical than real, particularly where Danahy held prominent executive positions in KIA and A&A and is now president of RBH, and where his association with RBH has been widely publicized.  We recognize that, construed to bar mere receipt of business, the agreement may be an impediment to Danahy's employment in the insurance brokerage business in the type of high level customer development position he holds with RBH.  He agreed to the terms, however, in what appears at this preliminary stage of the proceedings to have been a fair bargain freely entered into with the benefit of counsel.  No clear reason has emerged at this stage of the proceedings why Danahy should not be held to his bargain.

3. *Whether* [***23] *the injunction may extend to RBH.*

RBH claims that, even if the injunction is proper to prevent Danahy from violating his covenants, it is overbroad because it prevents RBH, a stranger to the covenants, from engaging freely in the insurance brokerage business through its other employees.  The order enjoins each of the parties from violating the terms of the noncompetition covenants. The injunction against RBH, however, is only as broad as Danahy's noncompetition agreement. As president and a director, Danahy is closely identified [*500] with the corporate entity. The injunction against RBH would dissolve of its own weight should Danahy leave RBH.  Should Danahy assume a different role in RBH's business, the effect of the injunction on RBH and its other insurance salesmen would also change.  If Danahy were to become a sales representative, without over-all responsibility for RBH's sales performance and without supervisory authority over other members of the sales force, RBH would be free, through its other sales personnel, to do business which the injunction presently prohibits.

RBH knew the full extent of Danahy's noncompetition agreements when Danahy was hired.  Depending [***24] upon the circumstance, a stranger to a noncompetition agreement who is aware of the agreement may be enjoined from violating the agreement.   *Old Corner Bookstore v. Upham, 194 Mass. 101, 106 (1907)*.  *Suburban Coat, Apron & Linen Supply Co. v. LeBlanc, 300 Mass. 509, 512 (1938)*. *Sulmonetti v. Hayes, 347 Mass. 390, 396 (1964)*. *Ingredient Technology Corp. v. Nay, 532 F. Supp. 627, 632 (E.D. N.Y. 1982)*. *West Shore Restaurant Corp. v. Turk, 101 So.2d 123, 128-129 (Fla. 1958)*. *Bates Chevrolet Corp. v. Haven Chevrolet, Inc., 13 A.D.2d 27, 31 (N.Y. 1961)*, aff'd *13 N.Y.2d 644 (1963)*. *Wells v. Powers, 354 S.W.2d 651, 654 (Tex. Civ. App. 1962)*. It is true that all the cases cited involved either business entities created for the purpose of competing, or parties who, because of a family or other close relationship, were viewed as the "alter ego" of a party to the agreement.  We do not think, however, that the right to have a third party enjoined from violating a noncompetition agreement is necessarily limited to those particular situations.  What is reasonable must be decided on a case by case basis.  The facts in this case are yet to be proved. [***25] Among the relevant facts that persuade us that A& [**31] A is likely to prevail ultimately against RBH are the facts that Danahy, as president, plays a dominant role in RBH and is in a position to exert influence over its activities, and that, because of the advertisements, Danahy is closely identified with RBH in the mind of the public.  This injunction does no more than [*501] to prevent RBH

Case 1:24-cv-13015-PBS    Document 27    Filed 03/03/25    Page 11 of 11

21 Mass. App. Ct. 488, *501; 488 N.E.2d 22, **31; 1986 Mass. App. LEXIS 1363, ***25

from obtaining benefits from Danahy's violation of the noncompetition covenants.

4. *Balancing of the risk of irreparable harm to the respective parties.* The trial judge did not abuse his discretion in the way he balanced the risk of harm to the parties in light of their respective chances of success on the merits, in concluding that the balance cut in favor of the plaintiff, and in concluding that money damages would not provide an adequate remedy to the plaintiff.

Absent from the judge's discussion, however, was any reference to the public interest, a factor which ought to have been considered. See All *Stainless, Inc. v. Colby, 364 Mass. 773, 778 (1974)*. Relying on *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. deLiniere, 572 F. Supp. 246, 249 (N.D. Ga. 1983)*, **[***26]** the defendants argue that the injunction deprives the insurance buying public of the right to select the broker of their choice, a right they ought to be able to exercise freely. See also *Alexander & Alexander, Inc. v. Wohlman, 19 Wash. App. 670, 687 (1978)*. But compare *O'Sullivan v. Conrad, 44 Ill. App.3d 752, 758 (1976)*. Based upon our reading of Danahy's supplemental affidavit, which describes how the insurance brokerage business operates, we would not necessarily equate the customer-insurance broker relationship with the client-stockbroker relationship discussed in *Merrill Lynch, Pierce, Fenner & Smith, supra.* Nor, in light of the number of competing firms in the industry and the size of the market still available to RBH, is the injunction a significant restraint on ordinary competition.

We note that Danahy, with the benefit of counsel and for substantial consideration, freely signed the agreement which included a provision that A&A would be entitled to an injunction in the event of a breach or a threatened breach of the noncompetition covenants. RBH, knowing of the existence of the covenants, had at least constructive notice of the provision regarding A&A's **[***27]** right to an injunction. While such a provision would not require a court to issue an injunction in the absence of equitable considerations justifying that relief, its existence is a factor properly added to the scale in weighing the equities.

 **[*502]** For the reason indicated in note 2, *supra*, that part of the modified order enjoining RBH from violating the terms of the noncompetition agreement between A&A and Daly is to be vacated, and, as so further modified, the order is affirmed.

*So ordered*.

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 3/7/2025 at 10:19 AM EST and filed on 3/7/2025

| | |
|---|---|
| **Case Name:** | Rooterman LLC v. Belegu et al |
| **Case Number:** | 1:24-cv-13015-PBS |
| **Filer:** | |
| **Document Number:** | 31 |

**Docket Text:**
**Transcript of Motion Hearing by video held on January 29, 2025, before Judge Patti B. Saris. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Lee Marzilli at leemarz@aol.com. Redaction Request due 3/28/2025. Redacted Transcript Deadline set for 4/7/2025. Release of Transcript Restriction set for 6/5/2025. (DRK)**

**1:24-cv-13015-PBS Notice has been electronically mailed to:**

Jeffrey M. Rosin    jrosin@ohaganmeyer.com, kvassall@ohaganmeyer.com, lvaldez@ohaganmeyer.com

Marc J. Randazza    mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman    jmw@randazza.com, ecf@randazza.com

Lisbeth Valdez    lvaldez@ohaganmeyer.com

**1:24-cv-13015-PBS Notice will not be electronically mailed to:**

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** yes
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1029851931 [Date=3/7/2025] [FileNumber=11251872-0
] [67c4966d2eeed4cbb77fb0881bca2ce152a295f6e9390cc7080528bfb3379e2916c
ec4ae0d6b4757da4bfa44a6e6642cdfe41c8ac23072320aeae66122b83c0e]]

**AA594**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>           Plaintiff,<br><br>   v.<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br><br>           Defendants. | Civil Action No. 1:24-cv-13015 |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants Klodian Belegu, Quality Air Care Corporation, Water Damage Restoration, Ltd. f/k/a RM Water Damage Restoration, Ltd., and 911 Sewer & Drain Corporation, hereby respond to Plaintiff's Notice of Supplemental Authority (ECF No. 27). The Court should strike such as improper under Local Rule 7.1(b)(3).

Plaintiff's notice is not a proper supplemental authority. Typically, "such supplemental filings should direct the Court's attention to legal authority or evidence that was not available to the filing party at the time that that party filed the original brief to which the subsequent supplemental filing pertains." *Girard v. Aztec RV Resort, Inc.*, 2011 U.S. Dist. LEXIS 105855, at *6 (S.D. Fla. Sep. 16, 2011). Plaintiff, however, is attempting to make argument as to a 39-year-old case, *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 488 N.E.2d 22 (1986). Plaintiff had plenty of opportunity to cite to *Danahy* prior to the hearing.

**AA595**

Moreover, as Plaintiff notes, *Danahy* involved significant factors regarding the individual's role at the non-party entity as well as being "closely identified with" the non-party "in the mind of the public."  Robert Danahy was the one performing insurance brokerage services for the company, RBH.  In contrast, Plaintiff introduced no evidence that the public closely identifies Mr. Belegu with non-party entities Water Damage Restoration or 911 Sewer & Drain.

For the foregoing reasons, the Court should disregard Plaintiff's notice of supplemental authority and deny any preliminary injunction, especially as to the non-party entities.

Dated: March 7, 2025.                Respectfully Submitted,

                                     /s/ Marc J. Randazza
                                     Marc J. Randazza, BBO# 651477
                                     mjr@randazza.com, ecf@randazza.com
                                     Jay M. Wolman, BBO# 666053
                                     jmw@randazza.com
                                     RANDAZZA LEGAL GROUP, PLLC
                                     30 Western Avenue
                                     Gloucester, MA 01930
                                     Tel: (978) 801-1776

                                     *Attorneys for Defendants.*

**AA596**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 7, 2025 the foregoing document was served on all parties

or their counsel of record through the CM/ECF system.

/s/ Marc J. Randazza
Marc J. Randazza

**AA597**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| Rooterman, LLC<br><br>*Plaintiff,*<br><br>v.<br><br>Klodian Belegu, Quality Air Care<br>Corporation, RM Water Damage<br>Restoration LTD and 911 Sewer & Drain<br>Corporation.<br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:24-cv-13015

---

## PLAINTIFF'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS WITH INCORPORATED MEMORANDUM OF LAW

Plaintiff/Defendant-in-Counterclaim, Rooterman, LLC ("Rooterman"), hereby moves to dismiss Defendants' counterclaims and hereby submits this Memorandum of Law in support of its motion. All of the counterclaims of Defendants/Counterclaimants, Klodian Belegu ("Belegu"), Quality Air Care Corporation ("QAC"), RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation (collectively, "Counterclaimants") must be adjudicated in arbitration, or alternatively, they are time-barred.

## I.    INTRODUCTION

In a six-count pleading, Counterclaimants challenge the validity of the thirteen franchise agreements entered into between 2019 and 2021 ("Franchise Agreements"), as well as the validity and enforceability of the Rooterman trademarks. However, the claims should not be adjudicated here as they are subject to binding arbitration, or, alternatively, fail to state a claim under Rule 12(b)(6) because they are time-barred.

The motion to compel arbitration is straightforward, as all counterclaims fall within the agreement to arbitrate, and are not within the same exception (*i.e.,* injunctive relief) utilized by

**AA598**

Rooterman to bring this action. As for the alternative relief of Plaintiff's request for dismissal of all counterclaims as time-barred, Belegu and QAC argue that the franchise agreements should be voided and that all monies paid under the franchise agreements should be returned by Rooterman based on the supposed "fraud" of A Corp. (Count I), breach of contract by A Corp. and/or Rooterman (Count II), and a violation of Chapter 93A by A Corp. and Rooterman (Count VI). The fundamental flaw for all of these counts is that even if the allegations were true (which they are not), Counterclaimants have failed to bring their claims within the 1 or 2 year contractually agreed upon limitations period set forth in Section 19.7(G) of each of their franchise agreements. Indeed, Counterclaimants' own allegations demonstrate that they knew or should have known of any facts giving rise to any such liability shortly after the first franchise agreements were entered into in 2019. Now, nearly six years later for some agreements, and over 4 years later for others, Counterclaimants are far too late to allege that they were fraudulently induced to enter into said agreements, or and that A. Corp. initially, and Rooterman starting in 2022, failed to honor obligations under the agreements. Even Defendants' counterclaims sounding in trademark (Counts III-V) are time-barred, as all three of them amount to, in essence, requests for declaratory relief that operate as "defenses" to Plaintiff's trademark enforcement claims, when the facts giving rise to these defenses were admittedly also known from the start of Mr. Belegu's franchise operations. Thus, if arbitration of all counterclaims is not Ordered, this Court should grant dismissal of all counterclaims as time-barred.

## II.    SUMMARY OF THE COMPLAINT AND COUNTERCLAIMS

"Rooterman" is a national franchise brand that provides plumbing, sewer, drain cleaning, damage restoration and related services in hundreds of locations throughout the United States. See Amended Complaint, ¶ 8, 22. Plaintiff/Defendant-in-Counterclaim, Rooterman, LLC ("Rooterman") is the successor in interest to A Corp.'s ownership of the "Rooterman" intellectual

**AA599**

property rights. See id., ¶ 2. Plaintiff acquired the Rooterman assets of A Corp. by way of an asset purchase agreement dated January 20, 2022. See id., ¶ 3; Counterclaims, ¶ 4. Rooterman owns several valid and enforceable trademarks in "Rooterman," "Rooterman to the Rescue," and "RM," as set forth in Exhibit B to the Amended Complaint, with the earliest trademark being registered and used continuously in United States commerce since August 2, 1991. See Complaint, ¶¶ 1, 7; Exhibit B. Mr. Belegu is a former multi-unit Franchisee of Rooterman and the sole owner of the Counterclaimant entities, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation. See id., ¶¶ 4-5; Counterclaims, ¶¶ 3-6. Between September 2019 to January 2021, Mr. Belegu individually and on behalf of his entities, QAC and non-party Water Damage Solution of Bergen, LLC,[1] purchased multiple Franchise units and executed thirteen franchise agreements with A Corp. to operate a "Rooterman" franchise throughout certain territories in New Jersey, New York, and Pennsylvania. See Complaint, ¶¶ 11-12; Counterclaims, ¶¶ 1, 12-13.

Plaintiff alleges various breaches of contract (all to be addressed in a parallel arbitration as Plaintiff previously informed the Court, see ECF-22, n.4), but filed this Court case under the exception to arbitration for requests for injunctive relief, including injunctive relief for the protection of its trademarks. Defendants counterclaim, but all of Defendants' counterclaims are subject to the arbitration clause in the parties' franchise agreement (which was the same in all 13 franchise agreements), providing as follows:

> Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation, any claims that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration

---

[1]     Plaintiff will utilize the Court Ordered expedited discovery period to determine Mr. Belegu's ongoing use of this entity, if any.

association. A CORP. and FRANCHISEE agree that arbitration shall be conducted on an individual and not a class-wide basis.

See Amended Complaint, Exhibit C, at § 19.7(C).

Counterclaimants' causes of action for fraud, breach of contract, and Chapter 93A are all readily within this clause. Counterclaimants' trademark "claims" should be as well, as they are actually defenses to Plaintiff's efforts to enforce its trademarks and represent, perhaps, Counterclaimants' effort to have their defenses to Plaintiff's trademark claims adjudicated without arbitrating them. Here, rather than adjudicate the merits of Plaintiff's trademark claims, and Defendants' defenses, this Court need only rule as to the elements of the injunction requested, *i.e.,* is there a reasonable likelihood of success on the merits; this Court need not rule on whether Plaintiff does succeed on the merits.

However, to the extent this Court rules that any of Plaintiff's counterclaims are properly in this Court, alternatively, as set forth in Part III.B below, they are time-barred under the parties' contractually shortened limitations period and Counterclaimants' admissions of fact pertaining to those counterclaims.

## III.    ARGUMENT

### A.  Counterclaimants Must Arbitrate Their Claims And Their Counterclaims Should Be Dismissed

Both federal and Massachusetts public policy favor agreements to arbitrate disputes. See Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq.; Massachusetts Arbitration Act ("MAA"), M. G. L. c. 251 §§ 1 et seq; see also AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 346 (2011) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24 (1983)) (the FAA reflects a "liberal federal policy favoring arbitration"); Miller v. Cotter, 448 Mass. 671, 677 (2007) (finding language of the FAA "remarkably similar" to the language of the MAA). M. G. L. c. 251 § 1 states, in part:

**AA601**

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

See also Raytheon Co. v. Automated Business Sys., Inc., 882 F.2d 6, 9 (1st Cir. 1989) (holding agreement for arbitration of "all disputes" arising from contract included award of punitive damages"); Chen He v. Edna St., LLC, 102 Mass. App. Ct. 1102 (2022) (holding arbitrable claims arising from facts which fall under the arbitration clause, as doubts resolved in favor of arbitration).

In light of this liberal policy, courts will grant a motion to compel arbitration where, as here, the parties have agreed to arbitrate and/or when doing so does not substantially prejudice the opposing party and will serve the interests of justice and efficiency. See Creative Solutions Group, Inc. v. Pentzer Corp., 252 F.3d 28, 32 (1st Cir. 2001); McInnes v. LPL Fin., LLC, 466 Mass. 256, 267 (2013) (holding moving party entitled to compel arbitration where there is no dispute of material fact as to whether parties executed a valid arbitration agreement that covered claims in complaint). Moreover, there is a presumption of arbitrability in contracts which contain an arbitration clause, as "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." See Chelsea v. New England Police Benevolent Ass'n Inc., Local 192, 491 Mass. 426, 430 (2023) (quoting Local No. 1710, Int'l Ass'n of Fire Fighters v. Chicopee, 430 Mass. 417, 421 (1999)); Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 9 (1st Cir. 2014).

Counterclaimants agreed to and should be compelled to arbitrate all of their counterclaims. See Amended Complaint, Exhibit C, § 19.7. Section 19.7(C) of the Franchise Agreements governs the claims that are required to be submitted to arbitration. It states as follows:

> Except as otherwise set forth in this Agreement, any controversy or claim arising out of or relating to this Agreement, or any breach, including without limitation,

> any claims that this Agreement or any part, is invalid, illegal or otherwise voidable or void, shall be submitted to arbitration before and in accordance with the arbitration rules of the American Arbitration Association in accordance with its commercial arbitration rules, or any other mutually agreeable arbitration association. A CORP. and FRANCHISEE agree that arbitration shall be conducted on an individual and not a class-wide basis.

See id. at § 19.7(C).

All of Counterclaimants' causes of action readily fall within this clause. Even the trademark "counterclaims" are not actually claims; they are defenses to Plaintiff's effort to enforce its claims, and whether Plaintiff ultimately succeeds on those claims, or whether any of Defendants' defenses thereto forestall that success, is something the arbitration between the parties will resolve.[2]

## B. Alternatively, All Of Plaintiffs' Counterclaims Should Be Dismissed As Time-Barred

A motion to dismiss should be granted when the allegations in a pleading show that the "events giving rise to the claim and the commencement of the action exceeds the applicable limitations period," and if the properly considered documents "'fails to sketch a factual predicate that would' provide a basis for tolling the statute of limitations." Abdallah v. Bain Capital LLC, 752 F.3d 114, 119 (1st Cir. 2014) (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320 (1st Cir. 2008); see also LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998) ("Granting a motion to dismiss based on a limitations defense is entirely appropriate when the pleader's allegations leave no doubt that an asserted claim is time-barred"). Notably, tolling of the statute of limitations does not occur where a party has "actual knowledge of the facts giving rise to his cause of action." Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics,

---

[2] Defendants may argue that RM Water Damage and 911 Sewer & Drain are not parties to the franchise agreements, and thereby the agreements to arbitrate. However, that argument would fail since Belegu is the sole owner of those entities and it is those entities that are likewise alleged to have engaged in the identical violations of Belegu himself. See Restoration Pres. Masonry Inc. v. Grove Eur. Ltd., 325 F.3d 54, 62 n.2 (2003); Machado v. System4 LLC, 471 Mass. 204, 211 (2015).

Inc., 412 F.3d 215, 239 (1st Cir. 2005) (quoting Stark v. Advanced Magnetics, Inc., 50 Mass. App.

Ct. 226, 233-34 (2000).

In Creative Playthings, the Massachusetts Supreme Judicial Court ("SJC") made clear that

contractual provisions which shorten the limitation period for asserting claims can be upheld.

Creative Playthings Franchising, Corp. v. Reiser, 463 Mass. 758, 766 (2012). Moreover, a

shortened limitations period in a franchise agreement is not contrary to public policy in

Massachusetts. Id. at 765-66; see also Machado v. System4 LLC, 471 Mass. 204, 219 (2015)

(internal quotations and citations omitted) (upholding contractually shortened limitations period

in franchise agreement and noting "Massachusetts law permits contractually shortened limitations

periods so long as they are reasonable and not contrary to other statutory provisions or to public

policy"); Alcorn v. Raytheon Co., 175 F. Supp. 2d 117, 121 (D. Mass. 2001) (internal quotations

and citations omitted) (Massachusetts courts have adopted the "dominant view in contract law,

that it is permissible to have a contractual limitation period shorter than the statute of limitation…

because it is consistent with the principle of party autonomy that underlies the law of contracts…")

Section 19.7(G) of the Franchise Agreement is the parties' contractual limitations period.

It states as follows:

> A CORP. and FRANCHISEE agree that no action (whether for arbitration,
> damages, injunctive, equitable or other relief, including but not limited to
> rescission) will be maintained by any party to enforce any liability or obligation of
> the other party, whether arising from this agreement or otherwise, unless brought
> before the expiration of the earlier of 1 year after the date of discovery of the facts
> resulting in such alleged liability or obligation or 2 years after the date of the first
> act or omission giving rise to such alleged liability or obligation, except that where
> state or federal law mandates or makes possible by notice or otherwise a short
> period, such shorter period shall apply.

See Complaint, Exhibit C, § 19.7(G). Here, like in Creative Playthings, the 1-year contractually

shortened limitations period included in the Franchise Agreements is inherently valid and

enforceable. See 463 Mass. at 763-766 (upholding valid contractually shortened limitations period

which limits the limitations period to 1 year after date of discovery of facts or eighteen months after the date of the first act or omission). Notably, Mr. Belegu (individually or through an entity) entered into thirteen franchise agreements with A Corp, a fact which necessarily evidences his explicit acceptance of the same contractual limitations period, 13 times over. See id. at 766.

Yet, all of Counterclaimants claims are time-barred, as they were not raised within 1-year of the date of their admitted discovery of the facts resulting in alleged liability.

### 1. Counterclaimants' claims of fraud in the inducement (Count I), breach of contract (Count II) and violations of 93A (Count VI) are time-barred

Plaintiff addresses Counts I and VI together, as they are identical, because for fraud in the inducement and 93A (Count I and VI), Counterclaimants allege the same factual basis for such claims. (Compare Counterclaims ¶¶ 59-65 with Counterclaims ¶¶ 102-109). Moreover, many of the same allegations of "fraud" track and reclassify those same allegations as alleged "breaches of contract." Thus, the arguments herein address all three of these causes of actions together, because all supposed material misrepresentations and/or breaches were either known or should have been known from 2019-2021, when Counterclaimants were entering into the 13 contracts with A Corp.

First, Counterclaimants allege that A Corp. materially misrepresented that it owns the marks "Rooter-Man," "Rooter-Man to the Rescue," and "Rotor-Man." See Counterclaims, ¶ 102. Accepted at face value, Mr. Belegu and/or QAC knew of the existence of these trademarks in 2019 at the time of their first purchase, as they are referenced in the franchise agreements (see Verified Complaint, Exhibit C, Section 1.8) or, alternatively, through basic due diligence and a simple public records search discovered and initiated a trademark claim asserting these issues within the 1-year period. See Rife v. One W. Bank, F.S.B., 873 F.3d 17, 20 (1st Cir. 2017) (holding tolling inappropriate where party possessed terms of agreement and "with the exercise of reasonable

diligence" could have discovered and initiated claim within limitations period). They did not, and this claim is clearly time-barred.

Similarly, Mr. Belegu alleges that A Corp. materially misrepresented that Mr. Belegu would otherwise be able to operate his pre-existing trade of water damage restoration outside of his franchise. See Counterclaims, ¶¶ 15, 20. However, the following sequence is notable: (i) Rooterman's website says, as acknowledged by Counterclaimants, that "Some services are only offered at participating locations" (See Counterclaims, ¶ 25), (ii) Mr. Belegu's franchised locations were admittedly one of them, and (iii) on his own websites at-issue in this case, such as www.rootermanplumberservices.com and www.rootermannewark.com, Mr. Belegu advertised that his companies offered water damage services under the Rooterman name in New Jersey. See Verified Complaint, Exhibit A at pp. 6, 19; ECF 30-1, Further Decl. of Nathan King ("Further Decl. of King"), Exhibit A at pp. 3, 6, 11, 28, 31, 33, 48, 52. Moreover, even according to a review of Mr. Belegu's services left by Shenelle LaPierre on the former Rooterman of NJ (and current 911 Sewer & Drain google page), Mr. Belegu also operated his water damage restoration services under the Rooterman name in April 2024, before his franchise agreements were terminated. See ECF 20-2, Reply Decl. of Nathan King ("Reply Decl. of King"), Exhibit C. Further still, one of Mr. Belegu's agents stated on his LinkedIn Page that he was a "Master Plumber/Manager at RM Water Damage Restoration ltd. *d/b/a Rooter-Man*." See Amended Complaint, Exhibit J. Of course, Rooterman's own website advertises water damage restoration services. See ECF 20-2, Reply Decl. of Nathan King, ¶ 4[3].

---

[3]    Extrinsic documents may be considered on a motion to dismiss including "documents the authenticity of which are not disputed by the parties; official public records; documents central to plaintiffs' claim; and documents sufficiently referred to in the complaint." See Freeman v. Town of Hudson, 714 F.3d 29, 36 (1st Cir. 2013). Thus, Mr. King's sworn statements filed in this case may be relied upon for purposes of this Motion without converting it into a motion for summary judgment.

Thus, Mr. Belegu's counterclaim in this regard is not only meritless, it is clearly time-barred because Mr. Belegu effectively admits to "knowing" that, if he wanted to assert he was entitled to engage in water damage services outside of his franchise, he needed to assert that within 1 year of knowing that (such as with a request for declaratory relief). At this point, the time to make that argument has long since passed.[4] Moreover, although also a substantive argument, as a further alternative to why this allegation must be dismissed, if water damage restoration services were not part of what A Corp. offered franchisees at the time the agreements were entered into (which it is not), then there could not have been a false statement made at that time with the intent to induce Mr. Belegu and QAC to enter into the Franchise Agreements. That is, there could not have been "fraud in the inducement" as alleged in Counterclaimants' Count I.

As another example, nearly six years after entering into his first franchise agreement and four years after entering a thirteenth franchise agreement, Counterclaimants allege that A Corp. and Rooterman "never lived up to their promises" and made several material misrepresentations to induce Mr. Belegu to enter into the agreements. However, as detailed more fully below, all such claims are time-barred.

Mr. Belegu alleges that A Corp. materially misrepresented that no other person/entity in the territories would use the "Rooter-Man" name in plumbing and sewer work. See Counterclaims, ¶ 2, 42, 47, 60, 103. However, Mr. Belegu states that he knew of facts that could result in the alleged liability on November 12, 2019, whereby he sent an email to Crystal McCormick at A Corp. detailing Google listings advertising "Rooterman" in the franchised areas that were not his

---

[4]     Notably, if water damage restoration services were not part of what A Corp. offered franchisees at the time the agreements were entered into (which it is not), then there could not have been a false statement made at that time with the intent to induce Mr. Belegu and QAC to enter into the Franchise Agreements. That is, there could not have been "fraud in the inducement" as alleged in Counterclaimants' Count I.

**AA607**

own. See ECF 18-1, Decl. of Belegu, ¶¶ 14-15.[5] He even states that he knew of further facts in January 2023, where the Google business result for "Rooter-Man" in a franchised territory had a phone number that belonged to a competitor. See id., ¶ 12. Relatedly, Mr. Belegu further claims that A Corp. and Rooterman have "unreasonably withheld permission for Mr. Belegu and QAC to bring action against those third parties" who were supposedly misusing trademarks. See Counterclaims, ¶ 47. Though not true based on, in part, public information,[6] these claims are clearly time-barred as well because they accrued upon Mr. Belegu buying his territories, but at the latest, these earlier dates referenced above.

Finally, Mr. Belegu alleges that A Corp. materially misrepresented that locally optimized websites would be developed for the marketing of their services in the territories. See Counterclaims, ¶ 38-39, 105. He claims that A Corp. and Rooterman were required to design Franchisee pages pursuant to § 7.1(B), and that they failed to provide sufficient sites, necessitating that Mr. Belegu to develop his own. See Counterclaims, ¶ 40-41. However, in his own testimony submitted to this Court, Mr. Belegu states that "A Corp. worked with me on at least 22 micro-sites," which would have been prior to the transfer of A Corp.'s rights to Rooterman in 2022. See ECF 18-1, Decl. of Belegu, ¶ 22. Thus, Mr. Belegu has admitted to addressing issues pertaining to locally optimized websites for marketing services in his territories, evidencing that no material

---

[5]      Mr. Belegu's own sworn statements filed in this case may be relied upon for purposes of this Motion without converting it into a motion for summary judgment. See Freeman, 714 F.3d at 36.

[6]      Contrary to these allegations, Rooterman has taken numerous efforts to enforce its trademarks and has filed lawsuits against former franchisees who continued to hold themselves out as a Rooterman franchisee post-termination, see Reply Decl. of King, ¶ 2). Rooterman has additionally made efforts to enforce its trademarks within Mr. Belegu's former franchised territories, including by sending cease and desist letters to persons and/or former franchisees believed to be infringing on the Rooterman Marks and name. See id. ("In the last year alone, I too have sent at least six cease and desist letters to person and/or former franchisees in New Jersey, California, and Ohio who are believed to be infringing on Rooterman's marks . . ."). Rooterman's outside counsel detailed additional steps they had taken between June 2020 and July 2022 to enforce its trademarks in a letter to Mr. Belegu dated March 20, 2023, including by sending cease and desist letters and demands to stop the infringement to persons/and or former franchisees believed to be infringing on the Rooterman marks and name. See id., Exhibit A.

**AA608**

misrepresentation was made to "induce" Mr. Belegu and QAC to enter into the franchise agreements. Even if this were untrue, however, Mr. Belegu further states that on November 15, 2023, Rooterman eliminated the micro-sites and that half of the sites were re-launched on May 19, 2024. See id., ¶¶ 24, 26. As such, Mr. Belegu would have known of an alleged cause of action for these Counts over fifteen months ago, which is again outside of the contractual limitations period. Thus, Counterclaimants claims for fraudulent inducement (Count I) and violations of 93A (Count VI) should be dismissed.

Notably, even if there were no contractually shortened limitations period, Mr. Belegu and QAC's fraud claims and Chapter 93A claims are time-barred, as needing to be commenced within 3 years and 4 years respectively. M.G.L. c. 260, §§ 2A, 5A; see also Petricca v. Simpson, 862 F. Supp. 13, 16 (D. Mass. 1994) (citing M.G.L. c. 260, § 2A); Arcieri v. New York Life Ins. Co., 63 F. Supp. 3d 159, 164 (D. Mass. 2014) (citing M.G.L. c. 260, § 5A (Chapter 93A consumer fraud claims must be brought within 4 years). The statute of limitations begins to run "when [a party] knows or reasonably should know of harm attributable to [opposing party]'s conduct." Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 994 (1st Cir. 1988) (citing Levin v. Berley, 728 F.2d 551,556 (1st Cir. 1984). Since Mr. Belegu knew, or reasonably should have known, of all the facts underlying his fraud claims since at least 2019, when these allegedly false statements were first made, Counterclaimants claims for fraudulent inducement (Count I) and violations of 93A (Count VI) should be dismissed as time-barred.

Mr. Belegu's one allegation that appears related to Count II alone is that A Corp. and/or Rooterman breached the franchise agreements by failing to provide a training program (Section 9.1) and failing to provide on-going assistance and support (Section 9.1E). While Section 9.1 requires A Corp to furnish, and Franchisee to complete, a training program on the operation of the

**AA609**

Rooterman franchise, there is a provision (Section 9.1(C)) where the training requirement is waived if a Franchisee has sufficient prior business experience. <u>See</u> Amended Complaint, Exhibit C. Mr. Belegu stated that he has been in the "hygiene and water damage restoration business for over ten years." <u>See</u> Counterclaims, ¶ 1. With over ten years of experience, he cannot claim he has standing to even assert he needed training, but if he did, that too accrued well over 1 year ago.  His allegation regarding ongoing assistance and support is similar. It too was known well over a year prior, as it was part of the basis Mr. Belegu stopped paying his royalties which was also over 1 year ago. <u>See</u> Decl. of Belegu, ¶ 50 ("It was I and QAC who built up the business without the necessary assistance of PSB/Plaintiff"); <u>see also</u> Amended Complaint, ¶ 16 (911 Sewer & Drain trademark registered April 8, 2022, shortly after Plaintiff's acquisition of A Corp.'s interest in Rooterman and first used in commerce on or about February 26, 2024, just before Belegu began a continued failure to pay royalties and fees under the franchise agreements).

On a substantive level, this contractual commitment, found in Section 9.3 of the franchise agreements, is not even a contractual commitment, but a reference to a discretionary opportunity. Section 9.3 states that "A CORP. shall furnish to FRANCHISEE from time to time such operating assistance and training, <u>as is, in A CORP's sole discretion, reasonably necessary</u>." <u>See</u> Amended Complaint, Exhibit C, § 9.3(E) (emphasis added). Thus, as a second alternative, if for any reason, this sole allegation is not time-barred and some supposed ongoing continued violation, it should be dismissed under Rule 12(b)(6) for failure to state a claim.

For all of these reasons, Counts I, II, and VI of the Counterclaims should be dismissed.

### 2. Counts III-V, The Trademark Defenses/Requests for Declaratory Relief Are Also Time-Barred

Plaintiff addresses Counts III-V together, as they all assert the same or similar factual basis for their claims for relief. Indeed, all of Counterclaimants' trademark claims are premised upon

**AA610**

trademarks somehow being deficient or improperly represented from the start of the franchise purchases. However, these franchise purchases undisputedly occurred from 2019-2021. As such, facts pertaining to all three of these counts were necessarily known from the start and are now long since barred by the 1-year limitations period.

Counterclaimants allege that A Corp. and Rooterman never owned or applied for a standard character mark in "Rooter-Man," (<u>See</u> Counterclaims, ¶¶ 29, 31, 33) or for "Rooter-Man to the Rescue," "Rotor-Man," or "RM" (<u>See id.</u> ¶ 34). <u>See id.</u> ¶ 85. Contrary to these allegations, A Corp. owned and Rooterman currently owns valid and protectable Marks in "Rooter-Man to the Rescue," "Rotor-Man," and "RM." <u>See</u> Amended Complaint, Exhibit B. Counterclaimants attempts to overlook these protectable marks and mischaracterize the law as requiring A Corp. and Rooterman to obtain standard character marks to receive protection under the Lanham Act. <u>Compare</u> Counterclaims, ¶¶ 29, 31, 33, 34, 85  <u>with</u> <u>SoClean, Inc. v. Sunset Healthcare Solutions, Inc.</u>, 554 F. Supp. 3d 284, 294 (D. Mass. 2021) (<u>quoting</u> <u>Qualitex Co. v. Jacobsen Prod. Co.</u>, 514 U.S. 159, 166 (1995) (As long as any element of a mark alone "can act as a symbol that distinguishes a firm's goods and identifies their source, without serving any other significant function, the mark is potentially eligible for protection under the Lanham Act") (internal quotations omitted). Thus, Counterclaimants allegations for their absence of servicemarks (Count III) claim are both meritless and, as set forth above, time-barred as Mr. Belegu and/or QAC knew of the existence of these trademarks in 2019 or, alternatively, through basic due diligence and a simple public records search could have discovered and initiated a trademark claim asserting these issues within the 1-year period. <u>See</u> <u>Rife</u>, 873 F.3d at 20.

Counterclaimants also allege that A Corp. and Rooterman abandoned their Marks (Count IV) as they knowingly failed to police them, (<u>See</u> Counterclaims, ¶¶ 43, 89, 91), but undisputedly,

A Corp. and Rooterman have taken various actions to enforce their name and Marks. See supra Section III.B.1; id. fn. 3. This aside, once again, Counterclaimants knew of facts giving rise to this claim in 2019, and further facts in 2023. See Decl. of Belegu, ¶¶ 12, 14-15. Thus, Counterclaimants allegations are not only without merit, but also clearly time-barred.

A similar fate befalls Count V – Counterclaimants' assertions that A Corp. and Rooterman granted a naked license to Mr. Belegu. See Counterclaims, ¶ 98-99. Counterclaimants allege that A Corp. and Rooterman granted a naked license as A Corp./Rooterman (i) never sent a representative to accompany a Franchise employee on the job, (ii) never inspected or reviewed the quality of work performed, and (iii) never engaged in quality control as to the work performed or advertising and marketing performed. See id. ¶¶ 52-56. However, it is undisputed that A Corp. granted Mr. Belegu and his entities a license to use the Rooterman Marks in 2019, when Mr. Belegu first bought a franchise territory. See Complaint, ¶ 11; Exhibit C, §§ 1.8, 8.1. Thus, Counterclaimants allegations are long since time-barred.

For all of these reasons, Counts III, IV, and V of the Counterclaims should be dismissed.

## IV.    CONCLUSION

For all of the foregoing reasons, the Motion should be granted in its entirety, and Defendants' Counterclaims should be dismissed.

<div style="margin-left: 50%;">

Respectfully submitted,

ROOTERMAN, LLC

By its Counsel

</div>

Dated: March 11, 2025

<div style="margin-left: 50%;">

/s/ Jeffrey M. Rosin
Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of March 2025, *Plaintiff's Motion with Incorporated Memorandum of Law in Support of its Motion to Dismiss* was electronically filed.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

<div style="margin-left: 50%;">

/s/ Jeffrey Rosin
Jeffrey M. Rosin

</div>

**AA613**

## CERTIFICATE OF CONSULTATION

I, Jeffrey M. Rosin, certify that on this 11th day of March 2025, I conferred with counsel

for Defendants in advance of this filing and we did not narrow the areas of dispute.

*/s/ Jeffrey Rosin*
Jeffrey M. Rosin

**AA614**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

## United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 4/11/2025 at 12:29 PM EDT and filed on 4/11/2025

| | |
|---|---|
| **Case Name:** | Rooterman LLC v. Belegu et al |
| **Case Number:** | 1:24-cv-13015-PBS |
| **Filer:** | |
| **Document Number:** | 52(No document attached) |

**Docket Text:**
**District Judge Patti B. Saris: ELECTRONIC ORDER entered Finding as Moot [2] Motion for Preliminary Injunction and Expedited Hearing by Rooterman LLC. (CGK)**

**1:24-cv-13015-PBS Notice has been electronically mailed to:**

Jeffrey M. Rosin    jrosin@ohaganmeyer.com, kvassall@ohaganmeyer.com, lvaldez@ohaganmeyer.com, nvelonis@ohaganmeyer.com

Marc J. Randazza    mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman    jmw@randazza.com, ecf@randazza.com

Lisbeth Valdez    lvaldez@ohaganmeyer.com

**1:24-cv-13015-PBS Notice will not be electronically mailed to:**

**AA615**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

INTENTIONALLY OMITTED

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

INTENTIONALLY OMITTED

**INTENTIONALLY OMITTED**

INTENTIONALLY OMITTED

**INTENTIONALLY OMITTED**

**INTENTIONALLY OMITTED**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>Klodian Belegu, Quality Air Care Corporation, Water Damage Restoration, Ltd f/k/a RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br><br>    Defendants. | Civil Action No. 1:24-cv-13015<br><br>**<u>EMERGENCY MOTION FOR PARTIAL STAY PENDING APPEAL</u>** |

NOW COME Defendants Klodian Belegu and Water Damage Restoration, Ltd. f/k/a RM Water Damage Restoration Ltd. ("Defendants"), by and through undersigned counsel, and pursuant to Fed. R. App. P. 8, hereby move this Honorable Court for an emergency partial stay of this Court's Memorandum and Order of April 11, 2025, pending appeal. (ECF No. 50). Specifically, these Defendants should not be immediately enjoined from performing water damage restoration/remediation services, for, *inter alia*, they were not properly part of the "services" covered by the non-compete provision. In support hereof, Defendants refer to the accompanying memorandum of law and exhibits, incorporated herein by reference.

Pursuant to Local Rule 7.1(a)(2), undersigned counsel hereby certify that they attempted in good faith to confer with Plaintiff to narrow the issues in this motion prior to filing, but were unable to do so.

WHEREFORE Movants respectfully request that this Honorable Court partially stay its injunction and enforcement of the non-compete provision as to water damage restoration/remediation services pending appeal.

AA634

Dated: April 15, 2025.                    Respectfully Submitted,

                                          /s/ Jay M. Wolman
                                          Jay M. Wolman, BBO# 666053
                                          jmw@randazza.com
                                          Marc J. Randazza, BBO# 651477
                                          mjr@randazza.com, ecf@randazza.com
                                          RANDAZZA LEGAL GROUP, PLLC
                                          30 Western Avenue
                                          Gloucester, MA 01930
                                          Tel: (978) 801-1776

                                          *Attorneys for Defendants.*

**AA635**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Jay M. Wolman
Jay M. Wolman

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>                        Plaintiff,<br><br>        v.<br><br>Klodian Belegu, Quality Air Care Corporation, Water Damage Restoration, Ltd f/k/a RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br><br>                        Defendants. | Civil Action No. 1:24-cv-13015<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR PARTIAL STAY PENDING APPEAL** |

Defendants Klodian Belegu and Water Damage Restoration, Ltd. f/k/a RM Water Damage Restoration Ltd. ("Defendants"), require emergency relief, partially staying this Court's Memorandum and Order of April 11, 2025, pending appeal. (ECF No. 50). Specifically, these Defendants should not be immediately enjoined from performing water damage restoration/remediation services. Water damage restoration/remediation services are not part of the Rooterman System and should not be subject to the non-compete provision. The harm to these Defendants of shutting down immediately is much greater than any harm Plaintiff might suffer.

## 1.0    Legal Standard

To receive a stay of injunctive relief pending appeal, "the moving party need not persuade the court that it is likely to be reversed on appeal." *Canterbury Liquors & Pantry v. Sullivan*, 999 F. Supp. 144, 150 (D. Mass. 1998). The factors at issue are: (1) likelihood of success on appeal; (2) irreparable harm absent relief; (3) a lack of substantial injury to others having an interest in the decision under appeal; and (4) service of the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *see also State of New Jersey v. Trump*, 131 F.4th 27 (1st Cir. Mar. 11, 2025); *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements Inc*., 794 F.3d 168, 171 (1st Cir. 2015). The "first

**AA637**

two factors are the most critical[.]" *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st 2010). These factors weigh in favor of a stay.

**2.0    Analysis**

Defendants are likely to succeed in an appeal of the injunction as to the water damage restoration/remediation services.[1]  As noted in the Order (ECF No. 50 at 10), the operative non-compete provision "prohibits the franchisee and related persons from 'directly or indirectly engag[ing] in' or 'be[ing] involved in any way with the services comprising the [Rooterman] System." ECF No. 50 at 10 (modifications in original); *see also* ECF No. 7-3 at § 18.1.  Section 2.1 of the agreement (ECF No. 7-1) granted Mr. Belegu a "license to conduct the business listed in Section 1.8" which itself was only identified as "Rooter-Man" "Rooter-Man to the Rescue" and "Rotor-Man[.]"  Water damage restoration/remediation was not part of the franchise agreement. As noted in the Opposition to the renewed motion for preliminary injunction, the marks at issue were in Class 37 (Drain cleaning services; Plumbing; Plumbing services; Drain and sewer cleaning and rootering services.  (ECF No. 18 at 4).  Yet, the Court determined that "[w]ater damage restoration is among the offerings provided by at least some Rooterman plumbers." *Id.*  In support, the Court cited to two things:

1) ECF No. 7 at ¶ 22 (Amended Complaint), which says:

> Rooterman provides a variety of plumbing, sewer, and drain cleaning services, including emergency plumbing services, drain cleaning, sewer line repair and replacement, water heater repair and installation, toilet repair and installation, garbage disposal repair and installation, sump pump repair and installation, leak detection, waterproofing, water softener repair and installation, and pipe repair and replacement, among other services. See Services, Rooterman, https://www.rooterman.com/services/ (last visited Dec. 16, 2024).

Water damage restoration was not among the services listed.

---

[1] While Defendants contest the enforceability of the provision as a whole and will challenge such on appeal, the focus of this motion is limited to water damage remediation/restoration services.

**AA638**

2)  ECF No. 22-1 at ¶ 4 (Declaration of Nathan King), which says, in relevant part:

> Rooterman's marks are not only for plumbing and drains, but a corollary to that business to that is for franchisees to offer and provide restoration services. See www.rooterman.com/services/restoration Franchisees are encouraged to build their businesses by doing that. As such, as the Rooterman website duly shows, restoration services are part of the Rooterman brand offerings as well.

However, Mr. King's declaration is belied by the service mark registrations themselves and does not demonstrate that water damage restoration/remediation is part of the Rooterman System; by his own words, it is a mere "corollary." Moreover, Mr. King was never subject to cross-examination on this declaration submitted as part of the reply, and the Court deemed it credible without neither confrontation nor an evidentiary hearing.  "When the parties' competing versions of the pertinent factual events are in sharp dispute, such that the propriety of injunctive relief hinges on determinations of credibility, the inappropriateness of proceeding on affidavits alone attains its maximum." *Campbell Soup Co. v. Giles*, 47 F.3d 467, 470 (1st Cir. 1995)(cleaned up).  Had there been a hearing, Mr. King would have been confronted, for example, with the following: Rooterman advertises they have "over 750 franchise locations[.]"  *See* **Exhibit 1**, Declaration of Jay M. Wolman ("Wolman Decl.") at ¶¶ 3-4; **Exhibit 2**.[2]  Yet, it appears only 13 such locations advertise such services.  *See* Wolman Decl. at ¶¶ 5-6; **Exhibit 3**.[3]  Nor is there any evidence that such was encompassed in the franchise agreements at the time Mr. Belegu executed them.

It is a "a fundamental principle of contract interpretation: an ambiguous contract ought be construed against the drafting party[.]"  *Saturn Mgmt. LLC v. Gem-Atreus Advisors, LLC*, 754 F.

---

[2] Available at https://plumbing-franchise.rooterman.com/
[3] **Exhibit 3** is a Google search for the phrase "water damage restoration" only on the "rooterman.com" website using the "site:" operator.  The results show only the following: Eastern Connecticut; Ashburnham, MA; Lawrence, MA; Lynchburg, VA; Central VA and VA Beach; Baton Rouge, LA; Orlando, FL; Chattanooga, TN; The Detroit Lakes, MN; Tampa & Hillsborough County; Nashville, TN; Coastal OR; and Sacramento & Elk Grove, CA.

Supp. 2d 272, 282 (D. Mass. 2010) citing *LFC Lessors, Inc. v. Pacific Sewer Maint. Corp.*, 739 F.2d 4, 7-8 (1st Cir. 1984).  Moreover, an ambiguity with "polar differences" in the parties' understanding—here, the parties have polar differences in whether the "services" franchised include water damage remediation/restoration—serves to invalidate the contract. *ITT Corp. v. LTX Corp.* 926 F.2d 1258, 1265 n. 7 (1st Cir. 1991). The earliest iteration of the webpage Mr. King cites to is from September 23, 2020,[4] and there is no evidence that Mr. Belegu understood the "services" he was agreeing to refrain from in the non-compete provision, when he signed it, included water damage restoration/remediation.

One need only consider the case of *Boulanger v. Dunkin' Donuts, Inc.,* 815 N.E.2d 572 (Mass. 2004) cited by the Court.  (ECF No. 50 at 11).  In *Boulanger*, the issue was enforceability of a non-compete provision precluding operation of a business like Dunkin' Donuts.  If some Dunkin' Donuts franchises, hypothetically, offered internet café services for a fee (including terminal usage, ethernet connectivity, and/or printing services) would this mean a franchisee would be barred from running a hotel that has a business center or managing a Staples store?  Of course not; that's not what it means to be a Dunkin' Donuts.  And water damage restoration/remediation is not what it means to be a Rooterman franchise.  Rooterman itself doesn't even bother to list water damage remediation services on its homepage—it only lists "plumbing, sewer, and drain cleaning services."  *See* Wolman Decl. at ¶¶ 7-8; **Exhibit 4**.[5]  The First Circuit is likely to either reverse this Court's determination of whether the non-compete provision includes water damage restoration/remediation or reverse and remand for an evidentiary hearing for the credibility of the

---

[4] Available at
https://web.archive.org/web/20200923202752/https://www.rooterman.com/services/restoration/
[5] Available at https://www.rooterman.com

Memorandum of Law in Support of Emergency Motion for Partial Stay Pending Appeal
1:24-cv-13015

**AA640**

parties to be assessed. Thus, Defendants are substantially likely to prevail on appeal on this issue and the preliminary injunction should be stayed.

As to the second factor, the Court credited "a risk to Rooterman's goodwill" and Mr. Belegu's assent to seeking injunctive relief as sufficient for irreparable harm. (ECF No. 50 at 15-16). However, that determination was a generalized determination as to enforcing the non-compete as a whole; there was no particularized assessment as to the water damage remediation/restoration business. Here, if Mr. Belegu and Water Damage Restoration, Ltd., are able to continue in the water damage remediation/restoration business, there is no evidence that Rooterman's goodwill is threatened. As discussed above, Rooterman's business is plumbing and sewer/drain; the water damage remediation/restoration business is a mere "corollary" at best and one that there is no evidence that customers actually associate with Rooterman. As Rooterman proffered no evidence of such association, it cannot be said there would be a loss of goodwill. Similarly, as there is a factual dispute over the meaning of the agreement when Mr. Belegu signed it, it cannot be said that he expressly assented to injunctive relief as to the water damage remediation/restoration business. Thus, the second factor favors a stay pending appeal.

In contrast, Mr. Belegu and Water Damage Restoration, Ltd. ("WDR"), will suffer substantial injury if enjoined from engaging in the water damage remediation/restoration business. Mr. Belegu's primary business is operating WDR. *See* **Exhibit 5**, Declaration of Klodian Belegu, at ¶ 3. WDR, prior to the issuance of the Court's injunction, operated two businesses: a) a plumbing and sewer/drain business under the name "911 Sewer & Drain"; and b) a water damage restoration and remediation business. *See id.* at ¶ 4. In the course and scope of business operations, there are two business loans in the amount of around $120,000. *See id.* at ¶ 5. If the water damage restoration/remediation business is enjoined, there will be no income to repay these loans. *See id.*

AA641

at ¶ 5. In the course and scope of business operations, there is credit card debt in the amount of around $70,000. *See id.* at ¶ 6. If the water damage restoration/remediation business is enjoined, there will be no income to repay the credit card debt. *See id.* at ¶ 6. Office rent is over $9,000 a month, which is over $171,000 until the expiration of the injunction. *See id.* at ¶ 7. If the water damage restoration/remediation business is enjoined, there will be no income and Defendants will be in breach and evicted. *See id.* at ¶ 7. Warehouse rent is around $5,500 a month, which is $104,500 until the expiration of the injunction. *See id.* at ¶ 8. If the water damage restoration/remediation business is enjoined, there will be no income and Defendants will be in breach and evicted. *See id.* at ¶ 8. In the course and scope of my business operations, there are two work vehicles with auto loans of around $70,000. *See id.* at ¶ 9. If the water damage restoration/remediation business is enjoined, there will be no income to repay these loans and the vehicles will be repossessed. *See id.* at ¶ 9. Although the Court ordered a $300,000 bond to secure the preliminary injunction, it does not appear to have been paid and, more importantly, it is far less than the minimum $535,000 of *expenses* that Defendants must nevertheless pay over the next 19 months of the injunction, and a bond for this amount would not even begin to cover all the lost income and the irreparable harm that will come to WDR as evictions and repossessions devastate its ability to ever recover. WDR will be bankrupt and Mr. Belegu may become destitute. Thus, the significant harm to Defendants demonstrates that the third factor favors a partial stay. And it is only a partial stay that is sought here. Mr. Belegu is not being greedy and asking for a complete stay – only a stay as to the part that seems beyond the penumbra of the franchise agreement. He may still be unable to make ends meet operating in this very narrow slice of his business, but at least he would have a fighting chance if he could continue that one service, and an increased bond

that more accurately reflects what he would lose could at least be there to compensate him if the entire matter resolves in his favor.

The public interest also favors a stay.  Defendants' landlords, lenders, employees, and contractors will all be harmed if WDR is shuttered.  And although it is not readily susceptible to measurement, the customers who need an experienced remediator will be harmed as well.  Water damage and mold renders premises uninhabitable in New Jersey.  *See, e.g., Poland v. Sandville*, 2012 N.J. Super. Unpub. LEXIS 1800, *4 (Super. Ct. App. Div. July 26, 2012)(residential); *Dumont Bd. of Educ. v. Borough of Dumont*, 2017 N.J. Super. Unpub. LEXIS 2544, *2 (Super. Ct. App. Div. Oct. 11, 2017)(public facilities).  Thus, the fourth factor favors a stay as well.

## 3.0    Conclusion

Whether or not the non-compete provision as a whole is enforceable, Defendants are likely to prevail on appeal of the narrow question of whether the provision precludes provision of water damage restoration/remediation services.  The harm occasioned by the preliminary injunction outweighs any harm to Rooterman in its absence, since such services were not even contemplated in the agreement and are rarely offered.  A partial stay pending appeal is warranted.


Dated: April 15, 2025.                    Respectfully Submitted,

                                          /s/ Jay M. Wolman
                                          Jay M. Wolman, BBO# 666053
                                          jmw@randazza.com
                                          Marc J. Randazza, BBO# 651477
                                          mjr@randazza.com, ecf@randazza.com
                                          RANDAZZA LEGAL GROUP, PLLC
                                          30 Western Avenue
                                          Gloucester, MA 01930
                                          Tel: (978) 801-1776

                                          *Attorneys for Defendants.*

AA643

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Jay M. Wolman
Jay M. Wolman

Memorandum of Law in Support of Emergency Motion for Partial Stay Pending Appeal
1:24-cv-13015

**AA644**

# **Exhibit 1**

Declaration of Jay M. Wolman

**AA645**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>*Plaintiff/Counterclaim*<br>*Defendant,*<br><br>v.<br><br>Klodian Belegu, Quality Air Care Corporation, Water Damage Restoration, Ltd f/k/a RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation,<br><br>*Defendants/Counterclaim*<br>*Plaintiffs.* | Civil Action No. 1:24-cv-13015<br><br>**<u>DECLARATION OF</u>**<br>**<u>JAY M. WOLMAN</u>** |

I, Jay M. Wolman, hereby declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.      I am counsel for Defendants in the above-captioned matter. I make this declaration in support of Defendants' Emergency Motion for Partial Stay Pending Appeal.

3.      On April 15, 2025, I accessed the Rooterman webpage, at the URL <https://plumbing-franchise.rooterman.com/>.

4.      A true and correct copy of that webpage is attached hereto as **<u>Exhibit 2</u>**.

5.      On April 15, 2025, I searched Google for the phrase "water damage restoration" only on the "rooterman.com" website using the "site:" operator.  The results show only the following:  Eastern Connecticut; Ashburnham, MA; Lawrence, MA; Lynchburg, VA; Central VA and VA Beach; Baton Rouge, LA; Orlando, FL; Chattanooga, TN; The Detroit Lakes, MN; Tampa & Hillsborough County; Nashville, TN; Coastal OR; and Sacramento & Elk Grove, CA.

6.      A true and correct copy of the results of that Google search are attached hereto as **Exhibit 3**.

7.      On April 15, 2025, I accessed the Rooterman home webpage, at the URL <https://www.rooterman.com>.

8.      A true and correct copy of that webpage is attached hereto as **Exhibit 4**.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 15, 2025                    By: /s/ Jay M. Wolman
                                             Jay M. Wolman

**AA647**

# **Exhibit 2**

Rooterman Plumbing Franchise Webpage

**AA648**

**RooterMan**

*"TO THE RESCUE"*

**Ready to Join a Nationally Trusted Brand?**

Schedule a Business Opportunity Review

**Home**        FAQs ⌄    Available Territories    Download the Guide    Contact Us    **(866) 508-1765**

---

🏅 **#1 Plumbing Franchise in America, according to Entrepreneur**

# RooterMan, The #1 Rated Plumbing Franchise.

RooterMan is the #1 plumbing franchise in America built on a well-known brand that customers as well as plumbers trust. We offer plumbing business for sale all over the the United States as well as the opportunity to open a plumbing franchise, or convert an existing plumbing business into a RooterMan franchise.  RooterMan's turn-key sales, marketing and operational system has made RooterMan the #1 plumbing franchise in America. Today, RooterMan has 750 franchise locations, and is a trusted national brand you can use to take your plumbing business to the next level.

**Download Our Franchise Opportunity Guide**          ( **(866) 508-1765** )

AA649



RooterMan Francise Opportunity

# Benefits of the RooterMan Plumbing Franchise Opportunity



### Low Overhead

RooterMan franchise owners can quickly launch their business and avoid high start-up costs.

### Exclusive Discounts & Partnerships

Benefit from our national buying power and exclusive discounts on equipment and products.

### Ongoing Corporate Support

We provide turnkey marketing programs, and proprietary business management software.

### Innovative Training and One-on-One Coaching

As a RooterMan franchise owner, you'll receive individualized coaching as you build and scale your business.

AA650


Learn More

DOWNLOAD THE ROOTERMAN FRANCHISE OPPORTUNITY GUIDE



*"I've been involved in several different franchises, from corporate levels to consulting, and I feel that RooterMan has the most to offer for us and our family. I think it's a great opportunity. - Peter Allad, RooterMan of Tampa*

# RooterMan to the Rescue!

Contact us today by calling us or fill out a plumbing franchise opportunity contact form to learn more about our plumbing service franchise opportunity.

**(866) 508-1765**

## LEARN MORE ABOUT ABOUT ROOTERMAN, THE #1 PLUMBING FRANCHISE OPPORTUNITY

First Name

Last Name

Phone

Email Address

AA651

Made in Webflow

Your message...

REQUEST MORE INFORMATION

By pressing "Request More Information", you agree that Premium Service Brands, LLC and/or RooterMan, LLC may contact you by phone, email and or text message about your inquiry, which may be automated and you may receive several text messages per month. You don't need to consent as a condition of any purchase, and you can revoke consent at any time.

# Discover the Benefits of the RooterMan Plumbing Franchise Opportunity

RooterMan is a plumbing franchise that has been providing exceptional services for over 40 years, making it the #1 plumbing franchise in America according to Entrepreneur. The franchise has grown significantly since its inception, and it now has over 750 locations across the United States. RooterMan's success is attributed to its excellent customer service, skilled technicians, and competitive pricing, making it an attractive option for both customers and potential franchisees.

For entrepreneurs looking for a plumbing franchise opportunity, RooterMan is an excellent choice. The company offers comprehensive training and support to its franchisees, including access to a team of experts, ongoing education and training, and marketing assistance. RooterMan also provides its franchisees with advanced technology tools and resources that enable them to provide top-notch services to their customers.

Another reason why RooterMan is the #1 plumbing franchise in America is the wide range of services it offers and the support that it offers to its franchisees in doing these services. The company provides plumbing services for residential and commercial customers, including drain cleaning, pipe repair and replacement, water heater installation and repair, and sewer line services. This diversity of services allows RooterMan franchisees to cater to a broad customer base, built on the strong marketing and brand recognition of RooterMan as a trusted national brand and increasing each franchisees ability to succeed.

RooterMan also provides plumbing business for sale to individuals looking to own their own business. Aspiring entrepreneurs can take advantage of the opportunity offered by RooterMan and become part of a reputable brand that is well-known and respected in the industry. By investing in a RooterMan franchise, entrepreneur

AA652

proven business model, established brand, and ongoing support from the company.

RooterMan's success as the #1 plumbing franchise in America is due to its exceptional services, skilled technicians, competitive pricing, and comprehensive support for franchisees. For individuals looking for a plumbing business for sale or a franchise opportunity, RooterMan is an excellent choice that provides extensive training, technology tools, and resources to help them succeed. The company's commitment to excellence and customer satisfaction is a testament to its reputation as a reliable and trusted plumbing service provider.



**ROOTERMAN PLUMBING FRANCHISE**

Franchise Opportunity Home Page

Frequently Asked Questions

Plumbing Franchise Opportunities

Available Franchise Territories

866-508-1765

Download the RooterMan Plumbing Franchise Opportunity Guide

Schedule a Business Opportunity Review

Contact Franchise Development

©2023 RooterMan. All rights reserved.

AA653



# **Exhibit 3**

Google Search Results

**AA654**

4/15/25, 11:23 AM
"water damage restoration" site:rootermancontents Document 54-3 · Google Search
Case 1:24-cv-13015-PBS    Document 54-3    Filed 04/15/25    Page 2 of 6

 "water damage restoration" site:rooterman            

All    Images    Videos    Short videos    Forums    Shopping    Maps    More ▾                    Tools ▾

Sponsored · **Water damage restoration | Hartford**    ⋮

✅ GOOGLE GUARANTEED

    **Restoration Operators - Hartford**
5.0 ★★★★★ (13) · Water damage restoration
4+ years in business · Serves Hartford
Open 24/7 · 24/7 emergency services


📞
Get phone number

    **Total Restoration**
5.0 ★★★★★ (113) · Water damage restoration
2+ years in business · Serves Hartford
Open 24/7 · 24/7 emergency services


💬
Message

📞
Get phone number

Show more ⌄

 RooterMan
https://www.rooterman.com › services › restoration

**Restoration | Eastern Connecticut**    ⋮

RooterMan offers a full range of **water damage restoration** services to help customers get their property back to pre-damage condition. Expert Drain Cleaning and ...

 RooterMan
https://www.rooterman.com › services › restoration

**Water Damage, Fire, Mold Removal**    ⋮

RooterMan provides fast and safe restoration services for water, fire, or mold damage. · **Water Damage Restoration** Services · Fire Damage Restoration Services.

 RooterMan
https://www.rooterman.com › ashburnham-ma › services

**Restoration | Ashburnham, MA**    ⋮

RooterMan prides itself on being experts in **water damage restoration** and offering straightforward pricing and around the clock emergency plumbing services.



**RooterMan**
https://www.rooterman.com › lawrence-mass › services

## Restoration | Lawrence, MA

In addition to **water damage restoration** services, RooterMan also offers drain cleaning, general plumbing, and septic system services. They are knowledgeable and ...



**RooterMan**
https://www.rooterman.com › lynchburg › services › rest...

## Restoration | Lynchburg, VA

RooterMan of Lynchburg, VA specializes in **water damage restoration** services. We understand the urgency of water damage, and our team is experienced in quickly ...



**RooterMan**
https://www.rooterman.com › services › restoration

## Restoration | Central Virginia and Virginia Beach

RooterMan offers both residential and commercial **water damage restoration** services and can provide emergency services 24/7. Drain Cleaning and General Plumbing ...



**RooterMan**
https://www.rooterman.com › baton-rouge › services › r...

## Restoration | Baton Rouge, LA

Our experienced team of professionals are experts in **water damage restoration**, and we offer an array of services for all types of water damage. We can help with ...



**RooterMan**
https://www.rooterman.com › orlando › services › restor...

## Restoration | Orlando, FL

RooterMan of Orlando, FL is a full-service plumbing company that specializes in **water damage restoration** and other services for residential and commercial ...

[ Rooterman's Professional... ]  [ Orlando, Fl Rooterman... ]  [ Floor Drains ]

**RooterMan**
https://www.rooterman.com › chattanooga › services › re...

## Restoration | Chattanooga, TN

Our technicians are available around the clock to assist with any **water damage restoration** or other emergency plumbing services you may need. We offer ...

[ Highly-Trained Technicians... ]  [ Waterproofing ]  [ Rooterman Services ]

**AA656**



**RooterMan**
https://www.rooterman.com › the-detroit-lakes › services

⋮

## Restoration | The Detroit Lakes, MN

RooterMan provides expert solutions to **water damage restoration**, drain cleaning, general plumbing, and septic systems. ... Comprehensive **Water Damage Restoration**.

[ Comprehensive Water Damage... ]    [ Septic System And Emergency... ]    [ Rooterman Services ]



1    2                              Next

Results are personalized - Try without personalization

● **06107, West Hartford, CT** - From your device - Update location

Help        Send feedback        Privacy        Terms

**AA657**

 "water damage restoration" site:rootermar     

All    Images    Videos    Short videos    Forums    Shopping    Maps    More ▾                    Tools ▾

Sponsored · **Water damage restoration | Hartford**    ⋮

✅ GOOGLE GUARANTEED

 **DC Restoration Enterprise**
5.0 ★★★★★ (17) · Water damage restoration
1 year in business · Serves Hartford
Open 24/7 · Free estimate

 Message      Get phone number

 **All Dry Services of Connecticut**
4.9 ★★★★★ (99) · Water damage restoration
3+ years in business · Serves Hartford
Open 24/7 · Free estimate

 Message      Get phone number

Show more ⌄

 RooterMan
https://www.rooterman.com › services › restoration
**Restoration | Tampa & Hillsborough County**
RooterMan is the premier provider of **water damage restoration** services in the Tampa Hillsborough area. They understand that water damage can be a serious issue, ...

 RooterMan
https://www.rooterman.com › services › services › restor...
**Restoration | Nashville, TN**
RooterMan of Nashville, TN is experienced in drain cleaning, general plumbing, and septic systems. We are the experts when it comes to **water damage restoration**, ...

 RooterMan
https://www.rooterman.com › coastal-oregon › services
**Restoration | Coastal Oregon**
Our **water damage restoration** services include water extraction, dehumidification, and structural drying. Septic System Services. RooterMan of Coastal Oregon is ...

**AA658**

 **RooterMan**
https://www.rooterman.com › services › services › restor...

## Restoration | Sacramento & Elk Grove, CA

Our technicians are available around the clock to assist with any **water damage restoration** or other emergency plumbing services you may need. We offer ...



‹  Previous          1    2

Results are personalized - **Try without personalization**

● **06107, West Hartford, CT** - **From your device** - **Update location**

Help        Send feedback        Privacy        Terms

# <u>Exhibit 4</u>

Rooterman Home Page

**AA660**

**RooterMan**
*"TO THE RESCUE"*

866.577.1221

Call RooterMan

Schedule Service     Services     What to Expect     Book Appointment     Contact Us          Find A Location

# Your Local Plumbing and Drain Cleaning Experts

With more than 50 years of experience, and millions of satisfied customers, RooterMan remains the number one choice for professional plumbing, sewer, and drain cleaning services.

## Find a Local RooterMan

Enter your zip code below to find your local RooterMan. We'll meet your plumbing needs!

'44140', 'S0A', '64030'

Search

*5 Digit Zip (US) -or- First 3 of Postal (CA)*

**AA661**

**RooterMan**
"TO THE RESCUE"

☎ **866.577.1221**

**Call RooterMan**

Schedule Service    Services    What to Expect    Book Appointment    Contact Us    **Find A Location**

# Our Services

With decades worth of experience we are available to solve your problems all year long.



### Emergency Plumbing

Our plumbers are ready to go for emergencies – including nights, weekends and holidays.

**Explore this Service**



### Plumbing & Drains

As the largest plumbing and drain service company, we make thousands of repairs every day.

**Explore this Service**



### Water Damage

Our teams are equipped with state-of-the-art water extraction and cleanup equipment.

**Explore this Service**



### Water Heaters

Trust RooterMan for repair and replacement of gas, electric and tankless water heaters.

**Explore this Service**

THIS IS WHAT WE DO

**AA662**

ROOTER MAN
"TO THE RESCUE"

**866.577.1221**

Call RooterMan

Schedule Service    Services    What to Expect    Book Appointment    Contact Us    Find A Location

across the US and Canada, all of them offering expert drain cleaning and plumbing services. If you have a plumbing problem – give us a call!

**866.577.1221**

WHAT PEOPLE ARE SAYING

# Customer Feedback

"I would highly recommend them to anyone!"

"They guys were
doing and very in

**AA663**

**ROOTERMAN**
*"TO THE RESCUE"*

📞 **866.577.1221**

**Call RooterMan**

Schedule Service    Services    What to Expect    Book Appointment    Contact Us    **Find A Location**

# Why Choose RooterMan?

We provide fast and dependable plumbing services at reasonable rates.

50+ Years of Service

Professional and Friendly Technicians

Same-day Service for Most Non-Emergencies

Guaranteed Repairs

Best Training

Unrivaled

**AA664**

**866.577.1221**

Call RooterMan

Schedule Service    Services    What to Expect    Book Appointment    Contact Us    Find A Location

Experts

## Plumbing Franchise Opportunity

## Services

Drain Cleaning

Tree Root Removal

Emergency Service

33+ More Services...

## RooterMan

Products

About

What to Expect

Franchising

Contact Us

## Find a Location

Location Finder

Site Search

ADA Statement

Contact:

866.577.1221

© RooterMan 2024. All rights reserved.

Privacy Policy

**AA665**

# **Exhibit 5**

Declaration of Klodian Belegu

**AA666**

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

<table>
<tr><td>

Rooterman, LLC,

         Plaintiff,

   v.

Klodian Belegu, Quality Air Care
Corporation, Water Damage Restoration,
Ltd. f/k/a RM Water Damage
Restoration LTD, and 911 Sewer &
Drain Corporation.

         Defendants.

</td><td>

Civil Action No. 1:24-cv-13015

**DECLARATION OF
KLODIAN BELEGU**

</td></tr>
</table>

I, Klodian Belegu, hereby declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.      I am a Defendant and I am the operator of Defendant Water Damage Restoration, Ltd. f/k/a RM Water Damage, Ltd., ("WDR") in the above-captioned matter.

3.      My primary business is operating WDR.

4.      WDR, prior to the issuance of the Court's injunction, operated two businesses:  a) a plumbing and sewer/drain business under the name "911 Sewer & Drain"; and b) a water damage restoration and remediation business.

5.      In the course and scope of my business operations, there are two business loans in the amount of around $120,000.  If the water damage restoration/remediation business is enjoined, there will be no income to repay these loans.

**AA667**

6.      In the course and scope of my business operations, there is credit card debt in the amount of around $70,000. If the water damage restoration/remediation business is enjoined, there will be no income to repay the credit card debt.

7.      Office rent is over $9,000 a month. If the water damage restoration/remediation business is enjoined, there will be no income and we will be in breach and evicted.

8.      Warehouse rent is around $5,500 a month. If the water damage restoration/remediation business is enjoined, there will be no income and we will be in breach and evicted.

9.      In the course and scope of my business operations, there are two work vehicles. The auto loans are around $70,000. If the water damage restoration/remediation business is enjoined, there will be no income to repay these loans and the vehicles will be repossessed.

I declare under penalty that the foregoing is true and correct.

Dated: 4-15-2025                    By: _____
                                              Klodian Belegu

RANDAZZA | LEGAL GROUP

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC<br><br>*Plaintiff,*<br><br>v.<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer    Drain Corporation.<br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 1:24-cv-13015

**PLAINTIFF S SUPPLEMENTAL E    IBITS FURT  ER SUPPORTIN   PLAINTIFF S OPPOSITION TO DEFENDANTS  MOTION FOR A PARTIAL STAY OF T   E PRELIMINARY INJUNCTION**

Plaintiff Rooterman, LLC ("Rooterman" or "Plaintiff") hereby files the attached supplemental exhibits in further support of Plaintiff's Opposition to Defendants' Motion for a Partial Stay of the Preliminary Injunction.  Attached hereto, please find:

<u>Exhibit 13</u>:  A screen shot of the 911 Sewer    Drain web page, as of today, April 22, 2025.  As the Court can readily see, "Water Damage Restoration" is part of the offerings of this defendant company that has been restrained by way of this Court's April 11, 2025 Order.

<u>Exhibit 14A</u>:  A Google Review from "5 days ago" dating after this Court's April 11, 2025 Order that show that Defendants continue to do business and defy this Court's Order as it reviews "Ron" and, notably, "Ron" is one of the plumbers who Plumbing Manager, Travis Hershner, identified. (<u>See</u> <u>Exhibit 14.B</u> (Hershner Depo. Excerpt, p.10)

<u>Exhibit 15:</u>  Various "blog" posts on the 911 Sewer    Drain website dated after this Court's April 11, 2025 Order up to today, April 22, 2025, that show that Defendants continued to advertise their services in defiance of this Court's order.

**AA669**

Exhibit 16: A full copy of the "Home" page on the 911 Sewer    Drain website, as of today, April 22, 2025.

Notably, when the telephone number on Exhibit 13 is dialed, 800-295-5798, a call center picks up, answers as "911 Sewer    Drain" and will openly schedule plumbing and drain services throughout New Jersey. This all continues to happen daily despite this Court's Order of April 11, 2025 Ordering that Defendants cease and desist plumbing and sewer business for the 2 year period therein.

Based on these additional exhibits, this Court should not only maintain the Order as currently issued but issue a clear warning to Mr. Belegu that any continued failure to comply with it shall be met with substantial sanctions.

WHEREFORE, and for the further reasons set forth above, the Defendants' Motion should be denied in its entirety.

Respectfully submitted,

ROOTERMAN, LLC

By its Counsel

Dated: April 22, 2025

_s  effre    sin_

Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C West
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

**AA670**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 22nd day of April 2025, *Plaintiff s      le  ental      issi  n in siti  n t  t e M ti  n f r a Partial  ta   f t e Preli  inar   n  n ti  n* was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

<u> s   effre     sin    </u>
Jeffrey M. Rosin

**AA671**

# EXHIBIT 13

**AA672**



# EXHIBIT 14A

AA674

# 911 Sewer & Drain

4.6 ★★★★⯪ (356)

Permanently closed

| Overview | Reviews | About |
|----------|---------|-------|



| Directions | Save | Nearby | Send to phone | Share |
|------------|------|--------|---------------|-------|

1049 Church Rd, Toms River, NJ 08755

Permanently closed

911sewerdrain.com

(800) 295-5798

2Q5P+V7 Toms River, New Jersey

Suggest an edit

## From the owner



Discover the Best Local Drain Snaking Services

5 days ago

Learn more

## Photos & videos






All    Bathroom    Pipe    By owner

## Review summary

5 ▬▬▬▬▬▬▬▬▬▬
4 ▬
3 ▪
2 ▪
1 ▪

**4.6**
★★★★⯪
356 reviews



**AA675**

L    "Before starting the job I was quoted a **price** and they stayed within that **budget**."

E    "When I scheduled the service, I was told 39.00 **dollar service charge**."

J    "Clear clogged piping to sink answered all my concerns and questions quite pricey"

## Reviews                                    ☐                                    ☐ Sort

**All**    technician  21    job  13    home  13    inspection  12    +6

B    **Betty Hester**
     4 reviews

         5 days ago   **NEW**

The company sent a tech Ron he was great very professional, kind and knowledgeable about his profession also the company very quickly to my request

☐ Like       ☐ Share

**AA676**

# EXHIBIT 14B

AA677

# In the Matter of:

*Rooterman, LLC vs*

*Klodian Belegu, Quality Air Care Corporation, et al.*

---

*Travis Hershner*

*April 02, 2025*

---

*68 Commercial Wharf ● Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*



Rooterman, LLC vs
Klodian Belegu, Quality Air Care Corporation, et al.

Travis Hershner
April 02, 2025

10

1    understand the question.

2         Q      Well, you said you perform

3    work for -- you manage plumbing for 911

4    Sewer & Drain?

5         A      Correct.

6         Q      What makes you think you

7    manage plumbing or 911 Sewer & Drain?

8         A      That's what the company name

9    is.

10        Q      Okay.  And how do you manage

11   plumbing for 911 Sewer & Drain?

12        A      Again, if you can repeat that.

13   Yeah, I'm not sure I understand that

14   question.

15        Q      Well, what are your daily

16   tasks for 911 Sewer & Drain?

17        A      Managing plumbers.

18        Q      How many plumbers are there?

19        A      Three plumbers.

20        Q      And what are their names?

21        A      There's Elvis, there is Ron

22   and there is -- oh, my God, Elvis, Ron, and

23   one of the guy's name is slipping me.

24   Sorry.  I apologize.  I don't -- I don't

**AA679**

# EXHIBIT 15

**AA680**





AA681

# Blog





## Essential Tips for Effective Plumber Service Calls in Bayonne

by blog | Apr 22, 2025 | Plumber Services

When faced with a plumbing issue, knowing how to handle a plumber service call in Bayonne can make all the difference.Whether it's a leaky faucet, a clogged drain, or a total plumbing overhaul, understanding the nuances of service calls is crucial for a successful...

**read more**

AA682

Blog - 911 Sewer & Drain



### Discover the Best Local Drain Snaking Services for Efficient Clogs Removal

by blog | Apr 17, 2025 | Plumber Services

Are you tired of dealing with stubborn clogs in your sink or toilet?If you've ever faced slow drainage or backed-up pipes, you know how frustrating and inconvenient it can be.Enter drain snaking, a reliable method for clearing blockages and maintaining a healthy...

**read more**





**AA683**

Blog - 911 Sewer & Drain

### Effective Drain Odor Removal Services: Banish Foul Smells for Good!

by blog | Apr 15, 2025 | Plumber Services

We've all been there—an unexpected, unpleasant smell wafting from the kitchen or bathroom drain.It can turn even the simplest of tasks into a daunting challenge.That's where effective drain odor removal services come into play.Understanding how these services work can...

**read more**



### Top Strategies for Reliable Kitchen Plumbing Repairs That Save You Time and Money

by blog | Apr 11, 2025 | Plumber Services

Are you tired of dealing with kitchen leaks, clogs, or odd smells?Reliable kitchen plumbing repairs are essential for every homeowner, not just for maintaining a functional kitchen but also for saving time and preventing costly damage.In this article, we'll explore...

**read more**





### Find the Best Plumbers for Leak Emergencies Near You – Fast and Reliable Solutions!

by blog | Apr 9, 2025 | Plumber Services

When a plumbing leak strikes, your home can turn into a nightmare in just moments.Water damage, mold growth, and escalating costs can quickly follow if the situation isn't handled promptly.That's why knowing how to find the best plumber for leak emergencies near you...

**read more**





**AA685**

## Transform Your Space: Discover the Best Residential Bathroom Remodeling Ideas

by blog | Apr 7, 2025 | Plumber Services

Are you dreaming of a stunning bathroom transformation?Whether you want to create a spa-like retreat or simply refresh your space, exploring the best residential bathroom remodeling ideas is essential for making your vision come to life.With so many design trends and...

**read more**



## Top Tips for Choosing the Best Water Pipe Insulation to Save Energy and Prevent Damage

by blog | Apr 2, 2025 | Plumber Services

Are you looking to save energy and protect your plumbing system?Then understanding the importance of water pipe insulation is key.Insulating your pipes not only helps in reducing energy costs but also prevents damage from freezing during colder months.In this article,...

**read more**





### Expert Solutions: Find the Best Clogged Toilet Plumber in Clifton

by blog | Mar 31, 2025 | Plumber Services

Clogged toilets can turn a routine day into a frustrating ordeal.If you've ever faced the overwhelming challenge of a clogged toilet, you know how essential it is to have a reliable clogged toilet plumber in Clifton at your disposal.In this article, we'll delve into...

**read more**





**AA687**

Essential Plumbing Maintenance Tips You Can Find Near You

by blog | Mar 28, 2025 | Plumber Services

When it comes to home ownership, one of the most critical aspects is plumbing maintenance.Many homeowners may not realize the importance of regular upkeep until an unexpected leak turns into a costly repair.Not only can a well-maintained plumbing system save you...

**read more**



Essential Guide to Burst Pipe Emergency Repair in Camden: Quick Solutions You Need

by blog | Mar 26, 2025 | Plumber Services

A burst pipe can turn your day upside down in an instant.Water flooding your home, structural damage, and potential health risks are just a few of the consequences that can follow this plumbing disaster.If you find yourself facing a burst pipe emergency in Camden,...

**read more**



AA688



## Top Tips for Effortless Bathroom Faucet Installations: Achieve the Best Results

by blog | Apr 21, 2025 | Plumber Services

Are you looking to upgrade your bathroom faucet?Installing a new faucet might seem daunting, but fear not!With a little preparation and some handy tips, you can achieve the best bathroom faucet installations without breaking a sweat.In this guide, we'll walk you...

**read more**





**AA689**

### Expert Guide to Hot Water Tank Repair in East Orange: Save Money and Stay Warm!

by blog | Apr 17, 2025 | Plumber Services

When the chill of winter sets in, a functional hot water tank becomes an essential part of your home.However, like any appliance, it can encounter issues.Residents seeking hot water tank repair in East Orange may find themselves wondering about the common problems,...

**read more**



### Expert Guide to Bathroom Fixture Installation in Union City: Transform Your Space with Ease

by blog | Apr 14, 2025 | Plumber Services

Are you looking to revamp your bathroom and bring a fresh, modern feel to your home?One of the most impactful ways to achieve this transformation is through bathroom fixture installation in Union City.Whether you're upgrading your faucets, sinks, or lighting,...

**read more**





### Top Local Pipe Corrosion Solutions in Passaic for a Durable Plumbing System

by blog | Apr 10, 2025 | Plumber Services

When it comes to maintaining a durable plumbing system, understanding the nuances of pipe corrosion is crucial.Homeowners in Passaic face unique challenges related to local pipe corrosion solutions that can effectively address these issues.In this article, we'll...

**read more**





**AA691**

### Discover Affordable Sewer Inspection Camera Services for Your Plumbing Needs

by blog | Apr 8, 2025 | Plumber Services

When it comes to maintaining your home's plumbing system, understanding the ins and outs of sewer inspections is crucial.Many homeowners may overlook the importance of these inspections, but the truth is, they can save you time, money, and a whole lot of hassle down...

**read more**



### Expert Tips for Effective Sewer Clog Troubleshooting Near You

by blog | Apr 4, 2025 | Plumber Services

Have you ever dealt with a troublesome sewer clog that made your bathroom unusable?If you're nodding in agreement, you're certainly not alone.Sewer clogs are a common yet frustrating issue for homeowners everywhere.If you're searching for effective sewer clog...

**read more**



**AA692**



### Discover Reliable 24-Hour Plumbing Solutions Near You for Immediate Assistance

by blog | Apr 2, 2025 | Plumber Services

When plumbing emergencies strike, time is of the essence. A burst pipe or a malfunctioning toilet can quickly turn into a disaster, potentially causing extensive damage and costing you in repairs. This is where the importance of reliable 24-hour plumbing solutions near...

**read more**





### Discover Top Commercial Drain Cleaning Services Near You for a Polished Plumbing Solution

by blog | Mar 31, 2025 | Plumber Services

In the hustle and bustle of managing a business, the last thing you want to deal with is a clogged drain.Not only do blocked drains disrupt operations, but they can also lead to severe plumbing issues down the line.This is where commercial drain cleaning near me...

**read more**



### Discover the Best Hydro Jetting Services for Ultimate Clog Removal

by blog | Mar 27, 2025 | Plumber Services

Are you tired of slow drains and frequent clogs?If so, it may be time to explore hydro jetting services.Hydro jetting is a powerful plumbing solution that uses high-pressure water streams to clear stubborn blockages within your pipes.In this article, we'll delve into...

**read more**





### Discover the Best Shower Head Installations Near You for Ultimate Bathing Bliss

by blog | Mar 25, 2025 | Plumber Services

When it comes to transforming your daily bathing routine, the shower head can make all the difference. Imagine stepping into your shower and feeling a cascade of water that's perfectly suited to your preferences. Not only does a quality shower head elevate your...

**read more**



### Discover Affordable Pipe Insulation Near You for Energy Savings and Comfort

**AA695**

by blog | Apr 18, 2025 | Plumber Services

When it comes to keeping your home comfortable year-round, one often overlooked aspect is pipe insulation.Investing in affordable pipe insulation near you can lead to substantial energy savings and enhanced comfort.But what is pipe insulation, and why should you care...

**read more**



### Finding the Best Plumber for Commercial Properties: Top Tips and Considerations

by blog | Apr 16, 2025 | Plumber Services

When it comes to maintaining a commercial property, finding the best plumber for commercial properties is a must.Unlike residential plumbing, commercial plumbing systems are often larger, more complex, and designed for higher volumes of usage.This can lead to specific...

**read more**



**AA696**



### Discover the Best Toilet Unclogging Services Near You for Hassle-Free Solutions

by blog | Apr 14, 2025 | Plumber Services

Clogged toilets can be a major inconvenience, often causing frustration and stress in your daily life.If you find yourself searching for the 'best toilet unclogging near me,' you're not alone.Understanding the common causes of toilet clogs, how to choose the right...

**read more**





**AA697**

Top Sump Pump Replacement Specialists: Ensuring Efficient Water Management for Your Home

by blog | Apr 9, 2025 | Plumber Services

When it comes to managing water effectively in your home, a sump pump is an unsung hero.These devices are critical for preventing flooding, especially in basements and crawl spaces.However, over time, sump pumps can wear down and lose efficiency.That's where a sump...

**read more**





Swift Solutions for Emergency Drain Repair in Cherry Hill: Your Ultimate Guide

by blog | Apr 7, 2025 | Plumber Services

When it comes to home maintenance, few issues can disrupt your daily life like a drainage problem.That's why understanding emergency drain repair in Cherry Hill is not just helpful—it's necessary.A clogged or damaged drain can lead to water damage, health hazards, and...

**read more**

AA698



## Expert Faucet Leak Repair Tips for Brick Homeowners

by blog | Apr 3, 2025 | Plumber Services

Faucet leaks are a common frustration for homeowners, often leading to wasted water and increased utility bills.If you're a resident of Brick, New Jersey, knowing how to tackle faucet leak repair in Brick can save you both time and money.In this guide, we'll delve...

**read more**





### Discover the Best Local Water Heater Services Near You for Reliable Solutions

by blog | Apr 1, 2025 | Plumber Services

When it comes to our homes, few appliances are as crucial as the water heater.It's the unsung hero that ensures warm showers, clean dishes, and cozy laundry days without a hitch.Understanding the importance of reliable water heater services is essential not only for...

**read more**



### Discover the Best Water Filtration System Installer in Elizabeth for Pure Water Solutions

by blog | Mar 28, 2025 | Plumber Services

When it comes to ensuring that your family has access to clean, safe drinking water, the importance of a reliable water filtration system cannot be overstated.In Elizabeth, residents are increasingly turning to advanced filtration systems to purify their tap water.But...

**read more**



**AA700**



### Find Affordable Local Drain Specialists: Expert Solutions for Your Plumbing Needs

by blog | Mar 26, 2025 | Plumber Services

When it comes to plumbing issues, particularly those involving drains, having access to knowledgeable and affordable local drain specialists can make all the difference.From clogged drains to unexpected backups, these professionals have the expertise to tackle various...

**read more**





**AA701**

### Essential Guide to Main Water Line Replacement: Tips for Homeowners

by blog | Mar 24, 2025 | Plumber Services

When it comes to home maintenance, homeowners often overlook the significance of their main water line.This critical component is responsible for delivering fresh water to your house, and its reliability can directly impact your daily life.If you're experiencing...

**read more**

« Older Entries



Copyright 2024 911 Sewer & Drain. All rights reserved. All available services, hours of operations, pricing structure, and guarantees may vary by location.



# EXHIBIT 16

**AA703**



## Welcome to **911 Sewer & Drain**

Your trusted partner in Emergency Plumbing and Drain Cleaning services. When plumbing disasters strike, we're the professionals you can rely on, 24/7.

At 911 Sewer & Drain, we understand that plumbing emergencies can happen at any time, disrupting your life and causing stress. Our team of skilled plumbers and technicians are equipped with the latest tools and expertise to handle any plumbing crisis with speed and efficiency.



**AA705**



## Emergency Plumbers

Introducing our Local Emergency Plumbing Services at 911 Sewer & Drain, your trusted partner in handling plumbing problems 24/7. With our advanced tools and expertise, you can rely on us to fix your problem fast and efficiently. Contact us now for all your emergency plumbing needs.

LEARN MORE





## Leak Repair

Our professional team of plumbers are available 24/7 to handle your home plumbing needs swiftly and efficiently. With advanced tools and extensive knowledge, our expert technicians can quickly fix any leak or burst pipe. Contact us now and let 911 Sewer & Drain get you fixed fast!

LEARN MORE



**AA707**



## Drain Cleaning

Need help with drain cleaning and clog removal? Our team of experts are available around the clock. Count on us to quickly address any plumbing problem you may have, from stubborn clogs to complete drain cleaning. Contact us now for all your drain cleaning needs.

LEARN MORE



# Best-in-Class Emergency Plumbing Services

Introducing our comprehensive range of plumbing services. From routine maintenance to complex repairs, we have you covered. Our skilled team of plumbers is equipped to handle any job with precision and expertise. Whether it's fixing leaky faucets, installing state-of-the-art water heaters, or tackling challenging sewer line issues, we are committed to delivering exceptional results.

With a focus on efficiency and customer satisfaction, we strive to provide the highest quality service in a timely manner. Trust in our expertise to ensure your plumbing needs are met with excellence. Contact us today for all your plumbing requirements and discover the difference of 911 Sewer & Drain.

**Services:**

- 24/7 Emergency Plumbing Services
- Drain Cleaning
- Water Heater Repair/Installation
- Sewer Line Repair/Replacement
- Pipe Leaks
- Toilet Repair/Installation
- Garbage Disposal Repair/Installation
- Sump Pump Repair/Installation
- Water Leak Detection

SCHEDULE SERVICE NOW

**AA709**





**AA710**



## Franchise Opportunities

Explore the extraordinary opportunity to become a 911 Sewer & Drain franchise and unlock boundless potential. Join a thriving network of motivated entrepreneurs who have discovered the lucrative business of sewer and drain services along with water damage restoration. With our robust support system and industry expertise, you'll be equipped to excel and build a thriving business.

Step into a world where customer satisfaction is paramount, and trust is earned through exceptional service. Embrace this remarkable chance to enjoy the freedom and rewards of owning your own franchise.

LEARN MORE



## Blog



## Essential Tips for Effective Plumber Service Calls in Bayonne

by blog | Apr 22, 2025 | Plumber Services

When faced with a plumbing issue, knowing how to handle a plumber service call in Bayonne can make all the difference. Whether it's a leaky faucet, a clogged drain, or a total plumbing overhaul, understanding the nuances of service calls is crucial for a successful...

read more



AA712

Top Tips for Effortless Bathroom Faucet Installations: Achieve the Best Results

by blog | Apr 21, 2025 | Plumber Services

Are you looking to upgrade your bathroom faucet?Installing a new faucet might seem daunting, but fear not!With a little preparation and some handy tips, you can achieve the best bathroom faucet installations without breaking a sweat.In this guide, we'll walk you...

read more



Discover Affordable Pipe Insulation Near You for Energy Savings and Comfort

by blog | Apr 18, 2025 | Plumber Services

When it comes to keeping your home comfortable year-round, one often overlooked aspect is pipe insulation.Investing in affordable pipe insulation near you can lead to substantial energy savings and enhanced comfort.But what is pipe insulation, and why should you care...

read more

« Older Entries





Contact Us
**(800) 295-5798** 

**Why Us**

**About Us**

**Blog**

**Own a Franchise**

**AA714**



Accepted forms of payment.



Copyright 2024 911 Sewer & Drain. All rights reserved. All available services, hours of operations, pricing structure, and guarantees may vary by location.

**AA715**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>             Plaintiff,<br><br>    v.<br><br>Klodian Belegu, Quality Air Care Corporation, Water Damage Restoration, Ltd f/k/a RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation,<br><br>             Defendants. | Civil Action No. 1:24-cv-13015<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL EXHIBITS FURTHER SUPPORTING PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR A PARTIAL STAY OF THE PRELIMINARY INJUNCTION** |

The Court should disregard and strike Plaintiff's impertinent so-called "Supplemental Exhibits Further Supporting Plaintiff's Opposition to Defendants' Motion for a Partial Stay of the Preliminary Injunction" (ECF No. 58). Not only was it filed in contravention of Local Rule 7.1(b)(3), it is immaterial to the question of whether a stay is warranted. It is solely intended to stoke the Court's ire, and it lacks germaneness to any of the factors as to whether a stay of appeal is warranted (*i.e.* likelihood of success on appeal, irreparable harm, balance of equities, and public interest).

Moreover, Plaintiff's purported evidence is evidence of nothing other than the fact that it jumps to conclusions, rather than showing Defendants have violated the injunction, which they claim it shows:

1) <u>Exhibit 13</u>: This is a web page, but it is not any of Defendants' web pages. At all relevant times, the domain 911sewerdrain.com has been owned by Andrew Madore, not Defendants. Until the entry of the injunction, it was utilized for the provision of

**AA716**

RANDAZZA | LEGAL GROUP

services by Defendant Water Damage Restoration, Ltd.,[1] for customers in New Jersey. However, since the entry of the injunction, Water Damage Restoration, Ltd., ("WDR") has ceased operations. For New Jersey customers, services are now provided by 911 Plumbing and Restoration, Inc. d/b/a 911 Sewer & Drain ("911 PR"). None of the defendants are owners or operators of 911 Plumbing and Restoration, Inc. *See* **Exhibit A**, Declaration of Sandro Paterno ("Paterno Decl."), at ¶ 3; and **Exhibit B**, Declaration of Klodian Belegu ("Belegu Decl.") at ¶ 5.

2) <u>Exhibit 14A</u>: All it shows is that Ron did a plumbing job. More importantly, it shows that WDR is "Permanently Closed". That a customer left a review does not evidence that any of the Defendants performed plumbing services following the entry of the injunction. The plumber named "Ron" identified by Plaintiff now works for 911 PR. Paterno Decl. at ¶ 4; Belegu Decl. at ¶ 6.

3) <u>Exhibit 15</u>: Again, this is not a website owned or operated by any Defendant. Paterno Decl. at ¶ 5; Belegu Decl. at ¶ 7.

4) <u>Exhibit 16</u>: As with Exhibits 13 & 15, it is not a website owned or operated by any Defendant. Paterno Decl. at ¶ 6; Belegu Decl. at ¶ 8.

Further, Rooterman represents, without evidence, that when the toll-free number listed on Madore's website is called, plumbing and drain services throughout New Jersey may be scheduled. Rooterman's counsel, Jeffrey Rosin, appears to have been one of the callers, having called from 617-571-8024 (with CallerID showing "Jeffrey Rosin"), to purportedly cancel a service call to a

---

[1] Although there is a defendant company named 911 Sewer & Drain Corp., it has not been an operating entity. Water Damage Restoration, Ltd., did business as and had a registered trade name of "911 Sewer & Drain" in New Jersey. *See* Belegu Decl. at ¶ 10.

- 2 -
Defendants' Response to Plaintiff's Supplemental Exhibits Further Supporting Plaintiff's
Opposition to Defendants' Motion
for a Partial Stay of the Preliminary Injunction
1:24-cv-13015

**AA717**

location at Westminster Drive, in Toms River, NJ, giving his own name, "Jeff", and whereupon he asked if the business was located at Church Road (WDR's location), but was told corporate operations were out of Elmwood Park, NJ.[2]  *See* Paterno Decl. at ¶ 7.  Thus, prior to filing Rooterman's purported exhibits, its own counsel knew that an entity other than one of the defendants was now operating under the business name of 911 Plumbing & Drain and that the website was, therefore, advertising the other entity's services, not WDR's.

Not only, therefore, was there no material purpose to Plaintiff's filing, its conclusions lack foundation.  The Court should, therefore, disregard it and caution Plaintiff to be mindful of its Rule 11 obligations.

Dated: April 23, 2025.                    Respectfully Submitted,

                                          /s/ Marc J. Randazza
                                          Marc J. Randazza, BBO# 651477
                                          mjr@randazza.com, ecf@randazza.com
                                          Jay M. Wolman, BBO# 666053
                                          jmw@randazza.com
                                          RANDAZZA LEGAL GROUP, PLLC
                                          30 Western Avenue
                                          Gloucester, MA 01930
                                          Tel: (978) 801-1776

                                          *Attorneys for Defendants.*

---

[2] Had Attorney Rosin not cancelled, services would have been performed by 911 PR, not by any Defendant.  *See* Paterno Decl. at ¶ 7; Belegu Decl. at ¶ 9.

Defendants' Response to Plaintiff's Supplemental Exhibits Further Supporting Plaintiff's
Opposition to Defendants' Motion
for a Partial Stay of the Preliminary Injunction
1:24-cv-13015

**AA718**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 23, 2025, the foregoing document was served on all parties

or their counsel of record through the CM/ECF system.

<p align="center">/s/ Marc J. Randazza<br>Marc J. Randazza</p>

Defendants' Response to Plaintiff's Supplemental Exhibits Further Supporting Plaintiff's
Opposition to Defendants' Motion
for a Partial Stay of the Preliminary Injunction
1:24-cv-13015

**AA719**

# **Exhibit A**

Declaration of Sandro Paterno

**AA720**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation.<br><br>　　　　　　Defendants. | Civil Action No. 1:24-cv-13015<br><br>**DECLARATION OF<br>SANDRO PATERNO** |

I, Sandro Paterno, hereby declare:

1.　　　I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.　　　I am the incorporator, sole shareholder, and sole board member of by 911 Plumbing and Restoration, Inc. d/b/a 911 Sewer & Drain ("911 PR"), a New Jersey Corporation. I make this declaration in furtherance of Defendants' Response to Plaintiff's Supplemental Exhibits Further Supporting Plaintiff's Opposition to Defendants' Motion for Partial Stay of the Preliminary Injunction.

3.　　　Plaintiff's Exhibit 13 is a web page, but it is not any of Defendants' web pages.  At all relevant times, upon information and belief, the domain 911sewerdrain.com has been owned by Andrew Madore, not Defendants.  Until the entry of the injunction, upon information and belief, it was utilized for the provision of services by Defendant Water Damage Restoration, Ltd.,[1] for

---

[1] Upon information and belief, although there is a defendant company named 911 Sewer & Drain Corp., it has not been an operating entity.  Water Damage Restoration, Ltd., did business as and had a registered trade name of "911 Sewer & Drain" in New Jersey.

**AA721**

customers in New Jersey. However, since the entry of the injunction, upon information and belief, Water Damage Restoration, Ltd., ("WDR") has ceased operations. For New Jersey customers, services are now provided by my company, 911 PR d/b/a 911 Sewer & Drain. None of the defendants are owners or operators of 911 PR.

4.      As to Plaintiff's Exhibit 14A, the plumber named "Ron" identified by Plaintiff now works for 911 PR.

5.      Plaintiff's Exhibit 15 does not show, upon information and belief, a website owned or operated by any Defendant.

6.      As to Plaintiff's Exhibit 16, as with Exhibits 13 & 15, it is not a website owned or operated by any Defendant.

7.      Rooterman represents that when the toll-free number listed on Madore's website is called, plumbing and drain services throughout New Jersey may be scheduled. Rooterman's counsel, Jeffrey Rosin, appears to have been one of the callers, having called from 617-571-8024 (with CallerID showing "Jeffrey Rosin"), to purportedly cancel a service call to a location at Westminster Drive, in Toms River, NJ, giving his own name, "Jeff", and whereupon he asked if the business was located at Church Road (WDR's location), but was told by 911 PR that corporate operations were out of Elmwood Park, NJ. Had Attorney Rosin not cancelled, services would have been performed by 911 PR, not by any Defendant.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4.23.2025          By: _____
                              Sandro Paterno

**AA722**

# __Exhibit B__

Declaration of Klodian Belegu

**AA723**

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC, | Civil Action No. 1:24-cv-13015 |
| Plaintiff, | |
| v. | **DECLARATION OF** |
| Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation. | **KLODIAN BELEGU** |
| Defendants. | |

I, Klodian Belegu, hereby declare:

1.      I am over 18 years of age and have never been convicted of a crime involving fraud or dishonesty. I have knowledge of the facts set forth herein, and if called as a witness, could and would testify competently thereto.

2.      I am a Defendant in the above-captioned matter. I make this declaration for myself and on behalf of Defendants Quality Air Care Corporation, Water Damage Restoration, Ltd. f/k/a RM Water Damage Restoration, Ltd., and 911 Sewer & Drain Corporation in support of Defendants' Response to Plaintiff's Supplemental Exhibits Further Supporting Plaintiff's Opposition to Defendants' Motion for Partial Stay of the Preliminary Injunction.

3.      Defendants do not control or maintain the website associated with the number 800-295-5798. Defendants do not have technical control or administrative access to the website, and Defendants are not involved in its operation or content. Even though the website may direct users to call the business number, those calls do not reach me, nor do they involve any business I own or operate.

**AA724**

4.      Defendants remain in compliance with this Court's Order dated April 11, 2025, and Defendants have ceased all activities as ordered.

5.      Plaintiff's Exhibit 13 is a web page, but it is not any of Defendants' web pages.  At all relevant times, upon information and belief, the domain 911sewerdrain.com has been owned by Andrew Madore, not Defendants.  Until the entry of the injunction, it was utilized for the provision of services by Defendant Water Damage Restoration, Ltd.,[1] for customers in New Jersey. However, since the entry of the injunction, Water Damage Restoration, Ltd., ("WDR") has ceased operations.  For New Jersey customers, upon information and belief, services are now provided by a different company, 911 Plumbing and Restoration, Inc. d/b/a 911 Sewer & Drain ("911 PR"). None of the defendants are owners or operators of 911 PR.

6.      As to Plaintiff's Exhibit 14A, the plumber named "Ron" identified by Plaintiff now, upon information and belief,  works for 911 PR.

7.      Plaintiff's Exhibit 15 does not show a website owned or operated by any Defendant.

8.      As to Plaintiff's Exhibit 16, as with Exhibits 13 & 15, it is not a website owned or operated by any Defendant.

9.      Rooterman represents that when the toll-free number listed on Madore's website is called, plumbing and drain services throughout New Jersey may be scheduled.  Any such services would have been performed, upon information and belief, by 911 PR, not by any Defendant.

10.      Although there is a defendant company named 911 Sewer & Drain Corp., it has not been an operating entity.  Water Damage Restoration, Ltd., did business as and had a registered trade name of "911 Sewer & Drain" in New Jersey.

---

[1] Upon information and belief, although there is a defendant company named 911 Sewer & Drain Corp., it has not been an operating entity.  Water Damage Restoration, Ltd., did business as and had a registered trade name of "911 Sewer & Drain" in New Jersey.

Declaration of Klodian Belegu
1:24-cv-13015

**AA725**

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4 - 23 - 25                    By: _____
                                          Klodian Belegu

**AA726**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| Rooterman, LLC )<br><br>*Plaintiff/Defendant-in-Counterclaim,* )<br><br>v. )<br><br>Klodian Belegu, Quality Air Care Corporation, RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation. )<br>*Defendants/Counterclaimants.* ) | Civil Action No. 1:24-cv-13015 |

## <u>MOTION FOR ADDITIONAL TIME TO POST BOND</u>

Plaintiff Rooterman LLC hereby moves for additional time to post the bond required by this Court's Order of April 11, 2025 ("April 11 Order"). As grounds for this Motion, Plaintiff states as follows:

1. Plaintiff is in touch with surety bond service company A.A. Dority Company, Inc. Plaintiff is in the process of gathering financial information to provide that is required by A.A. Dority. Plaintiff needs additional time, however, given Plaintiff is owned by another limited liability company, which itself is owned by other limited liability companies, to satisfy the bonding requirements of A.A. Dority.

2. Plaintiff's Corporate Disclosure Statement detailing an overview of this ownership structure was duly filed on April 22, 2025. (ECF-57) Due to an oversight, it was not earlier filed.

3. Defendants' pending Motion to partially modify and stay the injunction this Court Ordered (ECF-53) challenges the full scope of this Court's April 11 Order, though, as

Plaintiff just submitted in its Opposition and Supplemental Exhibits (ECF-56, ECF-58), Plaintiff believes the April 11 Order should not be modified at all.

4. Counsel for Plaintiff has, pursuant to Local Rule 7.1(a)(2), conferred with counsel for Defendants in advance of making this Motion, but counsel for Defendants would not agree to the relief requested herein.[1]

WHEREFORE, Plaintiff requests additional time, up to and including May 23, 2025 to post the bond required by this Court's April 11 Order.

Respectfully submitted,

ROOTERMAN, LLC

By its Counsel

Dated: April 23, 2025

*/s/ Jeffrey M. Rosin*
Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C West
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

---

[1] For the Court's further information, Plaintiff also notes its renewed interest in a mediation of this matter given the Court's April 11 Order, and seeks to participate in mediation in good faith and as soon as practicable after this Court's Scheduling Conference, and consistent with Local Rule 16. Plaintiff awaits Defendants' response to that matter, but preliminary, Plaintiff believes the parties have an agreed upon mediator from earlier correspondence to the extent they can agree on further mediation.

**AA728**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 23rd day of April 2025, *Plaintiff's Motion* was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

<div align="right">

*/s/ Jeffrey M. Rosin*
Jeffrey M. Rosin

</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| Rooterman, LLC | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:24-cv-13015 |
| | ) | |
| Klodian Belegu, Quality Air Care | ) | |
| Corporation, RM Water Damage | ) | |
| Restoration LTD and 911 Sewer & Drain | ) | |
| Corporation. | ) | |
| | ) | |
| *Defendants.* | ) | |

**DECLARATION OF JEFFREY M. ROSIN**

Pursuant to 28 U.S.C. § 1746, I, Jeffrey M. Rosin, hereby state that new evidence has been uncovered that Defendants continue to use Plaintiff's trademarks and operate businesses in violation of this Court's April 11, 2025 Order.

1.    First, Defendants have incorporated a new corporation on April 15, 2025, called "911 Plumbing and Restoration, Inc." with a d/b/a of "911 Sewer & Drain". Reportedly on such filing, Mr. Belegu's lawyer, Attorney Sandro Paterno is the owner of this corporation. (See Exhibit 1 hereto) Curiously, Attorney Paterno is the lawyer Mr. Belegu identified in his deposition as having incorporated all of Mr. Belegu's companies. (See Exhibit 2 hereto, K.Belegu Depo. Excerpt at pp. 74-75) Further, that corporation has, as Exhibit 1 shows, the same business address of all of Mr. Belegu's other defendant corporations, 1049 Church Road, Toms River, NJ. (Id. at p. 104) Attorney Paterno and Mr. Belegu admits that this business has been transferred to Attorney Paterno. (See ECF-59, 59-1, 59-2)

**AA730**

2.    Second, Andrew Madore, who Defendants identified as their outside information technology and marketing vendor (see ECF 28-1; see also Exhibit 2, at p. 81) is reportedly the owner of the 911sewerdrain.com domain according to ECF-59-2, ¶ 5, lines 2-3. Mr. Madore has been Mr. Belegu's trusted vendor for his business and marketing matters for years. (Id.)

3.    Based on Paragraphs 1 and 2 above and the exhibits therein, there appears to be a reformation or reorganization of Defendants' entities and their owners, to attempt to obfuscate the facts and responsibilities of Defendants by transferring business operations to one's trusted legal advisor and vendor reflects an intent to circumvent this Court's April 11 Order.

3.    However, and third, on April 22, 2022, and as part of my ongoing fact investigation in this case, this 911 Sewer & Drain website and entity is still linked to Plaintiff Rooterman's trademarks. More specifically, I called the number on the website for 911 Sewer & Drain on that website, 800-295-5798 (see Ex. 13 to ECF-58), to determine if that company was still scheduling plumbing jobs to determine if there was compliance with this Court's April 11, 2025 Order. That company is still scheduling plumbing as the text exchange confirming the appointment shows. See Exhibit 3. However, I shortly thereafter on that same day called to cancel that job I scheduled, and Exhibit 3 hereto also shows that full text communications I received after scheduling and canceling the job. Aside from learning this information, upon that job being cancelled, I then received a text message attached hereto as Exhibit 4 from a different number. As it says: "*Hi Jeff! If you loved Rooter Man of NJ would you mind leaving us a review....*" That same text in Exhibit 4 provided a link to "click" to provide a review. Then, the two screen shots that come into view when I click that link are attached hereto as Exhibit 5, again reflecting Plaintiff's name and trademark, and the corporation, "Rooterman of New Jersey" that Mr. Belegu operated as a franchisee. (See Exhibit 6, M.Belegu Depo. Excerpt at pp. 35-36)

**AA731**

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 24th DAY OF

APRIL 2025.

Jeffrey M. Rosin

**NEW JERSEY DEPARTMENT OF THE TREASURY**
**DIVISION OF REVENUE AND ENTERPRISE SERVICES**

**EXHIBIT**
**1**

### CERTIFICATE OF INC, (PROFIT)

### 911 PLUMBING AND RESTORATION INC.
### 0451272526

The above-named DOMESTIC PROFIT CORPORATION was duly filed in accordance with New Jersey State Law on 04/15/2025 and was assigned identification number 0451272526. Following are the articles that constitute its original certificate.

1. **Name:**
   911 PLUMBING AND RESTORATION INC.

2. **Registered Agent:**
   SANDRO PATERNO

3. **Registered Office:**
   58 WOODSHILL DRIVE SOUTH
   LAKEWOOD, NEW JERSEY 08701

4. **Business Purpose:**
   GENERAL

5. **Duration:**
   PERPETUAL

6. **Stock:**
   1000

7. **Effective Date of this filing is:**
   04/15/2025

8. **Designation of Shares:**
   THE AGGREGATE NUMBER OF SHARES WHICH THE CORPORATION SHALL HAVE AUTHORITY TO ISSUE IS 1000 SHARES, EACH SHARE BEING OF THE SAME CLASS, WITH NO PAR VALUE.

9. **First Board of Directors:**
   SANDRO PATERNO
   58 WOODSHILL DRIVE SOUTH
   LAKEWOOD, NEW JERSEY 08701

10. **Incorporators:**
    SANDRO PATERNO
    58 WOODSHILL DRIVE SOUTH
    LAKEWOOD, NEW JERSEY 08701

11. **Main Business Address:**
    1049 CHURCH ROAD
    TOMS RIVER, NEW JERSEY 08755

    **Signatures:**

    SANDRO PATERNO
    INCORPORATOR

AA733

## NEW JERSEY DEPARTMENT OF THE TREASURY
## DIVISION OF REVENUE AND ENTERPRISE SERVICES

### CERTIFICATE OF INC, (PROFIT)

### 911 PLUMBING AND RESTORATION INC.
### 0451272526



Certificate Number : 4276618911
*Verify this certificate online at*
*https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp*

*IN TESTIMONY WHEREOF, I have*
*hereunto set my hand and*
*affixed my Official Seal*
*15th day of April, 2025*

*Elizabeth Maher Muoio*
*State Treasurer*

### NEW JERSEY DEPARTMENT OF THE TREASURY
### DIVISION OF REVENUE AND ENTERPRISE SERVICES
### CERTIFICATE OF ALTERNATE NAME

### 911 PLUMBING AND RESTORATION INC.
### 0451272526

I, the Treasurer of the State of New Jersey, do hereby certify that the above-name did on the 17th of April, 2025, file and record in this department a Certificate of Alternate Name.

**1. Business Name:** 911 PLUMBING AND RESTORATION INC.

**2. New Jersey Business Entity ID:** 0451272526

**3. Alternate Name:**

**Name:** 911 SEWER AND DRAIN

**Activity To Be Conducted Using Alternate Name**
DRAIN CLEANING

**Alternate Name is Valid Until:** 04/17/2030

**Signature and Title**
SANDRO PATERNO, PRESIDENT

*IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal at Trenton, this 17th day of April, 2025*

*Elizabeth M. Muoio*
*State Treasurer*

Certificate Number : 4276801042

Verify this certificate online at

https://www1.state.nj.us/TYTR_StandingCert/JSP/Verify_Cert.jsp

**AA735**

**In the Matter of:**

*Rooterman, LLC vs*

*Klodian Belegu, Quality Air Care Corporation, et al.*

---

*Klodian Belegu*

*March 12, 2025*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*Magnals.com*



74

1                   (Resumed at 11:56.)

2       Q.  Mr. Belegu, we're back on the record.  You

3   said you formed lots of corporations over the

4   years; can you estimate how many?

5       A.  No, I can't recall.

6       Q.  Say that again.

7       A.  I can't recall.

8       Q.  Do you use a lawyer to form corporations or

9   do you do them on your own?

10      A.  Sometimes a lawyer, sometimes my wife.

11      Q.  And who's the lawyer you used?

12      A.  It was Paterno Law Firm.

13      Q.  So if there was a corporation formed for

14  you by a lawyer, it would be the "Paterna" Law Firm

15  that did it?

16              MR. WOLMAN:  Paterno.

17      A.  Paterno, yes.

18      Q.  And where in New Jersey is the Paterno Law

19  Firm?

20      A.  Actually, they are in Broadway, in New York

21  City, and the lawyer lives in Toms River.

22      Q.  Do you know whether every entity that's

23  been formed for you is a New Jersey entity?

24  Because, for example, you could form a Delaware

AA737

Rooterman, LLC vs
Klodian Belegu, Quality Air Care Corporation, et al.

Klodian Belegu
March 12, 2025

75

1  corporation.

2      A.  I don't know.  If a lawyer did it, I have

3  no idea.  I wouldn't say that is anything in

4  Delaware, but I'm going to have to ask my wife or

5  Sandro about that.

6      Q.  So your wife or who would know?

7      A.  Sandro, Alessandro.

8      Q.  Alexandra?

9      A.  Sandro is the lawyer, Sandro Paterno, yes.

10     Q.  Sandro Paterno?

11     A.  Yes.

12     Q.  So that we have the spelling, is it

13  S A N D R O?

14     A.  Sandro, yes, I believe so.  I called him

15  Alessandro for some reason for the past 20 years,

16  but I had it wrong, and he never said anything.

17     Q.  So I've heard you say that you did water

18  damage restoration work through Quality Air Care

19  Corporation?

20     A.  Correct.

21     Q.  Two companies with the words "water damage"

22  in them?

23     A.  Correct.

24     Q.  Are there any other corporations you've

**AA738**

Rooterman, LLC vs                                      Klodian Belegu
Klodian Belegu, Quality Air Care Corporation, et al.              March 12, 2025

81

1      A.   Century -- I forget his company name.

2            THE REPORTER:   Did you say Cedric or

3   Century?

4            THE WITNESS:   No, I'm trying figure

5   out.

6      A.   It's Drew Madore is his last name.

7      Q.   So Mr. Madore, M A D O R E?

8      A.   I believe so.   I forgot his company name,

9   starts with S.

10     Q.   And he does websites work for you?

11     A.   He does.

12     Q.   Has he always done the website work for

13  you, or has there been somebody else?

14     A.   There have been other people previously.

15     Q.   Who did you have before Mr. Madore?

16     A.   I can't recall their names, but it probably

17  has been a short time.   He has been the one and his

18  company the longest working, so technically since

19  2021 he has been dealing with.

20     Q.   So when you first got your franchise, your

21  first franchise, did you have any employees?

22     A.   Did I have any employees?   I hired 1099

23  employees for different territories, yes.

24     Q.   And what were their roles?

**AA739**

104

```
 1        A.  That used to be the front sign on our
 2   office, yes.
 3        Q.  When you say "that used to be the front
 4   sign on our office," I'm going to show you what
 5   we'll mark as Exhibit 5.
 6                (Exhibit 5, Photograph, marked for
 7   identification.)
 8        Q.  What are we looking at in Exhibit 5?
 9        A.  A picture of my office.
10        Q.  And what office is that?
11        A.  The one in Toms River, 1049 Church Street.
12                THE REPORTER:  Say it again.
13                THE WITNESS:  1049 Church Street, or
14   Church Road, my apologies.
15        Q.  And when did that sign get placed outside
16   of that office?
17        A.  Back in 2023.
18        Q.  Why in 2023?
19        A.  Because that's when everything merged and
20   we all moved in that office on end of 2022.
21        Q.  When you say "everything merged," what are
22   you referring to?
23        A.  Me, Kleves and Duljan and Toni.
24        Q.  That's when you merged RM Water Damage
```

**AA740**

EXHIBIT
3



8:07



EXHIBIT
5



+1 (629) 318-0237 ›

Text Message • SMS
Tuesday 2:55 PM

Hi Jeff! If you loved Rooter Man of NJ would you mind leaving us a review? Thanks, we really appreciate it! Here's the link: https://review.new/o/t/cbjmugv3

The sender is not in your contact list.

**Report Junk**

Text Message • SMS

**AA742**

◀ Messages



EXHIBIT
5

Hi Jeff!

Like Rooter Man of NJ? Let others know!
Leave a quick review on...

G  Google  >

Other review site options

🔒 nicejob.com

AA743



# Rooter Man of NJ

Toms River, NJ

**4.8** ★★★★★

G 4.7     ✦ 4.8

Learn more          Free Estimate

★★★★★

Rooter Man of NJ has earned an overall rating of **4.8** from **597** customers

## Leave us a review

☆ ☆ ☆ ☆ ☆          ✦ Powered by NiceJob

🔒 nicejob.com

**AA744**

# In the Matter of:

*Rooterman, LLC vs*

*Klodian Belegu, Quality Air Care Corporation, et al.*

---

*Megan Belegu*

*April 02, 2025*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
Magnals.com



35

1    Exhibit 1.  Share my screen with you.
2                        (Exhibit 1, Business
3          Entity Status Report, was marked for
4          identification.)
5    BY MR. ROSIN:
6          Q      Can you see the screen?  It
7    says Business Entity Status Report?
8          A      Yes.
9          Q      Hold on.  There's a company
10   there called -- well, it says, Principal
11   Name, Megan Belegu, for a company name
12   Rooterman of New Jersey, LLC.
13                  Are you familiar with
14   Rooterman of New Jersey, LLC?
15         A      I am.
16         Q      And what do you know about
17   that entity?
18         A      I know that it exists.
19         Q      And what does it do?
20         A      At the moment, nothing.
21         Q      And what did it used to do?
22         A      It ran the plumbing services
23   for Rooterman.
24         Q      And what do you mean it ran

**AA746**

Rooterman, LLC vs
Klodian Belegu, Quality Air Care Corporation, et al.

Megan Belegu
April 02, 2025

36

```
 1   the plumbing services for Rooterman?
 2        A      That was the corporation name.
 3        Q      So all plumbing service money
 4   went through that LLC?
 5        A      Correct.
 6        Q      Did it have its own bank
 7   account?
 8        A      That is the bank account that
 9   I was referring to.
10        Q      The one at TD Bank?
11        A      Yes.
12        Q      And that was for all of New
13   Jersey?
14        A      Yes.
15        Q      Was there a separate bank
16   account for Water Damage Restoration?
17        A      Not at that time.
18        Q      I'm just going to pull up the
19   next exhibit.
20               MR. WOLMAN:  Are you going to
21          be sending these one by one?
22               MR. ROSIN:  Yeah.
23               MR. WOLMAN:  Okay.
24   BY MR. ROSIN:
```

**AA747**

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC,<br><br>                Plaintiff,<br><br>    v.<br><br>Klodian Belegu, Quality Air Care Corporation, Water Damage Restoration, Ltd f/k/a RM Water Damage Restoration LTD and 911 Sewer & Drain Corporation,<br><br>                Defendants. | Civil Action No. 1:24-cv-13015<br><br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ADDITIONAL TIME TO POST BOND** |

Defendants Klodian Belegu, Quality Air Care Corporation, Water Damage Restoration Ltd. f/k/a RM Water Damage Restoration Ltd., and 911 Sewer & Drain Corporation hereby oppose Plaintiff's Motion for Additional Time to Post Bond (ECF No. 60).

"In the ordinary course, a litigant who seeks an extension of time must show good cause for the desired extension." *Rivera-Almodovar v. Instituto Socioeconomico Comunitario*, 730 F.3d 23, 26 (1st Cir. 2013) (citing Fed. R. Civ. P. 6(b)(1)). Plaintiff has failed to demonstrate good cause.

Plaintiff has known since the moment it originally sought a preliminary injunction that it would have to post a bond to secure a preliminary injunction "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). While the Court did not require the full $3 million requested by Defendants, Plaintiff failed to even prepare for the potential that the Court would require but 10% of that--$300,000.

**AA748**

Plaintiff knew or should have known that it would be required to post a bond of at least that amount. Now, it comes to this Court seeking to excuse its lack of diligence and extend the deadline because it, somehow, failed to produce sufficient timely information to one surety company. A court's decision on good cause "focuses on the diligence (or lack thereof) of the moving party more than it does on any prejudice to the party-opponent." *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004) (cleaned up). Plaintiff simply appears to have not been diligent.

While a motion for good cause does not focus on prejudice to the party-opponent, Mr. Belegu and Water Damage Restoration are prejudiced by an extension. The court entered a broad injunction against competition, even where they wouldn't actually be competing. They've had to completely stop and divest their operations (which Plaintiff continues to falsely attribute the unrelated entity's operations to Defendants (ECF No. 61)). And there is no guarantee Plaintiff will even satisfy this surety—in fact, it may well be that Plaintiff has been trying and failing for months to satisfy surety company after surety company.

If Rooterman cannot meet this Court's generous two-week deadline to post the bond, the injunction should be immediately dissolved.

Dated: April 24, 2025                    Respectfully Submitted,

/s/ Jay M. Wolman
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776
*Attorneys for Defendants.*

**AA749**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2025 the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Jay M. Wolman
Jay M. Wolman

Defendants' Opposition To Plaintiff's Motion
For Additional Time To Post Bond
1:24-cv-13015

**AA750**

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## United States District Court

### District of Massachusetts

**Notice of Electronic Filing**

The following transaction was entered on 4/29/2025 at 3:03 PM EDT and filed on 4/29/2025

| | |
|---|---|
| **Case Name:** | Rooterman LLC v. Belegu et al |
| **Case Number:** | 1:24-cv-13015-PBS |
| **Filer:** | |
| **Document Number:** | 63(No document attached) |

**Docket Text:**
**District Judge Patti B. Saris: ELECTRONIC ORDER entered re [53] Motion to Stay Pending Appeal and [60] Motion for Extension of Time to Post Bond.**

**Defendants have moved for a partial stay of this Court's preliminary injunction order pending appeal (Dkt. [53]). After review of the parties' filings, the Court DENIES the motion on the basis that Defendants have failed to demonstrate a likelihood of success on the merits. See Does 1-3 v. Mills, 39 F.4th 20, 24-25 (1st Cir. 2022) (standard for stay pending appeal). The record reflects both that water damage restoration is among the services comprising the Rooterman system and that Klodian Belegu offered water damage restoration services through his Rooterman franchises.**

**In connection with their motion, Defendants state under oath that their businesses will incur at least $535,000 in expenses during the period in which they are enjoined from violating the noncompetition obligation in the franchise agreements. The Court therefore increases the amount of the security bond to $535,000. See Fed. R. Civ. P. 65(c). Plaintiff's motion to extend the deadline to post bond (Dkt. [60]) is ALLOWED Plaintiff shall post a security bond in the amount of $535,000 by May 23, 2025. Defendants' obligation to comply with the Court's preliminary injunction order is suspended until Plaintiff posts bond, at which point the order shall go into effect. (CGK)**

**1:24-cv-13015-PBS Notice has been electronically mailed to:**

Jeffrey M. Rosin     jrosin@ohaganmeyer.com, kvassall@ohaganmeyer.com, lvaldez@ohaganmeyer.com, nvelonis@ohaganmeyer.com

Marc J. Randazza     mjr@randazza.com, ecf@randazza.com, ecf-6898@ecf.pacerpro.com

Jay M. Wolman     jmw@randazza.com, ecf@randazza.com

Lisbeth Valdez     lvaldez@ohaganmeyer.com

**1:24-cv-13015-PBS Notice will not be electronically mailed to:**

**AA751**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC<br><br>    *Plaintiff/Defendant-in-Counterclaim,*<br><br>    v.<br><br>Klodian Belegu, Quality Air Care<br>Corporation, RM Water Damage<br>Restoration LTD and 911 Sewer & Drain<br>Corporation.<br>    *Defendants/Counterclaimants.* | Civil Action No. 1:24-cv-13015 |

## NOTICE OF POSTING BOND
## AND REQUEST TO LIFT SUSPENSION ON INJUNCTION

Plaintiff Rooterman LLC hereby gives notice of posting the bond required by this Court's Order of April 11, 2025 ("April 11 Order"), as modified by Electronic Order of April 29, 2025 ("April 29 Order"). A true and correct copy of the $535,000 bond of Colonial Surety Company is attached hereto as Exhibit A, as further supported by Exhibit B.

Plaintiff hereby requests that the Clerk enter Exhibits A and B hereto on the docket as Plaintiff's compliance with the April 11 Order and the April 29 Order. Further, Plaintiff requests that, upon review of Exhibits A and B, this Court lift its suspension on the injunction entered by way of this Court's April 29 Order and grant such other relief or direction as this Court deems necessary and proper.

Respectfully submitted,
ROOTERMAN, LLC

By its Counsel

Dated: May 20, 2025

*/s/ Jeffrey M. Rosin*
Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

#6799528v1

**AA752**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 20th day of May 2025, *Plaintiff's Notice* was electronically filed. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

<div align="right">

/s/ *Jeffrey M. Rosin*
Jeffrey M. Rosin

</div>

**AA753**



123 Tice Boulevard
Woodcliff Lake, NJ 07677
(800) 221-3662

Bond No.: CSC-305858C

Bond Type: Injunction Bond

Case/Docket No.: 1:24-cv-13015-PBS

---

UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

> Rooterman LLC
> Plaintiff(s)
> vs.
> KLODIAN BELEGU, ETC
> Defendant(s)

KNOW ALL BY THESE PRESENTS:

That we, Rooterman LLC as Principal(s), and, Colonial Surety Company of 123 Tice Blvd, Suite 250, Woodcliff Lake, NJ 07677, a corporation authorized to transact surety business in the State of Massachusetts, as Surety, are held and firmly bound unto US District Court, as Obligee, in the maximum penal sum of Five Hundred Thirty Five Thousand Dollars and No Cents($535,000), lawful money of the United States of America, for the payment of which,well and truly to be made, we bind ourselves, our heirs, legal representatives, successors and assigns, jointly and severally, firmly by these presents.

Whereas, the above named plaintiff has duly applied to this court for an Injunction against the defendant in this action, according to the statute in such cases provided.

NOW THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH, That, if the said plaintiff shall pay the said defendant such damages as he sustains by reason of said change to an Injunction, if the Court finally decided that the said plaintiff is not entitled thereto (or to either or any of them, if more than one defendant), then this obligation shall be void, otherwise to remain in force and effect.

Signed, sealed, and dated this 20th day of May, 2025

Signature of Principal

Colonial Surety Company
Wayne Nunziata, President

**AA754**

# COLONIAL SURETY COMPANY

Duncannon, Pennsylvania

Administrative Office: 123 Tice Blvd., Suite 250, Woodcliff Lake, New Jersey 07677

## GENERAL POWER OF ATTORNEY

*Know all Men by These Presents,* That COLONIAL SURETY COMPANY, a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania and having an administrative office in Woodcliff Lake, Bergen County, NJ does by these presents make, constitute and appoint

_____ Wayne Nunziata or Michael Bonfante _____ of Woodcliff Lake and the State of New Jersey its true and lawful Attorney(s)-in-Fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver.

### Any and All Bonds

and to bind the Company thereby as fully and to the same extent as if such bonds were signed by the President, sealed with the corporate seal of the Company, hereby ratifying and confirming all that the said Attorney(s)-in-Fact may do in the premises. Said appointment is made under and by authority of the following resolution adopted by the Board of Directors of the Colonial Surety Company at a meeting held on the 25th day of July, 1950.

"*Be it Resolved,* that the President, any Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

"*Section I. Attorney-in-Fact.* Attorney-in-Fact may be given full power and authority for and in the name of and on behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements of indemnity and other conditional or obligatory undertakings and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed."

"*In Witness Whereof,* Colonial Surety Company has caused these presents to be signed by its _____ President and its corporate seal to be hereto affixed the _____ 30th _____ day of _____ March _____, A.D., 2023.

State of New Jersey  
County of Bergen } SS.

COLONIAL SURETY COMPANY

By _____  
Wayne Nunziata, President

On this _____ 30th _____ day of _____ March _____, in the year 2023, before me _____ Theresa La Monica _____, a notary public, personally appeared _____ Wayne Nunziata _____, personally known to me to be the person who executed the within instrument as _____ President _____, on behalf of the corporation therein named and acknowledged to me that the corporation executed it.

THERESA LA MONICA  
A Notary Public of New Jersey  
My Commission Expires September 9, 2025

_____  
Theresa La Monica          Notary Public

I, the undersigned President of Colonial Surety Company, hereby certify that the above and foregoing is a full, true and correct copy of the Original Power of Attorney issued by said Company, and do hereby further certify that the said Power of Attorney is still in force and effect.

GIVEN under my hand and the seal of said Company, at Woodcliff Lake, New Jersey this 20th day of May, 2025

_____  
Wayne Nunziata, President

Original printed with Blue and/or Black ink.  
For verification of the authenticity of this Power of Attorney you may call (201) 573-8788 and ask for the Power of Attorney clerk. Please refer to the above named individual(s) and details of the bond to which the power is attached.

Form S-100-101 (Rev 03/23)

**AA755**

State of New Jersey

County of Bergen

On this 20th day of May, 2025 before me, Conor Cronin, a Notary Public, personally came Wayne Nunziata, known to me to be the Attorney-In-Fact of Colonial Surety Company the corporation described in the within instrument, and I acknowledge that he executed the within instrument as the act of said Colonial Surety Company in accordance with authority duly conferred upon him by said Company.

Conor Cronin
Notary Public of New Jersey
My Commission Expires March 7th, 2028

Conor Cronin, Notary Public

**AA756**

## Colonial Surety Company
Duncannon, Pennsylvania
-Inc 1930-

## Balance Sheet as at December 31, 2024

| Cash & Invested Assets: | | Liabilities: | |
|---|---|---|---|
| Cash | $23,776,413 | Outstanding Losses & Loss Expenses | $4,635,227 |
| Cash Equivalents | 4,804,038 | Unearned Premiums | 21,499,593 |
| Common Stocks* | 9,038,436 | Funds Held | 5,474,051 |
| Bonds* | 66,216,280 | Reinsurance Payable | 11,457,352 |
| | | Accrued Expenses | 1,340,105 |
| | | Income Taxes Payable | 1,233,244 |
| **Total Cash & Invested Assets** | **$103,835,167** | Miscellaneous Liabilities | 6,295,864 |
| | | Commission Payable | (6,016,465) |
| | | **Total Liabilities** | **$45,918,971** |
| | | | |
| **Other Assets:** | | **Capital & Surplus:** | |
| Accrued Investment Income | $780,423 | Common Capital Stock | $ 4,000,000 |
| Premiums Receivable | 1,727,441 | Additional Paid in Capital | 1,000,000 |
| Funds Held – Collateral | 5,532,144 | Unassigned Surplus | 69,211,147 |
| Reinsurance Recoverable | 6,723,955 | | |
| Net Deferred Tax Assets | 1,508,412 | **Total Capital & Surplus** | **$74,211,147** |
| Other Assets | 22,576 | | |
| | | | |
| **Total Admitted Assets** | **$120,130,118** | **Total Liabilities, Capital & Surplus** | **$120,130,118** |

*Bonds and stocks are valued on basis approved by National Association of Insurance Commissioners.

STATE OF NEW JERSEY  }
                                    ss.:
COUNTY OF BERGEN     }

I, Wayne Nunziata, President of Colonial Surety Company, do hereby certify that the foregoing is a full, true and correct copy of the Financial Statement of said Company, as of December 31, 2024.

IN WITNESS WHEREOF, I have signed this statement at Woodcliff Lake, New Jersey, this 8th day of April, 2025.

_____
Wayne Nunziata, President

_____
Theresa La Monica, Notary Public

**THERESA LA MONICA**
**A Notary Public of New Jersey**
**My Commission Expires September 9, 2025**

**AA757**



# COMMONWEALTH OF MASSACHUSETTS

### DIVISION OF INSURANCE
#### COMPANY LICENSING

REC'D JUL 0 2 2018

1000 Washington Street, Suite 810 • Boston, MA 02118-6200
(617) 521-7794 • Toll-free (877) 563-4467
http://www.mass.gov/doi

Gary D. Anderson, Commissioner of Insurance

Colonial Surety Company
ATTN: Office of the President
123 Tice Boulevard
Suite 250
Woodcliff Lake, NJ 07677  USA

| | |
|---|---|
| NAIC #: | 10758 |
| Federal ID #: | 230485115 |
| Serial #: | 001157710000 |
| Effective Date: | 7/1/2018 |

## COMPANY LICENSE

### THIS IS TO CERTIFY THAT

### Colonial Surety Company

has fully complied with the requirements of the laws applicable to it and that it is authorized to issue policies and transact the kinds of business authorized under the Sections of Chapter 175 of the General Laws of Massachusetts and amendments thereto described by the following designations:

4 6F

### DESIGNATION CODES:

| | | | | |
|---|---|---|---|---|
| 1 | Fire | | 15 | Reinsurance (Reinsurance Companies Only) |
| 2A | Ocean & Inland Marine | | 16A | Life - All Kinds |
| 2B | Inland Marine Only | | 16B | Group Life Only |
| 4 | Fidelity and Surety | | 16C | Variable Annuity Authorization |
| 5A | Boiler | | 16D | Annuities Only |
| 5B | Boiler (No Inspector) | | 16E | Variable Life Authorization |
| 6A | Accident - All Kinds | | 17 | Repair - Replacement |
| 6B | Health - All Kinds | | 19 | Legal Services |
| 6C | Group Accident & Health | | 20 | Credit Involuntary Unemployment |
| 6D | Non-Can. Acc. & Health | | 51 | Stock Companies - (Extension of coverage |
| 6E | Workers' Compensation | | 54 | Mutual Companies - not specified in Section 47) |
| 6F | Liability other than Auto | | 54BX | Reinsurance except Life |
| 6G | Auto Liability | | 54BY | Nuclear Energy |
| 7 | Glass | | 54BZ | Special Hazards |
| 8 | Water Damage and Sprinkler Leakage | | 54C | Comprehensive M.V. & Aircraft |
| 9 | Elevator Property Damage and Collision | | 54D | Personal Property Floater |
| 10 | Credit | | 54E | Dwellings |
| 11 | Title | | 54F | Commercial Property |
| 12 | Burglary, Robbery, Theft | | 54G | Reinsurance - Life Companies Only |
| 13 | Livestock | | | |

This certificate shall remain in effect until midnight of 6/30/2019 unless said authority is amended or revoked in accordance with law.

License Effective Date: Jul 01, 2018.

*Gary D. Anderson*

Gary D. Anderson
Commissioner of Insurance

**AA758**

# COLLATERAL SECURITY AGREEMENT AND RECEIPT

Principal(s): _Premium Service Brands, LLC , Rooterman, LLC_
(Name(s) as it appear(s) on the Indemnification Agreement, General Indemnity Agreement, or other indemnity agreement)
Address: _126 Garnet St Suite J Charlottesville VA 22902_

Owner of Collateral Security: _Premium Service Brands, LLC_
(Name)

Address: _Same_

Colonial Surety Company (hereinafter, the "Surety") accepts the collateral transfer of the following security from the party or parties designated above as Owner(s) (hereinafter, collectively, the "Owner") and/or the Principal(s) (hereinafter, collectively, the "Principal"). The collateral identified below (hereinafter, the "Collateral") is deposited for the benefit of the Surety and its co-sureties, reinsurers, successors and assigns, in conjunction with an application for bonding credit, for good consideration, and under the agreements and upon the conditions hereinafter stated:

DESCRIPTION OF COLLATERAL:

1. Letter of Credit for $ _____

   No: _____

   Issue Date/Expiration Date: _____

   Bank (Name, Address & Ph): _____

2. Cash: $ _____ 535,000.⁰⁰ _____

## AGREEMENTS AND CONDITIONS

A. **Purpose and Use of Collateral**

1. For valuable consideration, receipt of which is hereby acknowledged, the Owner hereby grants a security interest in the Collateral together with any proceeds, thereon, and any additional or replacement collateral. The Collateral is hereby pledged, whether held by a third party or deposited with the Surety, as security to unconditionally and fully protect the Surety in connection with any and all bonding obligations as may exist or be created in the future between the Surety and the Owner, the Principal, any current or hereafter created or acquired subsidiary, affiliate, joint venture, or other legal entity in which the Owner or Principal has a substantial, material, or beneficial interest, or any other third party at the request of the Owner, Principal or Indemnitors. The Surety may enforce the terms of the Collateral Security Agreement and Receipt (hereinafter, the "Agreement") to protect and/or reimburse the Surety:

   i. For the enforcement and fulfillment of the provisions of the Indemnification Agreement, General Indemnity Agreement, Agreement of Indemnity, and/or other indemnity agreement (hereinafter, the "Indemnity Agreement");

   ii. Against any and all demands, liabilities, losses, costs, damages, attorneys' fees and expenses, interest, court costs and any and all other types of losses, costs or expenses of

3852721

**AA759**

whatsoever kind or nature, which the Surety may sustain and/or incur and which arise by reason of or in any manner in consequence of, no matter how remotely, the execution or procurement by the Surety of any bonds issued or procured by the Surety on behalf of the Principal, recognizance, undertaking or other obligation, regardless of when issued or incurred (all of which, together with any continuations and modifications thereof, are hereinafter referred to as the "Bonds"), heretofore or hereafter executed, assumed or procured by the Surety at the instance or request or on behalf of either the Owner or the Principal;

iii.  For the payment of all premiums on such Bonds and all other items of indebtedness due to the Surety and/or its agent from the Principal or Owner;

iv.  For the performance of every agreement (including continuations or modifications thereof, with or without consent of the Owner) made by the Owner or by any Principal concerning said Bonds;

v.  To secure and indemnify the Surety from any and all losses, costs, interests, expenses, and/or legal fees which Surety may incur or become liable for under the terms and provisions of all the agreements provided by the Owner and/or the Principal to the Surety, including but not limited to any Indemnity Agreement.

2.  To accomplish the purposes of such Collateral deposit, the Surety is authorized, and hereby appointed as attorney-in-fact for the Owner to act at any time and without notice or legal process, to sell, cash, surrender and use said Collateral, and to apply the Collateral or any proceeds to payment of or reimbursement in accordance with the terms of the Indemnity Agreement and this Agreement, as it may elect and, at its option and in its sole discretion.

3.  Owner represents him/her/itself to be the sole owner(s) of the Collateral, and agrees to save the Surety harmless from any loss, costs, expenses, damages or attorneys' fees arising from claims to any part of the Collateral by any person(s) and/or entity claiming adversely to the Owner or Surety. The Undersigned hereby appoints the Surety or the Surety's lawfully designated representative to execute any form(s) or document(s) which may be necessary to perfect the Surety's lien(s) on such Collateral including but not limited to forms proscribed by the Uniform Commercial Code such as form UCC-1, UCC-2 and UCC-3.

4.  If the Collateral, any substitutions thereof, or additions thereto, shall for any reason be of a value insufficient for the Surety's protection, in the Surety's opinion, the Owner and/or the Principal shall, upon demand, deposit additional collateral satisfactory to the Surety in an amount as Surety in its sole discretion deems appropriate. If the Owner and/or the Principal do not deposit additional collateral within five (5) days after demand, the Surety may, among other things, sell, deposit, invest, convert, cash, liquidate, exchange, renew, or dispose of the Collateral, at its discretion.

5.  The Surety shall not be liable for any loss or depreciation of the Collateral or the proceeds thereof, or damage thereto, and the Surety assumes no responsibility for the earning of any income thereon. In connection with any certificate of deposit or any other instrument evidencing the deposit of money with any person, firm or corporation included in the Collateral, it is understood that the Owner has selected the depository, or appointed the Surety to select the depository and the Owner assumes full responsibility for the safety of the deposited funds.

B.  **Types of Collateral**

2

**AA760**

1. **Cash**. If the Collateral pledged herein is in the form of cash, the Collateral is being delivered to the Surety to be held in the Surety's name. Ownership and control of the Collateral is vested in the Surety until all Bonds are exonerated in accordance with Section D of this Agreement. The Surety shall not pay interest on the Collateral it holds.

2. **Irrevocable Letter of Credit**. If the Collateral pledged herein is in the form of an Irrevocable Letter of Credit (hereinafter "ILOC"), it is the responsibility of the Owner and/or Principal to provide the Surety with a notice of renewal of that ILOC at least forty-five (45) days prior to its expiration date. This responsibility of renewal by the Owner and/or Principal shall continue for every renewal period unless the Owner and/or Principal receive written notification from the Surety that no renewal will be required. Should the Owner and/or Principal fail to provide a notice of renewal to the Surety within the time allowed under this paragraph then the Surety may require the Owner and/or Principal to pay a nonrefundable processing fee of $300.00 to the Surety and any other actual expenses incurred by the Surety in obtaining such a renewal. In addition to this fee, the Surety may exercise its right to draw on the ILOC and such proceeds shall be considered substitute Collateral under this Agreement.

   The Surety reserves the right, in its sole and absolute discretion, to accept or reject the issuing bank of the ILOC. At any time following receipt of an ILOC by the Surety, the Surety may, in its sole and absolute discretion, demand a replacement ILOC from a different issuing bank. The Owner and/or Principal shall, upon demand by the Surety, provide a replacement conforming ILOC within ten (10) calendar days. Should the Owner and/or Principal fail to provide a replacement ILOC to the Surety within the time allowed under this paragraph, the Surety may exercise its right to draw on the ILOC and such proceeds shall be considered substitute Collateral under this Agreement and/or require the Owner and/or Principal to pay a nonrefundable processing fee of $300.00 to the Surety in addition to any other actual expenses incurred by the Surety in obtaining such a renewal.

   The Surety, in its sole and absolute discretion, may draw up to the full amount of the ILOC to satisfy any claims made or may be made on/against the Surety and/or all items of indebtedness due to the Surety under or for said Bonds and/or Indemnity Agreement whether known or unknown to the Surety at the time of the draw.

**C.**   **Substitution of Collateral**

1. Any substitution of the Collateral shall be at the discretion of Surety as to the value, form, and source and the Owner agrees that any substitution shall be subject to the terms of this Agreement and of any Indemnity Agreement.

**D.**   **Release of Collateral**

1. The Surety may consider release of the Collateral upon its receipt of written evidence and/or information satisfactory to the Surety (in the Surety's sole discretion) of the following:

   i.   Discharge and exoneration from all liability under the Bonds, including a court order(s) discharging the Bonds;

   ii.   Proof of ownership of the Collateral by the applicant requesting its release; and

   iii.   Payment of all amounts due to the Surety from the Owner, Principal and/or Indemnitors as provided herein and/or in any Indemnity Agreement.

3

**AA761**

The Owner and Principal recognize that differences of opinion with regard to proof of ownership and of termination of the Surety's liability require the giving of considerable latitude to the Surety in the determination of what evidence is satisfactory. In the event the Surety determines the evidence is satisfactory to support a release of the Collateral, the Surety shall, within a reasonable period of time, return the Collateral or the proceeds thereof, less any deductions pursuant to the terms of this Agreement and/or any Indemnity Agreement.

E.    **Additional Collateral Provisions**

1.   This Agreement may not be modified, amended, assigned, negotiated, transferred or changed without the express written consent of a duly authorized officer of the Surety.

2.   By exercising or failing to exercise any of its rights, options or elections hereunder, the Surety shall not be deemed to have waived any breach or default on the part of any of the Owner and/or Principal or to have released any undersigned from any Owner and/or Principal of his/her/its/their obligations hereunder or under any Indemnity Agreement, unless such waiver or release is in writing and is signed by a duly authorized officer of the Surety. In addition, the waiver by the Surety of any breach or default hereunder shall not be deemed to constitute a waiver of any succeeding breach or default.

3.   The Surety, the Owner, and the Principal agree that the place of performance of this Agreement, including the promise to pay the Surety, shall be in New Jersey and venue for any suit shall be, at Surety's option, in New Jersey.

4.   All provisions of the Indemnity Agreement are incorporated herein by reference. The Owner understands that he/she/it is entitled to receive a copy of the Indemnity Agreement and the Surety agrees to provide said copy to the Owner, upon request.

5.   It is understood and agreed by the Owner and Principal that the rights, powers and remedies given to the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers and remedies which the Surety may have or acquire against the undersigned or others whether by the terms of any other agreement, including the Indemnity Agreement, or by operation of law or otherwise.

6.   The Surety shall be under no obligation to proceed against any or all of the Collateral before proceeding against any Principal or indemnitor of any Indemnity Agreement.

7.   If any part of this Agreement is found by a court of competent jurisdiction to be contrary to law, only that part of the Agreement is null and void and the balance of the Agreement continues in force until terminated or amended.

8.   Signatures transmitted by facsimile or email shall be accepted and deemed to be original signature and shall be binding on the parties upon signing.

Dated at _____ ji;2 0 _____ this __ 16 ᵀᴴ of __ May _____ , 20 25.

AA762

**SURETY**

By: _Michael Bonfante_
    Signature

_Michael Bonfante_
Print name of Authorized Representative of Surety

**PRINCIPAL**

By: _____
    Signature, as Officer and/or Individually

_John Patrick Donnelly_
Print Name of Authorized Agent of Principal

**OWNER – COLLATERAL**

By: _____
    Signature, as Officer and/or Individually

_John Patrick Donnelly, CFO_
Print Name of Owner

5

**AA763**

CERTIFICATE OF ACKNOWLEDGEMENT OF OWNER OF COLLATERAL

STATE OF ___Virginia___ )
COUNTY OF ___Albemarle___ )

    On _5/19/2025_ before me personally came _John Patrick Donnelly_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ___Virginia___ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_(signature)_

(Signature of Notary Public)

> Darcy Craig Spicer
> Commonwealth of Virginia
> Notary Public
> Commission No. 8034254
> My Commission Expires 8/31/2026

CERTIFICATE OF ACKNOWLEDGEMENT OF PRINCIPAL

STATE OF ___Virginia___ )
COUNTY OF ___Albemarle___ )

    On _5/19/2025_ before me personally came _John Patricia Donnelly_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ___Virginia___ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_(signature)_

(Signature of Notary Public)

> Darcy Craig Spicer
> Commonwealth of Virginia
> Notary Public
> Commission No. 8034254
> My Commission Expires 8/31/2026

**AA764**

CERTIFICATE OF ACKNOWLEDGEMENT OF SURETY

STATE OF ___New Jersey___ )
COUNTY OF ___Bergen___ )

    On ___5/20/25___ before me personally came _Michael Bonfont_, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of  that  the  foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
(Signature of Notary Public)

Conor J Cronin
A Notary Public of New Jersey
My Commission Expires March 7, 2028

7

**AA765**

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Rooterman, LLC<br><br>    *Plaintiff/Defendant-in-Counterclaim,*<br><br>v.<br><br>Klodian Belegu, Quality Air Care<br>Corporation, RM Water Damage<br>Restoration LTD and 911 Sewer & Drain<br>Corporation.<br>    *Defendants/Counterclaimants.* | ) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )<br>) )     Civil Action No. 1:24-cv-13015<br>) ) |

## NOTICE OF POSTING BOND
## AND REQUEST TO LIFT SUSPENSION ON INJUNCTION

    Plaintiff Rooterman LLC hereby gives notice of posting the bond required by this Court's Order of April 11, 2025 ("April 11 Order"), as modified by Electronic Order of April 29, 2025 ("April 29 Order"). A true and correct copy of the $535,000 bond of Colonial Surety Company is attached hereto as Exhibit A, as further supported by Exhibit B.

    Plaintiff hereby requests that the Clerk enter Exhibits A and B hereto on the docket as Plaintiff's compliance with the April 11 Order and the April 29 Order. Further, Plaintiff requests that, upon review of Exhibits A and B, this Court lift its suspension on the injunction entered by way of this Court's April 29 Order and grant such other relief or direction as this Court deems necessary and proper.

Respectfully submitted,
ROOTERMAN, LLC

By its Counsel

Dated: May 20, 2025

*/s/ Jeffrey M. Rosin*
Jeffrey M. Rosin, BBO# 629216
Lisbeth Valdez, BBO# 715826
O'HAGAN MEYER, PLLC
140 Kendrick Street, Bldg. C
Needham, MA 02494
Telephone: (617) 843-6800
Fax: (617) 843-6810
jrosin@ohaganmeyer.com
lvaldez@ohaganmeyer.com

#6799528v1

5/22/25
Allowed.

AA766